IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| AMERICAN CIVIL LIBERTIES UNION, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civ. Action No. 04-4151 (AKH) |
| | ) | |
| DEPARTMENT OF DEFENSE, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## DECLARATION OF DAVID M. HARDY

I, David M. Hardy, declare as follows:

(1)     I am currently the Section Chief of the Record/Information Dissemination Section

("RIDS"), Records Management Division ("RMD"), at Federal Bureau of Investigation

Headquarters ("FBIHQ") in Washington, D.C. I have held this position since August 1, 2002.

Prior to my joining the FBI, from May 1, 2001 to July 31, 2002, I was the Assistant Judge

Advocate General of the Navy for Civil Law. In that capacity, I had direct oversight over

Freedom of Information ("FOIA") policy, procedures, appeals, and litigation for the Navy. From

October 1, 1980 to April 30, 2001, I served as a Navy Judge Advocate, serving at various

commands and routinely working with FOIA matters. I am also an attorney, and have been

licensed to practice law in the State of Texas since 1980.

(2)     In my current capacity as Section Chief, I supervise the Freedom of

Information/Privacy Acts ("FOIPA") Litigation Support Unit. The statements contained in this

declaration are based upon my personal knowledge, upon information provided to me in my

official capacity, and upon conclusions and determinations reached and made in accordance therewith.

(3)     Due to the nature of my official duties, I am familiar with the procedures followed by the FBI in responding to requests for information from its files pursuant to the provisions of the FOIA, 5 U.S.C. § 552, and the Privacy Act of 1974, 5 U.S.C. § 552a. Specifically, I am aware of the treatment which has been afforded the FOIA requests of plaintiffs American Civil Liberties Union ("ACLU"), the Center for Constitutional Rights ("CCR"), Physicians for Human Rights ("PHR"), Veterans for Common Sense ("VCS"), and Veterans for Peace ("VFP"), for access to FBIHQ records concerning the treatment, deaths and renditions of individuals apprehended after the September 11, 2001 terrorist attacks in the United States, and who are currently being held, or who were formerly held in United States custody at military bases or in detention facilities outside of the United States.

(4)     My responsibilities also include the review of FBI information for classification purposes as mandated by Executive Order ("E.O.") 12958, as amended,[1] and the preparation of declarations in support of Exemption 1 claims under the FOIA.[2] I have been designated by the Attorney General of the United States as an original Top Secret classification authority and a declassification authority pursuant to Executive Order 12958, as amended, §§ 1.3 and 3.1.

(5)     The ACLU initiated this instant action on June 2, 2004. On July 6, 2004, plaintiffs amended their complaint and filed a motion for preliminary injunction which requested that the court order defendants to complete processing of the responsive records within 14 days

---

[1] 60 Fed. Reg. 19825 (1995), and 68 Fed. Reg. 15315 (2003).

[2] 5 U.S.C. § 552 (b)(1).

-2-

of the entry of the court's order and hold a status conference to schedule the filing of cross-motions for summary judgment. On July 30, 2004, defendants filed their answer and opposition to plaintiffs' motion for injunctive relief. On August 6, 2004, the ACLU filed its reply. On August 12, 2004, oral argument was held on the motion. After oral argument, the parties entered into an agreement which provided that the ACLU would provide defendants with a list of specific documents in which it was interested in by August 16, 2004. The agreement also provided that defendants would release non-exempt records identified in plaintiffs' list or provide a log listing specific exemptions to withhold information by August 24, 2004.

(6)     The agreement was adopted by the Court on August 17, 2004. The Court also scheduled a status conference for September 10, 2004. Accordingly, on August 24, 2004, the FBI produced a log claiming specific FOIA Exemptions for 1401 pages of material and released two (2) documents to plaintiffs.[3] The Stipulation and Order also provided that by September 1, 2004, the FBI would present the Court and plaintiff with a plan for the processing of and its response to plaintiffs' FOIA requests.[4] The FBI provided its proposed schedule on September 1, 2004. At the status conference held September 10, 2004, the Court advised that it would issue an order governing the production of documents. On September 15, 2004, the Court ordered that the FBI either produce the documents identified in privilege log or produce a Vaughn Index justifying the withholdings of documents identified in the log by October 15, 2004 (hereinafter "Court Order"). Furthermore, the Court ordered that the FBI must identify all of the remaining

---

[3]     Although the FBI originally cited 1401 pages in its August 24, 2004 log, upon further review, the documents were in fact misnumbered, and the actual page count is 1,388 pages.

[4]     The original deadline was August 30, 2004. However, the parties sought and obtained an extension of time until September 1, 2004.

responsive documents in a privilege log. The Court further ordered that documents which are classified must be identified in an in camera log.

(7)     As a result, in response to the September 15, 2004 Court Order, and in accordance with Vaughn v. Rosen, 484 F.2d 820 (D.C. Cir. 1973), the FBI submits this declaration which provides a justification for records identified in the FBI's log submitted August 24, 2004 which are being withheld from disclosure pursuant to FOIA Exemptions 1, 2, 5, 6, 7(C), 7(D), 7(E), and 7(F), 5 U.S.C. §§ 552(b)(1), (b)(2), (b)(5), (b)(6), (b)(7)(C), (b)(7)(D), and (b)(7)(F).[5]

(8)     Following automated searches in the FBI's Central Records System ("CRS"), and manual searches of various offices in FBIHQ,[6] the FBI ultimately identified 1388 pages of documents responsive to plaintiffs' requests of August 16, 2004.[7] After reviewing and processing these documents, on October 15, 2004, the FBI released to plaintiffs 1225 pages with redactions taken pursuant to FOIA Exemptions 1, 2, 5, 6, 7(C), 7(D), 7(E), and 7(F), 5 U.S.C. §§ 552 (b)(1), (b)(2), (b)(5), (b)(6), (b)(7)(C), (b)(7)(D), (b)(7)(E), and (b)(7)(F), with the remaining 42 pages withheld in full pursuant to FOIA Exemptions 1, 2, 5, 6, 7(C), 7(D), 7(E), and 7(F), 5 U.S.C. §§ 552 (b)(1), (b)(2), (b)(5), (b)(6), (b)(7)(C), (b)(7)(D), (b)(7)(E), and (b)(7)(F). In

---

[5] On October 15, 2004, the FBI sought relief from the Court Order and requested an extension of time until October 22, 2004 to submit its Vaughn declaration. See Declaration of Keith R. Gehle, dated October 15, 2004.

[6] See infra for a more detailed discussion of the CRS and the searches conducted by the FBI in this case.

[7] Of these pages, nine (9) were not reviewed, because they are duplicative of other responsive documents. Furthermore, six (6) documents were deemed non-responsive to plaintiffs' FOIA request and consequently were not reviewed (DETAINEE DOCUMENTS 9-14.)

addition, fifty-five (55) documents which originated with the Department of Air Force,

Department of the Army, the Department of Defense, and other government agencies have been

referred for direct response.[8]

## **PROCEDURAL HISTORY OF PLAINTIFFS' REQUESTS**

(9)     Through their FOIA requests dated October 7, 2003 and May 25, 2004, plaintiffs

have sought access to FBI records pertaining to the treatment of "individuals apprehended after

September 11, 2001, and held by the United States at military bases or detention facilities outside

the United States ("Detainees") [and who] have in some cases been tortured or subjected to

interrogation techniques that are prohibited by international and United States law." Plaintiffs'

request is particularly focused on the following three categories of FBI records: (a) records

concerning the treatment of Detainees in United States custody; (b) records concerning the death

of Detainees in United States custody; and (c) records related to the rendition of Detainees and

other individuals. Plaintiffs also sought expedited processing of their request.[9]

(10)     Plaintiffs filed their complaint in this case on June 2, 2004. In the meantime,

plaintiff's request for expedition was being considered by the U.S. Department of Justice's

Office of Public Affairs, which informed plaintiffs, by letter dated June 7, 2004, that their request

for expedited processing had been granted. Shortly thereafter, on or about June 17, 2004, the FBI

---

[8] The documents referred to other government agencies are addressed infra.

[9] Plaintiffs' requests were dated October 7, 2003, and May 25, 2004, respectively. The October 7, 2003 request was more narrow in scope, and sought access to FBI documents pertaining to the treatment of Afghan Detainees. The FBI's response to plaintiff's October 1, 2003 request, by letter dated October 14, 2003, advised plaintiffs that potentially responsive records, consisting of "interviews of the detainees" is exempt from disclosure in its entirety pursuant to Exemptions 7(A) and 7(C), 5 U.S.C. §§ 552 (b)(7)(A) and (b)(7)(C).

-5-

initiated a thorough search for responsive records. This search included a search of the FBI's Central Records System,[10] as well as the identification of responsive files by the responsible operational divisions within FBIHQ, primarily the Counterterrorism Division ("CTD"). Moreover, RIDS sent an Electronic Communication ("EC") (internal memorandum), dated July 6, 2004, to all FBIHQ Divisions requesting that all records potentially responsive to plaintiffs' requests be identified and turned over to RIDS for further review and processing. RIDS' search for, and processing of, potentially responsive records was now underway.

(11)   In the meantime, the proceedings in the litigation continued apace. On July 6, 2004, plaintiffs amended their complaint and filed a motion for preliminary injunction which requested that the court order defendants to complete processing of the responsive records within 14 days of the entry of the court's order and hold a status conference to schedule the filing of cross-motions for summary judgment. On July 30, 2004, defendants filed their answer and opposition to plaintiffs' motion for injunctive relief. On August 6, 2004, plaintiffs filed their reply. On August 12, 2004, oral argument was held on the motion. After oral argument, the parties entered into an agreement which provided that plaintiff would provide defendants with a list of specific documents in which they were particularly interested by August 16, 2004. The agreement also provided that defendants would release non-exempt records identified in

---

[10]  The FBI's Central Records System ("CRS"), which will be discussed in more detail below, enables it to maintain all information which it has acquired in the course of fulfilling mandated law enforcement responsibilities. The records consist of administrative, applicant, criminal, personnel, and other files compiled for law enforcement purposes. This system consists of a numerical sequence of files broken down according to subject matter. The subject matter of a file may relate to an individual, organization, company, publication, activity, or foreign intelligence matter. Certain records in this system are maintained at FBIHQ. Records that are pertinent to specific field offices are maintained in those field offices.

plaintiffs' list or provide a log listing specific FOIA exemptions for withheld information by August 24, 2004.

(12)      The agreement was adopted by the Court on August 17, 2004.  The Court also scheduled a status conference for September 10, 2004.  Accordingly, on August 24, 2004, the FBI produced a log claiming specific FOIA Exemptions for 1,401 pages, and released two (2) documents to plaintiffs.[11]  The Stipulation and Order also provided that by September 1, 2004, the FBI would present the Court and plaintiff with a plan for the processing of, and its response to plaintiffs' FOIA requests.[12]  The FBI provided its proposed schedule on September 1, 2004.  At the status conference held September 10, 2004, the Court advised that it would issue an order governing the production of documents.  On September 15, 2004, the Court ordered that the FBI, along with the other defendants, must either produce the documents identified in the August 24, 2004 log or produce a Vaughn Index justifying the withholdings by October 15, 2004 (hereinafter "Court Order").  Furthermore, the Court ordered that the FBI must identify all of the remaining responsive documents in a separate log, and ordered that documents which are classified be identified in an in camera log.

(13)      In response to the Court's Order, the FBI completed the processing of the approximately 1,400 pages of documents by October 15, 2004.  Specifically, 1388 pages were released on October 15, 2004, with information withheld pursuant to FOIA Exemptions 1, 2, 5, 6, 7(C), 7(D), 7(E) and 7(F), 5 U.S.C. §§ 552(b)(1), (b)(2), (b)(5), (b)(6), (b)(7)(C), (b)(7)(D),

---

[11] Although the FBI originally cited 1401 pages in its August 24, 2004 log, upon further review, the documents were in fact misnumbered, and the actual page count is 1,388 pages.

[12] The original deadline was August 30, 2004.  However, the parties sought and obtained an extension of time until September 1, 2004.

(b)(7)(E) and (b)(7)(F).[13] In addition, the FBI produced an 11-page log which addressed those documents of the remaining approximately 3,000 pages which may be described on the public record. The FBI sought a one-week extension of time until October 22, 2004, for completion of this Vaughn declaration in support of the FBI's production of the 1388 pages, as well as its work on the log which will address the remaining approximately 3,000 pages of potentially responsive records. The FBI has completed the log that addresses the approximately 3,000 pages of potentially responsive records, and has submitted it for in camera, ex parte review; the log is classified at the "Secret" level.

## EXPLANATION OF THE FBI'S CENTRAL RECORDS SYSTEM

(14)    The Central Records System ("CRS") utilized by the FBI enables it to maintain all information which it has acquired in the course of fulfilling mandated law enforcement responsibilities. The records maintained in the CRS consist of administrative, applicant, criminal, personnel, and other files compiled for law enforcement purposes. This system consists of a numerical sequence of files broken down according to subject matter. The subject matter of a file may relate to an individual, organization, company, publication, activity, or foreign intelligence matter. Certain records in this CRS are maintained at FBIHQ. Records that are pertinent to specific field offices of the FBI are maintained in those field offices.

(15)    Through the General Indices, FBIHQ and each field office can access the CRS. The General Indices are arranged in alphabetical order and consist of an index on various

---

[13] 1,225 pages have been released with redactions; 42 pages were released in full; 51 pages have been withheld in full; 55 pages have been withheld and are being referred to other agencies; 6 pages have been removed as non-responsive; and 9 pages have been removed as duplicative.

-8-

subjects, including the names of individuals and organizations. Only information considered

pertinent, relevant, or essential for future retrieval is indexed. Searches of the General Indices to

locate records concerning particular subjects are made by using the name of the subject of the

request as a search term.

(16)     The entries in the General Indices fall into two categories:

> (a)  A "main" entry --- A "main" entry carries the name corresponding with a
> subject of a file contained in the CRS.

> (b)  A "reference" entry --- "Reference" entries, sometimes called
> "cross-references," are generally only a mere mention or reference to an
> individual, organization, etc., contained in a document located in another "main"
> file.

(17)     FBI field divisions can also access the CRS through the General Indices

(automated and manual). Field Divisions have automated indexing functions.

(18)     On October 16, 1995, the Automated Case Support ("ACS") was implemented for

all Field Offices, Legal Attaches ("Legats"), and FBIHQ. Over 105 million records were

converted from automated systems previously utilized by the FBI. ACS consists of three

integrated, yet separately functional, automated applications that support case management

functions for all FBI investigative and administrative cases, which are:

(a)     Investigative Case Management ("ICM") - ICM provides the ability to

open, assign, and close investigative and administrative cases as well as set, assign, and track

leads. The Office of Origin ("OO"), which sets leads for itself and other divisions, as needed,

opens a case. The offices that receive leads are referred to as Lead Offices ("LOs"), formerly

known as Auxiliary Offices. When a case is opened, it is assigned a Universal Case File Number

("UCFN"), such as "12-SU-34567," which is utilized by all FBI offices, including FBIHQ, that

are conducting or assisting in the investigation. The "12" indicates the type of investigation, "SU" indicates the Office of Origin of the investigation, in this example Salt Lake City, and "34567" denotes the individual case file number for that particular investigation.

(b)     Electronic Case File ("ECF") - ECF serves as the central electronic repository for the FBI's official text-based documents. ECF supports the universal serial concept, where only the creator of a document serializes it into a file, providing single source entry of serials into the computerized system. All original serials are maintained in the OO case file.

(c)     Universal Index ("UNI") - UNI continues the universal concepts of ACS by providing a complete subject/case index to all investigative and administrative cases. Only the OO is required to index; however, the LOs may index additional information as needed. UNI, an 86.1 million record index, provides functions to index names to cases and to search names and cases for the FBI's investigative and administrative cases. Names of individuals or non-individuals are recorded with identifying information, such as sex, race, event date, date or place of birth, locality, social security number, or address.

(19)     The decision to index names other than subjects, suspects, and victims is a discretionary decision made by the investigative FBI Special Agent ("SA"), the supervisor in the field division conducting the investigation, and the supervising FBI Special Agent at FBIHQ. The FBI does not index every name in its files; it indexes only that information considered pertinent, relevant, or essential for future retrieval.

(20)     Without a "key" (index) to this mass of information, information essential to ongoing investigations could not be readily retrieved. The FBI files would thus be merely

-10-

archival in nature and could not be effectively used to serve the mandated mission of the FBI, which is to investigate violations of federal criminal statutes. Therefore, the General Indices to the CRS files are the means by which the FBI can determine what retrievable information, if any, the FBI may have in its CRS files on a particular subject matter, e.g., foreign detainees.

## SEARCH FOR RECORDS RESPONSIVE TO PLAINTIFFS' REQUEST

(21)    One of the problems of identifying documents responsive to plaintiffs' FOIA request has been the nature of the request, which does not lend itself naturally to the types of searches that the FBI normally conducts in response to a FOIA request seeking access to FBI investigative files. This is particularly the case where, as here, the subject matters of the request are very recent, and responsive records may not have yet been indexed to the CRS, and the subject matters may be too general and not related to a specific investigation. For these reasons, at the initial administrative search stage, an automated indices search in CRS for the following phrases failed to produce any responsive records: "detainees", "foreign detainees", "Afghan detainees", "Afghanistan detainees", "Iraq detainees", "Iraqi detainees", "detainees in U.S. custody", "treatment of detainees", "treatment of Afghan detainees", "treatment of Iraqi detainees", "torture of detainees", "rendition of detainees", and "repatriation of detainees." As a result, the FBI undertook a second search for potentially responsive records by means of an individualized inquiry of the most logical offices at FBIHQ to have potentially responsive records. The most logical FBIHQ division to have potentially responsive records was the Counterterrorism Division ("CTD") and the most logical Unit in that division was the Military Liaison and Detainee Unit ("MLDU"), which coordinates FBI interviews and other matters concerning detainees being held in United States custody by the Department of Defense in

-11-

facilities outside the United States.

(22)    MLDU was able to locate four FBIHQ files which potentially contained records responsive to plaintiffs' request: one file concerning the invasion of Iraq, one file concerning the search for the Iraqi leader, Saddam Hussein, one file concerning the bombing of the United Nations Headquarters in Iraq, and one file (file number 315N-HQ-C1406946) concerning the Military Liaison and Detainee Program administered by MLDU. Collectively, these four files consist of approximately 67,000 pages of documents and all four files were reviewed in their entirety to locate any potentially responsive records. Plaintiffs' request was broadly construed and any documents which contained information regarding the treatment, mistreatment, abuse, torture, death, rendition, or repatriation of any foreign detainees formerly or currently being held in United States custody in facilities outside the United States were considered to be responsive to this request, even if the information was as innocuous as a detainee's dislike of his prison diet or the fact that a detainee had a medical condition requiring treatment. Most of the responsive records from these four FBIHQ files were located in the file concerning the Military Liaison and Detainee Program, file number 315N-HQ-C1406946.

(23)    In its continuing efforts to search for potentially responsive records, on July 6, 2004, an EC was sent to all FBIHQ Divisions directing all personnel to conduct a thorough search of documents responsive to plaintiffs' FOIA requests. The FOIPA Litigation Support Unit personnel contacted various personnel throughout FBIHQ regarding potentially responsive documents, both in person and telephonically, to ascertain whether certain individuals possessed responsive documents. All potentially responsive documents were forwarded to the FOIPA Litigation Support Unit for review. On September 21, 2004, another EC was sent to all FBIHQ

-12-

Divisions to again search their offices for any responsive records; this additional search resulted in the location of approximately 3,500 documents.

(24)    Potentially responsive documents at FBIHQ were gathered from the following offices: the Office of the General Counsel ("OGC"), the Office of Congressional Affairs ("OCA"), CTD, the Inspection Division, the Criminal Investigative Division ("CID"), the Criminal Justice Information Services Division ("CJIS"), and the Critical Incident Response Group ("CIRG"). The nature of the documents ultimately identified as responsive to plaintiffs' requests will be described in further detail below.

## RECORDS RESPONSIVE TO PLAINTIFFS' FOIA REQUESTS

(25)    The records responsive to plaintiffs' FOIA requests were located through the search efforts discussed in the preceding paragraphs. The records addressed in this declaration consist of two distinct categories:  documents located in FBIHQ file 315N-HQ-C1406946 concerning the Military Liaison and Detainee Program, especially memoranda (hereinafter "Repatriation Memoranda") concerning the potential release, repatriation, or continued detention of certain Detainees, and documents which were located in OGC at FBIHQ, which consist of handwritten notes concerning legal discussion between FBI attorneys, e-mails between OGC and other FBIHQ Divisions, ECs from CTD concerning the treatment of Detainees, and reports by CIRG concerning the treatment of detainees.

## EXPLANATION OF FORMAT UTILIZED FOR THE JUSTIFICATION OF DELETED MATERIAL

(26)    Copies of the released pages were provided to plaintiffs on October 15, 2004. Each page was consecutively numbered as DETAINEES-1" through "DETAINEES-1388" at the

-13-

bottom of the pages. In addition, documents withheld in their entireties were replaced by "deleted page information sheets," which identified applicable FOIA exemptions relied upon to withhold the document in full, as well as the numbered pages that applied to those withheld documents. The exemptions asserted by the FBI as grounds of withholding documents in their entireties or in part are Exemptions 1, 2, 5, 6, 7(C), 7(D), 7(E), and 7(F) of the FOIA, 5 U.S.C. §§ 552(b)(1), (b)(2), (b)(5), (b)(6), (b)(7)(C), (b)(7)(D), (b)(7)(E), and (b)(7)(F).

(27) A coded format is used in this case to assist the Court and plaintiffs in reviewing the information withheld within the context of the documents themselves. Each instance of information withheld pursuant to the FOIA on the attached documents is accompanied by a coded designation that corresponds to the categories listed below. For example, if "(b)(7)(C)-1" appears on a document, the (b)(7)(C) designation refers to Exemption (b)(7)(C) of the FOIA concerning "Unwarranted Invasion of Privacy." The numerical designation (-1) following the "(b)(7)(C)" narrows the main category to the more specific subcategory, "Names of and/or Identifying Information Concerning FBI Special Agent and Support Personnel." Listed below are the categories used to explain the FOIA exemptions asserted to withhold protected material:

| SUMMARY OF JUSTIFICATION CATEGORIES | |
|---|---|
| **CODED CATEGORIES** | **INFORMATION WITHHELD** |
| **Category (b)(1)** | **CLASSIFIED INFORMATION** |
| **Category (b)(2)** | **AGENCY PERSONNEL RULES AND PRACTICES** |
| **(b)(2)-1** | Internal FBI Telephone Numbers. |
| **(b)(2)-2** | Internal FBI Fax Numbers. |

| SUMMARY OF JUSTIFICATION CATEGORIES | |
|---|---|
| **CODED CATEGORIES** | **INFORMATION WITHHELD** |
| **(b)(2)-3** | Interrogation Techniques, Procedures, and Interview Plans prepared by the National Center for the Analysis of Violent Crime ("NCAVC"), the Behavioral Analysis Unit ("BAU"), and the Critical Incident Response Group ("CIRG"). Cited in conjunction with (b)(7)(E)-1. |
| **Category (b)(5)** | **PRIVILEGED INFORMATION** |
| **(b)(5)-1** | Deliberative Process Privilege. |
| **(b)(5)-2** | Attorney-Client Privilege. |
| **(b)(5)-3** | Deliberative Process and Attorney-Client Privileges. |
| **Category (b)(6)** | **CLEARLY UNWARRANTED INVASION OF PERSONAL PRIVACY** |
| **(b)(6)-1** | Names and Identifying Information of FBI Special Agents ("SAs") and FBI Support Personnel. Cited in conjunction with (b)(7)(C)-1. |
| **(b)(6)-2** | Names and Identifying Information of non-FBI federal employees. Cited in conjunction with (b)(7)(C)-2. |
| **(b)(6)-3** | Names and Identifying Information of Foreign Detainees Interviewed by the FBI. Cited in conjunction with (b)(7)(C)-3 and (b)(7)(D)-1. |
| **(b)(6)-4** | Names and Identifying Information of Third Parties of Investigative Interest to the FBI. Cited in conjunction with (b)(7)(C)-4. |
| **(b)(6)-5** | Names and Identifying Information of Third Parties Merely Mentioned. Cited in conjunction with (b)(7)(C)-5. |
| **Category (b)(7)(C)** | **UNWARRANTED INVASION OF PERSONAL PRIVACY** |
| **(b)(7)(C)-1** | Names and Identifying Information of FBI SAs and FBI Support Personnel. Cited in conjunction with (b)(6)-1. |
| **(b)(7)(C)-2** | Names and Identifying Information of non-FBI federal employees. Cited in conjunction with (b)(6)-2. |

| SUMMARY OF JUSTIFICATION CATEGORIES | |
|---|---|
| **CODED CATEGORIES** | **INFORMATION WITHHELD** |
| **(b)(7)(C)-3** | Names and Identifying Information of Foreign Detainees Interviewed by the FBI. Cited in conjunction with (b)(6)-3 and (b)(7)(D)-1. |
| **(b)(7)(C)-4** | Names and Identifying Information of Third Parties of Investigative Interest to the FBI. Cited in conjunction with (b)(6)-4. |
| **(b)(7)(C)-5** | Names and Identifying Information of Third Parties Merely Mentioned. Cited in conjunction with (b)(6)-5. |
| **Category (b)(7)(D)** | **CONFIDENTIAL SOURCE MATERIAL** |
| **(b)(7)(D)-1** | Names and Identifying Information of Foreign Detainees Interviewed by the FBI (Implied Confidentiality). Cited in conjunction with (b)(6)-3 and (b)(7)(C)-3. |
| **(b)(7)(D)-2** | Foreign Government Agency Information (Implied Confidentiality). |
| **Category (b)(7)(E)** | **LAW ENFORCEMENT INVESTIGATIVE TECHNIQUES/PROCEDURES** |
| **(b)(7)(E)-1** | Interrogation Techniques, Procedures, and Interview Plans Prepared by the NCAVC, the BAU, and the CIRG. Cited in conjunction with (b)(2)-3. |
| **Category (b)(7)(F)** | **ENDANGER LIFE OR PHYSICAL SAFETY OF ANY INDIVIDUAL** |
| **(b)(7)(F)-1** | Information The Disclosure of Which Could Reasonably be Expected to Endanger the Life or Physical Safety of Any Individual. |

## APPLICATION OF FOIA EXEMPTION (b)(1)

(28)    5 U.S.C. § 552 (b)(1) exempts from disclosure those records that are

(A) specifically authorized under criteria established by an Executive Order to be kept Secret in the interest of national defense or foreign policy; and (B) are in fact properly classified

pursuant to such Executive Order . . . .

(29)   The FBI's analysis of the withholding of classified information contained in its records in a FOIA context is based on the standards articulated in the FOIA statute, 5 U.S.C. § 552 (b)(1).  Exemption 1 protects from disclosure those records that are "(A) specifically authorized under criteria established by an Executive Order to be kept Secret in the interest of national defense or foreign policy; and (B) are in fact properly classified pursuant to such Executive Order."

(30)   The FBI's analysis of whether Exemption 1 permits the withholding of agency records consists of two significant steps.  First, the FBI must determine whether the information contained in the records is information that satisfies the substantive and procedural criteria of the applicable Executive Order governing the classification and protection of national security information.  Only after those criteria have been satisfied may the FBI proceed to analyze whether the documents are exempt under FOIA Exemption 1.

(31)   In order for information to be properly classified it must first satisfy the requirements set forth in Section 1.1 (a) of E.O. 12958, as amended:

   (1)   an original classification authority is classifying the information;

   (2)   the information is owned by, produced by or for, or is under the control of the United States Government;

   (3)   the information falls within one or more of the categories of information listed in § 1.4 of this order; and

   (4)   the original classification authority determines that the unauthorized disclosure of the information reasonably could be expected to result in damage to the national security, which includes defense against transnational terrorism, and the original classification authority is able to identify or describe the damage.

(32)    As I will explain in further detail below, all information in the documents which I

determined to be classified is marked at the "Secret" level, since the unauthorized disclosure of

this information reasonably could be expected to cause serious damage to the national security.

See E.O. 12958, as amended, §§ 1.2(a)(2), (a)(3). In addition to these substantive requirements,

certain procedural and administrative requirements of E.O. 12958, as amended, must be followed

before information can be considered to be properly classified, including the proper identification

and marking of the documents. In order to ensure that the information in the ten documents is

properly classified, I made certain that all procedural requirements of E.O. 12958, as amended,

were followed:

> (1)    each document was marked as required and stamped with the proper
> classification designation;[14]
>
> (2)    each document was marked to indicate clearly which portions are
> classified, which portions are exempt from declassification as set forth in
> E.O. 12958, as amended, §§ 1.4 (b), (c) and (d), and which portions are
> unclassified;[15]
>
> (3)    the prohibitions and limitations on classification specified in E.O. 12958,
> as amended, § 1.7, were adhered to;
>
> (4)    the declassification policies set forth in E.O. 12958, as amended, §§ 3.1
> and 3.3 were followed; and
>
> (5)    any reasonably segregable portion of these classified documents that did
> not meet the standards for classification under E.O. 12958, as amended,
> were declassified and marked for release, unless withholding was
> otherwise warranted under applicable law.[16]

---

[14]    E.O. 12958, as amended, §§ 1.6 (a) (1) - (5).

[15]    E.O. 12958, as amended, § 1.6 (a) (5) (c).

[16]  5 U.S.C. § 552 (b) provides, in part, that "[a]ny reasonably segregable portion of a
record shall be provided to any person requesting such record after deletion of the portions which

(33)    In addition, my classification determinations will be reviewed by the U.S.

Department of Justice Department Review Committee ("DRC") at a future date.[17]  The DRC is

the FBI's appellate authority with regard to the implementation and administration of E.O.

12958, as amended, and related directives and guidelines concerning classified information. The

FBI is in the process of preparing those documents withheld in full or in part pursuant to

Exemption 1 for the DRC's review. The DRC will review all of my classification actions in the

documents at issue and make a determination as to the appropriateness of the classification

actions taken. Once the DRC completes its review, the FBI's RIDS Classification Unit ("CU")

will incorporate the DRC's findings and decisions into the documents, and the RIDS FOIPA

Litigation Support Unit will amend/adjust the FBI's Vaughn declaration being submitted today to

reflect the DRC's classification and declassification decisions.

## **FINDINGS OF DECLARANT**

(34)    With the above requirements in mind, I personally and independently examined

the FBI information withheld from the plaintiff pursuant to FOIA Exemption 1. As a result of

this examination, I determined that the information contained on certain Detainee pages[18] warrant

---

are exempt under this subsection." In this case, the information at issue has been carefully re-examined. Based on our re-review, and our consultation with the affected intelligence component of the foreign government, we have determined that no additional reasonably segregable portions may be declassified and released.

[17]  See 28 C.F.R. § 17.14 (2003).

[18]  Information classified and withheld pursuant to Exemption 1 appears on the following DETAINEE DOCUMENTS 6-8, 15-16, 20-23, 25, 26, 29, 32-34, 42, 60-62, 79-80, 84-85, 93-94, 97, 99-100, 109, 111-112, 114, 119, 125, 127-128, 130, 142, 153, 160, 182-184,188, 191-193, 216, 228, 230-231, 235-236, 248-252, 260-261, 335, 340-341, 354-355, 357, 359, 362-363, 372-373, 376, 378-379, 385-386, 390, 392, 396, 402-403, 408-409, 413-414, 438-440, 443, 447, 452, 510, 517, 519, 521-523, 525-528, 542, 549, 553-554, 557, 561, 563, 566, 571-577, 592,

classification at the "Secret" level, pursuant to E.O. 12958, as amended, § 1.4, as the release

could reasonably be expected to: (b) reveal foreign government information, (c) reveal

intelligence activities (including, special activities), sources intelligence sources or methods, or

cryptology, (d) reveal information that would seriously and demonstrably impair relations

between the United States and a foreign government, or (g) seriously and demonstrably

undermine ongoing diplomatic activities of the United States or reveal vulnerabilities or

capabilities of systems, installations, infrastructures, projects, plans, or protection services

relating to the national security, which includes defense against transnational terrorism.

## **FOREIGN GOVERNMENT INFORMATION**

(35)    E.O. 12958, § 6.1 (r), as amended, defines foreign government information as:

(1) Information provided to the United States Government by a foreign
government or governments, an international organization of governments, or any
element thereof, with the expectation that the information, the source of the
information, or both, are to be held in confidence; (2) information produced by the
United States Government pursuant to or as a result of a joint arrangement with a
foreign government or governments, or an international organization of
governments, or any element thereof, requiring that the information, the
arrangement, or both, are to be held in confidence; or (3) information received and
treated as "foreign government information" under the terms of a predecessor
order.

(36)    Most governments, unlike that of the United States, neither officially

594-595, 597-602, 604-609, 611-614, 624-626, 634-635, 650, 658-659, 663-664,  693, 695-696,
729, 735, 741, 754, 761-762, 769, 773, 776-777, 782, 787, 791-792, 800-802, 805, 810-811, 816,
823-824, 828-830, 847, 850; 856-857, 862, 866, 871, 875-876, 878, 883, 885, 887, 890, 896,
898, 902-903, 907-909, 911-912, 914, 920, 922, 925, 931, 934-935, 940-941, 947, 949, 956-957,
959, 964, 971, 1005, 1009, 1011, 1016, 1018-1020, 1022-1023, 1033, 1036, 1044, 1046, 1051,
1064, 1068,1082, 1084, 1089, 1099-1100, 1102-1103, 1105-1107, 1109-1112, 1116-1117, 1120-
1121, 1124, 1126, 1128-1138, 1145, 1147-1148, 1157-1159, 1163, 1165, 1169-1178, 1193,
1195, 1197-1199, 1201-1202, 1204-1205, 1207, 1215-1220, 1230-1232, 1241, 1248-1249, 1252-
1253, 1259, 1262-1264, 1290-1291, 1306-1309, 1336-1340, 1343-1350, 1353-1359, 1362-1366,
1371 and 1384.

-20-

acknowledge the existence of some of their intelligence and security services, nor the scope of their activities or the sensitive information generated by them. The free exchange of information among United States intelligence and law enforcement services and their foreign counterparts is predicated upon the understanding that these liaisons, and information exchanged from them, are to be kept in confidence. E.O. 12958, § 1.4 (b), as amended, authorizes the classification of foreign government information.

(37)    The release of official United States Government documents that show the existence of a confidential relationship with a foreign government reasonably could be expected to strain relations between the United States and the foreign governments and lead to diplomatic, political or economic retaliations. A breach of this relationship can be expected to have at least a chilling effect on the free flow of vital information to the United States intelligence and law enforcement agencies, which may substantially reduce their effectiveness. Although the confidential relationship of the United States with certain countries may be widely reported, they are not officially acknowledged.

(38)    Disclosure of such a relationship, predictably, will result in the careful analysis and possible compromise of the information by hostile intelligence services. The hostile service may be able to uncover friendly foreign intelligence gathering operations directed against it or its allies. This could lead to the neutralization of friendly allied intelligence activities or methods, the death of live sources, cause embarrassment to the supplier of the information, or result in economic or diplomatic retaliation against both the United States and the supplier of the information.

(39)    Even if the government from which certain information is received is not named

-21-

in or identifiable from the material it supplies, the danger remains that if the information were to be made public, the originating government would likely recognize the information as material it supplied in confidence. Thereafter, it would be reluctant to entrust the handling of its information to the discretion of the United States.

(40)     The occurrence of any one of the above events could reasonably be expected to cause, at a minimum, damage to the national security. Therefore, I determined the foreign government information withheld on certain pages[19] is properly classified at the "Secret" level and withheld in accordance with Section 1.4 (b) of Executive Order 12958, as amended, and exempt from disclosure pursuant to Exemption 1.

## INTELLIGENCE SOURCE

(41)     E.O. 12958, as amended, § 1.4(c), exempts intelligence sources. Redactions on certain pages[20] were made to protect the identity of a classified intelligence source. An intelligence source that requires continued classification is an individual who provided or is currently providing information that pertains to national security matters, the disclosure of which could reasonably be expected to result in damage to the FBI's intelligence and counterintelligence-gathering capabilities.

(42)     My review disclosed that the information pertaining to an intelligence source which remains classified is likely to identify this source. The withheld information and material

---

[19] Information withheld pursuant to E.O. 12958, as amended, § 1.4(b), appears on DETAINEE DOCUMENTS 6, 7, 15, 21, 29, 34, 127, 128, 413, 414, 769, 773, 922, 956, 957, 962, 971 and 1022.

[20] Information withheld pursuant to E.O. 12958, as amended, § 1.4(c), appears on DETAINEE DOCUMENTS 15, 16, 153, 160, 414, 452, 971, 1099, 1102, 1107, 1117, 1120 1124, 1126, 1128-1135, 1137, 1138, 1145, 1147, 1148, 1165, 1354-1359, 1365 and 1384.

-22-

provided by or that pertains to the source is specific and, if disclosed, reasonably could be expected to reveal the identity of the contributing source. I considered a number of factors in reaching this conclusion, including most importantly, the damage to the national security that will result by publicly identifying sources utilized in intelligence investigations, and the FBI's ability to protect and recruit intelligence sources in the future.

(43)    Disclosure of the identities of FBI intelligence sources, regardless of whether they are active or inactive, alive or deceased, can reasonably be expected to cause current and potential intelligence sources to fear that their identities will be publicly revealed at some point, in spite of the FBI's present expressed or implied assurance of confidentiality. This disclosure of sources' identities could jeopardize the physical well-being of the source or the source's family or associates or subject them to public ridicule and/or ostracism.

(44)    Thus, release of the information I determined to be source-identifying could reasonably be expected to cause serious damage to the national security by causing current intelligence sources to cease providing information, and discourage potential intelligence sources from cooperating with the FBI for fear their identifies will be publicly revealed at some point. Such a source reaction would eliminate one of the most crucial means of collecting intelligence information and, therefore, severely hamper the FBI's law enforcement efforts to detect and apprehend individuals who seek to damage the national security through violation of the United States criminal and national security laws. Thus, the intelligence source which is withheld by the FBI is properly classified in accordance with Section 1.4 (c) of the E.O. 12958 and exempt from disclosure pursuant to Exemption 1.

## INTELLIGENCE ACTIVITIES AND METHODS

(45)     E.O. 12958, as amended, § 1.4(c), exempts intelligence activities, intelligence

sources or methods, or cryptology.  Redactions on certain pages[21] were made to protect

intelligence activities or methods.  An intelligence activity or method includes any intelligence

action or technique utilized by the FBI against a targeted individual or organization that has been

determined to be of national security interest.  An intelligence method is used to indicate any

procedure (human or non-human) utilized to obtain information concerning such individual or

organization.

(46)     The intelligence activities or methods detailed in the withheld information are

effective means for the FBI to gather, store or disseminate intelligence information.  The criteria

utilized by the FBI in these instances to decide what actions by an individual or organization

warranted the commencement of an investigation, or caused a certain activity to be given

investigative attention over others, could be revealed through disclosure of these intelligence

methods.  The criteria applied and priorities assigned in these records are used in the FBI's

present intelligence or counterintelligence investigations, and are in accordance with the Attorney

---

[21]     Information withheld pursuant to E.O. 12958, as amended, § 1.4(c), appears on
DETAINEE DOCUMENTS 15, 16, 20, 21, 23, 25, 26, 28, 29, 32, 33, 42, 60-62, 79, 80, 84, 85;
93; 94, 97, 99, 100, 109, 111, 112, 114, 119, 125, 127, 130, 142, 153, 160, 182-184, 188, 191-
193, 216, 228, 230, 231, 235, 236, 248-252, 260, 261, 335, 340, 341, 354, 355, 357, 359, 362,
363, 372, 373, 376, 378, 379, 385, 386, 390, 392, 396, 402, 403, 408, 409, 413, 414, 438-440,
443, 444, 447, 452, 510, 517, 519, 521-523, 525-528, 542, 549, 553, 554, 557, 561, 563, 566,
571-577, 592, 594, 595, 597-602, 604-609, 611-614, 624-626, 634, 635, 650, 658, 659, 663, 664,
688, 692, 693; 695, 699, 729, 735, 741, 754, 761, 762, 776, 777, 782, 787, 791, 792, 801, 802,
805, 810, 811, 816, 823, 824, 828-830, 847, 850, 856, 857, 862, 866, 871, 875, 876, 878, 883,
885, 887, 890, 896, 898, 902, 903, 907-909, 911, 912, 914, 920, 922, 925, 934, 940, 949, 964,
971, 1016, 1018-1020, 1022, 1023, 1033, 1036, 1046, 1051, 1064, 1082, 1084, 1089, 1099,
1100, 1102, 1103, 1105-1107, 1109-1112, 1116, 1117, 1120, 1121, 1124, 1126, 1128-1138,
1145, 1147, 1148, 1157-1159, 1163, 1165, 1169-1178, 1193, 1195, 1197-1199, 1201-1205,
1207, 1215-1220, 1230-1232, 1241, 1248, 1249, 1252, 1253, 1257, 1258, 1259, 1262-1264,
1290, 1291, 1306-1309, 1343-1350, 1353-1359, 1362-1366, 1373, and 1384.

-24-

General's guidelines on FBI intelligence or counterintelligence investigations. The information obtained from the methods is very specific in nature, provided during a specific time period, and known to very few individuals. Disclosure of the specific information which describes the intelligence methods withheld in this case and still used by the FBI today to gather intelligence information could reasonably be expected to cause serious damage to the national security for the following reasons: (1) disclosure would allow hostile entities to discover the current methods used; (2) disclosure would reveal current specific targets of the FBI's national security investigations; and (3) disclosure would reveal the determination of the criteria used and priorities assigned to current intelligence or counterintelligence investigations. Hostile entities could then develop countermeasures which could severely disrupt the FBI's intelligence-gathering capabilities. This would severely damage the FBI's efforts to detect and apprehend violators of the United States' national security and criminal laws.

(47)    It is my determination that the release of this information could permit hostile governments to appraise the scope, focus, location, target and capabilities of the FBI's intelligence gathering methods and activities, and allow hostile agents to devise countermeasures to circumvent these intelligence activities or methods and render them useless in providing intelligence information. This would severely disrupt the FBI's intelligence gathering capabilities. I have therefore determined that this information is properly classified at the "Secret" level and withheld pursuant to E.O. 12958, as amended, §1.4 (c).

(48)    In addition, the FBI determined that the disclosure of file numbers on certain

pages[22] would lead to the exposure of particular intelligence activities at issue. These file numbers assigned by FBIHQ and field offices are associated with specific intelligence activities, which include channelization and dissemination instructions, and contain a geographical prefix or the originating office and case number, including the numerical characterization of the type of investigation followed by a chronological number assigned to a specific investigation/activity. The disclosure of an intelligence file number in the aggregate will enable a hostile analyst to attribute any information released from the documents containing such a file number to that particular file. A hostile analyst can identify the specific intelligence activity by supplying the missing pieces. Hence, a partial mosaic of the activity begins to appear as more information is channeled to the file. Disclosure of the intelligence activity file number can lead to the exposure of actual current activities or operations. Attributing certain documents of information to a specific intelligence activity will enable hostile analysts to ascertain the nature, objectives, scope or thrust of the investigations. Disclosure will also allow countermeasures to be implemented, making future operations more difficult, or compromise other ongoing planned intelligence operations. Accordingly, the release of the file numbers will lead to the exposure of the actual intelligence activity utilized in this case, and can reasonably be expected to cause serious damage to national security. I have therefore determined that the file numbers are properly classified at the "Secret" level and are properly withheld pursuant to E.O. 12958, as amended, § 1.4(c).

## **FOREIGN RELATIONS**

(49)    E.O. 12958, § 1.4 (d), as amended, is used to indicate cooperative endeavors

---

[22] This information is withheld pursuant to E.O. 12958, as amended, § 1.4(c), and appears on DETAINEE DOCUMENTS 335, 376, 624-626, 634, 635, 695, 761, 762, 782, 791, 801, 802, and 850.

between the FBI and named foreign governments' intelligence components. Redactions on certain pages[23] were made to protect information regarding the cooperative endeavors between the FBI and named foreign government components. Intelligence information is exchanged between these governments and the FBI with the express or written understanding that the relationship will be held in strict confidence. The retention of the secret nature of this exchange is essential to ensure continued liaison with cooperating foreign governments, which continues at the present time. It also is indicative of peaceful and cooperative relations between governments, both allies and foes, in conducting activities that are germane to a peaceful coexistence.

(50)    Information that affects the foreign relations of the United States, much like foreign government information, does not lose its sensitivity with the passage of time. The delicate liaison established between the United States and these foreign governments could be severely damaged should the United States decide to disclose these relationships. The foreign governments' cooperation in the FBI investigations at issue have not been publicly revealed. To do so now would endanger the spirit of law enforcement intelligence cooperation that the FBI has labored most strenuously to obtain. These governments are not as likely to continue to trust the United States if the FBI discloses their cooperation in violation of the confidentiality promise given, and will be less willing to cooperate in the future if their past and continuing requests for confidentiality are not honored.

(51)    Information that identifies intelligence information gathered by the United States either about or from a foreign country is sensitive. This condition exists due in part to the

---

[23] This information is withheld pursuant to E.O. 12958, as amended, § 1.4(d), and appears on DETAINEE DOCUMENTS 6, 7, 8, 15, 21, 22, 29, 34, 127, 128, 413, 414, 769, 773, 922, 956, 957, 962, 971 and 1022.

delicate nature of international diplomacy. This information must be handled with care so as not to jeopardize the fragile relationships that exist among the United States and certain foreign governments.

(52)     The unauthorized disclosure of information concerning foreign relations or foreign activities of the United States can reasonably be expected to lead to diplomatic or economic retaliation against the United States; identify the target, scope or time frame of intelligence activities of the United States in or about a foreign country, which may result in the curtailment or cessation of these activities; enable hostile entities to assess United States intelligence gathering activities in or about a foreign country and devise countermeasures against these activities; or compromise cooperative foreign sources which may jeopardize their safety and curtail the flow of information from these sources. As a result, I have determined that this information is properly classified at the "Secret" level pursuant to E.O. 12958, as amended, § 1.4(d).

## VULNERABILITIES OR CAPABILITIES INCLUDING DEFENSE AGAINST TRANSNATIONAL TERRORISM

(53)     The interception of various telecommunications is one of the FBI's most crucial means of collecting intelligence information today. The information on certain documents[24]

---

[24] Information withheld pursuant to E.O. 12958, as amended, § 1.4(g), appears on DETAINEE DOCUMENTS 20, 21, 23, 25, 26, 28, 29, 32, 33, 42, 60-62, 79, 80, 84, 85; 93; 94, 97, 99, 100, 109, 111, 112, 114, 119, 125, 127, 130, 142, 182-184, 188, 191-193, 216, 228, 230, 231, 235, 236, 248-252, 260, 261, 340, 341, 354, 355, 357, 359, 362, 363, 372, 373, 378, 379, 385, 386, 390, 392, 396, 402, 403, 408, 409, 413, 438-440, 443, 444, 447, 510, 517, 519, 521-523, 525-528, 542, 549, 553, 554, 557, 561, 563, 566, 571-577, 592, 594, 595, 597-602, 604-609, 611-614, 635, 650, 658, 699, 729, 776, 777, 787, 791, 802, 805, 810, 811, 816, 824, 828-830, 847, 856, 857, 862, 866, 871, 875, 876, 878, 883, 885, 887, 890, 896, 898, 902, 903, 907-909, 911, 912, 914, 920, 922, 925, 934, 940, 949, 964, 1016, 1018-1020, 1022, 1023, 1036, 1046, 1051, 1064, 1082, 1084, 1089, 1099, 1100, 1102, 1103, 1105-1107, 1109-1112, 1116,

-28-

withheld pursuant to Exemption 1 and in accordance with E.O. 12958, as amended, § 1.4 (g), identifies sophisticated collection technology developed and currently used by the FBI today to obtain intelligence information essential to the national security of the United States. This technology is essential in conducting both criminal and national security investigations. Disclosure of this technology to the public could reasonably be expected to cause serious damage to the national security for the following reasons:

(a) Disclosure would reveal, further than has already been revealed, that the FBI possesses the capability to monitor and retrieve intelligence information from specific types of communications;

(b) Disclosure would reveal the vulnerabilities of others' communications technologies and aid them in their ability to make specific, calculated changes in their communications security to avoid FBI monitoring of their communications resulting in the loss of valuable intelligence/counterintelligence information;

(c) Disclosure would assist the targets of intelligence/counterintelligence investigations in their efforts to design and create communications to feed the U.S. disinformation on a topic of importance to national security; and

(d) Disclosure would provide hostile entities the incite to develop technology that could ultimately be used against the United States.

(54) Any of these results of disclosure could potentially disrupt the intelligence gathering process by shutting off valuable sources of information to the United States. This

---

1117, 1121, 1124, 1128-1133, 1135-1137 1147, 1148, 1157-1159, 1163, 1353-1359,1362-1366, and 1373.

would severely hamper the FBI's law enforcement efforts to detect and apprehend those who seek to damage the national security through violations of the United States' national security and criminal laws. Thus, the information withheld to protect the FBI's telecommunications technology is properly classified at the "Secret" level and withheld pursuant to E.O. 12958, as amended § 1.4 (g).

## CLASSIFIED INFORMATION OF OTHER GOVERNMENT AGENCIES

(55)    The classified information contained on certain documents[25] originated with the Department of Defense and the Defense Intelligence Agency. The information is in the process of being referred to these agencies, and once their review is completed , the court will be provided with a separate Vaughn declaration which will address the classification decisions by the originating agencies.

## DEFENDANT'S BURDEN OF ESTABLISHING
## EXEMPTION ONE CLAIMS

(56)    The information withheld pursuant to Exemption 1 was examined in light of the body of information available to me concerning the national defense and foreign relations of the United States. This information was not examined in isolation. Instead, each individual piece of information was evaluated with careful consideration given to the impact that disclosure of this information will have on other sensitive information contained elsewhere in the United States intelligence community's files. Equal consideration was given to the impact that other information either in the public domain or likely known or suspected by present or potential adversaries of the United States, would have upon the information I examined.

---

[25] The information originating with other government agencies appears on DETAINEE DOCUMENTS 931, 935, 956, 959, 1005, 1009, 1011, 1033, 1044, 1046, 1068, and 1335-1340.

(57)     In those instances where, in my judgment, the disclosure of this information could reasonably be expected to cause serious damage to the national security, and its withholding outweighed the public benefit of disclosure, I exercised my prerogative as an original Top Secret classification authority and designated that information as classified in the interest of national security, and invoked Exemption 1 to prevent disclosure. Likewise, the justifications for the withheld classified information were prepared with the intent that they be read with consideration given to the context in which the classified information is found.

(58)     This context includes not only the surrounding unclassified information but also other information already in the public domain, as well as information likely known or suspected by other hostile intelligence entities. It is my judgment that any greater specificity in the descriptions and justifications set forth with respect to intelligence sources, intelligence methods or information relating to foreign relations of the United States, in this public declaration, could reasonably be expected to jeopardize the national security of the United States.

## EXEMPTION 2
## INTERNAL AGENCY RULES AND PRACTICES

(59)     5 U.S.C. § 552 (b)(2) exempts from disclosure information "related solely to the internal personnel rules and practices of an agency." This exemption protects routine internal administrative matters and functions of the FBI which have no effect on the public at large. Disclosure of this information could impede the effectiveness of the FBI's internal law enforcement procedures. Moreover, Exemption 2 also protects internal personnel rules and practices of the FBI where disclosure may risk circumvention of the law.

(60)     Exemption 2 has been asserted to protect the following categories of information:

-31-

(A) telephone and fax numbers; and (B) interrogation techniques, procedures and interview plans developed by the NCAVC, the BAU, and the CIRG.

## A.   **Telephone Numbers and Facsimile Numbers**

(61)   Exemption 2 has been asserted to protect the business telephone and fax numbers of FBI Special Agents ("SAs") responsible for interrogating detainees at Guantanamo Bay, Cuba, Iraq, Afghanistan, Iraq, and other locations.[26] Further, the FBI protected the business telephone and fax numbers of FBI support employees responsible for coordinating the FBI's behavioral analysis of the interview process at Guantanamo Bay. Further, the FBI protected the business telephone and fax numbers of FBI support employees responsible for providing instructions, guidance, and legal advice.

(62)   The business telephone numbers and fax numbers relate directly to the internal practices of the FBI in that they are used by these individuals during the performance of their duties. Disclosure of the telephone numbers of FBI SAs, and FBI support employees, could subject these individuals to harassing phone calls which could disrupt official business (including, impeding the ability of these employees to conduct and conclude law enforcement investigations in a timely manner). In addition, disclosure of the internal fax numbers of the FBI employees could cause these offices to be inundated with faxes which could also disrupt official business. Routine internal administrative information such as the business telephone phone numbers and fax numbers of FBI employees serve no public benefit, and there is no indication that there is a

---

[26] The FBI asserted Exemption 2 to protect telephone numbers and fax numbers of FBI SAs and support employees in DETAINEE DOCUMENTS 1; 851; 855; 861; 889; 923; 931; 959; 1004; 1043; 1067; 1106-1107; 1128; 1138-1139; 1156; 1161; 1165; 1172; 1178-1179; 1191; 1208; 1261; 1335; 1353 and 1385-1386.

genuine public interest in the disclosure of these numbers. Accordingly, because the internal business telephone numbers and fax numbers are solely related to the FBI's internal practices, because disclosure would not serve any public benefit, and because disclosure would impede the FBI's effectiveness, the FBI withheld this information pursuant to Exemption 2.

## B.   Interrogation Techniques, Procedures and Interview Plans Developed by the NCAVC, the BAU, and the CIRG

(63)   Exemption 2 has also been asserted to protect the interrogation techniques, procedures and interview plans developed by the NCAVC, the BAU, and the CIRG at Guantanamo Bay.[27] Specifically, the FBI asserted Exemption 2 to protect on-site assessments performed by the NCAVC, the BAU, and the CIRG. After September 11, 2001, FBI employees were deployed around the world to take the statements of individuals detained outside of the United States were believed to have information concerning the September 11, 2001 terrorist attacks, terrorism suspects and terrorist organizations. FBI SAs conducted interviews of numerous detainees at Guantanamo Bay. These individuals have provided the FBI with valuable intelligence information.

(64)   The NCAVC, the BAU, and the CIRG conducted on-site assessments of these detainees. The assessments contain the NCAVCs, the BAUs, and the CIRGs recommendations and opinions regarding the processing and interviewing of detainees at Guantanamo Bay. Specifically, the assessments contain the NCAVCs, the BAUs, and the CIRGs analysis of, and

---

[27] The FBI asserted Exemption 2 to protect interrogation techniques, procedures, and interview plans on DETAINEE DOCUMENTS 1; 851; 855; 861; 889; 923; 931; 959; 1004; 1043; 1067; 1106-1107; 1128; 1138-1139; 1156; 1161; 1165; 1172; 1178-1179; 1191; 1208; 1261; 1335; 1353 and 1385-1386. This information is also being withheld pursuant to Exemption 1, 5 U.S.C. § 552(b)(1).

recommendations concerning specific methods of interrogation for specific detainees. The assessments contain the details of the interrogation techniques and procedures used by the NCAVC, the BAU, and the CIRG.

(65)     The information at issue is internal because the on site assessments which contain the NCAVCs, the BAUs, and the CIRGs interrogation techniques, procedures and interview plans were developed by these divisions to coordinate all FBI behavioral-related support to the detainee interview process at Guantanamo Bay. Disclosure of this information would impede the effectiveness of the NCAVC, the BAU, and the CIRG in fighting the war on terrorism. Specifically, because the documents detail the specific approaches utilized by the NCAVC, the BAU, and the CIRG during interrogations, disclosure of this information would permit individuals to devise circumvention strategies. For example, the circumstances of the usefulness of the interrogation techniques, procedures, and interview plans are not widely known, and their use in concert with other elements of an investigation could compromise these techniques which would impede the effectiveness of the NCAVC, the BAU, and the CIRG.

(66)     Furthermore, disclosure of the specific interview plans developed for specific detainees would permit criminals or terrorists to gain specific knowledge of the circumstances under which detainees are interrogated which would permit them to devise circumvention strategies. Criminals or terrorists could use that information to adjust their behavior to avoid detection by the very law enforcement authorities responsible for interrogating these detainees. Ultimately, disclosure of the NCAVCs, the BAUs, and the CIRG interrogation techniques and procedures would only benefit those attempting to violate the law and avoid detection. As such, disclosure would impede the effectiveness of the FBI in obtaining valuable intelligence

information from detainees, and could reasonably be expected to risk circumvention of law.
Thus, the FBI properly protected this information pursuant to Exemption 2. Exemption 2 is cited
in conjunction with Exemption 7(E), see infra.

## EXEMPTION 5
## DELIBERATIVE PROCESS PRIVILEGE AND ATTORNEY-CLIENT PRIVILEGES

(67)    5 U.S.C. § 552 (b)(5) exempts from disclosure "inter-agency or intra-agency
memorandums or letters which would not be available by law to a party other than an agency in
litigation with the agency." This exemption has been construed to exempt those documents or
information normally privileged in the civil discovery context and it includes the deliberative
process and attorney-client privileges. The deliberative process privilege protects the internal
deliberations of the government by exempting from release recommendations, analyses, opinions,
speculation and other non-factual information prepared in anticipation of decision-making.
Generally, the attorney-client privilege protects confidential communications between an attorney
and her client relating to a legal matter for which the client has sought professional advice. This
privilege encompasses any opinions given by an attorney to her client based upon, and reflecting
those facts, as well as communications between attorneys that reflect client-supplied information.
The attorney-client privilege also protects confidential communications made to the attorney not
only by decision-making personnel, but also by lower-echelon employees.

(68)    In this case, the FBI protected information  which contains the opinions, advice,
evaluations, deliberations, policy formulation, proposals, conclusions or recommendations
covered by the deliberative-process privilege.[28]  Release of deliberative information would have

_____

[28] The FBI asserted Exemption 5 to protect information covered by the deliberative
process privilege in DETAINEE DOCUMENTS 20-39; 41-42; 44-47; 51-58; 60-73; 75-88; 90-

an inhibitive effect upon the development of FBI policy and administrative strategy. Further, the

FBI protected confidential communications between attorneys within its Office of the General

Counsel, FBI SAs, and other support employees.[29] Likewise, disclosure of the two-way

communications between the FBI's attorneys and their clients would impede the full disclosure of

all of the information that relates to the client's reasons for seeking legal advice, which is

necessary if the professional mission is to be carried out.[30]

## (b)(5)-1 -- DELIBERATIVE PROCESS PRIVILEGE

(69)    The FBI asserted the deliberative process privilege to protect the following

categories of information:  (A) draft documents;[31] (B) e-mails;[32] (C) Interview Techniques,

---

91; 93-122; 125-126; 128-142; 144-157; 159-176; 178-184; 187-197; 199-202; 204-224; 227-
273; 276-282; 284-285; 287-294; 296-333; 335-346; 352-400; 402-433; 435-461; 463-493; 497-
545; 549-592; 594-617; 621-674; 676-703; 705-735; 737-749; 751-802; 804-840; 842-844; 846-
850; 854-857; 862-863; 865-867; 869-885; 887-888; 890-899; 902-920; 922; 924-926;928-929;
32-938; 940-957; 960-964; 966-986; 988-1003; 1006-1039; 1042; 1045-1065; 1069-1077; 1079-
1098; 1152-1154; 1156-1159; 1163-1164; 1168-1178; 1181; 1189-1190; 1193-1195;
1197-1208; 1215-1220; 1222; 1225; 1230-1232; 1241; 1247-1250; 1256-1267; 1290-1291;
1306-1309; 1328-1333; 1335-1340; 1342-1349; 1353-1358; 1366 and 1373.

[29] The FBI asserted Exemption 5 to protect information covered by the attorney-client
privilege on DETAINEE DOCUMENTS 1179; 1201; 1223-1224; 1226; 1359 and 1374.

[30] The FBI asserted Exemption 5 to protect information covered by the attorney-client
and deliberative process privileges on DETAINEE DOCUMENTS 1099-1151; 1211; 1213-1214;
1221; 1223-1225; 1227-1229;1234-1238; 1255; 1298-1300; 1334; 1350; 1362-1368; 1370; 1373;
1375; 1377 and 1384-1385.

[31] The FBI asserted Exemption 5 to protect draft documents found at DETAINEE
DOCUMENTS 1353-61, 1362-1380.

[32] The FBI asserted Exemption 5 to protect e-mails found at DETAINEE DOCUMENTS
1150-1152; 1193, 1195, 1198, 1199, 1200, 1201-07, 1211, 1213, 1214, 1215-17, 1221, 1222,
1223, 1224-26, 1237-38, 1241, 1247, 1250, 1255, 1328, 1334, 1347; 1368-1370, and 1373-1376.

Procedures and Interview Plans Prepared by the NCAVC, the BAU, and the CIRG;[33] (D) Legal

Memoranda;[34] (E) Handwritten Notes;[35] (F) Repatriation Memoranda Prepared by the

Counterterrorism, Military Liaison & Detainee Unit concerning the continued detention, release,

or the repatriation of detainees held at Guantanamo Bay;[36] and (G) ECs.[37]

## A.   **Draft Documents**

(70)   The FBI withheld draft documents pursuant to the deliberative process privilege.

Specifically, the FBI withheld DETAINEE DOCUMENTS 1353-1361 which is a classified draft

Electronic Communication ("EC") which was never uploaded into the FBI's electronic system or

circulated within the FBI.[38]  The EC is a Word Perfect macro which replaces traditional

correspondence (i.e., Airtels, Memoranda, and Letters).  The purpose of this document is to

communicate within the FBI in a consistent format which can be uploaded onto the computer

network.  The document contains recommendations regarding suggested modifications of the

---

[33]  The FBI asserted Exemption 5 to protect interrogation techniques, procedures and interview plans prepared by the NCAVC, the BAU, and the CIRG found at DETAINEE DOCUMENTS DETAINEE DOCUMENTS 1162-67, 1168-78, 1218-19, 1230-31, 1232, 1248-1249, 1257-59, 1290-91, 1306, 1308, 1309, 1329-33, 1343-49.

[34]  The FBI asserted Exemption 5 to protect legal memoranda found at DETAINEE DOCUMENTS 1227-29, 1234-36, 1298-1300; 1384-1385.

[35]  The FBI asserted Exemption 5 to protect handwritten notes found at DETAINEE DOCUMENTS 1102-1153, 1350.

[36]  The FBI asserted Exemption 5 to protect Repatriation Memoranda found at DETAINEE DOCUMENTS 4-1101.

[37]  The FBI asserted Exemption 5 to protect certain information contained within ECs found at DETAINEE DOCUMENTS 1156-1160, 1179-1188, 1197, 1261-1267, 1353-1361.

[38]  This information is also being withheld pursuant to Exemption 1, 5 U.S.C. § 552(b)(1), see infra.

-37-

FBI's presence in Afghanistan. The document is predecisional because it was never formally adopted or presented to employees within the FBI as official FBI policy. Thus, disclosure of the draft EC prior to the adoption of agency policy would only result in public confusion. The document is deliberative because it contains recommendations regarding modifications of the FBI's presence in Afghanistan. In this case, because the EC contains recommendations which were never formally adopted by the FBI, disclosure would tend to inhibit these types of communications. If this information were disclosed, FBI personnel would be reluctant to provide such candid recommendations in the future.

(71)    Furthermore, the FBI withheld DETAINEE DOCUMENTS 1362-1367 which is a draft briefing memorandum[39] prepared by FBI General Counsel ("GC") Valerie Caproni for Director Robert S. Mueller in preparation for his May 20, 2004 testimony before the Senate Judiciary Committee and other broad-ranging requests the FBI received regarding its role in the detainee abuse scandal.[40] The document is predecisional because the GC did not make the final decision as to which information contained in the briefing memorandum would be presented to Congress. The document is deliberative because the briefing document summarizes issues and advises the GC of those issues. Disclosure of this draft document would discourage frank discussions on matters of policy between subordinates and superiors which is likely to have an

---

[39] It should be noted that the briefing memorandum is labeled "privileged, draft, not for further dissemination." Portions of this document have been referred to other government agencies pursuant to 28 C.F.R. § 16.4 (2003), see infra. Portions of this document have also been withheld pursuant to Exemption 1, 5 U.S.C. § 552(b)(1), see infra.

[40] It should be noted that Director Mueller's testimony was not identified for the production of the August 24, 2004 log. The FBI has been unable to locate a transcript of that testimony.

inhibitive effect on such communications. Furthermore, disclosure of this draft briefing

memorandum is likely to prevent government employees from engaging in full, frank, open

internal discussions.

**B.    E-mails**

(72)    E-mail operates as a way for individual FBI employees to communicate with each

other about current matters without having to leave their offices. These "discussions," which get

memorialized online, are part of the exchange of ideas and suggestions that accompanies all

decision-making and typically reflect the very preliminary assessments by FBI personnel about

issues on which they may be asked to make recommendations. Before the advent of computers,

these discussions probably would have occurred only orally with no record of their existence

being kept. The fact that these discussions are now recorded should not obscure the fact that they

are simply conversations among and between FBI personnel. These discussions are part of the

give and take of agency deliberations. If e-mail messages such as these are routinely released to

the public, FBI employees will be much more circumspect in their online discussions with each

other. This lack of candor will seriously impair the FBI's ability to foster the forthright, internal

discussions necessary for efficient and proper decision-making. Furthermore, exempting such

documents from disclosure also protects against public confusion that might result from

disclosure of preliminary opinions and information that do not, in fact, reflect the final views or

policies of the FBI. The deliberative process privilege is designed to protect not only documents

but also the integrity of the deliberative process itself where the exposure of the process would

result in harm.

(73)    In this case, the FBI protected e-mails from the Inspection Division to attorneys

-39-

within its Office of the General Counsel regarding the Inspection Division's inquiry into the

activities of FBI personnel at Abu Ghraib prison (DETAINEE DOCUMENT 1150, 1153-55).

The e-mails contain advice, opinions and recommendations of Inspectors within the Inspection

Division. Furthermore, the FBI protected e-mails concerning interrogation techniques,

procedures, and interview plans developed by the NCAVC, the BAU, and the CIRG (DETAINEE

DOCUMENTS 1193, 1195, 1198, 1199, 1200, 1201, 1202, 1203, 1204, 1205, 1206, 1207, 1215,

1216, 1217, 1222, 1241, 1247, 1250, 1328, and 1347).[41] These e-mails contain the NCAVCs, the

BAUs, and the CIRGs advice, opinions and recommendations concerning the interrogation of

detainees. The FBI also protected e-mails from FBI SAs within its CTD, NCAVC, BAU, and

CIRG divisions to attorneys within OGC seeking legal advice concerning the legality of certain

interrogation techniques being performed at Guantanamo Bay (DETAINEE DOCUMENTS 1211,

1213, 1214, 1221, 1223, 1224, 1225, 1226, 1237, 1238, 1255, 1334, 1368, 1369, 1370, 1373,

1374, 1375, 1376).[42] These e-mails contain these employees opinions and recommendations.

Lastly, the FBI protected e-mails from FBI SAs within its CTD, NCAVC, BAU, and CIRG

divisions which provide guidance concerning the interrogation of detainees in Afghanistan

(DETAINEE DOCUMENTS 1151-52).[43] All of these e-mails are preliminary opinions which do

not reflect the final views of the FBI, and are therefore pre-decisional. The e-mails are

---

[41] This information is also being withheld pursuant to Exemption 1, 5 U.S.C. § 552(b)(1),
see infra.

[42] This information is also being withheld pursuant to Exemption 1, 5 U.S.C. § 552(b)(1),
see infra.

[43] These documents are discussed in further detail below. Portions of these e-mails are
being withheld pursuant to Exemption 1, 5 U.S.C. § 552(b)(1), see infra.

deliberative because they express advice, opinions and recommendations. Thus, disclosure of this deliberative information is likely to stifle communications within the FBI.

## C.    Interrogation Techniques, Procedures and Interview Plans Prepared by the NCAVC, the BAU, and the CIRG

(74)    The FBI asserted Exemption 5 to protect the observations, opinions, and recommendations (including interview plans developed for specific detainees) prepared by the NCAVC, the BAU, and the CIRG during on-site assessment reviews at Guantanamo Bay (DETAINEE DOCUMENTS 1162-67, 1168-78, 1218-19, 1230-31, 1232, 1248-1249, 1257, 1259, 1290, 1291, 1306-09, 1329-33, 1343-49). The documents are pre-decisional because they do not reflect the final views of the FBI. The documents are deliberative because they contain the NCAVCs, BAUs, and the CIRGs opinions, advice, evaluations, deliberations, policy formulations, proposals, and recommendations. Release of this deliberative information would have an inhibitive effect upon its ability to conduct such assessments in the future.

## D.    Legal Memoranda

(75)    The FBI asserted the deliberative process privilege to protect a document titled "Legal Issues re Interrogation Techniques" (DETAINEE DOCUMENTS 1227-29, 1234-36, 1298-1300).[44] The document was prepared by an attorney within the CIRG. The document contains a legal analysis of various interrogation techniques and laws governing the interrogation of detainees. The memorandum was circulated among attorneys within OGC who provided legal advice and analysis of the memorandum. The memorandum is predecisional in that it does not reflect the final views of the FBI. The memorandum is deliberative in that it contains the CIRGs

---

[44] DETAINEE DOCUMENTS 1230-32, 1234-36, 1298-1300 are duplicates.

-41-

attorneys analysis, recommendations, and advice concerning the use of certain interrogation techniques. Given the predecisional and deliberative nature of the memorandum, disclosure of its contents would stifle full and frank communications of issues facing the FBI.

(76)    Furthermore, the FBI protected a classified legal memorandum titled "Blind Spirit; Corruption Federal Public Official-Executive Branch" (hereinafter "Blind Spirit ") (DETAINEE DOCUMENTS 1384-1385).[45] The document contains the legal analysis and recommendations of an FBI attorney regarding the "Blind Spirit" investigation. Because this document is classified, further description of the memorandum would disclose the very information the FBI seeks to protect. The memorandum is predecisional in that it does not contain the FBI's final views regarding this investigation. The memorandum is deliberative in that it contains the advice and recommendations of an FBI attorney concerning the conduct of the investigation and was prepared for his/her supervisor. Thus, because the memorandum is predecisional and deliberative, disclosure of this memorandum is likely to stifle full and frank communications within the FBI.

## E.    **Handwritten Notes**

(77)    In addition, the FBI asserted Exemption 5 to protect the handwritten notes of the GC Valerie Caproni (DETAINEE DOCUMENTS 1102-1153, 1350).[46] Furthermore, the FBI protected DETAINEE DOCUMENT 1377 which contains the handwritten notes of a law clerk who was tasked to perform research for the GC in connection with her preparation for Director Mueller's May 20, 2004 Congressional testimony. Disclosure of this document would permit an

---

[45] This information is also being withheld pursuant to Exemption 1, 5 U.S.C. § 552(b)(1), see infra.

[46] Some of the information is also being withheld pursuant to FOIA Exemption 1, 5 U.S.C. § 552(b)(1), see infra.

indirect inquiry in to the mental processes of the GC. Certain notes were taken by the GC in anticipation of Director Mueller's May 20, 2004 testimony before the Senate Judiciary Committee.[47] The withheld information includes the GCs' selection and analysis of particular facts and information obtained from FBI SAs, OGC attorneys and other support employees. The handwritten notes represent a distillation of significant facts which constitutes an exercise of judgment by the GC. The factual information is inextricably connected with the GCs' deliberations. Disclosure of the distilled facts would permit an indirect inquiry into the mental process of the GC. Disclosure of the GCs selection and analysis of specific facts would have a repressive and stifling effect on the FBI, which could adversely effect the successful performance of the FBI's mission.

## F.    Repatriation Memoranda Concerning the Continued Detention, Release or Repatriation of Detainees at Guantanamo Bay

(78)    The FBI asserted Exemption 5 to protect Repatriation Memoranda prepared by the CTDs, MDLU which conducted threat assessments of detainees at Guantanamo Bay at the direction of the DOJ, Assistant Attorney General ("AAG"). The memoranda were compiled to include investigative information obtained from the DOD and other law enforcement sources. The memoranda contain FBI SAs opinions, recommendations, and deliberations regarding whether to release, continue detention, or repatriate specific detainees. The memoranda are narrative in form and contain the personal information concerning each detainee, as well as an analysis of the detainees background.[48] Furthermore, the memoranda contain specific facts

---

[47] Director Mueller's testimony is discussed supra.

[48] The FBI withheld the personal identifying information of these detainees pursuant to Exemption 6 and 7(C), 5 U.S.C. §§ 552(b)(6) and (b)(7)(C), discussed infra.

-43-

selected by FBI SAs which form the bases for their decision to recommend release, continued

detention, or repatriation. The Repatriation Memoranda represent a distillation of significant facts

and  constitutes an exercise of judgment by FBI SAs. The background information of each

detainee is inextricably connected with the FBI SAs deliberations. Disclosure of the distilled facts

upon which FBI SAs base their decisions would permit an indirect inquiry into the mental process

FBI SAs undertake when making these recommendations. The Repatriation Memoranda are

predecisional in that the FBI does not make the final determination as to whether these detainees

should be released, remain in detention, or repatriated. The memoranda are deliberative because

they contain a distillation of specific facts by FBI SAs upon which a recommendation is made.

The memoranda are deliberative because they contain FBI SAs advice, opinions and

recommendations. Thus, disclosure of the Repatriation Memoranda could harm these

deliberations, and as a result could stifle frank communications within the FBI and the DOJ.

## G.    **Electronic Communications ("ECs")**

(79)    The FBI asserted Exemption 5 to protect ECs prepared by the CTD concerning the

FBI's global war on terrorism (DETAINEE DOCUMENTS 1156-1160).[49]  DETAINEE

DOCUMENTS 1156-1160 contain FBI SAs opinions, recommendations, and deliberations

regarding operations in Afghanistan.  Specifically, the EC contains the SAs analysis of the FBI's

resources in Afghanistan.  Furthermore, the FBI asserted Exemption 5 to protect certain

information within an EC prepared by the Inspection Division during its inquiry into the activities

of FBI personnel at Abu Ghraib prison from October 2003 through December 2003 (DETAINEE

---

[49]  This information is also being withheld pursuant to Exemption 1, 5 U.S.C. § 552(b)(1),
see supra.

DOCUMENTS 1179-1185, 1353-61).[50]  DETAINEE DOCUMENTS 1179-1185, 1353-1361

contain the opinions, discussions, and deliberations of FBI SAs regarding the interrogation

techniques of FBI employees during the inquiry.  Lastly, the FBI protected on-site assessments of

detainees at Guantanamo Bay prepared by the NCAVC, the BAU, and the CIRG (DETAINEE

DOCUMENTS 1162-67, 1197, 1261-67).[51]  DETAINEE DOCUMENTS 1197, 1261-67 contain

the opinions and recommendations of the NCAVC, the BAU, and the CIRG  regarding

interrogation techniques and tactics, as well as its analysis of the interrogation plans of specific

detainees.  Given the content of the ECs, they are predecisional and deliberative.  Disclosure of

the deliberative information contained within the ECs would have an inhibitive effect on the

exchange of frank communications within the FBI.

### (b)(5)-2 -- ATTORNEY-CLIENT PRIVILEGE

(80)     The FBI asserted Exemption 5 to protect information covered by the attorney-client

privilege for the following documents:  (A) Draft Documents; (b) E-mails; (B) Handwritten notes;

and (C) Legal Memoranda.

### A.     Draft Documents

(81)     As previously discussed, the FBI withheld DETAINEE DOCUMENTS 1362-1380

which is a draft briefing memorandum prepared by GC Valerie Caproni for Director Mueller in

preparation for his May 20, 2004 testimony.[52]  The document contains information supplied by

---

[50]  This document is discussed infra.

[51]  This information is also being withheld pursuant to Exemption 1, 5 U.S.C. § 552(b)(1),
see infra.

[52]  It should be noted that this document is labeled "privileged, draft, not for further
dissemination."  Portions of this document have been referred to other government agencies

FBI SAs within the CTD, NCAVC, BAU, and CIRG divisions to the GC who is the chief legal advocate for the FBI. The document was drafted to provide sound legal advice to Director Mueller. The document represents the GCs exercise of independent judgment as an advocate for the FBI. The draft document represents a selection of relevant and important facts which is a clear demonstration of the exercise in independent judgment. In this case, the facts divulged by the GCs clients, as well as the opinions given by the GC to Director Mueller based on those facts, is the type of communication that are protected by the attorney-client privilege. Disclosure of this draft document, which is protected by the attorney-client privilege would discourage full and frank communications between the GC and her clients when they are seeking legal advice.

**B.    E-mails**

(82)    The FBI has asserted Exemption 5 to protect e-mails covered by the attorney-client privilege because disclosure would reveal confidential communications between OGC attorneys, FBI SAs, and other support employees relating to legal matters for which FBI SAs and support employees have sought professional legal advice. In this case, the FBI protected e-mails from FBI SAs within its CTD, NCAVC, and CIRG divisions to attorneys within the OGC seeking legal advice concerning the legality of certain interrogation techniques being performed at Guantanamo Bay (DETAINEE DOCUMENTS 1211, 1213, 1214, 1221, 1223, 1224-26, 1237-38, 1255, 1334, 1368-1370, 1373-1376). The e-mails contain the OGC attorneys advice, opinions, recommendations and legal analysis of interrogation techniques being performed at Guantanamo Bay. Furthermore, the FBI protected e-mails from FBI SAs to attorneys within OGC seeking legal

pursuant to 28 C.F.R. § 16.4 (2003), see infra. Portions of this document have also been withheld pursuant to Exemption 1, see infra.

-46-

advice and guidance concerning the interrogation of detainees in Afghanistan (DETAINEE DOCUMENTS 1151-52). The e-mails contain OGC attorneys advice, opinions, recommendations, and legal analyses of interrogations of detainees in Afghanistan. Lastly, the FBI protected an e-mail from the Inspection Division to GC Valerie Caproni seeking the GCs opinions, advice, and recommendations regarding the Inspection Divisions inquiry into the activities of FBI personnel at Abu Ghraib prison (DETAINEE DOCUMENT 1150).

(83)    The internal e-mails contain confidential communications among FBI attorneys and FBI SAs, which reflect OGC attorneys advice, opinions, and recommendations based upon information supplied by FBI SAs and other support employees. Some of these communications contain questions posed by FBI SAs regarding interrogation techniques to OGC attorneys. Furthermore, the communications reflect the legal advice provided by OGC attorneys to FBI SAs in response to those questions. Lastly, the e-mails reflect discussions among attorneys within OGC concerning the formulation of FBI policy concerning the interrogation of detainees. The attorney-client privilege fundamentally applies to this information. Any opinions given by OGC attorneys to their clients based on client-supplied facts are entitled to protection. Disclosure of the attorney-client privileged information would vitiate the value of attorney-client privileged communications, which could adversely effect the performance of the FBI's mission.

## C.    **Handwritten Notes**

(84)    The FBI asserted Exemption 5 to protect the handwritten notes of the GC Valerie Caproni (DETAINEE DOCUMENTS 1102-1153).[53] As mentioned above, the notes were taken

---

[53] Portions of these notes are being withheld pursuant to Exemption 1, 5 U.S.C. § 552(b)(1), see infra.

by the GC in anticipation of Director Mueller's May 20, 2004 testimony before the Senate

Judiciary Committee. The GC is the FBI's chief advocate. The notes reflect a distillation of

significant facts which constitutes an exercise of judgment by the GC. The handwritten notes

reflect client supplied information. Disclosure of the GCs handwritten notes would vitiate the

value of attorney-client privileged communications, which could adversely effect the performance

of the FBI's mission.

## D.      **Legal Memoranda**

(85)     The FBI asserted Exemption 5 to protect a document concerning the legality of

interrogation techniques (DETAINEE DOCUMENTS 1227-29, 1234-36, 1298-1300).[54]  The

document contains a legal analysis of various interrogation techniques and laws governing the

interrogation of detainees. The memorandum is based upon client supplied information. The

memorandum was circulated among attorneys within OGC  who provided legal advice and

analysis of the memorandum. Furthermore, the FBI protected a classified legal memorandum

concerning the Blind Sprit investigation (DETAINEE DOCUMENTS 1384-1385).[55]  The

document contains the legal analysis and recommendations of an FBI employee concerning the

investigation. Because this document is classified, further description of the memorandum would

disclose the very information the FBI seeks to protect. Disclosure of material protected by the

attorney-client privilege would have a repressive and stifling effect on the attorneys within the FBI

who would be reluctant to communicate with their clients, as well as client's who may limit the

---

[54] This document is discussed supra.

[55] This information is also being withheld pursuant to Exemption 1, see infra. The document is discussed supra.

information they provide their attorneys when seeking legal advice out of fear that the communications may be exposed to the public. Ultimately, disclosure of legal memoranda prepared by FBI attorneys would vitiate the value of attorney-client privileged communications.

## EXEMPTION (b)(6)
## CLEARLY UNWARRANTED INVASION OF PERSONAL PRIVACY

(86) 5 U.S.C. § 552(b)(6) exempts from disclosure:

> personnel and medical files and similar files when the disclosure of such information would constitute a clearly unwarranted invasion of personal privacy.

(87) In asserting this exemption, each piece of information was scrutinized to determine the nature and strength of the privacy interest of any individual whose name and/or identifying information appears in the documents at issue. In withholding the information, the individual's privacy interest was balanced against the public's interest in disclosure. In making this analysis, public interest information was determined to be information which would shed light on the FBI's performance of its statutory duties. In each instance where information was withheld, it was determined that individual privacy rights outweighed the public interest. The only recognized public interest is that which sheds light on the operations and activities of the federal government.

### (b)(6)-1   Names of and/or identifying Information of FBI Personnel (SAs and Support Employees)

(88) Exemption (b)(6)-1 has been asserted to protect the names and identifying information of FBI SAs responsible for interrogating detainees held at Guantanamo Bay and SAs in the Inspection Division who conducted an inquiry into the activities of FBI personnel at Abu Ghraib prison from October 2003 through December 2003. In addition, the FBI protected the names of FBI SAs in the CTD, NCAVC, BAU and CIRG divisions who sought legal advice from

OGC attorneys. Furthermore, the FBI asserted Exemption 6 to protect the names of FBI SAs within the NCAVC, the BAU, and the CIRG responsible for coordinating the FBI's behavioral related support to the interview process. Lastly, the FBI protected the names and identifying information of support employees (OGC attorneys) responsible for providing legal advice to FBI SAs conducting investigations of these individuals.[56]

(89)    After September 11, 2001, the FBI began the process of interviewing detained terror suspects in Afghanistan, Guantanamo Bay and other locations in an effort to determine who is responsible for the attacks, and to obtain valuable intelligence information from these detainees in order to prevent future terrorism attacks. The treatment of these detainees by the Department of Defense, the Central Intelligence Agency, the Department of State, and the FBI has been the subject of intense media scrutiny. For example, prisoner abuse at the Abu Ghraib prison has been well-documented in the press. Accordingly, given the intense media scrutiny of the prisoner abuse scandal, as well as the publicity (adverse or otherwise) regarding the role of these FBI employees in the interrogation of these detainees, disclosure of their identities may seriously impede their effectiveness in conducting intelligence investigations, and other investigations in which they may become involved at a later date. Given the intense media scrutiny of the FBI's role in the interrogation of detainees at Guantanamo Bay, Afghanistan, Abu Ghraib, and other

---

[56] The FBI asserted Exemption 6 to protect the names and identifying information of FBI SAs and support employees in DETAINEE DOCUMENTS 1; 4; 16-17; 19; 40; 48; 50; 59; 74; 101; 124; 143; 177; 186; 198; 226; 274; 334; 345; 347-351; 434; 494; 496; 546; 548; 593; 618-620; 736; 851; 853; 855; 858-861; 889; 900-901; 921; 923; 930-931; 958-959; 987; 1004-1005;1043-1044; 1067-1068; 1099-1100; 1102-1105; 1107-1120; 1122; 1124-1154; 1156-1159; 1161-1163; 1167; 1169-1171; 1179-1184; 1186-1187; 1189-1239; 1241-1250;1254-1267; 1298; 1328-1331; 1334-1336; 1338-1340; 1342-1344; 1346-1350; 1353-1354; 1359; 1365-1366; 1368-1371; 1373-1375; 1381; 1384 and 1386.

locations, disclosure of the names and identifying information of these employees could subject

them to unauthorized inquiries by members of the media and the general public who seek access

to this type of information. Furthermore, disclosure of their identities could subject these

employees to threats and intimidation. Accordingly, the FBI determined that the FBI SAs and

support employees referenced in the responsive records maintain a substantial privacy interest in

not having their identities disclosed.

(90)    The FBI next examined the records at issue to determine whether there was any

public interest that outweighed the substantial privacy interests of the FBI SAs and support

employees. The FBI could not identify any discernible public interest. The disclosure of the

names of FBI SAs and support employees would not demonstrate how the FBI performs its

statutory duties pursuant to 18 U.S.C. § 2332(b) (2003) (Acts of Terrorism Transcending

National Boundaries). Although there have been allegations of abuse by government officials,

there have been no allegations that FBI SAs and support employees engaged in the type of

significant misconduct which would establish a public interest in the disclosure. More

specifically, there has been no allegations that FBI employees abused detainees held at

Guantanamo Bay, Afghanistan, Abu Ghraib and other locations. Thus, the disclosure of the

names of FBI SAs and support employees would shed no light on the performance of the FBI's

statutory duties. Ultimately, disclosure of the names of these employees would constitute a

clearly unwarranted invasion of their personal privacy. Therefore, the FBI has properly asserted

Exemption 6. Exemption (b)(6)-1 has been invoked in conjunction with Exemption (b)(7)(C)-1,

infra. The rationale for protecting the identities of FBI SAs and support employees pursuant to

(b)(6)-1 is the same as the rationale for protecting the identities of FBI SAs and support

employees pursuant to Exemption (b)(7)C)-1.

## (b)(6)-2    Names and Identifying Information of non-FBI Federal Employees

(91)    Exemption (b)(6)-2 has been asserted to protect the names and identifying

information of non-FBI federal employees.[57] The relevant inquiry here is whether public access

to this information would violate a viable privacy interest of the subjects of such information.

Disclosure of this identifying information could subject these employees to unauthorized

inquiries and harassment which could constitute an unwarranted invasion of their personal

privacy. The rationale for protecting non-FBI federal employees is the same as that for FBI

employees. (See infra.) Exemption (b)(6)-2 is cited in conjunction with (b)(7)(C)-2, infra.

### (b)(6)-3    Names and Identifying Information of Foreign Detainees Interviewed by the FBI

(92)    Exemption (b)(6)-3 has been asserted to protect the names and identifying

information of detainees interviewed by the FBI at Guantanamo Bay, Afghanistan, and other

locations.[58] As mentioned above, the FBI conducted interviews of these detainees to identify

---

[57]  The FBI asserted Exemption 6 to protect the names and identifying information of non-FBI federal employees in DETAINEE DOCUMENTS 15; 1122-1123; 1125-1126; 1128-1135; 1137-1148; 1154; 1158; 1162-1163; 1169-1171; 1186-1187; 1189-1190; 1193-1194; 1199; 1201; 1203-1204; 1211; 1213-1218; 1221-1226; 1232-1233; 1237; 1247; 1256-1257; 1262-1265; 1329-1331; 1334-1338; 1340; 1343-1346; 1354; 1359; 1363; 1366; 1368; 1370; 1373-1375; 1377; 1381 and 1384.

[58]  The FBI asserted Exemption 6 to protect the names and identifying information of detainees interviewed by FBI SAs in DETAINEE DOCUMENTS 15; 21-42; 44-47; 50-88; 90-122; 124-184; 186-225; 227-273; 276-285; 287-350; 352-461; 463-546; 548-617; 620-703; 705-749; 751-802; 804-840; 842-844; 846-850; 854; 856-857; 862-863; 865-867; 869; 871; 873-885; 887; 890; 892; 894; 896; 898; 902-920; 922; 924-926; 928-929; 932-936; 938; 940-957; 960-962; 964; 966-971; 973-979; 981; 983-986; 988-1003; 1006-1013; 1015-1016; 1018-1020; 1022-1036; 1038-1039;1041; 1045-1053; 1054; 1057-1061; 1063-1065; 1069-1077; 1079-1082; 1084; 1086-1091; 1093-1095; 1097-1099; 1102; 1105-1107; 1111; 1116-1117; 1121-1122; 1126;

-52-

those individuals responsible for the September 11, 2001 terrorist attacks and to gather intelligence information about terrorist suspects, groups, and future terrorist attacks. More specifically, the DOJ, AAG requested that the FBI provide comments and recommendations to assist the AAG's assessment of detainees located at Guantanamo Bay, Afghanistan, and other locations for the purpose of continued detention, release, or repatriation. The interviews are in narrative form and contain the name, place of birth, educational level, of the detainees.

(93)    To release the identities of these foreign detainees would not only constitute an unwarranted invasion of their personal privacy, but could subject these individuals to harassment or embarrassment, or result in undue public attention. Thus, the FBI determined that the disclosure of the personal identifying information of these detainees could reasonably be expected to constitute a clearly unwarranted invasion of personal privacy. After identifying the substantial privacy interests of the detainees, the FBI balanced this interest against the public interest in disclosure because disclosing the names and identifying information of the detainees will not shed light on the activities of the FBI. The FBI could not identify any discernible public interest in disclosure. Accordingly, the FBI has properly withheld this information pursuant to Exemption (b)(6)-3. Exemption (b)(6)-3 has been invoked in conjunction with Exemption (b)(7)(C)-3 and (b)(7)(D)-1.

---

1128; 1130-1132; 1135-1137; 1139; 1147; 1157; 1159; 1170; 1182-1183; 1186-1187; 1189-1190;1198-1199;1329-1331; 1336 and 1381.

**(b)(6)-4**    **Names and Identifying Information of Third Parties of Investigative Interest to the FBI**

(94)    Exemption (b)(6)-4 has been asserted to protect the names and identifying information of foreign detainees of investigative interest to the FBI.[59]  Specifically, the FBI withheld the names and identifying information of detainees of investigative interest who are currently being held, or who were formerly held at Guantanamo Bay, Afghanistan, and other locations.  Furthermore, the FBI withheld the names and identifying information of terrorist suspects who are of investigative interest to the FBI.  To release the identities of these foreign detainees as the subjects of law enforcement interest would not only constitute a clearly unwarranted invasion of their personal privacy, but could subject these individuals to harassment, embarrassment, or intimidation, or result in undue public attention.  Accordingly, these individuals maintain a substantial privacy interests in not having their identities disclosed.

(95)    In considering the public interest in this information, the FBI determined that there is no public interest to be served by releasing the identities of these third-party individuals because this information will not shed light on the operations and activities of the FBI, but would only identify certain individuals as being of interest to the FBI.  Any such disclosure would constitute an unwarranted invasion of their personal privacy.

___

[59]  The FBI asserted Exemption 6 to protect the names and identifying information of detainees of investigative interest in DETAINEE DOCUMENTS 18; 20-42; 44-47; 50-88; 90-122; 125-184; 186-225; 227-273; 275-285; 287-350; 352-461; 463-546; 548-617; 620-703; 705-749; 751-802; 804-840; 842-850; 1099; 1102; 1105-1107; 1110-1111; 1116-1117;1121-1122; 1126; 1128; 1130-1132; 1135; 1137; 1139; 1147; 1157; 1159; 1182-1183;1186-1187; 1189-1190; 1198-1199; 1201; 1203-1204; 1206-1208; 1218-1220; 1222-1223; 1230; 1232; 1238; 1262; 1264-1265; 1306-1309; 1328-1331; 1335-1340; 1343-1344; 1346-1348; 1362-1363; 1365-1367; 1373 and 1381.

(96)    In balancing the substantial privacy interest that these individuals have in this information against no legitimate public interest in its disclosure, the FBI determined that this information was properly withheld pursuant to Exemption (b)(6)-4. Exemption (b)(6)-4 has been invoked in conjunction with (b)(7)(C)-4 and (b)(7)(D)-1.

### (b)(6)-5    Names of Third Parties Merely Mentioned

(97)    Exemption 6 has been asserted to withhold the names of third parties who were merely mentioned during the course of interviews of detainees at Guantanamo Bay, Afghanistan and other locations.[60] These individuals are not of investigative interest to the FBI, but were merely mentioned during the course of these interviews. Disclosure of the identities of these third parties in this context could cause unsolicited and unnecessary attention to be focused on them and disclosure may embarrass them. For these reasons, the FBI has determined that the third party individuals merely mentioned in the responsive records maintain a strong privacy interest in not having their identities disclosed.

---

[60] The FBI asserted Exemption 6 to protect the names of third parties merely mentioned in DETAINEE DOCUMENTS 6-8; 15; 20; 23; 25; 28; 32-33; 35-37; 51-52; 55; 57; 60-66; 70; 75; 77; 79-80; 82-86; 88; 92; 94; 96-99; 102-109; 111; 113-114; 116-122; 126-128; 132; 134-142; 144-149; 151-157; 159-160; 162-163; 165-168; 170-175; 178; 181-184; 187-194; 196-197; 199-202; 204; 206-208; 210-219; 221-224; 227-228; 230-231; 234-244; 247-252; 254-257; 260-261; 263; 267-273; 276-281; 284-285; 287-289; 291-293; 296-297; 299-302; 305; 307-309; 311; 313-314; 316-328; 330-332; 335-337; 339-341; 343; 346; 350; 352-356; 359-362;365-368; 370; 372; 378-380; 382; 385-388; 390-393; 396; 400; 402; 405; 408; 411; 415; 417; 420-422; 424-427; 429-433; 435; 438-440; 442-452; 454-457; 459-461; 463-465; 467-477; 479-486; 488-492; 497-504; 506-513; 515-519; 521-535; 538-545; 549-557; 559-592; 594-617; 621-622; 624-629; 631-650; 652; 654-656; 658-663; 665-669; 671-674; 676; 678; 679-696; 699; 702; 706-707; 711-712; 714-718; 720-723; 725-726; 728; 730-734; 739-749; 751-758; 760-761; 764; 770-773; 776-778; 780-782; 787-789; 796-797; 800-802; 804-821; 824-825; 827-831; 833; 836; 843-844; 846-850; 1099; 1102; 1104-1107; 1109-1122; 1126; 1128; 1130-1132; 1135; 1137; 1139;1147-1148; 1154; 1157-1159; 1171; 1183; 1201; 1203; 1207; 1215-1216; 1332; 1368; 1374; and 1384.

-55-

(98)    After identifying the substantial privacy interest of the third parties merely

mentioned in the e-mails and detainee interviews, the FBI balanced those interests against the

public interest in disclosure.  The FBI could identify no discernible public interest in the

disclosure of this information because the disclosure of third parties' names will not shed light on

the operations and activities of the FBI.  Accordingly, the FBI determined that the disclosure of

this information would constitute an unwarranted invasion of personal privacy.  Thus, the FBI

properly protected the names of these third parties merely mentioned in the responsive records

pursuant to Exemption (b)(6)-5.  Exemption (b)(6)-5 has been invoked in conjunction with

Exemption (b)(7)(C)-5, infra.

## EXEMPTION 7
## EXEMPTION 7 THRESHOLD

(99)    Exemption 7 of the FOIA protects from mandatory disclosure records or

information compiled for law enforcement purposes, but only to the extent that disclosure could

reasonably be expected to cause one of the harms enumerated in the subpart of the exemption.

See 5 U.S.C. § 552(b)(7).  In this case, the harm that could reasonably be expect to result from

disclosure concerns personal privacy, confidential sources, law enforcement techniques, and

endangering the life or physical safety of any individual.

(100)   Before an agency can invoke any of the harms enumerated in Exemption 7, it

must first demonstrate that the records or information at issue were compiled for law

enforcement purposes.  Law enforcement agencies such as the FBI must demonstrate that the

records at issue are related to the enforcement of federal laws and that the enforcement activity is

within the law enforcement duty of that agency.

-56-

(101)   The records at issue in this case were compiled during the course of the FBI's interrogation of detainees held at Guantanamo Bay, Afghanistan, and other locations pursuant to 18 U.S.C. § 2332(b) (2003). In support of the FBI's overriding mission of identifying those responsible for the September 11, 2001 attacks and preventing acts of terrorism, the FBI deployed SAs around the world to interview terrorist suspects detained in Afghanistan, Guantanamo Bay, and other locations.

(102)   The documents at issue relate to FBI's overriding mission. More specifically, the documents are comprised of e-mails, legal memoranda and ECs concerning interrogation techniques and procedures (including an inquiry into the activities of FBI personnel at Abu Ghraib),[61] Repatriation Memoranda, on-site assessments prepared by the NCAVC, the BAU, and the CIRG.  Because the documents at issue relate to the FBI's mission of identifying terrorists and preventing acts of terrorism, these documents were compiled for law enforcement purposes because the FBI's actions were taken pursuant to 18 U.S.C. § 2332(b).  Thus, the enforcement activity is within the law enforcement duties of the FBI.  Accordingly, the information at issue readily meets the threshold requirement of Exemption 7.  The remaining inquiry is whether their disclosure "could reasonably be expected to constitute an unwarranted invasion of personal privacy," disclose the identity of a confidential source," "reveal law enforcement techniques," or "endanger the life of any individual."

---

[61]   It should be noted that the inquiry into the activities of FBI personnel at Abu Ghraib prison were compiled for law enforcement purposes.  The documents were compiled pursuant to specific allegations of governmental misconduct during the interrogation of these detainees.  The documents were not compiled as a result of the general monitoring of its employees.

-57-

## **EXEMPTION 7(C)**
## **UNWARRANTED INVASION OF PERSONAL PRIVACY**

(103)      5 U.S.C. § 552 (b)(7)(C) exempts from disclosure:

> records or information compiled for law enforcement purposes, but
> only to the extent that the production of such law enforcement
> records or information . . . could reasonably be expected to
> constitute an unwarranted invasion of personal privacy . . . .

(104)      In asserting this exemption, each piece of information was scrutinized to

determine the nature and strength of the privacy interest of any individual whose name and/or

identifying data appears in the documents at issue.  In withholding the information, the

individual's privacy interest was balanced against the public's interest in disclosure. In making

this analysis, public interest information was determined to be information which would shed

light on the FBI's performance of its statutory duties.  In each instance where information was

withheld, it was determined that individual privacy rights outweighed the public interest.

### **(b)(7)(C)-1      Names and/or Identifying Information Concerning FBI Personnel**
### **(SAs and Support Employees)**

(105)      Exemption (7)(C)-1 has been asserted to protect the names and identifying

information of FBI SAs and support employees responsible for interrogating detainees held at

Guantanamo Bay, SAs in the Inspection Division who conducted an inquiry into the activities of

FBI personnel at Abu Ghraib prison from October 2003 through December 2003, FBI SAs in the

CTD who sought the legal advice of OGC attorneys concerning the legality of certain

interrogation techniques, FBI SAs within the NCAVC, BAU, and the CIRG responsible for

coordinating the FBI's behavioral related support of the interview process at Guantanamo Bay

(including developing interview plans for detainees), and support employees (OGC attorneys)

-58-

responsible for providing legal advice to FBI SAs conducting investigations of these individuals.[62]

(106)    As previously discussed, the treatment of detainees has been the subject of intense media scrutiny.  Given the intense media scrutiny of the prisoner abuse scandal, as well as the publicity (adverse or otherwise) regarding FBI SAs role in the interrogation of these detainees, disclosure of their identities may seriously impede their effectiveness in conducting intelligence investigations, and other investigations in which they may become involved at a later date.  As such, disclosure of the names and identifying information of these employees could subject these employees to unauthorized inquiries by members of the media and the general public who seek access to this type of information.  Furthermore, disclosure of their identities could subject these employees to threats and intimidation.  Accordingly, the FBI determined that the FBI SAs and support employees referenced in the responsive records maintain a substantial privacy interest in not having their identities disclosed.

(107)    The FBI next examined the records at issue to determine whether there was any public interest that outweighed the substantial privacy interests of the FBI SAs and support employees.  The FBI could not identify any discernible public interest.  As previously discussed, the disclosure of the names of FBI SAs and support employees would not demonstrate how the

---

[62] The FBI asserted Exemption 7(C) to protect the names and identifying information of FBI SAs and support employees on DETAINEE DOCUMENTS 1; 4; 16-17; 19; 40; 48; 50; 59; 74; 101; 124; 143; 177; 186; 198; 226; 274; 334; 345; 347-351; 434; 494; 496; 546; 548; 593; 618-620; 736; 851; 853; 855; 858-861; 889; 900-901; 921; 923; 930-931; 958-959; 987; 1004-1005;1043-1044; 1067-1068; 1099-1100; 1102-1105; 1107-1120; 1122; 1124-1154; 1156-1159; 1161-1163; 1167; 1169-1171; 1179-1184; 1186-1187; 1189-1239; 1241-1250;1254-1267; 1298; 1328-1331; 1334-1336; 1338-1340; 1342-1344; 1346-1350; 1353-1354; 1359; 1365-1366; 1368-1371; 1373-1375; 1381; 1384 and 1386.

FBI performs its statutory duties pursuant to 18 U.S.C. § 2332(b). Thus, the disclosure of the names of FBI SAs and support employees would shed no light on the performance of the FBI's statutory duties. Ultimately, disclosure of the names of these employees would constitute an unwarranted invasion of personal privacy. Therefore, the FBI has properly asserted Exemption 7(C). Exemption (b)(7)(C)-1 has been invoked in conjunction with Exemption (b)(6)-2, supra. The rationale for protecting the identities of FBI SAs and support employees pursuant to (b)(7)(C)-1 is the same as the rationale for protecting the identities of FBI SAs and support employees pursuant to Exemption (b)(6)-1.

### (b)(7)(C)-2       Names and Identifying Information of non-FBI Federal Employees

(108)     Exemption (b)(7)(C)-2 has been asserted to protect the names and identifying information of non-FBI federal employees.[63] The relevant inquiry here is whether public access to this information would violate a viable privacy interest of the subjects of such information. Disclosure of this identifying information could subject these employees to unauthorized inquiries and harassment which could constitute an unwarranted invasion of their personal privacy. The rationale for protecting non-FBI federal employees is the same as that for FBI employees. (See infra.) Exemption (b)(7)(C)-2 has been invoked in conjunction with Exemption (b)(7)(C)-2, supra.

---

[63] The FBI asserted Exemption 7(C) to protect the names and identifying information of non-FBI federal employees on DETAINEE DOCUMENTS 15; 1122-1123; 1125-1126; 1128-1135; 1137-1148; 1154; 1158; 1162-1163; 1169-1171; 1186-1187; 1189-1190; 1193-1194; 1199; 1201; 1203-1204; 1211; 1213-1218; 1221-1226; 1232-1233; 1237; 1247; 1256-1257; 1262-1265; 1329-1331; 1334-1338; 1340; 1343-1346; 1354; 1359; 1363; 1366; 1368; 1370; 1373-1375; 1377; 1381 and 1384..

## (b)(7)(C)-3    Names and Identifying Information of Foreign Detainees Interviewed by the FBI

(109)    Exemption (b)(7)(C)-3 has been asserted to protect the identities of foreign detainees interviewed by the FBI at Guantanamo Bay, Afghanistan, and other locations.[64]  As mentioned above, the DOJ, AAG requested that the FBI provide comments and recommendations to assist the AAG's assessment of detainees with regard to repatriation. The interviews contain the name, place of birth, educational level, of the detainees. To release the identities of these foreign detainees would not only constitute an unwarranted invasion of their personal privacy, but could subject these individuals to harassment, or embarrassment, intimidation, or result in undue public attention. Thus, the FBI determined that the disclosure of the personal identifying information of these detainees could reasonably be expected to constitute an unwarranted invasion of personal privacy. After identifying the substantial privacy interests of the detainees, the FBI balanced the interest against the public interest in disclosure. The FBI could not identify any discernible public interest. Accordingly, the FBI has properly withheld this information pursuant to Exemption (b)(7)(C)-3. Exemption (b)(7)(C)-3 has been invoked in conjunction with Exemption (b)(6)-3 and (b)(7)(D)-1, infra.

---

[64]  The FBI asserted Exemption 7(C) to protect the identities of detainees interviewed by FBI SAs at Guantanamo Bay on DETAINEE DOCUMENTS 15; 21-42; 44-47; 50-88; 90-122; 124-184; 186-225; 227-273; 276-285; 287-350; 352-461; 463-546; 548-617; 620-703; 705-749; 751-802; 804-840; 842-844; 846-850; 854; 856-857; 862-863; 865-867; 869; 871; 873-885; 887; 890; 892; 894; 896; 898; 902-920; 922; 924-926; 928-929; 932-936; 938; 940-957; 960-962; 964; 966-971; 973-979; 981; 983-986; 988-1003; 1006-1013; 1015-1016; 1018-1020; 1022-1036; 1038-1039;1041; 1045-1053; 1054; 1057-1061; 1063-1065; 1069-1077; 1079-1082; 1084; 1086-1091; 1093-1095; 1097-1099; 1102; 1105-1107; 1111; 1116-1117; 1121-1122; 1126; 1128; 1130-1132; 1135-1137; 1139; 1147; 1157; 1159; 1170; 1182-1183; 1186-1187; 1189-1190;1198-1199;1329-1331; 1336 and 1381.

(b)(7)(C)-4        Names and Identifying Information of Third Parties of
                            Investigative Interest to the FBI

(110)  Exemption 7(C)-4 has been asserted to protect the names and identifying

information of third parties of investigative interest to the FBI.[65]  Specifically, the FBI withheld

the names and identifying information of detainees held at Guantanamo Bay and Afghanistan.

Furthermore, the FBI withheld the names and identifying information of terrorist suspects who

are of investigative interest to the FBI.  To release the identities of these foreign detainees as the

subjects of law enforcement interest would not only constitute an unwarranted invasion of their

personal privacy, but could subject these individuals to harassment, embarrassment, intimidation,

or result in undue public attention.  Accordingly, these individuals maintain a substantial privacy

interests in not having their identities disclosed.

(111)  In considering the public interest in this information, the FBI determined that

there is no public interest to be served by releasing the identities of these third-party individuals

because this information will not shed light on the operations and activities of the FBI, but would

only identify individuals who are of interest to the FBI.  Any such disclosure would constitute an

unwarranted invasion of their personal privacy.

(112)  In balancing the substantial privacy interest that these individuals have in this

information against no legitimate public interest in its disclosure, the FBI determined that this

---

[65]  The FBI asserted Exemption 7(C) to protect the names and identifying information of
third parties of investigative interest on DETAINEE DOCUMENTS 18; 20-42; 44-47; 50-88; 90-
122; 125-184; 186-225; 227-273; 275-285; 287-350; 352-461; 463-546; 548-617; 620-703; 705-
749; 751-802; 804-840; 842-850; 1099; 1102; 1105-1107; 1110-1111; 1116-1117;1121-1122;
1126; 1128; 1130-1132; 1135; 1137; 1139; 1147; 1157; 1159; 1182-1183;1186-1187; 1189-
1190; 1198-1199; 1201; 1203-1204; 1206-1208; 1218-1220; 1222-1223; 1230; 1232; 1238;
1262; 1264-1265; 1306-1309; 1328-1331; 1335-1340; 1343-1344; 1346-1348.

information was properly withheld pursuant to Exemption (b)(7)(C)-2.  Exemption (b)(7)(C)-2

has been invoked in conjunction with (b)(6)-2 and (b)(7)(D)-1.

### (b)(7)(C)-5    Names of Third Parties Merely Mentioned

(113)    Exemption 7(C)-5 has been asserted to withhold the names of third parties who

are merely mentioned during the course of interviews of detainees at Guantanamo Bay,

Afghanistan, and other locations.[66]  These individuals are not of investigative interest to the FBI,

but are merely mentioned during the course of these interviews.  Disclosure of the identities of

these third parties in this context could cause unsolicited and unnecessary attention to be focused

on them and disclosure may embarrass them.  For these reasons, the FBI has determined that the

third party individuals merely mentioned in the responsive records maintain a strong privacy

interest in not having their identities disclosed.

---

[66]  The FBI asserted Exemption 7(C) to protect the names of third parties merely
mentioned in DETAINEE DOCUMENTS 6-8; 15; 20; 23; 25; 28; 32-33; 35-37; 51-52; 55; 57;
60-66; 70; 75; 77; 79-80; 82-86; 88; 92; 94; 96-99; 102-109; 111; 113-114; 116-122; 126-128;
132; 134-142; 144-149; 151-157; 159-160; 162-163; 165-168; 170-175; 178; 181-184; 187-194;
196-197; 199-202; 204; 206-208; 210-219; 221-224; 227-228; 230-231; 234-244; 247-252; 254-
257; 260-261; 263; 267-273; 276-281; 284-285; 287-289; 291-293; 296-297; 299-302; 305; 307-
309; 311; 313-314; 316-328; 330-332; 335-337; 339-341; 343; 346; 350; 352-356; 359-362;365-
368; 370; 372; 378-380; 382; 385-388; 390-393; 396; 400; 402; 405; 408; 411; 415; 417; 420-
422; 424-427; 429-433; 435; 438-440; 442-452; 454-457; 459-461; 463-465; 467-477; 479-486;
488-492; 497-504; 506-513; 515-519; 521-535; 538-545; 549-557; 559-592; 594-617; 621-622;
624-629; 631-650; 652; 654-656; 658-663; 665-669; 671-674; 676; 678; 679-696; 699; 702; 706-
707; 711-712; 714-718; 720-723; 725-726; 728; 730-734; 739-749; 751-758; 760-761; 764; 770-
773; 776-778; 780-782; 787-789; 796-797; 800-802; 804-821; 824-825; 827-831; 833; 836; 843-
844; 846-850; 1099; 1102; 1104-1107; 1109-1122; 1126; 1128; 1130-1132; 1135; 1137;
1139;1147-1148; 1154; 1157-1159; 1171; 1183; 1201; 1203; 1207; 1215-1216; 1332; 1368;
1374 and 1384.

(114)     After identifying the substantial privacy interest of the third parties merely

mentioned, the FBI balanced those interests against the public interest in disclosure.  The FBI

could identify no discernible public interest in the disclosure of this information because the

disclosure of third parties' names will not shed light on the operations and activities of the FBI.

Accordingly, the FBI determined that the disclosure of this information would constitute an

unwarranted invasion of personal privacy.  Thus, the FBI properly protected the names of these

third parties merely mentioned in the responsive records pursuant to Exemption (b)(7)(C)-5.

Exemption (b)(7)(C)-5 has been invoked in conjunction with Exemption (b)(6)-5, infra.

## FOIA EXEMPTION 7(D)
## CONFIDENTIAL SOURCE MATERIAL

(115)     5 U.S.C. § 552(b)(7)(D) provides protection for

> records or information compiled for law enforcement purposes, but only to
> the extent that the production of such law enforcement records or
> information . . . could reasonably be expected to disclose the identity of a
> confidential source, including a State, local or foreign agency or authority
> or any private institution which furnished information on a confidential
> basis, and, in the case of a record or information compiled by a criminal
> law enforcement authority in the course of a criminal investigation, or by
> an agency conducting lawful national security intelligence investigation,
> information furnished by a confidential source.

(116)     Numerous confidential sources report to the FBI on a regular basis and are

"informants" within the common meaning of the term.  These sources provide information under

a variety of circumstances, including either an express or an implied assurance of confidentiality.

Releasing the information provided by these sources may likely reveal a confidential source's

identity.  The release of a source's identity would forever eliminate that source as a future means

of obtaining information.  In addition, when the identity of one source is revealed, that revelation

has a chilling effect on the activities and cooperation of other sources. It is only with the understanding of complete confidentiality (whether express or implied) that the aid of such sources can be enlisted, and only through this confidence that these sources can be persuaded to continue providing valuable assistance in the future.

(117)     As mentioned above, in the aftermath of September 11, 2001, the FBI began a large-scale, global terrorism investigation. FBI SAs were dispatched around the world to interview detained terrorist suspects in Afghanistan, Guantanamo Bay, and other locations. FBI SAs interviewed these detainees to gather valuable intelligence information about Al Qaeda, the Taliban, and other terrorist organizations. The documents responsive to plaintiffs' FOIA requests are comprised of documents concerning the interrogations of these employees, the interviews of these detainees, and recommendations regarding the repatriation, transfers, prosecutions, or the release of the these detainees.

(118)     In this case, the detainees were placed directly in positions that could subject them to acts of violent reprisals if the intelligence they provided to the FBI were disclosed. The FBI has learned through experience that individuals who provide information to the FBI  must be free to do so without fear of reprisal. The FBI has also learned that individuals who provide information to the FBI must be free to furnish that information with complete candor and without the understandable tendency to hedge or withhold information because of  fear that their names or their cooperation with the FBI will later be made public. Those who provide information to the FBI should be secure in the knowledge that their assistance and their identities will be held in confidence. The FBI asserted Exemption 7(D)-1 to protect the identities of, and intelligence provided by detainees during the course of interviews under circumstances from which a grant of

confidentiality may be implied. The FBI asserted Exemption 7(D)-2 to (A) protect the identity of

a foreign government agency who requested information from the FBI under circumstances from

which an assurance of confidentiality may be implied, and (B) foreign governments that provided

information to the FBI about specific foreign terrorist organizations and specific terrorism

suspects.

### (b)(7)(D)-1    Names and Information Provided by Foreign Detainees to the FBI Implied Confidentiality)

(119)    Exemption 7(D)-1 has been asserted to protect the identities of, and information

provided by foreign detainees to the FBI during the course of interviews conducted by FBI SAs.[67]

Certain detainees provided valuable intelligence about terrorist groups, organizations and

suspects. In this case, the intelligence information obtained from the detainees related to Al-

Qaeda, etc, all of which have proven to be extremely violent. Al Qaeda operatives were

responsible for the bombing of the World Trade Center and the Pentagon, the October 12, 2000

bombing of the United States Navy Destroyer USS Cole, the August 7, 1998 twin bombings of

the embassies in Nairobi, Kenya and Dar es Salaam, Tanzania, and the 1993 bombing of the

World Trade Center. Some of the detainees who provided valuable intelligence information to

---

[67] In addition to invoking Exemption 7(D)-1 to protect the names and information provided by foreign detainees to the FBI in DETAINEE DOCUMENTS 18-42; 44-47; 50-88; 90-122; 124-157; 158-184; 186-202; 204-224; 227-273; 276-282; 284-285; 287-294; 296-350; 352-461; 463-546; 548-617; 620-703; 705-749; 751-802; 804-840; 841-844; 846-850; 853-857; 860; 862-863; 865-867; 869; 871; 873-885; 887; 889-890; 892; 894; 896; 898; 900; 902-922; 924-926; 928-934; 936; 938; 940-962; 964; 966-971; 973-979; 981; 983-1004; 1006-1013; 1015-1016; 1018-1020; 1022-1036; 1038-1039; 1041; 1043; 1045-1053; 1055; 1057-1061; 1063-1066; 1069-1077; 1079-1082; 1084; 1086-1091; 1093-1095; 1097-1099; 1102; 1105-1107; 1111; 1116-1117; 1121-1122;1126; 1128; 1130-11321135-1137; 1139; 1147; 1157; 1159; 1182-1183; 1186-1187; 1189-1190; 1198-1199; 1204; 1329-1331; 1335-1337; 1339; 1348 and 1381.

the FBI were privy to the inner-workings of these terrorist organizations.

(120)    In this case, because the terrorist organizations cited above have a well documented history of violence, the detainees who provided intelligence information to the FBI would naturally expect that their identities, and the information that they provided would not be released to the general public. Because these individuals possess first hand knowledge of the inner-workings of these violent terrorist organizations, it is reasonable to infer that they expected that their identities would not be disclosed. Furthermore, because terrorism by nature is an extremely violent enterprise, the detainees who provided specific information about the terrorist enterprise would reasonably and justifiably fear violent reprisals or retaliation by these terrorist organizations. In this case, because the detainees provided information about violent terrorist organizations (whose violence is evidenced by murders and attempted murders of thousands of individuals), the detainees risk for violent reprisals is at an apex. Accordingly, it is reasonable to infer that each of the detainees that provided information to the FBI did so under circumstances from which an assurance of confidentiality may be implied. The information the third-party detainees provided under an assurance of confidentiality warrants the protection of the third party names, as well as the information they provided. Exemption 7(D)-1 is cited in conjunction with (b)(6)-3, (b)(6)-4, (b)(7)(C)-3 and (b)(7)(C)-4.

### (b)(7)(D)-2  Foreign Government Agency Information

### .    A.    Information Provided to a Foreign Government Agency

(121)    As mentioned above, FBI SAs were dispatched around the world to pursue leads, to interview detained terrorist suspects in Afghanistan, Guantanamo Bay and other locations, and

to support the work of the United States' international partners.[68]  The FBI has worked very closely with foreign law enforcement agencies  who have become partners with the FBI in its global war against terrorism.  These law enforcement agencies have requested information from and have provided information to the FBI.  While some countries have cooperated with the FBI in its global war on terrorism, the FBI has discovered that some countries are currently providing material support to designated terrorist organizations.  Furthermore, some countries actively attempted to subvert the post-September 11, 2001 investigation by providing false leads to FBI investigators.  Accordingly, protecting the FBI's relationships with foreign governments and law enforcement agencies who have chosen to cooperate with the FBI in its war against terrorism is of the utmost importance.

(122)     In this case, the FBI protected (1) information which could reasonably be expected to disclose the identity of a foreign law enforcement agency which sought the assistance of the FBI.  Furthermore, the FBI protected (2) the identities of and information provided to the FBI by foreign governmental agencies about specific terrorist groups and terrorists suspects.

### 1.  **Information Provided to a Foreign Government**

(123)     The FBI asserted Exemption (b)(7)(D)-2 to withhold the identity of a foreign government agency who requested information from the FBI (DETAINEE DOCUMENTS 6-8).[69]  The FBI provided documents which originated with the DOD to a FBI LEGAT who then provided the documents to the foreign government agency.  As mentioned above, the FBI has

---

[68]  The FBI asserted Exemption 7(D)-2 to protect foreign government information in DETAINEE DOCUMENTS 6-8; 1105-1106; 1111; 1148, and 1335.  This information is also being withheld pursuant to Exemption 1, supra.

[69]  This information is also being withheld pursuant to Exemption 1, see supra.

relied on the close cooperation of foreign governments in its global war on terrorism. The FBI

has requested and received valuable information from foreign governments about terrorist

suspects.

(124)    Given the fact that the information requested by the foreign government agency is

extremely sensitive, the foreign government agency would naturally have expected that the fact

that it requested this information from the FBI would remain confidential. Disclosure of the

identity of the foreign government agency would have a chilling effect on the FBI's relationship

with the agency. Disclosure of the identity of this foreign government agency could result in the

agency refusal to cooperate with the FBI in its global war on terrorism. Furthermore, disclosure

of the identity of this foreign government agency would have a chilling effect on the FBI's

relationship with other foreign law enforcement agencies who could refuse to provide sensitive

intelligence information to the FBI in the future if it became known that the FBI will disclose the

fact that the agency cooperated with the FBI. Accordingly, it is reasonable to infer that the

foreign government agency who requested information from the FBI requested the information

under circumstances from which an assurance of confidentiality may be implied.

## B. **Information Provided to the FBI by Foreign Governments**

(125)    In addition, the FBI asserted Exemption 7(D)-2 to protect intelligence information

provided to the FBI by foreign governments about specific terrorist organizations and terrorist

suspects (DETAINEE DOCUMENTS 15, 16, 21, 22, 29, 34, 127, 413, 414, 635, 761, 769, 773,

922, 956, 957, 962, 1022, 1105-06, 1111, 1148 and 1335).[70]  Specifically, FBI SAs prepared

---

[70] During the initial October 15, 2004 production, the FBI did not assert Exemption 7(D)-
2 for DETAINEE DOCUMENTS 15, 16, 21, 22, 29, 34, 127, 413, 414, 635, 761, 769, 773, 922,

assessments of detainees located at Guantanamo Bay. In deciding whether to continue to detain
specific individuals, FBI SAs utilized intelligence information obtained from foreign
governments.

(126)     Because of the sensitive nature of the information provided by the foreign
governments, the foreign governments would naturally have expected that the fact that it
provided intelligence information about terrorist organizations would remain confidential.
Disclosure of the identities of these foreign governments, and the information they provided
would have a chilling effect on the FBI's relationship with these foreign governments.
Disclosure of the identities of the foreign governments, and the information they provided could
result in its refusal to cooperate with the FBI in its global war on terrorism. Furthermore,
disclosure of the identities of these foreign governments and the information they provided
would have a chilling effect on the FBI's relationship with other foreign governments who could
refuse to provide such sensitive intelligence information to the FBI in the future. Accordingly,
given the sensitive nature of the information, it is reasonable to infer that the foreign
governments who provided the information to the FBI did so under circumstances from which an
assurance of confidentiality may be implied. Accordingly, the FBI has properly withheld the
identities of, and the information provided by these foreign governments pursuant to Exemption
7(D)-2.

---

956, 957, 962, 1022. The corrected documents will be provided to plaintiffs' under separate
cover. This information is also being withheld pursuant to Exemption 1, supra.

## EXEMPTION 7(E)
## LAW ENFORCEMENT INVESTIGATIVE TECHNIQUES AND PROCEDURES

(127)      5 U.S.C. § 552 (b)(7)(E) provides for the withholding of:

> law enforcement records which would disclose techniques and
> procedures for law enforcement investigations or prosecutions, or
> would disclose guidelines for law enforcement investigations or
> prosecutions if such disclosure could reasonably be expected to
> risk circumvention of the law.

In order for this exemption to apply, the use of the technique or procedure at issue must not

be well known to the public.

(128)      Exemption 7(E) has been asserted to protect the interrogation techniques and

procedures of the NCAVC , the BAU, and the CIRG.[71]  The FBI also asserted Exemption 7(E) to

protect on-site assessments performed by these divisions.  As previously discussed, these

assessments contain the NCAVCs, the BAUs, and the CIRGs interrogation techniques,

procedures, and  interview plans for specific detainees which were developed by these divisions

to obtain intelligence from the detainees.  Disclosure of the NCAVCs, the BAUs, and the CIRGs

interrogation techniques, procedures and interview plans could reasonably be expected to risk

circumvention of law by providing insight into how these divisions approach subjects of

interrogation in an effort to gather valuable intelligence.

(129)      Disclosure of the NCAVCs', the BAUs', and the CIRGs' techniques, procedures,

and interview plans would have disastrous, far-reaching consequences.  Specifically, disclosure

---

[71]  This information is also being withheld pursuant to Exemption 1.  Exemption 2 is cited
in conjunction with Exemption 7(E).  The FBI asserted Exemption 7(E) to protect interrogation
techniques and procedures on DETAINEE DOCUMENTS 1164; 1169-1177; 1199; 1201-1203;
1206-1207; 1218; 1227-1229; 1234-1236; 1248; 1256-1257; 1290; 1298-1300; 1306-1309;
1328; 1343-1346; 1349; 1354-1355;1359; 1362-1363; 1366; 1368 and 1374.

of this information would permit criminals or terrorists to learn how the NCAVC, the BAU, and the CIRG develop interrogation plans for detainees. These individuals could then adjust their behavior to avoid detection by the very law enforcement authorities responsible for obtaining valuable intelligence information from the detainees. Disclosure of this information could hamper and/or thwart the future usefulness of these techniques as part of an overall interview and interrogation plan. As such, disclosure of this information could reasonably be expected to risk circumvention of law. Accordingly, the FBI properly protected this information pursuant to Exemption 7(E). This Exemption is cited in conjunction with Exemption (b)(2)-3, supra.

## EXEMPTION 7(F)
## ENDANGERMENT OF THE LIFE OR PHYSICAL SAFETY OF ANY INDIVIDUAL

(130)   5 U.S.C. § 552 (b)(7)(F) provides for the withholding of:

> records or information compiled for law enforcement purposes, but
> only to the extent that the production of such law enforcement
> records or information ... could reasonably be expected to endanger
> the life or physical safety of any individual.

(131)   The FBI has asserted Exemption (b)(7)(F) to protect the names, Detainee

Numbers, and other identifying information in these records concerning the Detainees currently or formerly being held at Guantanamo and other detention facilities outside the United States. There are two separate and distinct concerns in releasing any identifying information concerning these Detainees. First, certain of the detainees are suspected of membership or alliances with known terrorist organizations. Second, certain of the detainees are suspected of cooperating with the FBI in its Counterterrorism and criminal investigative responsibilities. Each of these concerns manifest the extreme danger to the lives and physical safety of the detainees should their names or other identifying information be released.

-72-

(132)    Many of the detainees in these records either have been or one day will be
repatriated to their home countries. If their identities were to become public knowledge, both
they and their families would be at risk of endangerment to their lives and physical safety. Their
very detention by the United States Government in response to the current war on terrorist
organizations would lead other individuals to believe that detainees are members of, or allied
with, known terrorist organizations, regardless of whether or not they are in fact terrorists or
allies. The disclosure of their identities or identifying information would doubtless expose them
and their families to extreme danger in their homeland especially in light of the worldwide war
against terror. Their identification could subject them to governmental retribution, private
vengeance and societal excommunication. Identification of the detainees then becomes
synonymous with targeting them and their families.

(133)    The second concern in the disclosure of the identities of these detainees in that
they could be suspected of having cooperated with the FBI in its counterterrorism and criminal
investigative responsibilities, and would thus be at risk to their lives or physical safety from
members of terrorist organizations or other private acts of vengeance, bias or hatred by other
individuals. Ironically, the dangers referred to above are also possible in this concern but under
this concern they originate from the terrorists who would seek to prevent future cooperation
through fear, intimidation and physical harm. This risk of endangerment is heightened because
the act of repatriation itself might imply a benefit obtained through cooperation with the FBI.
Furthermore, the disclosure of the identities of detainees still in custody of the United States
Government would also endanger the lives and physical safety of their families in their home
countries since they could be subject to fear, intimidation and threats to their physical safety. As

-73-

the recent cases involving the abductions and beheadings of individuals in Iraq illustrates, the danger from terrorist organizations and other private individuals in acts of terrorism, vengeance, hatred and bias is all too real. Moreover, the identification of detainees may provide terrorists with a guide book as to the criteria used in determining who is repatriated and who is not, as well as who is prosecuted and who is not.

## DOCUMENTS REFERRED TO OTHER AGENCIES FOR CONSULTATION AND/OR DIRECT RESPONSE TO PLAINTIFFS' REQUEST

(134)     During the course of its review of the documents responsive to plaintiffs' request, the FBI identified certain documents which contained information originating with other agencies (Department of Air Force, Department of the Army and the Department of Defense.) In accordance with the DOJ regulations, 28 C.F.R. § 16.4, the FBI referred these documents either for consultation or for direct response to plaintiffs. A detailed accounting of the ultimate results of the FBI's efforts with respect to these consultations and referrals will be provided in a subsequent Vaughn declaration, as well as responses submitted or to be separately by, respectively, Department of the Air Force, Department of the Army (INSCOM) and Department of Defense (OGC).[72]

## CONCLUSION

(138)     FBIHQ has processed and released all segregable information from documents responsive to plaintiffs' requests. The FBI has carefully examined the records at issue in this

---

[72] Department of the Air Force referral and consultation documents are located at DETAINEE DOCUMENTS 1285-1289 and 1366; Department of the Army referral and consultation documents are located at DETAINEE DOCUMENTS 1193, 1248, 1257, 1263, 1268-1284, 1365 and 1367; and Department of Defense referral documents are located at DETAINEE DOCUMENTS 1292-1297, 1301-1305, 1310-1313, and 1315-1327.

case and has released 1,225 pages with redactions; 42 pages in full; 51 pages have been withheld in full; 55 pages have been withheld and are being referred to other agencies; 6 pages have been removed as non-responsive; and 9 pages have been removed as duplicative. These pages with carefully tailored redactions pursuant to FOIA Exemptions 1, 2, 5, 6, 7(C), 7(D), 7(E), and 7(F), 5 U.S.C. § 552(b)(1), (b)(2), (b)(5), (b)(6), (b)(7)(C), (b)(7)(D), (b)(7)(E), and (b)(7)(F). Furthermore, the FBI carefully examined the remaining pages withheld in full and in part, and determined that the information withheld from plaintiffs in this case, if disclosed, could reasonably be expected to damage national security, impede the effectiveness of the FBI's internal law enforcement procedures, interfere with and damage attorney-client privileged communications, as well as chill internal intra-agency deliberations, cause unwarranted invasions of the privacy interests of numerous individuals, disclose the identities of confidential sources, disclose techniques and procedures for law enforcement investigations, and endanger the life or physical safety of any individual. Accordingly, the FBI has released all reasonably segregable, nonexempt information in this case.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and

correct.

Executed this 22nd day of October, 2004.

DAVID M. HARDY
Section Chief
Record/Information Dissemination Section
Federal Bureau of Investigation
Washington, D.C.

-76-