UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| AMERICAN CIVIL LIBERTIES UNION, CENTER FOR CONSTITUTIONAL RIGHTS, PHYSICIANS FOR HUMAN RIGHTS, VETERANS FOR COMMON SENSE AND VETERANS FOR PEACE,<br><br>Plaintiffs,<br><br>v.<br><br>DEPARTMENT OF DEFENSE, AND ITS COMPONENTS DEPARTMENT OF ARMY, DEPARTMENT OF NAVY, DEPARTMENT OF AIR FORCE, DEFENSE INTELLIGENCE AGENCY; DEPARTMENT OF HOMELAND SECURITY; DEPARTMENT OF JUSTICE, AND ITS COMPONENTS CIVIL RIGHTS DIVISION, CRIMINAL DIVISION, OFFICE OF INFORMATION AND PRIVACY, OFFICE OF INTELLIGENCE, POLICY AND REVIEW, FEDERAL BUREAU OF INVESTIGATION; DEPARTMENT OF STATE; AND CENTRAL INTELLIGENCE AGENCY,<br><br>Defendants. | DOCKET NO. 04-CV-4151 (AKH)<br><br><br>*Document Electronically Filed* |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................. iii

TABLE OF EXHIBITS ...................................................................................................... vii

INTRODUCTION ............................................................................................................... 4

STATEMENT OF FACTS ................................................................................................... 6

ARGUMENT....................................................................................................................... 7

I.   DOD HAS IMPROPERLY INVOKED EXEMPTION 3 WITH RESPECT
     TO DOCUMENTS PERTAINING TO THE INTERNATIONAL
     COMMITTEE OF THE RED CROSS ........................................................... 10

     A.   The DOD Has Not Demonstrated that the Information Being
          Withheld Was Provided By, Otherwise Made Available By Or In
          Cooperation With the ICRC................................................................ 12

     B.   Further DOD Has Not Demonstrated That The ICRC Has Either
          Withheld These Documents From Public Disclosure Or Provided
          Them On the Condition That They Be Withheld From Public
          Disclosure........................................................................................... 15

II.  DEFENDANT DOD HAS IMPROPERLY INVOKED EXEMPTION 1
     TO WITHHOLD DOCUMENTS SETTING FORTH INTERROGATION
     TECHNIQUES................................................................................................ 16

     A.   The Court Must Conduct a De Novo Review of DOD's Decision to
          Withhold These Documents................................................................. 17

     B.   The Court's De Novo Review Must Determine Whether the
          Information in Question Was Specifically Authorized Under
          Criteria Established By The Applicable Executive Order to Be
          Kept Secret In the Interest of National Defense or Foreign Policy......... 19

     C.   DOD Did Not and Cannot Meet Its Burden of Proving That The
          Classification of These Documents Was Specifically Authorized
          Under the Criteria Set Forth in Executive Order 12,958. ....................... 23

     D.   Because DOD Has Provided An Inadequate Justification for
          Withholding These Documents, and Because There is Voluminous
          Evidence of Underlying Illegality, At a Minimum, the Court
          Should Conduct an In Camera Review of The Requested
          Documents ......................................................................................... 27

III. DEFENDANT CIA HAS IMPROPERLY INVOKED EXEMPTIONS 1
     AND 3 ............................................................................................................ 29

     A.   CIA's Invocation of Glomar in Response to Items 1, 29, and 61 is
          Improper............................................................................................. 30

# TABLE OF CONTENTS
(continued)

**Page**

    B.    Moreover, Documents Responsive to Item 43 Were Improperly Classified ................................................................................................... 33

IV.    DEFENDANT DOD HAS IMPROPERLY INVOKED EXEMPTIONS 6 AND 7 AS THE BASIS FOR WITHHOLDING PHOTOGRAPHS AND VIDEOTAPES DEPICTING ABUSE OF DETAINEES ................................... 34

CONCLUSION ....................................................................................................... 37

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*A. Michael's Piano Inc. v. F.T.C.*,
  18 F.3d 138 (2d Cir. 1994) ............................................................. 5, 8, 15

*Allen v. CIA*,
  636 F.2d 1287 (D.C. Cir. 1980) ........................................................... 25

*American Civil Liberties Union v. Department of Defense*,
  339 F.Supp. 501 (S.D.N.Y. 2004) ................................................... 1, 2, 4, 5

*Arieff v. United States Dept. of the Navy*,
  712 F.2d 1462 (D.C.Cir. 1983) ............................................................ 31

*Campbell v. United States Dep't of Justice*,
  164 F.3d 20 (D.C. Cir. 1998) ......................................................... 16, 18

*Church of Scientology International v. United States Department of Justice*,
  30 F.3d 224 (1st Cir. 1994) ............................................................... 32

*Citizens for Environmental Quality v. USDA*,
  602 F.Supp. 534 (D.D.C. 1984) ........................................................... 32

*Dayton Newspapers v. Department of Air Force*,
  35 F.Supp.2d 1033 (D.D.C. 1998) ....................................................... 32

*Department of Interior v. Klamath Water Users Protective Ass'n*,
  532 U.S. 1 (2001) ............................................................................. 5

*Dep't of Air Force v. Rose*,
  425 U.S. 352 (1976) ..................................................................... 5, 32

*Doe v. Ashcroft,*
  334 F.Supp.2d 471 (S.D.N.Y. 2004) ...................................................... 2

*Donovan*,
  806 F.2d 55, 59-60 (2d Cir. 1986) ................................................... 17, 25

*EPA v. Mink*,
  410 U.S. 73 (1973) ......................................................................... 18

*Frugone v. CIA*,
  169 F.3d 772 (D.C. Cir. 1999) ........................................................... 29

*Gardels v. CIA*,
  689 F.2d 1100 (D.C. Cir. 1982) ......................................................... 29

*Goldberg,*
    818 F.2d 71 (D.C.Cir. 1987) ........................................................................ 18

*Halpern v. FBI,*
    181 F.3d 279 (2d Cir. 1999) ................................................................. passim

*Harper v. DOD,*
    No. 93-35876, 1995 WL 392032 (9th Cir. July 3, 1995) ......................... 33

*Hayden v. National Security Agency/Central Security Serv.,*
    608 F.2d 1381 (D.C. Cir. 1979) ................................................................. 15

*John Doe Agency v. John Doe Corp.,*
    493 U.S. 146 (1989) ..................................................................................... 5

*Jones v. FBI,*
    41 F.3d 238 (6th Cir. 1994) ....................................................................... 25

*Lesar v. United States Dept. of Justice,*
    636 F.2d 472 (D.C.Cir. 1980) .................................................................... 13

*Medina-Hincapie v. Dep't. of State,*
    700 F.2d 737 (D.C. Cir. 1983) ..................................................................... 8

*Miller v. Casey,*
    730 F.2d 773 (D.C. Cir. 1984) .............................................................. 20, 29

*New York Public Interest Research Group v. United States Env'tl Protection*
    *Agency,*
     249 F.Supp.2d 327 (S.D.N.Y. 2003) .......................................................... 5

*NLRB v. Robbins Tire & Rubber Co.,*
    437 U.S. 214 (1978) ..................................................................................... 4

*Oglesby v. United States Dep't of the Army,*
    920 F.2d 57 n.12 (D.C. Cir. 1990) ............................................................. 33

*Patterson v. FBI,*
    893 F.2d 595 (3d Cir. 1990) ...................................................................... 25

*Phillippi v. CIA,*
    546 F.2d 1009 (D.C.Cir. 1976) .................................................................. 29

*Public Citizen v. Department of State,*
    276 F.3d 634 (D.C.Cir. 2002) .................................................................... 16

*Ray v. Turner,*
    587 F.2d 1187 (D.C. Cir. 1978) ........................................................... 18, 33

*Rugiero v. United States Dep't of Justice,*
    257 F.3d 534 ............................................................................................................ 26

*United States Dep't of Justice v. Reporters Committee for Freedom of the Press,*
    489 U.S. 749 (1989) ................................................................................................. 5

*United States Department of Justice v. Landano,*
    508 U.S. 165 (1993) ................................................................................................. 17

*United States Department of State v. Washington Post Co.,*
    456 U.S. 595 (1982) ................................................................................................. 31

*Vaughn v. Rosen,*
    484 F.2d 820 (D.C.Cir. 1973) ..........................................................................passim

*Weatherhead v. United States,*
    157 F.3d 735 (9th Cir. 1998).......................................................................... 17, 18

*Wheeler v. CIA,*
    271 F. Supp. 2d 132 (D.D.C. 2003) ...................................................................... 29

*Whitney v. Robertson,*
    124 U.S. 190 (1888) ................................................................................................. 22

**Statutes**

10 U.S.C. § 103c(b)(1)-(3) ............................................................................................ 9

10 U.S.C. § 130c ............................................................................................... 7, 8, 9, 12

10 U.S.C. § 130c(b)(1) ................................................................................................... 9

10 U.S.C. § 130c(b)(2) -(b)(3) ..................................................................................... 12

10 U.S.C. § 893 ............................................................................................................ 22

18 U.S.C. § 2340A ....................................................................................................... 22

18 U.S.C. § 2340A(a) ................................................................................................... 22

18 U.S.C. § 2441(a), (c)(1) .......................................................................................... 21

18 U.S.C. §§ 2340-2340A ............................................................................................ 23

5 U.S.C. § 552(a)(4)(B) ........................................................................................passim

5 U.S.C. § 552(b) ......................................................................................................... 32

5 U.S.C. § 552(b)(1) ....................................................................................... 6, 13, 16, 19

5 U.S.C. § 552(b)(1)-(9).............................................................................................. 5

5 U.S.C. § 552(b)(3) ................................................................................................ 6, 7, 8

5 U.S.C. § 552(b)(6) ................................................................................................ 6, 31

5 U.S.C. § 552(b)(7)(A)-(C) ........................................................................................ 6

5 U.S.C. § 552(b)(7)(C) ............................................................................................. 31

50 U.S.C. § 403-3(c)(7) ......................................................................................... 27, 28

**Other Authorities**

S.Rep. No. 813, 89th Cong., 1st Sess. 2, 3 (1965) ...................................................... 5

S.Rep. No. 93-1200, 93d Cong., 2d Sess. 11-12 (1974) ............................................ 19

# TABLE OF EXHIBITS

A.  Letter from Plaintiffs to United States Attorney's Office, dated August 16, 2004

B.  Declaration of Marilyn Dorn, dated October 15, 2004

C.  CIA List of Documents Responsive to Plaintiffs' August 16, 2004 List

D.  DOD List of Documents Responsive to Plaintiffs' August 16, 2004 List

E.  Declaration of Stewart Aly, dated October 15, 2004

F.  Scott Higham, *A Look Behind the "Wire" at Guantánamo*, WASH. POST, June 14, 2004,

G.  Neil A. Lewis, *Documents Build a Case for Working Outside the Laws in Interrogating Prisoners*, N.Y. TIMES, dated June 9, 2004

H.  ICRC Operational Update: U.S Detention related to the events of September 11, 2001 and its aftermath -- the role of the ICRC, from http://www.irc.org, dated May 11, 2004

I.  News reports containing ICRC descriptions of treatment of detainees

J.  R. Jeffrey Smith, *Knowledge of Abusive Tactics May Go Higher*, WASH. POST, May 16, 2004; Mark Mazetti, et al. *Inside the Iraq Prison Scandal*, USNews.com, May 24, 2004

K.  R. Jeffrey Smith and Josh White, *General Granted Latitude at Prison*, WASH. POST, June 12, 2004, at A01

L.  DOJ Memorandum for James Comey, DOJ, dated December 30, 2004

M.  DOJ Letter to General Ryder, dated July 14, 2004

N.  DOJ Memorandum for Alberto Gonzales, dated August 1, 2002

O.  John Barry et al., *The Roots of Torture: The Road to Abu Gharib began After 9/11. When Washington Wrote New Rules to Fight a New Kind of War*, Newsweek, May 24, 2004

P.  Support to the War on Terrorism and Homeland Security, from http://www.cia.gov

Q.  Thom Shanker and Andrea Elliot, *Rumsfeld Admits He Told Jailors to Keep Detainee Out of Red Cross View*, dated June 18, 2004

## INTRODUCTION

This case involves a request under the Freedom of Information Act ("FOIA") for records pertaining to the treatment of individuals apprehended after September 11, 2001, and held in United States custody in military bases or detention facilities outside the United States ("Detainees").  For well over a year, Plaintiffs American Civil Liberties Union ("ACLU"), Center for Constitutional Rights ("CCR"), Physicians for Human Rights ("PHR"), Veterans for Common Sense ("VCS") and Veterans for Peace ("VP") have sought documents related to the treatment of Detainees, as well as documents  regarding the government practice known as "rendition," whereby Detainees are transferred by the United States to countries known to employ torture and other illegal interrogation techniques.

Plaintiffs served two FOIA requests on Defendants Department of Defense ("DOD") and its components; Department of Homeland Security ("DHS"); Department of Justice ("DOJ") and its components; Department of State ("DOS"); and Central Intelligence Agency ("CIA"), all seeking identical categories of documents regarding (1) the treatment of Detainees, (2) the death of Detainees, and (3) the rendition of Detainees and other  individuals to countries known to employ torture or illegal interrogation methods.  The first request was filed in October 2003; having received no substantive response to that Request from Defendants, and amidst numerous news reports which established that detainees had been subjected to abusive and inhumane treatment, Plaintiffs filed a second FOIA request in May 2004.  Again, Plaintiffs received no substantive response.  In July 2004, Plaintiffs therefore filed this action, seeking a preliminary injunction to require the Defendants to process Plaintiffs' request in a timely fashion.  That motion was granted, and after Plaintiffs served Defendants with a list of specific documents that had been identified in the media, or to Congress or others, by August 16, 2004 [hereinafter "the List"],  *see* Exhibit A, the Court ordered Defendants to produce the requested documents or justify their decision to withhold the m through declarations stating the justification for the non-production of documents with specific reference to FOIA's nine statutory exemptions.

Defendants' decisions to invoke such exemptions as the basis for withholding certain documents on the List are the subject of this Motion for Partial Summary Judgment.

While Defendants have released certain documents on the List, they have also improperly invoked exemptions as the basis for withholding documents to which Plaintiffs are entitled. Defendants' continued refusal to disclose the requested records deprives Plaintiffs and the public of information critical to their ability to evaluate the government's policies and practices with respect to Detainees. There is mounting evidence that the abuse of Detainees that has already been revealed was not isolated or limited to a few incidents but was instead systemic, and that high-ranking government officials may have condoned or even authorized that abuse. Grave questions about who was ultimately responsible for Detainee abuse, as well as the extent and nature of such abuse remain unanswered as key records remain undisclosed. Plaintiffs thus seek information that is of the utmost public concern. *See American Civil Liberties Union v. Department of Defense*, 339 F.Supp. 501, 504 (S.D.N.Y. 2004).

As this Court has recognized, the disclosure of such information is crucial to checking "oppression and abuse," and thereby strengthening our democracy. *See id.* at 505 (noting that "'history and common sense teach us that an unchecked system of detention carries the potential to become a means for oppression and abuse,'" and that "[i]mplicit in the term 'national defense' is the notion of defending those values and ideals which set this Nation apart") (citations omitted); *see also Doe v. Ashcroft,* 334 F.Supp.2d 471, 519-20 (S.D.N.Y. 2004) ("In general, as our sunshine laws and judicial doctrine attest, democracy abhors undue secrecy, in recognition that public knowledge secures freedom."). Yet, Defendants have not and cannot justify withholdings with reference to the exemptions allowed under FOIA and have consistently failed to meet their burden to justify their decisions to withhold the requested documents through adequate declarations and indices. In addition, it appears that at least some of the documents are being withheld in order to conceal evidence of illegal activity. *See American Civil Liberties Union v. Department of Defense*, 339 F.Supp. at 504-05 (cautioning Defendants against withholding documents because they are "more of an embarrassment than a secret"). Thus, for

the reasons set forth in greater detail below, the Court should now order the Defendants to release those documents in compliance with FOIA.

## STATEMENT OF FACTS

On October 7, 2003, Plaintiffs submitted substantively identical FOIA requests in separate letters to Defendants DOD and its components, DOJ and its components, DOS and CIA. The same request was sent to Defendant DHS on December 13, 2003.  *See* Memorandum in Support of Plaintiffs' Motion for Preliminary Injunction, Exhibits 1-13 (Appendix B).  Plaintiffs' request sought records concerning (1) the treatment of Detainees; (2) the deaths of Detainees while in United States custody and (3) the rendition of Detainees and other individuals to countries known to employ torture or illegal interrogation techniques.  *See id.*, Amended Compl. ¶¶23, 45.  By separate letters filed on the same day, Plaintiffs submitted a request for expedited processing.  *See* Memorandum in Support of Plaintiffs' Motion for Preliminary Injunction, Exhibits 1-13 (Appendix C).  Plaintiffs filed a second FOIA request on May 25, 2004, seeking the same three categories of information as was in their first request, but specifically referring to particular records that had been made known to certain members of the media since October 2003 but remained unknown to the public-at-large.  *See* Amended Compl. ¶¶45-47; Exh. 1-13. Plaintiffs again sought expedited processing on various statutory and regulatory grounds.  None of the Defendants provided any records, or indices of records, in response to Plaintiffs' May 2004 Request.

In June 2004, Plaintiffs commenced this action.  On July 2, 2004 Plaintiffs sought a preliminary injunction to require Defendants to expeditiously process Plaintiffs' requests and to provide Plaintiffs with all responsive non-exempt documents that were the subject of Plaintiffs' requests.  On August 12, 2004, after a hearing before this Court, Plaintiffs' motion was granted and Defendants were ordered to respond in full to a specific list of enumerated documents prepared by Plaintiffs by August 23, 2004.  On August 16, 2004, Plaintiffs sent Defendants the

list of specifically enumerated documents, but Defendants did not respond in full to the Plaintiffs' request. On September 15, 2004 this Court issued an order directing Defendants to respond to Plaintiffs' August 16, 2004 List and "produce or identify" all documents responsive to Plaintiffs' FOIA requests on or before October 15, 2004. *American Civil Liberties Union v. Department of Defense*, 339 F.Supp.2d at 505. The Court also ordered Defendants to "provide plaintiffs with a declaration, as specified in *Vaughn v. Rosen*, 484 F.2d 820 (D.C.Cir. 1973), stating justification for non-production of documents itemized in plaintiffs' August 16, 2004 request." *Id*. at 505.

On October 15, 2004, CIA provided a declaration setting forth its responses to some of the items on Plaintiffs' August 16, 2004 List, and on November 30, 2004 provided an index of responsive documents to Plaintiffs' overall FOIA request that included reference to certain documents responsive to Item 43. *See* Exhibits B (Declaration of Marilyn A. Dorn) and C (CIA List of Documents Responsive to Plaintiffs' 16 August 2004 List). DOD failed to reply by October 15, 2004, and on November 8, 2004 provided Plaintiffs with a response, which merely included an annotated August 16, 2004 List, setting forth purported exemptions without further explanation. *See* Exhibit D (Department of Defense Response to Plaintiffs' Requests of August 16, 2004, dated November 8, 2004). The only other relevant document submitted by DOD was a Declaration submitted on October 15, 2004, explaining the agency's inability to comply with the Court's September 15, 2004 Order. *See* Exhibit E (Declaration of Stewart F. Aly).

## **ARGUMENT**

The purpose of FOIA is "to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed." *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978). FOIA is premised on the notion that "'the people are the only legitimate fountain of power, and it is from them that the constitutional charter, under which the several branches of government hold their

power, is derived.'" *A. Michael's Piano Inc. v. F.T.C.*, 18 F.3d 138, 140 (2d Cir. 1994) (quoting *The Federalist No.* 49, at 313-14 (James Madison) (Clinton Rossiter ed., 1961)). "Our government, relying as it does on the consent of the governed, may not succeed unless its 'people who mean to be their own governors . . . arm themselves with the power knowledge gives.'" *Id.* at 140-41 (quoting S.Rep. No. 813, 89th Cong., 1st Sess. 2, 3 (1965)). FOIA was "enacted to illuminate government activities . . .to provide a means of accountability, to allow Americans to know what their government is doing." *American Civil Liberties Union v. Dep't of Defense*, 339 F.Supp.2d at 504 (citing *Halpern v. FBI*, 181 F.3d 279, 284-85 (2d Cir. 1999); *New York Public Interest Research Group v. United States Env'tl Protection Agency,* 249 F.Supp.2d 327, 331 (S.D.N.Y. 2003) (purpose of FOIA is "to pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny") (quoting *Dep't of Air Force v. Rose*, 425 U.S. 352, 361 (1976)).

FOIA thus "adopts as its most basic premise a policy strongly favoring public disclosure of information in the possession of federal agencies." *Halpern v. FBI*, 181 F.3d 279, 286 (2d Cir. 1999). While there are nine exemptions pursuant to which an agency may withhold information, 5 U.S.C. §§ 552(a)(4)(B) & (b)(1)-(9)), the exemptions are narrowly construed and the Government bears the burden of proving that any one applies. *See Halpern*, 181 F.2d at 287; *see also Department of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 7-8 (2001) (FOIA exemptions are narrowly construed); *John Doe Agency v. John Doe Corp*., 493 U.S. 146, 151-52 (1989); *United States Dep't of Justice v. Reporters Committee for Freedom of the Press*, 489 U.S. 749, 755 (1989) (burden of proving that withholding the records is not improper falls on the agency). It is well established that these "limited exemptions do not obscure the basic policy that disclosure, not secrecy, is the dominant objective of the Act." *Klamath Water Users*, 532 U.S. at 7-8. In order to meet its burden of proving that the exemptions apply, the Government must submit a declaration and index setting forth the bases for its claimed exemptions under FOIA. *See Vaughn v. Rosen*, 484 F.2d 820, 826-28 (D.C.Cir. 1973). This so-called "*Vaughn* Declaration" is a "detailed analysis [of the withheld material] in manageable

segments,' without resort to 'conclusory and generalized allegations of exemptions.'"  *Halpern v. Federal Bureau of Investigation*, 181 F.3d at 290 (*quoting Vaughn v. Rosen*, 484 F.2d  826). The Act further provides that in determining whether one of the nine exemptions applies in a particular case, the Court must undertake a *de novo* review of the agency's decision to withhold documents, and that the Court may examine documents *in camera*, where necessary to perform this review.  5 U.S.C. § 552(a)(4)(B).

Defendants have not met their burden of proving that the relevant exemptions -- Exemption 1 (protecting classified information),[1] Exemption 3 (protecting information exempted under another statute),[2] Exemption 6 (protecting unauthorized invasions of privacy)[3] and Exemption 7 (protecting interference with criminal investigations)[4] -- were properly invoked in this case.  Indeed, Defendants have failed to provide adequate *Vaughn* declarations and indices, and to make specific determinations that all reasonably segregable information has been released.  Moreover, it is evident that Defendants are improperly withholding documents that do not meet the specific criteria set forth in the relevant exemptions, and appear to be using these exemptions to shield embarrassing information from public scrutiny.  Plaintiffs challenge the following exemption claims:

(1)  DOD's invocation of Exemption 3 with respect to documents pertaining to the International Committee of the Red Cross ("ICRC");

---

[1] "FOIA does not apply to matters that are: (1)(A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to such Executive order."  5 U.S.C. § 552(b)(1).

[2] "FOIA does not apply to matters that are . . . (3) specifically exempted from disclosure by statute (other than section 552b of this title), provided that such statute (A) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue, or (B) establishes particular criteria for withholding or refers to particular types of matters to be withheld."  5 U.S.C. § 552(b)(3).

[3] "FOIA does not apply to matters that are . . . (6) personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(6).

[4] "FOIA does not apply to matters that are . . . (7) records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information (A) could reasonably be expected to interfere with enforcement proceedings, (B) would deprive a person of a right to a fair trial or an impartial adjudication, (C) could reasonably be expected to constitute an unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(7)(A)-(C).

(2) DOD's invocation of Exemption 1 with respect to United States Army documents setting forth information about the interrogation of Detainees;

(3) CIA's invocation of national security under Exemptions 1 and 3 to withhold documents and to refuse to disclose whether or not the requested documents exist or are in the possession of the CIA; and

(4) DOD's invocation of Exemptions 6 and 7 with respect to photographs of Detainee abuse on the grounds of privacy.[5]

Because DOD and CIA have improperly invoked these exemptions with respect to the specific documents described, the Court should now order Defendants to release these documents.

## I.    DOD HAS IMPROPERLY INVOKED EXEMPTION 3 WITH RESPECT TO DOCUMENTS PERTAINING TO THE INTERNATIONAL COMMITTEE OF THE RED CROSS.

DOD has invoked FOIA's Exemption 3 to protect its communications with and about the International Committee of the Red Cross ("ICRC").  *See* Exhibit A (August 16, 2004 List, Items 8, 13, 49, 50, 51, and 58).  Exemption 3 allows non-disclosure when another statute, besides FOIA, explicitly permits a government agency to withhold information, "provided that such statute (A) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue, or (B) establishes particular criteria for withholding or refers to particular types of matters to be withheld." 5 U.S.C. § 552(b)(3).  DOD relies on 10 U.S.C. § 130c as the statutory basis for its invocation of Exemption 3.  *See* Exhibit E (Aly Decl., at ¶ 9); Exhibit D (Department of Defense Response to Plaintiffs' Requests of August 16, 2004, Dated November 8, 2004).  That statute permits national security officials to withhold sensitive information received from foreign governments or international organizations where certain conditions are

---

[5] Plaintiffs do not waive their right to challenge Defendants' decision to withhold other documents on the List, as well the redactions made on documents produced, in a subsequent summary judgment motion.

met.  Because DOD has not demonstrated that the information in question meets the requisite conditions of 10 U.S.C. § 130c, DOD's invocation of Exemption 3 in this instance is invalid.

In order to determine whether an agency is appropriately withholding information pursuant to Exemption 3, the Court engages in a two-step analysis:  first, the Court must determine if the particular statute addressing the non-disclosure of government information qualifies as a withholding statute for the purposes of Exemption 3; and second, the Court must determine if the withholding statute covers the particular information that the government seeks to exempt from disclosure.  *See Medina-Hincapie v. Dep't of State*, 700 F.2d 737, 740 (D.C. Cir. 1983); *A. Michael's Piano, Inc.*, 18 F.3d at 143.  Thus, 10 U.S.C. § 130c provides that a national security official may withhold "sensitive information" of foreign governments and international organizations if he makes each of the following determinations: (1) "The information was provided by, otherwise made available by, or produced in cooperation with, a foreign government or international organization;" (2) "The foreign government or international organization is withholding the information from public disclosure (relying for that determination on the written representation of the foreign government or international organization to that effect);" and (3) "Any of the following conditions are met:

> (A) The foreign government or international organization requests, in writing, that the information be withheld.
> (B) The information was provided or made available to the United States Government on the condition that it not be released to the public.
> (C) The information was an item of information, or is in a category of information, that the national security official concerned has specified in regulations prescribed under subsection (f) as being information the release of which would have an adverse effect on the ability of the United States Government to obtain the same or similar information in the future.

To qualify as a withholding statute, the statute must either require that the matters be withheld from the public in such a manner as to leave no discretion on the issue, or establish particular criteria for withholding or specify particular types of matters to be withheld.  *See* 5 U.S.C. § 552(b)(3).  Title 10 U.S.C. § 103c qualifies as a withholding statute because it establishes

particular criteria for withholding the requested information.  *See* 10 U.S.C. § 103c(b)(1)-(3). The pertinent question here is whether the withholding statute covers the particular information the Government seeks to exempt from disclosure.  Because the information at issue does not meet the three criteria set forth in the statute, this statute does not apply to the information the Government seeks to exempt from disclosure.

> **A.    The DOD Has Not Demonstrated that the Information Being Withheld Was Provided By, Otherwise Made Available By Or In Cooperation With the ICRC.**

To qualify as exempt under 10 U.S.C. § 130c, DOD must demonstrate that the information being withheld was "provided by, otherwise made available by, or in cooperation with, a foreign government or international organization."  10 U.S.C. § 130c(b)(1).  DOD has justified its decision to withhold these documents with the cursory statement that they are "documents constituting communications from the International Committee of the Red Cross ("ICRC") or containing information derived from such communications."  Exhibit E (Aly Decl., at ¶ 9).  This cursory declaration does not provide a sufficient basis for withholding the documents requested in Items 13, 49, 50, 51, and 58, as the requested documents plainly contain information that was not provided by the ICRC.[6]  To the contrary, it is abundantly clear that the documents responsive to Items 13, 49, 50, 51, and 58 contain information, opinions, and observations that derive from numerous sources, including United States military officers, as well as factual information not provided by the ICRC.  Because Plaintiffs do not have access to those documents, they cannot be certain of their contents.  Nonetheless, numerous news reports have provided information which establish that DOD has not and cannot meet its burden to justify withholding these documents.  Further, even if there is certain information contained in these documents that was provided by the ICRC, DOD is under a clear statutory obligation to segregate the exempt information and release the remainder of the information contained in the document that was not "provided by, otherwise made available by, or in cooperation with" the ICRC.

---

[6] Because Item 8 in fact seeks reports from the ICRC, Plaintiffs do not address it in this section.

Items 13, 49, and 58 seek documents that contain responses to or discussions with the ICRC.  Item 13 seeks records that contain a "[r]esponse to concerns raised by the ICRC regarding the treatment of Detainees;" Item 49 seeks a "[l]etter from military lawyers over the signature of Brig. Gen Janie Karpinski to the International Committee for the Red Cross (ICRC) responding to its concerns about conditions at Abu Ghraib;" and Item 58 seeks "[a] complete set of documents reflecting discussions between the ICRC and military officers at Guantánamo Bay."  *See* Exhibit A (August 16, 2004 List).  The responsive memoranda contain several categories of information that were plainly not provided by or otherwise made available by, or in cooperation with the ICRC, including, but not limited to, observations about the general tenor of the meetings between ICRC delegates and military officers, descriptions of and questions about various policies relating to the treatment of Detainees, and factual statements about conditions at the detention facilities.  *See* Exhibit F (Scott Higham, *A Look Behind the "Wire" at Guantánamo*, WASH. POST, June 14, 2004, at A01).  For example, military officers prepared a memorandum describing a meeting that occurred on or about January 21, 2003 between DOD officials and ICRC delegates.  *See id*.  This memorandum contains discussions about the tenor of the meeting with the ICRC ("The meeting was very informal, but well structured.") which constitute the observations of DOD military officials about the meeting, *not* information produced by the ICRC.  *See id*.  Another memorandum prepared after this meeting, entitled "General Observation and Meeting Notes," states that "[t]he officers wondered whether they should explain [to the Detainees that the reddish jumpsuits they were wearing was not a sign that they were going to be put to death], change the color of the jumpsuits or do nothing."  *See id*.  This memorandum, rather than containing information provided by the ICRC, contains statements about the treatment of detainees.

Certain other memoranda referenced in the relevant news articles contain factual statements about the detainees and their conditions of confinement which plainly do not meet the statutory standard and were not provided by or produced in cooperation with the ICRC.  One such memorandum contains a statement that the military decided to provide detainees with cloth

for their korans and a daily call to prayer.  Item 49, a letter to the ICRC from a military officer, contends that isolating some inmates at the prison for interrogation because of the significant intelligence value was a "military necessity," and states that prisoners held as security risks could legally be treated differently from prisoners of war or ordinary criminals.  *See* Exhibit G (Neil A. Lewis, *Documents Build a Case for Working Outside the Laws on Interrogating Prisoners*, N.Y. TIMES, June 9, 2004, at A8).  Again, this document does not contain information provided by the ICRC, but rather contains statements of policy about the use of isolation of Detainees, as well as discussions about the use of certain interrogation techniques.  *See id*.  These documents contain information and opinions that derive from numerous sources, including the observations, reflections, and factual assertions of the military officers drafting the documents about the meetings, about the conditions at Guantánamo, and about the DOD's policy and procedures.  If 10 U.S.C. § 103c protected information that had been produced by the agency, then the agency could exempt its own records from FOIA by sending them to the ICRC.

Items 50 and 51 seek, respectively, a memorandum for MP and MI personnel at Abu Ghraib from Colonel Marc Warren regarding a plan to restrict Red Cross access to Abu Ghraib, and a memorandum from a top legal adviser to Lt. Gen. Ricardo S. Sanchez to military intelligence and police personnel at the Abu Ghraib prison regarding a new plan to restrict Red Cross access to Abu Ghraib.  These items plainly concern the military's attempt to restrict ICRC access to Abu Ghraib or to certain Detainees held at Abu Ghraib; as such the information contained in those documents was most certainly not provided by the ICRC, and was absolutely not produced in cooperation with the ICRC.  To the contrary, these documents are internal military documents that set forth the military's plan to limit the ICRC's ability to visit certain Detainees and to observe their conditions of confinement.

In sum, because there is extensive contrary evidence demonstrating that these documents contain information that clearly does not meet the first criterion of the statute, the Court should order DOD to release these documents.

B.    **Further DOD Has Not Demonstrated That The ICRC Has Either Withheld These Documents From Public Disclosure Or Provided Them On the Condition That They Be Withheld From Public Disclosure.**

Title 10 U.S.C. § 130c also provides that the government must demonstrate (1) that the ICRC is "withholding the information from public disclosure (relying for that determination on the written representation of the foreign government or international organization to that effect);" and (2) "Any of the following conditions are met:

> (A) The foreign government or international organization requests, in writing, that the information be withheld; (B) The information was provided or made available to the United States Government on the condition that it not be released to the public; (C) The information was an item of information, or is in a category of information, that the national security official concerned has specified in regulations prescribed under subsection (f) as being information the release of which would have an adverse effect on the ability of the United States Government to obtain the same or similar information in the future."

> 10 U.S.C. § 130c(b)(2) -(b)(3).

DOD merely asserts in a conclusory statement that the ICRC always treats its documents as "strictly confidential," and provides them only on the condition that they not be released to the public.  Exhibit E (Aly Decl., at ¶ 9).  DOD's assertion does not satisfy its burden of proof with respect to either of these criteria.

First, DOD has not demonstrated that the ICRC has provided a written representation indicating that the ICRC is withholding this specific information from public disclosure.  Rather, DOD has merely alleged, without support, that the ICRC treats its documents as "strictly confidential."  The statute, however, contemplates the provision of a written representation that the *specific* information at issue is being withheld from public disclosure.  If there is no such representation with respect to this particular information, the DOD cannot meet this prong of the test.  Second, DOD has also not demonstrated that the ICRC provided all of the information contained in the requested documents on the condition that it be withheld.  Rather, there are indications to the contrary.  Thus, for example, the ICRC's website acknowledges that the ICRC

has felt "compelled to make some of its concerns public" with respect to the United States' treatment of Detainees in Iraq, Afghanistan and Guantánamo. *See* Exhibit H (ICRC's Operational Update, "US detention related to the events of 11 September 2001 and its aftermath - the role of the ICRC," 5/11/2004). Moreover, there have been numerous stories in the media containing ICRC statements and reports describing the treatment of Detainees. *See, e.g.*, Exhibit I (Press reports describing ICRC's public statements concerning the treatment of Detainees).

For this reason too, these documents do not meet the criteria set forth by the relevant withholding statute. Accordingly, the Court should grant summary judgment in favor of Plaintiffs and order DOD to disclose documents responsive to Items 8, 13, 49, 50, 51 and 58.

II.    DEFENDANT DOD HAS IMPROPERLY INVOKED EXEMPTION 1 TO WITHHOLD DOCUMENTS SETTING FORTH INTERROGATION TECHNIQUES.

DOD has invoked Exemption 1 as a basis for withholding documents responsive to, *inter alia*, Items 4, 37, 39, 40, 41, and 42. *See* Exhibit A. Exemption 1 exempts from disclosure matters that are "(A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to such Executive order." 5 U.S.C. § 552(b)(1). Executive Order 12,958, the applicable executive order here,[7] provides that certain authorized categories of information may be classified if their disclosure could result in damage to national security. The Order also makes clear that information may not be classified in order to "conceal violations of law," or to "prevent embarrassment." Executive Order, at § 1.8(a). Because DOD has provided no justification for withholding these documents, DOD's invocation of Exemption 1 with respect to these documents is improper.

---

[7] Executive Order 12,958 is applicable because it was the governing executive order when the relevant classifications decisions were made. *See Lesar v. United States Dept. of Justice*, 636 F.2d 472, 479-80 (D.C.Cir. 1980). Executive Order 12,958 was amended in part by Executive Order 13292 on March 25, 2003, but the provisions applicable to these documents remain unchanged.

FOIA requires that the Court conduct a *de novo* review of the DOD's decision to withhold documents responsive to Items 4, 37, 39-42 pursuant to Exemption 1.  The Court performs the requisite *de novo* review by examining the agency's declarations and indices and, where appropriate, by conducting an *in camera* review of the documents.  While courts have held that an agency's declarations are generally accorded "substantial weight" in the national security context, the statute nonetheless requires that the Court conduct a *de novo* review of the agency's decision to withhold documents.  If the Court determines that the DOD has not or cannot meet its burden of proving that the documents contain information that was specifically authorized under criteria established by Executive Order 12,958 to be kept secret in the interest of national defense or foreign policy, then the documents must be released.

DOD has provided no justification whatsoever for its decision to withhold the relevant documents.  It is evident that the documents should not have been classified under Executive Order 12,958 and that their disclosure will not cause damage to national security.  Instead, it appears that these documents are being withheld in order to conceal violations of law.  For these reasons, the Court should order the DOD to release the documents.  At a minimum, because the underlying documents concern illegality and misconduct on the part of the DOD, the Court must review the DOD's invocation of Exemption 1 with a heightened scrutiny and conduct an *in camera* review.

A.      **The Court Must Conduct a *De Novo* Review of DOD's Decision to Withhold These Documents.**

As set forth above, the Court must conduct a *de novo* review to determine whether the DOD has properly withheld records under any of FOIA's nine statutory exemptions, including Exemption 1.  5 U.S.C. § 552(a)(4)(B).  In Exemption 1 cases, as in all FOIA cases, the Government bears the burden of justifying the nondisclosure of information, and must provide a declaration--and in certain instances an index--that accords with the requirements of *Vaughn v. Rosen*, 484 F.2d 340 (D.C.Cir. 1973), setting forth the bases for withholding the requested documents.  The Court then makes a *de novo* determination -- on the basis of the affidavit and

indices submitted, or, where appropriate, on the basis of an *in camera* review of the requested documents -- of the validity of the exemptions claimed. Despite the potentially sensitive nature of the information involved in Exemption 1 cases, the language of the statute is plain and unambiguous: *de novo* review is the standard for judicial review in determining the applicability of all exemptions under FOIA.

The plain language of FOIA provides that when reviewing an agency's non-disclosure determination, "the court shall determine the matter *de novo*, and may examine the contents of such agency records in camera to determine whether such records or any part thereof shall be withheld under any of the exemptions," and that "the burden is on the agency to sustain its action." 5 U.S.C. § 552(a)(4)(B). *De novo* judicial review is a core element of the Act and is "essential to prevent courts reviewing agency action from issuing a meaningless judicial imprimatur on agency discretion." *A. Michael's Piano, Inc.*, 18 F.3d at 141 (citing S.Rep. No. 813, 89th Congress, 1st Sess. at 8). The statute does not distinguish between Exemption 1 and other exemptions when describing the applicable standard for judicial review, and the Act clearly states that the burden is on the Government in all cases, even those turning on the applicability of Exemption 1. *See Halpern*, 181 F.3d at 287 (describing the "*de novo*" standard of review as "faithful to the text, purpose and history of FOIA" in the context of Exemption 1).

As with all exemptions, the agency may bear its burden of proving that it has properly invoked Exemption 1, by submitting affidavits or other evidence showing that the information at issue has been properly classified. Such affidavits must show with "reasonable specificity" why the withheld material falls within the ambit of Exemption 1; the affidavits "will not suffice if the agency's claims are conclusory, merely reciting statutory standards, or if they are too vague or sweeping." *Hayden v. National Security Agency/Central Security Serv.*, 608 F.2d 1381, 1387 (D.C. Cir. 1979). Under the national security exemption, the requested material may be deemed classifiable on the basis of agency affidavits only if the affidavits contain reasonable specificity of detail, and not merely conclusory statements, and if they are not called into question by contradictory evidence in the record or by evidence of agency bad faith. *See Public Citizen v.*

*Department of State*, 276 F.3d 634 (D.C.Cir. 2002); *see also Halpern*, 181 F.3d at 293 (declaring that agency's "explanations read more like a policy justification" for Executive Order 12356, that the "affidavit gives no contextual description," and that it fails to "fulfill the functional purposes addressed in *Vaughn*"); *Campbell v. United States Dep't of Justice*, 164 F.3d 20, 31, 37 (D.C. Cir. 1998) (FBI failed to justify its Exemption 1 claim because its declaration did not "draw any connection between the documents at issue and the general standards that govern the national security exemption"), *on remand*, 193 F. Supp.2d 29, 37 (D.D.C. 2001) (finding declaration insufficient where it merely concluded, without further elaboration, that "disclosure of [intelligence information] . . . could reasonably be expected to cause serious damage to the national security").

An adequate Vaughn declaration and index permit the Court to undertake a *de novo* review and provide the FOIA requester with the opportunity to challenge the agency's withholding.  Here, because there is no Vaughn declaration or index justifying DOD's decision to withhold the documents under Exemption 1, the Court should grant Plaintiffs' motion for summary judgment and order DOD to release these documents.

> **B.     The Court's *De Novo* Review Must Determine Whether the Information in Question Was Specifically Authorized Under Criteria Established By The Applicable Executive Order to Be Kept Secret In the Interest of National Defense or Foreign Policy.**

Exemption 1 provides that the Court's *de novo* review must determine whether classification of the information in question was "specifically authorized" under criteria established by an executive order to be kept secret in the interest of national defense or foreign policy.  *See* 5 U.S.C. §552(b)(1).  Executive Order 12,958 contains four prerequisites for classifying information: (1) the information must be classified by an "original classification authority;" (2) the information must be "under the control of" the government; (3) the information must fall within one of the authorized withholding categories under this order and (4) the original classification authority must "determine[ ] that the unauthorized disclosure of the information reasonably could be expected to result in damage to the national security" and must

be "able to identify or describe the damage." Executive Order 12,958, at § 1.2(a). The authorized withholding categories, in turn, include: military plans, weapons systems, or operations; foreign government information; intelligence activities, sources or methods; and foreign relations or foreign activities of the United States, including confidential sources. Executive Order 12,958, at §1.5(a)-(d). "Damage to the national security" is defined as "harm to the national defense or foreign relations of the United States from the unauthorized disclosure of information, to include the sensitivity, value, and utility of that information." Executive Order 12,958, at § 1.1(l). Thus, the Court's task is to determine whether the information in question falls within one of the authorized withholding categories, and whether unauthorized disclosure could reasonably be expected to result in damage to national security. In no case, however, shall information be classified in order to "(1) conceal violations of law, inefficiency, or administrative error; (2) prevent embarrassment to a person, organization, or agency; (3) restrain competition; or (4) prevent or delay the release of information that does not require protection in the interest of national security." Executive Order 12,958, at §1.8(a).

In Exemption 1 cases, the Court must determine whether the agency "has adequately shown that the redacted [or withheld] information logically falls within the classification categories established by [the applicable Executive Order]." *Halpern*, 181 F.3d at 290; *see Donovan*, 806 F.2d 55, 59-60 (2d Cir. 1986) (ordering the FBI to release the documents because they did not meet the criteria set forth in the applicable executive order and their disclosure provided no danger of damage to national security), abrogated on other grounds *United States Department of Justice v. Landano*, 508 U.S. 165 (1993). Accordingly, the Court must determine whether the information at issue in fact falls within one of the authorized withholding categories and whether its disclosure could reasonably be expected to result in damage to national security. *See Weatherhead v. United States*, 157 F.3d 735, 742 (9th Cir. 1998) (undertaking an *in camera* review of the withheld documents and determining that the disclosure of the document could not

"reasonably be expected to result in damage to the national security").[8]  In *Weatherhead*, the Court considered the "sensitivity, value and utility" of the information, as set forth in the definition of damage to national security, in making its determination that the disclosure of these documents could not reasonably be expected to cause damage to national security.  *See id*.

Plaintiffs do not dispute that courts give "substantial weight" to the agency's declarations in the national security context, *see Halpern*, 181 F.3d at 295.  Nonetheless, it remains the case that the Court must conduct a *de novo* review of the agency's decision and determine whether the applicable order actually authorizes the exemption of the requested information.  Thus, the agency's classification determination is only afforded substantial weight, "when accompanied by reasonably detailed explanations of why material was withheld."  *See id*.  In deciding this issue, the Court must not "relinquish[] its independent responsibility."  *Goldberg*, 818 F.2d 71, 77 (D.C.Cir. 1987); *see also Campbell*, 164 F.3d at 30 ("While the agency's declarations merit substantial weight, such deference is not equivalent to acquiescence."); *Ray v. Turner*, 587 F.2d 1187, 1194 (D.C. Cir. 1978) (noting that FOIA drafters "stressed the need for objective, independent judicial determination, and insisted that judges could be trusted to approach the national security determinations with common sense, and without jeopardy to national security.").

Indeed, the 1974 amendments, which enacted the current version of FOIA, were passed in order to overturn *EPA v. Mink*, 410 U.S. 73 (1973), in which the United States Supreme Court held that courts should not review the propriety of classification decisions or look beyond the agency affidavit stating that the requested documents had been duly classified pursuant to an Executive Order.  *See id*. at 81-84.  In *Mink*, the Court found an *in camera* inspection to test the

---

[8] After a petition for certiorari was granted to review this case, *see United States v. Weatherhead*, 527 U.S. 1063 (1999), the Plaintiff discovered that the document at issue had already been released.  *See Weatherhead v. United States*, No. 95-519, slip op. at 2 (E.D. Wash. Mar. 29, 1996), reconsideration granted in pertinent part (E.D. Wash. Sept. 9, 1996) (upholding classification upon in camera inspection). The United States Supreme Court dismissed the case as moot, and vacated the judgment below on that basis.  *See United States v. Weatherhead*, 528 U.S. 1042 (1999).

propriety of the classification not to be permitted. *See id.* at 81. Congress, however, amended FOIA for the express purpose of overruling *Mink*. *See Halpern*, 181 F.3d at 291 (citing S.Rep. No. 93-1200, 93d Cong., 2d Sess. 11-12 (1974)). As a result, Exemption 1, which had previously covered matters "specifically required by Executive order to be kept secret in the interest of the national defense or foreign policy," was modified to exempt only matters that are "(A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to such Executive order." 5 U.S.C. § 552(b)(1). The 1974 amendments also clarified that *de novo* review should apply in all cases and specifically extended the availability of *in camera* inspections to Exemption 1 cases. *See Halpern*, 181 F.3d at 291.[9]

In sum, the Court must undertake a true *de novo* review of the government's classification determination, and while substantial weight would be afforded to sufficiently detailed affidavits demonstrating that the documents at issue met the relevant criteria, the judiciary must ultimately determine the propriety of these classification decisions because there are no sufficiently detailed affidavits demonstrating that the documents meet the relevant criteria.

---

[9] Moreover, the legislative history of the Act affirms that the courts are empowered to make true *de novo* determinations even in the national security context. While the Conference report recognizes "that the Executive departments responsible for national defense and foreign policy matters have unique insights into what adverse affects [sic] might occur as a result of public disclosure of a particular classified record," S. Conf. Rep. No. 9301299, at 12 (1974), the Senate Report states that "a government affidavit certifying the classification of material pursuant to an executive order will no longer ring the curtain down on an applicant's effort to bring such material to public light." Subcomm. On Government Information And Individual Rights, House Comm. On Government Operations & Subcomm. On Administrative Practice And Procedure, Senate Comm. On The Judiciary, 94th Cong., 1st Sess., Freedom Of Information Act And Amendments Of 1974 Source Book: Legislative History, Texts, And Other Documents 182 (Jt. Comm. Print 1975) [Hereinafter Source Book] (Reprinting S. Rep. No. 854, 93d Cong., 2d Sess. (1974)). The Senate Report also states that: "[i]t is essential...to the proper workings of the Freedom of Information Act that any executive branch review, itself, be reviewable outside the executive branch. And the courts . . . are the only forums available in which such review can properly be conducted." *See id.* at 183. Finally, the House Report provides that the language of Exemption 1 "means that the court, if it chooses to undertake review of a classification determination, including examination of the records in camera, may look at the reasonableness or propriety of the determination to classify the records under the terms of the Executive order." *Id.* at 127 (reprinting H.R. Rep. No. 876, 93d Cong., 2d Sess. (1974)).

**C.    DOD Did Not and Cannot Meet Its Burden of Proving That The Classification of These Documents Was Specifically Authorized Under the Criteria Set Forth in Executive Order 12,958.**

In this case, DOD has provided no justification for withholding the documents responsive to Items 4, 37, 39, 40, 41, and 42.  *See* Exhibit A (August 16, 2004 List).  Moreover, the classification of these documents is not authorized under the criteria set forth in Executive Order 12,958, and their disclosure could not reasonably be expected to cause damage to national security.

The items in question are army documents setting forth severe interrogation techniques and the mechanisms for obtaining approval to employ such techniques.  Item 4 seeks an interim policy put in place by Lt. General Ricardo Sanchez based on the Guantánamo Bay policy described in General Miller's report.  *See* Exhibit J (R. Jeffrey Smith, *Knowledge of Abusive Tactics May Go Higher*, WASH. POST, May 16, 2004, at A01; Mark Mazetti, et al. *Inside the Iraq Prison Scandal*, U.S. NEWS & WORLD REPORT, May 24, 2004).  Item 37 seeks documents showing that Lt. Gen. Ricardo Sanchez approved the use of high pressure interrogation techniques by senior military officials at Abu Ghraib without requiring them to obtain prior approval from outside the prison.  *See* Exhibit K (R. Jeffrey Smith and Josh White, *General Granted Latitude at Prison*, WASH. POST, June 12, 2004, at A01).  One such document includes a list permitting senior officials to use "military dogs, temperature extremes, reversed sleep patterns, sensory deprivation, and diets of bread and water on detainees whenever they wished." *See id*.  In October 2003 this policy was revised, and not only were several items removed from the list of permissible techniques, but, in addition, prison officials were required to obtain General Sanchez's approval for the remaining high-pressure methods.  *See id*. Item 39 seeks a Memorandum from the Combined Joint Task Force (CJTF-7) regarding the applicability of Army Field Manual 34-52 and sensory deprivation.  Items 40 and 41 seek documents regarding "interrogation and counter-resistance policy" listing interrogation tactics approved by Combined Joint Task Force-7.  *See id.*  One of these documents states that "at no time will detainees be treated inhumanely or maliciously humiliated."  *See id*.  This same document, however,

apparently permits the use of yelling, loud music, a reduction of heat in winter and air conditioning in summer, as well as stress positions -- all without first gaining the permission of anyone more senior than the "interrogation officer in charge" at Abu Ghraib. *See id*. Item 42 seeks a memorandum from CJTF-7 on interrogations.

Notably, many documents responsive to Plaintiffs' request concern illegal activity sanctioned by the highest levels of government. Based on the information available to Plaintiffs, these documents appear to condone the use of torture or cruel, inhuman or degrading treatment of Iraqi Detainees, which is illegal under applicable United States law. As recognized by a memorandum authored and released by the Department of Justice on December 30, 2004, "[t]orture is abhorrent both to American law and values and to international norms." *See* Exhibit L (December 30, 2004 DOJ Memorandum). The War Crimes Act provides that it is a war crime for any member of the U.S. Armed Forces or for a U.S. national to commit an act "inside or outside the United States" that, among other things, is "defined as a grave breach in any of the [Geneva Conventions] or any protocol to such convention to which the United States is a party." 18 U.S.C. § 2441(a), (c)(1). Each of the four Geneva Conventions provides that "willful killing, torture or inhuman treatment, including biological experiments, [and] willfully causing great suffering or serious injury to body or health" constitute grave breaches of the Conventions. Geneva Convention for the Amelioration of the Condition of the Wounded and Sick in Armed Forces in the Field, Aug. 12, 1949, art. 50, 6 U.S.T. 3114; Geneva Convention for the Amelioration of the Condition of Wounded, Sick and Shipwrecked Members of the Armed Forces at Sea, Aug. 12, 1949, art. 51, 6 U.S.T. 3217; Geneva Convention Relative to the Treatment of Prisoners of War, Aug. 12, 1949, 6 U.S.T. 3316, art. 130; Geneva Convention Relative to the Protection of Civilian Persons in Time of War, Aug. 12, 1949, 6 U.S.T. 3516, art. 147. The War Crimes Act thus not only provides a basis for imposing criminal liability upon a person who commits torture, but also incorporates the prohibition against torture in the Geneva

Conventions into U.S. criminal law.[10]   Moreover, members of the Armed Forces who commit

acts of torture also face potential prosecution under 10 U.S.C. § 893, which provides that any

person subject to the Uniform Code of Military Justice "who is guilty of cruelty toward, or

oppression or maltreatment of, any person subject to his orders shall be punished as a court-

martial may direct."

Congress affirmed the prohibition against torture less than two months ago, explaining

that "the Constitution, laws, and treaties of the United States and the applicable guidance and

regulations of the United States Government prohibit the torture or cruel, inhuman, or degrading

treatment of foreign prisoners held in custody by the United States."   Ronald W. Reagan

National Defense Authorization Act for Fiscal Year 2005, Pub. L. No. 108-375, § 1091(a)(6),

118 Stat. 1811, 2068 (2004).  Consistent with that recognition, Congress stated that "[i]t is the

policy of the United States to … ensure that no detainee shall be subject to torture or cruel,

inhuman, or degrading treatment or punishment that is prohibited by the Constitution, laws, or

---

[10]      The treaties to which the United States is a party, which, along with the Constitution and federal laws, are "the supreme Law of the Land."  U.S. Const., art. VI, cl. 2; *see also Whitney v. Robertson*, 124 U.S. 190, 194 (1888) ("By the constitution, a treaty is placed on the same footing, and made of like obligation, with an act of legislation.  Both are declared by that instrument to be the supreme law of the land, and no superior efficacy is given to either over the other.").  These treaties repudiate torture, most sweepingly in the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT"), G.A. Res. 46, U.N. GAOR 39th Sess., Supp. No. 51, at 197, U.N. Doc. A/RES/39/708 (1984), *reprinted in* 23 I.L.M. 1027 (1984).  The Senate ratified CAT (which President Reagan submitted to the Senate and President George H.W. Bush supported) in 1990, and the United States became a party to the treaty with the enactment of 18 U.S.C. § 2340A in 1994.  Article 2 of CAT requires each state party to take all necessary actions "to prevent acts of torture in any territory under its jurisdiction."  *Id*., art. 2(1).  It also provides that "[n]o exceptional circumstances whatsoever, whether a state of war or a threat of war, internal or political instability or any other public emergency, may be invoked as a justification of torture."  *Id*., art. 2(2).  Article 16 expands the scope of CAT to reach "acts of cruel, inhuman or degrading treatment or punishment which do not amount to torture as defined in article I, when such acts are committed by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity."  *Id*., art. 16(1).  Congress enacted 18 U.S.C. § 2340A to implement CAT.  Section 2340A prescribes penalties for any person who "commits or attempts to commit torture" outside of the United States.  18 U.S.C. § 2340A(a).

The United States is also a party to the International Covenant on Civil and Political Rights ("ICCPR"), G.A. Res. 2200A (XXI), U.N. GAOR, 21st Sess., Supp. No. 16, at 52, U.N. Doc. A/6316 (1966).  That treaty—which President George H.W. Bush supported and the Senate ratified in 1992—contains, among other things, an explicit prohibition against torture:  "No one shall be subjected to torture or to cruel, inhuman or degrading treatment or punishment."  Article 7.  The ICCPR's prohibition against torture is one of seven articles as to which no derogation is permitted in any circumstances.  Article 4 (2).  As a result, the ICCPR, like CAT, makes the prohibition against torture absolute.

treaties of the United States."   *Id.* § 1091(b)(1), 118 Stat. at 2069.   Congress also required the

Secretary of Defense to take immediate, concrete actions to advance these principles.

Specifically, the Secretary of Defense must ensure that policies are developed to guarantee that

"members of the Armed Forces, and all persons acting on behalf of the Armed Forces or within

facilities of the Armed Forces, treat persons detained by the United States Government in a

human manner consistent with the international obligations and laws of the United States and the

policies set forth in section 1091(b)."   *Id.* § 1092(a), 118 Stat. at 2069.

Nonetheless, there is no question but that Detainees have been subjected to torture, and

cruel, inhuman and degrading treatment.   *See, e.g*., Exhibit M ((1) July 14, 2004 Letter from T.J.

Harrington, FBI, to Major General Donald J. Ryder, Department of the Army; (2) June 25, 2004

Memorandum from L.E. Jacoby, Defense Intelligence Agency, to Under Secretary of Defense

for Intelligence; (3) June 10, 2004 Memorandum for Record - Report of Violations of the

Geneva Conventions and the International Laws of Land Warfare; (4) Internal FBI e-mail

referring to "extreme interrogation techniques that were planned and implement against certain

detainees;" (5) December 5, 2003 e-mail to Gary Bald, et al.; (6) Memorandum entitled GTMO

Issues for SAC Wiley; (7) May 22, 2002 Statement; (8) August 2, 2004 e-mail to Valerie

Caproni).[11]   These documents detail numerous instances of torture, and cruel, inhuman and

degrading treatment by DOD personnel against Detainees.   There is also extensive evidence that

this unlawful treatment has been ordered and authorized at the highest levels of government and

the military.   Indeed, the Department of Justice authored a memorandum in August 2002

authorizing torture, and stating that "severe" pain under 18 U.S.C. §§ 2340-2340A is limited to

pain "equivalent to the pain accompanying serious physical injury, such as organ failure,

impairment of bodily function, or even death."   *See* Exhibit N (August 2002 Department of

Justice Memorandum).   This memorandum was withdrawn by DOJ in June 2004, and replaced

with a memorandum on December 30, 2004, which specifically sets forth the DOJ's

---

[11] The first document was leaked to the Associated Press.   The second was produced by the Defense Intelligence
Agency, a DOD component, in response to Plaintiffs' FOIA request.   The remainder were produced by the FBI in
response to Plaintiffs' FOIA request.

disagreement with the definition of pain presented in the August 2002 memorandum.  *See* Exhibit L (December 30, 2004 Memorandum, at 2 (stating that "we disagree with statements in the August 2002 Memorandum limiting 'severe' pain under the statute to 'excruciating and agonizing' pain . . . or to 'pain accompanying serious physical injury, such as organ failure, impairment of bodily function, even death.'")).  Thus, it is evident, even from the Government's own admission, that the legal standards under which the government was operating authorized the use of torture in interrogations of Detainees.  As such, these documents, which set forth the authorized interrogation techniques, contain evidence of illegality, or at the very least conduct embarrassing to the United States government.

The Executive Order on which the DOD relies does not permit an agency to withhold records in order to hide illegal activity.  As set forth above, there are clear indications -- based on news reports and the nature of records that have already been released -- that Defendant DOD is withholding records in violation of the Executive Order, however, as DOD has not provided any justification for withholding these documents (because it has not provided Vaughn declarations), the Court need not reach the question of whether the DOD is withholding records to hide illegality or prevent embarrassment.  Because DOD provides no legitimate justification for withholding these documents, the Court should find that they are being improperly withheld and order DOD to release the documents.

> **D.    Because DOD Has Provided An Inadequate Justification for Withholding These Documents, and Because There is Voluminous Evidence of Underlying Illegality, At a Minimum, the Court Should Conduct an *In Camera* Review of The Requested Documents.**

Because the DOD's declarations do not adequately justify the decision to withhold the documents, and because the documents concern illegal activity, at a minimum the Court must conduct an *in camera* review in order to determine whether or not each agency's decision to withhold the documents is appropriate and whether the information at issue meets the criteria set forth in Executive Order 12,958.  FOIA specifically authorizes the *in camera* examination of documents.  5 U.S.C. § 552(a)(4)(B).  When agency affidavits are insufficiently detailed to

permit meaningful review of exemption claims, where there is contrary record evidence, or where there is evidence of bad faith, an *in camera* review is appropriate.

An *in camera* review is appropriate whenever the district court determines that it cannot make a *de novo* determination on the basis of the affidavits and indices that the agency has presented. *Patterson v. FBI*, 893 F.2d 595, 599 (3d Cir. 1990) (finding *in camera* review of two documents appropriate when agency description of records was insufficient to permit meaningful review and to verify good faith of agency in conducting its investigation); *Allen v. CIA*, 636 F.2d 1287, 1291 (D.C. Cir. 1980) (holding that conclusory affidavit by agency requires remand to district court for in camera inspection of document). In *Donovan*, for example, the district court determined that an *in camera* inspection was an appropriate exercise of its discretion because the agency's affidavits did not adequately justify the agency's non-disclosure of the requested documents. 806 F.2d at 59-60. In this case, the agency has submitted no affidavits to justify the non-disclosure of the requested documents. At a minimum, then, the Court should review these documents in order to determine whether they have been properly withheld.

Moreover, the Court may also conduct an *in camera* review where the documents at issue concern illegal activity. *See Jones v. FBI*, 41 F.3d 238, 242-44 (6th Cir. 1994) (finding *in camera* inspection necessary, not because FBI acted in bad faith with regard to plaintiff's FOIA request, but due to evidence of illegality with regard to FBI's underlying investigation). Even where there is no evidence that the agency acted in bad faith with regard to the FOIA action itself there may be "evidence of bad faith or illegality with regard to the underlying activities which generated the documents at issue." *Jones*, 41 F.3d 242. Where it becomes apparent that the subject matter of a request involves activities which, if disclosed, would "publicly embarrass the agency or that a so-called 'cover up' is presented, government affidavits lose credibility." *See id.* 243. In *Jones*, for example, because the FBI's COINTELPRO investigation went beyond the ordinary detection and prevention of criminal activity to well-documented infringements of civil liberties whose disclosure threatened public embarrassment of the FBI, the Court found that an *in*

*camera* review was appropriate.  *See also Rugiero v. United States Dep't of Justice*, 257 F.3d 534, 547.

It is clear that the documents at issue here contain evidence of illegality.  *See* discussion supra in II.C.  For this reason, the Court should undertake an *in camera* review of these documents in order to determine whether or not they should be disclosed under FOIA.


III.    DEFENDANT CIA HAS IMPROPERLY INVOKED EXEMPTIONS 1 AND 3.

Defendant CIA has invoked Exemptions 1 and 3 as a basis for withholding documents responsive to, *inter alia*, Items 1, 29, 43 and 61.  *See* Exhibit A (August 16, 2004 List).  Items 1 and 29 seek memoranda from the DOJ to the CIA, one interpreting the convention against torture and one specifying interrogation methods that the CIA may use against senior al-Qaeda members.  Item 61 seeks an order from President Bush authorizing the CIA to set up detention facilities outside the United States.  The CIA has refused to respond to these requests, invoking what is referred to as a Glomar response, a doctrine that permits agencies to refuse to confirm or deny the existence of records, when doing so would itself reveal exempted information.[12]  With respect to Item 43, which seeks documents relating to CIA Director George Tenet's request that Defense Secretary Donald Rumsfeld hold an Iraqi suspect at a detention center but not be listed on the prison rolls, as well as Secretary Rumsfeld's order implementing that request, the CIA acknowledged that it has responsive documents, but refused to release them.

As set forth above, the Court is obligated to conducted a *de novo* review of the CIA's decision to withhold these documents pursuant to Exemptions 1 and 3, and to determine whether or not the documents were properly classified under Executive Order 12,958.  The withholding statute for Exemption 3 purposes is the National Security Act which authorizes the director of intelligence to protect intelligence sources and methods from "unauthorized disclosure."  50

---

[12] This type of response was first judicially recognized in *Phillippi v. CIA*, 546 F.2d 1009 (D.C. Cir. 1976), in which the Court held that the CIA could refuse to confirm or deny its ties to Howard Hughes' submarine retrieval ship, the *Glomar Explorer*.  *See id.* at 1013.

U.S.C. § 403-3(c)(7).  First, the CIA's invocation of the Glomar response for Items 1, 29, and 61 is inappropriate, as the first two items are legal memoranda and do not require that the CIA disclose covert operations, and acknowledging the existence of Item 61 would not reveal information in one of the authorized withholding categories, the disclosure of which could reasonably be expected to cause damage to national security.  Second, the CIA has provided no justification for classifying documents responsive to Item 43.  For this reason, the Court should order their release.  In the alternative, and at a minimum, the Court should undertake an *in camera* review on the grounds that there is evidence of illegality in the underlying documents.

> **A.** **CIA's Invocation of Glomar in Response to Items 1, 29, and 61 is Improper.**

The CIA's invocation of the Glomar response for Items 1, 29 and 61 is improper.  The Glomar response is available to the CIA when it seeks to protect itself from revealing covert or clandestine activities in circumstances where confirming or denying that the requested documents exist would do so.  This response has been used by the CIA in the past to protect itself from disclosing that it had undertaken a certain clandestine activity or that the agency had worked with a particular source or operative.  In this case, the CIA invokes the Glomar response in order to protect the existence of documents containing legal analysis from the DOJ.  The CIA has not and cannot meet its burden of proving that the existence of these memoranda would, in itself, reveal the existence of covert or clandestine activities.

Item 1 seeks a "[m]emorandum from DOJ to CIA interpreting Convention Against Torture."  This memorandum is reported to contain a legal interpretation of the Convention Against Torture, and provides that certain interrogation techniques -- including sleep deprivation, the use of phobias and the deployment of "stress factors" -- are legally permissible.  *See* Exhibit O (John Barry et al., *The Roots of Torture: The Road to Abu Ghraib Began After 9/11, When Washington Wrote New Rules to Fight a New Kind of War*, NEWSWEEK, May 24, 2004).  The memorandum also contains a prohibition on "causing severe physical or mental pain."  *See id*.  Item 29 seeks a legal memorandum from the DOJ setting forth the interrogation methods that the

CIA may use against senior al-Qaeda members.  This memorandum apparently provides a legal justification for the use of an interrogation technique known as "waterboarding," in which a Detainee is made to believe that he is drowning.  Item 61 seeks a directive signed by President Bush that grants the CIA the authority to establish detention facilities outside of the United States and outlining interrogation methods that may be used against Detainees. *See id.*

The CIA asserts that a Glomar response is appropriate here on the grounds that the requested items "allege specific CIA involvement with the treatment, death, or rendition of detainees in U.S. custody which, if true, would be related to purported clandestine activity that CIA has not officially acknowledged or denied."  *See* Exhibit B (Dorn Decl., at ¶ 13).  The CIA also states that "Plaintiffs' request seeks records that would exist only if CIA had engaged in clandestine activities or had clandestine intelligence interests in the subjects of Plaintiffs' request."  *See id.*, at ¶ 15.  The CIA argues that the existence or non-existence of these records would be classified to protect national security pursuant to § 1.4(c) (intelligence activities and intelligence sources and methods) and § 1.4(d) (foreign relations or foreign activities of the United States).  The CIA also withholds these documents under Section 103(c)(7) of the National Security Act of 1947, 50 U.S.C. § 403-3(c)(7), which authorizes the director of intelligence to protect intelligence sources and methods from "unauthorized disclosure."[13]

The Glomar response is an inappropriate response to these particular requests.  The Glomar doctrine can be used to refuse to confirm or deny the existence of records where the

---

[13] This Act provides that the CIA Director of Intelligence (DI) shall protect intelligence sources and methods from unauthorized disclosure.  Disclosure is unauthorized when it would be contrary to the terms of Executive Order 12,958, and other statutes supplying protection to CIA information, and hence the National Security Act does not provide the CIA with any greater substantive protections than those embodied in Exemption 1.  Indeed, the National Security Act merely states that it is the duty of the Director of Intelligence to ensure that such unauthorized disclosures not occur.  In fact, in the amended version of the Act passed on December 17, 2004, this section specifically provides that the DI should promulgate guidelines for protecting intelligence sources and methods under "the relevant Executive Orders and other statutes."  PL 108-458, 118 Stat 3638, 3651 (amending the National Security Act to provide that the Director of Intelligence should create guidelines for the "[c]lassification of information under applicable law, Executive orders, or other Presidential directives.").  This new provision serves to clarify that "unauthorized disclosure" refers to these other substantive provisions, including Executive Order 12,958.  Thus, this statute provides no additional substantive protections to the CIA.

response in itself would confirm the existence of covert activities.  *See, e.g., Phillippi v. CIA*, 546 F.2d 1009, 1013 (D.C.Cir. 1976) (dealing with request for records regarding Glomar Explorer submarine-retrieval ship); *Frugone v. CIA*, 169 F.3d 772, 775 (D.C. Cir. 1999) (finding that the CIA properly refused to confirm or deny whether plaintiff was ever employed by the CIA); *Miller v. Casey*, 730 F.2d 773, 776 (D.C. Cir. 1984) (applying response to request for any record reflecting any attempt by Western countries to overthrow Albanian government); *Gardels v. CIA*, 689 F.2d 1100, 1105 (D.C. Cir. 1982) (applying response to request for any record revealing any covert CIA connection with University of California); *Wheeler v. CIA*, 271 F. Supp. 2d 132, 140 (D.D.C. 2003) (allowing the agency to give a Glomar response to a request for records concerning plaintiff's activities as a journalist in Cuba during the 1960s).  These are situations in which the response, even if the document was withheld, would reveal in concrete terms the existence of clandestine activity.

Here, by contrast, with respect to Items 1 and 29, Plaintiffs seek legal memoranda.  These documents do not reveal the existence of clandestine activity but rather constitute the Department's conclusions as to the legal limits on interrogation.  The fact of their existence does not in itself reveal the existence of particular operations or even of the CIA's level of involvement in such operations.  While the documetns describe legal limitations on the CIA, they do not disclose anything about CIA policy.  Similarly, Item 61 provides the CIA with certain authority but its disclosure would not reveal whether the CIA has chosen to exercise that authority.  Moreover, the CIA has publicly acknowledged its role in conducting interrogations for the purpose of gathering intelligence, and in its 2002 Annual Report, the CIA describes its significant role in detaining al-Qaeda operatives.  *See* Exhibit P (CIA 2002 Annual Report) ("Central Intelligence Agency (CIA) officers worked with foreign intelligence services to detain more than 2,900 al-Qa'ida operatives and associates in over 90 countries.").  Thus, with respect to Items 1, 29, and 61, the CIA has not met its burden, under *Vaughn v. Rosen*, of proving that acknowledging the existence of these memoranda could reveal information in one of the authorized withholding categories of Executive Order 12,958, thereby causing damage to the

national security.  It is incumbent upon the agency not only to prove that the disclosure of these memoranda could possibly cause damage to the national security but also to identify and describe that damage.  *See* Executive Order 12,958, at § 1.2(c).  For this reason, the Court should order the CIA to release these documents.

### B.    Moreover, Documents Responsive to Item 43 Were Improperly Classified.

Documents responsive to Item 43 were not properly classified as they are outside the scope of the Executive Order, and additionally do not fall within one of the authorized withholding categories.  They concern neither intelligence activities, sources or methods nor foreign relations or foreign activities.  In addition, the CIA has not presented any justification for withholding these documents.

Item 43 seeks documents relating to the CIA Director's request that Defense Secretary Donald Rumsfeld hold an Iraqi suspect at a high level detention center but not be listed on the prison rolls, as well as Rumsfeld's order implementing that request.  This document plainly does not reveal information about intelligence sources and methods.  The fact that the CIA asked that a prisoner be held unofficially has already been officially revealed by Defense Secretary Rumsfeld.  As such, this information is already properly within the public domain.  Moreover, the CIA has provided no justification or Vaughn declaration for withholding this information, nor can the CIA do so as these documents do not contain information either about intelligence sources or intelligence methods.

In addition, the underlying documents merely contain evidence of illegality or unlawful activity.  DOD acknowledged that the prisoner should have been, but was not, registered with the ICRC.  *See* Exhibit Q (Shanker et al., *Rumsfeld Admits He Told Jailers to Keep Detainee in Iraq Out of Red Cross View*, N.Y. TIMES, June 18, 2004, at A10).  The Executive Order clearly prohibits the classification of documents "in order to conceal violations of law."  Executive Order 12,958, at § 1.8(a).   The documents should therefore be released.  At a minimum, the

Court must undertake an *in camera* review to ascertain whether or not they are being improperly withheld.

IV.   DEFENDANT DOD HAS IMPROPERLY INVOKED EXEMPTIONS 6 AND 7
      AS THE BASIS FOR WITHHOLDING PHOTOGRAPHS AND VIDEOTAPES
      DEPICTING ABUSE OF DETAINEES.

DOD has improperly invoked Exemptions 6 and 7 as the basis for withholding photographs and videotapes depicting the abuse of Detainees. Item 10 seeks videotapes and photographs of abuse; Item 11 seeks videotapes and photographs depicting abuse at Iraqi facilities; and Item 69 seeks photographs of Joseph Darby, a military policeman, engaging in Detainee mistreatment at Abu Ghraib.  In response to each of these requests, DOD invoked Exemptions 6 and 7 and merely stated that the Department is "currently reassessing the public and privacy interests associated with these records."  Exemption 6 permits the government to withhold information contained in "personnel and medical files and similar files" when the disclosure of such information "would clearly constitute an unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(6).  Exemption 7(C) provides protection for law enforcement information where its disclosure "could reasonably be expected to constitute an unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(7)(C).  However, Exemptions 6 and 7(C) are inapplicable here because the photographs and videotapes can be released with appropriate redactions deleting all personally identifying information, and thus there is no basis for withholding the entire record.

The disclosure of these records would only constitute an "invasion of personal privacy" under Exemptions 6 and 7(C) if the public could identify the Detainees depicted.  The threshold requirement for analysis under Exemptions 6 and 7 is whether or not the requested information "applies to a particular individual."  *United States Department of State v. Washington Post Co*., 456 U.S. 595 (1982) (Exemption 6); *see also Arieff v. United States Dept. of the Navy*, 712 F.2d 1462, 1467-68 (D.C.Cir. 1983) (finding no protection under Exemption 6 for a list of drugs

ordered by members of large group because there was no information identifying particular individuals). If the information does not identify or contain information identifying a particular individual, then its disclosure does not constitute an "invasion of personal privacy."

As with all exemptions, any reasonably segregable, nonexempt portions of requested records must be released. *See* 5 U.S.C. § 552(b).[14] In the context of Exemptions 6 and 7(C), the government may effect such segregation by deleting personally identifying information and by releasing all non-exempt information. For example, in *Department of the Air Force v. Rose*, the United States Supreme Court ordered the release of case summaries of disciplinary proceedings, provided that the personal identifying information was deleted. 425 U.S. 352, 380-81 (1976); *see also Dayton Newspapers v. Department of Air Force*, 35 F.Supp.2d 1033, 1035 (D.D.C. 1998) (ordering release of military-wide medical tort-claims database with "claimants' names, social security numbers, home addresses, home/work telephone numbers and places of employment" redacted); *Citizens for Environmental Quality v. USDA*, 602 F.Supp. 534, 538-39 (D.D.C. 1984) (ordering disclosure of health test results with names redacted). At a minimum, the government must provide a Vaughn declaration explaining why the documents cannot be released with identifying information redacted. *See Church of Scientology International v. United States Department of Justice*, 30 F.3d 224, 230-31 (1st Cir. 1994). Here DOD has not provided a Vaughn declaration, index or any basis for finding that the information cannot be released even where individual privacy concerns are addressed.

The invocation of privacy concerns is inappropriate in this instance given that Defendant DOD has an obligation to release "any reasonably segregable portion of a record." *See* 5 U.S.C. § 552(b). Because all identifying features could be redacted from the photographs and videotapes in order to protect the privacy of Detainees, DOD is obligated to segregate and release the remaining portion of the record. At a minimum, DOD is obligated to "make specific findings of segregability for each of the withheld documents." *Oglesby v. United States Dep't of*

---

[14] Defendants are plainly well aware of their ability to segregate information given the extensive redactions taken on released documents.

*the Army*, 920 F.2d 57, 66 n.12 (D.C. Cir. 1990) (dictum) (noting failure of Army affidavit to specify whether any reasonably segregable portions of 483-page document were withheld); *Ray v. Turner*, 587 F.2d 1187, 1197 (D.C. Cir. 1978) (remanding for greater specificity in affidavit because agency may not rely on "exemption by document" approach); *Harper v. DOD*, No. 93-35876, 1995 WL 392032, at *2 (9th Cir. July 3, 1995) (reversing part of district court order that permitted agency to withhold entire report , because district court failed to make "necessary findings" on segregability).  Exemptions 6 and 7(C) do not warrant the government's decision to categorically withhold the photographs or videotapes, without conducting a review of whether they contain images or details that identify the individuals depicted or of whether such details can be redacted or obscured in the released version of the record.

For these reasons, the Court should order Defendant DOD to disclose the requested photographs and videotapes.   DOD, in accordance with its responsibility under FOIA to reasonably segregate information, may delete or redact personally identifying information but must otherwise release all material.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court grant Plaintiffs' Motion for Partial Summary Judgment, and order Defendants DOD and CIA to release the documents described above.

Respectfully submitted,

Dated: January 13, 2005

_s/ Lawrence S. Lustberg (LL-1644)
Lawrence S. Lustberg (LL-1644)
Megan Lewis (ML-3429)
GIBBONS, DEL DEO, DOLAN
GRIFFINGER & VECCHIONE, P.C.
One Riverfront Plaza
Newark, New Jersey 07102
llustberg@gibbonslaw.com
phone: (973) 596-4700
facsimile: (973) 596 0545


Jameel Jaffer (JJ-4653)
Amrit Singh (AS-9916)
Judy Rabinovitz (JR-1214)
Omar C. Jadwat (OJ-5792)
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
125 Broad St.
New York, New York 10004

Barbara Olshansky (BO-3635)
Jeffrey E. Fogel (JF-3848)
Michael Ratner (MR-3347)
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, New York 10012

Beth Haroules (BH-5797)
Arthur Eisenberg (AE-2012)
NEW YORK CIVIL LIBERTIES
UNION FOUNDATION
125 Broad Street
New York, NY 10004
*Attorneys for Plaintiffs*

34