DAVID N. KELLEY
United States Attorney for the
Southern District of New York
By: SEAN H. LANE (SL-4898)
    PETER M. SKINNER (PS-9745)
Assistant United States Attorneys
86 Chambers Street, Third Floor
New York, New York 10007
Tel.: (212) 637-2737
Fax: (212) 637-2750

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------- x
AMERICAN CIVIL LIBERTIES UNION,
CENTER FOR CONSTITUTIONAL RIGHTS,
PHYSICIANS FOR HUMAN RIGHTS,
VETERANS FOR COMMON SENSE AND
VETERANS FOR PEACE,                              :    ELECTRONICALLY FILED

               Plaintiffs,

                                                 :    04 Civ. 4151 (AKH)
       v.

DEPARTMENT OF DEFENSE, AND ITS
COMPONENTS DEPARTMENT OF ARMY,                   :    **DEFENDANTS' STATEMENT**
DEPARTMENT OF NAVY, DEPARTMENT OF :                   **PURSUANT TO LOCAL RULE 56.1**
AIR FORCE, DEFENSE INTELLIGENCE
AGENCY; DEPARTMENT OF HOMELAND
SECURITY; DEPARTMENT OF JUSTICE,
AND ITS COMPONENTS CIVIL RIGHTS
DIVISION, CRIMINAL DIVISION, OFFICE OF :
INFORMATION AND PRIVACY, OFFICE OF :
INTELLIGENCE POLICY AND REVIEW,
FEDERAL BUREAU OF INVESTIGATION;
DEPARTMENT OF STATE; AND CENTRAL
INTELLIGENCE AGENCY,

               Defendants.
------------------------------------------------------------- x

Pursuant to Rule 56.1 of the Local Civil Rules of the United States District Court for the Southern District of New York, Defendants state that there is no genuine issue to be tried with respect to the following facts:

1. Plaintiffs' Amended Complaint addresses twenty-six separate FOIA requests – two rounds of requests submitted to thirteen different agencies or agency components. See Am. Compl. at ¶¶ 22, 45.

2. The description of the documents sought by both sets of FOIA requests is identical, with the second set of requests simply seeking more recent documents on the same subjects. See Declaration of Lawrence S. Lustberg in Support of Plaintiffs' Motion for Preliminary Injunction, dated July 6, 2004 ("Lustberg Decl."), attaching FOIA requests from Exs. 1-13.

3. Plaintiffs' FOIA requests seek records on three topics: (1) the treatment of individuals apprehended after September 11, 2001 and held by the United States at military bases or detention facilities outside the United States ("detainees"); (2) the deaths of detainees in custody; and (3) the government's practice of "rendering" detainees to countries known to use torture. See id.

4. On April 16, 2004, Plaintiffs identified documents and categories of documents that they wanted the Government to prioritize in its search for and processing of records responsive to their FOIA requests. See Memorandum of Law in Support of Plaintiffs' Motion for Partial Summary Judgment ("Pls.' Br."), Ex. A. Plaintiffs identified 70 requests on their August 16, 2004 list (the "List"). Id.

5.  The Department of Defense ("DOD") and the Central Intelligence Agency (the "CIA") responded to Plaintiffs' List in October and November 2004. See Pls.' Br., Exs. B-E.

6.  Six of Plaintiffs' seventy requests seek production of documents relating to the International Committee of the Red Cross (the "ICRC"). See Pls.' Br., Ex. A. Request 8 seeks "[a]ll reports of the International Committee for the Red Cross concerning treatment and detention of Detainees in Iraq," approximates the date of the records as February 2004, and cites an internet address as the source of the description of the documents. Id. An index of the documents responsive to Request 8 has been provided. See Second Declaration of Stewart F. Aly ("Second Aly Decl."), Exh. A. All ICRC reports were provided to DOD by the ICRC. Id., ¶ 18. DOD is withholding the responsive documents. Id., ¶ 4.

7.  Request 13 seeks a "[r]esponse to concerns raised by the ICRC regarding the treatment of Detainees" but does not approximate the date of the record or records. Pls.' Br., Exh. A. It cites an article from the June 14, 2004 edition of the Washington Post, titled "A Look Behind the 'Wire' at Guantanamo," as the source of the description of the document. Id. An index of the documents responsive to Request 13 has been provided. See Second Aly Decl., Exh. B. DOD is withholding the responsive documents. See id., ¶ 5.

8.  Request 49 seeks a "[l]etter from military lawyers over the signature of Brig. General Janis Karpinski to the [ICRC] responding to its concerns about conditions at Abu Ghraib," and approximates the date of the letter as December 24, 2003. Pls.' Br., Exh. A. It cites an article from the June 9, 2004 edition of the New York Times, titled "Documents Build a Case for Working Outside the Laws in Interrogations," as the source of the description of the

document. Id. The requested document is a three-page letter signed by General Karpinski dated December 24, 2003 that is addressed to the ICRC Protection Coordinator. Second Aly Decl., ¶ 6. DOD is withholding the responsive document. Id.

        9.     Request 50 seeks a "[m]emorandum for MP and MI personnel at Abu Ghraib" from a United States Army officer "Re: New plan to restrict Red Cross access to Abu Ghraib," and approximates the date of the memorandum as January 2, 2004. Pls.' Br., Ex. A. It cites a Congressional subpoena proposed by Senators Leahy and Feinstein as the source of the description of the document. Id. In connection with Request 50, and in response to other inquiries about the document described in the request, DOD has searched locations where copies of the requested document could reasonably be expected to be found, but no such document matching Plaintiffs' description has been located. Second Aly Decl., ¶ 8. DOD also has searched the files in the office of the Deputy General Counsel (International Affairs), where the compilation of documents relating to the ICRC is maintained, but no such document has been located. Id. DOD also has contacted the named author of the memorandum, and he unequivocally denied signing any document matching the description provided by Plaintiffs. Id. DOD has concluded that such a document does not exist. Id., ¶ 10.

        10.    Request 51 seeks a "[m]emorandum from a top legal adviser to Lt. Gen. Ricardo S. Sanchez, to military intelligence and police personnel at the Abu Ghraib prison, regarding a new plan to restrict Red Cross access [to] Abu Ghraib," and approximates the date of the memorandum as January 4, 2004. Pls.' Br., Exh. A. It cites an article from the June 18, 2004 edition of the New York Times, titled "Rumsfeld Admits He Told Jailers to Keep Detainee in Iraq Out of Red Cross," as the source of the description of the document. Id. DOD has been

unable to locate a document responsive to Request 51. Second Aly Decl., ¶¶ 9-10. DOD has located a four-page memorandum dated January 8, 2004 that memorializes confidential communications from the ICRC related to a visit to Abu Ghraib. Id., ¶ 10. The memorandum is not addressed to military police or military intelligence personnel, and it makes no reference to Lieutenant General Ricardo S. Sanchez. Id. In addition, the memorandum does not address a "New plan to restrict Red Cross access to Abu Ghraib." Id. The memorandum is signed by the Deputy Commander, Headquarters 205th Military Intelligence Brigade and Forward Operating Base Abu Ghraib, and it memorializes communications from the ICRC related to a January 2004 visit to a detention facility, including a discussion of ICRC access to detainees. Id. DOD is withholding the memorandum. See id.

      11.    Request 58 seeks "[a] complete set of documents reflecting discussions between the ICRC and military officers at Guantanamo Bay," but does not approximate the dates of the records. Pls.' Br., Exh. A. It cites the news article referred to in Request 13 as the source of the description of the documents. Id. An index of the documents responsive to Request 58 has been provided. See Second Aly Decl., Exh. C. DOD has produced to Plaintiffs redacted copies of the responsive documents. Id., ¶ 11.

      12.    The ICRC plays a unique and important role with regard to persons detained in connection with armed conflicts. The ICRC communicates with individual detainees and enables them to communicate with their families. See Declaration of Charles A. Allen, dated March 25, 2005 ("Allen Decl."), ¶ 3. The ICRC also reports to governments engaged in hostilities regarding the condition of prisoners of war and detainees held by the various nations involved. See id.

13. Under long-standing practice, the ICRC requires and maintains confidentiality as to its communications with governments regarding the ICRC's observations and findings to ensure that the ICRC maintains continued access to detainees and detention facilities. Allen Decl., ¶¶ 5, 16; Second Aly Decl., ¶ 13. Detaining powers require confidentiality by the ICRC to protect the security of their military and detention operations and to protect the lives and safety of their military and security personnel. Allen Decl., ¶ 9.

14. The United States has a detention facility at the U.S. Naval Base at Guantanamo Bay. Allen Decl., ¶ 10. Commencing in early 2002, the United States transferred enemy combatants captured abroad to detention facilities at Guantanamo. Id. The United States also has detention facilities in Iraq, including a facility at Abu Ghraib, at which persons captured in Iraq are detained. Id.

15. The ICRC has requested opportunities to visit detainees at Guantanamo and in Iraq, and the United States has granted those requests. Allen Decl., ¶ 10; Second Aly Decl., ¶ 12. As a result of such visits, ICRC employees have communicated to DOD observations and findings, verbally and in writing, regarding the detainees and their conditions of detention. See Allen Decl., ¶ 11; Second Aly Decl., ¶ 12; Declaration of Diane E. Beaver, dated March 24, 2005 ("Beaver Decl."), ¶ 3. ICRC communications to DOD have included information pertaining to military operations and have identified by name U.S. military units and personnel, detention facilities, and detainees. Allen Decl., ¶ 13. DOD officials have responded to the ICRC in writing, as well as orally in the course of meetings or telephone conversations. See Beaver Decl., ¶ 3; Second Aly Decl., ¶ 12. DOD staff have sometimes prepared minutes of

such meetings, which have been shared with ICRC staff to ensure their accuracy. Beaver Decl., ¶ 3.

16. The ICRC has stated that it treats as confidential its observations and findings regarding detainees at Guantanamo and in Iraq, and that it has provided such information on the condition that DOD not release such information to the public. See Beaver Decl., ¶ 5; Second Aly Decl., ¶¶ 13-14; Allen Decl., ¶ 12. The ICRC has confirmed that "all records of communications from the ICRC or its representatives regarding detainees at Guantanamo and Iraq have been provided by the ICRC to the DoD on condition that the documents not be released to the public," and that "the ICRC itself is withholding such documents from public disclosure." Second Aly Decl., ¶ 13 & Exh. D (letter dated March 9, 2005, from Finn Ruda of the ICRC to Stewart Aly of DOD). In addition, the ICRC has stamped the reports it has submitted to DOD as "strictly confidential and intended only for the authorities to whom it is presented." Second Aly Decl., ¶ 13; Beaver Decl., ¶ 6; Allen Decl., ¶ 12.

17. An operational update issued by the ICRC states the following:

**Dialogue with the US authorities**

The ICRC regularly discusses its findings concerning Bagram and Guantanamo Bay with the military authorities in the camps as well as with the appropriate US representatives in Kabul and Washington. While the ICRC has felt compelled to make some of its concerns public, notably regarding the legal status of the detainees, the primary channel for addressing issues related to detention remains its direct and confidential dialogue with the US authorities.

**Confidentiality. Why?**

Whenever the ICRC visits places of detention, its findings and observations about the conditions of detention and the treatment of detainees are discussed directly and confidentially with the authorities in charge. Bagram and Guantanamo Bay are no exceptions. The ICRC's

> lack of public comment on detention issues must therefore not be interpreted to mean that it has no concerns.
>
> Confidentiality is an important working tool for the ICRC in order to preserve the exclusively humanitarian and neutral nature of its work. The purpose of this policy is to ensure that the ICRC obtains and, importantly, maintains, access to tens of thousands of detainees around the world held in highly sensitive situations of armed conflict or other situations of violence.
>
> The ICRC is also concerned that any information it divulges about its findings could easily be exploited for political gain.

Pls.' Br., Exh. H (May 11, 2004 Operational Update, "US detention related to the events of 11 September 2001 and its aftermath — the role of the ICRC") (boldface in original).

18. The ICRC has also stated the following: "<u>The reports written by the ICRC after each visit are given to the detaining authorities and are not intended for publication</u> — the point being that detention problems are best solved through constructive dialogue based on mutual confidence, rather than in the glare of publicity which inevitably carries the risk of politicizing the issues." Allen Decl., Exh. A at 2 (ICRC statement regarding visits to detainees) (emphasis in original).

19. The Secretary of Defense established the required treatment of ICRC reports in a directive issued in the form of a Memorandum dated July 14, 2004 (Subject: Handling of Reports from the International Committee of the Red Cross), which states in part:

> All ICRC communications shall be marked with the following statement: "ICRC communications are provided to DoD as confidential, restricted-use documents. As such, they will be safeguarded the same as SECRET NODIS information using classified information channels. Dissemination of ICRC communications outside of DoD is not authorized without the approval of the Secretary or Deputy Secretary of Defense."

See Allen Decl., Exh. B; Second Aly Decl., ¶ 15.

20. Requests 4, 37 and 41 on the List all concern policies put into effect by Lieutenant General Ricardo s. Sanchez. See Pls.' Br., Ex. A. Requests 39, 40 and 42 on the List all address memoranda from the Combined Joint Task Force. See id. DOD has located two documents responsive to Requests 4, 37, 39, 40, 41 and 42. Second Aly Decl., at ¶¶ 23-24. Both of those documents have been declassified and released to Plaintiffs. Id., ¶¶ 25-26 & Exs. E, F.

21. Request 1 seeks a Department of Justice memorandum that allegedly endorsed the use of "a whole range of techniques – including sleep deprivation, the use of phobias and the deployment of 'stress factors' – in interrogating Qaeda suspects." Pls.' Br., Ex. O at 3.

22. Request 29 seeks a Department of Justice memorandum that allegedly addressed specific interrogation techniques, including "waterboarding." Pls' Br. at 27.

23. Request 61 concerns a Presidential order that purportedly authorized the CIA to set up detention facilities outside the United States and outlined interrogation techniques that could be used against detainees held in those facilities. Pls.' Br., Ex. O at 3.

24. Request 43 seeks "Documents relating to Central Intelligence Director George Tenet's request that Defense Secretary Donald Rumsfeld hold an Iraqi suspect at a high level detention center but not be listed on the prison rolls, and Rumsfeld's order implementing that request." Pls.' Br., Ex. A.

25. The CIA has located 72 documents responsive to this request. Declaration of Marilyn A. Dorn, dated March 30, 2005 ("Fourth Dorn Decl."), ¶ 21.

26. Requests 10 and 11 seek categories of documents. Request 10 seeks "videotapes, photographs and other records of abuse, including videotapes, photographs and other records of abuse catalogued and stored in Guantanamo Bay facilities." Pls.' Br., Ex. A. Request 11 seeks "videotapes, photographs and other records depicting abuse at Iraqi facilities." Id.

27. DOD is still processing photographs and videotapes in its possession to determine what other media are responsive to Requests 10 and 11. Declaration of Phillip J. McGuire, dated March 30, 2005 ("Second McGuire Decl."), ¶ 11. Each photograph and videotape must be reviewed and addressed individually for purposes of asserting exemptions. Id.

28. Request 69 seeks photographs of abuse or mistreatment of detainees at Abu Ghraib taken by Joseph Darby, a military policeman, and provided to the Army's Criminal Investigative Division. See Pls.' Br., Ex. A. DOD has invoked Exemptions 6 and 7(C) as a basis for withholding release of these photographs based upon the privacy interests of the detainees pictured in the photographs. Second McGuire Decl., ¶¶ 2, 5-11.

29. The United States is a party to both the Geneva Convention Relative to the Treatment of Prisoners of War of August 12, 1949, 6 U.S.T. 3316, 74 U.N.T.S. 135 (the "Third Geneva Convention"), and the Geneva Convention Relative to the Protection of Civilian Persons in Time of War, Aug. 12, 1949, 6 U.S.T. 3516, 75 U.N.T.S. 287 (the "Fourth Geneva Convention").

30. The Geneva Conventions were developed with the exigencies of warfare in mind and address in detail certain obligations of High Contracting Parties with respect to individuals detained during armed conflict or belligerent occupation. See Declaration of

Geoffrey S. Corn, dated March 25, 2005 ("Corn Decl."), ¶ 7; see also, e.g., Third Geneva Convention, 6 U.S.T. 3316. Common Article 2 of the Third and Fourth Geneva Conventions provides that the Conventions apply "to all cases of declared war or of any other armed conflict which may arise between two or more of the High Contracting Parties." Declaration of Edward R. Cummings, dated March 24, 2005 ("Cummings Decl."), ¶ 8. Common Article 2 further states that the Conventions shall also apply "to all cases of partial or total occupation of the territory of a High Contracting Party." Id. The United States and Iraq are High Contracting Parties to each of these Conventions. Id., ¶ 9. The responsive Darby photos were taken during a period when the United States was engaged in an international armed conflict and occupation within the meaning of Common Article 2. Corn Decl., ¶ 6; Cummings Decl., ¶ 9.

    31.  With regard to prisoners of war, Article 13 of the Third Geneva Convention states that a Detaining Power with custody over a prisoner of war must protect that prisoner of war, "particularly against acts of violence or intimidation and against insults and public curiosity." Corn Decl., ¶ 8; Cummings Decl., ¶ 10. Accordingly, a Detaining Power has a "positive obligation" to treat detainees humanely, including protecting their honor against insult and public curiosity. Corn Decl., ¶ 8 (citing ICRC Commentary to Article 13 of Third Geneva Convention). Similarly, Article 14 of the Third Geneva Convention mandates protection of a detainee's honor, which includes protection against, inter alia, slander, insult and any violation of secrets of a personal nature. Corn Decl., ¶ 8 (citing Article 14 of Third Geneva Convention and applicable ICRC Commentary).

32.     Article 27 of the Fourth Geneva Convention provides analogous protection for protected civilians detained by an occupying force:

> Protected persons are entitled, in all circumstances, to respect for their persons, their honor, their family rights, their religious convictions and practices, and their manners and customs. They shall at all times be treated humanely, and shall be protected especially against all acts of violence or threats thereof and against insults and public curiosity.

Corn Decl., ¶ 9; Cummings Decl., ¶ 11. "The word 'treatment' must be understood [in Article 27] in its most general sense as applying to all aspects of man's life." Corn Decl., ¶ 9 (citing ICRC Commentary to Article 27).

33.     The United States historically has interpreted Article 13 of the Third Geneva Convention and Article 27 of the Fourth Geneva Convention to prohibit the taking and publication of detainee photographs where it would subject detainees to public curiosity, including images depicting detainees in degrading or humiliating circumstances, such as instances where a detainee had been abused or mistreated. Cummings Decl., ¶¶ 12-19; Corn Decl., ¶¶ 10-12. The United States traditionally has protested the parading of American prisoners of war, including in Hanoi in 1966 or exposing prisoners of war on television. Cummings Decl., ¶ 13. President Bush described the "brutal parading" of Allied pilots by Iraq in January 1991 as a violation of the Geneva Conventions. Id. In a formal protest to the Government of Iraq, the United States stated that "unlawful coercion and misuse of prisoners of war for propaganda purposes, the failure to respect their honor and well-being, and the subjection of such individuals to public humiliation" violated the Geneva Conventions. Id.

34. In 2003, several photographs were published of the in-processing of detainees into Guantanamo. Id., ¶ 14. After strong international criticism of the Guantanamo photographs, DOD issued specific guidelines on the kind of photographs that would be permitted. Id. The Guantanamo guidelines state that "[t]he policy of limiting photography is in accord with treating detainees consistent with the protections provided under the Third Geneva Convention. This is not a change in policy; it is in conformity with long-standing U.S. policy, procedure, and practice." Id.

35. These guidelines were consistent with guidelines in long-standing military regulations on prisoners of war. Id., ¶ 15. Specifically, Army Regulation 190-8, paragraph 1-5d provides:

> Photographing, filming, and video taping of individual [enemy prisoners of war, civilian internees and retained personnel] for other than internal Internment Facility administration or intelligence/counterintelligence purposes is strictly prohibited. No group, wide area or aerial photographs of [enemy prisoners of war, civilian internees and retained personnel] or facilities will be taken unless approved by the senior Military Police officer in the Internment Facility commander's chain of command.

Cummings Decl., ¶ 15. Paragraph 1-9 further provides that:

> In the interest of national security, <u>and the protection of the prisoners from public curiosity</u>, and in adherence to the [Third and Fourth Geneva Conventions], [enemy prisoners of war, civilian internees and retained personnel] and other detainees will not be photographed as per paragraph 1-5d.

Id. (emphasis added).

36. DOD issued similar guidelines in connection with embedded news media and the conflict in Iraq. Those guidelines provide that "no photographs or other visual media

13

showing an enemy prisoner of war or detainee's recognizable face, name tag or other identifying feature or item may be taken." Id., ¶ 16. They also prohibit "still or video imagery of custody operations or interviews with persons under custody." Id.

37. In addition, the ICRC has had a significant influence on the interpretation of Article 13. Id., ¶ 17. The ICRC, which focuses on preserving the integrity and dignity of individuals in detention, generally has taken the view that Article 13 of the Third Geneva Convention requires parties to a conflict to avoid publication of images that show prisoners of war in degrading or humiliating positions or allow the identification of individual detainees. Id.

38. The responsive Darby photos were compiled for law enforcement purposes. The United States Army Criminal Investigation Command ("CID") opened a report of investigation immediately after receiving these photographs. Second McGuire Decl., ¶ 6. This information has "been used extensively by CID agents to conduct the investigations into incidents of abuse of detainees at Abu Ghraib." Id.

39. The responsive Darby photos are "photographs of foreign nationals who appear to be under the control of the United States." Second McGuire Decl., ¶ 8. The detainees in these photographs "often appear naked or otherwise improperly clothed, posed in ways that were designed to embarrass and humiliate the individuals in the pictures." Id.

40. Obscuring the faces of detainees depicted in the responsive Darby photos does not assure that the identities of these individuals will not be established, especially given some of these photographs previously were unofficially placed into the public domain. Corn Decl., ¶ 11; Second McGuire Decl., ¶ 8. Even with redactions, each detainee depicted in the responsive Darby photos would still "suffer the personal humiliation and indignity accordant

14

with the knowledge that these photographs [of abuse or mistreatment] have been placed in the public domain." Corn Decl., ¶ 11

41. The United States has recognized that abuse and mistreatment of detainees took place at the Abu Ghraib prison in Iraq and released detailed accounts of these abuses.

42. Plaintiffs have received, and will continue to receive, other records relating to the abuse or mistreatment of detainees, including reports of criminal investigations. See Second McGuire Decl., ¶ 10.

43. Defendants' additional justifications for withholding the information responsive to the requests that have been challenged by plaintiffs are provided in the following accompanying declarations: Declaration of Charles A. Allen, dated March 25, 2005, and the exhibits attached thereto, the Second Declaration of Stewart F. Aly, dated March 23, 2005, and the exhibits attached thereto, the Declaration of Diane E. Beaver, dated March 24, 2005, the Declaration of Geoffrey S. Corn, dated March 25, 2005, the Declaration of Edward R. Cummings, dated March 24, 2005, the Declaration of Marilyn A. Dorn, dated October 15, 2004, the Declaration of Marilyn A. Dorn, dated March 30, 2005, the Declaration of Phillip J. McGuire, dated October 14, 2004, and the Declaration of Phillip J. McGuire, dated March 30, 2005.

By submitting this statement, Defendants reserve the right to contend that any of the above-referenced facts is not material to the present action.

Dated: New York, New York
March 30, 2005

        Respectfully submitted,

        DAVID N. KELLEY
        United States Attorney for the
        Southern District of New York
        Attorney for Defendants

By:   /s/ Sean H. Lane
        SEAN H. LANE (SL-4898)
        PETER M. SKINNER (PS-9745)
        Assistant United States Attorneys
        86 Chambers Street, Third Floor
        New York, New York 10007
        Tel.: (212) 637-2737
        Fax: (212) 637-2750

TO:   Lawrence S. Lustberg, Esq.
       Megan Lewis, Esq.
       Gibbons, Del Deo, Dolan, Griffinger & Vecchione, P.C.
       One Riverfront Plaza
       Newark, New Jersey  07102