UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------- x

AMERICAN CIVIL LIBERTIES UNION,
CENTER FOR CONSTITUTIONAL RIGHTS,
PHYSICIANS FOR HUMAN RIGHTS,
VETERANS FOR COMMON SENSE AND
VETERANS FOR PEACE,

              Plaintiffs,

         v.

DEPARTMENT OF DEFENSE, AND ITS
COMPONENTS DEPARTMENT OF ARMY,
DEPARTMENT OF NAVY, DEPARTMENT OF
AIR FORCE, DEFENSE INTELLIGENCE
AGENCY; DEPARTMENT OF HOMELAND
SECURITY; DEPARTMENT OF JUSTICE,
AND ITS COMPONENTS CIVIL RIGHTS
DIVISION, CRIMINAL DIVISION, OFFICE OF
INFORMATION AND PRIVACY, OFFICE OF
INTELLIGENCE POLICY AND REVIEW,
FEDERAL BUREAU OF INVESTIGATION;
DEPARTMENT OF STATE; AND CENTRAL
INTELLIGENCE AGENCY,

              Defendants.

----------------------------------------------------------- x

ELECTRONICALLY FILED

04 Civ. 4151 (AKH)

## DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND IN SUPPORT OF DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

DAVID N. KELLEY
United States Attorney for the
Southern District of New York
Attorney for Defendants
86 Chambers Street, 3rd Floor
New York, New York 10007
Tel: (212) 637-2737
Fax: (212) 637-2750

SEAN H. LANE (SL-4898)
PETER M. SKINNER (PS-9745)
  – Of Counsel –

# Table of Contents

PRELIMINARY STATEMENT .................................................... 1

BACKGROUND .................................................................. 3

    A.     Procedural History ........................................... 3

    B.     The Challenged Requests ...................................... 4

             1.     The ICRC Documents .................................. 4

             2.     Documents Concerning DOD Interrogation Techniques ........ 8

             3.     Documents That Have Been "Glomared" by the CIA .......... 8

             4.     CIA Documents Responsive to Request 43 .................. 9

             5.     DOD Photographs ...................................... 9

ARGUMENT .................................................................. 10

I.     FOIA AND SUMMARY JUDGMENT STANDARDS .................... 10

II.    DOD HAS PROPERLY INVOKED EXEMPTION THREE FOR
       DOCUMENTS MEMORIALIZING COMMUNICATIONS
       WITH THE ICRC ..................................................... 11

    A.     Standard for Exemption 3 ..................................... 12

    B.     DOD Properly Withheld the ICRC Documents Under Exemption 3 ... 12

             1.     10 U.S.C. § 130c ..................................... 12

             2.     10 U.S.C. § 130c Is an Exempting Statute .................. 15

             3.     The ICRC Documents Fall Within the Scope of
                  10 U.S.C. § 130c ..................................... 16

                  a.     Request 8 ..................................... 16

                  b.     Requests 13 and 49 ............................ 18

|  |  | c. | Request 50 .................................... 19 |

|  |  | d. | Request 51 .................................... 20 |

|  |  | e. | Request 58 .................................... 20 |

III. THE CIA PROPERLY INVOKED THE GLOMAR DOCTRINE TO
REFUSE TO CONFIRM OR DENY THE EXISTENCE OF
REQUESTS 1, 29 AND 61 ........................................... 21

A.  Whether the CIA Possesses Records Responsive to Requests 1,
29 and 61 Is Properly Classified under Exemption 1 ............... 22

   1.  Standard for Exemption 1 ............................ 22

   2.  Whether the Requested Records Exist Is Properly Classified
Because It Concerns Intelligence Methods and Activities ...... 24

   3.  The CIA's Glomar Response Is Also Proper Because
Confirming the Existence or Non-Existence of the
Requested Records Would Affect Foreign Relations ......... 31

B.  The CIA's Glomar Assertion in This Case Is also Proper Under
FOIA Exemption 3 ........................................ 33

IV. THE CIA HAS PROPERLY WITHHELD INFORMATION RESPONSIVE
TO REQUEST 43 PURSUANT TO EXEMPTIONS 1, 2, 3, 5
AND 7(A) ...................................................... 38

A.  The CIA Properly Classified Documents Responsive to
Request 43 at the Secret and Top Secret Levels ................... 38

   1.  Information Involving CIA Intelligence Sources ............. 39

   2.  Information Involving CIA Intelligence Methods ............ 42

   3.  Information Concerning Intelligence Activities .............. 43

   4.  Plaintiffs' Arguments That the CIA Has Improperly Classified
Information Responsive to Request 43 Are
Without Merit ..................................... 44

ii

|  |  | a. | The CIA Has Not Waived Its FOIA Exemptions Through a Public Disclosure ............ 45 |
|  |  | b. | The CIA Has Not Classified Information in Order to Conceal Violations of Law .................... 47 |

B. The CIA Properly Withheld Information Responsive to Request 43 Under Exemption 3 ......................................... 49

    1. The CIA's Withholdings Under the National Security Act of 1947 Are Protected by Exemption 3 .......... 50

    2. The CIA's Withholdings Under the Central Intelligence Agency Act of 1949 Are Protected by Exemption 3 .......... 51

C. The CIA Has Properly Withheld Information Under Exemptions 2, 5, and 7 ...................................... 52

    1. CIA Internal Information Is Exempt Under Exemption 2 ...... 52

    2. CIA Privileged Materials Are Exempt Under Exemption 5 .... 53

    3. CIA Law Enforcement Materials Are Exempt under Exemption 7(A) ................................................ 56

V. DEFENDANT DOD HAS PROPERLY WITHHELD FROM RELEASE PHOTOGRAPHS OF IRAQ DETAINEES ............................ 57

A. Exemptions 6 and 7(C) Protect Individual Privacy Interests .......... 58

    1. Exemption 6 ......................................... 58

    2. Exemption 7(C) ...................................... 60

B. The Relationship Between the United States's Treaty Obligations and FOIA Exemptions 6 and 7(C) ............................ 62

C. The United States May Not Subject Detainees to Insult and Public Curiosity Pursuant to the Third and Fourth Geneva Conventions ..... 63

iii

D.    The Photographs Are Protected from Disclosure Under Exemptions 6 and 7(C), Because Their Release Would Subject the Pictured Detainees to Insults and Public Scrutiny, and Thus Would Constitute an Unwarranted Invasion of Their Privacy .......................... 67

        1.    The Responsive Darby Photos Are Personal Information and Were Compiled for Law Enforcement Purposes ............ 67

        2.    The Responsive Darby Photos Should Not Be Released Because the Privacy Interests of These Detainees, as Set Forth in the Third and Fourth Geneva Conventions, Outweigh any Public Interest Served by Release of the Photographs ..... 68

CONCLUSION ................................................................. 75

## Declarations and Exhibits Submitted with Government's Motion

Declaration of Charles A. Allen, dated March 25, 2005

> Exhibit A: International Committee of the Red Cross, "ICRC visits to persons deprived of their freedom: an internationally mandated task, implemented worldwide" (Feb. 27, 2004)
>
> Exhibit B: Memorandum from Secretary of Defense, "SUBJECT: Handling of Reports from the International Committee of the Red Cross" (July 14, 2004)

Second Declaration of Stewart F. Aly, dated March 23, 2005

> Exhibit A: Index of documents responsive to Request 8
>
> Exhibit B: Index of documents responsive to Request 13
>
> Exhibit C: Index of documents responsive to Request 58
>
> Exhibit D: Letter dated March 9, 2005 from Finn Ruda of the International Committee of the Red Cross to Stewart F. Aly of the Department of Defense
>
> Exhibit E: Document responsive to Requests 4, 37, 39, 40, 41, and 42 dated September 14, 2003
>
> Exhibit F: Document responsive to Requests 4, 37, 39, 40, 41, and 42 dated October 12, 2003

Declaration of Diane E. Beaver, dated March 24, 2005

Declaration of Geoffrey S. Corn, dated March 25, 2005

Declaration of Edward R. Cummings, dated March 24, 2005

> Exhibit A: U.S. Department of State Dispatch, Vol. 2, No. 4, "Iraqi Mistreatment of POWS"(January 28, 1991)
>
> Exhibit B: DOD Guantanamo Guidelines

Exhibit C: Army Regulation 190-8: Enemy Prisoners of War, Retained Personnel, Civilian Internees and Other Detainees

Exhibit D: DOD Guidelines in connection with Embedded News Media

Fourth Declaration of Marilyn A. Dorn, dated March 30, 2005

Exhibit A: Vaughn Index for Documents Responsive to Item No. 43 of Plaintiffs' 16 August 2004 List

Declaration of Phillip J. McGuire, dated March 30, 2005

## PRELIMINARY STATEMENT

Defendants Department of Defense ("DOD") and the Central Intelligence Agency (the "CIA") (collectively, the "Government") , by their attorney, David N. Kelley, United States Attorney for the Southern District of New York, respectfully submit this memorandum of law in opposition to Plaintiffs' motion for partial summary judgment seeking release of selected documents under the Freedom of Information Act, 5 U.S.C. § 552 ("FOIA"), and in support of the Government's cross-motion for partial summary judgment as to these same documents..

Plaintiffs seek the release of records under FOIA regarding the abuse and mistreatment of overseas detainees held in the custody of the United States after September 11, 2001. Plaintiffs now challenge the exemptions invoked by the Government to withhold five categories of documents. First, Plaintiffs seek reports from the International Committee on the Red Cross (the "ICRC"), and other related documents, which are exempt from release under FOIA Exemption 3 pursuant to 10 U.S.C. § 130c. See Memorandum of Law in Support of Plaintiffs' Motion for Partial Summary Judgment ("Pls.' Br.") at 7-13. Second, Plaintiffs seek documents setting forth interrogation activities that they claim DOD improperly withheld under Exemption 1. Id. at 13-26. Third, Plaintiffs contest the CIA's refusal to confirm or deny the existence of the documents sought by Requests 1, 29 and 61 on Plaintiffs' List of 70 Requests, dated August 16, 2004, attached as Ex. A to Plaintiffs' motion (the "List" and, individually, the "Requests"). Pls.' Br. at 26-30. Fourth, Plaintiffs object to the CIA's classification of information responsive to Request 43. Id. at 30. Finally, Plaintiffs claim that DOD has improperly withheld photographs depicting abuse of detainees. Id. at 31-33.

Plaintiffs' challenge to DOD's withholding of ICRC documents fails because 10 U.S.C. § 130c is a withholding statute and the documents at issue fall within the scope of that statute.

Accordingly, the ICRC documents have been properly withheld under Exemption 3.

As to Plaintiffs' request for DOD documents setting forth interrogation techniques, DOD located two responsive documents after a diligent search. As both of those documents have been released to Plaintiffs, this issue is now moot.

Plaintiffs' objection to the CIA's "Glomar response" with regard to Requests 1, 29 and 61 is without merit because the CIA's refusal to confirm or deny the existence of the documents was proper under FOIA Exemptions 1 and 3. First, the CIA's classification of the existence of the three requested documents, which purportedly address specific interrogation and detention activities, was proper because the existence or non-existence of the documents would confirm the CIA's interest in the activities at issue. Second, the existence of the documents constituted information that was properly withheld under the National Security Act of 1943, as it would reveal information about the CIA's intelligence sources and methods.

Plaintiffs' objection to the CIA's classification of documents responsive to Request 43 is likewise without merit. The information was properly classified because an original classification authority determined that its release would threaten national security. Moreover, the CIA did not classify the information for the purpose of concealing violations of the law. Further, the CIA has not officially disclosed the information; therefore, the CIA has not waived its FOIA exemptions with regard to the information. Finally, although Plaintiffs have only challenged the CIA's application of Exemption 1 to the information withheld with regard to Request 43, the information was also properly withheld under Exemptions 2, 3, 5 and 7(A).

With regard to DOD's withholding of photographs of detainee abuse, these photographs were properly withheld under Exemptions 6 and 7(C) because the substantial privacy interests

2

implicated by such photographs outweighs any public interest in their release. Indeed, release of these photographs would not significantly further the public interest because the underlying misconduct in these photographs has already been widely publicized and publicly confirmed by the Government, and because there are less intrusive means to satisfy the public's right to know. Finally, withholding these photographs is consistent not only with the privacy concerns recognized by Exemptions 6 and 7(C), but also with the United States's obligations under the Geneva Conventions, a relevant consideration given that an act of Congress like FOIA should not be construed to conflict with international treaty obligations if any other possible construction exists.

As explained in greater detail below, therefore, the Government has satisfied its burden to justify withholding the information that Plaintiffs have challenged in their motion for partial summary judgment. Accordingly, Plaintiffs' motion should be denied and the Government's motion for summary judgment should be granted with regard to Requests 1, 4, 8, 10, 11, 13, 29, 37, 39, 40, 41, 42, 43, 49, 50, 51, 58, 61 and 69 from Plaintiffs' List.

## BACKGROUND

### A. Procedural History

Plaintiffs' Amended Complaint addresses twenty-six separate FOIA requests – two rounds of requests submitted to thirteen different agencies or agency components. See Am. Compl. at ¶¶ 22, 45. The description of the documents sought by both sets of requests is identical, with the second set of requests simply seeking more recent documents on the same subjects. See Declaration of Lawrence S. Lustberg in Support of Plaintiffs' Motion for Preliminary Injunction, dated July 6, 2004 ("Lustberg Decl."), attaching FOIA requests from Exs.

1-13. The requests seek records on three topics: (1) the treatment of individuals apprehended after September 11, 2001 and held by the United States at military bases or detention facilities outside the United States ("detainees"); (2) the deaths of detainees in custody; and (3) the government's practice of "rendering" detainees to countries known to use torture. See id.

Given the broad scope of Plaintiffs' FOIA requests, Plaintiffs subsequently identified documents and categories of documents that they wanted the Government to prioritize in its search for and processing of records responsive to their FOIA requests. See Pls.' Br., Ex. A (identifying 70 requests). DOD and the CIA responded to Plaintiffs' List in October and November 2004. See Pls.' Br., Exs. B-E. On January 13, 2005, Plaintiffs moved for summary judgment challenging the positions of DOD and the CIA with regard to certain of the requests.

**B.    The Challenged Requests**

Plaintiffs' summary judgment motion challenges the response of DOD and the CIA to nineteen of the requests on the List. Pls.' Br. at 7-33. The challenges fall into five general categories described below. See id.

**1.    The ICRC Documents**

First, Plaintiffs seek reports from the ICRC in the possession of DOD as well as related communications by the ICRC to and from DOD (the "ICRC Documents"). See Pls.' Br., Ex. A, Requests 8, 13, 49, 50, 51, and 58. The ICRC plays a unique and important role with regard to persons detained in connection with armed conflicts. ICRC communicates with individual detainees and enables them to communicate with their families. See Declaration of Charles A. Allen, Deputy General Counsel (International Affairs) in DOD's OGC, dated March 25, 2005 ("Allen Decl."), at ¶ 3. The ICRC also reports to governments engaged in hostilities regarding

4

the condition of prisoners of war and detainees held by the various nations involved. See id.

Under long-standing practice, the ICRC requires and maintains confidentiality as to its communications with governments regarding the ICRC's observations and findings to ensure that the ICRC maintains continued access to detainees and detention facilities. Id., ¶¶ 5, 16; Second Decl. of Stewart F. Aly, dated March 23, 2005 ("Second Aly Decl."), ¶ 13. Likewise, detaining powers require confidentiality by the ICRC to protect the security of their military and detention operations and to protect the lives and safety of their military and security personnel. Allen Decl., ¶ 9.

The ICRC's standard operating procedures for visiting detainees, and DOD's standard operating procedure governing visits by the ICRC to detainees at Guantanamo and in Iraq, are consistent with these guiding principle of confidentiality. See Declaration of Diane E. Beaver, dated March 24, 2005 ("Beaver Decl."), ¶ 5; Allen Decl., ¶¶ 4-5, 11. Thus, the ICRC has stated that it treats as confidential its observations and findings regarding detainees at Guantanamo and in Iraq, and that it has provided such information on the condition that DOD not release such information to the public. See Beaver Decl., ¶ 5; Second Aly Decl., ¶¶ 13-14; Allen Decl., ¶ 12. The ICRC has confirmed that "all records of communications from the ICRC or its representatives regarding detainees at Guantanamo and Iraq have been provided by the ICRC to the DOD on condition that the documents not be released to the public," and that "the ICRC itself is withholding such documents from public disclosure." Second Aly Decl., ¶ 13 & Ex. D (letter dated March 9, 2005, from Finn Ruda of the ICRC to Stewart Aly of DOD). In addition, the ICRC has stamped the reports it has submitted to DOD as "strictly confidential and intended only for the authorities to whom it is presented." Second Aly Decl., ¶ 13; Beaver Decl., ¶ 6;

5

Allen Decl., ¶ 12.

An operational update issued by the ICRC emphasizes the importance of the

confidentiality of its dialogue with the United States as follows:

## Dialogue with the US authorities

The ICRC regularly discusses its findings concerning Bagram and Guantanamo
Bay with the military authorities in the camps as well as with the appropriate US
representatives in Kabul and Washington. While the ICRC has felt compelled to
make some of its concerns public, notably regarding the legal status of the
detainees, the primary channel for addressing issues related to detention remains
its direct and confidential dialogue with the US authorities.

## Confidentiality. Why?

Whenever the ICRC visits places of detention, its findings and observations about
the conditions of detention and the treatment of detainees are discussed directly
and confidentially with the authorities in charge. Bagram and Guantanamo Bay
are no exceptions. The ICRC's lack of public comment on detention issues must
therefore not be interpreted to mean that it has no concerns.

Confidentiality is an important working tool for the ICRC in order to preserve the
exclusively humanitarian and neutral nature of its work. The purpose of this
policy is to ensure that the ICRC obtains and, importantly, maintains, access to
tens of thousands of detainees around the world held in highly sensitive situations
of armed conflict or other situations of violence.

The ICRC is also concerned that any information it divulges about its findings
could easily be exploited for political gain.

Pls.' Br., Ex. H (May 11, 2004 Operational Update, "US detention related to the events of 11

September 2001 and its aftermath — the role of the ICRC") (boldface in original).[1]  The ICRC

has also stressed the importance of the dialogue it has with governments in conjunction with the

production of its reports: "The reports written by the ICRC after each visit are given to the

---

[1]      Notably, in an effort to show that the ICRC has publicly disclosed the requested
documents, Plaintiffs quote a snippet from this ICRC operational update but make no reference
to the ICRC's clear iteration of its confidentiality policy. See Pls.' Br. at 12-13.

6

detaining authorities and are not intended for publication — the point being that detention problems are best solved through constructive dialogue based on mutual confidence, rather than in the glare of publicity which inevitably carries the risk of politicizing the issues." Allen Decl., Ex. A at 2 (ICRC statement regarding visits to detainees) (emphasis in original).

Plaintiffs seek ICRC reports and ICRC communications to and from DOD that are covered by the ICRC's confidentiality provisions. For example, Request 8 seeks "[a]ll reports of the International Committee for the Red Cross concerning treatment and detention of Detainees in Iraq," Pls. Br., Ex. A, and Request 13 seeks a "[r]esponse to concerns raised by the ICRC regarding the treatment of Detainees," id. Further, Request 49 seeks a "[l]etter from military lawyers over the signature of Brig. General Janis Karpinski to the [ICRC] responding to its concerns about conditions at Abu Ghraib," and Request 58 seeks "[a] complete set of documents reflecting discussions between the ICRC and military officers at Guantanamo Bay," but does not approximate the dates of the records. Id. DOD has withheld all or portions of these documents. See Second Aly Decl., ¶¶ 4-6, 11.[2]

---

[2]      DOD did not withhold documents responsive to Request 50, which seeks a "[m]emorandum for MP and MI personnel at Abu Ghraib" from a United States Army officer "Re: New plan to restrict Red Cross access to Abu Ghraib," Pls. Br., Ex. A, as no document responsive to that request appears to exist. Second Aly Decl., ¶¶ 8, 10. In any event, DOD did not locate a document responsive to this request. See id. Further, no document responsive to Request 51, which seeks a "[m]emorandum from a top legal adviser to Lt. Gen. Ricardo S. Sanchez, to military intelligence and police personnel at the Abu Ghraib prison, regarding a new plan to restrict Red Cross access [to] Abu Ghraib," Pls. Br., Ex. A, appears to exist. Second Aly Decl., ¶¶ 9-10. Plaintiffs approximate the date of the memorandum as January 4, 2004. Pls.' Br., Ex. A. DOD has located a memorandum dated January 8, 2004 relating to Abu Ghraib, but it does not fit the description or characterization provided by Plaintiffs. See Second Aly Decl., ¶ 10. In any event, DOD is withholding that document. See id.

7

## 2. Documents Concerning DOD Interrogation Techniques

Plaintiffs seek a variety of classified DOD memoranda and policies concerning interrogation techniques. Pls' Br. at 13-26. The descriptions of the requests at issue – Requests 4, 37, and 39-42 – overlap. For example, Requests 4, 37 and 40 all concern policies put into effect by Lieutenant General Ricardo S. Sanchez. See Pls.' Br., Ex. A. Likewise, Requests 39, 40 and 42 all address memoranda from the Combined Joint Task Force. See id. DOD has determined that the six requests address two documents. Second Aly Decl., at ¶¶ 23-24. Both of these documents have been declassified and released to Plaintiffs. Id., ¶¶ 25-26 & Exs. E, F. Accordingly, Plaintiffs' challenge to DOD's withholding of documents responsive to Requests 4, 37 and 39-42 is moot.

## 3. Documents That Have Been "Glomared" by the CIA

Plaintiffs also challenge the CIA's refusal to confirm or deny the existence of three purported documents sought by Requests 1, 29 and 61 that supposedly address specific interrogation and detention activities. Pls.' Br. at 26-30. Requests 1 and 29 seek Department of Justice legal opinions. Id., Ex. A. Request 1 seeks a memo that allegedly endorsed the use of "a whole range of techniques – including sleep deprivation, the use of phobias and the deployment of 'stress factors' – in interrogating Qaeda suspects." Pls.' Br., Ex. O at 3. The memo sought in Request 29 also purportedly addressed a specific interrogation activity, "waterboarding." Pls.' Br. at 28. Likewise, Request 61 concerns a supposed Presidential order that purportedly authorized the CIA to set up detention facilities outside the United States and outlined interrogation techniques that could be used against detainees held in those facilities. Pls.' Br., Ex. O at 3.

8

### 4. CIA Documents Responsive to Request 43

In addition, Plaintiffs challenge the CIA's classification of documents responsive to Request 43. Pls.' Br. at 30. Request 43 seeks "Documents relating to Central Intelligence Director George Tenet's request that Defense Secretary Donald Rumsfeld hold an Iraqi suspect at a high level detention center but not be listed on the prison rolls, and Rumsfeld's order implementing that request." Pls.' Br., Ex. A. The CIA has located 72 documents responsive to this request. Declaration of Marilyn A. Dorn, dated March 30, 2005 ("Fourth Dorn Decl."), ¶ 21. The documents include the request from Director of Central Intelligence ("DCI") Tenet (see Index to Fourth Dorn Decl., Document No. 428), as well as a Congressional notification (Document No. 29), synopses of the events underlying the requests (Document Nos. 13 and 273), and various drafts and internal communications. Although Plaintiffs challenge only the CIA's withholding of these documents under Exemption 1, the CIA has also withheld these documents under Exemptions 2, 3, 5, and 7(A).

### 5. DOD Photographs

Finally, Plaintiffs seek specific photographs of abuse or mistreatment of detainees at Abu Ghraib taken by Joseph Darby, a military policeman, and provided to the Army's Criminal Investigative Division (the "responsive Darby photos"). See Pls.' Br. at 31 & Ex. A.[3]

---

[3]     Plaintiffs' motion also seeks release of one broad and open-ended category of documents: all "photographs and videotapes depicting the abuse of detainees." See Pls.' Br. at 31 (citing Requests 10 and 11 on the List); see List (Pls' Ex. A) (Request 11 seeking "videotapes, photographs and other records depicting abuse at Iraqi facilities" and Request 10 seeking "videotapes, photographs and other records of abuse, including videotapes, photographs and other records of abuse catalogued and stored in Guantanamo Bay facilities."). Requests 10 and 11 do not seek specific documents but rather categories of documents. See Response of DOD to List, at 10 and 11 (Pls.' Ex. D). In fact, DOD is still processing photographs and videotapes to determine what other media are responsive to plaintiffs' requests. See, e.g.,

## ARGUMENT

## I.    FOIA AND SUMMARY JUDGMENT STANDARDS

FOIA was enacted to "ensure an informed citizenry, . . . needed to check against corruption and hold the governors accountable to the governed." NLRB v. Robbins Tire & Rubber Co., 437 U.S. 214, 242 (1978). FOIA requires each federal agency to make available to the public a wide array of information, and sets forth procedures by which requesters may obtain such information. See 5 U.S.C. § 552(a). At the same time, FOIA exempts nine categories of information from disclosure, while providing that "[a]ny reasonably segregable portion of a record shall be provided . . . after deletion of the portions which are exempt under this subsection." 5 U.S.C. § 552(b).

In accordance with FOIA's "goal of broad disclosure, these exemptions have been consistently given a narrow compass." Department of the Interior and Bureau of Indian Affairs v. Klamath Water Users, 532 U.S. 1, 8 (2001) (citation and internal quotation marks omitted); see also Grand Central P'ship, Inc. v. Cuomo, 166 F.3d 473, 478 (2d Cir. 1999). While narrowly construed, however, FOIA exemptions "are intended to have meaningful reach and application." John Doe Agency v. John Doe Corp., 493 U.S. 146, 152 (1989). Indeed, Congress recognized that public disclosure is not always in the public interest. Rather, "FOIA represents a balance

---

Declaration of Philip J. McGuire, dated March 30, 2005 ("Second McGuire Decl."), ¶ 11. Moreover, each photograph and videotape must be reviewed and addressed individually for purposes of asserting exemptions. Id. For example, to determine whether a photograph is exempt from release under exemption 7(A), the Government must determine whether release of that specific photograph will have an impact on a specific law enforcement proceeding. Id.; see National Security Archives v. FBI, 759 F. Supp. 872, 883 (D.D.C. 1991). Accordingly, as the Government has not processed this category of records, plaintiffs' motion for summary judgment should be denied without prejudice as to Requests 10 and 11.

struck by Congress between the public's right to know and the government's legitimate interest in keeping certain information confidential." Center for Nat'l Sec. Studies v. DOJ, 331 F.3d 918, 925 (D.C. Cir. 2003) (citing John Doe Agency, 493 U.S. at 152).

Summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure is the procedural vehicle by which most FOIA actions are resolved. See, e.g., Miscavige v. IRS, 2 F.3d 366, 369 (11th Cir. 1993) ("Generally, FOIA cases should be handled on motions for summary judgment, once the documents in issue are properly identified."). "In order to prevail on a motion for summary judgment in a FOIA case, the defendant agency has the burden of showing that its search was adequate and that any withheld documents fall within an exemption to FOIA." Carney v. DOJ, 19 F.3d 807, 812 (2d Cir. 1994). "Affidavits or declarations supplying facts indicating that the agency has conducted a thorough search and giving reasonably detailed explanations why any withheld documents fall within an exemption are sufficient to sustain the agency's burden." Id. (footnote omitted); see also Halpern v. FBI, 181 F.3d 279, 291 (2d Cir. 1999) (same) (citation, alterations, and internal quotation marks omitted). Although this Court reviews de novo the agency's determination that requested information falls within a FOIA exemption, see 5 U.S.C. § 552(a)(4)(B); Halpern, 181 F.3d at 287, the declarations submitted by the agency in support of its determination are "accorded a presumption of good faith," Carney, 19 F.3d at 812 (citation and internal quotation marks omitted).

## II. DOD HAS PROPERLY INVOKED EXEMPTION THREE FOR DOCUMENTS MEMORIALIZING COMMUNICATIONS WITH THE ICRC

DOD has withheld documents responsive to Requests 8, 13, 49, and 58, which seek reports from the ICRC as well as related communications between the ICRC and DOD, because

11

disclosure of the information is barred by a withholding statute. DOD has not located documents

responsive to Requests 50 and 51. Accordingly, DOD has properly withheld the information

under FOIA Exemption 3.

## A. Standard for Exemption 3

In examining an Exemption 3 claim, a court must determine, first, whether the claimed

statute is a statute of exemption under FOIA, and, second, whether the withheld material satisfies

the criteria of the exemption statute. See Sims v. CIA, 471 U.S. 159, 167 (1985); A. Michael's

Piano, Inc. v. FTC, 18 F.3d 138, 143 (2d Cir. 1994); Fitzgibbon v. CIA, 911 F.2d 755, 761 (D.C.

Cir. 1990). Because the threshold issue for the application of Exemption 3 is based on the statute

invoked by the agency, the analysis is distinct from that employed to analyze other FOIA

exemptions. As the D.C. Circuit has explained, "Exemption 3 differs from other FOIA

exemptions in that its applicability depends less on the detailed factual contents of specific

documents; the sole issue for decision is the existence of a relevant statute and the inclusion of

withheld material within the statute's coverage." Fitzgibbon, 911 F.2d at 761-62 (quoting Assoc.

of Retired R.R. Workers v. United States R.R. Retirement Bd., 830 F.2d 331, 336 (D.C. Cir.

1987) and Goland v. CIA, 607 F.2d 339, 350 (D.C. Cir. 1978)).

## B. DOD Properly Withheld the ICRC Documents Under Exemption 3

### 1. 10 U.S.C. § 130c

The exempting statute that applies to the ICRC Documents is 10 U.S.C. § 130c, titled

"Nondisclosure of information: certain sensitive information of foreign governments and

international organizations." Subsection 130c(a), entitled "Exemption from disclosure,"

provides that "[t]he national security official concerned (as defined in subsection (h)) may

12

withhold from public disclosure otherwise required by law sensitive information of foreign

governments in accordance with this section." 10 U.S.C. § 130c(a). The definition of "national

security official concerned" in subsection (h) includes the Secretary of Defense. 10 U.S.C.

§ 130c(h)(1)(A).

Subsection 130c(b), entitled "Information Eligible for Exemption," provides:

[f]or the purposes of this section, information is sensitive information of a foreign
government only if the national security official concerned makes each of the
following determinations with respect to the information:

(1) That the information was provided by, otherwise made
available by, or produced in cooperation with, a foreign
government or international organization.

(2) That the foreign government or international organization is
withholding the information from public disclosure (relying for
that determination on the written representation of the foreign
government or international organization to that effect).

(3) That any of the following conditions are met:

(A) The foreign government or international
organization requests, in writing, that the
information be withheld.

(B) The information was provided or made
available to the United States Government on
condition that it not be released to the public.

(C) The information is an item of information, or is
in a category of information, that the national
security official has specified in regulations
prescribed under subsection [g] as being
information the release of which would have an
adverse effect on the ability of the United States
Government to obtain the same or similar
information in the future.

10 U.S.C. § 130c(b).

13

The definition of "international organization" includes "[a] public international organization designated pursuant to section 1 of the International Organizations Immunities Act (59 Stat. 669; 22 U.S.C. 288) as being entitled to enjoy the privileges, exemptions, and immunities provided in such Act." 10 U.S.C. § 130c(h)(3)(A). The International Organizations Immunities Act, in turn, defines "international organization" as "a public international organization in which the United States participates pursuant to any treaty or under authority of any Act of Congress" and which "shall have been designated by the President through appropriate Executive Order." 22 U.S.C. § 288f-3. The ICRC qualifies as an "international organization" under section 130c because the President designated the ICRC as an "international organization" in Executive Order ("E.O.") No. 12643, 53 Fed. Reg. 24247 (June 23, 1988). Allen Decl. ¶ 15.

In enacting 10 U.S.C. § 130c, Congress intended to "protect from unauthorized disclosure" sensitive — but not formally classified — information provided by a designated international organization, where such information was provided to the United States "under the condition that it be protected from unauthorized release," and where the information is "subject to certain special controls and protected from release outside the organization." S. Rep. 106-292, 106th Cong., 2nd Sess. 2000, 2000 WL 575371, at *355 ("Authority to withhold certain sensitive information from public disclosure"). The Senate Committee observed that, prior to enactment of 10 U.S.C. § 130c, the only way for the United States to protect such information from unauthorized disclosure was to classify the information in the interests of national security under E.O. 12958, and that this procedure "requires that the security requirements for classified information apply, including security clearances, safes, and precautions in transmission." Id.

14

Thus, the Senate Committee noted, "this situation frequently imposes unnecessary costs and has caused problems for cooperative defense programs." Id. In short, by enacting 10 U.S.C. § 130c, Congress intended to protect information like the ICRC Documents from unauthorized disclosure and to avoid the "unnecessary costs" and "problems" that would otherwise be incurred if the Government were obliged to formally classify such information.

The third prong of 10 U.S.C. § 130c(b) requires that one of three conditions be met. One of those conditions is that the Secretary has specified in regulations that release of the item or category of information at issue would have an adverse effect on the ability of the United States Government to obtain the same or similar information in the future. 10 U.S.C. § 130c(b)(3)(C); see also 10 U.S.C. § 103c(g) (national security officials shall prescribe regulations to carry out section 103c). The Secretary established the required treatment of ICRC reports in a directive issued in the form of a Memorandum dated July 14, 2004 (Subject: Handling of Reports from the International Committee of the Red Cross). Allen Decl., ¶ 13 & Ex. B; Second Aly Decl., ¶ 15. That memorandum contains the following statement regarding the confidentiality of ICRC communications:

> All ICRC communications shall be marked with the following statement: "ICRC communications are provided to DoD as confidential, restricted-use documents. As such, they will be safeguarded the same as SECRET NODIS information using classified information channels. Dissemination of ICRC communications outside of DoD is not authorized without the approval of the Secretary or Deputy Secretary of Defense."

See Allen Decl., Ex. B; Second Aly Decl., ¶ 15.

### 2. 10 U.S.C. § 130c Is an Exempting Statute

The threshold requirement for Exemption 3 exclusion from public disclosure is that the

statute invoked qualifies as an Exemption 3 withholding statute. A. Michael's Piano, 18 F.3d at 143 (citations omitted). To qualify as an exempting statute, the statute must establish "particular criteria for withholding or refer[] to particular types of matters to be withheld." 5 U.S.C. § 552(b)(3)(B). The terms of 10 U.S.C. § 130c set forth particular criteria for withholding materials. See 10 U.S.C. § 130c. Moreover, Plaintiffs concede that 10 U.S.C. § 103c is an exempting statute. Pls.' Br. at 8-9. Accordingly, 10 U.S.C. § 130c is an exempting statute for purposes of FOIA Exemption 3.

## 3. The ICRC Documents Fall Within the Scope of 10 U.S.C. § 130c

For ICRC materials to be withheld pursuant to 10 U.S.C. § 130c, three requirements must be met. First, the information must have been provided by, made available by, or produced in cooperation with the ICRC. See 10 U.S.C. § 130c(b)(1). Second, the ICRC must make a written representation that it is withholding the information from public disclosure. See 10 U.S.C. § 130c(b)(2). Third, the ICRC must either request in writing that the information be withheld, must have provided the information to the United States on condition that it not be released to the public, or regulations must specify that release of the information would have an adverse effect on the ability of the United States to obtain the same or similar information in the future. See 10 U.S.C. § 130c(b)(3). To the extent that DOD has withheld ICRC information, all three conditions have been met.

### a. Request 8

DOD has properly withheld all documents responsive to Request 8. First, all ICRC reports were provided to DOD officials by the ICRC. Second Aly Decl., ¶ 18. Second, the ICRC has represented in writing that it is withholding the information contained in those reports from

16

public disclosure. See id., ¶ 13 & Ex. D. Third, the ICRC has requested in writing that the United States withhold the information. See id.; see also Beaver Decl., ¶ 6; Allen Decl., ¶ 12. Fourth, the ICRC provided the reports on condition that the United States not release the reports to the public. See id. Finally, the Secretary's directive regarding ICRC communications prohibits dissemination of such communication outside of DOD. See Allen Decl., ¶ 13 & Ex. B, Second Aly Decl. ¶ 15.[4] Thus, all of the requirements of 10 U.S.C. § 130c have been met.

Plaintiffs mistakenly claim that 10 U.S.C. § 130c "contemplates the provision of a written representation that the specific information at issue is being withheld from public disclosure." Pls.' Br. at 12 (emphasis in original). This attempt to invent a new statutory requirement should be rejected. The statute does not require a written representation related to each item of "specific" information, and Plaintiffs cite no authority for such a requirement. Moreover, requiring the ICRC to provide a new, written confidentiality representation each time it provides information to the United States would directly contradict Congress' intent in enacting 10 U.S.C. § 130c. The intent of the statute was to reduce the time and resources spent in handling and classifying materials. See S. Rep. 106-292, 2000 WL 575371, at *355. Plaintiffs, in contrast, seek to increase the time and resources spent on handling ICRC materials. Because Plaintiffs'

---

[4]     Although the Secretary's directive is not technically a regulation, it specifies that release of the item or category of information at issue would have an adverse effect on the ability of the United States Government to obtain the same or similar information in the future. Allen Decl. ¶ 13 & Ex. B. The directive provides that: "ICRC communications are provided to DoD as confidential, restricted-use documents," and that "Dissemination of ICRC communications outside of DoD is not authorized without the approval of the Secretary or Deputy Secretary of Defense." Allen Decl., Ex. B. The Secretary also emphasized that compliance with the confidentiality procedures as to ICRC reports is "essential to enabling the Department to continue to meet its responsibilities and obligations for the humane care and full accountability for all persons captured or detained during military operations." Id. Therefore, the Secretary made the requisite findings as set forth in 10 U.S.C. § 130c(b)(3)(C).

17

proposed requirement lacks a statutory basis and contradicts Congressional intent, it should be rejected.

Plaintiffs also seem to imply that there is an exception to 10 U.S.C. § 130c if confidential information is leaked by a third party. See Pls.' Br. at 12-13. Plaintiffs appear to claim that the ICRC does not truly have a policy of confidentiality regarding its observations and findings related to detainees because two or three news reports claim to describe portions of an ICRC report. See id. This position is untenable. As shown above, the ICRC has made specific, and repeated, representations that it treats its observations and findings as confidential and that it provides them to the United States on the condition that their confidentiality be maintained. See Background, Section B.1., supra. Indeed, one of the documents upon which Plaintiffs rely emphasizes at length the confidentiality of its dialogue with the United States. See Pls.' Br., Ex. H (ICRC discussion of importance of confidentiality).

In short, the ICRC reports meet the requirements set forth in 10 U.S.C. § 130c. Accordingly, DOD has properly withheld all documents responsive to Request 8.

### b. Requests 13 and 49

DOD also has properly withheld the documents responsive to Requests 13 and 49. First, any response by DOD to ICRC "concerns" regarding the treatment of detainees was produced "in cooperation with" the ICRC. See 10 U.S.C. § 130c(b)(1). A critical element of DOD's cooperation with the ICRC is the dialogue it has with the ICRC regarding detainees. See Allen Decl., Ex. A (ICRC report stating that "detention problems are best solved through constructive dialogue"); Beaver Decl., ¶ 3 (DOD minutes of ICRC meetings shared with ICRC to ensure accuracy). That dialogue consists of both verbal and written communications, including the

documents responsive to Requests 13 and 49. See id. Second, any ICRC "concerns" and any

United States responses are covered by the ICRC's written representations that it is withholding

its communications from public disclosure, Second Aly Decl., Ex. D, and that its "dialogue" with

the United States is "confidential," see Pls.' Br., Ex. H. Finally, as noted above, the ICRC has

requested that the United States withhold such information, the ICRC provides its observations

and findings on condition that the United States not release them to the public, and the

Secretary's directive regarding ICRC communications prohibits dissemination of such

communications outside of DOD. Second Aly Decl., ¶ 19.

Plaintiffs essentially disregard the "in cooperation with" element of 10 U.S.C. § 130c that

exempts from disclosure information produced by DOD "in cooperation with" the ICRC. Thus,

Plaintiffs contend that information communicated to the ICRC by DOD as part of their

confidential dialogue must be disclosed. See Pls.' Br. at 10-11. Otherwise, Plaintiffs assert,

"then the agency could exempt its own records from FOIA by sending them to the ICRC." Id.

Plaintiffs' argument is a red herring. The exempting statute would not allow DOD to

exempt any record from disclosure merely by providing a copy of the record to the ICRC.

Rather, a record would only be exempt from disclosure if it was produced to the ICRC in

cooperation with the ICRC. Here, the withheld documents were produced in cooperation with

the ICRC because they were responses to ICRC concerns, as the Plaintiffs in fact characterized

them in the Requests. Accordingly, they were properly withheld.

### c. Request 50

DOD has been unable to locate a document responsive to Request 50. In fact, the named

author of the memorandum Plaintiffs described unequivocally denies having signed a document

19

matching Plaintiffs' description. See Second Aly Decl. ¶¶ 8, 10. Accordingly, DOD has not produced a document responsive to Request 50.

### d. **Request 51**

DOD has been unable to locate a document responsive to Request 51. Second Aly Decl., ¶¶ 9-10. DOD has, however, located a four-page memorandum dated January 8, 2004 that memorializes confidential communications from the ICRC related to a visit to Abu Ghraib. Id., ¶ 10. It is not, however, addressed to military police or military intelligence personnel, and it makes no reference to Lieutenant General Ricardo S. Sanchez. Id. In addition, it does not address a "New plan to restrict Red Cross access to Abu Ghraib." Id. It is signed by the Deputy Commander, Headquarters 205th Military Intelligence Brigade and Forward Operating Base Abu Ghraib, and it memorializes communications from the ICRC related to a January 2004 visit to a detention facility, including a discussion of ICRC access to detainees. Id.

Even if the document was responsive, DOD has properly withheld it for the same reasons that it properly withheld the ICRC reports responsive to Request 8. Second Aly Decl., ¶ 20. First, the memorandum memorializes communications to DOD from the ICRC relating to detainees. Id. Second, the ICRC has requested in writing that all such communications be kept confidential. Id., Ex. D. Third, the ICRC has requested that the United States withhold the information, id., the ICRC provides its observations and findings on condition that the United States not release them to the public, and the Secretary's directive regarding ICRC communications prohibits dissemination of such communications outside of DOD, id., ¶ 20.

### e. **Request 58**

DOD has produced the documents responsive to Request 58 in redacted form. The

20

request seeks all documents reflecting discussions between the ICRC and military officers at

Guantanamo Bay. Minutes of such meetings have sometimes been prepared by DOD staff and

have been shared with ICRC personnel to ensure their accuracy. See Beaver Decl., ¶ 3. The

redacted material was properly withheld because it is information provided by the ICRC or

produced in cooperation with the ICRC relating to detainees at Guantanamo Bay. See id.; see

also Second Aly Decl., ¶ 21. As noted above, the ICRC has affirmed in writing that it is

withholding such information from public disclosure and has requested in writing that DOD

withhold such information. Moreover, the ICRC provided such information to DOD on

condition that it not be released to the public, and the Secretary directed that it not be

disseminated outside of DOD. To the extent non-exempt material has been redacted, it is non-

segregable from exempt information. Second Aly Decl., ¶ 21. Accordingly, DOD properly

withheld the redacted portions of the documents produced in response to Request 58.

In sum, DOD has properly invoked Exemption 3 in withholding or redacting the

responsive ICRC documents. Accordingly, as to the ICRC documents, Plaintiffs' motion for

summary judgment should be denied, and Defendants' motion for summary judgment should be

granted.

## III. THE CIA PROPERLY INVOKED THE GLOMAR DOCTRINE TO REFUSE TO CONFIRM OR DENY THE EXISTENCE OF REQUESTS 1, 29 AND 61

With respect to Requests 1, 29 and 61, the CIA properly refused to confirm or deny the

existence of the records Plaintiffs requested. This type of response to a FOIA request is known

as a "Glomar response," after the CIA's successful defense of its refusal to confirm or deny the

existence of records regarding a ship named the Glomar Explorer in Phillippi v. CIA, 546 F.2d

21

1009, 1011 (D.C. Cir. 1976). In refusing to confirm or deny the existence of the requested information, the CIA relied upon two FOIA exemptions, 5 U.S.C. § 552(b)(1) and 5 U.S.C. § 552(b)(3). Declaration of Marilyn A. Dorn, dated October 15, 2004 ("First Dorn Decl."), ¶ 13; Fourth Dorn Decl., ¶ 18. The very fact of whether the CIA possesses records responsive to Requests 1, 29 and 61 is exempt from disclosure under Exemption 1 because it is classified for reasons of national security pursuant to Executive Order and under Exemption 3 because it could reveal intelligence activities and methods that the DCI has the statutory responsibility to protect.

## A. Whether the CIA Possesses Records Responsive to Requests 1, 29 and 61 Is Properly Classified under Exemption 1

### 1. Standard for Exemption 1

Exemption 1 protects records that are: (1) specifically authorized under criteria established by an Executive Order to be kept secret in the interest of national defense or foreign policy, and (2) are in fact properly classified pursuant to E.O. See 5 U.S.C. § 552 (b)(1). Section 1.1(a)(4) of E.O. 12958 states that an agency may classify information that fits into one or more of the Executive Order's categories for classification when the appropriate classification authority "determines that the unauthorized disclosure of the information reasonably could be expected to result in damage to national security." 68 Fed. Reg. 15315, 15315 (March 25, 2003).[5] Section 3.6(a) of E.O. 12958 further states that "an agency may refuse to confirm or deny the existence or nonexistence of requested records whenever the fact of their existence or nonexistence is itself classified under this order or its predecessors." Id. at 15324.

---

[5]     E.O. 12958 was amended by E.O. 13292, effective March 25, 2003. See Exec. Order No. 12958, 3 C.F.R. (1995), reprinted as amended in 50 U.S.C. § 435 note at 91 (supp. 2004); see also Exec. Order No. 13,292, 68 Fed. Reg. 15315 (March 28, 2003). All citations herein to E.O. 12958 are to the Order as amended by E.O. 13292.

22

An agency can demonstrate that it has properly withheld information under Exemption 1 if it establishes that it has met the substantive and procedural requirements of the Executive Order. Substantively, the agency must show that the records at issue logically fall within the exemption, i.e., that E.O. 12958 authorizes the classification of the information at issue. Procedurally, the agency must demonstrate that it followed the proper procedures in classifying the information. See Salisbury v. United States, 690 F.2d 966, 970-73 (D.C. Cir. 1982); Military Audit Project v. Casey, 656 F.2d 724, 737-38 (D.C. Cir. 1981). An agency meeting both tests is then entitled to summary judgment. See, e.g., Abbotts v. NRC, 766 F.2d 604, 606-08 (D.C. Cir. 1985); Miller v. Casey, 730 F.2d 773, 776 (D.C. Cir. 1984).

Agency decisions to withhold classified information under FOIA are reviewed de novo by the district court, and the agency bears the burden of proving its claim for exemption. See 5 U.S.C. § 552(a)(4)(B); Miller, 730 F.2d at 776. Nevertheless, because agencies have "unique insights" into the adverse effects that might result from public disclosure of classified information, the courts must accord "substantial weight" to an agency's affidavits justifying classification. Military Audit Project, 656 F.2d at 738; accord Doherty v. DOJ, 775 F.2d 49, 52 (2d Cir. 1985); Earth Pledge Foundation v. CIA, 988 F. Supp. 623, 626 (S.D.N.Y. 1996) (court must "'accord substantial weight to an agency's affidavit concerning the details of the classified status of the disputed record'") (quoting Miller, 730 F.2d at 776), aff'd 128 F.2d 788 (2d Cir. 1997).

"Summary judgment is warranted on the basis of agency affidavits where the affidavits describe 'the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by

23

either contrary evidence in the record or by evidence of agency bad faith.'" Miller, 730 F.2d at

776 (quoting Military Audit, 656 F.2d at 738); see also Maynard v. CIA, 986 F.2d 547, 555-56

(1st Cir. 1993) (same). Where the agency's affidavits meet this standard, "the court is not to

conduct a detailed inquiry to decide whether it agrees with the agency's opinions." Halperin v.

CIA, 629 F.2d 144, 148 (D.C. Cir. 1980). To do so would violate the principle of according

substantial weight to the expert opinion of the agency. See Stillman v. CIA, 319 F.3d 546, 548

(D.C. Cir. 2003) (criticizing district court for failing to "evaluate the pleadings and affidavits to

be submitted by the Government in defense of classification decision," thereby erroneously

withholding deference ordinarily owed to national security officials).

Here, the requirements of the Executive Order have been met because a CIA officer with

authority to make original classification decisions has determined that the fact of the existence or

non-existence of records containing the information requested in Requests 1, 29 and 61 "would

be classified for reasons of national security pursuant to § 1.4(c) (intelligence activities and

intelligence sources and methods) and § 1.4(d) (foreign relations or foreign activities of the

United States) of Executive Order 12958." First Dorn Decl., ¶ 16; Fourth Dorn Decl., ¶ 18.

## 2. Whether the Requested Records Exist Is Properly Classified Because It Concerns Intelligence Methods and Activities

Interrogation and detention activities are intelligence activities and methods within the

meaning of § 1.4(c) of E.O. 12958. See Fourth Dorn Decl., ¶ 11 ("interrogation and detention

activities . . . would be intelligence activities and methods within the meaning of the Executive

Order"). Therefore, as Plaintiffs do not contest, see Pls.' Br. at 27-30, the information requested

– alleged memos and orders concerning interrogation and detention activities – falls within one

24

of the categories of information listed in Section 1.4 of E.O. 12958.

Moreover, the existence or non-existence of the information requested is properly classified under the Executive Order. Section 1.1(a)(4) of E.O. 12958 provides that information may be classified where "the original classification authority determines that the unauthorized disclosure of the information reasonably could be expected to result in damage to the national security and the original classification authority is able to identify or describe the damage." 68 Fed. Reg. at 15315.[6]

Ms. Dorn, the Information Review Officer ("IRO") for the Directorate of Operations, possesses original classification authority pursuant to Section 1.3(c) of E.O. 12958. First Dorn Decl., ¶ 4; Fourth Dorn Decl., ¶ 2; see also Pipko v. CIA, 312 F. Supp. 2d 669, 678 (D.N.J. 2004) (holding that statement under oath that IRO "holds original classification authority at the TOP SECRET level" was sufficient to establish that the IRO was "an 'original classification authority' within the meaning of Executive Order 12958"). Under Section 1.3(a)(2) of the Order, the President designated the DCI as an original classification authority up to the Top Secret level. 68 Fed. Reg. at 15316. The DCI has delegated this authority, in accordance with Section 1.3(c)(2) of the Order, to a limited number of CIA officials. Fourth Dorn Decl., ¶ 30. Ms. Dorn is one of the officials who has been designated with original classification authority. Id., ¶¶ 2, 30. Therefore, Ms. Dorn is "authorized to conduct classification reviews and to make original

---

⁶       Section 1.1(a)(2) of E.O. 12958 also provides that information may be classified where it "is owned by, produced by or for, or is under the control of the United States Government." 68 Fed. Reg. at 15315. Ms. Dorn has determined that the information Plaintiffs request "comprises information that is owned by, produced by or for, or is under the control of CIA." Fourth Dorn Decl., ¶ 31(1). Moreover, Plaintiffs do not dispute that the existence or non-existence of the information requested is a fact that falls within the language of Section 1.1(a)(2). See Pls.' Br. at 27-30.

25

classification decisions." Id., ¶ 30.

Ms. Dorn has determined, based on her experience and authority as a classification official, that:

> CIA confirmation of the existence of the records requested in item
> nos. 1, 29 and 61 would confirm a CIA interest in or use of specific
> intelligence methods and activities. Similarly, a CIA response that
> it had no records responsive to those items would suggest that the
> CIA was not authorized to use or was not interested in using these
> intelligence methods and activities. Either response would provide
> foreign intelligence agencies and other groups hostile to the United
> States with information about CIA's intelligence activities and
> methods.

Fourth Dorn Decl., ¶ 13; see also id., ¶ 16 ("the mere confirmation or denial of the existence or

non-existence of documents responsive to item nos. 1, 29 and 61 of plaintiffs' list reasonably

could be expected to cause serious damage to the national security of the United States because

confirming the existence or non-existence of such documents would give our enemies

information about specific intelligence methods and activities utilized by the CIA or of interest to

the CIA"); First Dorn Decl., ¶ 15 (the existence or non-existence of the requested information

"could reasonably be expected to cause damage to the national security of the United States").

Ms. Dorn reached this conclusion because the records Plaintiffs request in Requests 1, 29

and 61 "would exist if CIA had engaged in clandestine intelligence activities **or** had an interest in

pursuing clandestine intelligence activities upon which DOJ allegedly advised or which were

allegedly included in the 'Presidential Directive.'" Fourth Dorn Decl., ¶ 10 (emphasis in

original). The "CIA would not request legal memoranda or authorizations from the President for

intelligence activities in which it had not interest." Id., ¶ 11. Therefore, as Ms. Dorn explained:

26

> [C]onfirming or denying the existence or non-existence of these documents would necessarily confirm or deny a CIA intelligence interest in engaging in these intelligence methods or activities in the war on terrorism. Specifically, confirming the existence of these documents would acknowledge a CIA intelligence interest in detainee interrogation and detention activities (which would be intelligence activities and methods within the meaning of the Executive Order), and would further acknowledge a CIA capability to pursue such intelligence activities and employ such methods. A denial of the existence of these documents would acknowledge a lack of CIA interest capability.

Id.

Ms. Dorn further identified and described the damage to the CIA's intelligence activities

and methods that would result from a confirmation or denial of the existence of the records

requested in determining that:

> Merely acknowledging that the CIA sought legal opinions or authorizations addressing specific interrogation and detention activities is itself classified because the answer provides information about the types of intelligence methods and activities that are available to the CIA or may be of interest to the CIA. Revealing this information reasonably could be expected to interfere with the United States Government's collection of intelligence in the war on terrorism.

Id., ¶ 12. The information Plaintiffs seek would therefore "be of material assistance to those who

would seek to detect, disrupt, or damage the intelligence operations of the United States." Id.,

¶ 14.

A confirmation or denial of the records requested would also aid hostile organizations in

the allocation of their "limited resources." See id., ¶ 14. If the CIA were to publicly

acknowledge that it has obtained DOJ memoranda about specific interrogation activities and a

Presidential authorization to use specific types of detention facilities, hostile organizations would

27

not need to consume resources to verify CIA interest in those intelligence sources and methods. See id. Rather, because the information would be in the public domain, hostile organizations would be able to allocate their limited resources to other means of opposing United States intelligence operations. See First Dorn Decl., ¶ 15 ("[a] CIA response that it had no records responsive to one or more portions of Plaintiffs' request would tend to negate the purported activities or interests and would lessen the burden on foreign intelligence agencies attempting to track the CIA's covert activities, relationships, and intelligence interests").

For all of these reasons, the CIA properly determined that "the mere confirmation or denial of the existence or non-existence of records responsive to item nos. 1, 29 and 61 reasonably could be expected to cause serious damage to national security through the disclosure of intelligence activities and intelligence methods." Id., ¶ 19. This case therefore falls within a long line of cases where the federal courts have affirmed the CIA's classification of the existence or non-existence of information that might demonstrate the Agency's interest in a particular intelligence method or activity.

For example, in Rubin v. CIA, No. 01 Civ. 2274 (DLC), 2001 WL 1537706, at *1 (S.D.N.Y. Dec. 3, 2001), plaintiff filed a FOIA request with the CIA seeking records regarding two literary figures, Stephen Spender and T.S. Eliot. The CIA refused to confirm or deny the existence or non-existence of records responsive to plaintiff's request. Id. The CIA justified its position by explaining that "[a]cknowledging that the Agency has information or has no information about these two foreign nationals is itself classified because the answer provides information about the types of people who may be of foreign intelligence interest to the Agency." Id. at *3 (emphasis added). In granting summary judgment in favor of the CIA, Judge Cote

28

reasoned that confirming or denying the existence of the requested information would effectively disclose "the very fact that must be protected in this case – whether the CIA has a current or past covert interest in a specific individual." Id. at 4 (emphasis added). This case, where the CIA has classified the existence or non-existence of information about the types of interrogation and detention activities that may be of foreign intelligence interest, Fourth Dorn Decl,. ¶¶ 12-14, is analogous to Rubin, where the court affirmed the CIA's classification of information about the "types of people who may be of foreign intelligence interest," 2001 WL 1537706, at *3.

Likewise, the District Court for the District of Columbia recently held in Wolf v. CIA that a Glomar response was proper where, as here, "disclosure could possibly reveal information about intelligence interests or activities that could threaten national security." No. 01-0729 (RJL), 2004 WL 3168220, at *3 (D.D.C. July 14, 2004) (emphasis added). In Wolf, plaintiff submitted a FOIA request for information concerning a former candidate for president of Colombia. Id. at *1. The Wolf court concluded that the CIA properly determined that it could neither confirm nor deny the existence of the records requested because, inter alia, "disclosure could possibly reveal general CIA methods of information gathering (which could be magnified if a foreign intelligence service submitted FOIA requests)." Id. at *3. Similarly, in this case, confirmation or denial of the records requested would reveal information about CIA methods of information gathering because the records requested concern specific interrogation and detention activities.[7]

---

[7]    See also Bassiouni v. CIA, No. 02 C 4049, 2004 WL 1125919, at *6-7 (N.D. Ill. March 31, 2004) (affirming the "CIA's ability to refuse to confirm or deny the existence of responsive records" where CIA affirmation established a "specific and plausible basis for concluding" that identification of records would have a detrimental effect on "intelligence methods, interests, sources and capabilities") (emphasis added); Pipko, 312 F. Supp. 2d at 677-

Plaintiffs maintain that the CIA may refuse to confirm or deny the existence of records only "where the response in itself would confirm the existence of <u>covert activities</u>." Pls.' Br. at 29 (emphasis added). This misstates the law. The CIA may refuse to confirm or deny the existence of records not only where the fact of the records' existence would confirm clandestine activities, but also where the confirmation or denial would indicate the CIA's intelligence interests or methods. <u>See, e.g., Rubin</u>, 2001 WL 1537706, at \*4; <u>Wolf</u>, 2004 WL 3168220, at \*3.

Moreover, in <u>Hunt v. CIA</u>, 981 F.2d 1116 (9th Cir. 1992), the Ninth Circuit explicitly rejected Plaintiffs' argument. In <u>Hunt</u>, a lower court had held, as Plaintiffs argue here, that "the CIA can refuse to confirm or deny the existence of records <u>only when the information would relate to covert actions</u>." <u>Id.</u> at 1118 (emphasis added). The lower court relied upon legislative history to the Central Intelligence Agency Information Act in reaching this conclusion. <u>Id.</u> The Ninth Circuit disagreed, rejecting the proposition that the CIA was precluded "from using a

78 (adopting CIA argument that confirming or denying existence of records pertaining to particular individuals "could identify human intelligence sources, as well as reveal information about the CIA's <u>specific intelligence interests or activities</u>") (emphasis added); <u>Wheeler v. CIA</u>, 271 F. Supp. 2d 132, 140 (D.D.C. 2003) (affirming CIA's refusal to confirm or deny records concerning a journalist because identification of records would threaten "the CIA's methods of operating"); <u>Arabian Shield Development Co. v. CIA</u>, No. 3-98-CV-0624-BD, 1999 WL 118796, at \*3 (N.D. Tex. Feb. 26, 1999) (affirming Glomar response where CIA provided declaration establishing that confirming or denying existence of records requested would, <u>inter alia</u>, confirm that the CIA "has an <u>intelligence interest</u> or a facility in a particular foreign location" and that the CIA has "an intelligence relationship with, or an <u>intelligence interest in</u>, the named individuals and corporations) (emphasis added); <u>Nayed v. Immigration and Naturalization Service</u>, Civ. A. No. 91-805 SSH, 1993 WL 524541 (D.D.C. Nov. 29, 1993) (CIA properly asserted Glomar response where confirmation or denial of information requested "would be an admission of the identity of a CIA <u>intelligence interest</u>") (emphasis added); <u>Sirota v. CIA</u>, No. 80 Civ. 2050 (GLG), 1981 WL 158804, at \*1 (S.D.N.Y. Sept. 18, 1981) (adopting CIA argument that it could not reveal whether records pertaining to two foundations existed "without disclosing whether or not it had used these foundations as a front for <u>covert intelligence activities or had some other intelligence interest</u> in them") (emphasis added).

Glomar response unless the FOIA request relates to covert action," id. at 1121, and holding

instead that the CIA could rely on the Glomar doctrine to refuse to confirm or deny the existence

of documents relating to a particular foreign national, id. at 1120. In reaching this conclusion,

the Hunt court reasoned that the "extent of the CIA interest in a foreign national is not relevant,"

as "any such interest, if made public, may create the danger that sources and methods of

intelligence gathering will be compromised." Id. at 1121 (emphasis added).

Therefore, Plaintiffs' suggestion notwithstanding, the Glomar doctrine is not narrowly

confined to instances where the existence of records would confirm CIA involvement in covert

activities. Instead, the doctrine is broadly applicable to instances such as those presented in this

case, where the CIA cannot confirm or deny the existence of records without revealing CIA

intelligence interests, methods or activities.

### 3. The CIA's Glomar Response Is Also Proper Because Confirming the Existence or Non-Existence of the Requested Records Would Affect Foreign Relations

In addition to determining that the existence of the information Plaintiffs request in

Requests 1, 29 and 61 is classified to protect intelligence methods and activities, Ms. Dorn

concluded that "to either confirm or deny the existence or non-existence of these documents

would affect the United States' foreign relations." Fourth Dorn Decl., ¶ 15. Foreign relations

would be affected because foreign governments cooperating in the war on terrorism would have

to react to the CIA's public confirmation of the existence or non-existence of the records

Plaintiffs seek:

31

> Many countries cooperate with the United States in the war on
> terrorism. Some do so openly; others only secretly. Those
> countries may be less willing to cooperate if the U.S. Government
> were to officially acknowledge CIA current or past clandestine
> intelligence activities and methods, or intelligence interests.

Id., ¶ 16.

This case is therefore analogous to Earth Pledge Foundation v. CIA, where Judge Koeltl,

and subsequently the Second Circuit, held that a Glomar response was proper. 988 F. Supp. at

627-28. In Earth Pledge, a FOIA requester sought documents related to an alleged CIA station in

the Dominican Republic. Id. at 625. In affirming the CIA's Glomar response, the district court

endorsed the CIA's argument that "official confirmation that the CIA operated an installation and

conducted espionage in a foreign country could cause a diplomatic confrontation and lead to the

disruption of foreign relations." Id. at 625, 628. Similarly, in this case, official disclosure of

CIA interest or lack of interest in specific interrogation and detention methods might cause a

diplomatic confrontation with foreign governments cooperating with the United States in the war

on terror. See Fourth Dorn Decl., ¶ 15.[8]

---

[8]    See also Wolf, 2004 WL 3168220, at *3 (affirming Glomar response where an
"official acknowledgment" of records concerning a foreign national "could adversely affect
relations with a foreign government"); Bassiouni, 2004 WL 1125919, at *7 (affirming Glomar
response in part because identification of records responsive to FOIA request would have
"detrimental effects on United States foreign relations"); Rubin, 2001 WL 1537706, at *3-4
(affirming Glomar response where CIA provided sworn statement establishing that "the
confirmation or denial of Agency possession of records relating to particular foreign nationals
may impact U.S. foreign relations negatively"); Arabian Shield, 1999 WL 118796, at *3
(affirming Glomar response where "revealing that the agency has collected intelligence regarding
specific individuals or corporations, or has an intelligence interest or a facility in a particular
foreign location, could trigger a negative diplomatic or economic response or invite retaliation
against American interests in that country").

## B. The CIA's Glomar Assertion in This Case Is also Proper Under FOIA Exemption 3

The CIA's Glomar assertion in this case is also proper under FOIA Exemption 3. As explained above, see supra Section II.A., to qualify for exclusion under Exemption 3, the Government must show that "(1) the statute invoked qualifies as an exemption 3 withholding statute, and (2) the materials withheld fall within that statute's scope." A. Michael's Piano, 18 F.3d at 143. In this case, the CIA relies on Section 103-3(c)(7) of the National Security Act, 50 U.S.C.A. § 403-3(c)(7), as the statutory basis for its refusal to confirm or deny the existence of the records Plaintiffs request. See Fourth Dorn Decl., ¶ 18.

Section 103-3(c)(7) provides that the Director of Central Intelligence shall "protect intelligence sources and methods from unauthorized disclosure." 50 U.S.C.A. § 403-3(c)(7).[9] In Sims, the Supreme Court held that the statutory command to "protect intelligence sources and methods from unauthorized disclosure" qualifies as an Exemption 3 withholding statute. 471 U.S. at 167. Since Sims, federal courts have uniformly recognized that the National Security Act qualifies as a withholding statute within the meaning of Exemption 3. See, e.g., Assassination Archives and Research Center v. CIA, 334 F.3d 55, 58 (D.C. Cir. 2003) ("section 103-3(c)(7) of the National Security Act of 1947, 50 U.S.C.A. § 403-3(c)(7), . . . is a statute that shields qualifying information from disclosure under [FOIA] because it meets the two criteria of Exemption 3"); Hunt, 981 F.2d at 1118 (National Security Act mandate that DCI is "responsible

---

[9]     Section 103-3(c)(7) of the National Security Act of 1947 was amended on December 17, 2004 by the National Intelligence Act. See Fourth Dorn Declaration at 47 n.10. The National Intelligence Act, however, is not yet in effect. Id. Accordingly, the CIA relies on the National Security Act, which is still controlling as of the date of this brief, for purposes of this summary judgment motion.

for protecting intelligence sources and methods from disclosure . . . qualifies as a statutory exemption to disclosure under Exemption 3") (internal citation omitted); Rubin, 2001 WL 1537706, at \*3 (holding that earlier codification at 50 U.S.C.A. § 403-3(c)(6) of mandate that DCI "protect intelligence sources and methods from unauthorized disclosure" qualified as withholding statute).

The IRO is "charged with implementing" the DCI's "statutory responsibilities" under Section 103(c)(7) of the National Security Act of 1947, as amended, 50 U.S.C.A. § 403-3(c)(7) (West 2003) (the "NSA"), with respect to the CIA's Directorate of Operations. Fourth Dorn Decl., ¶ 97. Accordingly, courts have repeatedly held that a statement under oath by the IRO, as opposed to a statement from the DCI, is sufficient to invoke the Act's protections for purposes of Exemption 3 of the FOIA. See Assassination Archives, 334 F.3d at 56-58 (relying on IRO declaration in considering whether CIA had properly invoked National Security Act protections in responding to FOIA request); Pipko, 312 F. Supp. 2d at 677-79 (same); Bassiouni, 2004 WL 1125919, at \*4-8 (same); Wheeler, 271 F. Supp. 2d at 135-36, 140-41 (same); Aranha v. CIA, No. 99 Civ. 8644 (JSM), 2000 WL 1505988, at \*1 (S.D.N.Y. Oct. 6, 2000) (same); Arabian Shield, 1999 WL 118796, at \*3-5 (same); see also Rubin, 2001 WL 1537706, at \*3-4 (relying on declaration from the Chief of the CIA's Public Information Release Division in considering whether CIA had properly invoked National Security Act protections in responding to FOIA request); Earth Pledge, 988 F. Supp. at 625-26, 627-28 (relying on CIA declarations in considering whether CIA had properly invoked National Security Act protections in responding to FOIA request).

To establish Exemption 3's second prong – that the information at issue falls within the

34

scope of the withholding statute – the CIA must demonstrate that "an answer to the request can

'reasonably be expected to lead to unauthorized disclosure of intelligence sources and methods.'"

Wolf, 2004 WL 3168220, at *3 (quoting Gardels v. CIA, 689 F.2d 1100, 1103 (D.C. Cir. 1982)

and Halperin, 629 F.2d at 147); see also Arabian Shield, 1999 WL 118796, at *4 (same). As the

Supreme Court held in Sims, the CIA's discretion in determining what would constitute an

unauthorized disclosure of intelligence sources and methods is quite broad:

> [I]t is the responsibility of the Director of Central Intelligence, not
> that of the judiciary, to weigh the variety of complex and subtle
> factors in determining whether disclosure of information may lead
> to an unacceptable risk of compromising the Agency's intelligence-
> gathering process.

471 U.S. at 180; see also Hunt, 981 F.2d at 1120 (describing CIA's discretion to withhold

information under Exemption 3 as "a near-blanket FOIA exemption"); Fitzgibbon, 911 F.2d at

766 ("The assessment of harm to intelligence sources, methods and operations is entrusted to the

Director of Central Intelligence, not to the courts"); Rubin, 2001 WL 1537706, at *3 ("The

statute vests in the Director of Central Intelligence 'very broad authority to protect all sources of

intelligence information from disclosure'") (quoting Sims, 471 U.S. at 168-69); Arabian Shield,

1999 WL 118796, at *4 (the CIA's determination of what would "lead to the unauthorized

disclosure of intelligence sources and methods" is "almost unassailable"). Such broad discretion

is justified because "even superficially innocuous information" might reveal valuable intelligence

sources and methods. Sims, 471 U.S. at 178; see also Maynard v. CIA, 986 F.2d 547, 554-55

(1st Cir. 1993) (emphasizing that information that may appear innocuous to the court could

reveal significant intelligence sources and methods); Fitzgibbon, 911 F.2d at 762 ("the fact that

the District Court at one point concluded that certain contacts between CIA and foreign officials

35

were 'nonsensitive' does not help [plaintiff] because apparently innocuous information can be protected and withheld").

Plaintiffs are therefore incorrect in suggesting that the National Security Act provides the CIA with "no additional substantive protections" than those available under E.O. 12958. Pls.' Br. at 28 n.13. Unlike Section 1.1(a)(4) of E.O. 12958, the National Security Act does not require a determination that the disclosure of information would be expected to result in damage to national security. Compare 50 U.S.C.A. § 403-3(c)(7) with 68 Fed. Reg. at 15315. Furthermore, the National Security Act does not require the CIA to identify or explain the damage to intelligence sources and methods, as is required by Section 1.1(a)(4) of E.O. 12958. Compare 50 U.S.C.A. § 403-3(c)(7) with 68 Fed. Reg. at 15315. Indeed, "Exemption 3 does not require that the CIA prove with certainty that public disclosure of the requested information will reveal sources and methods of intelligence." Sirota, 1981 WL 158804, at *2. Instead, the CIA "need show only that confirming or denying the existence of the requested agency files could reasonably be expected to result in disclosing this information." Id. Accordingly, the CIA's mandate to protect intelligence sources and methods under the National Security Act is broader than its ability to classify information in accordance with E.O. 12958. See Assassination Archives, 334 F.3d at 58 n.3 ("Because we conclude that the Agency easily establishes that the records AARC seeks are exempt from disclosure under Exemption 3, we do not consider the applicability of Exemption 1"); Hunt, 981 F.2d at 1118 (holding that "[w]e need not decide in this case whether exposure of the Agency's 'sources and methods' equals 'damage to the national security' under Exemption 1" because "Exemption 3 provides sufficient grounds to hold in favor of the Agency").

Here, the CIA has more than met its burden of establishing that the confirmation or denial of the records Plaintiffs request could reasonably be expected to result in the unauthorized disclosure of intelligence methods. The documents requested – two legal memoranda and a Presidential directive – purportedly address specific interrogation and detention activities. See Pls.' Br. at 27-28. These activities would be intelligence activities and methods. See Fourth Dorn Decl., ¶ 11. The CIA would not request legal memoranda or authorizations from the President for activities that it did not have an interest in utilizing. Id. Therefore, "confirming the existence of these documents would acknowledge a CIA intelligence interest in detainee interrogation and detention activities." Id. Conversely, a "denial of the existence of these documents would acknowledge a lack of CIA interest or capability" concerning these specific interrogation and detention activities. Id. The CIA has established that confirmation or denial of the existence of the records requested in Requests 1, 29 and 61 would indicate the CIA's interest in specific intelligence methods – interrogation and detention activities. Accordingly, the CIA has established that the confirmation or denial of the existence of these records falls within the scope of the Section 103(c)(7) of the National Security Act, which mandates that the DCI "protect intelligence sources and methods from unauthorized disclosure." See Rubin, 2001 WL 1537706, at *3 (Exemption 3 satisfied where confirmation or denial of existence of documents would disclose "whether the CIA has a current or past covert interest in a specific individual"); Earth Pledge, 988 F. Supp. at 627-28 (Exemption 3 satisfied where CIA refused to confirm or deny the existence of a specific field station); Sirota, 1981 WL 158804, at *1-2 (Exemption 3 satisfied because CIA confirmation or denial of records related to specific foundations would provide information about "which foundations the CIA is currently using, or has used in the past,

37

as a cover for CIA activities").

## IV. THE CIA HAS PROPERLY WITHHELD INFORMATION RESPONSIVE TO REQUEST 43 PURSUANT TO EXEMPTIONS 1, 2, 3, 5 AND 7(A)

Plaintiffs' objections to the CIA's withholding of documents responsive to Request 43 are also without merit. See Pls.' Br. at 30. The CIA located 72 documents responsive to Request 43. Fourth Dorn Decl., ¶ 21. After conducting "a line-by-line review . . . to identify and release meaningful, reasonably segregable, non-exempt portions of documents," the CIA determined that "there are no meaningful segments of information that reasonably can be segregated for release." Id., ¶ 22.

The CIA withheld these documents under FOIA Exemptions 1, 2, 3, 5 and 7(A). In a detailed index attached to the Fourth Dorn Declaration, the CIA justified withholding each document by applying the relevant exemptions on a document-by-document basis. Although Plaintiffs only opposed the application of Exemption 1 to these documents, see Pls.' Br. at 30, this brief, which is offered both in opposition to Plaintiffs' motion and in support of the Government's cross-motion for summary judgment, addresses all of the exemptions.

### A. The CIA Properly Classified Documents Responsive to Request 43 at the Secret and Top Secret Levels

The CIA withheld information under Exemption 1 on the grounds that the information was properly classified as information concerning foreign government information, intelligence activities, intelligence sources or methods, or foreign relations or activities of the United States. Fourth Dorn Decl., ¶ 31. These withholdings were proper under E.O. 12958, the Executive Order governing the classification of information.[10]

[10] See supra, Section III.A.1, for the standard for applying Exemption 1.

First, as noted above, see supra, Section III.A.2., Ms. Dorn has been designated an original classification authority within the meaning of E.O. 12958. Ms. Dorn has personally reviewed all of the information responsive to Request 43 that has been withheld under Exemption 1. Id., ¶ 31. As a result of this review, Ms. Dorn has determined that the information "comprises information that is owned by, produced by or for, or is under the control of CIA." Id.

In addition, Ms. Dorn has determined that the information falls within one or more of the categories of information set forth in Section 1.4 of E.O. 12958. Id.; see also 68 Fed. Reg. at 15317. Specifically, Ms. Dorn has determined that the information falls within three general categories: "foreign government information, § 1.4(b); intelligence activities and intelligence sources or methods, § 1.4(c); and foreign relations or foreign activities of the United States, including confidential sources, § 1.4(d)." Id.

Finally, Ms. Dorn has determined that all of this information, "if disclosed, reasonably could be expected to result in damage, serious damage, or exceptionally grave damage to the national security that [she] can identify or describe." Id. Ms. Dorn supports this conclusion with a detailed description of the types of information that have been classified and the specific damage to the national security that reasonably could be expected to result if that information were released. Id., ¶¶ 36-90. In the index attached to her declaration, Ms. Dorn further explains on a document-by-document basis which types of classified information are present in each document that has been withheld.

## 1. Information Involving CIA Intelligence Sources

The first category of information withheld by the CIA pursuant to Exemption 1 pertains to CIA intelligence sources, such as human sources and foreign liaison and government

39

information. Fourth Dorn Decl., ¶¶ 36-57.

The CIA "must rely on information from knowledgeable sources" to "gather intelligence from around the world for the President and other United States Government officials to use in making policy decisions." Id., ¶ 37. These sources can include "individual human sources, foreign intelligence and security services, and foreign governments generally." Id., ¶ 38. Secrecy is a key component of the CIA's relationship with its intelligence sources. See id., ¶¶ 37, 39.

Being identified as a CIA intelligence source may result in retribution, harassment or even death. See id., ¶¶ 39-40 (describing array of serious adverse consequences that may occur if a CIA intelligence source is identified); id., ¶ 41 (noting that retribution may follow from identification even if source is not cooperating with the CIA). As a result, intelligence sources will be unwilling to cooperate without a promise that the CIA "can and will do everything in its power to prevent the public disclosure of their association with the CIA." Id., ¶ 37. Further, the release of information identifying CIA intelligence sources will jeopardize the agency's ability to "recruit future sources." Id., ¶ 44. Such information is protected by Exemption 1. See Schrecker v. DOJ, 254 F.3d 162, 166 (D.C. Cir. 2001) (protecting intelligence sources because release would harm national security by "dissuading current and future sources from cooperating").

Even a small disclosure may jeopardize a CIA intelligence source because "the very nature of the information that the source communicates necessarily tends to reveal the identity of the human source because of the limited number of individuals with access to the information." Id., ¶ 43. Overall, the disclosure of any information tending to reveal the CIA's human sources creates a risk that these sources – and the "critical intelligence" that they provide – will be lost, "seriously and adversely affect[ing] the national security of the United States." Id., ¶ 45. "[T]he

40

FOIA does not require the CIA to lighten the task of our adversaries around the world by providing them with documentary assistance from which to piece together the truth." Phillippi, 655 F.2d at 1332.

In addition to human sources, the CIA must also protect foreign liaison and government source information. Fourth Dorn Decl., ¶ 47. Foreign liaison information is "information that the CIA obtains clandestinely from foreign intelligence and security services." Id. Similarly, "foreign government information is information that the CIA obtains clandestinely from officials of foreign governments with whom the CIA maintains an official liaison relationship." Id. ¶ 18. If the CIA were to disclose information revealing these relationships, "internal or external political pressure on the foreign government could cause the foreign liaison or foreign government official to limit or even end the CIA relationship, causing the United States Government to lose valuable foreign intelligence." Id., ¶ 50.

Courts routinely find classification of intelligence sources proper. See, e.g., Hogan v. Huff, No. 00 Civ. 6753 (VM), 2002 WL 1359722, at *8 (S.D.N.Y. June 21, 2002) (classification proper where disclosure of information would "compromis[e] the secrecy relied upon by intelligence sources"); Rubin, 2001 WL 1537706, at *3-4 (information concerning potential CIA sources was properly classified and withheld under Exemption 1); McErlean v. United States DOJ, No. 97 Civ. 7831 (BSJ), 1999 WL 791680, at *5 (S.D.N.Y. Sept. 30, 1999) (information that "identifies, by name, components of specific foreign governments" and information that was "provided to the FBI" by foreign government is properly withheld under Exemption 1); Earth Pledge, 988 F. Supp. at 627 (information that would "break the CIA's pledge of confidentiality to intelligence sources" was properly classified); Sirota, 1981 WL 158804, at *4 (CIA properly

41

classified information about foundations where information might threaten sources).

In light of these considerations, the CIA has withheld information that would reveal its intelligence sources. See, e.g., Document No. 13 (synopsis that "reveals . . . location of CIA stations" and "intelligence sources"); Document No. 269 (email forwarding "Operational Cable"); Document No. 273 (summary that details "intelligence about the individual, intelligence reporting related to attacks on Coalition Forces in Iraq and other terrorist activity").

## 2. Information Involving CIA Intelligence Methods

The CIA has likewise properly classified intelligence methods, such as cover, field installations, cryptonyms and pseudonyms, foreign intelligence relationships, and dissemination-control markings. Fourth Dorn Decl., ¶¶ 58-85.

Intelligence methods are the "means by which the CIA accomplishes its mission." Id., ¶ 58. "A particular intelligence method is effective only so long as it remains unknown and unsuspected to its target." Id., ¶ 60. Once the nature of an intelligence method – or even its application in a particular context – is discovered, it "usually ceases to be effective." Id. Knowledge of the CIA's intelligence methods "would be of invaluable assistance to those who wish to detect, penetrate, counter, or evaluate the activities of the CIA." Id., ¶ 61. Indeed, if the details of a particular intelligence method are discovered, the CIA can no longer rely on that method to obtain information. Id., ¶¶ 62-63.

Courts have repeatedly endorsed the CIA's ability to classify intelligence methodology information. See Hogan, 2002 WL 1359722, at *8 (information properly withheld under Exemption 1 where disclosure of the information "would potentially harm the agency by exposing its methods"); Wolf, 2004 WL 3168220, at *3 (classification warranted where

42

"disclosure could reveal general CIA methods of information gathering"); Arabian Shield, 1999 WL 118796, at *3 (information about "whether the agency maintains a facility in Sana'a, Yemen" was classified correctly); Earth Pledge, 988 F. Supp. at 628 (releasing information about CIA field station would threaten national security); Davy v. CIA, No. 00-2134 (RJL), 2004 WL 3168217, at *6 (D.D.C. July 7, 2004) (CIA met burden of establishing information concerning "cryptology" was properly classified).

As a result of these considerations, the CIA has withheld information which would reveal its intelligence methods. See, e.g., Document No. 274 ("full text" of cable describing circumstances of the detainee at issue in Request 43); Document No. 289 (cable addressing "intelligence issues surrounding the detainee in item no. 43"); Document No. 274 (email forwarding cable that reveals "CIA cryptonyms" and "the location of CIA stations").

## 3. Information Concerning Intelligence Activities

Similarly, the CIA has properly classified information concerning intelligence activities. Fourth Dorn Decl., ¶¶ 86-90. Intelligence activities "refer to the actual implementation of intelligence sources and methods in the operational context." Id., ¶ 86.

To disclose an intelligence activity "would reveal U.S. intelligence needs, priorities, and capabilities to a foreign intelligence service or hostile organization." Id., ¶ 87. CIA interest in a specific individual also represents an intelligence activity, because admitting interest in an individual "essentially admits to that operative that one or more of his intelligence or terrorist activities have been detected by the CIA." Id., ¶ 88. Even in a case "where the targeted operative is no longer active," the identification of a CIA interest in the individual still alerts "the foreign intelligence service or terrorist organization for which he worked" that his "intelligence

43

activities may have been detected by the CIA." Id. Therefore, the foreign intelligence service or terrorist organization would "be alerted to [the] fact that ay information gained from that operative's missions may compromised to the CIA." Id.

The Government's classification of this type of intelligence activity information has been routinely affirmed by the courts. See McErlean, 1999 WL 791680, at *5 (information that "identifies an FBI investigative unit which is assigned to, and specializes in, specific intelligence or counterintelligence operations" was properly classified); Arabian Shield, 1999 WL 118796, at *3 (information concerning CIA's "specific activities occurring in Yemen" was properly classified); Daily Orange Corp. v. CIA, 532 F. Supp. 122, 126 (S.D.N.Y. 1982) (information about CIA covert activities at a university was properly classified); Sirota, 1981 WL 158804, at *4 (CIA properly classified information about foundations where information might threaten "future intelligence operations").

The CIA has thus classified information that would reveal specific intelligence activities or the identity of the individual at issue in Request 43. See, e.g., Document No. 266 (email that "reveals . . . CIA information about the detainee"); Document No. 428 (letter that contains "background and biographical information on the detainee in question").

## 4. Plaintiffs' Arguments That the CIA Has Improperly Classified Information Responsive to Request 43 Are Without Merit

Plaintiffs argue that the CIA has improperly classified information responsive to Request 43 because the information is already "within the public domain," Pls.' Br. at 30, and also because the "underlying documents merely contain evidence of illegality or unlawful activity," id. Neither argument has merit.

### a. The CIA Has Not Waived Its FOIA Exemptions through a Public Disclosure

When information has been "officially acknowledged," its "disclosure may be compelled even over an agency's otherwise valid exemption claim." Fitzgibbon, 911 F.2d at 765. There are three criteria to determine whether an item has been "officially acknowledged." Id. (citing Afshar v. Department of State, 702 F.2d 1125, 1133 (D.C. Cir. 1983)). First, "the information requested must be as specific as the information previously released." Id. Second, "the information requested must match the information previously disclosed." Id. For example, an official disclosure will not "waive the protection to be accorded information that pertained to a later time period." Id. Third, "the information requested must already have been made available through an official and documented disclosure." Id. Plaintiffs cannot demonstrate that any, let alone all three, of the criteria apply here.

As a threshold matter, Plaintiffs' argument fails because the CIA's FOIA exemptions are not waived where, as here, the official disclosure is not made by the CIA. As the D.C. Circuit held, "we do not deem 'official' a disclosure made by someone other than the agency from which the information is being sought." Frugone v. CIA, 169 F.3d 772, 774 (D.C. Cir. 1999) (collecting cases). In Frugone, the court held that an acknowledgment by the Office of Personnel Management of a relationship between a FOIA requester and the CIA did not affect the CIA's right to invoke FOIA exemptions to refuse to acknowledge a relationship with the requester. Id. Therefore, in this case, the Secretary of Defense's statement does not affect the CIA's ability to assert FOIA exemptions with regard to information related to that disclosure, because the CIA and the Department of Defense are separate agencies. See id.

45

Moreover, Plaintiffs' argument fails because they do not identify an official and documented disclosure of the information requested in Request 43; namely, all records related to DCI Tenet's request to Secretary Rumsfeld. See Pls.' Br. at 30. Nor could they, as the mere fact that a request was made is the only information that has been officially acknowledged. See Fourth Dorn Decl., ¶ 20. Therefore, plaintiffs have not established that the full scope of Request 43 has been officially acknowledged. See Wolf, 2004 WL 3168220, at *4 ("CIA did not waive its FOIA exemptions because it did not make information public regarding [the subject of FOIA request] through an official and documented disclosure").

Similarly, Plaintiffs have not established that the information requested by Request 43 is "as specific as" Secretary Rumsfeld's statement, or that the information requested "matches" Secretary Rumsfeld's statement. See Fitzgibbon, 911 F.2d at 765. DCI Tenet's request is embodied in only one document – Document 428. Fourth Dorn Decl., Ex. A at 107-09. The remaining 71 documents relate to the request, but do not specifically match Secretary Rumsfeld's public disclosure, as that disclosure was limited to the fact that a request was made. Fourth Dorn Decl., ¶ 20. Further, as Ms. Dorn observed, the "disclosure of any information concerning the individual and the incident," id., ¶ 24 – such as the "name of the individual" or "information the CIA has collected on this individual (i.e., his background and activities"), id., ¶ 25 – "would tend to reveal intelligence sources and methods," id., ¶ 24. Plaintiffs have not and cannot establish that the documentation of the request itself or any of the other 71 documents related to the request specifically match the public disclosure. Accordingly, the CIA has not waived its FOIA exemptions with regard to the documents responsive to Request 43. See Assassination Archives, 334 F.3d at 61 (FOIA exemptions were not waived where plaintiff failed to make "specific

46

showing" that any official disclosures revealed information "as specific as" the information

requested) (emphasis in original); Public Citizen v. Dep't of State, 11 F.3d 198, 203-04 (D.C.

Cir. 1993) (even if testimony before Congress effected "partial disclosures of classified

information" contained in the requested documents, those disclosures did not result in waiver

because they did not precisely track the records sought to be released); Fitzgibbon, 911 F.2d at

766 ("The mere fact that the CIA voluntarily transmitted an official document to a congressional

committee does not mean that the Agency can thereby automatically be forced to release any

number of other documents.").

## b. The CIA Has Not Classified Information in Order to Conceal Violations of Law

Plaintiffs' blanket assertion that records responsive to Request 43 cannot be classified

because they "merely contain evidence of illegality or unlawful activity" is also without merit.

Pls.' Br. at 30. Section 1.7(a) of E.O. 12958 states: "In no case shall information be classified in

order to . . . conceal violations of law, inefficiency, or administrative error." 68 Fed. Reg. at

15318 (emphasis added). On its face, the Executive Order does not bar the Government from

classifying information that might contain evidence of the violation of a law, but rather bars the

Government from classifying otherwise unclassified information "in order to" – i.e., for the

purpose of – concealing violations of law. See id. As the Arabian Shield court reasoned when

presented with the same argument Plaintiffs make here:

> Plaintiff argues that the requested information was improperly
> classified by the CIA because "national security secrecy cannot be
> used to conceal information pertaining to the commission of a
> crime." However, a careful reading of the Executive Order
> compels a different conclusion. The order provides that "[i]n no
> case shall information be classified in order to . . . conceal

47

> violations of law, inefficiency or administrative error." Exec.
> Order 12598 § 1.8(a)(1) (emphasis added). Section 1.8 thus
> prohibits an agency from classifying documents as a ruse when
> they could not otherwise be withheld from public disclosure. It
> does not prevent the classification of national security information
> merely because it might reveal criminal or tortious acts.

1999 WL 118796, at \*4 (emphasis in original).[11] Accordingly, classification is proper where, as

here, "Plaintiff has neither argued nor offered evidence that the CIA classified the requested

information for the purpose of concealing a crime." Id.; see also Billington v. DOJ, 11 F. Supp.

2d 45, 58 (D.D.C. 1998) (rejecting argument that FBI violated Executive Order provisions

barring classification in order to conceal violations of law or embarrassing information where

plaintiff did "not provide any proof of the FBI's motives in classifying the information" and there

was no evidence "that the FBI was involved in an attempt to cover-up information"), aff'd in

part, vacated in part, 233 F.3d 581 (D.C. Cir. 2000).

This conclusion is further supported by another Presidential directive, § 1.7of E.O.

12333, which provides that senior officials in the intelligence community must:

> Report to the Attorney General possible violations of federal
> criminal laws by employees and of specified criminal laws by any
> other person as provided in procedures agreed upon by the
> Attorney General and the heads of the department or agency
> concerned, in a manner consistent with the protection of
> intelligence sources and methods, as specified in those procedures.

46 Fed. Red. 59941 (Dec. 4, 1981) (emphasis added). Therefore, under E.O. 12333, intelligence

officials are required to protect intelligence sources and methods even when reporting criminal

---

[11]      Until 2003, the provision now contained in Section 1.7(a) of E.O. 12958 was
contained in Section 1.8(a) of the same Order. The Arabian Shield court cited Section 1.8(a)
because it considered the pre-2003 version of the Order. The 2003 amendment did not affect the
substance of the relevant language of E.O. 12958. Compare 68 Fed. Reg. at 15318 (the 2003
amendment) with 60 Fed. Reg. 19825, 19829 (the pre-2003 version of E.O. 12598).

48

violations to the Justice Department. See id. Plainly, if intelligence sources and methods are protected in the severe circumstances contemplated by E.O. 12333, they may also be protected by classification under E.O. 12958, even where information that is otherwise properly classified might reveal evidence of a violation of law.

Ms. Dorn has explained that the CIA "does not classify information to conceal violations of law." Fourth Dorn Decl., ¶ 26. Moreover, Ms. Dorn has personally confirmed that in this case, she has "not classified any information in order to conceal violations of law." Id.; see also id., ¶¶ 33 (explaining that Ms. Dorn personally reviewed all of the classified material withheld to determine whether that information "continues to meet the standards for classification under Executive Order 12958"). In contrast, Plaintiffs have produced no evidence concerning the CIA's motives in classifying the information at issue. Accordingly, the information responsive to Request 43 was properly classified. See Arabian Shield 1999 WL 118796, at *4; Billington, 11 F. Supp. 2d at 58.

## B. The CIA Properly Withheld Information Responsive to Request 43 Under Exemption 3

The CIA also properly withheld information responsive to Request 43 under Exemption 3, which permits the withholding of information as authorized by separate statute. The CIA relied upon two statutes – Section 103(c)(7) of the NSA, and Section 6 of the Central Intelligence Agency Act of 1949, as amended, 50 U.S.C.A. § 403g (West Supp. 2003) (the "CIA Act") – in withholding information under Exemption 3.[12]

---

[12]     See supra, Section II.A. for the standard for applying Exemption 3.

## 1. The CIA's Withholdings Under the National Security Act of 1947 Are Protected by Exemption 3

The NSA requires the DCI to safeguard information concerning CIA intelligence sources

and methods. See 50 U.S.C.A. § 403-3(c)(7). The statute falls within the ambit of Exemption 3.

See, e.g., Sims, 471 U.S. at 167-68 ("Congress vested in the [DCI] very broad authority to

protect all sources of intelligence information from disclosure."); Assassination Archives, 334

F.3d at 58 ("section 103(c)(7) of the [NSA] . . . is a statute that shields qualifying information

from disclosure under [FOIA] because it meets the two criteria of Exemption 3"); Hunt, 981 F.2d

at 1118; Rubin, 2001 WL 1537706, at *3.

The DCI's obligation to protect information pertaining to agency sources and methods

reflects Congress's intent to "give the [agency] broad authority to protect the secrecy and

integrity of the intelligence process." Sims, 471 U.S. at 170.

> Plainly the broad sweep of this statutory language comports with
> the nature of the Agency's unique responsibilities. To keep
> informed of other nations' activities bearing on our national
> security the Agency must rely on a host of sources. At the same
> time, the Director must have the authority to shield those Agency
> activities and sources from any disclosures that would
> unnecessarily compromise the Agency's efforts.

Id. at 169. In a similar vein, the Ninth Circuit has noted that the "sources and methods" statutory

mandate is a "near-blanket FOIA exemption," which is "only a short step [from] exempting all

CIA records from FOIA." Hunt, 981 F.2d at 1120. Accordingly, the CIA need only demonstrate

that the information "relates to intelligence sources and methods." Fitzgibbon, 911 F.2d at 762.

Like the agency's determination under Exemption 1, the agency's determination under

exemption 3 is entitled to "substantial weight and due consideration." Id.; see Linder v. DOD,

50

133 F.3d 17, 25 (D.C. Cir. 1998).

Ms. Dorn discussed in detail how disclosing the information requested in response to Request 43 would reveal intelligence sources and methods. See Fourth Dorn Decl., ¶¶ 28-90 (explanation of harm to result from disclosure of intelligence sources and methods); id., Ex. A (document-by-document description); see also supra at Section IV.A. (explaining harm to intelligence sources and methods). Accordingly, the CIA has satisfied its obligation to establish that the information was properly withheld under the National Security Act.

### 2. The CIA's Withholdings Under the Central Intelligence Agency Act of 1949 Are Protected by Exemption 3

The CIA has also properly withheld information under the CIA Act. Section 6 of the CIA Act mandates that the CIA "shall be exempted from . . . the provisions of any other law which require the publication or disclosure of the organization, functions, names, official titles, salaries, or numbers of personnel employed by the Agency . . . ." 50 U.S.C.A. § 403g. The CIA Act also meets the requirements of Exemption 3. See, e.g., Goland, 607 F.2d at 350-51; Davy, 2004 WL 3168217, at *7; Pipko, 312 F. Supp. 2d at 678-79.

Pursuant to this statute, the CIA has withheld "CIA employees' names and personal identifiers (for example, employee signatures and initials), official titles, file numbers, dissemination markings, and internal organizational data." Fourth Dorn Decl., ¶ 101. This information was withheld because the CIA "routinely withholds the names of its employees who may come into public view during the course of their duties." Id., ¶ 102. Disclosure of their identities could "compromise past, present, or future intelligence operations or activities; identify them as targets for terrorists or hostile foreign intelligence services; or place their lives, the lives

51

of their families, and the lives of human intelligence sources with whom they have worked, in jeopardy." Id. The CIA has also withheld internal filing information that tends to reveal "the structure of the CIA records systems." Id., ¶ 103. Further, "the titles or other organizational identifiers and filing instructions of CIA organizational components have been withheld." Id., ¶ 104. All of this information was withheld to prevent the disclosure of details of "CIA personnel, structure, organization, and procedures," as such disclosure could "possibly [be] used as a tool for hostile penetration or manipulation." Id., ¶ 103.

The CIA withheld this information pursuant to the NSA and the CIA Act, which shield such information from disclosure under the FOIA. Accordingly, the information is protected by Exemption 3, and summary judgment should be granted in favor of the CIA. See Davy, 2004 WL 3168217, at *7.

## C. The CIA Has Properly Withheld Information Under Exemptions 2, 5, and 7

In addition, several of the documents, or portions thereof, have been properly withheld on the independent basis that they also are exempt from disclosure under Exemptions 2, 5, and 7(A).

### 1. CIA Internal Information Is Exempt Under Exemption 2

Exemption 2 applies to, among other things, "routine matters of merely internal interest." Crooker v. ATF, 670 F.2d 1051, 1069 (D.C. Cir. 1981). The CIA has invoked Exemption 2 to withhold its administrative and routing notations, which are routine matters of merely internal interest. See Fourth Dorn Decl., ¶ 94; see also, e.g., Document Nos. 269 and 275. The withheld administrative routing information is "internal, clerical information" the release of which holds virtually no public interest. Id., ¶ 94. Accordingly, the CIA has properly withheld materials pursuant to Exemption 2. See Crooker, 670 F.2d at 1069; Lesar v. DOJ, 636 F.2d 472, 485-86

52

(D.C. Cir. 1980); Colon v. EOUSA, No. 98-0180, 1998 WL 695631, at *3 (D.D.C. Sept. 29, 1998).

## 2. CIA Privileged Materials Are Exempt Under Exemption 5

The CIA has properly withheld privileged materials under Exemption 5. See Fourth Dorn Decl., ¶¶ 27, 105-06; see also id. at ¶ 6 & attached Vaughn index. Exemption 5 protects "inter-agency or intra-agency memorandums or letters which would not be available by law to a party . . . in litigation with the agency." 5 U.S.C. § 552(b)(5). "By this language, Congress intended to incorporate into the FOIA all the normal civil discovery privileges." Hopkins v. HUD, 929 F.2d 81, 84 (2d Cir. 1991); see also Renegotiation Bd. v. Grumman Aircraft Eng'g Corp., 421 U.S. 168, 184 (1975); Tigue v. DOJ, 312 F.3d 70, 76 (2d Cir. 2002). Here, the CIA has withheld materials that are protected by the attorney-client privilege, the attorney work product doctrine, and the deliberative process privilege.

The purpose of the attorney-client privilege is "to encourage full and frank communication between attorneys and their clients," and thereby encourage "the observance of law and administration of justice." Upjohn Co. v. United States, 449 U.S. 383, 389 (1981). Several documents withheld by the CIA are subject to the attorney-client privilege. See, e.g., Document Nos. 13 and 273 (summaries containing legal advice from attorneys related to detainee at issue); 269, 276, 277, 279, 280, 281, 282, 288, 289, 303, 304, 335, 336, 340, 344, 345, 351, 412, 423, 424, 429, 430, 433, 434, and 435 (emails between attorneys and CIA personnel); 224, 225, 226, 265, 266, 373, 381, 394 and 397 (draft documents containing advice from attorneys). The documents withheld relate to "(1) instances where CIA officials requested legal advice from CIA and other government attorneys; and (2) instances where CIA and other government

53

attorneys offered CIA officials advice on a variety of legal issues arising from CIA's activities." Fourth Dorn Decl. ¶ 107. The "requests for legal advice and the legal advice rendered were kept confidential." Id. Accordingly, because CIA officials were dealing with their "attorneys as would any private party seeking advice," Coastal States Gas Corp. v. DOE, 617 F.2d 854, 863 (D.C. Cir. 1980), these records are protected by the attorney-client privilege and were properly withheld under Exemption 5.

The attorney work product doctrine exempts from disclosure "mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation," see Fed. R. Civ. P. 26(b)(3), including materials prepared "in anticipation of litigation," A. Michael's Piano, 18 F.3d at 146. Here, the information withheld on the basis of the attorney work product doctrine "reflect[s] the mental impressions, thought processes, and evaluations of CIA attorneys." Fourth Dorn Decl., ¶ 108. The CIA attorneys knew "at the time [they] were compiling their work product" that the circumstances concerning Request 43 "frequently spawn investigations that lead to criminal or administrative sanctions." Id. Therefore, the CIA attorneys "were compiling their work product at a time when they anticipated criminal or civil litigation." Id. Accordingly, the records have been properly withheld under Exemption 5. See NLRB v. Sears, Roebuck & Co., 421 U.S.132, 154 (1975) (finding similar documents privileged); Germosen v. Cox, No. 98 Civ. 1294 (BSJ), 1999 WL 1021559, at *14 (S.D.N.Y. Nov. 9, 1999) (same); Winterstein v. DOJ, 89 F. Supp. 2d 79, 81-82 (D.D.C. 2000) (same).

A record is protected by the deliberative process privilege if its source is a "Government agency," Klamath, 532 U.S. at 8, if it is "predecisional," Grand Central, 166 F.3d at 482, and if it

54

is "deliberative," id. A record is "predecisional" if it is "prepared in order to assist an agency decisionmaker in arriving at his decision," Renegotiation Board, 421 U.S. at 184, and a record is "deliberative" if "it reflects the give-and-take of the consultative process," Wolfe v. HHS, 839 F.2d 768, 774 (D.C. Cir. 1988) (citation and internal quotation marks omitted) (en banc).

The CIA has withheld several documents that meet all three requirements of the deliberative process privilege. See, e.g., Document Nos. 16, 24, 36, 44, 250, and 417 (draft responses to questions from Congress); 13 and 21 (synopsis and draft synopsis of events underlying Request 43); 273 (summary of events underlying Request 43); 346 (memorandum to counsel concerning Iraq); 224, 225, 226 and 265 (drafts of notification to Congress regarding detainee at issue); 291, 303, 304, 311, 312, 316, 317, 318, 319, 335, 336, 340, 344, 345, 412, 413, 423, 430, 432, and 433 (guidance and analysis of events underlying Request 43); 250, 260, 263, 266, 282, 297, 302, 413, 423, 424, and 435 (emails with attached draft documents). These documents contain "recommendations, candid internal discussions, preliminary judgments, multiple draft responses, briefing papers, proposed recommendations or proposed answers," the disclosure of which "would reveal the thought process of CIA officials, including intelligence officers, and CIA attorneys." Fourth Dorn Decl., ¶ 111. Because CIA officials "expected that these matters would remain confidential," their disclosure "would discourage open and frank discussions among CIA personnel, thereby threatening the confidence needed to ensure the candor of future CIA deliberations." Id. Accordingly, these records are protected by the deliberative process privilege and have properly been withheld pursuant to Exemption 5. See Sears, 421 U.S. at 150; Jimenez v. FBI, 938 F. Supp. 21, 28-29 (D.D.C. 1996); LaRouche v. DOJ, Civ. A. No. 90-2753, 1993 WL 388601, at *9 (D.D.C. June 25, 2993).

### 3. CIA Law Enforcement Materials Are Exempt under Exemption 7(A)

The CIA has properly withheld information from disclosure pursuant to FOIA Exemption 7(A). See Fourth Dorn Decl., ¶ 6 & attached Vaughn index (Document Nos. 13, 275 and 346). Exemption 7(A) authorizes the withholding of "records of information compiled for law enforcement purposes, but only to the extent that production of such law enforcement records or information . . . could reasonably be expected to interfere with enforcement proceedings." 5 U.S.C. § 552(b)(7)(A); see also Lawyers Committee for Human Rights v. INS, 721 F. Supp. 552, 563 (S.D.N.Y. 1989) (Government must "identify a particular individual or a particular incident as the object of its investigation" and show "the connection between the individual or incident" and a "possible security risk [or] violation of federal law").

The subject matter of Request 43 relates to an ongoing investigation by the CIA's Office of Inspector General (the "OIG"). Fourth Dorn Decl., ¶ 114 ("The OIG is investigating the events underlying item no. 43"); see also Ortiz v. HHS, 70 F.3d 729, 732-33 (2d Cir. 1995) ("An Inspector General of a federal government agency engages in law enforcement activities within the meaning of FOIA"). The OIG has determined that the release of certain information in the records responsive to Request 43 "could reasonably be expected to interfere with that investigation." Fourth Dorn Decl., ¶ 114. Specifically, release of these records would "(1) reveal the course, nature, scope or strategy of an ongoing investigation, (2) prematurely reveal evidence in this ongoing investigation, (3) hinder OIG ability to control or shape the investigation, and (4) reveal investigative trends, emphasis, or targeting schemes.." Id. As a result, disclosure of the investigative materials could hinder the OIG's ability to control and shape its ongoing investigation and might "enable the targets to interfere with the investigation by fabricating

56

defenses, harassing witnesses or destroying evidence that has not yet been located by the OIG."
Id. In short, releasing the information withheld under Exemption 7(A) would threaten the
ongoing investigation into the events underlying Request 43. See id. Accordingly, the CIA has
properly withheld law enforcement materials under Exemption 7(A). See Robbins Tire , 437
U.S. at 240-41; Mapother v. DOJ, 3 F.3d 1533, 1541-42 (D.C. Cir. 1993); Local 32B-32J,
Service Employees Int'l Union, AFL-CIO v. GSA, No. 97 Civ. 8509 (LMM), 1998 WL 726000,
at *8 (S.D.N.Y. Oct. 15, 1998); Dow Jones & Co. v. DOJ, No. 94 Civ. 0527 (SS), 1995 WL
6155, at *5 (S.D.N.Y. Jan. 9, 2005).

## V.    DEFENDANT DOD HAS PROPERLY WITHHELD FROM
        RELEASE PHOTOGRAPHS OF IRAQ DETAINEES

Plaintiffs seek photographs of abuse or mistreatment of detainees at Abu Ghraib taken by
Joseph Darby, a military policeman, and provided to the Army's Criminal Investigative Division
(the "responsive Darby photos"). See Pls. Memo. at 31. DOD has invoked Exemptions 6 and
7(C) as a basis for withholding release of these photographs based upon the privacy interests of
the detainees pictured in the photographs. Second McGuire Decl., ¶¶ 2, 5-11. DOD has invoked
these two privacy exemptions in light of the United States's international treaty obligations under
the Third and Fourth Geneva Conventions, which prohibit subjecting detainees to insult and
public curiosity. As release of these photographs of abuse and mistreatment would subject the
pictured detainees to insult and public curiosity, regardless of any redactions made to the
photographs, such release would constitute an unwarranted invasion of their personal privacy
under Exemptions 6 and 7(C) and would be inconsistent with the United States's obligations
under the Geneva Conventions. In addition, release of these photographs will not significantly

57

further the public interest because the abuse and mistreatment depicted in these photographs already has been the subject of extensive public disclosure, including in court martials, investigations and official DOD reports. Thus, release would not have the effect of confirming governmental misconduct or making additional information available to the public regarding the underlying misconduct. Accordingly, the responsive Darby photographs are exempt from release under FOIA.

## A.   Exemptions 6 and 7(C) Protect Individual Privacy Interests

### 1.   Exemption 6

The purpose of Exemption 6 is to "protect individuals from the injury and embarrassment that can result from the unnecessary disclosure of personal information." United States Department of State v. Washington Post Co., 456 U.S. 595, 599 (1982). Exemption 6 protects "personnel or medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). The Supreme Court has interpreted Exemption 6 broadly, making clear that all information that "applies to a particular individual" meets the threshold requirement for protection under this exemption. Washington Post Co., 456 U.S. at 602. The statutory language files "similar" to personnel or medical files has been read broadly by the Supreme Court to encompass any "information which applies to a particular individual." Id.; see also New York Times Co. v. NASA, 920 F.2d 1002, 1005 (D.C. Cir. 1990) (finding voice tapes from the shuttle Challenger to be "similar files" because they identified crew members by the sound and inflection of their voices). Highly personal information has been held to be exempt from disclosure under FOIA. National Archives and Records Admin. v. Favish, 541 U.S. 157, 124 S. Ct. 1570, 1579-80 (2004) (photographs of scene

58

of the suicide of Deputy White House Counsel Vincent Foster); see also, e.g., Department of Defense v. FLRA, 510 U.S. 487, 497 (1994) (names and addresses); United States Dept. of Justice v. Ray, 502 U.S. 164, 175-76 (1991) (names and addresses, marital and employment status, information regarding children, and information concerning attempts to enter the United States); Washington Post, 456 U.S. at 602 (passport information); Judicial Watch, Inc. v. United States Dep't of Commerce, 83 F. Supp. 2d 105, 112 (D.D.C. 1999) (date of birth, visa, and passport data); Church of Scientology v. United States Dep't of the Army, 611 F.2d 738, 747 (9th Cir. 1979) (religious affiliation).

Once it has been established that the information at issue "applies to a particular individual," the focus of the inquiry turns to whether disclosure of the record at issue would "constitute a clearly unwarranted invasion of personal privacy," 5 U.S.C. § 552(b)(6), which requires a balancing of the public's interest in disclosure against the interest in privacy that would be furthered by non-disclosure. See Department of Defense v. FLRA, 510 U.S. 487, 495 (1994); Department of Justice v. Reporters Comm. for Freedom of Press, 489 U.S. 749, 776 (1989); Department of the Air Force v. Rose, 425 U.S. 352, 372 (1976). Establishing that disclosure of personal information would serve a cognizable public interest is the plaintiff's burden. See Carter v. United States Dep't of Commerce, 830 F.2d 388, 391 n.13 (D.C. Cir. 1987). The "simple invocation of a legitimate public interest . . . cannot itself justify the release of personal information. Rather, a court must first ascertain whether that interest would be served by disclosure." Hopkins v. HUD, 929 F.2d 81, 88 (2d Cir. 1991); see also Carter, 830 F.2d at 391 & n.13 (establishing public interest is requester's burden). The "only relevant public interest to be weighed in this balance is the extent to which disclosure would serve the core

purpose of FOIA, which is contribut[ing] significantly to public understanding of the operations or activities of the government." Dep't of Defense v. Fed. Labor Relations Authority, 510 U.S. 487, 495-96 (1994) (internal citation and quotation marks omitted) (emphasis added). Where government misconduct is asserted as the basis for a public interest in an Exemption 6 or 7(C) claim, the requester must establish that the public interest is a significant one and that the information sought is likely to advance that interest. Favish, 541 U.S. at 172-73; see Davis, 968 F.2d at 1282 (inquiring whether information sought would confirm or refute alleged government misconduct) (citing SafeCard, 926 F.2d at 1205-06).

## 2. Exemption 7(C)

FOIA Exemption 7 protects from mandatory disclosure "records or information compiled for law enforcement purposes," to the extent that disclosure could result in one of the six harms enumerated in subparts (A) through (F) of the exemption. See 5 U.S.C. § 552(b)(7). Thus, judicial review of an agency's assertion of Exemption 7 "requires a two-part inquiry." FBI v. Abramson, 456 U.S. 615, 622 (1982). First, the relevant record must have been "compiled for law enforcement purposes." Id.; Quinon v. FBI, 86 F.3d 1222, 1228 (D.C. Cir. 1996). A record is compiled for law enforcement purposes if: (1) the activity that gives rise to the documents is related to the enforcement of federal laws or the maintenance of national security; and (2) the nexus between the activity and one of the agency's law enforcement duties is based on information sufficient to support at least a "colorable claim" of its rationality. See Keys v. DOJ, 830 F.2d 337, 340 (D.C. Cir. 1987); Pratt v. Webster, 673 F.2d 408, 420-21 (D.C. Cir. 1982); Blanton v. DOJ, 63 F. Supp. 2d 35, 44 (D.D.C. 1999).

60

Assuming a record was compiled for law enforcement purposes, then it must be determined whether the release of that record "would have one of the six results specified in [FOIA]." Exemption 7(C) specifically protects from disclosure "records or information compiled for law enforcement purposes" if disclosure "could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C). Like Exemption 6, Exemption 7(C) "call[s] for a balancing of the privacy interests that would be compromised by disclosure against the public interest in release of the requested information." McCutcheon, 30 F.3d at 185; Davis v. DOJ, 968 F.2d 1276, 1281 (D.C. Cir. 1992). As the Supreme Court explained in Reporters Committee, however, "Exemption 7(C)'s privacy language is broader than [that of] Exemption 6 in two respects. First, whereas Exemption 6 requires that the invasion of privacy be 'clearly unwarranted,' the adverb 'clearly' is omitted from Exemption 7(C). . . . Second, whereas Exemption 6 refers to disclosures that 'would constitute' an invasion of privacy, Exemption 7(C) encompasses any disclosure that 'could reasonably be expected to constitute' such an invasion." 489 U.S. at 756 (quoting 5 U.S.C. § 552(b)(6), (7)(C)).

Courts have construed the public interest component narrowly, noting that the public interest "must be assessed in light of FOIA's central purpose," and that this purpose "is not fostered by disclosure about private individuals that is accumulated in various government files but that reveals little or nothing about an agency's conduct." Nation Magazine v. United States Customs Serv., 71 F.3d 885, 894 (D.C. Cir. 1995) (quotation marks and citation omitted). Rather, the information must "contribute significantly to public understanding of the operations or activities of the government.'" Reporters' Comm., 489 U.S. at 775 (emphasis added); Favish,

61

541 U.S. at 172-73 (public interest must be significant and information sought must be likely to advance that interest); see Davis, 968 F.2d at 1282 (analyzing whether information would confirm or refute alleged government misconduct).

## B. The Relationship between the United States's Treaty Obligations and FOIA Exemptions 6 and 7(C)

In determining whether the responsive Darby photos should be released, this Court must not only consider Exemptions 6 and 7(C) but also the relevant United States international treaty obligations: here, the United States's treaty obligations under the Third and Fourth Geneva Conventions setting forth standards regarding the treatment of detainees. Indeed, the classic tenet of statutory interpretation is that "an act of Congress [like FOIA] ought never to be construed to violate the law of nations if any other possible construction remains . . . ." Murray v. Schooner Charming Betsy, 6 U.S. (2 Cranch) 64, 81, 2 L.Ed. 208 (1804) ("Charming Betsy"); see MacLeod v. United States, 229 U.S. 416, 434 (1913) ("The statute should be construed in the light of the purpose of the government to act within the limitation of the principles of international law, . . . and it should not be assumed that Congress proposed to violate the obligations of this country to other nations . . . ."); Weinberger v. Rossi, 456 U.S. 25, 32 (1982) (noting well established Charming Betsy rule of statutory construction); see also Federal-Mogul Corp. v. United States, 63 F.3d 1572, 1581 (Fed. Cir. 1995) ("[A]bsent express Congressional language to the contrary, statutes should not be interpreted to conflict with international obligations."); United States v. Thomas, 893 F.2d 1066, 1069 (9th Cir.1990) (noting that courts adhere to this principle "out of respect for other nations").[13]

---

[13]     Courts have long taken the view that the Geneva Conventions do not create rights enforceable by individuals in United States courts. See, e.g., Johnson v. Eisentrager, 339 U.S.

Under Charming Betsy and its progeny, this Court should read the FOIA statute and its

accompanying exemptions in a manner consistent with the United States's international

obligations under the Geneva Conventions regarding the treatment of detainees. As set forth

below, the responsive Darby photographs should be withheld pursuant to Exemptions 6 and 7(C)

to protect the substantial privacy interests of the detainees depicted in these photographs, a result

consistent with the United States's international obligations under the Geneva Conventions.

## C. The United States May Not Subject Detainees to Insult and Public Curiosity Pursuant to the Third and Fourth Geneva Conventions

The United States is a party to both the Geneva Convention Relative to the Treatment of

Prisoners of War of August 12, 1949, 6 U.S.T. 3316, 74 U.N.T.S. 135 (the "Third Geneva

Convention"), and the Geneva Convention Relative to the Protection of Civilian Persons in Time

of War, Aug. 12, 1949, 6 U.S.T. 3516, 75 U.N.T.S. 287 (the "Fourth Geneva Convention"). The

Third and Fourth Geneva Conventions entered into force on October 21, 1950, and the United

States ratified these two Geneva Conventions in July 1955.[14]

---

763, 789 n.14 (1950); Huynh Thi Anh v. Levi, 586 F.2d 625, 629 (6th Cir. 1978) ; but see In re:
Guantanamo Detainee Cases, 355 F. Supp. 2d 443, 2005 WL 195356, at * 31 (D.D.C. Jan. 31,
2005). Rather, enforcement of United States international obligations under the Geneva
Conventions is "reserved to the executive authority of the government who are parties to the
treaties." Khalid v. Bush, 355 F. Supp. 2d 311, 2005 WL 100924, at *9-10 (D.D.C. Jan. 19,
2005) (citations omitted); see Johnson v. Eisentrager, 339 U.S. 763, 789 n.14 (1950) (noting that
responsibility for observance and enforcement of 1929 Geneva Convention was upon political
and military authorities); Comm. of the U.S. Citizens Living in Nicaragua v. Reagan, 859 F.2d
929, 937-38 (D.C. Cir. 1988). This does not mean, however, that this Court cannot look under
Charming Betsy and its progeny to United States international obligations under the Geneva
Conventions to inform its interpretations of Exemptions 6 and 7(C) of FOIA.

[14]     President Truman transmitted the Geneva Conventions to the Senate on April 25,
1951. See Senate Comm. on Foreign Relations, Geneva Conventions for the Protection of War
Victims, S. Exec. Rep. No. 84-9 (1955), reprinted in 84 Cong. Rec. 9958, 9963 (1955). The
Senate gave its consent to ratification on July 6, 1955. Id. at 9972-73. The United States

The Geneva Conventions were developed with the exigencies of warfare in mind, and they address in detail certain obligations of High Contracting Parties with respect to individuals detained during armed conflict or belligerent occupation. See Declaration of Geoffrey S. Corn, dated March 25, 2005 ("Corn Decl."), ¶ 7; see also, e.g., Third Geneva Convention, 6 U.S.T. 3316. Common Article 2 of the Third and Fourth Geneva Conventions provides that the Conventions apply "to all cases of declared war or of any other armed conflict which may arise between two or more of the High Contracting Parties." Declaration of Edward R. Cummings, dated March 24, 2005 ("Cummings Decl."), ¶ 8. Common Article 2 further states that the Conventions shall also apply "to all cases of partial or total occupation of the territory of a High Contracting Party." Id. The United States and Iraq are High Contracting Parties to each of these Conventions. Id., ¶ 9. The responsive Darby photos were taken during a period when the United States was engaged in an international armed conflict and occupation within the meaning of Common Article 2. Corn Decl., ¶ 6; Cummings Decl., ¶ 9.

With regard to prisoners of war, Article 13 of the Third Geneva Convention states that a detaining power with custody over a prisoner of war must protect that prisoner of war, "particularly against acts of violence or intimidation and against insults and public curiosity." Corn Decl., ¶ 8; Cummings Decl., ¶ 10. Accordingly, a detaining power has a "positive obligation" to treat detainees humanely, including protecting their honor against insult and public curiosity. Corn Decl., ¶ 8 (citing ICRC Commentary to Article 13 of Third Geneva Convention). Similarly, Article 14 of the Third Geneva Convention mandates protection of a detainee's honor,

---

formally ratified the treaties on July 14, 1955. See Geneva Convention Relative to the Treatment of Prisoners of War of August 12, 1949, 6 U.S.T. 3316, 74 U.N.T.S. 135.

which includes protection against, <u>inter alia</u>, slander, insult and any violation of secrets of a personal nature. Corn Decl., ¶ 8 (citing Article 14 of Third Geneva Convention and applicable ICRC Commentary).

Article 27 of the Fourth Geneva Convention provides analogous protection for protected civilians detained by an occupying force:

> Protected persons are entitled, in all circumstances, to respect for their persons, their honor, their family rights, their religious convictions and practices, and their manners and customs. They shall at all times be treated humanely, and shall be protected especially against all acts of violence or threats thereof and against insults and public curiosity.

Corn Decl., ¶ 9; Cummings Decl., ¶ 11. "The word 'treatment' must be understood [in Article 27] in its most general sense as applying to all aspects of man's life." Corn Decl., ¶ 9 (citing ICRC Commentary to Article 27).

The United States historically has interpreted Article 13 of the Third Geneva Convention and Article 27 of the Fourth Geneva Convention to prohibit the taking and publication of detainee photographs where it would subject detainees to public curiosity, including images depicting detainees in degrading or humiliating circumstances, such as instances where a detainee had been abused or mistreated. Cummings Decl., ¶¶ 12-19; Corn Decl., ¶¶ 10-12. The United States traditionally has protested the parading of American prisoners of war, including in Hanoi in 1966 or exposing prisoners of war on television. Cummings Decl., ¶ 13. President Bush described the "brutal parading" of Allied pilots by Iraq in January 1991 as a violation of the

Geneva Conventions. Id.[15] In a formal protest to the Government of Iraq, the United States

stated that "unlawful coercion and misuse of prisoners of war for propaganda purposes, the

failure to respect their honor and well-being, and the subjection of such individuals to public

humiliation" violated the Geneva Conventions. Id.

In 2003, several photographs were published of the in-processing of detainees into

Guantanamo. Id., ¶ 14. After strong international criticism of the Guantanamo photographs,

DOD issued specific guidelines on the kind of photographs that would be permitted. Id. The

Guantanamo guidelines state that "[t]he policy of limiting photography is in accord with treating

detainees consistent with the protections provided under the Third Geneva Convention. This is

not a change in policy; it is in conformity with long-standing U.S. policy, procedure, and

practice." Id.

These guidelines were consistent with guidelines in long-standing military regulations on

prisoners of war. Id., ¶ 15. Specifically, Army Regulation 190-8, paragraph 1-5d provides:

> Photographing, filming, and video taping of individual [enemy
> prisoners of war, civilian internees and retained personnel] for
> other than internal Internment Facility administration or
> intelligence/counterintelligence purposes is strictly prohibited. No
> group, wide area or aerial photographs of [enemy prisoners of war,
> civilian internees and retained personnel] or facilities will be taken
> unless approved by the senior Military Police officer in the
> Internment Facility commander's chain of command.

Cummings Decl., ¶ 15. Paragraph 1-9 further provides that:

> In the interest of national security, and the protection of the
> prisoners from public curiosity, and in adherence to the [Third and

---

[15] See U.S. Department of State Dispatch, Vol. 2, No. 4 (January 28, 1991)
("Iraqi Mistreatment of POWs") at
http://dosfan.lib.uic.edu/ERC/briefing/dispatch/1991/html/Dispatchv2no04.html.

66

> Fourth Geneva Conventions], [enemy prisoners of war, civilian internees and retained personnel] and other detainees will not be photographed as per paragraph 1-5d.

Id. (emphasis added).

DOD issued similar guidelines in connection with embedded news media and the conflict in Iraq. Those guidelines provide that "no photographs or other visual media showing an enemy prisoner of war or detainee's recognizable face, name tag or other identifying feature or item may be taken." Id., ¶ 16. They also prohibit "still or video imagery of custody operations or interviews with persons under custody." Id.

In addition, the ICRC has had a significant influence on the interpretation of Article 13. Id., ¶ 17. The ICRC, which focuses on preserving the integrity and dignity of individuals in detention, generally has taken the view that Article 13 of the Third Geneva Convention requires parties to a conflict to avoid publication of images that show prisoners of war in degrading or humiliating positions or allow the identification of individual detainees. Id.

**D. The Photographs Are Protected from Disclosure under Exemptions 6 and 7(C), Because Their Release Would Subject the Pictured Detainees to Insults and Public Scrutiny, and Thus Would Constitute an Unwarranted Invasion of Their Privacy**

**1. The Responsive Darby Photos Are Personal Information and Were Compiled for Law Enforcement Purposes**

Given that plaintiffs have specifically requested photographs of abuse and mistreatment of detainees, it cannot be seriously disputed that such records satisfy the threshold requirement of "personal information" within the meaning of Exemptions 6 and 7(C). See Favish, 541 U.S. 157, 124 S. Ct. at 1579-80. Moreover, the responsive Darby photos were compiled for law enforcement purposes. More specifically, the United States Army Criminal Investigation

67

Command ("CID") opened a report of investigation immediately after receiving these photographs. Second McGuire Decl., ¶ 6. This information has "been used extensively by CID agents to conduct the investigations into incidents of abuse of detainees at Abu Ghraib." Id. Accordingly, these photographs are records "compiled for law enforcement purposes" for purposes of Exemption 7(C). See Mapother v. Department of Justice, 3 F.3d 1533, 1540-41 (D.C. Cir. 1993).

2.   **The Responsive Darby Photos Should Not Be Released Because the Privacy Interests of These Detainees, as Set Forth in the Third and Fourth Geneva Conventions, Outweigh any Public Interest Served by Release of the Photographs**

Having satisfied the definition of "personal information" under both Exemptions 6 and 7(C), the Court must determine whether release of the photographs would constitute an unwarranted invasion of privacy, which requires a balancing of the public interest in disclosure against the private interest furthered by non-disclosure.

Under the balancing test traditionally applied to both Exemption 6 and 7(C), the Court must first determine the personal privacy interest implicated by the requested records. See Albuquerque Publishing Co. v. United States Dep't of Justice, 726 F. Supp. 851, 855 (D.D.C. 1989) ("[o]ur preliminary inquiry is whether a privacy interest is involved"). Here, the responsive Darby photos are "photographs of foreign nationals who appear to be under the control of the United States." Second McGuire Decl., ¶ 8. The detainees in these photographs "often appear naked or otherwise improperly clothed, posed in ways that were designed to embarrass and humiliate the individuals in the pictures." Id. Given the personal nature of these photographs, these records clearly implicate a significant privacy interest under Exemptions 6

68

and 7(C). See Favish, 541 U.S. 157, 124 S. Ct. at 1577-80 (recognizing the privacy interests in photographs of Vince Foster's deceased body despite noting that a family for purposes of personal privacy does not stand in the same position as the individual who is the subject of the disclosure); Ray, 502 U.S. at 175-76 (where highly personal information regarding "marital and employment status, children, living conditions and attempts to enter the United States" is "linked publicly with particular, named individuals," disclosure amounts to a "significant" invasion of privacy).

Recognition of the significant privacy interests of these detainees also comports with the United States's international obligations under the Third and Fourth Geneva Conventions, which prohibit conduct that, inter alia, subjects detainees to "public curiosity." Consistent with the plain meaning of these terms,[16] the United States has interpreted this prohibition on "public curiosity" to prohibit the public release of photographs that depict detainees in degrading or humiliating positions. See Corn Decl., ¶¶ 8, 10-12; Cummings Decl., ¶¶ 12-19.[17] Indeed, the United States has interpreted the Geneva Conventions as prohibiting the release of the

---

[16] The primary definition of the word "curiosity" is "a desire to know," which is further defined as "inquisitiveness about others' concerns" or a "desire to investigate." Webster's Third New International Dictionary (1986) (definition 1). While the primary definition of the word "public" is "of, relating to, or affecting the people as an organized community," the most relevant definition of the word for purposes of this case appears to be "accessible to or shared by all members of the community." Id. (definitions 1a and 4a).

[17] The courts must afford "great weight" to Executive Branch treaty constructions. Sumitomo Shoji America, Inc. v. Avagliano, 457 U.S. 176, 185 (1982) (where parties to treaty agree on meaning of treaty provision, and interpretation "follows from the clear treaty language[, the court] must, absent extraordinarily strong contrary evidence, defer to that interpretation"); Kolovrat v. Oregon, 366 U.S. 187, 194 (1961) ("while courts interpret treaties for themselves, the meaning given to them by the departments of government particularly charged with their negotiation and enforcement is given great weight").

photographs sought by plaintiffs which, by the very nature of the request, depict abuse and mistreatment of detainees and would subject these detainees to public curiosity. Corn Decl., ¶¶ 5, 10-11; Cummings Decl., ¶¶ 5-6, 12. Indeed, this interpretation is consistent with past precedents interpreting this prohibition, including during the Vietnam War, during the first Gulf War, and in various DOD regulations and guidance. See Cummings Decl., ¶¶ 13-17.

After examining the privacy interests at stake, the Court must determine whether release would significantly contribute to the public interest or whether release could reasonably be expected to constitute an unwarranted invasion of personal privacy. Here, release of the responsive Darby photos will not significantly further the public interest because these photographs are not necessary to confirm or refute evidence of Government misconduct nor will they contribute significantly to the public's knowledge of these events. Indeed, allegations and instances of such abuse have been widely publicized, a fact plaintiffs document extensively in their brief. Moreover, the United States has recognized that abuse and mistreatment took place at the Abu Ghraib prison in Iraq and has released detailed accounts of these abuses. See FY 2005 National Defense Authorization Act, 108 P.L. 375, 118 Stat. 1811 (2004).[18] For example, in the

---

[18]    In the Act, Congress specifically found that:

> (1) the abuses inflicted upon detainees at the Abu Ghraib prison in
> Baghdad, Iraq, are inconsistent with the professionalism,
> dedication, standards, and training required of individuals who
> serve in the United States Armed Forces;
> (2) the vast majority of members of the Armed Forces have upheld
> the highest possible standards of professionalism and morality in
> the face of illegal tactics and terrorist attacks and attempts on their lives;
> (3) the abuse of persons in United States custody in Iraq is
> appropriately condemned and deplored by the American people;
> (4) the Armed Forces are moving swiftly and decisively to identify,
> try, and, if found guilty, punish persons who perpetrated such abuse;

report of Major General George Fay, there is a 27-page summary of abuses including detailed narratives of 44 specific incidents (pages 68 to 95) followed by a 22 page chart showing the nature of reported abuse in numerous incidents.[19] Similarly, the Independent Panel chaired by a former Secretary of Defense briefly summarized the allegations of abuse and the investigations into them in the course of its review of detention operation.[20] In addition, the Report of Major General Taguba, statements and other annexes to the Defense Department reports and many Army reports of criminal investigations already released to the plaintiffs in this case provide a great deal of detail about the events at Abu Ghraib.

In light of the public confirmation of misconduct and information available on this issue, release of these photographs would not contribute any additional information regarding the underlying unlawful conduct but instead merely would promote public curiosity, a result inconsistent with Exemptions 6 and 7(C) and the United States's international obligations under the Geneva Conventions. See Favish, 541 U.S. at 172-73 (noting threat to privacy based on

---

> (5) the Department of Defense and appropriate military authorities
> must continue to undertake corrective action, as appropriate, to
> address chain-of-command deficiencies and the systemic
> deficiencies identified in the incidents in question;
> (6) the Constitution, laws, and treaties of the United States and the
> applicable guidance and regulations of the United States
> Government prohibit the torture or cruel, inhuman, or degrading
> treatment of foreign prisoners held in custody by the United States.

National Defense Authorization Act, § 1091(a).

[19] See http://www.defenselink.mil/news/Aug2004/d20040825fay.pdf;
http://www.defenselink.mil/news/Aug2004/d20040825fay.pdf.
[20] See http://www.defenselink.mil/news/Aug2004/d20040824finalreport.pdf;
http://www.defenselink.mil/news/Aug2004/d20040824finalreport.pdf.

expectation of renewed interest if photographs were released of suicide scene); see Davis, 968 F.2d at 1282 (analyzing whether information sought would confirm or refute alleged government misconduct); Department of Defense v. FLRA, 510 U.S. 487, 496-96 (1994); McCutcheon, 30 F.3d at 189.

Moreover, Plaintiffs have received, and will continue to receive, other records relating to the abuse or mistreatment of detainees, including reports of criminal investigations. See Second McGuire Decl., ¶ 10. Thus, if the detainee photographs of abuse or mistreatment are withheld from release, Plaintiffs will still receive records under FOIA about the underlying conduct in question but in a manner that does not expose detainees to "public curiosity" such as to violate their personal privacy under FOIA and is consistent with the United States's obligations under the Geneva Conventions. As there are less intrusive means to satisfy the public's right to know on this issue, these photographs should not be released. See United States Dep't of Defense v. FLRA, 964 F.2d 26, 29-30 (D.C. Cir. 1992) (concluding that it was appropriate to consider for purposes of FOIA's public interest calculation whether there are alternative sources and means for obtaining information); see also Office of Capital Collateral Counsel v. Department of Justice, 331 F.3d 799, 803-04 (11th Cir. 2003) (as there was substantial public information about certain Government misconduct, any public interest in knowing the Government's response to allegations of misconduct could be satisfied through other publicly available information).

Plaintiffs' offer to redact identifying information from these photographs does not swing the balance in favor of disclosure under FOIA. See Pls.' Br. at 31. As a threshold matter, obscuring the faces of these detainees by no means assures that the identities of these individuals will not be established, especially given that some of these photographs previously were

72

unofficially placed into the public domain. Corn Decl., ¶ 11; Second McGuire Decl., ¶ 8; see Carter v. United States Dep't of Commerce, 830 F.2d 388, 391 (D.C. Cir. 1987) (given information "already in the public domain, release of certain portions of [the requested records, even with redactions] could easily lead to a revelation of [the identities of the individuals]."); Alirez v. NLRB, 676 F.2d 423, 428 (10th Cir. 1982) (deletion of names and other identifying information was inadequate to protect identities of individuals given limited number of people involved in the underlying incidents). Moreover, even with identifying information redacted, release of these photographs "would be inconsistent with the obligations of the United States to treat the individuals depicted humanely and would pose a great risk of subjecting these individuals to public insult and curiosity." Corn Decl., ¶ 5. Even with redactions, each detainee depicted would still "suffer the personal humiliation and indignity accordant with the knowledge that these photographs [of abuse or mistreatment] have been placed in the public domain." Corn Decl. ¶ 11; see New York Times Co. v. NASA, 782 F. Supp. 628, 631-32 (D.D.C. 1991) (concluding that voice tapes from the shuttle Challenger would "cause the Challenger families pain" and inflict "a disruption [to] their peace of mind every time a portion of the tape is played within their hearing"), on remand from 920 F.2d 1002, 1005 (D.C. Cir. 1990).[21]

---

[21] Images, such as group photographs, that neither identify individuals nor show mistreatment are generally less objectionable. Id., ¶ 18. The practice of Contracting Parties as well as neutral organizations such as the ICRC suggests that such images do not provoke the level of protest that images that degrade or identify prisoners do. Id. However, the explicit terms of Plaintiffs' request seek records regarding the abuse or mistreatment of detainees. See Pls. Memo at 31 (seeking generally photographs and videotapes depicting abuse of detainees and, more specifically, "photographs of Joseph Darby . . . engaging in Detainee mistreatment at Abu Ghraib.") (emphasis added).

Accordingly, for all these reasons, this Court should withhold release of the responsive Darby photos under Exemptions 6 and 7(C) given the substantial privacy interests at stake. Such a result is consistent with the text and case law construing those provisions as well as the United States's international obligations under the Geneva Conventions. See Charming Betsy, 6 U.S. (2 Cranch) at 81; MacLeod, 229 U.S. at 434; Weinberger, 456 U.S. at 32; see also Kissinger v. Reporters Committee for Freedom of the Press, 445 U.S. 136, 154 (1980) (noting Court's "reluctance to construe FOIA as silently departing from prior long-standing principles"); Morrison-Knudsen Co. v. Department of the Army, 595 F. Supp. 352, 356 (D.D.C. 1984) ("[T]he use of FOIA to unsettle well-established procedures governed by a comprehensive regulatory scheme must be viewed not only with caution but with concern.") (internal citations omitted), aff'd, 762 F.2d 138 (D.C. Cir. 1985).

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' motion for summary

judgment and grant the Government's cross-motion for summary judgment with regard to

Plaintiffs' challenges to the Governments responses to Requests 1, 4, 8, 10, 11, 13, 29, 37, 39,

40, 41, 42, 43, 49, 50, 51, 58, 61 and 69 from Plaintiffs' List.

Dated: New York, New York
       March 30, 2005

Respectfully submitted,

DAVID N. KELLEY
United States Attorney for the
Southern District of New York
Attorney for Defendants

By:    /s/ Sean H. Lane
       SEAN H. LANE (SL-4898)
       PETER M. SKINNER (PS-9745)
       Assistant United States Attorneys
       86 Chambers Street, 5th floor
       New York, N.Y. 10007