UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------- x

AMERICAN CIVIL LIBERTIES UNION,
CENTER FOR CONSTITUTIONAL RIGHTS,
PHYSICIANS FOR HUMAN RIGHTS,
VETERANS FOR COMMON SENSE AND
VETERANS FOR PEACE,

                    ELECTRONICALLY FILED

        Plaintiffs,

                    04 Civ. 4151 (AKH)

        v.

DEPARTMENT OF DEFENSE, AND ITS
COMPONENTS DEPARTMENT OF ARMY,
DEPARTMENT OF NAVY, DEPARTMENT OF
AIR FORCE, DEFENSE INTELLIGENCE
AGENCY; DEPARTMENT OF HOMELAND
SECURITY; DEPARTMENT OF JUSTICE,
AND ITS COMPONENTS CIVIL RIGHTS
DIVISION, CRIMINAL DIVISION, OFFICE OF
INFORMATION AND PRIVACY, OFFICE OF
INTELLIGENCE POLICY AND REVIEW,
FEDERAL BUREAU OF INVESTIGATION;
DEPARTMENT OF STATE; AND CENTRAL
INTELLIGENCE AGENCY,

        Defendants.

------------------------------------------------------------- x

## DEFENDANTS' REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

DAVID N. KELLEY
United States Attorney for the
Southern District of New York
Attorney for Defendants
86 Chambers Street, 3rd Floor
New York, New York 10007
Tel: (212) 637-2737
Fax: (212) 637-2750

SEAN H. LANE (SL-4898)
PETER M. SKINNER (PS-9745)
  – Of Counsel –

# Table of Contents

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

I.      DOD PROPERLY WITHHELD ICRC INFORMATION . . . . . . . . . . . . . . . . . . . 3

        A.      Plaintiffs' Argument Regarding the Promulgation of
                Regulations Under 10 U.S.C. § 130c is Meritless . . . . . . . . . . . . . . . . . . . 4

        B.      DOD's Search for the Requested ICRC Documents Was
                Adequate and Plaintiffs' Mere Speculation to the Contrary
                Should be Rejected . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

        C.      DOD Properly Withheld ICRC Information Responsive
                to Request 13, 49 and 58 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

        D.      The Withheld ICRC Information is Confidential . . . . . . . . . . . . . . . . . . 10

II.     THE CIA PROPERLY INVOKED THE GLOMAR DOCTRINE . . . . . . . . . . . 11

        A.      The CIA Properly Classified the Existence or Non-Existence
                of Records Responsive to Requests 1, 29 and 61 . . . . . . . . . . . . . . . . . 12

        B.      The CIA's Glomar Assertion Is also Proper Under Exemption 3 . . . . . . 14

III.    THE CIA HAS PROPERLY JUSTIFIED THE WITHHOLDING
        OF INFORMATION RESPONSIVE TO REQUEST 43 . . . . . . . . . . . . . . . . . . 15

        A.      All of the Information Withheld in Response to Request 43 Is
                Covered by Exemptions 2, 5 and 7, Which Plaintiffs Do Not Oppose . . . 15

        B.      The CIA Has Provided Ample Information Supporting Its
                Invocation of Exemptions 1 and 3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

IV.     DOD HAS PRODUCED ALL DOCUMENTS RESPONSIVE
        TO REQUESTS 4, 37, AND 39-42 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

V.     THE DARBY PHOTOGRAPHS WERE PROPERLY WITHHELD .........25

       A.     As the Darby Photographs Depict Detainees in a Humiliating or
              Degrading Way, These Photographs Should be Protected from
              Release Under the Geneva Conventions ........................26

       B.     The Darby Photographs Should be Protected from Release
              Because There Are Less Intrusive Means to Obtain the
              Same Information, Including Records of Court Martial
              Proceedings and Investigative Files ............................31

CONCLUSION ...........................................................33

## Declarations and Exhibits Submitted with Government's Reply Brief

Third Declaration of Stewart F. Aly, dated May 19, 2005

Second Declaration of Michael G. Seidel, dated May 18, 2005

Exhibit A:    Findings, transcripts and exhibits from court martial of
              Specialist Jeremy Sivits

## PRELIMINARY STATEMENT

Defendants Department of Defense ("DOD") and the Central Intelligence Agency (the "CIA") (collectively, the "Government"), by their attorney, David N. Kelley, United States Attorney for the Southern District of New York, respectfully submit this reply memorandum of law in further support of their motion for partial summary judgment.

In response to the Government's 75-page initial brief, Plaintiffs submitted an opposition that is more remarkable for what it does not say than for what it says. Plaintiffs ignore major sections of the Government's brief and offer scant opposition to many of the Government's legal arguments. Moreover, in most instances, Plaintiffs merely complain that the Government's declarations could have been more detailed rather than challenging the Government's justifications head-on. These arguments ring hollow, however, given the Government's voluminous and detailed evidentiary submissions. Indeed, the factual record before the Court demonstrates that the Government has met its burden to justify the withholding of each of the five categories of records addressed in the Government's motion.[1]

First, the Government is entitled to summary judgment regarding documents memorializing communications between DOD and the ICRC. In their opposition brief, Plaintiffs offer two one-paragraph arguments, without citation to any legal authority, about the promulgation of regulations and the adequacy of DOD's search. However, DOD is entitled to rely upon the specific provisions set forth in 10 U.S.C. § 130c for withholding information, and Plaintiffs' unsupported speculation about the adequacy of DOD's search for ICRC information cannot defeat summary judgment. Plaintiffs' other arguments, relating to whether the ICRC and

---

[1]     Unless otherwise specified, the definitions and abbreviations in the Government's initial brief are incorporated herein by reference.

DOD have produced "confidential" information "in cooperation" with each other, should be rejected for the reasons stated in the Government's moving papers; namely, that confidentiality and cooperation are the core principles guiding the exchange of information between the ICRC and DOD.

Second, the CIA's Glomar response with regard to Requests 1, 29 and 61 is justified under Exemptions 1 and 3. Plaintiffs do not dispute that the existence or non-existence of the records requested is properly classified in the interest of foreign relations. Moreover, the existence or non-existence of the records requested is also properly classified to protect intelligence methods and activities, as it would demonstrate CIA interest in specific interrogation and detention activities. Further, the information requested plainly falls within the CIA's mandate under the National Security Act to protect intelligence methods, which, as Plaintiffs do not contest, is even broader than the CIA's ability to protect classified information under E.O. 12958.

Third, the CIA has amply justified its non-disclosure of 72 documents responsive to Request 43. As an initial matter, Plaintiffs do not address, and thereby effectively concede, that Exemptions 2, 5 and 7 apply to all of these documents. Therefore, the Court need not consider Plaintiffs' half-hearted complaints about the sufficiency of the CIA's declaration justifying its invocation of Exemptions 1 and 3 for the non-disclosure of the same 72 documents. Nevertheless, the CIA met its burden for summary judgment on Exemptions 1 and 3 because Ms. Dorn's 56-page declaration and 126-page Vaughn index provide specific details establishing that the information withheld logically falls within the scope of those exemptions.

Fourth, DOD has provided all documents responsive to Requests 4, 37 and 39-42. While

2

Plaintiffs claim that there are two additional responsive documents that were not produced by DOD, these two documents are merely drafts of the memoranda already produced to Plaintiffs and, in fact, such drafts are not responsive to Requests 4, 37 and 39-42.

Finally, DOD properly withheld the Darby photographs because the privacy interests in these documents, as informed by the Geneva Conventions, outweigh the public interest in disclosure of these documents. Indeed, Plaintiffs' claim that these photographs can be released if they are redacted is contrary to the Government's interpretation of its treaty obligations under the Geneva Conventions, which provide that photographs depicting humiliating or degrading treatment of detainees should not be released regardless of whether the detainees can be identified. Moreover, as numerous Circuit courts have recognized, such documents should not be released where there are less intrusive means to satisfy the public's right to know; in this case, the Government has provided, and will continue to provide, documents relating to the underlying conduct depicted in these photographs, including transcripts of the court martial proceedings of Abu Ghraib personnel.

## ARGUMENT

## I. DOD PROPERLY WITHHELD ICRC INFORMATION

DOD has properly withheld information responsive to the ICRC requests. As a threshold matter, Plaintiffs have withdrawn Requests 50 and 51, see Plaintiffs' Opposition Brief ("Pls.' Opp. Br.") at 4 n.1; therefore, DOD should be granted summary judgment as to those requests. In addition, Plaintiffs make no challenge to DOD's response to Request 8, other than their claims that DOD's search was inadequate and that DOD may not rely on 10 U.S.C. § 130c because no regulations have been promulgated pursuant to that statute. As outlined below, because DOD

3

may rely on 10 U.S.C. § 130c and DOD's search was in fact sufficient, DOD should be granted summary judgment as to Request 8. Finally, DOD properly withheld information responsive to Requests 13, 49 and 58 because such information met the requirements of 10 U.S.C. § 130c. Therefore, DOD should be granted summary judgment as to Requests 13, 49 and 58.

## A.    Plaintiffs' Argument Regarding the Promulgation of Regulations Under 10 U.S.C. § 130c is Meritless

Plaintiffs contend that because regulations have not yet been promulgated pursuant to 10 U.S.C. § 130c(g), DOD may not withhold information based on the statute. Pls.' Opp. Br. at 5. Implicit in Plaintiffs' argument is the contention that the detailed standards set forth in the statute for determining whether information is exempt from disclosure are without force in the absence of regulations.[2]

As an initial matter, Plaintiffs' argument is inconsistent with their position in their moving papers, which stated that "[t]he pertinent question [regarding the ICRC information] is whether the withholding statute covers the particular information the Government seeks to exempt from disclosure." Pls.' Br. at 9. In any event, Plaintiffs' argument is without merit. Although regulations have not yet been promulgated by DOD, the statute itself establishes

---

[2]        Notably, Plaintiffs do not affirmatively seek the promulgation of regulations by DOD. Nor can they, given that the statute does not require that regulations be issued by a date certain. See Natural Res. Def. Council, Inc. v. Thomas, 885 F.2d 1067, 1075 (2d Cir. 1989) (noting distinction between statutory provisions that include stated deadlines, which should generally be construed as creating non-discretionary duties, and those that do not) (citations omitted); Cronin v. Browner, 898 F. Supp. 1052, 1059 (S.D.N.Y. 1995) ("A non-discretionary or mandatory duty arises only where an agency bears a duty to act by a date certain.") (citation omitted). In essence, then, Plaintiffs argue that the statute is without force because no regulations have been issued. Congress, however, placed no such limitation on the efficacy of the statute. See 10 U.S.C. § 130c.

4

detailed requirements for the exemption of information. Plaintiffs fail to cite any authority for the proposition that DOD cannot rely on the statutory provisions merely because regulations have not yet been promulgated. See Pls.' Opp. Br. at 5. Indeed, the Supreme Court rejected a similar argument in SEC v. Chenery Corp.:

> [W]e did not mean to imply thereby that the failure of the Commission to anticipate this problem and to promulgate a general rule withdrew all power from that agency to perform its statutory duty in this case. To hold that the Commission had no alternative in this proceeding but to approve the proposed transaction, while formulating any general rules it might desire for use in future cases of this nature, would be to stultify the administrative process. That we refuse to do.[3]

332 U.S. 194, 201-02 (1947).

Here, Plaintiffs contend that DOD has no alternative but to turn over the ICRC documents. But such a result would render the statute meaningless and would withdraw DOD's authority to rely on its terms in determining whether information is exempt from disclosure. Such a result would "stultify the administrative process" and should be rejected. Id. at 202.

In short, because DOD applied the standards set forth in 10 U.S.C. § 130c in making its determination that the withheld ICRC information is exempt from disclosure, the fact that regulations have not yet been prescribed is not controlling.

## B. DOD's Search for the Requested ICRC Documents Was Adequate and Plaintiffs' Mere Speculation to the Contrary Should Be Rejected

Plaintiffs baldly contend that DOD's search was "plainly inadequate." Pls.' Opp. Br. at 5.

Plaintiffs again cite no legal precedent in support of their one-paragraph argument, id. at 5-6, and

---

³ Moreover, the Secretary's directive regarding ICRC communications sets forth the requirements for handling such confidential communications within DOD, and, as a practical matter, such a directive functions internally as a regulation. See Allen Decl., Ex. B, Second Aly Decl., ¶ 1.

their argument fails.

In order to fulfill FOIA's search requirement, the Government is required to "identify the searched files" and "recite facts which enable the District Court to satisfy itself that all appropriate files have been searched." Garcia v. DOJ, 181 F. Supp. 2d 356, 368 (S.D.N.Y. 2002) (citation omitted). However, "a search for responsive documents need not, and indeed could not be perfect." Id. (citation omitted). A search is reasonable and adequate even if "it fails to produce all relevant material." Id. (citation omitted). The agency is not expected to take extraordinary measures to find the requested records, but only to conduct a search "reasonably designed to identify and locate responsive documents." Id. (citations omitted).

The declarations of Stewart F. Aly met these requirements, and they are accorded "a presumption of good faith." Carney v. DOJ, 19 F.3d 807, 812 (2d Cir. 1994). As an initial matter, Mr. Aly explained that due to the "incredible breadth" of Plaintiffs' requests, DOD has enlisted "not less than 250 individuals, and likely many more, at various locations within the Department" to search for responsive documents. First Aly Decl., ¶¶ 12, 14. In addition, various DOD components have participated in the searches, including the Army, the Army Criminal Investigative Command, the Navy, and the Defense Intelligence Agency. Id. ¶ 3. The initial logs created by DOD catalogued more than 150,000 pages worth of responsive documents, not including numerous CD ROMs, audio tapes and other files. Id. ¶ 4.

As to the ICRC requests specifically, Mr. Aly explained that DOD searched the files in the office of the Deputy General Counsel (International Affairs), where the compilation of documents relating to the ICRC is maintained. Second Aly Decl., ¶¶ 8, 9. He also described measures taken to locate a specific memorandum requested by Plaintiffs, which included contacting the named

6

author of the memorandum. See id. ¶ 8. Given these efforts by DOD, which included searching DOD's repository of ICRC documents, DOD has established that it conducted a search "reasonably designed to identify and locate responsive documents." Garcia, 181 F. Supp. 2d at 368.

In contrast, Plaintiffs offer nothing more than their conclusory assertion that the declarations were "clearly incomplete" and their speculation that DOD responses to "concerns raised by the ICRC would certainly have been memorialized and discussed" in other documents. Pls.' Opp. Br. at 5-6. Because Plaintiffs fail to offer non-speculative evidence regarding the existence of additional responsive documents, DOD is entitled to summary judgment as to the adequacy of its search. See Wilbur v. CIA, 355 F.3d 675, 678 (D.C. Cir. 2004) ("the agency's failure to turn up a particular document, or mere speculation that as yet uncovered documents might exist, does not undermine the determination that the agency conducted an adequate search for the requested records") (citations omitted); Garcia, 181 F. Supp. 2d at 367, 368 (stating that non-speculative evidence regarding existence of documents is necessary to defeat Government motion for summary judgment) (citations omitted).[4]

---

[4]     Plaintiffs' complaint about DOD's search also is flawed because Plaintiffs have mischaracterized the scope of the ICRC documents sought by their own requests. More specifically, Plaintiffs' Request 13 calls for a "response" from DOD to the ICRC but Plaintiffs now claim that "internal" DOD documents should have been located in the search for documents responsive to Request 13. Compare Pls.' Br., Ex. D at 4 (Request 13) with Pls.' Opp. Br. at 6. However, a "response" to the ICRC, by definition, would not be an internal DOD document but rather would consist of documents sent by DOD to the ICRC. Thus, internal DOD documents are not responsive to Request 13; whether or not they should have been located is irrelevant.

7

## C. DOD Properly Withheld ICRC Information Responsive to Requests 13, 49 and 58

Based on dictionary definitions of the words "cooperation" and "cooperate" and reference to a third-party account of a criticism by an ICRC official of the United States, Plaintiffs argue that DOD and the ICRC have not exchanged information "in cooperation" for purposes of 10 U.S.C. § 130c. Pls.' Opp. Br. at 7-8. This argument should be rejected. As DOD has already demonstrated, DOD and the ICRC act in cooperation relating to the ICRC's access to detainees. See Defs.' Br. at 4-7. Specifically, the ICRC has publicly stated: "[D]etention problems are best solved through constructive dialogue[.]" Allen Decl., Ex. A at 2. Further, the United States has granted ICRC requests to visit detainees, and, as a result, DOD and the ICRC have exchanged information verbally and in writing. Second Aly Decl., ¶ 12. The parties' cooperation involves meetings between ICRC and DOD representatives, and DOD provides minutes of such meetings to the ICRC to ensure the accuracy of the minutes. Beaver Decl., ¶ 3. For example, the United States has even extended to the ICRC the privileges and immunities provided by the International Organizations Immunities Act. See Exec. Order No. 12643 of June 23, 1988. Through its cooperation with DOD, therefore, the ICRC pursues its humanitarian purposes, which include obtaining access to detainees, advising governments on the condition of detainees, and facilitating communications between detainees and their families. Allen Decl., ¶ 3.

Notwithstanding substantial evidence of ICRC-DOD cooperation, which evidence is comprised of the actions and statements of the ICRC and DOD, Plaintiffs erroneously rely on a third-party hearsay news account of a single criticism that has not been substantiated in this proceeding by either of the relevant parties. See Fridman v. City of New York, 183 F. Supp. 2d

8

642, 646 n.2 (S.D.N.Y.) ("Newspaper articles . . . are hearsay testimony . . . and, as such, are inadmissible on a motion for summary judgment."), aff'd, 2002 WL 31778026 (2d Cir. Dec. 10 2002). In any event, this news report does not support Plaintiffs' contention that the ICRC and DOD do not share information "in cooperation" with each other. The only basis on which DOD and the ICRC exchange information is "in cooperation" with each other. Neither party is compelled to do so. Indeed, entities and individuals often cooperate without seeing eye-to-eye on all issues. Indeed, adversaries in litigation — who by definition hold opposing views — often cooperate in certain respects. Plaintiffs' overly narrow interpretation of the statutory term "in cooperation," and their contention that the ICRC and DOD have not exchanged information "in cooperation," should thus be flatly rejected.

Plaintiffs also claim that "the requested documents" withheld by DOD were not "produced in cooperation" with the ICRC. Pls.' Opp. Br. at 8. Plaintiffs miss the point when they focus on the exemption of "documents." The exempting statute addresses "information," not "documents." See 10 U.S.C. § 130c(b) ("Information Eligible for Exemption"). The dialogue between DOD and the ICRC necessarily requires a give-and-take involving responses to questions, concerns or statements by each party. Any information that is part of that dialogue is therefore produced in cooperation between DOD and the ICRC, and it is exempt from disclosure. The specific documents Plaintiffs claim "presumably never have been shown to the ICRC," Pls.' Opp. Br. at 8, clearly consist of information that falls within the ambit of the DOD-ICRC dialogue, see Second Aly Decl., Tab B (Item 11 (addressed to the ICRC), Item 12 (recites ICRC concerns), Item 18 (forwards an ICRC document but was partially released)); Tab C (Item 2 (summary of ICRC issues), Item 4 (same), Item 5 (same)). Accordingly, although some of the

9

relevant <u>documents</u> were not provided directly by the ICRC, the <u>information</u> was produced in cooperation with the ICRC.

## D. The Withheld ICRC Information Is Confidential

As previously outlined at length, confidentiality is the principle that guides the relationship between DOD and the ICRC. See Defs.' Br. at 4-7. The ICRC requires <u>and</u> maintains confidentiality as to its communications with governments regarding the ICRC's observations and findings to ensure that the ICRC maintains access to detainees. See Allen Decl., ¶¶ 5, 16. Thus, ICRC visits to detainees in Guantanamo and Iraq are confidential. See Beaver Decl., ¶ 5; Allen Decl., ¶¶ 4-5, 11. Further, the ICRC has confirmed in writing that all records of its communications regarding detainees at Guantanamo and Iraq have been provided to DOD on condition that they not be released to the public and that the ICRC is withholding them from the public. Second Aly Decl., ¶ 13 & Ex. D. Moreover, the ICRC has repeatedly stressed in writing the confidentiality of its dialogue with the United States:

- "[T]he primary channel for addressing issues related to detention remains [the ICRC's] direct and <u>confidential</u> dialogue with the US authorities;" Pls.' Br., Ex. H (emphasis added).

- "Whenever the ICRC visits places of detention, its findings and observations about the conditions of detention and the treatment of detainees are discussed directly and <u>confidentially</u> with the authorities in charge." <u>Id.</u> (emphasis added).

- "<u>Confidentiality</u> is an important working tool for the ICRC in order to preserve the exclusively humanitarian and neutral nature of its work." <u>Id.</u> (emphasis added).

- "[D]etention problems are best solved through constructive dialogue based on mutual <u>confidence</u>, rather than in the glare of publicity which inevitably carries the risk of politicizing the issues." Allen Decl., Ex. A at 2 (emphasis added).

Thus, it is clear that the information that DOD has withheld "was provided or made

available to the United States Government on condition that it not be released to the public." 10 U.S.C. § 130c(b)(3)(B). Moreover, these written statements by the ICRC are evidence that the ICRC has requested that the information be withheld. Id. § 130c(b)(3)(A).

In addition, the ICRC has requested in writing that DOD maintain the "confidentiality of [the ICRC's] communications," has stated that "all records of communications from the ICRC or its representatives regarding detainees in Guantanamo and Iraq have been provided by the ICRC to the DoD on condition that the documents not be released to the public," and has stated that "the ICRC itself is withholding such documents from public disclosure." Second Aly Decl., Ex. D.

Plaintiffs' semantic arguments to the contrary ignore the general principle of confidentiality that governs ICRC communications to and from detaining powers, and more particularly, its applicability to ICRC communications to and from the United States regarding detainees in Guantanamo and Iraq. Plaintiffs essentially ask this Court to disregard the ICRC's longstanding policy of confidentiality. If, as Plaintiffs would have it, DOD were compelled to turn over the withheld ICRC information, the ICRC's policy of confidentiality would be abrogated and cooperation between the United States and the ICRC could be adversely affected. Given the importance of the ICRC's humanitarian mission, and DOD's demonstration of the applicability of Exemption 3 to the withheld ICRC information, DOD should be granted summary judgment as to the ICRC documents.

## II.    THE CIA PROPERLY INVOKED THE GLOMAR DOCTRINE

In its moving brief, the Government explained that the CIA's refusal to confirm or deny the existence of documents responsive to Requests 1, 29 and 61 was justified under FOIA

11

Exemptions 1 and 3. This "Glomar response" was justified under Exemption 1 because Ms. Dorn, a CIA officer with authority to make original classification decisions, determined that the existence or non-existence of records containing the information requested in Requests 1, 29 and 61 is classified for reasons of national security under both the intelligence activities and methods and the foreign relations prongs of Executive Order 12958. First Dorn Decl., ¶ 16; Fourth Dorn Decl., ¶ 18. Further, the Glomar response was justified under Exemption 3 because Plaintiffs' request could reasonably be expected to result in the unauthorized disclosure of intelligence methods. Plaintiffs' opposition, which ignores the distinctions between Exemptions 1 and 3, does little more than raise the empty complaint that the CIA could have provided more detail in its Vaughn declaration.

## A. The CIA Properly Classified the Existence or Non-Existence of Records Responsive to Requests 1, 29 and 61

In a misguided attempt to distinguish the litany of cases cited in support of the CIA's invocation of the Glomar doctrine, Plaintiffs point out that the CIA's cases address instances where information was requested about a "particular individual or field of operation." Pls.' Opp. Br. at 13. Plaintiffs' requests are just as specific in this case. Requests 1 and 29 seek DOJ legal memoranda that allegedly address specific interrogation activities, including "sleep deprivation," the "use of phobias and the deployment of stress factors," and "waterboarding." Pls.' Br. at 28 & Ex. O at 3. Likewise, Request 61 concerns a purported Presidential Order that authorized a specific intelligence activity – the use of detention facilities outside the United States. Pls.' Br. Ex. O at 3. Therefore, just like a request for information about a specific individual, a specific field station or a specific operation, the confirmation or denial of the existence of the documents

12

requested would confirm or deny a CIA interest in a specific intelligence method or activity. See Fourth Dorn Decl., ¶ 11; Defs.' Br. at 31-32. Accordingly, the CIA properly classified the existence or non-existence of documents responsive to Requests 1, 29 and 61 under E.O. 12958.

Further, the Court has more than enough detail to conduct an independent review of the CIA's classification of the existence or non-existence of records responsive to Requests 1, 29 and 61. Ms. Dorn explained that the specific alleged interrogation and detention activities addressed by Plaintiffs' requests would be intelligence activities and methods within the meaning of the Executive Order, and that the CIA would not request legal memoranda or authorizations from the President for activities that it did not have an interest in utilizing. Fourth Dorn Decl., ¶ 11. Ms. Dorn further explained, in great detail, the damage to CIA intelligence activities and methods that would result from a confirmation or denial of the existence of the records requested. See Fourth Dorn Decl., ¶¶ 10-14. Accordingly, Ms. Dorn has demonstrated that the information withheld logically falls within Exemption 1. See Earth Pledge Foundation v. CIA, 988 F. Supp. 623, 626 (S.D.N.Y. 1996) (CIA satisfied its burden for summary judgment where it established that the information withheld logically fell within the scope of a FOIA exemption).

Plaintiffs also take no position with regard to Ms. Dorn's conclusion that "to either confirm or deny the existence or non-existence of these documents would affect the United States' foreign relations." Fourth Dorn Decl., ¶ 15. This alone is sufficient to affirm the CIA's invocation of the Glomar doctrine with respect to Requests 1, 29 and 61. See, e.g., Earth Pledge, 988 F. Supp. at 627-28.

Finally, Plaintiffs' accusation that the Government has ignored the language of FOIA with regard to the standard of review is unfounded. See Pls.' Opp. Br. at 12. The parties agree

13

that, where the justification for withholding is supported "with reasonably specific detail," the

Court must accord "substantial weight" to the declarations justifying classification. Military

Audit Project v. Casey, 656 F.2d 724, 737-38 (D.C. Cir. 1981). In short, there can be no dispute

that where, as here, the Court has enough information to understand why the CIA classified

information, it should not second-guess the classification decision itself. See Frugone v. CIA,

169 F.3d 772, 775 (D.C. Cir. 1999) (because "courts have little expertise in either international

diplomacy or counterintelligence operations, we are in no position to dismiss the CIA's facially

reasonable concerns" about the harm that disclosure could cause to national security).

## B. The CIA's Glomar Assertion Is also Proper Under Exemption 3

The CIA's Glomar assertion is also proper under Exemption 3. Plaintiffs do not contest

that the National Security Act of 1947, as amended, 50 U.S.C.A. § 403-3(c)(7) (West 2003) (the

"NSA"), is a withholding statute within the meaning of Exemption 3.[5] More strikingly, Plaintiffs

effectively concede that the NSA provides a broader mandate to protect intelligence sources and

methods than E.O. 12958, because the NSA does not require the CIA to identify or explain the

---

[5]     Certain provisions of the Intelligence Reform and Terrorism Prevention Act of
2004, Pub. L. No. 108-458, 118 Stat. 3638, which amends the NSA, were not in effect at the time
of the Government's opening brief. Defs.' Br. at 33 n.9. When the Director of National
Intelligence ("DNI") was appointed in April 2005, certain provisions of the Intelligence Reform
and Terrorism Prevention Act became effective, including Section 1101(a), which amended the
NSA to provide to the DNI the authority to protect intelligence sources and methods. This
amendment does not affect this case, however, as the NSA was the statute in effect at the time of
plaintiffs' FOIA requests. See, Pub. Citizen Health Research Group v. FDA, 704 F.2d 1280,
1284 (D.C. Cir. 1983) ("To invoke Exemption 3, an agency must demonstrate that . . . a statute
exists and was in effect at the time of the request") (emphasis added); Hunt v. Commodity
Futures Trading Comm'n, 484 F. Supp. 47, 49 n.1 (D.D.C. 1979) (holding that government, in
invoking Exemption 3, "must rely . . . on the statute in effect at the time of the request"); see also
King v. DOJ, 830 F.2d 210, 214 (D.C. Cir. 1987) (agency may invoke Exemption 1 upon the
basis of the classification procedures in effect at the time of classification).

14

damage to intelligence sources and methods that would be caused by disclosure. See Pls.' Opp.

Br. at 11-13. Therefore, because Plaintiffs do not challenge Ms. Dorn's finding that the alleged

interrogation and detention activities covered by Requests 1, 29 and 61 would be intelligence

methods and activities, Fourth Dorn Decl., ¶ 11, the CIA has the authority under the NSA and

Exemption 3 to refuse to either confirm or deny the existence of the records requested. See

Defs.' Br. at 36-37.

## III. THE CIA HAS PROPERLY JUSTIFIED THE WITHHOLDING OF INFORMATION RESPONSIVE TO REQUEST 43

The CIA's detailed Vaughn declaration also amply justifies its withholding of

information responsive to Request 43 under FOIA Exemptions 1, 2, 3, 5, and 7. As a threshold

matter, Plaintiffs do not challenge, and thereby effectively concede, the CIA's invocation of

Exemptions 2, 5 and 7. Because it is clear that one or more of Exemptions 2, 5 and 7 apply to

all of documents withheld in response to Request 43, there is no need for the Court to consider

whether the CIA sufficiently justified its non-disclosure under Exemptions 1 and 3.

Nevertheless, the CIA's invocation of Exemptions 1 and 3 is also proper because the CIA has

explained why the information withheld logically falls within the scope of those exemptions.

### A. All of the Information Withheld in Response to Request 43 Is Covered by Exemptions 2, 5 and 7, Which Plaintiffs Do Not Oppose

The CIA moved for summary judgment with regard to 72 documents responsive to

Request 43 and supported its motion with a Vaughn declaration that justified the withholding of

those documents under, inter alia, Exemptions 2, 5 and 7. See Carney, 19 F.3d at 812

("Affidavits or declarations supplying facts indicating that the agency has conducted a thorough

search and giving reasonably detailed explanations why any withheld documents fall within an

15

exemption are sufficient to sustain the agency's burden.").[6] Once the CIA moved for summary judgment on this issue, the burden shifted to Plaintiffs to explain why the CIA's justifications under Exemptions 2, 5 and 7 failed as a matter of law, or to demonstrate that the CIA's declaration was controverted by either contrary evidence in the record or by evidence of agency bad faith. See Earth Pledge, 988 F. Supp. at 626. Perhaps recognizing that they could not meet this burden, Plaintiffs declined to challenge the CIA's invocation of these exemptions. See Pls.' Opp. Br. at 14 n.2.

Where, as here, plaintiffs do not oppose an agency's arguments in support of a motion for summary judgment with regard to information withheld under a FOIA exemption, plaintiffs are deemed to have conceded that the information was properly withheld. For example, in Feshbach v. SEC, the SEC moved for summary judgment with respect to documents withheld pursuant to Exemptions 2, 4, 5, 7 and 8. 5 F. Supp. 2d 774, 780 (N.D. Cal. 1997). Plaintiffs moved for summary judgment only with respect to documents withheld under Exemptions 2, 5, 7 and 8. Id. The court held that "summary judgment will be granted in favor of the Commission as to

---

[6]     It was clear from the Fourth Dorn Declaration that Exemptions 2, 5 or 7 apply to all documents withheld in response to Request 43. Indeed, Exemption 7 was claimed with respect to all 72 documents. See Fourth Dorn Decl., Ex. A at 1-126. Exemption 5 was likewise claimed with respect to all 72 documents, and it was apparent from the descriptions included in the index to the Fourth Declaration that nearly all of the information withheld was covered by an Exemption 5 privilege. For example, 21 of the documents (Document Nos. 13, 16, 21, 24, 29, 36, 39, 44, 46, 224, 225, 226, 265, 373, 381, 394, 397, 402, 431, 444, 445) are drafts that are covered in their entirety by one or more of the attorney client, attorney work product or deliberative process privileges. See id. Further, 43 of the documents (Document Nos. 250, 260, 263, 266, 269, 273, 276, 277, 279, 280, 281, 282, 288, 289, 291, 297, 302, 303, 304, 311, 312, 316, 317, 318, 319, 335, 336, 340, 344, 345, 412, 413, 417, 423, 424, 430, 432, 433, 434, 436, 437, 438, and 439) are emails where it is plain from the descriptions that the entire communication was withheld under one or more of the attorney client, attorney work product or deliberative process privileges. See id.

16

documents withheld pursuant to Exemption 4," because plaintiffs "do not oppose summary judgment with respect to documents withheld pursuant to Exemption 4." Id.; see also Jefferson v. DOJ, 284 F.3d 172, 174 (D.C. Cir. 2002) ("Previously, this court affirmed the grant of summary judgment insofar as [plaintiff] did not challenge . . . the government's reliance on 5 U.S.C. § 552(b)(2) ("Exemption 2") and 5 U.S.C. § 552(b)(2) ("Exemption 5") to redact certain material"); Wickwire Gavin, P.C. v. DIA, 330 F. Supp. 2d 592, 602 (E.D. Va. 2004) ("The Plaintiff does not challenge the assertion of FOIA exemption 5. The Court will therefore grant summary judgment as to the documents claimed exempt under FOIA Exemption 5."); Maydak v. DOJ, 254 F. Supp. 2d 23, (D.D.C. 2003) ("Plaintiff does not challenge the FBI's justification for withholding information under [exemptions 7(C) and 7(D)] and therefore concedes the issue"); Hollar v. IRS, No. 95-1882 (RMU), 1997 WL 732542, at *7 n.9 (D.D.C. Aug. 7, 1997) (plaintiff "conceded" that documents were "properly withheld" where he "did not challenge the applicability" of exemptions in his "opposition to defendant's motion for summary judgment").

Accordingly, Plaintiffs have conceded that the information withheld in response to Request 43 was proper under Exemptions 2, 5 and 7. Because all of the documents withheld in response to Request 43 are covered by one or more of these exemptions, the Court need not determine whether the CIA's invocation of Exemptions 1 and 3 was proper.

## B. The CIA Has Provided Ample Information Supporting Its Invocation of Exemptions 1 and 3

In any case, the CIA has satisfied its burden of showing that the information withheld in response to Request 43 was also properly withheld under Exemptions 1 and 3.[7]

_____

[7]       The CIA relied upon two statutes – Section 103(c)(7) of the NSA, and Section 6 of the Central Intelligence Agency Act of 1949, as amended, 50 U.S.C.A. § 403g (West Supp.

As an initial matter, Plaintiffs incorrectly accuse the CIA of failing to identify DCI

Tenet's request to Secretary Rumsfeld. See Pls.' Opp. Br. at 14. The request was clearly labeled

as "Document No. 428: Letter from the DCI to the Secretary of Defense" in the index to the

Fourth Dorn Declaration. Fourth Dorn Decl., Ex. A at 107-09. Moreover, the CIA did not

"bury" this document. To ensure that Plaintiffs would locate DCI Tenet's request, the CIA

identified the request as Document 428 in its moving brief. Defs.' Br. at 46 ("DCI Tenet's

request is embodied in only one document – Document 428."). Further, Ms. Dorn included a

footnote in her declaration that flagged DCI Tenet's request as Document 428. Fourth Dorn

Decl., at 15 n.8. Despite these multiple references to DCI Tenet's request, Plaintiffs apparently

failed to locate it.[8]

Plaintiffs' arguments on the merits are likewise mistaken. First, their contention that the

CIA waived its right to claim exemptions with regard to information responsive to Request 43 is

_____

2003) (the "CIA Act") – in withholding information under Exemption 3. See Defs.' Br. at 49-52.
Plaintiffs do not dispute that the CIA properly withheld information under the CIA Act. See Pls.'
Opp. Br. at 14-15. Accordingly, Plaintiffs concede that the CIA properly withheld "CIA
employees' names and personal identifiers (for example, employee signatures and initials),
official titles, file numbers, dissemination markings, and internal organizational data." Fourth
Dorn Decl., ¶ 101; see also Defs.' Br. at 51-52.

[8]     In their opposition brief, Plaintiffs also demand for the first time a response from
DOD with regard to Request 43. Pls.' Opp. Br. at 14. It has been clear since November 8, 2004,
when DOD provided its response to Plaintiffs' List of 70 Requests, that DOD was not responding
to Request 43 under the schedule set by the Court's Orders of September 15, 2004 and November
1, 2004. See Pls.' Br., Ex. D at 11 (DOD's response to List of 70 does not include a response for
Request 43). Instead, the CIA responded to Request 43 on behalf of the Government, as that
request sought CIA documents or documents with CIA equities; namely, the request from DCI
Tenet, all documents related to that request, and the order from Secretary Rumsfeld
implementing that request. See id., Ex. A at 9-10; id., Ex. C. Given that DOD continues to
search for and process documents, however, DOD will prioritize the search for documents
embodying Secretary Rumsfeld's order. If any such documents exist, they will be processed by
DOD, in coordination with the CIA.

18

contrary to law. As in their opening brief, see Pls' Br. at 30, Plaintiffs argue in their opposition

that the CIA cannot classify information responsive to Request 43 because "this information has

already been revealed by Defense Secretary Rumsfeld," see Pls.' Opp. Br. at 14-15. The CIA

explained in its moving brief, however, that it does not waive its exemptions where, as here, the

"official disclosure" in question was not made by the CIA. See Defs.' Br. at 45. The CIA further

explained that, even if the official disclosure had been made by the CIA, it would not require the

release of all records related to the request, because Plaintiffs have not and cannot establish that

the documentation of the request itself or any of the other 71 documents related to the request

specifically match Secretary Rumsfeld's disclosure. See id. at 46-47. The case law cited in the

CIA's moving brief, which Plaintiffs do not address, therefore establishes that the CIA has not

waived its right to invoke FOIA exemptions with regard to information responsive to Request 43.

See Defs.' Br. at 46-47.

Second, Plaintiffs have abandoned their argument that the CIA cannot classify documents

responsive to Request 43 because those documents "merely contain evidence of illegality or

unlawful activity." Pls.' Br. at 30. Indeed, Plaintiffs do not dispute that, as the CIA explained in

its moving papers, see Defs.' Br. at 47-49, Executive Order 12958 does not bar the Government

from classifying information that might contain evidence of the violation of a law, but rather bars

the Government from classifying information "in order to" conceal violations of law. See Pls.'

Opp. Br. at 15. Instead, Plaintiffs suggest that it is "appropriate" for the Court to conduct an in

camera review to ascertain whether the documents "are being improperly withheld" because

DOD purportedly acknowledged that the detainee at issue "should have been but was not

registered with the ICRC." Id.

19

Not surprisingly, Plaintiffs cite no legal authority for this novel position.[9] Nor could they, as the case law makes clear that classification is proper where, as here, "Plaintiff has neither argued nor offered evidence that the CIA classified the requested information for the purpose of concealing a crime." Arabian Shield Development Co. v. CIA, No. 3-98-CV-0624-BD, 1999 WL 118796, at \*4 (N.D. Tex. Feb. 26, 1999). Plaintiffs do not challenge Ms. Dorn's confirmation that she has "not classified any information in order to conceal violations of law." Fourth Dorn Decl., ¶ 26. In the absence of contrary evidence or evidence of bad faith, Ms. Dorn's declaration is entitled to "substantial weight." See, e.g., Earth Pledge, 988 F. Supp. at 626. Therefore, there is no reason to conduct an in camera review of the documents to verify that Ms. Dorn was being truthful when she swore that she had not improperly classified information to conceal violations of law.

Third, Plaintiffs' unsubstantiated allegation that the "declaration submitted by the CIA does not demonstrate that there is no reasonably segregable information" is incorrect. Pls.' Opp. Br. at 15. Ms. Dorn explained in detail her review to determine whether there was any segregable information responsive to Request 43 that could be produced:

> These documents have been denied in full because I have determined that no meaningful, reasonably segregable portion of those documents could be released. The determination of segregability was made based upon a careful review of the documents in this case, both individually, and as a whole. Indeed, a line-by-line review was conducted for all the documents, individually and as a whole, at issue to identify and release meaningful, reasonably segregable, non-exempt portions of documents. Any non-exempt information is so inextricably intertwined with the exempt information that there are no meaningful, reasonably segregable, non-

---

[9]    Plaintiffs cite to pages 27-29 of their opening brief as support for this proposition. See Pls.' Opp. Br. at 15. That section of Plaintiffs' opening brief, however, addresses the Glomar doctrine and says nothing about the propriety of in camera review of documents. See Pls.' Br. at 27-29.

20

> exempt portions. Therefore, I determined that there are no meaningful segments
> of information that reasonably can be segregated for release.

Fourth Dorn Decl., ¶ 22. Plainly, Ms. Dorn's certification with regard to her segregability review

was sufficient to establish that there was no reasonably segregable information that could be

produced to Plaintiffs. See Pray v. FBI, No. 95 Civ. 0380 (SHS), 1998 WL 440843, at *3

(S.D.N.Y. Aug. 3, 1998) (rejecting plaintiff's challenge to segregability determination where

Vaughn declaration stated "[t]here is no further reasonably segregable portion of any of the

withheld materials which can be released"); ACLU v. DOJ, 833 F. Supp. 399, 403 (S.D.N.Y.

1993) (requiring DOJ, which had provided "no assurance" that it had conducted segregability

review, to "expressly certify that the documents withheld have been inspected to determine

whether any portions are disclosable").

Finally, Plaintiffs' complaint that the CIA has not presented sufficient evidence to justify

its withholdings is again mistaken with regard to the information withheld in response to

Request 43. As the D.C. Circuit has noted, "a Vaughn index is not a work of literature; agencies

are not graded on the richness or evocativeness of their vocabularies." Landmark Legal Fund v.

IRS, 267 F.3d 1132, 1138 (D.C. Cir. 2001). Instead, summary judgment is warranted on the

basis of agency declarations if the declarations "describe 'the justifications for non-disclosure

with reasonably specific detail, demonstrate that the information withheld logically falls within

the claimed exemption, and are not controverted by either contrary evidence in the record nor by

evidence of agency bad faith.'" Earth Pledge, 988 F. Supp. at 626 (quoting Miller v. Casey, 730

F.2d 773, 776 (D.C. Cir. 1984)). Here, Plaintiffs do not argue that there is contrary evidence in

the record or evidence of agency bad faith. See Pls.' Opp. Br. at 15. Nor could Plaintiffs

credibly take issue with Ms. Dorn's detailed justifications for non-disclosure under Exemptions 1 and 3. See Fourth Dorn Decl., ¶¶ 28-91 (describing why information was withheld under Exemption 1); id., ¶¶ 95-104 (describing why information was withheld under Exemption 3). The issue, therefore, is whether the CIA has sufficiently demonstrated that the information withheld logically falls within Exemptions 1 and 3.

Plaintiffs concede that the CIA has provided sufficient information to demonstrate that the name of the detainee, cryptonyms, and the location of CIA stations fall within Exemptions 1 and 3. See Pls.' Opp. Br. at 15. Plaintiffs maintain, however, that the CIA has failed to adequately explain why "the rest of the information" has been withheld. See id. In addition to the name of the detainee, cryptonyms and the location of CIA stations, the CIA has withheld the following types of information under Exemptions 1 and 3: information about the detainee; information that would reveal certain intelligence sources, methods and activities; information that would reveal foreign relations and foreign activities of the United States; and foreign government information. See, e.g., Fourth Dorn Decl., Ex. A at 1-3 (Document No. 13), 7-9 (Document No. 29), 11-13 (Document No. 39), and 32-95 (Document No. 269).

The CIA has provided sufficient information to demonstrate that "information about the detainee" falls within Exemptions 1 and 3. As Ms. Dorn explained:

[D]isclosure of the information the CIA has collected on this individual (i.e., his background and activities), would tend to reveal intelligence sources and methods because revealing the information could indicate how, when, and in what circumstances it was collected. For example, if only one source knew certain information about an individual, revealing that information could disclose the identity of that source. Similarly, if a certain method was used to target the individual and gather information about him, revealing the information that CIA knows could compromise that intelligence method.

22

Fourth Dorn. Decl., ¶ 25. It is therefore logical that information about the detainee would fall within the protections for intelligence sources, methods and activities provided by Exemptions 1 and 3.

Moreover, the detailed information the CIA provided about each document withheld provides the Court with sufficient information to find that the non-disclosed information falls within Exemptions 1 and 3. For example, Ms. Dorn described Document No. 13 as follows:

> This undated, single-page document is a synopsis and timeline of events surrounding the detainee in item no. 43. The synopsis traces the chain of events from capture up to an investigation of the detainee's experience while detained. The synopsis is comprised of an introductory paragraph setting forth assessments, and describing a process of interaction between federal agencies. This paragraph is followed by bullet-points about the detainee and his detention.

Fourth Dorn Decl., Ex. A at 1. It is certainly logical that information about the detainee's "capture" as well as the "detainee's experience while detained," which would concern specific CIA activities as well as specific CIA sources and methods, would fall within the protections of Exemption 1 for the reasons explained from paragraphs 36-90 of the Fourth Dorn Declaration.

Likewise, the description of Document 39 provides ample details demonstrating that the information withheld falls within Exemptions 1 and 3:

> This thirty-page draft document consists entirely of draft questions and answers, periodically interspersed with editorial comment, to serve as a briefing aid for the Director of Central Intelligence (DCI) for a hearing before the HPSCI. The questions are set out in bold, and answers are provided in bullet-pointed sentences or paragraphs as appropriate. The questions and draft answers involve, *inter alia*, the status of ongoing investigations by the CIA OIG and other internal CIA investigations and after-action reviews. The questions also request information (if any) concerning CIA activities in Iraq. The questions also request information (if any) regarding CIA knowledge of mistreatment or abuse of detainees.

Id., Ex. A at 11. Indeed, it is logical that a response to a specific question about "CIA activities

23

in Iraq" would contain information about CIA activities that is covered by Exemptions 1 and 3 for the reasons explained in paragraphs 86-90 of the Fourth Dorn Declaration. It is also logical that information about the treatment of detainees (or the lack of such information) would address intelligence sources and methods that are protected by Exemptions 1 and 3, as explained in greater detail from paragraphs 36-64 of the Fourth Dorn Declaration.

Accordingly, the CIA respectfully submits that it has provided sufficient information to establish that the information withheld logically falls within Exemptions 1 and 3.[10]

## IV.   DOD HAS PRODUCED ALL DOCUMENTS
## RESPONSIVE TO REQUESTS 4, 37, AND 39-42

As part of their List of 70, Plaintiffs sought specific documents and memoranda approving or putting into place the use of certain interrogation techniques within DOD. See Pls.' Br., Ex. A, Requests 4, 37, 39-42. On or about March 23, 2005, DOD produced two documents responsive to these specific requests: a September 14, 2003 memorandum and an October 12, 2003 memorandum, both of which approved or put into place the use of certain interrogation techniques within DoD. See Second Aly Decl., ¶¶ 23-26 (referring to Exhibits E and F).

Plaintiffs now argue that DOD has failed to produce all documents responsive to

---

[10]   Should the Court disagree, the next step would be to determine whether there is additional information the CIA could provide in an ex parte, in camera declaration that would allow the Court to review of the CIA's invocation of Exemptions 1 and 3. See Earth Pledge, 988 F. Supp. at 626 (requiring production of in camera declaration "demonstrating that the CIA's justifications for nondisclosure satisfied FOIA's statutory exemptions" where the court determined that it needed more information than the CIA was able to provide in a public declaration). The last step would be an in camera review of the documents at issue. See NLRB v. Robbins Tire & Rubber Co., 437 U.S. 214, 224 (1978) (explaining that FOIA's in camera review provision is "designed to be invoked when the issue before the District Court could not be otherwise resolved"); Guccione v. Nat'l Indian Gaming Comm'n, No. 98-CV-164, 1999 U.S. Dist. LEXIS 15475, at *3 (S.D. Cal. Aug. 5, 1999) ("in camera review is a last resort, to be used only when the propriety of the withholding cannot otherwise be determined").

Requests 4, 37 and 39-42. Pls.' Opp. Br. at 10-11. In particular, Plaintiffs contend that DOD has failed to produce two documents: a September 10, 2003 memorandum and a September 28, 2003 memorandum. As evidence of the purported existence of these two memoranda, Plaintiffs cite to two sources: 1) two paragraphs from the report prepared by Major General George Fay (Exhibit 2 to Pls.' Opp. Br.); and 2) a New York Times article (Exhibit 3 to Pls.' Opp. Br.). As the text of these two "sources" make clear, however, the memoranda dated September 10, 2003 and September 28, 2003 are merely drafts of the two memoranda that were already provided to Plaintiffs. See Third Declaration of Stewart F. Aly, dated May 19, 2005 ("Third Aly Decl."), ¶¶ 3-9. Such drafts are not responsive to Requests 4, 37, and 39-42, which sought only memoranda that approved or put into place the use of certain interrogation techniques within DOD. Accordingly, the Court should reject Plaintiffs' arguments regarding Requests 4, 37, 39-42.

## V. THE DARBY PHOTOGRAPHS WERE PROPERLY WITHHELD

The Government's moving brief established that the Darby photographs were properly withheld under Exemptions 6 and 7 because the substantial privacy interests implicated by these photographs, as set forth in the Geneva Conventions, outweigh the public interest in their release, especially because the underlying misconduct depicted in the photographs has already been widely publicized and the public's right to know can be satisfied in a less intrusive manner.[11]

---

[11]    Plaintiffs complain that DOD should be required to produce any and all photographs and videotapes relating to the abuse or mistreatment of detainees. Pls.' Opp. Br. at 17 (citing Requests 10 and 11 on List of 70). However, as explicitly noted in DOD's November 2004 response to the List of 70, Plaintiffs' request for all photographs was too broad to permit a full response until after DOD completes its search for and processing of all responsive documents. See Pls.' Br., Ex. D, page 3 (DOD chart responding to List of 70 with comment on Requests 10 and 11). In fact, DOD has not yet processed all of the photographs and other media

Defs.' Br. at 57-74. Nothing in Plaintiffs' opposition changes this result.

## A. As the Darby Photographs Depict Detainees in a Humiliating or Degrading Way, These Photographs Should Be Protected from Public Release Under the Geneva Conventions

As a threshold matter, Plaintiffs do not dispute that, under the Charming Betsy line of cases, an act of Congress like FOIA should be construed in a manner consistent with the United States' international treaty obligations under the Geneva Conventions. See Defs.' Br. at 62-63. Instead, Plaintiffs disagree that the privacy interests justify the withholding of these photographs and claim that release of these images in redacted form is consistent with the Geneva Conventions. Pls.' Opp. Br. at 18-25. In support of their position, Plaintiffs rely upon two declarations which claim that the Geneva Conventions permit release of these photographs in redacted form. See Declaration of Scott Horton, dated April 27, 2005 ("Horton Decl."), ¶¶ 16, 24; Declaration of Marco Sassòli, dated April 28, 2005 ("Sassòli Decl."), ¶¶ 5, 15, 16. In doing so, Plaintiffs mistakenly assume that resolution of this issue is determined by a battle of legal experts. However, the Government submitted the declarations of Edward Cummings and Geoffrey Corn to provide evidence of the United States' interpretation of its treaty obligations under the Geneva Conventions, an interpretation which must be afforded "great weight." Kolovrat v. Oregon, 366 U.S. 187, 194 (1961) ("while courts interpret treaties for themselves, the meaning given to them by the departments of government particularly charged with their negotiation and enforcement is given great weight"); see Sumitomo Shoji America, Inc. v.

---

in its possession. See Second McGuire Decl., ¶ 11. In any event, to the extent that the photographs already processed by DOD are being withheld based solely on Exemptions 6 and 7(c), the Court's resolution of the pending motion regarding the Darby photographs also will resolve whether these other already processed photographs should be released under FOIA.

Avagliano, 457 U.S. 176, 185 (1982) (where parties to treaty agree on meaning of treaty provision, and interpretation "follows from the clear treaty language[, the court] must, absent extraordinarily strong contrary evidence, defer to that interpretation").

Both of the Government's declarants possess an ample basis to opine on the United States' interpretation of its treaty obligations under the Geneva Conventions. Edward Cummings has had official responsibility for interpreting the Geneva Conventions on behalf of the Department of State for more than 25 years, spanning five different Presidents. Cummings Decl., ¶ 2. Geoffrey Corn advises senior officials in the Department of the Army on all matters related to the law of war. Corn Decl., ¶ 2. Moreover, both of these officials provide a reasoned explanation of the relevant provisions of the Geneva Conventions and how these provisions operate to bar the release of the requested photographs.

Plaintiffs have not provided "extraordinarily strong evidence" to contradict the Executive's interpretation of the Geneva Conventions. Rather, Plaintiffs simplistically, and erroneously, argue that the Geneva Conventions prevent release of detainee photographs only where a detainee can be specifically identified in a photograph. Pls.' Opp. Br. at 21-24. In fact, the Geneva Conventions also bar the release of photographs that depict detainees in humiliating or degrading circumstances, regardless of whether the individual detainees pictured can be identified. See Defs.' Br. at 63-67, 69-70.[12] This fact is made clear by both Government declarants. Cummings Decl., ¶¶ 12, 17-19 (noting that photographs that depict mistreatment of

---

[12]      As a threshold matter, the mere taking of the Darby photographs violated DOD regulations because the photographs were taken for personal, rather than official, purposes. See Cummings Decl., ¶ 15. DOD regulations prohibiting the taking of such photographs provide a bright line rule that memorializing long-standing military practice and exist to prevent exposing detainees to public curiosity in violation of the Geneva Conventions. Id., ¶¶ 14, 15.

detainees are protected from public release under the Geneva Conventions); Corn Decl., ¶ 10
(due to the inherently humiliating content of the photographs requested by Plaintiffs, the release
of these photographs would violate the Geneva Conventions even with identifying information
redacted).

Here, Plaintiffs specifically seek photographs and media that depict detainee abuse or
mistreatment, Pls.' Br. at 31, images which are inherently humiliating or degrading and thus are
barred from release. The bar against the release of such humiliating or degrading photographs is
not surprising given the Geneva Conventions' core principle of maintaining the dignity and
integrity of individuals in detention. See Corn Decl., ¶¶ 8-11; Cummings Decl., ¶ 12. Indeed,
Plaintiffs' exclusive focus upon the redaction of identifying information erroneously ignores that
the release of humiliating and degrading photographs of detainees at Abu Ghraib would subject
the finite universe of these detainees to "the personal humiliation and indignity accordant with
the knowledge that these photographs have been placed in the public domain." Corn Decl., ¶ 11.
Thus, as Plaintiffs specifically seek photographs that depict detainees in a humiliating or
degrading light, such photographs are protected from public release under the Geneva
Conventions.[13]

---

[13]     Plaintiffs contend that DOD has improperly withheld the Darby photographs
because the declarations submitted by DOD do not evaluate these documents on a photograph-
by-photograph basis. Pls.' Opp. Br. at 26-27. Plaintiffs' complaint is meritless because, as noted
above, Plaintiffs specifically seek images of detainee mistreatment and abuse which are, by
definition, barred from release under the Geneva Conventions. Morever, as the Government's
declarations make clear, the Army did individually review the more than 1,300 Darby
photographs and assorted media to determine which of these documents are responsive to
Plaintiffs' requests and whether the responsive documents are appropriate for release under
FOIA. Second McGuire Decl., ¶¶ 3-4, 8; Corn Decl., ¶ 5; Declaration of Michael G. Seidel,
dated May 18, 2005 ("Second Seidel Decl."), ¶ 2. As a result of this process, the Army
determined that 144 photographs and four movies are arguably responsive to Plaintiffs' requests.

28

Relying upon a statement contained in a single news article that apparently originated in the South African press and was reprinted off the Internet, both of Plaintiffs' declarants categorically state that the ICRC has taken the position that such photographs may be disseminated if their faces and identifying features are obscured. See Sassòli Decl., ¶ 12 (cited in Pls.' Opp. Br. at 23); Horton Decl., ¶ 24. However, this news article, and the statements contained within it, should not be considered by the Court because such statements are hearsay. Tasini v. New York Times Co., 184 F. Supp. 2d 350, 357 n.8 (S.D.N.Y. 2002) (declining to consider newspaper articles as competent evidence on a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1) because "[n]ewspaper articles are simply not evidence of anything other than the fact they were published; they are not admissible to prove the truth of the matter asserted therein") (citing Doe v. Karadzic, No. 93 Civ. 878/1163 (PKL) (HBP), 1997 WL 45515, at *6 (S.D.N.Y. Feb. 4, 1997)); Fridman, 183 F. Supp. 2d at 646 n.2 (newspaper articles are hearsay testimony and inadmissible); see also Fitzgerald v. Henderson, 251 F.3d 345, 360-61 (2d Cir. 2001) (citing Fed. R. Civ. P. 56(e) for the proposition that a plaintiff ordinarily must present affidavits based on personal knowledge and setting forth facts that would be admissible

---

Second McGuire Decl., ¶ 4. In this process, DOD erred on the side of caution by including as responsive any photograph that could be construed as depicting the abuse or mistreatment of a detainee. In fact, some of the photographs may not be responsive to Plaintiffs' requests because they do not, on their face, depict abuse or mistreatment or even provide information about the treatment of detainees in a general sense. However, to the extent the Court determines that the specific depiction in each individual photograph is relevant to determine the photographs releasability under FOIA, the Government will provide an in camera submission to the Court.

in evidence to withstand a motion for summary judgment), cert. denied, 536 U.S. 922 (2002).[14]

Similarly, Plaintiffs' claim that statements in a textbook about the practices of the government of Great Britain support Plaintiffs' interpretation of the Geneva Conventions is unavailing. Pls.' Opp. Br. at 22-23. In addition to being inadmissible hearsay, the cited portion of the textbook does not address the question of whether the British government permits the release of photographs that depict detainees in a degrading or humiliating light. In fact, the information contained in the textbook actually echoes the interpretation provided by the Government in this case; namely, that publication of humiliating or degrading images of detainees violates the Geneva Conventions. Pls.' Opp. Br., Ex. 6, at 53 (noting the "adverse reaction in the West [in 1991] to the showing of captured pilots on Iraqi television as humiliating and degrading treatment" and that DOD Secretary Donald Rumsfeld in 2003 protested that "it was illegal for prisoners of war to be shown in humiliating circumstances" after captured

_____

[14]     Moreover, the news article does not support Plaintiffs' position. While Plaintiffs' two declarants claim that the article demonstrates that the ICRC's position is that the DOD can release these photographs with identifying information redacted, the article does not make that assertion. Rather, the article reports that the ICRC expressly declined to offer such an opinion:

> [The spokesperson from the ICRC] declined to comment directly on whether Rumsfeld could release all of the pictures provided the faces of the detainees were obscured.

Horton Decl., Ex. B, Sassòli Decl., Ex. A. (emphasis added) (offering only that "'blurring faces might be a good way' to ensure that detainees can't be recognized in pictures"). Indeed, the point made by the article is that release of these photos by a news organization -- the Washington Post -- does not violate the Geneva Conventions because "only governments are bound by the treaties" and, therefore, "it is up to governments to pass the sort of legislation that would prevent the media from publishing photos that breached the Geneva Conventions . . . ." Horton Decl., Ex. B. In fact, the article notes that the Washington Post published a front page photo of a detainee with the inmate's face clearly visible, id.; the public release of this photographs would be a clear violation of the Geneva Conventions if released by a government that is a party to the Geneva Conventions.

30

American soldiers were shown on al-Jazeera television). Indeed, even Plaintiffs are forced to concede that "States have condemned 'parading' of prisoners which seemed designed to insult or mock the prisoners," Pls.' Opp. Br. at 22, but Plaintiffs do not, and cannot, explain how that situation is any different from the public release of images that depict detainees in degrading or humiliating circumstances.

Plaintiffs further claim that United States' policy actually permits release of these photographs, Pls.' Opp. Br. at 22, notwithstanding the express statements to the contrary by declarants from DOD and the State Department. Cummings Decl., ¶¶ 14-18; Corn Decl., ¶¶ 10-11. In support of this argument, Plaintiffs erroneously contend that DOD guidelines on media access allow the dissemination of such photographs. Pls.' Br. at 22. But DOD's media guidance nowhere authorizes the public dissemination of photographs of detainees; in fact, the guidance makes abundantly clear that all photography or filming of detainees for public release is prohibited. See Cummings Decl. ¶ 14 (restricting photographs of detainees in accord with protections provided by the Geneva Conventions), ¶ 15 (noting that photographs and filming of detainees is not permitted other than for internal administration of the detainee facility or for intelligence purposes) (citing Ex. C to Cummings Decl.).

## B. The Darby Photographs Should Be Protected from Release Because There Are Less Intrusive Means to Obtain the Same Information, Including Records of Court Martial Proceedings and Investigative Files

Regardless of how the Court weighs the respective privacy and public interests at stake in the Darby photographs, these records should be withheld for the additional, independent reason that there is a less intrusive means to satisfy the public's right to know. As numerous appellate courts have recognized, the balancing test for public access between privacy interests

31

and public interest may include consideration of whether other sources of information would suffice for obtaining the information sought. See Defs.' Br. at 72 (citing cases from the D.C. Circuit and the Eleventh Circuit); see also Heights Community Congress v. Veterans Admin., 732 F.2d 526, 529-30 (6th Cir.) (denying release of requested information and noting that public interest was served by information already released and plaintiff could pursue other avenues for obtaining the desired information), cert. denied, 469 U.S. 1034 (1984); accord Painting Industry of Hawaii Market Recovery Fund v. United States Air Force, 26 F.3d 1479, 1485 (9th Cir. 1994) (concluding that requested information was exempt and noting that "requesters have less intrusive means of procuring the information they seek") (citing Heights Community Congress); Rural Housing Alliance v. United States Dep't of Agriculture, 498 F.2d 73, 78 (D.C. Cir. 1974) (remanding issue under Exemption 6 back to the district court with instructions on remand to consider, inter alia, whether "any alternative sources of information" might be available).

Plaintiffs do not dispute the underlying notion that the Court should consider whether there are less intrusive means to satisfy the public's right to know. Pls.' Opp. Br. at 26. Instead, Plaintiffs make the conclusory claim that there is no less intrusive means to obtain this information. Plaintiffs are incorrect. The underlying information at issue concerns the abuse or mistreatment of detainees. In response to Plaintiffs' FOIA requests, the Army has already released documents which provide descriptive accounts of the conduct depicted in and associated with these photographs. See Second Seidel Decl., ¶¶ 3-6. For example, the Army released records from court martial proceedings against military personnel at Abu Ghraib who are being prosecuted in connection with this conduct; these records provide specific details regarding the underlying conduct, including a description of the conduct depicted in the relevant Darby

32

photographs. Id. Moreover, the Government continues to process documents which detail such conduct, and will continue to release such documents as the documents become available and are processed. Id. ¶¶ 3, 6. As the release of these photographs would not shed additional "light on the agency's conduct," Pls.' Opp. Br. at 26, the Darby photographs should not be released because their release would constitute an unwarranted invasion of privacy. See Painting Industry of Hawaii Market Recovery Fund, 26 F.3d at 1486 (noting that Government had agreed to provide a significant amount of underlying information sought by requesters and usefulness of additional information sought was outweighed by the privacy interests at stake).

## CONCLUSION

For the foregoing reasons, as well as the reasons outlined in the Government's initial brief, the Court should deny Plaintiffs' motion for summary judgment and grant the Government's motion for summary judgment with regard to the documents withheld in response to Plaintiffs' List of 70, dated August 16, 2004.

Dated: New York, New York
May 19, 2005

Respectfully submitted,

DAVID N. KELLEY
United States Attorney for the
Southern District of New York
Attorney for Defendants

By:     /s/ Sean H. Lane
        SEAN H. LANE (SL-4898)
        PETER M. SKINNER (PS-9745)
        Assistant United States Attorneys
        86 Chambers Street, 5th floor
        New York, N.Y. 10007

33