UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ x

AMERICAN CIVIL LIBERTIES UNION,
CENTER FOR CONSTITUTIONAL RIGHTS,
PHYSICIANS FOR HUMAN RIGHTS,                    ECF CASE
VETERANS FOR COMMON SENSE AND
VETERANS FOR PEACE,

            Plaintiffs,

                                 04 Civ. 4151 (AKH)

            v.

DEPARTMENT OF DEFENSE, AND ITS
COMPONENTS DEPARTMENT OF ARMY,
DEPARTMENT OF NAVY, DEPARTMENT OF :
AIR FORCE, DEFENSE INTELLIGENCE
AGENCY; DEPARTMENT OF HOMELAND
SECURITY; DEPARTMENT OF JUSTICE,
AND ITS COMPONENTS CIVIL RIGHTS
DIVISION, CRIMINAL DIVISION, OFFICE OF :
INFORMATION AND PRIVACY, OFFICE OF
INTELLIGENCE POLICY AND REVIEW,
FEDERAL BUREAU OF INVESTIGATION;
DEPARTMENT OF STATE; AND CENTRAL
INTELLIGENCE AGENCY,

            Defendants.

------------------------------------------------------------ x

## DEFENDANTS' SUPPLEMENTAL MEMORANDUM OF LAW IN FURTHER SUPPORT OF DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

DAVID N. KELLEY
United States Attorney for the
Southern District of New York
Attorney for Defendants
86 Chambers Street, 3rd Floor
New York, New York 10007
Tel: (212) 637-2737
Fax: (212) 637-2750

SEAN H. LANE (SL-4898)
PETER M. SKINNER (PS-9745)
HEATHER K. McSHAIN (HM-5883)
   – Of Counsel –

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................ 1

STATEMENT OF FACTS .............................................................. 4

   A.    The Global War on Terrorism ......................................... 4

        1.    Operation ENDURING FREEDOM ............................. 4

        2.    Operation IRAQI FREEDOM ................................. 5

   B.    Insurgents and Terrorists Continue to Disrupt the Missions of Operations
        ENDURING FREEDOM and IRAQI FREEDOM, Resulting in Military
        and Civilian Casualties in Afghanistan and Iraq ......................... 5

        1.    Insurgent Activity in Iraq ...................................... 6

        2.    Insurgent Activity in Afghanistan ............................... 8

   C.    The Rioting and Violence Following the Newsweek Report of Alleged
        United States Desecration of the Koran at Guantanamo Bay, Cuba ........... 9

   D.    The Darby Photos Covered by Exemption 7(F) ........................... 11

        1.    [Redacted] ................... 11

        2.    [Redacted] .................... 12

POINT I:     THE GOVERNMENT'S INVOCATION OF EXEMPTION 7(F)
          IS APPROPRIATE AT THIS JUNCTURE IN THE LITIGATION .......... 13

POINT II:    AS RELEASE OF THESE REDACTED PHOTOGRAPHS AND VIDEOS
          COULD REASONABLY BE EXPECTED TO ENDANGER THE LIVES AND
          PHYSICAL SAFETY OF MILITARY PERSONNEL AND CIVILIANS,
          THESE IMAGES ARE PROPERLY WITHHELD UNDER
          EXEMPTION 7(F) ................................................. 16

   A.    The Legal Standard Under Exemption 7(F) ............................. 16

B.  The Government Has Established That Release of These Darby Photos
Could Reasonably Be Expected to Endanger the Life or Physical
Safety of Individuals .................................................... 19

    1.  Release of These Images Is Likely to Endanger the Life and Safety of
        Individuals in Light of Prior Violence That Occurred After Publication
        of the Newsweek Story on the Koran and Prior Publication of Images
        of Detainees at Abu Ghraib .................................................... 20

    2.  Redacted .................................................... 21

C.  These Darby Photos Should Be Withheld Pursuant to Exemption 7(F)
Even in Redacted Form .................................................... 26

CONCLUSION .................................................... 28

Defendant the Department of Defense ("DOD" or the "Government") respectfully submits this memorandum to supplement its partial motion for summary judgment, filed on March 30, 2005. In its motion for partial summary judgment, the Government argued, inter alia, that certain photographs and images in the possession of the Department of the Army ("Army") were properly withheld under Exemptions 6 and 7(C) of the Freedom of Information Act, 5 U.S.C. § 552 ("FOIA"), because the substantial privacy interests implicated by these images outweigh the public interest in their release. The Government now files this brief, and supporting declarations, to assert Exemption 7(F) as an additional basis for withholding such images, described in detail below, because public release of these records could reasonably be expected to endanger the safety and lives of individuals, including soldiers and civilians in Iraq, Afghanistan, and elsewhere.

## PRELIMINARY STATEMENT

Plaintiffs filed FOIA requests seeking, inter alia, photographs and images of abuse or mistreatment of detainees at Abu Ghraib provided to the Army's Criminal Investigative Commanded by Joseph Darby, a military policeman (the "Darby Photos"). In the Government's summary judgment motion filed on March 30, 2005, DOD invoked Exemptions 6 and 7(C) as a basis for withholding release of the Darby Photos based upon the privacy interests of the detainees pictured in the photographs. DOD invoked these two privacy exemptions in light of the United States's international treaty obligations under the Third and Fourth Geneva Conventions, which prohibit subjecting detainees to public curiosity and humiliation.

On May 26, 2005, the Court held oral argument regarding whether the Darby Photos were properly withheld under FOIA. As part of the proceedings, the Court held an in camera ex parte proceeding during which the Government showed the Court a sample of the Darby Photos to set

forth more fully DOD's concerns regarding public release of these documents. On June 1, 2005, the Court entered an order that made rulings as to these sample Darby Photos, including resolving questions about the responsiveness of various photographs to Plaintiffs' FOIA requests and requiring the redaction of identifying information. The June 1, 2005 Order also required the Government to reprocess and redact all of the Darby Photos in accordance with the Court's rulings regarding the sample Darby Photos. Pursuant to the Court's June 1, 2005 Order, the Army reviewed each of the potentially responsive Darby Photos and determined that 87 photographs and four movies are responsive to Plaintiffs' FOIA requests (the responsive "Darby Photos"). Third Declaration of Philip J. McGuire, dated July 20, 2005 ("Third McGuire Decl.") ¶¶ 2-6.[1]

On June 10, 2005, the Government requested until July 22, 2005 to complete the reprocessing of the four movies because of the time-intensive nature of the frame-by-frame redaction process. The Court has not yet ruled on the parties' motions for summary judgment or issued an order mandating the release of any of the Darby Photos.

In connection with DOD's reprocessing of the Darby Photos, DOD provided copies of the reprocessed responsive Darby Photos to high-level officials and officers within DOD and the Army with responsibility for the ongoing war in Iraq and Afghanistan to inform them of the status of the litigation and the potential release of these documents. Declaration of General

---

[1]     The Government has not evaluated whether any FOIA exemptions, including but not limited to Exemption 7(F), apply to the photographs that have been determined to be unresponsive to Plaintiffs' FOIA requests, and the Government reserves its right to assert FOIA exemptions, as appropriate, if these documents are determined to be responsive to Plaintiffs' FOIA requests. See Third McGuire Decl. ¶¶ 3-6 and accompanying index identified as Exhibit A to Third McGuire Decl. (detailing 57 non-responsive photographs).

Richard B. Myers,[2] dated July 21, 2005 ("Myers Decl.") ¶ 19. After reviewing these images, DOD officials and officers expressed grave concern regarding the likelihood of violence occurring as a result of the release of the reprocessed responsive Darby Photos, even in redacted form; in particular, they were concerned that given the violence associated with the recent Newsweek story recounting alleged incidents of mistreatment of the Koran, similar acts of violence might occur if the United States officially released photographs and images that graphically depicted the mistreatment and abuse of detainees. Myers Decl. ¶¶ 19, 26.

Based on the judgment of officials within DOD and the State Department, disclosure of these photographs and images, even in redacted form, "could reasonably be expected to endanger the life or physical safety of any individual." 5 U.S.C. § 552(b)(7)(F). The grave risk that release of these Darby Photos poses to innocent civilians and soldiers did not become apparent to DOD until after the Government had submitted its summary judgment papers; accordingly, DOD previously did not invoke Exemption 7(F) as a basis for withholding these documents. Nonetheless, given the important public interests at stake and in light of DOD's recent assessment of the safety issues associated with potential release of these images, DOD now asserts Exemption 7(F) as to these records.

---

[2]     General Myers is the Chairman of the Joint Chiefs of Staff and he serves as the senior military advisor to the President of the United States, the Secretary of Defense, and the National Security Council. Myers Decl. ¶ 1. He is the highest ranking uniformed officer in the United States Armed Forces. Id.

## STATEMENT OF FACTS

A.    The Global War on Terrorism

      1.    Operation ENDURING FREEDOM

Following the terrorist attacks on September 11, 2001, the United States entered into a

war against global terrorism. On October 7, 2001, the United States military, with the support of

a worldwide coalition, launched "Operating ENDURING FREEDOM," to drive the oppressive

Taliban regime from Afghanistan. Myers Decl. ¶ 4. The initial military objectives of Operation

ENDURING FREEDOM, as articulated by President George W. Bush in his September 20, 2001

Address to a Joint Session of Congress and his October 7, 2001 Address to the Country, included

the destruction of terrorist training camps and infrastructure within Afghanistan, the capture of

all al Qaeda leaders, and the cessation of terrorist activities in Afghanistan. See President George

W. Bush, Address to the Nation from the Treaty Room (October 7, 2001) (available at

http://www.whitehouse.gov/news/releases/2001/10/20011007-8.html); President George W.

Bush, Address to a Joint Session of Congress and the American People (Sept. 20, 2001)

(available at http://www.whitehouse.gov/news/releases/2001/09/20010920-8.html). In an

October 7, 2001 Department of Defense briefing, Secretary of Defense Donald Rumsfeld stated

that the United States' objectives were to make clear to Taliban leaders that the harboring of

terrorists is unacceptable, to acquire intelligence on al Qaeda and Taliban resources, to develop

relations with groups opposed to the Taliban, to prevent the use of Afghanistan as a safe haven

for terrorists, and to destroy the Taliban military allowing opposition forces to succeed in their

struggle. See Secretary of Defense Donald H. Rumsfeld and Chairman of the Joint Chiefs of

Staff Richard B. Myers, Briefing on Enduring Freedom (October 7, 2001) (available at

http://www.dod.gov/transcripts/2001/t10072001_t1007sd.html). As a result of that successful effort, the Taliban was removed from power and, on October 9, 2004, the Afghan people elected their first democratic head of state, the president of Afghanistan. Myers Decl. ¶ 4.

### 2. Operation IRAQI FREEDOM

On March 19, 2003, the United States, along with Coalition Forces, launched Operation IRAQI FREEDOM to remove the dictatorial and murderous regime of Saddam Hussein. See President George W. Bush, Address to the Nation from the Oval Office (March 19, 2003) (available at http://www.whitehouse.gov/news/releases/2003/03/print/20030319-17.html); Myers Decl. ¶ 4. In his address to the Nation on March 19, 2003, President Bush stated that "[w]e come to Iraq with respect for its citizens, for their great civilization and for the religious faiths they practice. We have no ambition in Iraq, except to remove a threat and restore control of that country to its own people." President George W. Bush, Address to the Nation from the Oval Office (March 19, 2003) (available at http://www.whitehouse.gov/news/releases/2003/03 /print/20030319-17.html). Operation IRAQI FREEDOM succeeded in toppling Suddam Hussein's regime from power. Myers Decl. ¶ 4. Sovereignty of Iraq has been transferred to an interim government, and democratically elected representatives of the Iraqi people are in the process of completing work on a national constitution. Myers Decl. ¶ 4.

**B. Insurgents and Terrorists Continue to Disrupt the Missions of Operations ENDURING FREEDOM and IRAQI FREEDOM, Resulting in Military and Civilian Casualties in Afghanistan and Iraq**

Despite the success of Operations ENDURING FREEDOM and IRAQI FREEDOM, insurgents and terrorists continue to wage a violent campaign to disrupt the democratization process in both Iraq and Afghanistan by mounting violent and deadly assaults against the

5

multinational troops that remain in the region. Declaration of Ronald Schlicher,[3] dated July 20, 2005 ("Schlicher Decl.") ¶ 9; see also Myers Decl. ¶¶ 4, 8. As part of the worldwide commitment to strengthening and defending the emerging democracies in Afghanistan and Iraq, over 140,000 U.S. troops are part of the ongoing mission in Iraq and more than 19,000 U.S. troops remain on the ground in Afghanistan. Myers Decl. ¶ 4.

1.    Insurgent Activity in Iraq

As General Abizaid testified to the Senate Armed Services Committee on June 23, 2005, the overall strength of the insurgency is about the same as it was six months ago, although "there are more foreign fighters coming into Iraq than there were six months ago." Myers Decl. ¶ 6. Current estimates of the number of insurgents are in the range of 16,000 with perhaps 1,000 of that number being foreign fighters. Id. Currently, the number of insurgent attacks per day in Iraq is at 70. Myers Decl. ¶ 7. DOD's assessments indicate that the lethality of the attacks is on average increasing, resulting in both military and civilian injuries and fatalities. Myers Decl. ¶¶ 5, 7; Schlicher Decl. ¶ 9. Attacks are increasingly targeted at Iraqi police and security forces, government personnel, and civilians. Schlicher Decl. ¶ 9.

By way of example, as of July 15, 2005, 64 personnel under Chief of Mission authority have been killed in Iraq since the U.S. Embassy Baghdad opened on June 28, 2004. Schlicher Decl. ¶ 9. Redacted observed near-term increases in the assassination of Iraqi government officials – 52 in the three-month period ending June 27, 2005 (as well as a very recent uptick in

---

[3]    Mr. Schlicher formerly served as Deputy Assistant Secretary and Coordinator for Iraq in the Bureau of Near Eastern Affairs (NEA) within the United States Department of State, as well as Director of the Iraq Task Force within the Department of State. Schlicher Decl. ¶¶ 1, 3. Mr. Schlicher currently has the rank of Minister-Counselor in the Senior Foreign Serivce. Schlicher Decl. ¶ 2.

6

insurgent attacks on senior diplomatic officials from regional neighbors of Iraq). Myers Decl. ¶ 9. In addition, recent attacks have targeted Iraqi civilians indiscriminately, resulting in high death tolls. Schlicher Decl. ¶ 9. These attacks are conducted with the aim of terrorizing the Iraqi population and preventing the establishment of the rule of law. Schlicher Decl. ¶ 9.

Experience has shown that the insurgents have and will use any means necessary to incite violence and justify their use of deadly force. Myers Decl. ¶ 8. The insurgents justify their attacks with claims that U.S.-led international military forces seek to dominate Iraq; the Iraqi government is complicit in this effort; and/or international forces have impugned the dignity and honor of Iraqis at the personal, familial, and/or national scale. Schlicher Decl. ¶ 9.

DOD has documented situations in which the insurgents falsely portray their attacks as the result of U.S. actions in Iraq. See Myers Decl. ¶ 8. For example, Global Islamic Media Front specializes in producing flash videos which typically feature dozens of images of Iraqi women and children whose suffering is attributed to U.S. actions in Iraq as opposed to the acts of sabotage and violence perpetrated by the insurgents. Myers Decl. ¶ 8(a). By way of another example, last year DOD documented doctored images and videos that purported to reveal U.S. soldiers raping Iraqi women. Myers Decl. ¶ 8(b). These images were distributed on pro-Islamist and Arabic news web sites as actual examples of U.S. "barbarism." Myers Decl. ¶ 8(b). The videos were actually doctored images that had originated on a Hungarian pornography site. Myers Decl. ¶ 8(b). Specific references to these images surfaced in subsequent Muslim sermons throughout the Middle East, calling for retaliatory violence. Myers Decl. ¶ 8(c).[4]

---

[4]    In response to similarly doctored rape images purporting to depict the alleged rape of three Iraqi women at a British-run prison in Iraq, Sheik Abdul-Sattar al-Bahadli of Basra called for Jihad and offered $350 for anyone capturing a British soldier, $150 for killing one, and

DOD has noted other instances of insurgent attacks after the disclosure of images depicting alleged abuse of detainees. Myers Decl. ¶ 8(d). When photographs depicting mistreatment at Abu Ghraib were leaked in 2004, they were widely circulated in the Arabic press, both print and electronic, throughout the region. Schlicher Decl. ¶ 10. They were used to buttress a wide range of extremist and hostile commentary promoting the idea that torture and abuse of Arab prisoners is a widespread and common occurrence by U.S. military forces. Schlicher Decl. ¶ 10. They were also used to support the claim that Americans are hypocritical in their alleged support for human rights in the world and that they deserved harsh treatment by Islamist insurgent forces as payback. Schlicher Decl. ¶ 10. Moreover, on January 21, 2005, three days after 22 photographs of detainees in British custody were made public, an Iraqi insurgent suicide car bomber drove his vehicle toward the gate of a British base in southern Iraq. Myers Decl. ¶ 8(d). His vehicle detonated just as it was intercepted and before reaching the gate, but the explosion resulted in numerous injuries. Id.

2.    Insurgent Activity in Afghanistan



The situation in Afghanistan remains volatile, particularly as the Taliban-led insurgency attempts to derail the political process by increasing attacks in the run-up to the September 18th National Assembly elections. Myers Decl. ¶ 11. Violence has steadily risen since May, and levels of Taliban, al-Qaeda, and Hezb-e Islami Gulbuddin ("HIG") attacks against U.S. military forces in June were at the second highest level

---

stated that "[a]ny Iraqi who takes a female solider (foreign) can keep her as a slave or gift to himself." Myers Decl. ¶ 8(c).

8

since the Taliban fell in late 2001. Myers Decl. ¶ 11.



Insurgents in Afghanistan employ a relatively sophisticated and aggressive information

operations campaign. Myers Decl. ¶ 13. Taliban spokesmen respond quickly to claim credit

when insurgents conduct successful attacks against Coalition or Afghan Forces, and even claim

tactical successes for incidents not related to the insurgency. Id. The Taliban are also quick to

spread disinformation about culturally sensitive issues such as the Coalition's treatment of

Afghan women as a means of turning public opinion against the United States and other Western

countries. Id.

C.    The Rioting and Violence Following the Newsweek Report of Alleged
      United States Desecration of the Koran at Guantanamo Bay, Cuba

On April 30, 2005, Newsweek reported that an unnamed U.S. official had seen a

government report documenting desecration of the Koran at the U.S. facility at Guantanamo Bay,

Cuba. Myers Decl. ¶ 15; Schlicher Decl. ¶ 12. On May 16, 2005, Newsweek retracted a

statement in the article that the abuse had been uncovered in an "internal military investigation"

after its source was unable to confirm where he had seen the purported information. Myers Decl.

¶ 15; Schlicher ¶ 12. Newsweek also offered further qualifications on the story in its May 23,

9

2005, issue. Myers Decl. ¶ 15; Schlicher Decl. ¶ 12.

The Koran's alleged desecration, as reported by <u>Newsweek</u>, was perceived as such an affront to the Islamic faith that massive anti-U.S. demonstrations quickly erupted in the Palestinian territories, Egypt, Sudan, Bangladesh, Pakistan, and Indonesia. Myers Decl. ¶ 16; Schlicher Decl. ¶ 12. DOD intelligence assessments indicate that the volatile public sentiments in these Muslim countries were exploited by organized, anti-American extremists who succeeded in fomenting violent and deadly demonstrations. Myers Decl. ¶ 16. In Afghanistan, in particular, where over 19,000 U.S. troops are currently serving in Operation ENDURING FREEDOM, violent demonstrations began in the eastern provinces and spread to the capital, Kabul. Myers Decl. ¶ 17; Schlicher Decl. ¶ 12. The United Nations, as a precautionary measure, withdrew all its foreign staff from Jalalabad, where two of its guest houses were attacked, government buildings and shops were targeted, and the offices of two international aid groups were destroyed. Myers Decl. ¶ 17; Schlicher Decl. ¶ 12. At least 17 deaths in Afghanistan have been attributed to the reaction to the Koran story. Myers Decl. ¶ 17; Schlicher Decl. ¶ 12.

Despite Newsweek's published retraction, press reports **Redacted** **Redacted** indicate that Muslims believe that United States personnel continue to desecrate the Koran in an effort to humiliate Muslims. Myers Decl. ¶ 18. For example, Al-Basaaír, the website of the Iraqi Sunni Clergymen Council, asserts that desecration of the Koran is a daily occurrence in Iraq under U.S. occupation and posted numerous photographs of another alleged such incident. Myers Decl. ¶ 18. According to the website: "To humiliate the Koran in Iraq is a well-known tactic of the occupation and allied forces. The Koran has been desecrated by the Crusaders and the Jews. The latest incident of this happened when American soldiers raided the

10

Al-Quds Mosque in . . . Al-Ramadi. . . . The soldiers searched the entire mosque, tore the Koran, and beat the worshipers during the morning prayers." Myers Decl. ¶ 18.

## D.    The Darby Photos Covered by Exemption 7(F)

The responsive Darby Photos and movies at issue depict detainees or other foreign nationals under the control of the United States.[5] Second Declaration of Philip J. McGuire, dated March 30, 2005, ¶¶ 4, 8. The photographs and videos depict abuse and mistreatment that are completely abhorrent to the way the United States treats detainees under its control. The detainees in the images are "often naked or otherwise inappropriately clothed, posed in ways designed to embarrass and humiliate the individuals in the pictures." Id. ¶ 8. These photographs and videos are illustrative only of isolated activity by one military unit, and the United States Government deplores the conduct depicted in the Darby Photos. In fact, criminal charges in military courts-martial have been brought relating to the conduct at Abu Ghraib against 11 service members, resulting in eight convictions (three cases remain pending). Myers Decl. Addendum. To date, numerous administrative actions and non-judicial punishments have also been issued. Id.; Myers Decl. ¶¶ 25, **Redacted**

1.    **Redacted**

**Redacted**

**Redacted**

[5]    **Redacted**

**Redacted**

11



2. Redacted

Redacted

Redacted



**POINT I**

**THE GOVERNMENT'S INVOCATION OF EXEMPTION 7(F)
IS APPROPRIATE AT THIS JUNCTURE IN THE LITIGATION**

As a general rule, the Government "must assert all exemptions at the same time, in the

original district court proceedings." Maydak v. U.S. Dep't of Justice, 218 F.3d 760, 764 (D.C.

Cir. 2000) (denying the Government's motion for remand to the district court where the

Government intended to raise new exemptions because the law enforcement proceedings against

the plaintiff ended while the Government's appeal was pending, making Exemption 7(A)

inapplicable). However, courts have found exceptions to the general rule where, as here, the

Government properly asserts new FOIA exemptions for the first time at later stages of the

litigation at both the district court and appellate levels.[6]

For example, in Piper v. U.S. Dep't of Justice, – F. Supp. 2d –, 2005 WL 1384337, at *3

(D.D.C. June 13, 2005) (slip op.), the district court allowed the Government to raise new FOIA

_____

[6]        In Maydak v. U.S. Dep't of Justice, 362 F. Supp. 2d 316, 319 (D.D.C. 2005)
("Maydak II"), the district court permitted new or additional FOIA exemptions to be asserted in a
piecemeal fashion so long as the additional exemptions are asserted "in the original district court
proceedings." Specifically, the district court allowed the Government to assert new FOIA
exemptions in a renewed motion for summary judgment. Id. Rejecting plaintiff's motion to
strike the Government's new defenses, the district court held that the Government could assert
the new FOIA exemptions, explaining that "plaintiff has had ample opportunity to respond to
BOP's alleged new claims, which, in any event, are being asserted in 'the original district court
proceedings.'" Id. (citing Maydak, 218 F.3d at 764 ("Maydak I")). In so holding, the district
court distinguished Maydak I, explaining that in Maydak I "the District of Columbia Circuit was
contemplating whether to remand a case to the district court pursuant to its discretionary
authority under 28 U.S.C. § 2106." Id.

13

exemptions in a Rule 60(b) motion filed with the district court while plaintiff also had a pending appeal. The district court acknowledged the general rule that FOIA exemptions should be raised at the initial proceedings before the district court, but held that "in certain FOIA cases where the judgment will impinge on rights of third parties that are expressly protected by FOIA, such as privacy or safety, district courts not only have the discretion, but sometimes the obligation to consider newly presented facts and to grant relief under Rule 60(b)." Id.; see also August v. FBI, 328 F.3d 697, 702 (D.C. Cir. 2003) (remanding case to district court under authority of 28 U.S.C. § 2106 because third party safety and privacy interests at stake and "[t]he law does not require that third parties pay for the Government's mistakes"). In so holding, the district court highlighted that the Government had "acted in good faith, if also with sluggish neglect, and with the interests of the third-party individuals at heart." Piper, – F. Supp. 2d –, 2005 WL 1384337, at *4; see also Computer Profs. for Social Responsibility v. U.S. Secret Service, 72 F.3d 897, 903 (D.C. Cir. 1996) (reversing district court's denial of Rule 60(b) motion to reconsider based upon Secret Service's new in camera declaration, and ruling that Exemptions 7(C) and 7(D) were properly invoked in light of new declaration, where Secret Service showed good faith and speed in bringing motion, and third-party interests were at stake).

The Piper decision is consistent with other decisions on the same issue, including a decision of this Court. In National Council of La Raza v. Dep't of Justice, 03 Civ. 2559 (LAK), 2004 WL 2314455, at *1 (S.D.N.Y. Oct. 14, 2004), the district court allowed the Government's motion for reconsideration and upheld in part the Government's assertion of Exemption 5 based upon an in camera review of the document at issue. In so holding, the district court noted that the Government previously had failed to present the document in question for in camera inspection

14

or disclose the full scope of the document in its underlying motion for summary judgment. Id. Citing Local Civil Rule 6.3, the district court noted that strict compliance with the rule would bar consideration of the Government's arguments, but reconsidered its ruling "[n]evertheless, . . . [because] FOIA Exemption 5, serve[s] important public interests." Id.; see also Williams v. FBI, No. Civ. A. 91-1054-LFO, 1997 WL 198109, at *2 (D.D.C. Apr. 16, 1997) (permitting the Government to assert a new exemption in a motion for reconsideration, noting that there is "no rule that prohibits the district court, sua sponte, from applying the law in order to achieve a just result" and that "the policy militating against piecemeal litigation is less weighty where the district court proceedings are not yet completed."); Jordan v. U.S. Dep't of Justice, 591 F.2d 753, 780 (D.C. Cir. 1978) (recognizing "that there could be circumstances where, through pure mistake, the Government attorneys had not invoked the correct exemption in the district court. If the value of the material which otherwise would be subject to disclosure were obviously high, e.g., confidential information compromising the nation's foreign relations or national security, and it appeared highly likely was intended to be protected by one of the nine enumerated exemptions, then under 28 U.S.C. § 2106, the appellate court would have discretion to 'remand the case and . . . require such further proceedings to be had as may be just under the circumstances.'"), reversed on other grounds sub nom Crooker v. Bureau of Alcohol, Tobacco, and Firearms, 670 F.2d 1051, 1053 (D.C. Cir. 1981).

In this case, the Government's invocation of Exemption 7(F) is appropriate at this time. As a threshold matter, the releasability of the Darby Photos is pending before this Court. Moreover, the danger to innocent third parties associated with the release of these Darby Photos did not come to light until after the Government's submission of its summary judgment briefing

15

and, in fact, DOD did not complete until June 20, 2005, its military assessment of the

implications of the release of these images in light of the regional reaction to the Newsweek

story. Myers Decl. ¶ 19; Schanen v. Dep't of Justice, 798 F.2d 348, 349 (9th Cir. 1986)

(allowing Government to assert FOIA Exemptions for first time on appeal on motion for

rehearing where "[r]elease of the documents would endanger the lives and well-being of agents

and informants."). In any event, given the grave risk of harm that release of these Darby Photos

will pose to innocent third-parties, this Court may and should consider the Government's

invocation of Exemption 7(F) at this juncture of the litigation.

## POINT II

## AS RELEASE OF THESE REDACTED PHOTOGRAPHS AND VIDEOS COULD REASONABLY BE EXPECTED TO ENDANGER THE LIVES AND PHYSICAL SAFETY OF MILITARY PERSONNEL AND CIVILIANS, THESE IMAGES ARE PROPERLY WITHHELD UNDER EXEMPTION 7(F)

### A. The Legal Standard Under Exemption 7(F)

Exemption 7(F) provides that documents may be exempted from disclosure under FOIA

if they are "records or information compiled for law enforcement purposes, but only to the extent

that the production of such law enforcement records or information . . . could reasonably be

expected to endanger the life or physical safety of any individual." 5 U.S.C. § 552(b)(7)(F). As

previously established, the Darby Photos were compiled for law enforcement purposes. The

receipt of these images by Army CID was the catalyst for the initiation of criminal investigations,

and since their receipt, the images consistently have been maintained for the purposes of

furthering a thorough criminal investigation and prosecution, and as evidence therein. Third

McGuire Decl. ¶ 8.

16

As originally drafted, Exemption 7(F) only protected records that "would . . . endanger the life or physical safety of law enforcement personnel." Pub. L. No. 93-502, 88 Stat. 1561, 1563 (1974) (subsequently amended). Following its amendment in 1986 to protect against disclosure of records that "could . . . endanger the life or physical safety of any individual," courts applying this exemption have tended to construe it broadly and give substantial deference to the custodial agency's determination that such a risk exists and warrants withholding of documents. See Linn v. United States Dep't of Justice, Civ. A. No. 92-1406, 1995 WL 631847, at \*9 (D.D.C. Aug. 22, 1995) (in evaluating the validity of an agency's invocation of Exemption 7(F), the court should "within limits, defer to the agency's assessment of danger"). "Indeed, both the Supreme Court and [the D.C. Circuit] have expressly recognized the propriety of deference to the executive in the context of FOIA claims which implicate national security." Center for National Security Studies v. U.S. Dep't of Justice, 331 F.3d 918, 926-27 (D.C. Cir. 2003) (noting that "a court may rely on government affidavits to support the withholding of documents under FOIA exemptions. It is equally well-established that the judiciary owes some measure of deference to the executive in cases implicating national security, a uniquely executive purview.") (citation omitted). The agency's assessment of danger needs to establish a "nexus between the specific material withheld and harm to persons." Linn, 1995 WL 631847, at \*9. "Although [Exemption 7(F)] applies equally to information subject to Exemption 7(C), it does not require any balancing test." Shores v. F.B.I., 185 F. Supp. 2d 77, 85 (D.D.C. 2002) (emphasis in original).

In its present expansive form, Exemption 7(F) clearly may be invoked to protect the lives of persons other than law enforcement personnel. See, e.g., Garcia v. Dep't of Justice, 181 F.

17

Supp. 2d 356, 378 (S.D.N.Y. 2002) (protecting private citizens and third parties); Sanders v. U.S. Dep't of Justice, Civ. A. No. 91-2263-0, 1992 WL 97785, at *5 (D. Kan. April 21, 1992) (protecting from disclosure plaintiff's mental health records and identities of medical personnel who prepared those records because disclosure could "aggravate her condition to the point that she could harm someone involved in the investigation"). Moreover, the exemption is not limited to known, named individuals, but is available to protect "any individual" reasonably at risk. See, e.g., Larouche v. Webster, 75 Civ. 6010 (MJL), 1984 WL 1061, at *8 (S.D.N.Y. Oct. 23, 1984) (Exemption 7(F) protects FBI laboratory report containing description of home-made machine gun because disclosure of report risks harm to any and all law enforcement personnel who face daily possibility of confronting armed individuals).

Indeed, Exemption 7(F) has been invoked to protect from disclosure information that, if released, could place the public at large in danger. In Living Rivers, Inc. v. U.S. Bureau of Reclamation, 272 F. Supp. 2d 1313, 1321-22 (D. Utah 2003), the district court found that the Government had properly invoked Exemption 7(F) in response to a non-profit environmental group's FOIA request for copies of inundation maps prepared by the United States Bureau of Reclamation ("BOR") for the areas below the Hoover Dam and the Glen Canyon Dam. Id. at 1314. According to BOR, the maps were created to evaluate the effects of dam failure on communities and power plants located downstream from the dams. Id. at 1315. The district court summarized BOR's argument as follows:

> The BOR contends that disclosure of the inundation maps "could reasonably place at risk the life or physical safety of those individuals who occupy the downstream areas that would be flooded by a breach of the Hoover Dam or Glen Canyon Dam." In his declaration, Mr. Todd referred to a dam failure as a "weapon of mass destruction," mentioned that "[t]he maps show estimated travel times for the

18

> flood progression at key locations, which are usually communities of populated areas," and stated that the maps "are vital . . . to warn and evacuate people from potential flood zones." Mr. Todd also stated that "[t]errorists could use the inundation maps to estimate the extent of flooding that would be occasioned by attacking individual features of the dam. Terrorists could also use the inundation maps to compare the amount of flooding and damage that would result from attacking one dam as compared to attacking another dam."

Id. at 1321.

Broadly applying Exemption 7(F) to unspecified individuals who could be hurt by breaches of the Hoover and Glen Canyon Dams, the district court found that "Mr. Todd's statements concerning risk assessment by terrorists demonstrate that the release of the maps could increase the risk of an attack on the dams," and held that BOR satisfied its burden of justifying non-disclosure of the inundation maps pursuant to Exemption 7(F). Id. at 1322; accord LaRouche v. Webster, No. 75 Civ. 6010 (MJL), 1984 WL 1061, at *8 (S.D.N.Y. Oct. 23, 1984) (upholding application of Exemption 7(F) to FBI laboratory report containing a description of a handmade gun: "This Court finds persuasive [Special Agent Binney's] statement that '[t]hose persons who are charged with law enforcement face the possibility of confronting armed individuals everyday; however, they should not have added to that threat the real possibility of facing individuals armed with home-made devices constructed from the expertise of other law enforcement people.' This exemption is thus found properly asserted.").

B.  The Government Has Established That Release of These Darby Photos Could _____ Reasonably Be Expected to Endanger the Life or Physical Safety of Individuals

Because release of these images could reasonably be expected to endanger the life or safety of individuals, including but not limited to United States personnel and civilians in Iraq and Afghanistan, these records are properly withheld under Exemption 7(F).

19

1.    Release of These Images Is Likely to Endanger the Life and Safety of Individuals
      in Light of Prior Violence That Occurred After Publication of the Newsweek
      Story on the Koran and Prior Publication of Images of Detainees at Abu Ghraib

General Myers has concluded that release of these images "will pose a clear and grave

risk of inciting violence and riots" against American and Coalition troops, U.S. personnel and

civilians in Iraq and Afghanistan. Myers Decl. ¶ 25; see Schlicher Decl. ¶¶ 7, 15. In light of the

vitriolic and violent reaction to Newsweek's Koran report, see Myers Decl. ¶¶ 15-19, Schlicher

Decl. ¶¶ 11-12, the official release of these horrendous images is reasonably expected to subject

U.S. personnel and Coalition Forces in Iraq and Afghanistan to a "serious and grave risk." Myers

Decl. ¶ 26; Schlicher Decl. ¶¶ 7, 15.                    Redacted

                                            Redacted

Indeed, when images of abuse at Abu Ghraib prison were leaked in April of 2004, these

images were widely disseminated in the Arab press, both print and electronic, and used to

buttress a wide range of extremist and hostile commentary promoting the idea that torture and

abuse of Arab prisoners is a widespread and common occurrence by U.S. military forces.

Schlicher Decl. ¶ 10.                           Redacted

                                        Redacted

                        Redacted                              Indeed, three days

after 22 photographs of detainees in British custody were made public, an Iraqi insurgent suicide

car bomber drove his vehicle towards the gate of a British base in Southern Iraq; the resulting

detonation caused numerous serious injuries. Myers Decl. ¶ 8(d).

As General Myers explains, the insurgents will use any means necessary to incite

20

violence, and, specifically, will focus on perceived United States or Coalition mistreatment of

Iraqi civilians and detainees as a propaganda and recruiting tool to aid their cause. Myers Decl.

¶¶ 8, 25.[7]


Redacted

In the expert opinions of DOD and the State Department, official release of these

photographs and videos could reasonably be expected to endanger the life or physical safety of

U.S. personnel and civilians in Iraq and Afghanistan. These assessments are based on the current

situation in Iraq and Afghanistan. Accordingly, these photographs and videos are properly

withheld under Exemption 7(F). See Living Rivers, Inc., 272 F. Supp. 2d at 1321.

2.      Redacted

The propriety of the Government's invocation of Exemption 7(F) for these records is

reinforced when the photographs and images are viewed in the context of the Muslim faith,

Redacted

---

[7]      The fact that such a release would be ordered by this Court does not mitigate these
harms    Redacted

Redacted

21



Redacted

22



Redacted

23



The images here include depictions of abuse, mistreatment, and humiliation that are

objectively deplorable to people of any faith or culture. [Redacted]

Redacted

Given the nature of these images, it can reasonably be expected that their public release

by the United States will subject U.S. and allied troops and personnel and civilians in Iraq and

Afghanistan to a serious and grave risk of harm.

Having demonstrated that the life or physical safety of American soldiers, American

civilians, and civilians in Iraq and Afghanistan could be endangered by the release of these

24

images, the Court should uphold the Government's invocation of Exemption 7(F). See Brady-Lunny v. Massey, 185 F. Supp. 2d 928, 932 (C.D. Ill. 2002) (concluding that Exemption 7(F) may be applied to a generalized threat of harm, even where the specific individuals and harm cannot be predicted).



See Garcia v. Dep't of Justice, 181 F. Supp. 2d 356, 370 (S.D.N.Y. 2002) (holding that records were properly withheld under Exemption 7(F) where agency stated plaintiff posed a specific threat of harassment and violence to special agents who investigated plaintiff); Shores v. F.B.I., 185 F. Supp. 2d 77, 85 (D.D.C. 2002) (holding that FBI properly withheld names of cooperating witnesses as well as others who were interviewed in prosecuting plaintiff); Housely v. F.B.I., CIV. A. Nos. 87-2579, 87-3231, 1988 WL 30751, at *3

25

(D.D.C. March 24, 1988) ("The FBI has invoked Exemption 7(F) to protect the identities of several informants who have helped secure plaintiff's conviction of drug and weapons charges. Plaintiffs has threatened harm to these individuals. Therefore the Court concludes that the agencies have properly invoked Exemption 7(F).").

C.    These Darby Photos Should Be Withheld Pursuant
      to Exemption 7(F) Even in Redacted Form

The Government's assessment of risk to civilians and military personnel upon release of these Darby Photos applies even if identifying information is redacted from the photographs and films. According to DOD and the State Department, redaction of the photographs and videos, while lessening the privacy concerns as to the detainees, will not prevent or alleviate the risk of riots and violence erupting if these photographs and videos are released. Myers Decl. ¶¶ 34-35; Schlicher Decl. ¶ 14.



The Linn case is instructive on this point. In Linn, the District of Columbia District Court held that the Bureau of Prisons ("BOP") did not meet its burden of showing that Exemption 7(F) justified withholding pages of plaintiff's central inmate monitoring file that contained

26

information pertaining to plaintiff's separation status. Linn, 1995 WL 631847, at *8. BOP

sought to exempt disclosure of the information under Exemptions 7(C) and 7(F), and provided

the same explanation for application of both exemptions. Id. at **7-8. In denying summary

judgment on BOP's application of 7(F), the court took issue with the fact that BOP did not

explain why redactions of identifying information will not suffice:

> that is, assuming the BOP could establish some nexus between the disclosure of
> identifying information and a risk to the safety of some individual(s), as with the
> BOP's invocation of the privacy concerns of Exemption 7(C) [], the BOP has not
> provided any reason for concluding that disclosure of the documents could be
> expected to create a risk to the safety of others if identifying information were
> redacted from those documents.

Id. at *8. Here, by contrast, redaction will not erase the risk of harm identified by DOD and the

State Department. Indeed, the Government has explained in detail why redacting identifying

information from the photographs and videos will not prevent acts of violence upon their release.

Schlicher Decl. ¶ 14; Myers Decl. ¶ 35. Accordingly, even in a redacted form these photographs

and videos are properly withheld pursuant to Exemption 7(F).

27

## CONCLUSION

Redacted

DATED:    New York, New York
          July 22, 2005

                              Respectfully submitted,
                              DAVID N. KELLEY
                              United States Attorney for the
                              Southern District of New York
                              Attorney for Defendants

                        By:   /s/ Sean H. Lane
                              SEAN H. LANE (SL-4898)
                              PETER M. SKINNER (PS-9745)
                              HEATHER K. McSHAIN (HM-5883)
                              Assistant United States Attorneys
                              86 Chambers Street, 3rd Floor
                              New York, New York  10007
                              (212) 637-2737

28