UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

AMERICAN CIVIL LIBERTIES UNION, CENTER FOR
CONSTITUTIONAL RIGHTS, PHYSICIANS FOR HUMAN
RIGHTS, VETERANS FOR COMMON SENSE AND
VETERANS FOR PEACE,

        Plaintiffs,

    v.

DEPARTMENT OF DEFENSE, AND ITS COMPONENTS
DEPARTMENT OF ARMY, DEPARTMENT OF NAVY,
DEPARTMENT OF AIR FORCE, DEFENSE INTELLIGENCE
AGENCY; DEPARTMENT OF HOMELAND SECURITY;
DEPARTMENT OF JUSTICE, AND ITS COMPONENTS
CIVIL RIGHTS DIVISION, CRIMINAL DIVISION, OFFICE
OF INFORMATION AND PRIVACY, OFFICE OF
INTELLIGENCE, POLICY AND REVIEW, FEDERAL
BUREAU OF INVESTIGATION; DEPARTMENT OF STATE;
AND CENTRAL INTELLIGENCE AGENCY,

        Defendants.

DOCKET NO. 04-CV-4151 (AKH)

---

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' SUPPLEMENTAL MEMORANDUM OF LAW AND IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ...................................................................................... ii

INTRODUCTION ................................................................................................. 1

ARGUMENT ........................................................................................................ 2

    I.     THE INVOCATION OF EXEMPTION 7(F) TO SHIELD
         GOVERNMENT MISCONDUCT FROM PUBLIC SCRUTINY IS
         UNPRECEDENTED AND CONTRARY TO THE LEGISLATIVE
         HISTORY OF THIS PROVISION ........................................................... 3

         a.    Exemption 7(F) applies only when release of documents would
              endanger individuals with a nexus to law enforcement interests............... 3

         b.    Legislative history confirms that Exemption 7(F) only applies
              when release of documents would endanger individuals with a
              nexus to law enforcement interests ........................................................... 7

    II.    EVEN IF EXEMPTION 7(F) APPLIES TO THIS CASE, DEFENDANT
         HAS NOT SHOWN THAT DISCLOSURE OF THE DARBY IMAGES
         COULD "REASONABLY BE EXPECTED TO ENDANGER THE LIFE
         OR PHYSICAL SAFETY OF ANY INDIVIDUAL." ...................................... 10

    III.   PERMITTING THE GOVERNMENT TO WITHOLD EVIDENCE OF
         ITS OWN MISCONDUCT ON GROUNDS OF ADVERSE REACTION
         WOULD EVISCERATE THE PRINCIPLES OF DEMOCRACY AND
         GOVERNMENT ACCOUNTABILITY ENSHRINED IN THE
         FREEDOM OF INFORMATION ACT ............................................................ 13

CONCLUSION ................................................................................................... 15

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*A. Michael's Piano, Inc. v. Fed. Trade Comm'n,*
18 F.3d 138 (2d Cir. 1994) ............................................................................... 14

*ACLU v. Dep't of Defense,*
339 F. Supp.2d 501 (S.D.N.Y. 2004) .................................................. 1, 2, 13, 14

*Blanton v. United States Dep't of Justice,*
182 F. Supp. 2d 81 (D.D.C. 2002) ....................................................................... 4

*Brady-Lunny v. Massey,*
185 F. Supp. 2d 928 (C.D. Ill. 2002) ................................................................ 5, 6

*Brunetti v. FBI,*
357 F. Supp. 2d 97 (D.D.C. 2004) ....................................................................... 4

*Butler v. United States Dep't of Justice,*
368 F. Supp. 2d 776 (E.D. Mich. 2005) .............................................................. 4

*Carbe v. Bureau of Alcohol, Tobacco, and Firearms,*
No. CIV.A.03-1658 (RMC), 2004 WL 2051359 (D.D.C. Aug. 12, 2004) .............. 3

*Center for National Security Studies v. United States Dep't of Justice,*
331 F.3d 918 (D.C. Cir. 2003) ............................................................................. 5

*Durham v. United States Dep't of Justice,*
829 F. Supp. 428 (D.D.C. 1993) .......................................................................... 5

*Foster v. United States Dep't of Justice,*
933 F. Supp. 687 (E.D. Mich. 1996) .................................................................... 5

*Garcia v. United States Dep't of Justice,*
181 F. Supp. 2d 356 (S.D.N.Y. 2002) ............................................................... 4, 5

*Halpern v. FBI,*
181 F.3d 279 (2d Cir. 1999) ................................................................................ 3

*Housley v. FBI,*
No. CIV.A.87-2579, 1988 WL 30751 (D.D.C. Mar. 18, 1988) .......................... 5, 6

*Jimenez v. FBI,*
938 F. Supp. 21 (D.D.C. 1996) ............................................................................ 4

*John Doe Agency v. John Doe Corp.,*
493 U.S. 146 (1989) ............................................................................................. 3

*Larouche v. Webster,*
   No. 75-CIV-6010 (MJL), 1984 WL 1061 (S.D.N.Y Oct. 23, 1984) .................................. 6, 10

*Linn v. United States Dep't of Justice,*
   No. CIV.A.92-1406, 1995 WL 631847 (D.D.C. Aug. 22, 1995) ............................... 5

*Living Rivers v. United States Bureau of Reclamation,*
   272 F. Supp. 2d 1313 (D. Utah, 2003)............................................................... 6, 10

*NLRB v. Robbins Tire & Rubber Co.,*
   437 U.S. 214 (1978)................................................................................... 2

*Rugiero v. United States Dep't of Justice,*
   257 F.3d 534 (6th Cir. 2001) ......................................................................... 4

*Sanders v. United States Dep't of Justice,*
   No. CIV.A.91-2263-0, 1992 WL 97785 (D. Kan. Apr. 21, 1992) ............................ 5

*Shores v. FBI,*
   185 F. Supp. 2d 77 (D.D.C. 2002)................................................................. 4, 5

**Statutes**
5 U.S.C. § 552(a)(4)(B) ................................................................................ 10

5 U.S.C. § 552(b)(1) .................................................................................... 9

5 U.S.C. § 552(b)(7)(F).............................................................................. 1, 3, 7

**Other Authorities**
*Exec. Order No. 13,292, § 1.7(a), 68 Fed. Reg. 15,315, 15,318 (Mar. 25, 2003)*.......................... 9

*Freedom of Information Act: Hearings on S. 587, S. 1235, S. 1247, S. 1730, and S. 1751 Before
   the Subcomm. on the Constitution of the Senate Comm. on the Judiciary*, 97th Cong. 1009-10
   (1981)................................................................................................... 8

*Freedom of Information Act—Appendix: Hearings on S. 587, S. 1235, S. 1247, S. 1730, and
   S. 1751 Before the Subcomm. on the Constitution of the Senate Comm. on the Judiciary*, 97th
   Cong. 38 (1981) ....................................................................................... 8

Josh White, *Abu Ghraib Tactics Were First Used at Guantanamo*, Wash. Post, Jul. 14, 2005 ... 13

LTG Randall M. Schmidt & BG John T. Furlow, *Investigation into FBI Allegations of Detainee
   Abuse at Guantanamo Bay, Cuba Detention Facility*, AR 15-6 Report, June 9, 2005, at 19-20
   (Schmidt-Furlow Report)................................................................................ 13

*Newsweek* article dated April 30, 2005 ......................................................... 11

*Pub. L. No. 99-570, §§ 1801-1804, 100 Stat. 3207*
  (codified as amended at 5 U.S.C. § 552 (2002)) ........................................................ 7

*R. Jeffrey Smith, General Is Said to Have Urged Use of Dogs, Wash. Post, May 26, 2004* ........ 14

## **Congressional Record**
132 Cong. Rec. H9455-05 (daily ed. Oct. 8, 1986) ........................................................ 7

132 Cong. Rec. S13965-02 (daily ed. Sept. 27, 1986) .................................................... 8

132 Cong. Rec. S14252-01 (daily ed. Sept. 30, 1986) .................................................... 7

132 Cong. Rec. S14270-01 (daily ed. Sept. 30, 1986) .................................................... 9

# INTRODUCTION

In April 2004, when gruesome images of prisoner abuse in Iraq were leaked to the public, the government responded by insisting that the abuse was confined to the transgressions of a handful of low-ranking "rogue" soldiers at Abu Ghraib. Since then, however, numerous documents leaked or otherwise released to the public establish beyond any doubt that such abuse was not aberrational, but widespread and systemic in Iraq, Afghanistan and Guantanamo Bay. Today, more than a year after the Abu Ghraib images came to light, questions about the extent of abuse by U.S. forces and high-level responsibility for that abuse still remain a subject of intense public debate. This case is about the public's right to obtain information relevant to this debate under the Freedom of Information Act ("FOIA"). More generally, this case is about the hallmark of our democracy: that no one is above the law. *See* ACLU v. Dep't of Defense, 339 F. Supp.2d 501, 502 (S.D.N.Y. 2004).

The present motion concerns photographs and videotapes of abuses at Abu Ghraib (the "Darby images") provided to the Army by Joseph Darby, a military policeman. The government initially objected to the release of these images on the grounds that such release would violate the privacy and Geneva Convention rights of the detainees depicted in the images. On June 1, 2005, the Court ordered that Defendants process and redact the responsive images so as to eliminate any identifying information.

Defendant Department of Defense ("Defendant") now seeks to withhold the Darby images on the grounds that they are so "horrendous" that their release will inflame the Muslim world, fuel the insurgency, and thereby endanger military and civilian personnel. *See* Def.'s Memo. of Law at 20. In support of its argument, Defendant relies on an expansive interpretation of FOIA's Exemption 7(F), 5 U.S.C. § 552(b)(7)(F), which is both unprecedented and fundamentally at odds with the underlying purpose of FOIA. Moreover, this interpretation of

Exemption 7(F) would eviscerate the principles of open government and accountability enshrined in FOIA.

Plaintiffs share Defendant's concern about the dangers facing American soldiers and others in Iraq and Afghanistan. In addition, Plaintiffs recognize that release of these images may produce a strong reaction at home and abroad. But the dangers that Defendants fear will result from the release of these images are of a wholly different kind, and far more attenuated, than those encompassed by Exemption 7(F). Indeed, as retired U.S. Army Colonel Michael Pheneger points out in his Declaration and as General Richard Myers implicitly acknowledges in his, the dangers facing American soldiers and others in Iraq and Afghanistan exist as a consequence of the war and are likely to persist regardless of the release of the Darby images. *See* Declaration of Michael E. Pheneger, dated Aug. 2, 2005 ("Pheneger Decl."), ¶¶ 5-9; Declaration of Richard B. Myers, dated July 21, 2005 ("Myers Decl."), ¶¶ 4-13. Moreover, as Congress recognized in enacting FOIA, there is a grave danger in shielding government misconduct from public scrutiny. Democracy requires an informed citizenry. The best way for the government to address the reaction it fears is not by hiding misconduct but by addressing it in a forthright and credible manner.

## ARGUMENT

The Freedom of Information Act was enacted to "ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption to hold the governors accountable to the governed." NLRB v. Robbins Tire & Rubber Co., 437 U.S. 214, 242 (1978); *see also* ACLU v. Dep't of Defense, 339 F. Supp. 2d at 504 ("Congress enacted FOIA to illuminate government activities" and "to provide a means of accountability, to allow Americans to know what their government is doing."). "It seeks to permit access to official information long shielded unnecessarily from public view and . . . to create a judicially enforceable public

right to secure such information from possibly unwilling official hands." <u>John Doe Agency v.</u> <u>John Doe Corp.</u>, 493 U.S. 146, 151-52 (1989) (internal quotation marks omitted). The Act's "most basic premise [is] a policy strongly favoring public disclosure of information in the possession of federal agencies." <u>Halpern v. FBI</u>, 181 F.3d 279, 286 (2d Cir. 1999).

Defendant seeks to withhold the Darby images on the basis of Exemption 7(F) of FOIA, which shields from disclosure "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . could reasonably be expected to endanger the life or physical safety of any individual." 5 U.S.C. § 552(b)(7)(F). Like all FOIA exemptions, this exemption must be "narrowly construed with doubts resolved in favor of disclosure." <u>Halpern</u>, 181 F.3d at 287 (internal quotation marks omitted); <i>see also</i> <u>John Doe Agency</u>, 493 U.S. at 152 (1989).

## I. THE INVOCATION OF EXEMPTION 7(F) TO SHIELD GOVERNMENT MISCONDUCT FROM PUBLIC SCRUTINY IS UNPRECEDENTED AND CONTRARY TO THE LEGISLATIVE HISTORY OF THIS PROVISION.

### a. <u>Exemption 7(F) applies only when release of documents would endanger individuals with a nexus to law enforcement interests.</u>

Defendant invokes Exemption 7(F) to withhold the Darby images on the grounds that their disclosure "will pose a clear and grave risk of inciting violence and riots against American and Coalition troops, U.S. personnel and civilians in Iraq and Afghanistan." Def. Mem. of Law at 20. But this Exemption only provides the basis for withholding records that would endanger individuals with a nexus to law enforcement interests. <i>See, e.g.</i>, <u>Carbe v. Bureau of Alcohol,</u> <u>Tobacco, and Firearms</u>, No. CIV.A.03-1658 (RMC), 2004 WL 2051359, at *7 (D.D.C. Aug. 12, 2004) (Exemption 7(F) "permits withholding names and identifying information of federal employees and third persons who may be unknown to the requester in connection with a particular law enforcement matter."); <u>Blanton v. United States Dep't of Justice</u>, 182 F. Supp. 2d

81, 86 (D.D.C. 2002) (Exemption 7(F) "has been interpreted to afford 'broad protection to the identities of individuals mentioned in law enforcement files.'") (citing Jimenez v. FBI, 938 F. Supp. 21, 30 (D.D.C. 1996)).

In recognition of this limitation, courts have permitted the government to rely on Exemption 7(F) in only three narrowly defined contexts. First, the government may rely on Exemption 7(F) where the release could endanger law enforcement agents. *See, e.g.*, Rugiero v. United States Dep't of Justice, 257 F.3d 534, 552 (6th Cir. 2001) (agency properly withheld "information about DEA agents"); Butler v. United States Dep't of Justice, 368 F. Supp. 2d 776, 786 (E.D. Mich. 2005) (allowing DEA to withhold documents "where disclosing the documents could endanger DEA agents and individuals who provided information to the DEA"); Blanton, 182 F. Supp. 2d at 87 ("disclosure of documents containing the identities of FBI agents and non-law enforcement persons assisting in the investigation could endanger their safety"); Garcia v. United States Dep't of Justice, 181 F. Supp. 2d 356, 378 (S.D.N.Y. 2002) ("evidence of [Plaintiff's] violent criminal history and propensity for retaliation is sufficient to support its invocation of Exemption 7(F)" with respect to "the names, signatures or other identifying information concerning FBI Special Agents who were responsible for conducting, supervising, and/or maintaining this investigation").

Second, courts have permitted reliance on Exemption 7(F) where the release of records could endanger witnesses or informants. *See, e.g.*, Brunetti v. FBI, 357 F. Supp. 2d 97, 108-09 (D.D.C. 2004) (allowing withholding of "names, identifying information and information provided by third parties during the course of the FBI investigation"); Shores v. FBI, 185 F. Supp. 2d 77, 85 (D.D.C. 2002) (upholding Exemption 7(F) as to the "names and/or identifying information concerning three cooperating witnesses as well as others who were interviewed

concerning Plaintiff"); <u>Foster v. United States Dep't of Justice</u>, 933 F. Supp. 687, 693 (E.D. Mich. 1996) ("an agency may justifiably withhold law enforcement reports when their release would endanger the life or physical safety of informants"); <u>Housley v. FBI</u>, No. CIV.A.87-2579, 1988 WL 30751, at *3 (D.D.C. Mar. 18, 1988) (finding invocation of Exemption 7(F) proper "to protect the identities of several informants who have helped secure Plaintiff's conviction of drug and weapons charges" where "Plaintiff has threatened to harm these individuals"); <u>Durham v. United States Dep't of Justice</u>, 829 F. Supp. 428, 434 (D.D.C. 1993) ("disclosure of the identity, or information enabling identification, of the individuals who assisted the government in its case against the Plaintiff could reasonably endanger their lives"); <u>Garcia</u>, 181 F. Supp. 2d at 378 (allowing agency to withhold identifying information of "private citizens and third parties who provided information to the FBI concerning the criminal activities of Plaintiff").

Third, courts have permitted the government to rely on Exemption 7(F) where the release of records could endanger inmates. *See, e.g.,* <u>Brady-Lunny v. Massey</u>, 185 F. Supp. 2d 928, 932 (C.D. Ill. 2002) (affirming withholding of inmate names in light of "inmates' gang ties, interest in escape, and motive for violence against informants and rivals").

Virtually all of the authorities cited by Defendant upholding the application of Exemption 7(F) rest on concern for the safety of individuals connected in some manner to law enforcement interests.[1] *See, e.g.,* <u>Garcia</u>, 181 F. Supp. 2d at 378 (S.D.N.Y. 2002) (FBI and non-FBI government agents and informants); <u>Shores</u> *v. FBI*, 185 F. Supp. 2d 77, 85 (D.D.C. 2002) (witnesses in criminal prosecution); <u>Sanders v. United States Dep't of Justice</u>, No. CIV.A.91-2263-0, 1992 WL 97785, at *5 (D. Kan. Apr. 21, 1992) (FBI informants); <u>Larouche v. Webster</u>,

---

[1] The holding in <u>Center for National Security Studies v. United States Dep't of Justice</u>, 331 F.3d 918, 920 (D.C. Cir. 2003), did not rest on Exemption 7(F). <u>Linn v. United States Dep't of Justice</u>, No. CIV.A.92-1406, 1995 WL 631847, at *9 (D.D.C. Aug. 22, 1995), denied Defendant summary judgment with respect to records withheld on the basis of Exemption 7(F).

No. 75-CIV-6010 (MJL), 1984 WL 1061, at *5 (S.D.N.Y Oct. 23, 1984) (law enforcement officers); Housley v. FBI, No. CIV.A.87-2579, 1988 WL 30751, at *3 (D.D.C. Mar. 18, 1998) (DEA agents and non-agent informants); Brady-Lunny v. Massey, 185 F. Supp. 2d 928, 932 (C.D. Ill. 2002) (prison inmates).

Defendant, however, does not claim that the individuals it seeks to encompass within 7(F) bear any connection to law enforcement interests, rather it relies on an anomalous district court case, Living Rivers v. United States Bureau of Reclamation, 272 F. Supp. 2d 1313 (D. Utah, 2003), to argue that Exemption 7(F) may be invoked to withhold information that "if released could place the public in danger." Def. Memo of Law at 18-19. As an initial matter, there are serious questions as to whether Living Rivers was correctly decided. Plaintiffs are aware of no other court that has held that Exemption 7(F) can be used in this way. Moreover, Living Rivers did not engage in an extended analysis of whether Exemption 7(F) can be applied in this manner. In any event, it can be readily distinguished because the potential harm envisaged from disclosure did not flow from adverse reaction to the underlying records, but from technical information in the records that itself could be used by terrorists to cause flood damage. Living Rivers, 272 F. Supp. 2d at 1321-22.

Defendant does not argue that the Darby images contain technical information that can be exploited in this way. Rather, it argues that the Darby images must be withheld because they are incendiary. Defendant does not cite to a single case in which a court has allowed records to be withheld under Exemption 7(F)—or, indeed, any other Exemption—on this basis. It would be particularly inappropriate to permit such a result here, where the records at issue on their face pertain to government misconduct.

**b.**   **Legislative history confirms that Exemption 7(F) only applies when release of documents would endanger individuals with a nexus to law enforcement interests.**

Congress amended Exemption 7(F) in the Freedom of Information Reform Act of 1986, as part of the Anti-Drug Abuse Act of 1986. *See* Pub. L. No. 99-570, §§ 1801-1804, 100 Stat. 3207 (codified as amended at 5 U.S.C. § 552 (2002)). Prior to its amendment in 1986, the Exemption protected from disclosure "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . *would* endanger the life or physical safety of *law enforcement personnel.*" 5 U.S.C. § 552(b)(7)(F) (1984) (emphasis added). In changing "law enforcement personnel" to "any individual," Congress was concerned about the safety of informants and other individuals connected to law enforcement whose identities could be revealed through disclosure of the underlying law enforcement records.

Indeed, the change from "law enforcement personnel" to "any individual" was expressly limited to just this purpose. *See* 132 Cong. Rec. H9455-05 (daily ed. Oct. 8, 1986) (statement of Rep. English) (recognizing that the 1986 amendments made "only modest changes to the FOIA"). The legislative history of this provision demonstrates an intention to expand the reach of Exemption 7(F) to witnesses and confidential informants connected to law enforcement interests. *See* 132 Cong. Rec. H9455-05 (daily ed. Oct. 8, 1986) (statement of Rep. English) ("Much of the impetus for adjustment of the [FOIA] provisions . . . comes from the concerns . . . that the act is exploited by organized crime figures attempting to learn whether they are the targets of investigative law enforcement activities, as well as the identities of informants. . . . The amendments to the [FOIA] . . . are designed to deal with these particularized law enforcement problems."); 132 Cong. Rec. S14252-01 (daily ed. Sept. 30, 1986) (statement of Sen. Denton) ("we need to rectify the chilling effect that FOIA requests have on informants who fear exposure

through information released under the act"); 132 Cong. Rec. S13965-02 (daily ed. Sept. 27, 1986) (statement of Sen. Leahy) ("The language of our amendment [number 3066] addresses the problem which was the concern of the original proposal, the use of FOIA by sophisticated criminal enterprises to learn about ongoing criminal investigations."); *id.* (statement of Sen. Hatch) (internal quotation marks omitted) (expressing concern that "[i]nformants are rapidly becoming an extinct species because of fear that their identities will be revealed in response to a FOIA request"); *id.* (noting reports that "the act has harmed the ability of law enforcement officers to enlist informants and carry out confidential investigations," and that "FOIA should be amended because it is used by lawbreakers 'to evade criminal investigation or retaliate against informants'"); *id.* ("FOIA contains an exemption that is supposed to protect informants, but even a quick look at that language reveals that the current protection is not sufficient."); *id.* (quoting letter from William H. Webster, Dir., F.B.I., to Sen. Dole) ("This provision would amend the Freedom of Information Act to offer needed protections for confidential undercover informants and investigations."); *Freedom of Information Act: Hearings on S. 587, S. 1235, S. 1247, S. 1730, and S. 1751 Before the Subcomm. on the Constitution of the Senate Comm. on the Judiciary*, 97th Cong. 1009-10 (1981) (statement of William H. Webster, Dir., FBI) (expressing concerns that informants and potential informants feared being exposed through FOIA disclosures); *Freedom of Information Act—Appendix: Hearings on S. 587, S. 1235, S. 1247, S. 1730, and S. 1751 Before the Subcomm. on the Constitution of the Senate Comm. on the Judiciary*, 97th Cong. 38 (1981) (statement of Sen. Hatch) ("The bill would replace the words 'law enforcement personnel' with the words 'any natural person,' thus extending Exemption 7(F) to include such persons as witnesses and potential witnesses whose personal safety is of central importance to the law enforcement process."); S. Rep. No. 98-221, at 2 (1983) ("A major aspect

of these hearings was the Committee's concern that the confidentiality of informants and sensitive law enforcement investigations is jeopardized by FOIA disclosures."); *id.* at 23 (expressing the concern that FOIA is being used to collect information piecemeal to compromise the confidentiality of investigative activities). [2] In contrast, there is absolutely no evidence in this history of any congressional intent to extend this exemption to protect the lives or safety of parties unrelated to law enforcement.

Defendant should not be permitted to avail itself of Exemption 7(F) to broadly invoke national security interests unrelated to law enforcement without adhering to established restrictions on withholding records on such grounds. In the context of Exemption 1, for example, there are strict constraints governing the withholding of records for national security reasons. *See* 5 U.S.C. § 552(b)(1) (providing for withholding of records "specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and . . . are in fact properly classified pursuant to such Executive Order"). Executive Order 13,292 imposes important safeguards to protect against the over-classification of materials. *See* Exec. Order No. 13,292, § 1.7(a), 68 Fed. Reg. 15,315, 15,318 (Mar. 25, 2003) (providing that "[i]n no case shall information be classified in order to . . . conceal violations of law, inefficiency, or administrative error [or to] prevent embarrassment to a person, organization or agency"). Defendant may not circumvent such constraints by invoking Exemption 7(F).

## II.    EVEN IF EXEMPTION 7(F) APPLIES TO THIS CASE, DEFENDANT HAS NOT SHOWN THAT DISCLOSURE OF THE DARBY IMAGES COULD

---

[2] Congress recognized that the text of the 1986 amendment was identical to the language proposed in section 10 of S. 774 during the 98th Congress, and that Senate Report 98-221, of the Senate Judiciary Committee explained the "meaning and intended effect" of the amendment. 132 Cong. Rec. S14270-01 (daily ed. Sept. 30, 1986) (statement of Sen. Leahy). Accordingly, the legislative histories of S. 774 from the 98th Congress and its predecessor, S. 1730 from the 97th Congress, are relevant to an understanding of the intended effects of the 1986 amendments to the FOIA.

**"REASONABLY BE EXPECTED TO ENDANGER THE LIFE OR PHYSICAL SAFETY OF ANY INDIVIDUAL."**

Plaintiffs certainly share Defendant's concern for the safety of military and civilian personnel in Iraq, Afghanistan and elsewhere. Defendant has not, however. met its burden of showing that disclosure of the Darby images could "reasonably be expected" to endanger these individuals. *See* 5 U.S.C. § 552(a)(4)(B) ("the burden is on the agency to sustain its action").

The causal chain between the disclosure of the Darby images and the resulting harm identified by Defendant is at best attenuated. As demonstrated above, the overwhelming majority of cases construing Exemption 7(F) rely on a direct link between the disclosure of records that identify an individual and harm to that individual. The only two cases that do not fit this pattern, Larouche and Living Rivers, involve the disclosure of technical information that also bears a direct causal relationship to the anticipated harm. *See* Larouche, 1984 WL 1061, at *8; Living Rivers, 272 F. Supp. 2d at 1321. For example, in Larouche, laboratory reports containing descriptions of a homemade machine gun were withheld by the government on the grounds that the information could be used to manufacture weapons to use against law enforcement officers. Larouche, 1984 WL 1061, at *8. Similarly, in Living Rivers, inundation maps were withheld by the government on the grounds that terrorists could use them directly to cause flood damage. *See* Living Rivers, 272 F. Supp. 2d at 1321-22. In contrast to those two cases, here there is at least one significant additional link in the causal chain because any harm would ensue from a reaction to the records at issue and not directly from the records themselves.

Defendant points to no evidence that the release of the Abu Ghraib abuse images in April of 2004—an event analogous to the release of the Darby images—endangered lives, focusing instead on "hostile commentary" ensuing from their release. *See* Schlicher Decl. ¶ 10; Def.'s Memo. of Law at 20. It mentions an Al Qaeda leader's after-the-fact "description" of a single

suicide bombing in Iraq that occurred three days after the release of photographs depicting detainee abuse by British soldiers. Myers Decl. ¶ 8(d). Defendant can cite to no link between the Al Qaeda leader and the suicide bomber that lends credence to the Al Qaeda leader's characterization of the attack as a "response to the harm inflicted by British occupation forces on our brothers in prison." *Id.* (internal quotation marks omitted).

As set forth in the Declaration of Michael Pheneger:

> [I]n asserting that this attack responded to a specific provocation (i.e. – the photos of British abuse of detainees) I believe General Myers mistakes propaganda for motivation. It is painfully clear those insurgents in Iraq and Afghanistan and terrorist organizations like Al-Qaeda will continue their effort in pursuit of their political and military objectives as long as they have the will and resources to do so. . . . Insurgents may publicly cite photos or alleged "provocations" to justify their actions, but that reflects propaganda, not cause and effect.

Pheneger Decl. ¶ 7.

Nor has Defendant shown that the April 30, 2005 *Newsweek* story relating to Koran abuse endangered lives. Indeed, General Myers himself acknowledged that violence had been wrongly attributed to the Newsweek story related to Koran abuse:

> It's the -- it's a judgment of our commander in Afghanistan, General Eikenberry, that in fact the violence that we saw in Jalalabad was not necessarily the result of the allegations about disrespect for the Koran -- and I'll get to that in just a minute -- but more tied up in the political process and the reconciliation process that President Karzai and his Cabinet is conducting in Afghanistan. So that's -- that was his judgment today in an after-action of that violence. He didn't -- he thought it was not at all tied to the article in the magazine.[3]

*See also* Pheneger Decl. ¶ 8 (noting that General Myers' admission "illustrates the fallacy of cause and effect relationships in this context"). On May 23, 2005, President Hamid Karzai of

---

[3] *See* Transcript of DOD News Briefing, May 12, 2005, *available at* http://www.dod.gov/transcripts/2005/tr20050512-secdef2761.html

Afghanistan confirmed that the "so called demonstrations" in Afghanistan "were, in reality, not related to the Newsweek story. They were more against the elections in Afghanistan; they were more against the progress in Afghanistan; they were more against the strategic partnership with the United States."[4]

Similarly, on or about May 18, 2005, the FBI released to Plaintiffs documents describing numerous allegations of Koran abuse, including the flushing of a Koran down the toilet, at Guantanamo Bay. Defendant has not asserted that the release of these documents endangered lives, even though they were made publicly available.

Defendant's affidavits demonstrate that insurgents have at their disposal the means to fabricate inflammatory material—including false images of abuse—to further their cause. *See* Myers Decl. ¶ 8; Schlicher Decl. ¶ 13(C)(4). Such material can be generated for propaganda and violence in whatever quantities the insurgents see fit regardless of whether the Darby photographs are released.

| Redacted |
| --- |

These generalizations, which are highly suspect, further exemplify the attenuated nature of Defendant's arguments. Furthermore, Defendant's asserted concern for Muslim sensibilities is difficult to reconcile with its calculated development and use of interrogation methods to exploit those very sensibilities.[5]

---

[4] Transcript of White House Press Conference, May 23, 2005, *available at* http://www.whitehouse.gov/news/releases/2005/05/20050523.html.

[5] *See* Memorandum from William J. Haynes II, General Counsel, to Donald Rumsfeld, Secretary of Defense (Nov. 27, 2002) (Rumsfeld Order) (a request, signed by Secretary Rumsfeld on December 2, 2002, authorizing "the removal of all comfort items (including religious items)" and the use of "detainees [sic] individual phobias (such as fear of dogs) to induce stress"), *available at* http://www.washingtonpost.com/wp-srv/nation/documents/dodmemos.pdf; Memorandum from Ricardo S. Sanchez, Lieutenant General, to Commander, U.S. Central Command (Sept. 14, 2003) (Sanchez Sept. Order) (order authorizing the presence of military working dogs to "[e]xploit[] Arab fear of dogs"), *available at* http://www.aclu.org/Files/getFile.cfm?id=17850.

III. **PERMITTING THE GOVERNMENT TO WITHOLD EVIDENCE OF ITS OWN MISCONDUCT ON GROUNDS OF ADVERSE REACTION WOULD EVISCERATE THE PRINCIPLES OF DEMOCRACY AND GOVERNMENT ACCOUNTABILITY ENSHRINED IN THE FREEDOM OF INFORMATION ACT.**

As debate continues over the extent of prisoner abuse and the appropriateness of Defendant's use of aggressive interrogation techniques, the Darby photos assume a critical significance. Defendant DOD, however, seeks to withhold these images on the grounds of averting adverse reaction. This reasoning sweeps too broadly and taken to its logical conclusion would preclude the disclosure of all records responsive to Plaintiffs' FOIA requests while insulating the government entirely from the oversight mechanisms provided in FOIA.

As this Court has aptly recognized, photographs are the "best evidence that the public could have as to what occurred at a particular time, better than testimony, which can be self-serving, better than summaries, which can be misleading, and better even than a full description no matter how complete that description might be."[6] The Darby images make visible the scope and severity of the abuse which occurred at Abu Ghraib. In addition, they enable the public to enter into the debate about the appropriateness of the different interrogation tactics that our government is using in waging the war on terror.

For example, photographs of detainee abuse at Abu Ghraib already leaked to the public show detainees wearing women's underwear on their heads, naked detainees standing before female soldiers, and in perhaps the most famous photograph, Pfc. Lyndie England holding a leash attached to a detainee's neck.[7] Although Defendant decries these images as the work of rogue officers, a recently released report into FBI allegations of detainee abuse at Guantanamo identifies many of these same interrogation methods as having been specifically authorized as "Ego Down" and/or "Futility" techniques.[8] The Abu Ghraib photographs convey a fuller sense

---

[6] Transcript of proceedings in *ACLU v. United States Dep't of Defense*, 04-Civ-4151, May 26, 2005 at 14.

[7] Josh White, *Abu Ghraib Tactics Were First Used at Guantanamo*, Wash. Post, Jul. 14, 2005.

[8] *See* LTG Randall M. Schmidt & BG John T. Furlow, *Investigation into FBI Allegations of Detainee Abuse at Guantanamo Bay, Cuba Detention Facility*, AR 15-6 Report, June 9, 2005, at 19-20 (Schmidt-Furlow Report) (reporting that a Guantanamo detainee subjected to "Pride and Ego Down" and "Futility" interrogation techniques

of the abuse entailed in these techniques than the orders of Secretary Rumsfeld and LTG Sanchez also authorizing such methods.[9] Similarly, other released Abu Ghraib photos show detainees cowering before dogs.[10] The use of dogs to terrorize detainees is another interrogation technique that has been specifically authorized in both Iraq and Guantanamo. These photographic images are far more effective at conveying the effect of such a technique than any written description.[11]

Moreover, Defendants' argument for withholding these photographs sweeps so broadly that it would eviscerate the very purpose for which FOIA was enacted. As this Court has recognized, FOIA provides a "means of accountability, to allow Americans to know what their government is doing." *See* <u>ACLU v. United States Dep't of Defense</u>, 339 F. Supp. 2d at 504. "Full agency disclosure under this 'sunshine law' has as its premise the Founders' view that 'the people are the only legitimate fountain of power and it is from them that the constitutional charter, under which the several branches of government hold their power, is derived.'" <u>A. Michael's Piano, Inc. v. Fed. Trade Comm'n</u>, 18 F.3d 138, 140 (2d Cir. 1994) (quoting The Federalist No. 49, at 313-14 (James Madison) (Clinton Rossiter ed., 1961)).

In an argument that subverts the principles of public accountability embodied in FOIA, Defendant Department of Defense seeks to withhold evidence of its own misconduct to avert

---

"was forced to wear a woman's bra and had a thong placed on his head," led around the room on a leash, forced to perform a series of dog tricks, and forced to stand naked before females), *available at* http://www.defenselink.mil/news/Jul2005/d20050714report.pdf.

[9] *Compare* Rumsfeld Order (Guantanamo); Sanchez Sept. Order; Memorandum from Ricardo S. Sanchez, Lieutenant General, to Combined Joint Task Force Seven (Oct. 12, 2003) (Sanchez Oct. Order) (orders describing "Pride and Ego Down" as "[a]ttacking or insulting the ego of a detainee" and "Futility" as "[i]nvoking the feeling of futility of a detainee"), *available at* http://www.aclu.org/Files/getFile.cfm?id=17848, *with* Photographs of Abu Ghraib Detainee Abuse (depicting Lyndie England with a detainee, naked detainees and a detainee wearing women's underwear), *available at* http://www.antiwar.com/news/?articleid=2444.

[10] *See* R. Jeffrey Smith, *General Is Said to Have Urged Use of Dogs*, Wash. Post, May 26, 2004 (noting that "[a]t least four photographs obtained by The Washington Post—each apparently taken in late October or November—show fearful prisoners near unmuzzled dogs").

[11] *Compare* Rumsfeld Order (authorizing use of "detainees [sic] individual phobias (such as fear of dogs) to induce stress"), *and* Sanchez Sept. Order (authorizing presence of military working dogs to "[e]xploit[] Arab fear of dogs"), *with* Photographs of Abu Ghraib Detainee Abuse (depicting detainees cowering before dogs), *available at* http://www.antiwar.com/news/?articleid=2444.

adverse reaction. Defendant's argument, taken to its logical conclusion, would preclude the disclosure of *all* responsive records exposing government misconduct on the ground that the release of such information would feed the enemy. Under this argument, the worse the atrocity committed by the United States government, the greater the protection from disclosure afforded to records of these atrocities under FOIA. Plainly, this argument must be rejected.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court grant Plaintiffs' Cross Motion for Partial Summary Judgment, and order Defendant Department of Defense to release the Darby images of abuse.

Respectfully submitted,

_____/LSL/_____
Lawrence S. Lustberg (LL-1644)
Megan Lewis (ML-3429)
GIBBONS, DEL DEO, DOLAN
GRIFFINGER & VECCHIONE, P.C.
One Riverfront Plaza
Newark, New Jersey 07102
(973) 596-4500

Jameel Jaffer (JJ-4653)
Amrit Singh (AS-9916)
Judy Rabinovitz (JR-1214)
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
125 Broad St.
New York, New York 10004

Barbara Olshansky (BO-3635)
Michael Ratner (MR-3347)
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, New York 10012

Beth Haroules (BH-5797)
Arthur Eisenberg (AE-2012)
NEW YORK CIVIL LIBERTIES
UNION FOUNDATION
125 Broad Street
New York, NY 10004

Dated: August 3, 2005          *Attorneys for Plaintiffs*