UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------ x
AMERICAN CIVIL LIBERTIES UNION,
CENTER FOR CONSTITUTIONAL RIGHTS,
PHYSICIANS FOR HUMAN RIGHTS,                  ECF CASE
VETERANS FOR COMMON SENSE AND
VETERANS FOR PEACE,

               Plaintiffs,

                                            04 Civ. 4151 (AKH)

             v.

DEPARTMENT OF DEFENSE, AND ITS
COMPONENTS DEPARTMENT OF ARMY,
DEPARTMENT OF NAVY, DEPARTMENT OF
AIR FORCE, DEFENSE INTELLIGENCE
AGENCY; DEPARTMENT OF HOMELAND
SECURITY; DEPARTMENT OF JUSTICE,
AND ITS COMPONENTS CIVIL RIGHTS
DIVISION, CRIMINAL DIVISION, OFFICE OF
INFORMATION AND PRIVACY, OFFICE OF
INTELLIGENCE POLICY AND REVIEW,
FEDERAL BUREAU OF INVESTIGATION;
DEPARTMENT OF STATE; AND CENTRAL
INTELLIGENCE AGENCY,

               Defendants.
------------------------------------------------------------ x

**DEFENDANTS' SUPPLEMENTAL REPLY MEMORANDUM OF LAW IN FURTHER
SUPPORT OF DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

DAVID N. KELLEY
United States Attorney for the
Southern District of New York
Attorney for Defendants
86 Chambers Street, 3rd Floor
New York, New York 10007
Tel: (212) 637-2737
Fax: (212) 637-2750

SEAN H. LANE (SL-4898)
PETER M. SKINNER (PS-9745)
HEATHER K. McSHAIN (HM-5883)
    – Of Counsel –

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................. 1

ARGUMENT - THE DARBY IMAGES ARE PROPERLY WITHHELD
UNDER EXEMPTION 7(F) BECAUSE THEIR RELEASE COULD
REASONABLY BE EXPECTED TO ENDANGER THE LIVES AND
PHYSICAL SAFETY OF MILITARY PERSONNEL AND CIVILIANS ................... 3

    A.    The Government Has Established That Release of These Images
        "Could Reasonably Be Expected to Endanger the Life or Physical Safety
        of Any Individual" ............................................ 3

    B.    The Plain and Unambiguous Language of Exemption 7(F) Protects
        "Any Individual" Whose Life or Physical Safety Might Be Endangered from
        the Release of Records Compiled for Law Enforcement Purposes ............ 8

        1.    Because the Phrase "Any Individual" in FOIA
            Exemption 7(F) is Plain and Unambiguous,
            This Court Should Not Look to Legislative History ................. 8

        2.    Plaintiffs' Interpretation of Exemption 7(F) Is at Odds
            with the Case Law ......................................... 11

CONCLUSION ............................................................. 14

# PRELIMINARY STATEMENT

Defendant the Department of Defense ("DOD" or the "Government") respectfully submits this memorandum in response to Plaintiffs' Opposition to Defendants' Supplemental Memorandum of Law and in Support of Plaintiffs' Motion for Partial Summary Judgment, dated August 3, 2005, as well as the Brief of Amici Curiae, dated August 3, 2005.

The Government's moving brief and supporting declarations established that release of the Darby images could reasonably be expected to endanger the lives and physical safety of United States and Coalition military personnel and civilians in Iraq, Afghanistan and elsewhere.[1] Notwithstanding the detailed declarations provided by General Myers, the Chairman of the Joint Chiefs of Staff, and Ronald Schlicher, the recent Deputy Assistant Secretary of State and Coordinator for Iraq, Plaintiffs dispute the likelihood that violence will erupt if these images are released. Relying upon a declaration from Michael Pheneger, an officer of the ACLU who last served in the United States Army more than a decade ago, Plaintiffs contend that "the dangers that Defendants fear will result from the release of these images" are too "attenuated." Pls.' Opp. Br. at 2. However, nothing in Mr. Pheneger's declaration provides any basis to discount, let alone challenge, the military and political assessment of the Government's two senior and highly qualified declarants.

The gravamen of Mr. Pheneger's declaration is his conclusion that violence and insurgent attacks will continue in Iraq and Afghanistan regardless of whether the Darby images are released. According to Mr. Pheneger, this Court therefore should order the release of these images because the "long term benefits of openness and freedom of information outweigh the

---

[1] The abbreviations used in this reply memorandum conform to those used in the Government's Memorandum of Law, dated July 22, 2005.

short-term costs that dissemination of [such] information may impose." Declaration of Michael Pheneger, dated Aug. 2, 2005 ("Pheneger Decl.") ¶ 9. Mr. Pheneger's logic and conclusion is flawed for three reasons. First, Mr. Pheneger's opinion should be given little weight because he has not provided an adequate basis for his opinions. Second, Mr. Pheneger improperly seeks to impose a balancing test upon a statute that does not require one. Third, Mr. Pheneger's reasoning improperly eviscerates the protections of Exemption 7(F) based upon the possibility of violence stemming from other causes. Nothing in the statute contemplates such an interpretation. Indeed, his interpretation ignores the plain language of the statute, which requires a showing only that release of records gathered for law enforcement purposes could reasonably be expected to endanger the life or physical safety of any individual.

Continuing to ignore the plain language of the statute, Plaintiffs argue in the alternative that statements contained in the legislative history demonstrate that the term "any individual" as found in Exemption 7(F) should be interpreted by this Court to mean "any individual with a nexus to law enforcement interests." This argument is contrary to settled principles of statutory interpretation. The Court need not, and should not, look to legislative history in this case because the language of Exemption 7(F) is clear and unambiguous – there can be no debate as to the meaning of "any individual." Moreover, courts have previously applied Exemption 7(F) to protect individuals that did not have a so-called "nexus to law enforcement interests." Accordingly, this Court should reject Plaintiffs' invitation to legislate, and uphold the Government's invocation of Exemption 7(F) to protect the military personnel and civilians in Iraq, Afghanistan and elsewhere who will be at risk if the Darby images and videos are released.

2

## ARGUMENT

## THE DARBY IMAGES ARE PROPERLY WITHHELD UNDER EXEMPTION 7(F) BECAUSE THEIR RELEASE COULD REASONABLY BE EXPECTED TO ENDANGER THE LIVES AND PHYSICAL SAFETY OF MILITARY PERSONNEL AND CIVILIANS

### A. The Government Has Established That Release of These Images "Could Reasonably Be Expected to Endanger the Life or Physical Safety of Any Individual"

Plaintiffs argue that the Government has not demonstrated that the Darby images satisfy the requirements of Exemption 7(F). Pls.' Opp. Br. at 10-12. In support of this argument, Plaintiffs rely upon the declaration of Michael Pheneger, who disagrees with the conclusions of the Chairman of the Joint Chiefs of Staff and the recent State Department Deputy Assistant Secretary and Coordinator for Iraq regarding the likelihood of violence if these images are publicly released. Plaintiffs' reliance on Mr. Pheneger is highly problematic for several reasons.

As a threshold matter, Mr. Pheneger's declaration fails to establish that he has an adequate basis for his opinions regarding the current security situation in Iraq and Afghanistan. See Fed. R. Evid. 702 (permitting the use of opinion testimony where a witness is qualified as an expert by "knowledge, skill, experience, training, or education" on the subject matter of his testimony). Mr. Pheneger is a former Colonel in the United States Army who last served in the military more than a decade ago and whose military service does not appear to include any service or expertise in Iraq or Afghanistan. Pheneger Decl. ¶¶ 1, 2. Mr. Pheneger admittedly does not have current access to classified information and it appears likely that he has not had such access for some time. Id. ¶ 2. Rather, his opinions are based upon nothing more than a variety of "published sources." Id. With all due respect to Mr. Pheneger's past military service, there is nothing in his declaration that provides a basis for his claim that he possesses sufficient

3

expertise to address the risks inherent in release of these images based upon the current military and political climate in Iraq, Afghanistan and elsewhere in the Middle East. See In re Agent Orange Prod. Liab. Litig., 818 F.2d 187, 193 (2d Cir. 1987) (courts accord little weight to unsubstantiated opinion of an expert).

Indeed, several specific statements in Mr. Pheneger's declaration demonstrate the limits of his knowledge on the relevant issues. For example, Mr. Pheneger states that he has seen no convincing evidence that publication of images in 2004 caused loss of life. See Pheneger Decl. ¶ 9. Although Mr. Pheneger may be unaware of it, such violence did occur. 

Similarly, Mr. Pheneger mistakenly seizes upon a statement by General Myers at a news briefing the day immediately following demonstrations in Afghanistan as support for Plaintiffs' position that no causal connection can be made between the Newsweek report of Koran abuse and the violence in Afghanistan. See Pheneger Decl. ¶ 8; Pls.' Opp. Br. at 11. This news briefing was held to address the closing of military bases across the United States. Second Declaration of Richard B. Myers, dated August 10, 2005, ¶ 6 ("Second Myers Decl."). At the end of the news briefing, General Myers responded to a question about whether the previous day's violence in Afghanistan was caused by the Newsweek article, and he relayed to the press the initial impressions of another U.S. Army officer on that subject. Id. ¶ 6. Given that he "had seen no evolved intelligence analysis at that time, [General Myers] was deliberately cautious in

4

[his] remarks" and thus unwilling to make such a connection. Id.² After subsequent intelligence analysis of the situation, however, General Meyers and DOD came to conclude that such a connection did exist, not only for Afghanistan but also for Iraq and other areas of the Middle East. Id. ¶ 6; Myers Decl. ¶ 16. Notably, the State Department came to exactly the same conclusion. Schlicher Decl. ¶ 12.³

---

² The full text of the news briefing provides the appropriate context for understanding General Myers' comments on May 12, 2005:

> Q. Do either one of you have anything about the demonstrations in Afghanistan, which were apparently sparked by reports that there was a lack of respect by some interrogators at Guantanamo for the Koran. Do either one of you have anything to say about that?
>
> GEN. MYERS: It's the -- it's a judgment of our commander in Afghanistan, General Eikenberry, that in fact the violence we saw in Jalalabad was not necessarily the result of allegations about disrespect for the Koran -- and I'll get to that in just a minute -- but was more tied up in the political process and the reconciliation processes that President Karzai and his Cabinet is conducting in Afghanistan. So that's -- that was the judgment today in an after-action of that violence. He didn't -- he thought it was not at all tied to the article in the magazine.

Second Myers Decl., ¶ 6, Enclosure 1, Page 10 of 11 (emphasis added).

³ Ronald Schlicher states his conclusion on this issue in very specific terms:

> [The Newsweek report] resulted in anti-U.S. demonstrations in Muslim communities throughout the Middle East and South Asia. There were strong anti-American demonstrations in the West Bank and Gaza as well as Egypt. Similar demonstrations were reported to have taken place in Afghanistan, Sudan, Bangladesh, Pakistan, and Indonesia. In particular, protests in Afghanistan resulted in significant violence and the deaths of several demonstrators. As a precautionary measure, the United Nations relocated its entire foreign staff from Jalalabad, Afghanistan where two of its guesthouses were attacked. In addition, Afghani government buildings were targeted as well as the offices of two international aid groups. Reports attribute approximately 17 deaths to the public reaction to the Koran story.

Putting aside the limits on his knowledge of the relevant issues, Mr. Pheneger does not dispute certain fundamental facts relevant to this motion. For example, he admits that "[i]nsurgents may publicly cite photos or alleged 'provocations' to justify their actions." Pheneger Decl. ¶ 7. Similarly, Mr. Pheneger does "not underestimate the propaganda impact of the release of additional photos . . . ." Id.

Rather than dispute the violent impact that release of the images will have, Mr. Pheneger seeks to recast the issue based upon his own value judgments. Mr. Pheneger's notes that "[t]he [insurgent] attacks will continue regardless of whether the photos and tapes are released." Pheneger Decl. ¶ 7. From this fact, he concludes that these images should be released because the "long-term benefits of openness and freedom of information outweigh the short-term costs that the dissemination of [such] information may impose." Id. ¶ 9. Mr. Pheneger's logic is flawed. The weighing of such competing societal interests is not appropriate because Exemption 7(F) "does not require a balancing test" between the public interest in disclosure and the reasons for withholding the information from release. Shores v. F.B.I., 185 F. Supp. 2d 77, 85 (D.D.C. 2002) (emphasis in original); compare Shores, 185 F. Supp. 2d at 85 with United States Dep't of Defense v. F.L.R.A., 510 U.S. 487, 495 (1994) (inquiry of whether disclosure of the record would constitute a clearly unwarranted invasion of personal privacy under Exemption 6 requires a balancing of the public's interest in disclosure against the interest in privacy that would be furthered by non-disclosure) (citation omitted).

Mr. Pheneger's argument also improperly eviscerates the protections of Exemption 7(F). He appears to argue that information may be released despite a determination that it may

---

Schlicher Decl. ¶ 12.

endanger the life or physical safety of individuals so long as there is a possibility of violence to those same individuals from other causes. However, the relevant issue is not whether the insurgents will continue their violent campaign to halt to the democratization of Iraq and Afghanistan, but rather whether release of the Darby images could reasonably be expected to endanger the life or physical safety of any individual. Indeed, there is no support for Mr. Pheneger's position in the statute or case law. In LaRouche v. Webster, 75 Civ. 6010 (MJL), 1984 WL 1061, at *8 (S.D.N.Y. Oct. 23, 1984), the court held that Exemption 7(F) was properly invoked to bar disclosure of an FBI laboratory report containing a description of a home-made machine gun. In holding that Exemption 7(F) exempted the lab report from disclosure under FOIA, the court explained:

> Special Agent Binney said in his second affidavit that this exemption was applied to an FBI laboratory report containing a description of a home-made machine gun. This Court finds persuasive his statement that "[t]hose persons who are charged with law enforcement face the possibility of confronting armed individuals everyday; however, they should not have added to that threat the real possibility of facing individuals armed with home-made devices constructed from the expertise of other law enforcement people." This exemption is thus found properly asserted.

Id. at *8 (citation omitted). Using Mr. Pheneger's flawed reasoning, the court in LaRouche would have released the records because law enforcement personnel no doubt would confront "armed individuals" regardless of whether the records at issue were released. The LaRouche court instead recognized that, even though law enforcement personnel face violence from other sources, they should not have to endure an added risk of violence due to the release of information under FOIA. Similarly, the controlling issue here is whether the Government has established that release of the Darby images could reasonably be expected to endanger the lives

7

and physical safety of military personnel, civilians [Redacted] in Iraq and Afghanistan, regardless of whether these individuals might face the threat of violence for other reasons. See Myers Decl. ¶ 25 [Redacted].

Mr. Pheneger also blithely concludes that official release of such images is irrelevant because, in his opinion, "it will be clear to everyone that the [G]overnment went to considerable effort to prevent it." Pheneger Decl. ¶ 11. Mr. Pheneger provides no basis for this conclusion, which is directly at odds with the opinions offered by General Myers and recent Deputy Assistant Secretary Schlicher. [Redacted]



In sum, the declaration of Mr. Pheneger should be given little weight by this Court because he has not provided a basis for his conclusions and because his reasoning is flawed and inconsistent with the plain language of Exemption 7(F).

**B. The Plain and Unambiguous Language of Exemption 7(F) Protects "Any Individual" Whose Life or Physical Safety Might Be Endangered from the Release of Records Compiled for Law Enforcement Purposes**

**1. Because the Phrase "Any Individual" in FOIA Exemption 7(F) is Plain and Unambiguous, This Court Should Not Look to Legislative History**

In their opposition, Plaintiffs rely heavily on the legislative history of Exemption 7(F) in support of their position that Congress intended the term "any individual" in Exemption 7(F) to actually mean "any individual with a nexus to law enforcement interests." Pls.' Opp. Br. at 7.

This argument violates settled principles of statutory interpretation because the Court should not look to legislative history where, as here, the statutory language is clear and unambiguous.

The Supreme Court has made clear that the interpretation of a statute begins with the statutory language itself. T.V.A. v. Hill, 437 U.S. 153, 184 n.29 (1978). "When confronted with a statute which is plain and unambiguous on its face, [judges] ordinarily do not look to legislative history as a guide to its meaning." Id. Indeed, "[t]he preeminent canon of statutory interpretation requires [courts] to 'presume that [the] legislature says in a statute what it means and means in a statute what it says there.'" BedRoc Ltd., LLC v. United States, 541 U.S. 176, 183 (2004) (quoting Connecticut Nat'l Bank v. Germain, 503 U.S. 249, 253-54 (1992)). "Thus, [an] inquiry begins with the statutory text, and ends there as well if the text is unambiguous." Id.

Only "[w]hen the plain language and canons of statutory interpretation fail to resolve statutory ambiguity [will courts] resort to legislative history." United States v. Dauray, 215 F.3d 257, 264 (2d Cir. 2000). Courts "should prefer the plain meaning since that approach respects the words of Congress. In this manner [courts] avoid the pitfalls that plague too quick a turn to the more controversial realm of legislative history." Lamie v. United States Trustee, 540 U.S. 526, 536 (2004). See also Ratzlaf v. United States, 510 U.S. 135, 147-48 (1994) (courts should "not resort to legislative history to cloud a statutory text that is clear"); Davis v. Michigan Dep't of Treasury, 489 U.S. 803, 808 n.3 (1989) ("Legislative history is irrelevant to the interpretation of an unambiguous statute").

Here, Exemption 7(F) provides that records or information compiled for law enforcement purposes may be exempted from disclosure under FOIA "to the extent that production of such law enforcement records or information . . . could reasonably be expected to endanger the life or

9

physical safety of any individual." 5 U.S.C. § 552(b)(7)(F) (emphasis added).[4] Thus, Exemption 7(F) is clear and unambiguous – there can be no debate that it covers anyone, regardless of his or her relationship to law enforcement. See Dauray, 215 F.3d at 260 (determining that where Congress had not defined the terms at issue, the court would "consider the ordinary, common-sense meaning of the words"); Harris v. Sullivan, 968 F.2d 263, 265 (2d Cir. 1992) (same).

Notwithstanding the plain and unambiguous language of Exemption 7(F), Plaintiffs would have this Court add qualifying language to the phrase "any individual" to transform the statute to permit withholding only where there is a threat to "any individual with a nexus to law enforcement interests." Pls.' Opp. Br. at 7. Such a limitation is absent from the statute. 5 U.S.C. § 552(b)(7)(F) (preventing release to protect "any individual"). Given the plain and unambiguous language of the statute, this Court should reject Plaintiffs' invitation to legislate: "[I]f courts were free to 'correct' what they believe to be congressional oversights by construing unambiguous statutes to the contrary of their plain meaning . . . even a good faith attempt to further Congress's goals would open the way to judicial hijacking of the power to legislate." Consolidated Rail Corp. v. United States, 896 F.2d 574, 579 (D.C. Cir. 1990); see also Lamie, 540 U.S. at 534 (an "awkward" or "even ungrammatical" statute is not so ambiguous as to require analysis of legislative history). To the extent that Plaintiffs complain that the plain language of the statute may extend beyond the specific goals identified in the legislative history,

---

[4] Plaintiffs have not disputed that these records were compiled for law enforcement purposes. See Third McGuire Decl. ¶8. Plaintiffs also have not challenged the Government's contention that redaction would not mitigate the harms caused by release of these images. See Defs.' Br. at 26-27.

10

Plaintiffs' complaint is misplaced: legislation "often [goes] beyond the principal evil [at which the statute was aimed] to cover reasonably comparable evils, and it is ultimately the provisions of our laws rather than the principal concerns of our legislators by which [courts] are governed." Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75, 79 (1998).

The plain meaning of "any individual" includes United States and Coalition troops, U.S. personnel and civilians in Iraq and Afghanistan, see Myers Decl. ¶ 25, [Redacted] [Redacted]. Accordingly, the Court should affirm the Government's invocation of Exemption 7(F) based upon the plain meaning of the statute. See American Tobacco Co. v. Patterson, 456 U.S. 63, 68 (1982) (federal courts must assume that the legislative purpose is expressed by the ordinary meaning of the words used in the statute and, in the absence of clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive) (citations omitted); United States v. Fisher, 2 Cranch 358, 399 (1805) ("Where a law is plain and unambiguous, whether it be expressed in general or limited terms, the legislature should be intended to mean what they have plainly expressed, and consequently no room is left for construction.").

### 2. Plaintiffs' Interpretation of Exemption 7(F) Is at Odds with the Case Law

In support of their claim that Exemption 7(F) only covers individuals with a nexus to law enforcement interests, Plaintiffs claim that Exemption 7(F) case law covers only three narrowly defined contexts, namely where release "could endanger law enforcement agents . . . witnesses or informants . . . [or] inmates." Pls.' Opp. Br. at 4-5. Plaintiffs contend these three contexts constitute the outer boundaries of courts' applications of 7(F).

11

However, Plaintiffs' attempt to limit the scope of Exemption 7(F) is inconsistent with the case law. For example, the court in Living Rivers, Inc. v. U.S. Bureau of Reclamation, 272 F. Supp. 2d 1313, 1321-22 (D. Utah 2003), upheld the Government's invocation of 7(F) to protect unspecified individuals who could be hurt by breaches of the Hoover and Glen Canyon Dams. Similarly, the court in Brady-Lunny v. Massey, 185 F. Supp. 2d 928, 932 (C.D. Ill. 2002), concluded that Exemption 7(F) permits the withholding from newspapers of names of all inmates housed at a county jail, not just those identified as informants or sources, "given inmates' gang ties, interest in escape, and motive for violence against informants and rivals."

Despite Plaintiffs' assertion that Sanders v. Dep't of Justice, Civ. A. No. 91-2263-0, 1992 WL 97785, at *5 (D. Kan. April 21, 1992), fits nicely into their "nexus to law enforcement" argument, see Pls.' Opp. Br. at 5, the court in Sanders actually relied upon Exemption 7(F) to prevent the release of not only the "identity of a custodian of records at a medical facility who furnished the [plaintiff's mental health records] . . . to the FBI" but also to protect the "identities of medical personnel who prepared the mental health records of the plaintiff." The medical personnel who treated the plaintiff in Sanders had no nexus to law enforcement interests, id. at *5, but the court nonetheless affirmed the withholding of the records under Exemption 7(F) due to the risk that disclosure posed to those individuals.

Thus, Plaintiffs' claim that the Government's invocation of 7(F) to protect military troops and civilians in Iraq and Afghanistan is "unprecedented," Pls.' Opp. Br. at 1, 3, is incorrect. While no court has confronted the exact facts of this case, the prior precedent and the plain language of Exemption 7(F) support the Government's invocation of 7(F) to protect the safety of troops, civilians [Redacted]. Myers Decl. ¶ 25; Schlicher Decl. ¶ [Redacted]

12

[Redacted] 15.[5]

Finally, Plaintiffs and Amici Curiae contend that the Government's invocation of Exemption 7(F) should be rejected because "it would fast become an exception that entirely swallows the rule." Amici Curiae Br. at 3; see Pls.' Opp. Br. at 13-15. This argument, however, is unsupported by the record and irrelevant to the straight forward statutory inquiry before this Court.

To date, DOD has processed more than 100,000 pages of documents in response to Plaintiffs' FOIA requests. Notwithstanding the high volume of documents processed in this litigation, this is the first instance where DOD has invoked Exemption 7(F) to withhold a record. The Government's invocation of Exemption 7(F) covers less than 100 records, which is a mere fraction of one percent of the documents processed in this case. The Government has invoked Exemption 7(F) only in the most limited of circumstances, based upon a real and substantiated concern about violence against members of the United States military as well as civilians in Iraq,

---

[5] Amici Curiae assert that "[o]nly two district court cases use Exemption 7(F) to protect anything other than information about named individuals, and in those instances it was for technical information that courts found could have been directly utilized to commit crime or terrorism." Amici Curiae Br. at 9. However, this argument suffers from the same defect as Plaintiffs' effort to limit Exemption 7(F) to protect only individuals with a nexus to law enforcement: the limitation has no basis in the statute. Indeed, the plain language of Exemption 7(F) covers any "information or records compiled for law enforcement . . . " and, therefore, is not limited to technical information that could be used to support a crime or terrorism. See 5 U.S.C. § 552(b)(7)(F). Moreover, Amici Curiae fail to appreciate that the Iraqi insurgency and other groups will seize upon these images as grist for their propaganda mill, which will result in violent attacks, increased terrorist recruitment, continued financial support, and exacerbation of tensions between the Iraqi and Afghani population and U.S. and Coalition Forces. Myers Decl. ¶ 25. Much like the plans for the Hoover and Glen Canyon Dams, these records when placed in terrorist hands "could reasonably place at risk the life or physical safety" of the public, including members of the American military and civilians in Iraq and Afghanistan. See Living Rivers, Inc., 272 F. Supp. 2d at 1321; see also Myers Decl. ¶¶ 2, 8, 25; Schlicher Decl. ¶¶ 15-16.

Afghanistan and elsewhere.

In any event, Plaintiffs' complaint about the breadth of Exemption 7(F) should be addressed to Congress, not this Court. Rather, this Court should interpret Exemption 7(F) as written, and leave to Congress whether the scope of the protection afforded by the exemption is appropriate.

## CONCLUSION


Redacted

DATED:   New York, New York
         August 10, 2005

                              Respectfully submitted,

                              DAVID N. KELLEY
                              United States Attorney for the
                              Southern District of New York
                              Attorney for Defendants

By:   /s/ Sean H. Lane
      SEAN H. LANE (SL-4898)
      PETER M. SKINNER (PS-9745)
      HEATHER K. McSHAIN (HM-5883)
      Assistant United States Attorneys
      86 Chambers Street, 3rd Floor
      New York, New York 10007
      (212) 637-2737