UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
AMERICAN CIVIL LIBERTIES UNION, et al.,  :
  :    **OPINION AND ORDER**
              Plaintiffs,  :    **GRANTING IN PART AND**
  :    **DENYING IN PART MOTIONS**
    -against-  :    **FOR PARTIAL SUMMARY**
  :    **JUDGMENT**
DEPARTMENT OF DEFENSE, et al.,  :
  :    04 Civ. 4151 (AKH)
              Defendants.  :
-----------------------------------------------------------------x

ALVIN K. HELLERSTEIN, U.S.D.J.:

        The American Civil Liberties Union and other plaintiffs have demanded that the

government produce relevant documents concerning the "treatment of Detainees in United

States custody," the "death of Detainees in United States custody," and the "rendition of

Detainees and other individuals" to countries known to employ torture. Plaintiffs' demands

under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, were first made on October 7,

2003. The government, after being inattentive for many months to the obligations imposed on it

by FOIA, see Am. Civil Liberties Union v. Dep't of Def., 339 F. Supp. 2d 501 (S.D.N.Y. 2004)

("Opinion and Order of September 15, 2004"), has made large, but not complete, production,

reviewing and turning over thousands of documents from various of its agencies. The present

motions relate to documents claimed to be possessed by, or of concern to, two government

agencies, the Department of Defense ("DOD") and the Central Intelligence Agency ("CIA").

        More than one year ago, on August 16, 2004, in order to facilitate the

government's processing of documents, plaintiffs created a priority list of enumerated

documents (the "August 16, 2004 List"). The priority list was a subset of previous demands that

plaintiffs most wished to be produced and which, based on public references to such documents,

1

plaintiffs believed the government could readily process. The priority list focused on specifically identified records, such as records "provided by defendant agencies to Congress, members of Congress, or congressional committees," or "discussed or identified in the media." My Opinion and Order of September 15, 2004 set out an expedited procedure with respect to the August 16, 2004 List.[1] Specifically, the government was required to produce the documents responsive to the List, or provide a declaration showing that an exemption against production applied, see Vaughn v. Rosen, 484 F.2d 820 (D.C. Cir. 1973), following which there would be motions for partial summary judgment to resolve disputes regarding documents claimed to be exempt.

Initially, defendant CIA took the position that it did not have to search its operational files and identify responsive documents, claiming an exemption by statute. See CIA Information Act, 50 U.S.C. § 431. However, the CIA Information Act itself provides exceptions to the exemptions from FOIA that it affords the CIA, and I held that since the agency had already conducted a search pursuant to an investigation of its Inspector General into allegations of improprieties of CIA operatives in Iraq, the statute by its explicit terms no longer exempted the CIA from its obligations under FOIA to search. I ordered the CIA to search its investigative files for responsive documents, and either to produce them or show them to be exempt. See Am. Civil Liberties Union v. Dep't of Def., 351 F. Supp. 2d 265 (S.D.N.Y. 2005) (Opinion and Order of February 2, 2005, modified, April 18, 2005).[2]

Against this backdrop, plaintiffs and defendants both moved for summary judgment on issues arising from plaintiffs' priority list of August 16, 2004. "Summary

---

[1] With respect to the remainder of plaintiffs' outstanding requests, the Opinion and Order of September 15, 2004 required the government to produce responsive documents or identify them in a log to be publicly filed or examined ex parte and in camera.

[2] The CIA informed plaintiffs on April 15, 2005 that all Office of Inspector General ("OIG") documents pertaining to ongoing investigations or law enforcement activities were exempt under FOIA. The CIA subsequently informed plaintiffs, in a letter dated July 15, 2005, that all responsive documents in the files of the OIG that no longer relate

judgment is the procedural vehicle by which most FOIA actions are resolved." Jones-Edwards v. Appeal Bd. of the Nat'l Sec. Agency Cent. Sec. Agency, 352 F. Supp. 2d 420, 423 (S.D.N.Y. 2005) (citing Miscavige v. IRS, 2 F.3d 366, 369 (11th Cir. 1993) ("Generally, FOIA cases should be handled on motions for summary judgment, once the documents in issue are properly identified.")).

This Opinion addresses five categories of issues that are disputed: (1) the DOD's withholding of reports and documents relating to the International Committee of the Red Cross; (2) documents relating to the DOD's interrogation activities; (3) the CIA's refusal to confirm or deny the existence or possession of certain documents; (4) the CIA's representation, with regard to documents relating to a request by former CIA Director Tenet to Secretary of Defense Rumsfeld that a certain Iraqi suspect be held at a high-level detention center and not be identified, that there are no meaningful, reasonably segregable portions of the documents that are not exempt from production; and (5) the DOD's withholding of photographs taken by Joseph Darby at Abu Ghraib prison and provided to the Army's Criminal Investigative Division. This written decision expands on, and supersedes, the rulings and observations that I made at the public and in camera oral arguments held on May 26, May 31, August 15, and August 30, 2005.

The Applicable Legal Principles

As the Second Circuit recently observed, "FOIA was enacted in order to 'promote honest and open government and to assure the existence of an informed citizenry [in order] to hold the governors accountable to the governed.'" Nat'l Council of La Raza v. DOJ, 411 F.3d 350, 355 (2d Cir. 2005) (alteration in original) (quoting Grand Cent. P'ship, Inc. v. Cuomo, 166 F.3d 473, 478 (2d Cir. 1999)). Clearly, however, the policy of open disclosure is

_____

to pending investigations or law enforcement proceedings were also exempt under FOIA.

not the only policy to consider.  FOIA itself recognizes this, and provides nine exemptions against disclosure.  It is the burden of the relevant agency to show that an adequate search was made, and that a "specific, enumerated exemption[] set forth in" FOIA authorizes it to withhold a document from production.  Id.; Carney v. DOJ, 19 F.3d 807, 812 (2d Cir. 1994); see also Tax Analysts v. IRS, 410 F.3d 715, 719-20 (D.C. Cir. 2005) (reiterating that the requirement for granting summary judgment to an agency is that the "agency must show, viewing the facts in the light most favorable to the requester, that there is no genuine issue of material fact").  The showing must meet an exacting standard, since, "[c]onsistent with FOIA's purposes, these statutory exemptions are narrowly construed."  Nat'l Council of La Raza, 411 F.3d at 355-56 (citing Dep't of Interior v. Klamath Water Users Protective Ass'n, 532 U.S. 1, 8 (2001)).

　　　　　My inquiry with respect to the documents in issue is particularly acute.  Our nation has been at war with terrorists since their September 11, 2001 suicide crashes into the World Trade Center, the Pentagon, and a field in Shanksville, Pennsylvania, killing thousands and wounding our nation in ways that we still cannot fully recount—indeed, we were at war with terrorists since well before that event.  American soldiers are fighting and dying daily in Afghanistan and Iraq.  The morale of our nation is a vital concern and directly affects the welfare of our soldiers.  How then to deal with the commands of FOIA and the strong policy it reflects "to promote honest and open government," "to assure the existence of an informed citizenry," and "to hold the governors accountable to the governed"?  Of course, national security and the safety and integrity of our soldiers, military and intelligence operations are not to be compromised, but is our nation better preserved by trying to squelch relevant documents that otherwise would be produced for fear of retaliation by an enemy that needs no pretext to attack?

FOIA places a heavy responsibility on the judge to determine "<u>de novo</u>" if documents withheld by an agency are properly withheld under an exemption and, if necessary, to examine the withheld documents "<u>in camera</u>":

> On complaint, the district court of the United States in the district in which the complainant resides, or has his principal place of business, or in which the agency records are situated, or in the District of Columbia, has jurisdiction to enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant. In such a case the court shall determine the matter de novo, and may examine the contents of such agency records in camera to determine whether such records or any part thereof shall be withheld under any of the exemptions set forth in subsection (b) of this section, and the burden is on the agency to sustain its action. In addition to any other matters to which a court accords substantial weight, a court shall accord substantial weight to an affidavit of an agency concerning the agency's determination as to technical feasibility under paragraph (2)(C) and subsection (b) and reproducibility under paragraph (3)(B).

5 U.S.C. § 552(a)(4)(B); <u>see</u> <u>also</u> <u>Al-Fayed v. CIA</u>, 254 F.3d 300, 307 (D.C. Cir. 2001) ("[I]t is precisely because FOIA's terms apply government-wide that we generally decline to accord deference to agency interpretations of the statute, as we would otherwise do under <u>Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.</u>, 467 U.S. 837, 104 S. Ct. 2778, 81 L. Ed. 2d 694 (1984).").

An agency's burden, although high, is not impractical.  It suffices if the agency shows, by "[a]ffidavits or declarations supplying facts," that the agency has conducted a "thorough search" for responsive documents, and has given "reasonably detailed explanations why any withheld documents fall within an exemption." <u>Carney</u>, 19 F.3d at 812; <u>see</u> <u>also</u> <u>Vaughn v. Rosen</u>, 484 F.2d 820, 826-28 (D.C. Cir. 1973) (requiring as justification for claims of exemption "a relatively detailed analysis in manageable segments" and outlining guidelines for indexing).  A district judge is required to give "<u>substantial</u> <u>weight</u> to an agency's affidavit concerning the details of the classified status of the disputed record." <u>Miller v. Casey</u>, 730 F.2d

773, 776 (D.C. Cir. 1984).  Once the agency has made a reasonable response, the burden on a

FOIA plaintiff is high:

> In order to justify discovery once the agency has satisfied its burden, the plaintiff must make a showing of bad faith on the part of the agency sufficient to impugn the agency's affidavits or declarations, or provide some tangible evidence that an exemption claimed by the agency should not apply or summary judgment is otherwise inappropriate.

Carney, 19 F.3d at 812 (citations omitted).  The declarations submitted by the agency in support

of its determination are "accorded a presumption of good faith."  Id.

My duty as a judge is to apply the legal principles of the statute and cases

discussed above.

## I.     International Committee of the Red Cross Documents

Plaintiffs demand production of all reports of the International Committee of the

Red Cross ("ICRC") concerning the treatment of detainees in Iraq (Item 8 of the prioritized

August 16, 2004 List); the government's responses to the ICRC's concerns (Item 13); a letter

from military lawyers over the signature of Brig. Gen. Janis Karpinski to the ICRC responding

to its concerns about conditions at Abu Ghraib (Item 49); and a complete set of documents

reflecting discussions between the ICRC and military officers at Guantánamo Bay (Item 58).[3]

Defendant DOD objected to production, arguing that responsive documents are exempted under

FOIA Exemption 3, which provides that FOIA disclosure requirements do not apply to matters

that are

> specifically exempted from disclosure by statute (other than section 552b of this title), provided that such statute (A) requires that the matters be withheld from the

---

[3] Plaintiffs also originally moved for summary judgment on Items 50 and 51.  Defendant DOD claimed that there were no documents responsive to requests 50 (Memorandum for MP and MI personnel at Abu Ghraib from Col. Marc Warren, regarding a new plan to restrict Red Cross access to Abu Ghraib) and 51 (Memorandum from a top legal adviser to Lt. Gen. Ricardo S. Sanchez, to military intelligence and police personnel at Abu Ghraib, regarding a new plan to restrict Red Cross access to Abu Ghraib), except, potentially, a four-page memorandum, dated January 8, 2004, memorializing communications from the ICRC regarding a visit to Abu Ghraib, which DOD is withholding.  Plaintiffs accordingly withdrew those two requests without prejudice to reasserting them at a later date.

public in such a manner as to leave no discretion on the issue, or (B) establishes particular criteria for withholding or refers to particular types of matters to be withheld.

5 U.S.C. § 552(b)(3). The relevant statute, 10 U.S.C. § 130c, authorizes the withholding of "sensitive information" to the extent such withholding is requested by a foreign government or international organization. See 10 U.S.C. § 130c(a). Section 130c provides that if the information was "provided by, otherwise made available by, or produced in cooperation with" the foreign government or international organization, and certain other criteria are satisfied, the information may be exempted from release by the United States government. In particular, the national security official concerned must determine each of the following:

(1) That the information was provided by, otherwise made available by, or produced in cooperation with, a foreign government or international organization.

(2) That the foreign government or international organization is withholding the information from public disclosure (relying for that determination on the written representation of the foreign government or international organization to that effect).

(3) That any of the following conditions are met:

(A) The foreign government or international organization requests, in writing, that the information be withheld.

(B) The information was provided or made available to the United States Government on the condition that it not be released to the public.

(C) The information is an item of information, or is in a category of information, that the national security official concerned has specified in regulations prescribed under subsection [(g)] as being information the release of which would have an adverse effect on the ability of the United States Government to obtain the same or similar information in the future.

Id. § 130c(b).

Under FOIA, "[t]he two threshold criteria needed to obtain exemption 3 exclusion from public disclosure are that (1) the statute invoked qualifies as an exemption 3 withholding statute, and (2) the materials withheld fall within that statute's scope." A.

Michael's Piano, Inc. v. Fed. Trade Comm'n, 18 F.3d 138, 143 (2d Cir. 1994) (citing CIA v. Sims, 471 U.S. 159, 167 (1985)).  Exemption 3, as the Second Circuit explained, "incorporates the policies of other statutes"; a statute that meets the requirements of Exemption 3 "may effectively exclude certain matters from disclosure, namely, as stated in exemption 3, those matters 'specifically exempted from disclosure by [the subject] statute.'"  Id. (alteration in original) (quoting 5 U.S.C. § 552(b)(3)).

There is no dispute, except for one argument discussed below in this paragraph, that 10 U.S.C. § 130c qualifies as a withholding statute and that the ICRC qualifies as an appropriate international organization; the only question is whether the disputed materials fall within the statute's scope.  See id. at 144 ("[W]e follow the approach taken by the Supreme Court in construing withholding statutes, looking to the plain language of the statute and its legislative history, in order to determine legislative purpose." (citing Sims, 471 U.S. at 168-73)).  Plaintiffs' only argument that the statute does not apply is that no regulations have been promulgated to support the determination of the relevant national security official, the Secretary of Defense, that the release of the information would have "an adverse effect on the ability of the United States Government to obtain the same or similar information in the future."  See 10 U.S.C. § 130c(b)(3)(C), (g), (h)(1)(A).  However, the text of the relevant portion of the statute is in the disjunctive; the statute does not provide that the promulgation of regulations is a necessary precondition to the statute's effectiveness.  Furthermore, a directive of Secretary Donald Rumsfeld requires confidential treatment of all ICRC communications.  See Decl. of Charles A. Allen, Deputy Gen. Counsel (Internat'l Affairs), Office of Gen. Counsel, DOD, dated Mar. 25, 2005, ¶ 13 & Ex. B (describing and attaching Memo, Sec'y of Def., July 14, 2004).  Accordingly, plaintiffs' argument is without merit.  I hold that 10 U.S.C. § 130c

constitutes a withholding statute for the purposes of FOIA Exemption 3. I therefore turn to examine if the documents responsive to Items 8, 13, 49, and 58 fall within the scope of 10 U.S.C. § 130c.

Item 8 requests the reports delivered by the ICRC to DOD. Such reports clearly fall within the scope of 10 U.S.C. § 130c and accordingly, they are covered by FOIA Exemption 3. At oral argument, plaintiffs conceded that the ICRC reports were properly exempted under the statute, and I so ruled. Tr. of May 31, 2005, at 12.

The government argues that Items 13, 49, and 58 reflect a dialogue between DOD and the ICRC, and thus were produced "in cooperation with" the ICRC, and are properly exempted under 10 U.S.C. § 130c(b)(1). Plaintiffs disagree with this characterization and argue, in addition, that with respect to at least some documents, extensive discussions in the press constitute a waiver of confidentiality.

The ICRC represented that it maintained, and requested that the United States government likewise maintain, confidentiality with respect to the disputed information, see Letter from Finn Ruda, Deputy Head of ICRC's Delegation for United States and Canada to Stewart F. Aly, Assoc. Deputy Gen. Counsel, DOD, confirming "that all records of communications from the ICRC or its representatives regarding detainees in Guantánamo and Iraq have been provided by the ICRC to the DOD on condition that the documents not be released to the public." Second Decl. of Stewart F. Aly, dated Mar. 23, 2005, Ex. D (attaching letter) [hereinafter Second Aly Decl.]. The Finn letter also states that "the ICRC itself is withholding such documents from public disclosure." Id. The requirements of § 130c(b)(2) and (b)(3) are thus satisfied.

As to the government's first argument, that the contested information was

"provided by, otherwise made available by, or produced in cooperation with" the ICRC, see 10 U.S.C. § 130c(b)(1), I examined a sample of the documents ex parte and in camera. The government provided a binder of samples — tabs A, B, C, and D, pertaining, respectively, to Items 8, 13, 49, and 58. Tab B[4] provided a sample of four out of twenty-two responsive documents; Tab C contained the one responsive document identified by DOD; and Tab D provided a sample of three of thirty-eight documents.

The documents sampled essentially contained responses by DOD to the observations reported by the ICRC, thereby exposing the information "provided by" the ICRC. Just as an attorney's responses to a client's requests for advice are privileged — see, e.g., Coastal States Gas Corp. v. Dep't of Energy, 617 F.2d 854, 862 (D.C. Cir. 1980) (noting that "[w]hile its purpose is to protect a client's disclosures to an attorney, the federal courts extend the privilege also to an attorney's written communications to a client"); In the Matter of Fischel, 557 F.2d 209, 211 (9th Cir. 1977) ("Ordinarily the compelled disclosure of an attorney's communications or advice to the client will effectively reveal the substance of the client's confidential communication to the attorney. To prevent this result, the privilege normally extends both to the substance of the client's communication as well as the attorney's advice in response thereto."); see also 8 J. Wigmore, Evidence § 2320 at 628-29 (McNaughton rev. 1961) (describing that one reason for privileging an attorney's communications to a client is that disclosure could "lead[] to inferences of the tenor of the client's communications"); 1 McCormick on Evidence § 89 at 326 (John W. Strong ed., 4th ed. 1992) ("[I]t is generally held that the privilege will protect at least those attorney to client communications which would have a tendency to reveal the confidences of the client.") — so the DOD's responses to the ICRC are exempt, for otherwise the ICRC's request for confidentiality would be compromised.

---

[4] Tab A pertained to Item 8, which was no longer contested; I examined the documents provided under Tabs B, C,

Specifically, I ruled as follows, after <u>in</u> <u>camera</u> inspection of the sample of documents provided by the government: with respect to Tab B documents, responses to concerns raised by the ICRC regarding the treatment of detainees (Item 13), I ruled that the documents, if produced, would disclose information reported by the ICRC to DOD, and were therefore exempt and that no segregable portion could meaningfully be produced following redaction. <u>See</u> 5 U.S.C. § 552(b). With respect to Item 49, a letter from military lawyers over the signature of Brig. Gen. Janis Karpinski to the ICRC responding to its concerns about conditions at Abu Ghraib, I ruled that the single document could be redacted, and thus the portions not covered by 10 U.S.C. § 130c must be disclosed. With respect to Item 58, a complete set of documents reflecting discussions between the ICRC and military officers at Guantánamo Bay, the documents had already been produced in redacted form. I ruled that the redactions had been made appropriately, and thus that the government had satisfied its burden.

I accepted over plaintiffs' challenge the government's representation that the samples it provided were fairly representative, and I ruled that the principles reflected in my rulings be applied by the government to all other documents in these categories that were responsive to plaintiffs' requests.

## II.      DOD Interrogation Activities

Plaintiffs seek summary judgment to obtain DOD's responses to requests for: an interim policy put into effect by Lt. Gen. Ricardo Sanchez based on the Guantánamo Bay policy set forth in Gen. Miller's report (Item 4); documents showing that Lt. Gen. Sanchez approved the use of high-pressure interrogation techniques by senior officials at Abu Ghraib without requiring them to obtain prior approval from outside the prison (Item 37); a memorandum from the Combined Joint Task Force (CJTF-7) regarding the applicability of Army Field Manual 34-

and D.

52 and sensory deprivation (Item 39); a document regarding "Interrogation and Counter-Resistance Policy" listing interrogation tactics approved by CJTF-7 (Item 40); a directive of Lt. Gen. Sanchez entitled "Interrogation and Counter-Resistance Policy" (Item 41); and a memorandum from CJTF-7 on interrogations (Item 42).

Defendant DOD represented that it possessed only two responsive documents, both of which had been declassified, and that the two had already been turned over to plaintiffs. Defs.' Br., at 8 (citing Second Aly Decl., ¶¶ 23-26 & Exs. E, F). In response to plaintiffs' challenge, DOD identified drafts of the two disclosed memoranda, Third Decl. of Stewart F. Aly, dated May 19, 2005, ¶¶ 3-9, and, although offering to process the drafts, advised that they probably would be withheld under FOIA Exemption 5, since they constituted the agency's deliberative processes. See 5 U.S.C. § 552(b)(5) (providing exemption for "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency"). I ruled that the government's representation as to the completeness of its production had to be accepted, and that the government should complete its processing of the drafts by June 21, 2005, with leave to plaintiffs to raise objections to exemptions claimed by the government.[5]

III.    CIA's Glomar Responses

The third dispute concerns a response by the CIA, neither confirming nor denying that it possesses documents responsive to three of plaintiffs' requests. Plaintiffs' first request is for a memorandum from the Department of Justice ("DOJ") to the CIA interpreting the Convention Against Torture (Item 1). Plaintiffs, referring to leaks about the document in the press, comment that the documents may have expressed opinions on certain interrogation techniques, such as "sleep deprivation," the "use of phobias," and the "deployment of 'stress

_____

[5] Since the parties have not advised me of any continuing issues, I consider this phase of the proceedings closed.

factors,'" distinguishing such techniques from those "causing severe physical or mental pain." Plaintiffs' second request is for a DOJ memorandum specifying interrogation methods that the CIA may use against top Al-Qaeda members (Item 29), which, according to plaintiffs, may permit a technique known as "waterboarding" whereby a detainee believes he is drowning. Plaintiffs' third request is for a directive signed by President Bush granting the CIA the authority to set up detention facilities outside the United States and/or outlining interrogation methods that may be used against detainees (Item 61).

The CIA, responding to these three categories of requests, gave a "Glomar response," neither admitting nor denying the existence of these documents in its possession, and claiming that the very fact of the existence or non-existence of the documents must be withheld.[6] The CIA represents that it cannot admit or deny that it possesses documents relating to these categories without revealing "intelligence activities" or "methods," and that it must therefore give a Glomar response.

(a) The Dorn Declarations

The CIA Information Review Officer, Marilyn A. Dorn, states in her declaration:

> CIA confirmation of the existence of the records requested in item nos. 1, 29, and 61 would confirm a CIA interest in or use of specific intelligence methods and activities. Similarly, a CIA response that it had no records responsive to those items would suggest that the CIA was not authorized to use or was not interested in using these intelligence methods and activities. Either response would provide foreign intelligence agencies and other groups hostile to the United States with information about CIA's intelligence activities and methods.

See Fourth Decl. of Marilyn A. Dorn, dated Mar. 30, 2005, ¶ 13 [hereinafter Fourth Dorn Decl.].

Ms. Dorn claims that records responsive to the three items requested cannot be

---

[6] In response to my question at oral argument about whether a DOJ memorandum could instead be requested, and even possibly be obtained, from the Department of Justice, the government represented that "agencies with the equities in the existence or nonexistence of documents tend to be the ones responding. So…it is appropriate that the CIA is litigating this issue." See Tr. of May 31, 2005, at 63.

identified as either existing, or not existing, without compromising national security.  If the CIA were to state that the documents existed, the CIA would be admitting that it "had engaged in clandestine intelligence activities **or** had an interest in pursuing clandestine intelligence activities upon which DOJ allegedly advised or which were allegedly included in the 'Presidential Directive,'" and would also "acknowledge a CIA capability to pursue such intelligence activities and employ such methods," because the "CIA would not request legal memoranda from DOJ or authorizations from the President for intelligence activities in which it had no interest."  Id. ¶¶ 10-11.  If, on the other hand, it were to deny the existence of the documents, its denial "would acknowledge a lack of CIA interest or capability."  Id. ¶ 11.  Hence, it can neither admit nor deny.

Ms. Dorn states that the "mere confirmation or denial of the existence or non-existence of [such] documents…reasonably could be expected to cause serious damage to the national security," id. ¶ 16, because it would "interfere with the United States Government's collection of intelligence in the war on terrorism," id. ¶ 12, and be of "material assistance" to those who would disrupt our intelligence operations, id. ¶ 14.  Ms. Dorn states also that confirmation or denial of the existence of the requested documents could bear on the foreign relations of the United States, since countries that cooperate with us "may be less willing to cooperate if the U.S. Government were to officially acknowledge CIA current or past clandestine intelligence activities and methods, or intelligence interests."  Id. ¶ 15.

Following oral argument in May, the CIA submitted a Fifth Declaration of Marilyn A. Dorn, dated July 15, 2005 [hereinafter Fifth Dorn Decl.], a classified document, which supplements the agency's justifications for its Glomar responses.  I have reviewed the Fifth Dorn Declaration in camera and ex parte.  This Opinion discloses no fact or argument that

is not part of the public record.

The CIA justifies its Glomar response, neither admitting nor denying the existence of three categories of documents responsive to plaintiffs' demands, on the basis of Exemptions 1 and 3 to FOIA. I discuss each of these exemptions in turn.

(b) <u>Exemption 1</u>

Exemption 1 exempts matters that are "(A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to such Executive order." 5 U.S.C. § 552(b)(1). Executive Order 12958, effective as amended March 25, 2003, provides for classification of national security information. Exec. Order No. 12958, <u>reprinted</u> <u>as</u> <u>amended</u> by E.O. 13292 in 50 U.S.C. § 435 [hereinafter E.O. 12958]; <u>see</u> <u>also</u> Exec. Order No. 13292, 68 Fed. Reg. 15315 (Mar. 28, 2003). Pursuant to E.O. 12958, an agency may classify information within specified categories if the appropriate classification authority[7] "determines that the unauthorized disclosure of the information reasonably could be expected to result in damage to the national security":

> Sec. 1.1. Classification Standards. (a) Information may be originally classified under the terms of this order only if all of the following conditions are met:
> (1) an original classification authority is classifying the information;
> (2) the information is owned by, produced by or for, or is under the control of the United States Government;
> (3) the information falls within one or more of the categories of information listed in section 1.4 of this order; and
> (4) the original classification authority determines that the unauthorized disclosure of the information reasonably could be expected to result in damage to the national security, which includes defense against transnational terrorism, and the original classification authority is able to identify or describe the damage.

E.O. 12958 § 1.1(a). Permissible categories of information that may be classified include information concerning: (a) military plans, weapons systems, or operations; (b) foreign

government information; (c) intelligence activities (including special activities), intelligence sources or methods, or cryptology; and (d) foreign relations or foreign activities of the United States, including confidential sources.  Id. § 1.4.  Information may not be classified to "conceal violations of law," to "prevent embarrassment," or to prevent or delay release of information "that does not require protection":

> Sec. 1.7. Classification Prohibitions and Limitations.
> (a) In no case shall information be classified in order to:
>> (1) conceal violations of law, inefficiency, or administrative error;
>> (2) prevent embarrassment to a person, organization, or agency;
>> (3) restrain competition; or
>> (4) prevent or delay the release of information that does not require protection in the interest of the national security.

Id. § 1.7(a).  The Executive Order also provides for a Glomar response; in response to a FOIA request, "[a]n agency may refuse to confirm or deny the existence or nonexistence of requested records whenever the fact of their existence or nonexistence is itself classified under this order or its predecessors."  Id. § 3.6(a).

(c)  Exemption 3

The CIA also justifies its Glomar responses under Exemption 3, which exempts matters "specifically exempted from disclosure by statute . . . (A) requir[ing] that the matters be withheld from the public in such a manner as to leave no discretion . . ., or (B) establish[ing] particular criteria for withholding or refer[ring] to particular types of matters to be withheld." 5 U.S.C. § 552(b)(3).  The framework for analyzing agency withholdings under Exemption 3 was outlined earlier in connection with the ICRC documents.  See A. Michael's Piano, Inc. v. Fed. Trade Comm'n, 18 F.3d 138, 143 (2d Cir. 1994) (requiring the government to show that "(1) the statute invoked qualifies as an exemption 3 withholding statute, and (2) the materials withheld fall within that statute's scope").

---

[7] Ms. Dorn has the requisite classification authority.  See E.O. 12958 §§ 1.1(a), 1.3.

The qualifying statute here is Section 103(c)(7) of the National Security Act of 1947, as amended, 50 U.S.C.A. § 403-3(c)(7) (West 2003), which commands the Director of Central Intelligence ("DCI") to "protect intelligence sources and methods from unauthorized disclosure." [8] See CIA v. Sims, 471 U.S. 159, 167-68 (1985); Assassination Archives and Research Ctr. v. CIA, 334 F.3d 55, 58 (D.C. Cir. 2003). The CIA contends that a substantive answer to plaintiffs' requests can "reasonably be expected to lead to unauthorized disclosure of intelligence sources and methods." Wolf v. CIA, 357 F. Supp. 2d 112, 117 (D.D.C. 2004) (quoting Gardels v. CIA, 689 F.2d 1100, 1103 (D.C. Cir. 1982)).

The Supreme Court in Sims, analyzing the "intelligence sources and methods" language of the statute, held that its "broad sweep" "comport[ed] with the nature of the Agency's unique responsibilities." 471 U.S. at 169 (construing an earlier version of the statute authorizing the DCI to protect "intelligence sources and methods"). The Supreme Court ruled that "the plain meaning of the statutory language, as well as the legislative history of the National Security Act…indicates that Congress vested in the Director of Central Intelligence very broad authority to protect all sources of intelligence information from disclosure," and that the DCI, not the judiciary, has the responsibility to weigh the factors and decide if disclosure "may lead to an unacceptable risk of compromising the Agency's intelligence-gathering process." Id. at 168-69, 180; see also Fitzgibbon v. CIA, 911 F.2d 755, 766 (D.C. Cir. 1990) ("The assessment of harm to intelligence sources, methods and operations is entrusted to the Director of Central Intelligence, not to the courts." (citing Sims)).

---

[8] The recently enacted Intelligence Reform and Terrorism Prevention Act of 2004, Pub. L. No. 108-458, 118 Stat. 3638 (Dec. 17, 2004) (except as otherwise expressly stated, effective not later than six months after enactment, as provided by section 1097 of such Act), amends the National Security Act. For example, section 1011(a) of the 2004 Act, 50 U.S.C.A. § 403-1(i)(1), provides that the "Director of National Intelligence shall protect intelligence sources and methods from unauthorized disclosure." The government argues, however, that the withholding statute in effect at the time of plaintiffs' requests governs the requests. Plaintiffs have not challenged this position. I agree with the government, see Pub. Citizen Health Research Group v. FDA, 704 F.2d 1280, 1284 (D.C. Cir. 1983) ("To invoke Exemption 3, an agency must demonstrate that…a statute exists and was in effect at the time of the request…."), and apply the withholding statute in effect at the time of plaintiffs' requests.

(d) <u>Analysis</u>

The Glomar response, by which the agency neither admits nor denies that it possesses a requested document, traces its roots to <u>Phillippi v. CIA</u>, 546 F.2d 1009 (D.C. Cir. 1976) [hereinafter <u>Phillippi I</u>]. That case involved the Glomar Explorer, a large ship ostensibly designed for oceanic research. The ship was recorded as owned by the Summa Corporation, a corporation owned or controlled by Howard Hughes. However, according to accounts appearing in the media, the real owner and operator was the CIA. A controversy arose concerning whether the CIA—before the news stories appeared—had attempted to persuade the media not to publish these accounts. The plaintiff, Phillippi, a journalist, filed suit under FOIA to uncover such contacts between the CIA and the news media, demanding production of:

> all records relating to the Director's or any other agency personnel's attempts to persuade any media personnel not to broadcast, write, publish, or in any other way make public the events relating to the activities of the Glomar Explorer, including, but not limited to, files, documents, letters, [etc.].

<u>Id.</u> at 1011 n.1. The CIA, asserting that the "existence or nonexistence of the requested records was itself a classified fact exempt from disclosure under Sections (b)(1) and (3) of FOIA," <u>id.</u> at 1012, determined that "in the interest of national security, involvement by the U.S. Government in the activities which are the subject matter of [Phillippi's] request can neither be confirmed nor denied." <u>Id.</u> The CIA was concerned that admission or denial of contacts with the press would amount to admission or denial of its involvement with the Glomar Explorer project and would thereby compromise "intelligence sources and methods" in violation of section 102(d)(3) of the National Security Act of 1947, 50 U.S.C. § 403(d)(3) (1970), and "severely damage the foreign relations and the national defense of the United States." <u>Id.</u> at 1011, 1013-14 (Aff. of Brent Scowcroft, Ass't to Pres. for Nat'l Sec. Affairs). As the Court of Appeals described the issue:

> In effect, the situation is as if appellant had requested and been refused permission to see a document which says either "Yes, we have records related to contacts with the media concerning the Glomar Explorer" or "No, we do not have any such records."

Id. at 1012. The Court of Appeals remanded to require the CIA to "submit a public justification, which is as detailed as is possible, for refusing to confirm or deny the existence of the requested records." Id. at 1015 n.12. The Court of Appeals held that the district court should discharge its de novo review obligation by first creating "as complete a public record as is possible," and only then, if necessary, by "examin[ing] classified affidavits in camera and without participation by plaintiff's counsel." Id. at 1013.

Later cases, relying on Phillippi I, have approved Glomar responses where substantive responses, either admitting or denying that particular documents existed, "would remove any 'lingering doubts' that a foreign intelligence service might have on the subject, and [where] the perpetuation of such doubts may be an important means of protecting national security." Frugone v. CIA, 169 F.3d 772, 774-75 (D.C. Cir. 1999) (citing Military Audit Project v. Casey, 656 F.2d 724, 745 (D.C. Cir. 1981)); see also Hunt v. CIA, 981 F.2d 1116, 1118 (9th Cir. 1992).

The danger of Glomar responses is that they encourage an unfortunate tendency of government officials to over-classify information, frequently keeping secret that which the public already knows, or that which is more embarrassing than revelatory of intelligence sources or methods. That over-classification was evident in Phillippi, after administrations changed and "the government acknowledged both that the CIA was responsible for the [Glomar Explorer] project" and that "CIA officials had tried to dissuade members of the press from publishing stories about it." Phillippi v. CIA, 655 F.2d 1325, 1328 (D.C. Cir. 1981) [hereinafter Phillippi II]. Yet, even then, the CIA was allowed to redact records to withhold descriptions of

conversations between the CIA and the press.  The district court rejected plaintiff's arguments

that since the world already knew, possibly from the CIA's own disclosures, that the real

purpose of the Glomar Explorer apparently extended beyond oceanic research to raising a lost

Russian submarine from the ocean floor, there could be no remaining statutory purpose to

withhold descriptions of contacts with the press.  The Court of Appeals upheld the district

court's deference to the CIA, holding that courts lacked competence to decide such delicate

questions affecting national security and should defer to "well-documented and specific

affidavits of the CIA."  Id. at 1330.

> In sum, the line between what may be revealed and what must be concealed is itself
> capable of conveying information to foreign intelligence agencies.  For this reason,
> this court cannot simply assume, over the well-documented and specific affidavits of
> the CIA to the contrary, that revelation of seemingly innocent information which
> might nonetheless jeopardize a fallback cover story is required under the FOIA,
> either because the information in question has already been made public, or even, as
> in the present case, because it was disseminated for confidential purposes by the
> CIA itself.  Without the ability to engineer controlled leaks of disinformation, the
> CIA would be deprived of the ability to disseminate a fallback cover while
> simultaneously protecting it.

Id.  The Court of Appeals also accepted that there was a national interest in keeping foreign

analysts in the dark, and leaving them unsure if that which was publicly disclosed was all that

was secretly known.  As the Court of Appeals put it:

> FOIA does not require the CIA to lighten the task of our adversaries around the
> world by providing them with documentary assistance from which to piece together
> the truth.

Id. at 1332.  And, further, even if the only question was whether to recognize officially that

which was informally or unofficially believed to exist, the niceties of international diplomacy

sometimes make it important not to embarrass a foreign country or its leaders, and exemptions

from FOIA protect that concern as well.  Id. at 1332-33.

Historians will evaluate, and legislators debate, how wise it is for a society to

give such regard to secrecy. The practice of secrecy, to compartmentalize knowledge to those having a clear need to know, makes it difficult to hold executives accountable and compromises the basics of a free and open democratic society. It also creates a dangerous tendency to withhold information from those outside the insular group, for fear of compromising the sources and integrity of intelligence. The consequences can be dire for, as noted in the 9/11 Commission Report, the strict need-to-know, proprietary approach to intelligence that has been employed by government agencies prevents the effective use of our vast storehouse of information. 9/11 Comm'n Rep. (2004), § 13.3, at 416-17 ("The biggest impediment to all-source analysis—to a greater likelihood of connecting the dots—is the human or systemic resistance to sharing information."). Identities of terrorists may be locked in the files of one agency and not given to another, or reported, if at all, only at the very top of chains of command, denying real-time need to know by those at operating points. The insularity of information tends to cause a multiplicity of intelligence-gathering agencies, each zealously protecting its own private sources in competition with other agencies. See, e.g., Judith Miller, A New York Cop in Israel, Stepping a Bit on F.B.I. Toes, N.Y. Times, May 15, 2005, § 1, at 37 (discussing tensions between the New York Police Department and the FBI arising from their separate intelligence-gathering endeavors abroad, in turn resulting from the NYPD's desire to have quick access, on an equal footing with federal agencies, to key counter-terrorism information).

There was no more cogent critic of the penchant by government officials to over-classify information than the late Senator Daniel Patrick Moynihan, and few with his competence and experience. Senator Moynihan, reflecting on his experiences as Chairman of the Commission on Protecting and Reducing Government Secrecy, among many other relevant

positions, commented at the conclusion of his book, Secrecy:

> [A] huge proportion of the government's effort at classifying is futile anyway. Let [George F.] Kennan have the last word. In a letter of March 1997 he writes: "It is my conviction, based on some 70 years of experience, first as a government official and then in the past 45 years as an historian, that the need by our government for secret intelligence about affairs elsewhere in the world has been vastly over-rated."…

> A case can be made…that secrecy is for losers. For people who don't know how important information really is. The Soviet Union realized this too late. Openness is now a singular, and singularly American, advantage. We put it in peril by poking along in the mode of an age now past. It is time to dismantle government secrecy, this most pervasive of Cold War-era regulations. It is time to begin building the supports for the era of openness that is already upon us.

Daniel Patrick Moynihan, Secrecy, 226-27 (Yale Univ. Press 1998); see generally Rep. of the Comm'n on Protecting and Reducing Gov't Secrecy (1997).

This is not to say that there is no room for secrets, or that the courts have the competence or the expertise of national security experts. Indeed, the courts generally respect the CIA's right to make a Glomar response. See Bassiouni v. CIA, 392 F.3d 244, 246 (7th Cir. 2004) ("Every appellate court to address the issue has held that the FOIA permits the CIA to make a 'Glomar response' when it fears that inferences from Vaughn indexes or selective disclosure could reveal classified sources or methods of obtaining foreign intelligence."). Most such cases involve requests by persons who claim to have had employment or other personal connections to the agency, or who seek such information about others who may have had such relationships. By giving a Glomar response, the CIA is able to avoid identifying its employees, or targets, and their activities. See, e.g., id. at 245 (Glomar response necessary to avoid "reveal[ing] details about intelligence-gathering methods"); Frugone v. CIA, 169 F.3d 772, 774 (D.C. Cir. 1999) (Glomar response necessary to avoid acknowledgment of employment); Minier v. CIA, 88 F.3d 796, 801-02 (9th Cir. 1996) (Glomar response necessary to avoid revealing if

person was a CIA agent); <u>Hunt v. CIA</u>, 981 F.2d 1116, 1119 (9th Cir. 1992) ("[D]isclosure of the existence or non-existence of records pertaining to Eslaminia," an Iranian national allegedly murdered by Hunt, "is tantamount to a disclosure whether or not he was a CIA source or intelligence target.").

Other cases defer to the CIA's unwillingness to describe its intelligence-gathering activities. <u>See</u>, <u>e.g.</u>, <u>Miller v. Casey</u>, 730 F.2d 773, 774 (D.C. Cir. 1984) (upholding Glomar response to request for "information concerning alleged efforts by the United States and other countries to infiltrate intelligence agents and potential guerrillas into Albania during the period 1945-53"); <u>Gardels v. CIA</u>, 689 F.2d 1100, 1102-03 (D.C. Cir. 1982) (upholding Glomar response to request by a student at the University of California for "documents revealing covert CIA connections with or interest in the University"); <u>Wolf v. CIA</u>, 357 F. Supp. 2d 112, 114 (D.D.C. 2004) (upholding Glomar response to request by a researcher for records concerning Jorge Elicier Gaitan, a former Colombian presidential candidate who was assassinated in 1948); <u>Earth Pledge Found. v. CIA</u>, 988 F. Supp. 623, 625 (S.D.N.Y. 1996) (upholding Glomar response to request for communications between the CIA station in the Dominican Republic and CIA headquarters "pertaining to contacts with dissident elements, hostile to the regime of Rafael Trujillo").

In the present case, the CIA justifies its Glomar responses, in its publicly filed documents, by referencing the same types of concerns as those found in the cases. Ms. Dorn states that the "CIA would not request legal memoranda from DOJ or authorizations from the President for intelligence activities in which it had no interest"; that "[m]erely acknowledging that the CIA sought legal opinions or authorizations addressing specific interrogation and detention activities is itself classified because the answer provides information about the types

of intelligence methods and activities that are available to the CIA or may be of interest to the CIA"; and that "[r]evealing that information reasonably could be expected to interfere with the United States Government's collection of intelligence in the war on terrorism."  Fourth Dorn Decl. ¶¶ 11-12.  Further, Ms. Dorn states that our foreign relations could be compromised because hitherto cooperating countries "may be less willing to cooperate if the U.S. Government were to officially acknowledge CIA current or past clandestine intelligence activities and methods, or intelligence interests."  Id. ¶ 15.  In the Fifth Dorn Declaration, a classified document submitted to me in camera, Ms. Dorn provides further elaboration and describes particularized harms to justify the agency's Glomar responses.

In Miller v. Casey, 730 F.2d 773 (D.C. Cir. 1984), the Court of Appeals upheld a Glomar response under Exemptions 1 and 3 upon descriptions of specific probable harms that might flow from substantive admissions or denials.  The request in Miller was for:

> All information on attempts by the U.S., U.K., and other western countries to infiltrate intelligence agents and potential guerrillas into Albania during the period between the end of World War II and the death of Stalin in 1953, including but not limited to those operations apparently betrayed to the Russians by Kim Philby.

Id. at 774.  In response, the Information Review Officer for the Directorate of Operations of the CIA (the same position held by Ms. Dorn), described why national security and the United States' foreign relations would be compromised by a substantive disclosure:

> 1) disclosure now might prevent foreign countries from participating in future covert missions, 2) disclosure might hamper future relations with Albania, 3) a pattern of denials or affirmances would permit hostile nations to piece together a "catalog" of U.S. covert missions, 4) denial or affirmance would enable the Soviet Union to ascertain the reliability of its double agent, Kim Philby, 5) acknowledgement could jeopardize sources and sympathizers still within Albania, 6) acknowledgement could hamper future recruitment of sources, and 7) acknowledgement would reveal the particular intelligence method--infiltration of agents--allegedly used in the mission.

Id. at 775-76.

The Information Review Officer showed also how acknowledging the existence of the Albanian program would reveal "intelligence sources or methods" in three possible ways, thereby compromising them: "by providing the critical confirmation which would allow Albanian leaders to identify participants in the covert action; by damaging future CIA efforts to recruit sources; and by revealing how, where and when the CIA has deployed its resources." Id. at 777-78. Upon these particularized justifications, the Court of Appeals upheld the CIA's Glomar response under Exemptions 1 and 3 to FOIA.

Courts interpret FOIA to afford agency affidavits "a presumption of good faith" and award agencies "summary judgment on the basis of affidavits" that are "adequate on their face." Carney v. DOJ, 19 F.3d 807, 812 (2d Cir. 1994); see also Miller, 730 F.2d at 776 ("[T]he district court must accord substantial weight to an agency's affidavit concerning the details of the classified status of the disputed record." (quotations omitted)). Clearly, the need for such deference is particularly acute in the area of national security. The statutory text of FOIA, however, requires the court to "determine the matter de novo," 5 U.S.C. § 552(a)(4)(B), for "[i]n no case" is classification to conceal "violations of law" or "inefficiency, or administrative error," or to mask "embarrassment." See E.O. 12958 § 1.7; see also Phillippi I, 546 F.2d at 1013-15 & n.12. Largely, the courts fail to grapple with this tension, ruling instead that the administrative assertions of secrecy should be accepted without much, if any, de novo review.

In the case before me, Item 29, a DOJ memorandum specifying interrogation methods that the CIA may use against top Al-Qaeda members, and Item 61, a directive signed by President Bush granting the CIA the authority to set up detention facilities outside the United States and/or outlining interrogation methods that may be used against detainees, specifically refer to "interrogation methods" alleged to be considered, and perhaps used, by the CIA in

connection with detainees in United States' custody. The discussions of these documents in the public press, undoubtedly arising from numerous leaks of the documents, raise concern, however, that the purpose of the CIA's Glomar responses is less to protect intelligence activities, sources or methods than to conceal possible "violations of law" in the treatment of prisoners, or "inefficiency" or "embarrassment" of the CIA. Compare 50 U.S.C.A. § 403-3(c)(7) (West 2003) (protecting intelligence sources and methods), and E.O. 12958 § 1.4 (same; permissible subjects of classification), with E.O. 12958 § 1.7 (criteria that forbid classification). The Dorn Declarations amply discuss the need to protect "intelligence sources and methods." But they do not describe the intelligence sources or methods themselves, or reflect any discussion within the administration whether the particular methods might constitute a "violation[] of law," or an "embarrassment," or administrative "inefficiency" or "error," when debate on these points within the administration probably occurred, as suggested by the discussions in the press. See E.O. 12958 § 1.7. And since the existence of the documents that plaintiffs request, which give rise to all this controversy, is neither admitted nor denied, there is nothing to show the court that might allow me to arrive at my own conclusions. In short, I am not given enough relevant information to make the de novo determinations that FOIA would seem to require. See 5 U.S.C. § 552(a)(4)(B).

Nevertheless, under the cases and notwithstanding FOIA's clear statutory command, there is small scope for judicial evaluation in this area. See, e.g., Phillippi II, 655 F.2d 1325. The Fifth Dorn Declaration sets out that which the cases require. See Miller, 730 F.2d 773. The agency's arguments that it should not be required officially to acknowledge the precise "intelligence activities" or "methods" it employs or considers—for example, whether it has any role whatsoever in the interrogation of detainees—are given deference by the courts, for

the CIA, not the courts, is deemed to have the competence to "weigh the variety of complex and subtle factors in determining whether disclosure of information may lead to an unacceptable risk of compromising the Agency's intelligence-gathering process." Sims, 471 U.S. at 180; see also Fitzgibbon v. CIA, 911 F.2d 755, 766 (D.C. Cir. 1990) (disapproving the district court's performance of "its own calculus as to whether or not harm to the national security or to intelligence sources and methods would result from disclosure"). On the basis of the Fourth and, in particular, the Fifth Dorn Declarations, I accept the CIA's Glomar response with respect to Items 29 and 61 of the August 16, 2004 List.

Item 1, however, a "[m]emorandum from DOJ to CIA interpreting the Convention Against Torture," does not, by its terms, implicate "intelligence sources or methods." The CIA's Glomar response to that item focuses, not on plaintiffs' demand, but on plaintiffs' effort to explain to the government why, because of frequent references in the public press, it should not be difficult for the government to process its response. Thus, plaintiffs referred to news reports of interrogation techniques that may have been justified in the memorandum, such as "sleep deprivation," the "use of phobias," and the "deployment of 'stress factors,'" distinguishing such practices from those that cause "severe physical or mental pain" characteristic of torture. The CIA justifies its Glomar response not on the text of the demand, but on all those references, as if they were part of the demand itself. See Fourth Dorn Decl., at 5 n.4. In effect, the agency seeks to use plaintiffs' attempt to provide assistance to the government in identifying the memorandum as a basis for withholding information about the item requested. But plaintiffs' speculation as to the possible contents of the memorandum is not controlling; rather, it is the unembellished request set forth in the August 16, 2004 List (set out in the "Description of Record" column) that controls. The List was created for the benefit of

defendant agencies, and they must be bound by it.  See Miller, 730 F.2d at 777 (The "agency

[i]s bound to read [the request] as drafted, not as either agency officials or [the requester] might

wish it was drafted.").  I rule, therefore, that acknowledging whether or not the memorandum

requested by plaintiffs exists reveals nothing about the agency's practices or concerns or its

"intelligence sources or methods."  Available exemptions can be proved if necessary to avoid

compromise, if any, to the interest of national defense or foreign policy.  Since the government

has failed in its burden to justify its Glomar response, see 5 U.S.C. § 552(a)(4)(B); Halpern v.

FBI, 181 F.3d 279, 287 (2d Cir. 1999); Carney v. DOJ, 19 F.3d 807, 812 (2d Cir. 1994), the

government shall produce the documents relating to Item 1, or prove that the same are exempt

from production.

IV.  CIA Request to DOD to Detain an Iraqi Suspect Without Identifying the
     Suspect

The fourth set of issues involves seventy-one documents responsive to Item 43 of

the August 16, 2004 List, a request by former CIA Director Tenet to Defense Secretary

Rumsfeld that the DOD hold an Iraqi suspect at a high-level detention center, but that he not be

listed on the prison rolls, and an order by Secretary Rumsfeld implementing the request.  The

CIA, responding on behalf of the government,[9] withheld the documents under Exemptions 1,

2,[10] 3, 5 and 7(A).[11]  In particular, with respect to Exemption 1, the CIA relied upon Executive

Order 12958, which governs the classification of national security information.  With respect to

Exemption 3, the CIA relied upon the National Security Act, 50 U.S.C.A. § 403-3(c)(7) (West

2003), and Section 6 of the Central Intelligence Agency Act of 1949, as amended, 50

---

[9] Perhaps as the agency with the greatest "equity" in the documents.  See note 6, supra.

[10] Exemption 2 exempts from FOIA matters that are "related solely to the internal personnel rules and practices of
an agency."  5 U.S.C. § 552(b)(2).

[11] Exemption 7(A) exempts "records or information compiled for law enforcement purposes, but only to the extent
that the production of such law enforcement records or information (A) could reasonably be expected to interfere
with enforcement proceedings."  5 U.S.C. § 552(b)(7)(A).

U.S.C.A. § 403g (West Supp. 2003), as the statutes furnishing the requisite authority to withhold.[12]

The CIA supported its position by providing a <u>Vaughn</u> index of 126 pages, describing each document by its length and general subject matter, but not as to its specific content. <u>See</u> Fourth Dorn Decl., Ex. A. At the end of each description, Ms. Dorn represented that "There is no meaningful, reasonably segregable portion of the document that can be released."

Plaintiffs challenge whether, indeed, there are no "meaningful, reasonably segregable" portions of the documents. If there are, those portions must be produced. <u>See</u> 5 U.S.C. § 552(b) ("Any reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt under this subsection."). Plaintiffs asked the court to review <u>in camera</u> each of the seventy-one responsive documents. Plaintiffs do not press their challenge to Ms. Dorn's showing that the documents overall are exempt from production.

An agency seeking to withhold material may satisfy its burden under FOIA by affidavits evincing a thorough search and providing reasonably detailed explanations for the withholding. <u>Carney v. DOJ</u>, 19 F.3d 807, 812 (2d Cir. 1994). Cases generally disfavor <u>in camera</u> inspections by district court judges as the primary method for resolving FOIA disputes. <u>See</u>, <u>e.g.</u>, <u>NLRB v. Robbins Tire and Rubber Co.</u>, 437 U.S. 214, 224 (1978) ("The <u>in camera</u> review provision is discretionary by its terms, and is designed to be invoked when the issue before the District Court could not be otherwise resolved; it thus does not mandate that the documents be individually examined in every case."); <u>Halpern v. FBI</u>, 181 F.3d 279, 287 (2d Cir. 1999) ("When a government agent can attest in a sworn affidavit that the redactions are

[12] Exemptions 1 and 3, and their implementing regulations and statutes, were discussed in the previous section of

necessary, and elaborate on the reasons for the redactions with sufficient specificity, the district court should be able to rule on the appropriateness of the redactions without conducting an in camera review of the redacted materials."); PHE, Inc. v. DOJ, 983 F.2d 248, 253 (D.C. Cir. 1993) (noting that in FOIA cases "in camera review is generally disfavored").

However, when a court is not able to resolve to its own satisfaction an agency's determination to withhold documents, it may require a further showing by the agency and, if necessary, it may conduct an in camera review. See Halpern, 181 F.3d at 295 (ruling that, on remand, "the district court may, in its discretion, order in camera review of the unredacted documents themselves," and remarking that "[i]n camera review is considered the exception, not the rule, and the propriety of such review is a matter entrusted to the district court's discretion" (quoting Local 3, Int'l Bhd. of Elec. Workers, AFL-CIO v. NLRB, 845 F.2d 1177, 1180 (2d Cir. 1988))).

Ms. Dorn's Fourth Declaration describes the nature of each of the seventy-one documents, and the procedures by which she determined non-segregability with respect to each document. Fourth Dorn Decl. ¶ 22. Ms. Dorn's statement that a "line-by-line review was conducted for all the documents, individually and as [a] whole" is undocumented, and her statement that "there are no meaningful, reasonably segregable, non-exempt portions" of the seventy-one documents is conclusory, for she does not describe the individual documents paragraph by paragraph and line by line. Id. FOIA provides that the district judge has the responsibility, ultimately, to make the determination, 5 U.S.C. § 552(a)(4)(B), and I determined that there was no feasible way for me to evaluate the conclusory determination of lack of segregability at the end of each of Ms. Dorn's document descriptions without viewing at least a sample of the documents in camera.

I ordered the plaintiffs to select a sample size of fifteen documents, that is, about 20% of the total set of seventy-one responsive documents, and the government to re-review those fifteen to confirm that there are no segregable portions that may be released, subject to my review.  Plaintiffs identified the fifteen documents to be reviewed, numbered according to the numbering scheme provided in Ms. Dorn's Fourth Declaration—13, 39, 263, 269, 273, 279, 291, 304, 335, 337, 346, 402, 428, 429, and 431—and the government re-reviewed them, and confirmed its position as to non-segregability.

Following this confirmation by the government, the CIA, in further support of its position, provided two classified declarations, Decl. of Porter J. Goss, Dir., CIA, dated Aug. 3, 2005; Sixth Decl. of Marilyn A. Dorn, dated Aug. 5, 2005, which I reviewed in camera.  The Sixth Dorn Declaration furnishes a further explanation of the agency's determination of non-segregability, and attaches an eighty-eight page Vaughn index addressing solely the fifteen documents identified by plaintiffs.  The agency argues that the Sixth Dorn Declaration and Vaughn index should avert the need for an in camera review of the fifteen documents themselves, but, to the extent I determine otherwise, the agency is prepared to provide minimally redacted versions of the documents.  The Declaration of CIA Director Goss describes the information that is redacted.

I have reviewed the Goss Declaration and the Sixth Dorn Declaration.  The explanations provided therein more substantially support the agency's position.  In particular, the Vaughn index attached to the Sixth Dorn Declaration conveys a better sense of the nature and contents of the sample fifteen documents identified by plaintiffs.  Accordingly, I am now satisfied that there is no meaningful, reasonably segregable, non-exempt portion of the seventy-one documents that can be produced.  See Halpern, 181 F.3d at 294 ("What a district court

needs from the government, in a <u>Vaughn</u> affidavit, is information that is…specific enough to obviate the need for an <u>in camera</u> review….").  Since plaintiffs' objection was restricted to the issue of segregability, and since plaintiffs have not objected to my tentative ruling that the Goss Declaration and Sixth Dorn Declaration sufficed, I now consider the fourth dispute to be closed and grant summary judgment to the government.

V.    <u>The Darby and Related Photographs of Abuse of Detainees</u>

Plaintiffs and defendants seek summary judgment with respect to DOD's withholding of certain photographs and videotapes depicting abuse of detainees (Items 10,[13] 11,[14] and 69) in Guantánamo Bay and Iraq.  Oral argument focused on Item 69,[15] which requested a "report of Detainee mistreatment and a CD with photographs that Joseph Darby, a military policeman assigned to Abu Ghraib, provided to the Army's Criminal Investigations Division."  The government initially represented that 144 original photographs and four movies were responsive,[16] and that the images "were taken for personal, rather than official, purposes."  Defs.' Reply Br., at 27 n.12.

I first reviewed, <u>ex parte</u> and <u>in camera</u>, a sample of eight photographs offered by defendant DOD.  My Order dated June 1, 2005 reflected my rulings on the responsiveness of each photograph in the sample, as well as on the appropriateness and extent of redactions in

---

[13] Item 10 requested videotapes, photographs and other records of abuse, including videotapes, photographs and other records of abuse catalogued and stored in Guantánamo Bay facilities.

[14] Item 11 requested videotapes, photographs and other records depicting abuse at Iraqi facilities.

[15] The government indicated at oral argument and in its reply papers that DOD had not yet finished processing all of the photographs and other media in its possession that might be responsive to requests 10 and 11, but that to the extent any such items already had been processed and withheld under Exemptions 6 and 7(C), DOD would apply my rulings on the Darby photographs to any such images.  I held at oral argument that that procedure was satisfactory.  <u>See</u> Tr. of May 26, 2005, at 14; <u>see also</u> <u>id.,</u> at 28 (suggesting that the parties, at the end of oral argument, create a schedule of items that need to be processed).

[16] These figures reflected the number of images initially determined to be responsive.  Other images on the two CDs provided by Darby to the Army's Criminal Investigation Command ("CID"), including duplicates and photographs wholly unrelated to plaintiffs' concerns, are not part of this litigation.  <u>See</u> Second Decl. of Phillip J. McGuire, Dir. of U.S. Army Crime Records Ctr., CID, dated Mar. 30, 2005, ¶¶ 3, 4 [hereinafter Second McGuire Decl.].

connection therewith, and I required the government to apply those rulings to all photographs responsive to plaintiffs' requests. The government processed the remaining photographs taken by Darby, and determined that eighty-seven photographs and four movies, redacted as appropriate, were responsive. See Third Decl. of Phillip J. McGuire, Dir. of U.S. Army Crime Records Ctr., CID, dated July 20, 2005, ¶ 6. In a session held in camera and ex parte on August 9, 2005, I viewed all eighty-seven photographs and four videos (collectively, the "Darby photographs"), in both their unredacted and redacted forms.

(a) Exemptions 6 and 7(C)

The government, contending that FOIA Exemptions 6, 7(C), and 7(F), 5 U.S.C. § 552(b)(6), (b)(7)(C), (b)(7)(F), apply, opposes the release of the Darby photographs.

Exemption 6 exempts:

> personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy.

Exemption 7 exempts:

> records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information (A) could reasonably be expected to interfere with enforcement proceedings, (B) would deprive a person of a right to a fair trial or an impartial adjudication, (C) could reasonably be expected to constitute an unwarranted invasion of personal privacy, (D) could reasonably be expected to disclose the identity of a confidential source, including a State, local, or foreign agency or authority or any private institution which furnished information on a confidential basis, and, in the case of a record or information compiled by criminal law enforcement authority in the course of a criminal investigation or by an agency conducting a lawful national security intelligence investigation, information furnished by a confidential source, (E) would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law, or (F) could reasonably be expected to endanger the life or physical safety of any individual.

I first address Exemptions 6 and 7(C); Exemption 7(F) will be addressed separately in a

later section.

The government argues that release of the Darby photographs, even if redacted, would constitute an "unwarranted invasion of personal privacy."  The government contends that even though the public, in Iraq and elsewhere, has seen photographs from Abu Ghraib when first they appeared in the press, presumably similar to the Darby photographs, the individuals depicted in the photographs would be recognized, even from redacted photographs.

Exemptions 6 and 7(C) contain the identical phrase "unwarranted invasion of personal privacy."  Exemption 6, however, has been interpreted to present a higher standard, since the agency must establish that disclosure "would" constitute a "clearly unwarranted" invasion, whereas Exemption 7(C) allows for the withholding of records or information that "could reasonably be expected" to constitute an "unwarranted" invasion.  DOJ v. Reporters Comm. for Freedom of the Press, 489 U.S. 749, 756 (1989).  Nonetheless, both exemptions require similar considerations by the reviewing district court.  See, e.g., FLRA v. Dep't of Veterans Affairs, 958 F.2d 503, 510 (2d Cir. 1992) ("And though Reporters Committee involved Exemption 7(C) its discussion governs Exemption 6, for the noted differences bear only on the type of information sought and the degree of invasion to a privacy interest that will be tolerated.").

Exemption 6 is to be interpreted broadly as encompassing "information which applies to a particular individual," Dep't of State v. Washington Post Co., 456 U.S. 595, 602 (1982); in general, this exemption protects "individuals from the injury and embarrassment that can result from the unnecessary disclosure of personal information."  Id. at 599.  When such information is sought, courts are to "determine whether release of the information would constitute a clearly unwarranted invasion of that person's privacy."  Id. at 602.

Under Exemption 7, "the government must demonstrate that (1) the document

was compiled for law enforcement purposes, and (2) release of the material would result in one

of the harms enumerated in the statute," Ortiz v. Dep't of Health and Human Servs., 70 F.3d

729, 732 (2d Cir. 1995)—in the case of 7(C), an "unwarranted invasion of personal privacy."  If

there is a "personal privacy interest recognized by the statute," courts consider whether the

"privacy claim is outweighed by the public interest in disclosure."  Nat'l Archives and Records

Admin. v. Favish, 541 U.S. 157, 160 (2004); see also Dep't of Veterans Affairs, 958 F.2d at 510

("[O]nce a more than de minimis privacy interest is implicated the competing interests at stake

must be balanced in order to decide whether disclosure is permitted under FOIA.").

    (b)  Analysis

A question may be raised as a threshold matter with respect to Exemption 7(C)'s

application to the Darby photographs, whether the photographs were indeed "compiled for law

enforcement purposes."  The government represents that the Army Criminal Investigation

Command ("CID") "opened a report of investigation immediately after receiving these

photographs" and that the information therein contained has "been used extensively by CID

agents to conduct the investigations into incidents of abuse of detainees at Abu Ghraib."  Defs.'

Br., at 67-68 (citing Second McGuire Decl., ¶ 6).  The government claims, accordingly, that the

Darby photographs were "compiled for law enforcement purposes."[17]  Plaintiffs appear to agree

with this analysis.  See Pls.' Reply Br., at 16-17 n.4.

Accordingly, even though the Darby photographs were, in the government's own

words, "taken for personal, rather than official, purposes," Defs.' Reply Br., at 27 n.12, I will

assume for the purposes of Exemption 7 that the Darby photographs were "compiled for law

---

[17] Amicus curiae The American Legion, in a brief filed August 11, 2005, at 8-9, argues that the Darby photographs
are not properly the subject of plaintiffs' FOIA requests since the photographs were actually under the control of
courts martial or of military authority exercised in the field in time of war when plaintiffs made their second FOIA
request on May 25, 2004.  Since, however, the government is the party in interest and since the government has not

enforcement purposes." This assumption is consistent with case law under FOIA. See Ortiz, 70

F.3d at 732-33 (an unsigned, unsolicited letter used by the Department of Health and Human

Services' Office of Inspector General to launch a criminal investigation, and kept in its

investigative files, was "compiled for law enforcement purposes"); Dep't of Veterans Affairs,

958 F.2d at 508 ("To qualify as agency records, the requested information must either be

created or obtained by the agency and within its control at the time the FOIA request is made.");

see also Ctr. for Nat'l Sec. Studies v. DOJ, 331 F.3d 918, 926 (D.C. Cir. 2003) (requiring "(1) a

rational nexus between the investigation and one of the agency's law enforcement duties; and

(2) a connection between an individual or incident and a possible security risk or violation of

federal law"); Quiñon v. FBI, 86 F.3d 1222, 1228 (D.C. Cir. 1996) (examining if the record was

"created or acquired in the course of an investigation").

 I am satisfied from my review that publication of redacted photographs will not

constitute an "unwarranted invasion of personal privacy," since all identifying characteristics of

the persons in the photographs have been redacted, and therefore, as a preliminary matter, I do

not find a cognizable "invasion of personal privacy." If, as the government argues, the

protagonists might recognize themselves in re-publications of the photographs, or be recognized

by members of the public, see, e.g., Massey v. FBI, 3 F.3d 620, 624 (2d Cir. 1993) ("Persons

can retain strong privacy interests in government documents containing information about them

even where the information may have been public at one time." (citing Reporters Committee,

489 U.S. at 762-63)), even without identifying characteristics being revealed, that possibility is

no more than speculative, a speculation which could apply equally to textual descriptions

without pictures.

 The Supreme Court addressed similar concerns in Dep't of the Air Force v. Rose,

---

raised this objection, I do not consider it.

425 U.S. 352 (1976), as further explained in <u>Reporters Committee</u>, 489 U.S. at 768-69 (1989)

(remarking that "much of our discussion" in <u>Rose</u>, which dealt with Exemption 6, was

applicable to <u>Reporters Committee</u>, which dealt with Exemption 7(C)). <u>Rose</u> involved a request

submitted to the Air Force for case summaries of honor and ethics hearings, with personal

references and other identifying information removed from the summaries. The summaries

were kept in the United States Air Force Academy's Honor and Ethics Code reading files, and

were regularly posted on forty squadron bulletin boards and circulated to various faculty

members and administration officials. 425 U.S. at 355. Without examining the summaries to

form its own view, the district court held that Exemption 6 was unavailable to the Air Force

because "disclosure of the summaries without names or other identifying information would not

subject any former cadet to public identification and stigma, and the possibility of identification

by another former cadet could not, in the context of the Academy's practice of distribution and

official posting of the summaries, constitute an invasion of personal privacy proscribed by

§ 552(b)(6)," but it granted summary judgment to the Air Force on other grounds. <u>Id.</u> at 357.

The Second Circuit reversed, concluding that the district court's decision

"'ignores certain practical realities' which militated against the conclusion 'that the Agency's

internal dissemination of the summaries lessens the concerned cadets' right to privacy, as

embodied in Exemption Six.'" <u>Id.</u> at 358 (quoting 495 F.2d 261, 267-68 (2d Cir. 1974)). The

Court of Appeals remanded for further proceedings in which the Air Force was to "'produce the

summaries themselves in court' for an <u>in camera</u> inspection 'and cooperate with the judge in

redacting the records so as to delete personal references and all other identifying

information. . . . [The Court of Appeals thought] it highly likely that the combined skills of

court and Agency, applied to the summaries, will yield edited documents sufficient for the

purpose sought and sufficient as well to safeguard affected persons in their legitimate claims of

privacy.'" Id. The Supreme Court affirmed, id. at 380-82, and, as it later explained in

Reporters Committee, approved the procedure by which the district court was to remove

identifying information and thereby protect the claimed privacy interest:

> [W]e doubly stressed the importance of the privacy interest implicated by disclosure
> of the case summaries. First: We praised the Academy's tradition of protecting
> personal privacy through redaction of names from the case summaries. But even
> with names redacted, subjects of such summaries can often be identified through
> other, disclosed information. So, second: Even though the summaries, with only
> names redacted, had once been public, we recognized the potential invasion of
> privacy through later recognition of identifying details, and approved the Court of
> Appeals' rule permitting the District Court to delete "other identifying information"
> in order to safeguard this privacy interest.

489 U.S. at 769; see also id., 489 U.S. at 762, 771 (examining the personal privacy interest "in

avoiding disclosure of personal matters" and finding substantial privacy interest in criminal rap

sheets, even though "events summarized in a rap sheet have been previously disclosed to the

public"). The Court has reaffirmed that the "redaction procedure is…expressly authorized by

FOIA." Dep't of State v. Ray, 502 U.S. 164, 174 (1991) (applying Exemption 6).

The procedures I adopted and the rulings I made in the in camera sessions

embody the principles set out in Rose and Reporters Committee. I examined each of the Darby

photographs, in both its original and redacted forms. Where I determined that the government

could better mask identifying features, I ordered it to do so. Furthermore, in the case of a

certain small number of photographs, mainly of female detainees, and one of the videos, where

the context compelled the conclusion that individual recognition could not be prevented without

redaction so extensive as to render the images meaningless, I ordered those images not to be

produced. Having viewed the remaining Darby photographs, as thus redacted, I hold that there

is no "invasion of personal privacy" under Exemptions 6 and 7(C). See, e.g., Ray, 502 U.S. at

175-76 (noting that "disclosure of such personal information [regarding marital and employment status, children, living conditions and attempts to enter the United States] constitutes only a de minimis invasion of privacy when the identities of the interviewees are unknown"). If, because someone sees the redacted pictures and remembers from earlier versions leaked to, or otherwise obtained by, the media that his image, or someone else's, may have been redacted from the picture, the intrusion into personal privacy is marginal and speculative, arising from the event itself and not the redacted image.

Moreover, even were I to find an "invasion of personal privacy," any further intrusion into the personal privacy of the detainees by redacted publications would be, with the exception of the small number described above, minimal and, under a balancing analysis, not "unwarranted" in light of the public interest policy of FOIA. The Supreme Court has set forth its most recent iteration of the balancing analysis under Exemption 7(C) in Nat'l Archives and Records Admin. v. Favish, 541 U.S. 157 (2004); see also Reporters Committee, 489 U.S. at 772 ("[W]hether disclosure of a private document under Exemption 7(C) is warranted must turn on the nature of the requested document and its relationship to the basic purpose of the Freedom of Information Act to open agency action to the light of public scrutiny, rather than on the particular purpose for which the document is being requested.") (quotations omitted). As discussed above, since Exemption 7(C) contains the easier burden for the government, I address that Exemption. See Reporters Committee, 489 U.S. at 762 n.12 ("Because Exemption 7(C) covers this case, there is no occasion to address the application of Exemption 6.").

In Favish, the Supreme Court held that the public interest in photographs of the death scene of Vincent Foster, Jr., deputy counsel to President Clinton, was insufficiently supported in light of the substantial interest in privacy of Vincent Foster's family. The Court

arrived at this holding after asking whether the information requested would advance a

significant public interest:

> Where the privacy concerns addressed by Exemption 7(C) are present, the exemption requires the person requesting the information to establish a sufficient reason for the disclosure. First, the citizen must show that the public interest sought to be advanced is a significant one, an interest more specific than having the information for its own sake. Second, the citizen must show the information is likely to advance that interest. Otherwise, the invasion of privacy is unwarranted.

Favish at 172.

> With the exception of the small number of Darby photographs that I ordered to

be withheld, where the risk of exposure is too great and the informational value is minimal, the

balancing analysis weighs in favor of disclosure in the present case. There is a substantial

public interest in these pictures, evidenced by the active public debate engendered by the

versions previously leaked to the press, or otherwise obtained by the media. See discussion in

section (c) of this Opinion, infra. Moreover, the government concedes that wrongful conduct

has occurred. Defs.' Br., at 70-72. Plaintiffs assert that they seek release of the Darby

photographs to inform and educate the public, and to spark debate about the causes and forces

that led to the breakdown of command discipline at Abu Ghraib prison and, possibly, by

extension, to other prisons in Iraq, Afghanistan, Guantánamo, and perhaps elsewhere. These are

the very purposes that FOIA is intended to advance. The photographs are sought to "shed[]

light on an agency's performance of its statutory duties" and to "contribut[e] significantly to

public understanding of the operations or activities of the government." Pls.' Reply Br., at 24

(quoting Reporters Committee, 489 U.S. at 773 & 775). As I remarked at oral argument:

> photographs present a different level of detail and a different medium, and are the best evidence that the public could have as to what occurred at a particular time, better than testimony, which can be self-serving, better than summaries, which can be misleading, and better even than a full description no matter how complete that description might be.

Tr. of May 26, 2005, at 14. There is no alternative, less intrusive means by which the

information may be elicited. See, e.g., Dep't of Def. Dep't of Military Affairs v. FLRA, 964

F.2d 26, 29-30 (D.C. Cir. 1992). The redacted originals, rather than piece-meal leaks and

possibly partial depictions of several of the pictures, are more probative of what Darby and his

fellow military personnel actually did. Under the requirements of Favish, the claimed public

interest in production of the redacted photographs is substantiated and far outweighs any

speculative invasion of personal privacy.

        The government also opposes production because, it argues, doing so would

conflict with the United States' obligations under the Geneva Conventions. The Geneva

Convention Relative to the Treatment of Prisoners of War of August 12, 1949, 6 U.S.T. 3316,

74 U.N.T.S. 135 (the "Third Geneva Convention") provides that a detaining power must protect

a prisoner of war "particularly against acts of violence or intimidation and against insults and

public curiosity." Art. 13. The Geneva Convention Relative to the Protection of Civilian

Persons in Time of War, Aug. 12, 1949, 6 U.S.T. 3516, 75 U.N.T.S. 287 (the "Fourth Geneva

Convention") provides that civilians under detention are entitled to "respect for their persons,

their honor….shall at all times be treated humanely, and shall be protected especially against all

acts of violence or threats thereof and against insults and public curiosity." Art. 27.

        Defendants present evidence that the United States historically has interpreted

these two conventions to forbid the taking and publishing of photographs of detainees, see Decl.

of Edward R. Cummings, Ass't Legal Adviser for Arms Control and Verification, Dep't of

State, dated Mar. 24, 2005, ¶¶ 12-17 [hereinafter Cummings Decl.], and argue that publication

of the photographs in this case would conflict with the United States' treaty obligations

thereunder. See id. ¶ 19; Decl. of Geoffrey S. Corn, Special Ass't to Judge Advocate Gen. for

Law of War Matters, Dep't of Army, dated Mar. 25, 2005, ¶¶10-11 [hereinafter Corn Decl.].

The government's treaty interpretations are entitled to respect. See Kolovrat v. Oregon, 366

U.S. 187, 194 (1961) ("While courts interpret treaties for themselves, the meaning given to them

by the departments of government particularly charged with their negotiation and enforcement

is given great weight.").

      The government argues that "[e]ven if the identities of the subjects of the

photographs are never established," those subjects could suffer humiliation and indignity

against which the Geneva Conventions were intended to protect. Corn Decl. ¶ 11. It also states,

without supporting documentation, that the ICRC has taken the position that the Third Geneva

Convention forbids publishing images that "show prisoners of war in degrading or humiliating

positions or allow the identification of individual POWs." Cummings Decl. ¶ 17. The

redactions and withholding that I ordered should protect civilians and detainees against "insults

and public curiosity" and preserve their "honor." Production of these images coheres with the

central purpose of FOIA, to "promote honest and open government and to assure the existence

of an informed citizenry [in order] to hold the governors accountable to the governed," Nat'l

Council of La Raza v. DOJ, 411 F.3d 350, 355 (2d Cir. 2005). Accordingly, I hold that the

government may not withhold the Darby photographs, redacted to eliminate all identifying

characteristics of the persons shown in the photographs, under Exemptions 6 and 7(C).

      (c)  The Government's Supplemental Argument: Exemption 7(F)

      On July 28, 2005, more than two months after the motion was initially argued,

the government added another ground of claimed exemption, Exemption 7(F), to supplement its

opposition to production of the Darby photographs. Exemption 7(F), 5 U.S.C. § 552(b)(7)(F),

exempts

    records or information compiled for law enforcement purposes, but only to the

extent that the production of such law enforcement records or information…(F) could reasonably be expected to endanger the life or physical safety of any individual.

Plaintiffs and amici curiae, The Reporters Committee for Freedom of the Press and other prominent news organizations, object to my consideration of the government's eleventh-hour argument in reliance on Exemption 7(F). See Proposed Br. Amici Curiae, filed Aug. 3, 2005. Amici argue that the exemption now pressed by the government could have been presented much earlier, certainly by the date of oral argument in May, and that its invocation at this late date delays the ultimate resolution of the issues. Amici contend that the government's supplemental argument is not made in "good faith" and should not be considered by the court. See Piper v. DOJ, 374 F. Supp. 2d 73, 78-79 (D.D.C. 2005). While I appreciate the concern of amici, I rule that the government's opposition, although filed late, should be considered. See, e.g., Nat'l Council of La Raza v. DOJ, No. 03 Civ. 2559, 2004 WL 2314455, at *1 (S.D.N.Y. Oct. 14, 2004); see also August v. FBI, 328 F.3d 697 (D.C. Cir. 2003). The issue of the physical safety of our troops in Iraq and Afghanistan, and of the citizens of those countries, has been of paramount concern throughout this case, and it is sensible to address the issue squarely under the framework advanced by the government. The parties agreed to an expedited briefing schedule in order to minimize delays.[18]

The government contends that publication of the Darby photographs pursuant to court order is likely to incite violence against our troops and Iraqi and Afghan personnel and civilians, and that redactions will not avert the danger. The government argues that the terrorists will use the re-publication of the photographs as a pretext for further acts of terrorism.

---

[18] As requested by the government, certain portions of the government's submission—its Supplemental Memorandum of Law and supplemental declarations—were filed under seal in accordance with my Sealing Order of July 28, 2005 to withhold (1) specific descriptions of the images whose release is in issue, and (2) sensitive information relating to national security and the United States' foreign relations. Plaintiffs objected to the sealing of the submission except with respect to the first item, the specific descriptions of the Darby photographs. However, I was able to establish consensus in enlarging the public record so that all the government's arguments

See Second Amended Decl. of Richard B. Myers, Chairman, Joint Chiefs of Staff, dated Aug. 25, 2005, ¶¶ 8, 31 (stating that the "insurgents will use any means necessary to incite violence and, specifically, will focus on perceived U.S. or Coalition mistreatment of Iraqi civilians and detainees as a propaganda and recruiting tool to aid their cause," and that "redaction of the photographs and videos will not alleviate or lessen this risk").  Plaintiffs, on the other hand, provide the declaration of a scholar on the Middle East who states that, in his opinion, "there is nothing peculiar about Muslim culture in Iraq or elsewhere that would make people react to these pictures in a way different from other people's reactions elsewhere in the world."  Decl. of Khaled Fahmy, Prof., New York Univ., dated Aug. 4, 2005, ¶ 8.  In addition, Professor Fahmy suggests that there is a large group of Iraqis, and of Muslims generally, who respond favorably when we show the openness of our society and the accountability of our government officials, and that we would suppress those values and that favorable response by preventing publication of the Darby photographs.  See id. ¶ 11.

Our nation does not surrender to blackmail, and fear of blackmail is not a legally sufficient argument to prevent us from performing a statutory command.  Indeed, the freedoms that we champion are as important to our success in Iraq and Afghanistan as the guns and missiles with which our troops are armed.  As President Bush stated in his 2005 State of the Union address,

> [t]he attack on freedom in our world has reaffirmed our confidence in freedom's power to change the world.  We are all part of a great venture:  to extend the promise of freedom in our country, to renew the values that sustain our liberty, and to spread the peace that freedom brings.

Available at http://www.whitehouse.gov/news/releases/2005/02/20050202-11.html.  Justice Anthony Kennedy, in a recent interview, expanded on the same point:

> Why should world opinion care that the American Administration wants to bring

---

could be made publicly.  Oral argument on the expanded public record was held on August 15, 2005.  This Opinion discloses no fact or argument that is not part of the public record.

freedom to oppressed peoples? Is that not because there's some underlying common mutual interest, some underlying common shared idea, some underlying common shared aspiration, underlying unified concept of what human dignity means? I think that's what we're trying to tell the rest of the world, anyway.

Jeffrey Toobin, <u>Swing Shift</u>, The New Yorker, Sept. 12, 2005, at 50.

The terrorists in Iraq and Afghanistan do not need pretexts for their barbarism; they have proven to be aggressive and pernicious in their choice of targets and tactics. They have driven exploding trucks into groups of children at play and men seeking work; they have attacked doctors, lawyers, teachers, judges and legislators as easily as soldiers. Their pretexts for carrying out violence are patent hypocrisies, clearly recognized as such except by those who would blur the clarity of their own vision. With great respect to the concerns expressed by General Myers, my task is not to defer to our worst fears, but to interpret and apply the law, in this case, the Freedom of Information Act, which advances values important to our society, transparency and accountability in government.

Exemption 7(F) was enacted to protect the safety of individuals involved in law enforcement investigations. Originally, the exemption protected only "law enforcement personnel." <u>See</u> Pub. L. No. 93-502, 88 Stat. 1561, 1563 (1974) (exempting "investigatory records compiled for law enforcement purposes, but only to the extent that the production of such records would… endanger the life or physical safety of law enforcement personnel"). In 1986, Exemption 7(F) was amended to protect all those put at risk through their participation in law enforcement proceedings, whether as sources of information or as witnesses. <u>See</u> Freedom of Information Reform Act of 1986, Pub. L. No. 99-570, §§ 1801-1804, 100 Stat. 3207; <u>see also</u> <u>Garcia v. DOJ, Office of Info. and Privacy</u>, 181 F. Supp. 2d 356, 378 (S.D.N.Y. 2002) (withholding names and identifying information of government agents and private citizen informers where subject of investigation had history of retaliation and violence); <u>Blanton v.</u>

45

DOJ, 182 F. Supp. 2d 81, 87 (D.D.C. 2002) (same, in connection with racial hate crime, the bombing of a church, and charges of first degree murder), aff'd, 64 Fed. Appx. 787 (2003); Shores v. FBI, 185 F. Supp. 2d 77, 85 (D.D.C. 2002) (same, identities of cooperating witnesses where plaintiff had already attempted retaliation).

    Exemption 7(F) has thus been construed to protect individuals involved in law enforcement investigations and trials, as officials and as private citizens providing information and giving testimony.  At least twice, however, the statute has been applied to give protection to broader groups of individuals who were not involved in particular criminal investigations and prosecutions.  See Living Rivers, Inc. v. U.S. Bureau of Reclamation, 272 F. Supp. 2d 1313, 1321 (D.Utah 2003) (withholding inundation maps for fear terrorists could use the information to place at risk the life or physical safety of downstream residents who would be flooded by a breach of the Hoover Dam or Glen Canyon Dam); Larouche v. Webster, 75 Civ. 6010, 1984 WL 1061, at *8 (S.D.N.Y. Oct. 23, 1984) (withholding FBI laboratory report describing manufacture of home-made machine gun to protect law enforcement personnel from encounters with criminals armed with home-made weapons).  Moreover, at least one court has ruled that "[u]nlike Exemption 7(C), which involves a balancing of societal and individual privacy interests, 7(F) is an absolute ban against certain information and, arguably, an even broader protection than 7(C)." Raulerson v. Ashcroft, 271 F. Supp. 2d 17, 29 (D.D.C. 2002). Accordingly, the government argues that once it has established that the Darby photographs are "records or information compiled for law enforcement purposes," any non-trivial concern that it advances about the life or physical safety of any individual entitles it to withhold the photographs under Exemption 7(F).

    Plaintiffs, on the other hand, argue that Living Rivers and Larouche are

aberrational, see Maydak v. DOJ, 362 F. Supp. 2d 316, 321 n.4 (D.D.C. 2005) ("In general, this exemption [7(F)] has been interpreted to apply to names and identifying information of law enforcement officers, witnesses, confidential informants and other third persons who may be unknown to the requester."). Plaintiffs also argue that since Congress lodged its concern about endangerment to life and safety under Exemption 7, and did not address the concern in an independent and generally applicable exemption, Exemption 7(F) should be applied in its narrow context, to the concern expressed by Congress, and not as a catch-all exemption. See Tr. of Aug. 30, 2005, at 22-23. In essence, plaintiffs contend that Exemption 7(F) should not be a substitute for the government's power to classify information requiring protection.

Larouche was decided before the statutory amendment and without much analysis of Exemption 7(F). Its focus was on law enforcement—on the dangers of home-made machine guns to law enforcement personnel—a nexus to Exemption 7(F)'s central purpose. With regard to Living Rivers, the inundation maps were compiled by the Bureau of Reclamation to "maintain law and order and protect persons and property within Reclamation projects and on Reclamation lands" by protecting and alerting threatened communities, 272 F. Supp. 2d at 1319 (citing 43 U.S.C. § 373b(a)), again a nexus to law enforcement in that context. However, there is no such nexus with respect to the Darby photographs.[19] The Darby photographs are being withheld, not to protect anyone involved in the courts martial investigations and prosecutions, but for another purpose. The persons who took the photographs, or handed them over to commanding officers, do not ask for protection. Law enforcement officials charged with investigating the circumstances that surrounded the taking of the Darby photographs do not ask

---

[19] In its brief, at 4, amicus The American Legion suggests that because the Darby photographs "apparently concern, at least in part, activities inside a reserve brigade of military police," the photos should be withheld because "[t]heir lives would be endangered by disclosure of the Darby photos, and they deserve no less protection than civilian police receive under the FOIA." The government makes no such argument, and indeed, it is clear from General Myers' declaration that he is concerned broadly about potential danger to all members of the United States' armed forces and public, as well as to Iraqi and Afghan personnel and civilians.

for protection, and there is no allegation that release of the photographs will endanger their lives. And since the identifying characteristics of the detainees are to be redacted, they too are not endangered. The sole justification for suppressing the photographs is the DOD's concern about speech—generally, how some might exploit the Darby photographs, in propaganda and in terrorist activities, by arguing, through false extension, that the pictures represent the attitudes of all American soldiers, or indeed of all Americans, toward the Iraqi people.

It is not necessary for me to rule if Larouche and Living Rivers are, or are not, appropriate extensions of Exemption 7(F). I reject, however, the government's argument that reasoning must stop once a threat to life or safety is discerned. Balancing and evaluation are essential aspects of the judicial function, no less in considering the exemptions of FOIA than in other areas of the law. It is clear to me that the core values that Exemption 7(F) was designed to protect are not implicated by the release of the Darby photographs, but that the core values of FOIA are very much implicated.

The interest at stake arises from pictures of flagrantly improper conduct by American soldiers—forcing prisoners under their charge to pose in a manner that compromised their humanity and dignity. As I stated at the time of the original argument, and as I reiterated previously in this decision, the pictures are the best evidence of what happened, better than words, which might fail to describe, or summaries, which might err in their attempt to generalize and abbreviate. Publication of the photographs is central to the purposes of FOIA because they initiate debate, not only about the improper and unlawful conduct of American soldiers, "rogue" soldiers, as they have been characterized, but also about other important questions as well—for example, the command structure that failed to exercise discipline over the troops, and the persons in that command structure whose failures in exercising supervision

may make them culpable along with the soldiers who were court-martialed for perpetrating the wrongs; the poor training that did not create patterns of proper behavior and that failed to teach or distinguish between conduct that was proper and improper; the regulations and orders that governed the conduct of military forces engaged in guarding prisoners; the treatment of prisoners in other areas and places of detention; and other related questions.

Suppression of information is the surest way to cause its significance to grow and persist. Clarity and openness are the best antidotes, either to dispel criticism if not merited or, if merited, to correct such errors as may be found. The fight to extend freedom has never been easy, and we are once again challenged, in Iraq and Afghanistan, by terrorists who engage in violence to intimidate our will and to force us to retreat. Our struggle to prevail must be without sacrificing the transparency and accountability of government and military officials. These are the values FOIA was intended to advance, and they are at the very heart of the values for which we fight in Afghanistan and Iraq. There is a risk that the enemy will seize upon the publicity of the photographs and seek to use such publicity as a pretext for enlistments and violent acts. But the education and debate that such publicity will foster will strengthen our purpose and, by enabling such deficiencies as may be perceived to be debated and corrected, show our strength as a vibrant and functioning democracy to be emulated.

In its most recent discussion of FOIA, the Supreme Court commented that "FOIA is often explained as a means for citizens to know what 'their Government is up to.' The sentiment is far from a convenient formalism. It defines a structural necessity in a real democracy." Favish, 541 U.S. at 171-72. As President Bush said, we fight to spread freedom so the freedoms of Americans will be made more secure. It is in compliance with these principles, enunciated by both the President and the highest court in the land, that I order the

government to produce the Darby photographs that I have determined are responsive and appropriately redacted.

## Conclusion.

For the reasons stated, the motions for partial summary judgment, by plaintiffs and by defendants, are granted and denied as discussed herein. This Opinion and Order is stayed twenty days in order to allow for appeal by either side, should it wish to do so.

SO ORDERED.

Dated: New York, New York
September 29, 2005

ALVIN K. HELLERSTEIN
United States District Judge