UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

AMERICAN CIVIL LIBERTIES UNION,
CENTER FOR CONSTITUTIONAL RIGHTS,
PHYSICIANS FOR HUMAN RIGHTS,
VETERANS FOR COMMON SENSE, and
VETERANS FOR PEACE,

        Plaintiffs,

    v.                          04 Civ. 4151 (AKH)

DEPARTMENT OF DEFENSE, AND ITS
COMPONENTS DEPARTMENT OF ARMY,
DEPARTMENT OF NAVY, DEPARTMENT OF
AIR FORCE, DEFENSE INTELLIGENCE
AGENCY; DEPARTMENT OF HOMELAND
SECURITY; DEPARTMENT OF JUSTICE,
AND ITS COMPONENTS CIVIL RIGHTS
DIVISION, CRIMINAL DIVISION,
OFFICE OF INFORMATION AND PRIVACY,
OFFICE OF INTELLIGENCE POLICY AND
REVIEW, FEDERAL BUREAU OF
INVESTIGATION; DEPARTMENT OF STATE;
and CENTRAL INTELLIGENCE AGENCY,

        Defendants.

---

## EIGHTH DECLARATION OF MARILYN A. DORN
### INFORMATION REVIEW OFFICER
### CENTRAL INTELLIGENCE AGENCY

### Introduction

I, MARILYN A. DORN, hereby declare and state:

1.  I am the Information Review Officer (IRO) for the
National Clandestine Service (NCS)[1] of the Central Intelligence

---

[1] The NCS is the successor to the Directorate of Operations (DO).

Agency (CIA).  After serving one and a half years as Associate
NCS/IRO, I was appointed to my current position on 1 August
2003.

2.   The NCS is the organization within the CIA responsible
for conducting the CIA's foreign intelligence and
counterintelligence activities; conducting special activities,
including covert action; conducting liaison with foreign
intelligence and security services; serving as the repository of
foreign counterintelligence information; supporting clandestine
technical collection; and coordinating CIA support to the
Department of Defense and other U.S. Government agencies.

3.   The Associate Deputy Director of the CIA has appointed
me Records Validation Officer (RVO) for the purpose of this and
certain other litigation.  As RVO, I am authorized to have
access to all CIA records on any subject relevant to this
litigation, and am authorized to sign declarations on behalf of
the CIA regarding searches of CIA records systems and the
contents of records, including those located in, or containing
information under the cognizance of, CIA directorates other than
the NCS.

4.   As a senior CIA official and under a written delegation
of authority pursuant to section 1.3(c) of Executive Order

12958, as amended,[2] I hold original classification authority at the TOP SECRET level. I am authorized, therefore, to conduct classification reviews and to make original classification and declassification decisions. When acting as RVO, which I am doing in this litigation, my original classification and declassification authority extends to all CIA information.

5. Through the exercise of my official duties, I am familiar with this civil action. I make the following statements based upon my personal knowledge and information made available to me in my official capacity.

6. The purpose of this declaration is to describe, to the greatest extent possible on the public record, the Plaintiffs' Freedom of Information Act (FOIA) request, the procedural history of this case, the President's 6 September 2006 speech acknowledging the existence of a CIA detention and interrogation program, the effect of the President's speech on this case, the CIA's records search for documents responsive to Plaintiffs' FOIA request, the documents located, and the FOIA exemptions upon which the CIA relies to withhold the documents.

---

[2] Executive Order 12958 was amended by Executive Order 13292. See Exec. Order No. 13292 (Mar. 28, 2003). All citations to Exec. Order No. 12958 are to the Order as amended by Exec. Order No. 13292. See Exec. Order No. 12,958, 3 C.F.R. 333 (1995), reprinted as amended in 50 U.S.C.A. § 435 note at 180 (West. Supp. 2006).

## Plaintiffs' FOIA Request

7.   Plaintiffs' 25 May 2004 letter (hereinafter "general FOIA request") requested records since 11 September 2001 relating to "the treatment of Detainees in United States custody, the deaths of Detainees in United States custody; and, the rendition of Detainees and other individuals to foreign powers known to employ torture or illegal interrogation techniques." Plaintiffs' 16 August 2004 letter specified 70 items that they considered included within their general FOIA request. This declaration addresses three of Plaintiffs' specific requests. Item No. 1 requested a "Late 2001 Memorandum from DOJ to CIA interpreting the Convention Against Torture." Item No. 29 requested a "DOJ memorandum, specifying interrogation methods that the CIA may use against top al-Qaeda members." Item No. 61 requested a "Directive signed by President Bush that grants CIA, the authority to set up detention facilities outside the United States and/or outlining interrogation methods that may be used against Detainees."

## Procedural History

8.   Relying on the *Glomar* doctrine and FOIA Exemptions b(1) and b(3), the CIA refused to confirm or deny the existence of documents responsive to Items No. 1, 29, and 61.  The CIA

4

determined that confirming or denying the existence of the documents would have revealed whether it had an interest in engaging in a clandestine intelligence activity.  On 29 September, 2 November, and 19 December 2005, the Court upheld the CIA's *Glomar* response with respect to Items No. 29 and 61, but denied its *Glomar* response with respect to Item No. 1.  On 14 February 2006, the CIA offered an administrative response to Plaintiffs with respect to Item No. 1.  The CIA responded that it had not located any documents responsive to Item No. 1, but had located one similar document that was responsive to the general FOIA request.  The CIA withheld this document in its entirety on the bases of FOIA Exemptions b(1), b(3), and b(5).

9.  On 9 January 2006, Plaintiffs appealed the district court's judgment upholding the CIA's *Glomar* response with respect to Items No. 29 and 61.  The parties completed their briefing on the *Glomar* issue by 22 May 2006 and the appeal was argued to the U.S. Court of Appeals for the Second Circuit on 12 June 2006.  The Court of Appeals requested and received supplemental letter briefs from the CIA and Plaintiffs on 16 June and 21 June 2006, respectively.  On 6 September 2006, while the appeal was pending, President Bush delivered a speech acknowledging the existence of a CIA terrorist detention and interrogation program, which is described in paragraphs 12-13.  That same date, the CIA filed a notice advising the appeals

court that the President's speech may affect the CIA's position with respect to Plaintiffs' appeal.

10.   On 12 September 2006, the Court of Appeals ordered the CIA to show cause why, in light of the President's 6 September 2006 speech, the portion of the judgment of the district court relating to the *Glomar* issue should not be vacated and the case remanded for further proceedings.  On 18 and 20 September 2006, respectively, the CIA and Plaintiffs consented to a remand to the district court.  On 22 September 2006, the Court of Appeals vacated the portion of the judgment of the district court relating to the *Glomar* issue and remanded the case for further proceedings.  On 2 November 2006, the Court of Appeals issued its mandate.[3]

11.   On 10 November 2006, the CIA withdrew its *Glomar* response and acknowledged that it had located two documents responsive to Items No. 29 and 61.  The CIA withheld these documents in their entirety on the bases of FOIA Exemptions b(1), b(3), and b(5).

---

[3] By order dated 1 November 2006, the appeals court recalled its 25 September 2006 mandate and amended its 22 September 2006 order to clarify that the court was vacating only that portion of the district court's order that was the subject of this appeal--the *Glomar* issue--and was not vacating the entire district court order, which also dealt with other agencies and documents.

The President's 6 September 2006 Speech

12.   On 6 September 2006, President Bush delivered a speech that officially acknowledged the existence of a CIA terrorist detention and interrogation program.  The President acknowledged that a small number of suspected terrorist leaders and operatives captured during the war on terrorism have been held and questioned outside the United States in a program operated by the CIA.  He further acknowledged that the CIA employed an alternative set of interrogation procedures that the Department of Justice (DOJ) had reviewed and determined to be lawful.  He announced that fourteen suspected terrorists in CIA custody had been transferred to the United States Naval Base Guantanamo Bay, Cuba.  He stated that, due to the transfers, no detainees remained in the CIA program.  He also stated that as more suspected high-ranking terrorists are captured, the need to obtain intelligence from such individuals will remain critical, and having a CIA program for questioning terrorists will continue to be crucial to getting lifesaving information.

13.   The President emphasized that he was making limited disclosures only and specifically declined to provide any information relating to the details of the CIA terrorist detention and interrogation program, including the locations where the detainees were held, the details of their confinement,

and the specific interrogation methods proposed, authorized, or

employed with them.  The President stated:

> Many specifics of this program, including where these
> detainees have been held and the details of their
> confinement, cannot be divulged.  Doing so would provide
> our enemies with information they could use to take
> retribution against our allies and harm our country.  I can
> say that questioning the detainees in this program has
> given us information that has saved innocent lives by
> helping us stop new attacks here in the United States and
> across the world . . . .

> . . . . And so the CIA used an alternative set of
> procedures . . . . I cannot describe the specific methods
> used -- I think you understand why -- if I did, it would
> help the terrorists learn how to resist questioning and to
> keep information from us that we need to prevent new
> attacks on our country . . . .

> This program has been and remains one of the most
> vital tools in our war against the terrorists.  It is
> invaluable to America and to our allies.

> Were it not for this program, our intelligence
> community believes that al Qaeda and its allies would have
> succeeded in launching another attack against the American
> homeland.  By giving us information about terrorist plans
> we could not get anywhere else, this program has saved
> innocent lives.

### Declassification

14.  In his speech, the President stated that he officially

acknowledged the existence of a CIA terrorist detention and

interrogation program for two reasons.  First, he stated that

the CIA had largely completed its questioning of the fourteen

suspected terrorists and that it was time to bring them into the

open to start the process for bringing them to trial.  Second,

he stated that the *Hamdan* decision had put into question the future of the CIA program.

15.   Section 3.1(b) of Executive Order 12958 provides that, in some exceptional cases, the need to protect classified information may be outweighed by the public interest in disclosure of the information.  In light of the President's determination to bring the CIA detainees to trial, the Director of the CIA, in accordance with section 3.1(b), determined that the public interest in disclosure of the existence of the CIA terrorist detention and interrogation program and the limited information disclosed in the President's speech outweighed the need to protect certain limited classified information relating to the existence of the program.  Neither the President nor the Director of the CIA disclosed any information relating to the details of the CIA terrorist detention and interrogation program, including the locations where the detainees were held, the details of their confinement, or the specific interrogation methods proposed, authorized, or employed with them.

CIA Records Search

16.   The CIA processed Plaintiffs' requests for records responsive to Items No. 1, 29, and 61 in accordance with the FOIA, 5 U.S.C. § 552, as amended.  After conducting a diligent search of relevant systems of records that was reasonably

calculated to discover any responsive records, the CIA located one document responsive to Item No. 29 and one document responsive to Item No. 61.  The CIA did not locate a document responsive to Item No. 1, but did locate one similar document that is responsive to the general FOIA request in Plaintiffs' 25 May 2004 letter.  The CIA has included this document in this Vaughn declaration, and for purposes of this declaration will refer to this document as "responsive" to Item No. 1.

17.  The document responsive to Item No. 1 is withheld in its entirety on the basis of FOIA Exemption b(5).  The documents responsive to Items No. 29 and 61 are withheld in their entirety on the bases of FOIA Exemptions b(1), b(3), and b(5).  All of the documents are withheld in their entirety because there is no meaningful, non-exempt information that can be reasonably segregated from the exempt information.

### FOIA Exemption b(1)

18.  FOIA Exemption b(1) provides that the FOIA does not apply to matters that are:

(A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and

(B) are in fact properly classified pursuant to such Executive order.

5 U.S.C. § 552(b)(1).

10

19.  The authority to classify information is derived from a succession of Executive orders, the most recent of which is Executive Order 12958.  I have reviewed the two documents responsive to Items No. 29 and 61 under the criteria established by Executive Order 12958 and have determined that the information withheld on the basis of FOIA Exemption b(1) is in fact properly classified pursuant to the Order.

20.  Section 6.1(h) of the Executive Order defines "classified national security information" or "classified information" as "information that has been determined pursuant to this order or any predecessor order to require protection against unauthorized disclosure and is marked to indicate its classified status when in documentary form."  Section 6.1(y) of the Order defines "national security" as the "national defense or foreign relations of the United States."

21.  Section 1.1(a) of the Executive Order provides that information may be originally classified under the terms of this order only if all of the following conditions are met:

   (1) an original classification authority is classifying the information;

   (2) the information is owned by, produced by or for, or is under the control of the United States Government;

   (3) the information falls within one or more of the categories of information listed in section 1.4 of this order; and

11

> (4) the original classification authority determines
> that the unauthorized disclosure of the information
> reasonably could be expected to result in damage to the
> national security, which includes defense against
> transnational terrorism, and the original classification
> authority is able to identify or describe the damage.

Exec. Order 12958, § 1.1(a).

22.  *Original classification authority* - Section 1.3(a) of
the Executive Order provides that the authority to classify
information originally may be exercised only by the President
and, in the performance of executive duties, the Vice President;
agency heads and officials designated by the President in the
*Federal Register;* and United States Government officials
delegated this authority pursuant to section 1.3(c) of the
Order.  Section 1.3(c)(2) provides that TOP SECRET original
classification authority may be delegated only by the President;
in the performance of executive duties, the Vice President; or
an agency head or official designated pursuant to section
1.3(a)(2) of the Executive Order.

23.  In accordance with section 1.3(a)(2), the President
designated the Director of the CIA as an official who may
classify information originally as TOP SECRET.[4]  Under the
authority of section 1.3(c)(2), the Director of the CIA has

---

[4] Order of President, Designation under Executive Order 12958, 70 Fed. Reg.
21,609 (Apr. 21, 2005), reprinted in U.S.C.A. § 435 note at 192 (West Supp.
2006).  This order succeeded the prior Order of President, Officials
Designated to Classify National Security Information, 60 Fed. Reg. 53,845
(Oct. 13, 1995), reprinted in U.S.C.A. § 435 note at 486 (West 2006), in
which the President similarly designated the Director of the CIA as an
official who may classify information originally as TOP SECRET.

delegated original TOP SECRET classification authority to me. Section 1.3(b) of the Executive Order provides that original TOP SECRET classification authority includes the authority to classify information originally as SECRET and CONFIDENTIAL. With respect to the information for which FOIA Exemption b(1) is asserted in this case, I have reviewed the documents responsive to Items No. 29 and 61 and have determined that they contain information that is currently and properly classified TOP SECRET by an original classification authority.

24. *U.S. Government information* - Information may be originally classified only if the information is owned by, produced by or for, or is under the control of the United States Government. With respect to the information for which FOIA Exemption b(1) is asserted in this case, I have reviewed the documents responsive to Items No. 29 and 61 and have determined that they are owned by the U.S. Government, produced by the U.S. Government, and under the control of the U.S. Government.

25. *Categories of classified information* - Information may be classified only if it concerns one of the categories of information set forth in section 1.4 of the Executive Order. With respect to the information for which FOIA Exemption b(1) is asserted in this case, I have reviewed the documents responsive to Items No. 29 and 61 and have determined that they contain

13

information that concerns one or more of the following

classification categories in the Executive Order:

> (a)   Information concerning intelligence activities
> (including special activities), or intelligence sources or
> methods [§ 1.4(c)]; and

> (b)   Information concerning foreign relations or
> foreign activities of the United States, including
> confidential sources [§ 1.4(d)].

26.   *Damage to the national security* – Section 1.2(a) of

the Executive Order provides that information shall be

classified at one of three levels if the unauthorized disclosure

of the information reasonably could be expected to cause damage

to the national security, which includes defense against

transnational terrorism, and the original classification

authority is able to identify or describe the damage.

Information shall be classified TOP SECRET if its unauthorized

disclosure reasonably could be expected to result in *extremely*

*grave damage* to the national security; SECRET if its

unauthorized disclosure reasonably could be expected to result

in *serious damage* to the national security; and CONFIDENTIAL if

its unauthorized disclosure reasonably could be expected to

result in *damage* to the national security.

27.   With respect to the information for which FOIA

Exemption b(1) is asserted in this case, I have reviewed the

documents responsive to Items No. 29 and 61 and have determined

that their unauthorized disclosure reasonably could be expected

to result in extremely grave damage to the national security, including damage to the United States' defense against transnational terrorism, and thus they are classified TOP SECRET.  The damage to national security, including damage to the United States' defense against transnational terrorism, that reasonably could be expected to result from the unauthorized disclosure of this classified information is described in the relevant paragraphs below in the sections identifying the documents responsive to Items No. 29 and 61.  See ¶¶ 57-60 and 70-74.

28.   *Proper purpose* - I have reviewed the documents responsive to Items No. 29 and 61 and have determined that no information has been classified in order to conceal violations of law, inefficiency, or administrative error; prevent embarrassment to a person, organization or agency; restrain competition; or prevent or delay the release of information that does not require protection in the interests of national security.

29.   *Marking* - I have reviewed the documents responsive to Items No. 29 and 61 and have determined that they are properly marked in accordance with section 1.6 of the Executive Order. Each document bears on its face one of the three classification levels defined in section 1.2 of the order; the identity, by name or personal identifier and position, of the original

classification authority; the agency and office of origin, if
not otherwise evident; declassification instructions; and a
concise reason for classification that, at a minimum, cites the
applicable classification categories of section 1.4.

30. *Proper classification* - I have reviewed the documents
responsive to Items No. 29 and 61 and have determined that they
have been classified in accordance with the substantive and
procedural requirements of Executive Order 12958 and that,
therefore, they are currently and properly classified.

31. *Special access program* - Section 6.1(kk) of the
Executive Order defines a "special access program" as "a program
established for a specific class of classified information that
imposes safeguarding and access requirements that exceed those
normally required for information at the same classification
level." Section 4.3 of the Order specifies the U.S. Government
officials who may create a special access program. This section
further provides that for special access programs pertaining to
intelligence activities (including special activities, but not
including military operations, strategic, and tactical
programs), or intelligence sources or methods, this function
shall be exercised by the Director of the CIA. This section
specifies that special access programs shall be established only
when the program is required by statute or upon a specific
finding that the vulnerability of, or threat to, specific

information is exceptional; and the normal criteria for
determining eligibility for access applicable to information
classified at the same level are not deemed sufficient to
protect the information from unauthorized disclosure.

32.  Officials of the National Security Council (NSC)
determined that in light of the extraordinary circumstances
affecting the vital interests of the United States and the
sensitivity of the activities contemplated in the document, it
is essential to limit access to the information in the document
responsive to Item No. 61.  NSC officials established a special
access program[5] governing access to information relating to
activities described in the document, including the CIA
terrorist detention and interrogation program.  As the executive
agent for implementing the terrorist detention and interrogation
program, the CIA is responsible for limiting access to such
information in accordance with the NSC's direction.

33.  The documents responsive to Items No. 29 and 61
contain classified information, including information relating
to the CIA terrorist detention and interrogation program, that
falls within the strict access provisions of this special access
program.

---

[5] The name of the special access program is itself classified SECRET.

FOIA Exemption b(3)

34.   FOIA Exemption b(3) provides that the FOIA does not apply to matters that are:

> specifically exempted from disclosure by statute (other than section 552b of this title), provided that such statute
>
>> (A) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue, or
>>
>> (B) establishes particular criteria for withholding or refers to particular types of matters to be withheld . . .

5 U.S.C. § 552(b)(3).   I have reviewed the documents responsive to Items No. 29 and 61 and have determined that there are two relevant withholding statutes.

35.   *National Security Act of 1947* - Section 102A(i)(1) of the National Security Act of 1947, as amended, 50 U.S.C.A. § 403-1(i)(1) (West Supp. 2006), provides that the Director of National Intelligence (DNI) shall protect intelligence sources and methods from unauthorized disclosure.   I have reviewed the documents responsive to Items No. 29 and 61 and have determined that they contain information, including information relating to the CIA's terrorist detention and interrogation program, that if disclosed would reveal intelligence sources and methods, including clandestine intelligence activities and interrogation methods.   For this reason, the DNI authorized the Director of the CIA to take all necessary and appropriate measures in this

18

case to ensure that intelligence sources and methods are protected from disclosure. The CIA, therefore, relies on the National Security Act of 1947 to withhold any information that would reveal intelligence sources and methods.

36.  In contrast to Executive Order 12958, the National Security Act's statutory requirement to protect intelligence sources and methods does not require the CIA to identify or describe the damage to national security that reasonably could be expected to result from their unauthorized disclosure.  In any event, the information relating to intelligence sources and methods in the documents responsive to Items No. 29 and 61 that is covered by the National Security Act is the same as the information relating to intelligence sources and methods that is covered by the Executive Order for classified information. Therefore, the damage to national security, including damage to the United States' defense against transnational terrorism, that reasonably could be expected to result from the unauthorized disclosure of such information relating to intelligence sources and methods is co-extensive with the damage that reasonably could be expected to result from the unauthorized disclosure of classified information, which is described in the relevant paragraphs below in the sections identifying the documents responsive to Items No. 29 and 61.  See ¶¶ 57-60 and 70-74.

37. *Central Intelligence Agency Act of 1949* - Section 6 of
the Central Intelligence Agency Act of 1949, as amended,
50 U.S.C.A. § 403g (West Supp. 2006), provides that in the
interests of the security of the foreign intelligence activities
of the United States and in order to further implement section
403-1(i) of Title 50, which provides that the DNI shall be
responsible for the protection of intelligence sources and
methods from unauthorized disclosure, the CIA shall be exempted
from the provisions of any law which requires the publication or
disclosure of the organization, functions, names, official
titles, salaries, or numbers of personnel employed by the CIA.
In accordance with section 403-4a(d) of the National Security
Act of 1947, as amended, 50 U.S.C.A. § 403-4a(d) (West. Supp.
2006), foremost among the functions of the CIA is the collection
of intelligence through human sources and by other appropriate
means.

38. I have reviewed the documents responsive to Items No.
29 and 61 and have determined that they contain information,
including information relating to the CIA's terrorist detention
and interrogation program, that if disclosed would reveal the
functions of the CIA, including the conduct of clandestine
intelligence activities to collect intelligence from human
sources using interrogation methods.  In the interests of the
security of the foreign intelligence activities of the United

20

States and in order to further implement the DNI's
responsibility to protect intelligence sources and methods from
unauthorized disclosure, the CIA relies on the Central
Intelligence Agency Act of 1949 to withhold any information that
would reveal the functions of the CIA, including the collection
of foreign intelligence through intelligence sources and
methods--such as the conduct of clandestine intelligence
activities to collect intelligence from human sources using
interrogation methods.

39.   Again, in contrast to Executive Order 12958, the CIA
Act's statutory requirement to further protect intelligence
sources and methods by protecting CIA functions does not require
the CIA to identify or describe the damage to national security
that reasonably could be expected to result from their
unauthorized disclosure.  In any event, the information relating
to CIA functions and intelligence sources and methods contained
in the documents responsive to Items No. 29 and 61 that is
covered by the CIA Act's statutory requirement is the same as
the information relating to intelligence sources and methods
that is covered by the Executive Order for classified
information.  Therefore, the damage to national security,
including damage to the United States' defense against
transnational terrorism, that reasonably could be expected to
result from the unauthorized disclosure of CIA functions and

intelligence sources and methods is co-extensive with the damage
that reasonably could be expected to result from the
unauthorized disclosure of classified information, which is
described in the relevant paragraphs below in the sections
identifying the documents responsive to Items No. 29 and 61.
See ¶¶ 57-60 and 70-74.

### FOIA Exemption b(5)

40.   FOIA Exemption b(5) provides that the FOIA does not
apply to matters that are inter-agency or intra-agency
memorandums or letters which would not be available by law to a
private party other than an agency in litigation with the
agency.  I have reviewed the three documents at issue and have
determined that they are inter-agency memoranda that contain
information that is protected from disclosure by four
privileges.

41.   *Attorney-client* - The attorney-client privilege
protects confidential communications between a client and his
attorney relating to a matter for which the client has sought
legal advice.  I have reviewed the document responsive to Item
No. 29 and have determined that it contains confidential
communications between attorneys at the Office of Legal Counsel
(OLC) of DOJ and its client, the CIA, relating to a matter for
which the CIA sought DOJ's legal advice.  This document was

prepared by OLC in its role of assisting the Attorney General in the discharge of his responsibilities as legal advisor to the President and the heads of the Executive Branch departments and agencies. In preparing this document, OLC performed a purely advisory role, providing legal advice and assistance. Although I understand that on rare occasions OLC has drafted memoranda with the expectation that they will be made public, generally OLC memoranda are prepared with the expectation that they will be held in confidence. This document was prepared by OLC for the CIA with the joint expectation of the CIA and OLC that it would be held in confidence, and it has been held in confidence.

42. I have reviewed the document responsive to Item No. 61 and have determined that a portion of it contains confidential communications among attorneys at CIA, DOJ, and the NSC staff, and their client, the President, relating to a matter for which the NSC sought their legal advice. The NSC is the President's principal forum for considering national security and foreign policy matters with his senior national security advisors and cabinet officials. A portion of this document was prepared by NSC attorneys, with input from DOJ attorneys and CIA attorneys, as part of the NSC's role of advising the President on legal matters affecting the national security and foreign policy. A portion of this document was prepared by NSC officials with the

expectation of the President, NSC, DOJ, and CIA that it would be held in confidence, and it has been held in confidence.

43. The document responsive to Item No. 29 and a portion of the document responsive to Item No. 61 reveal information provided by government clients to government attorneys, as well as opinions given by those attorneys to their clients based upon and reflecting that information, as well as communications among attorneys that reflect client-supplied information.

44. *Attorney work-product* - The attorney work-product privilege protects information, legal analysis, and opinions prepared by attorneys in contemplation of criminal, civil, and administrative proceedings.

45. I have reviewed the documents responsive to Items No. 1 and 29 and have determined that they contain information, legal analysis, and opinions prepared by OLC attorneys at the request of the CIA in contemplation of criminal, civil, and administrative proceedings.[6]  These two documents were prepared by OLC for the CIA with the joint expectation of the CIA and OLC that they would be held in confidence, and they have been held in confidence.

46. *Deliberative process* - The deliberative process privilege protects inter-agency or intra-agency predecisional

---

[6] In its administrative response letters dated 14 February and 10 November 2006, the CIA claimed the attorney work-product privilege for the document responsive to Item No. 1, but did not claim the attorney work-product privilege for the document responsive to Item No. 29.

deliberations, including preliminary evaluations, opinions, and recommendations of government officials. The documents responsive to Items No. 1 and 29 and a portion of the document responsive to Item No. 61 contain inter-agency predecisional deliberations, including preliminary evaluations, opinions, and recommendations of NSC, DOJ, and CIA officials. Disclosure of the deliberations would discourage open, frank discussions on matters of policy between subordinates and superiors, result in premature disclosure of proposed policies before they are finally adopted, and create public confusion by disclosing considerations that were not in fact ultimately the grounds for a governmental action.

47. With respect to the withheld information protected by the attorney-client, attorney work-product, and deliberative process privileges, compelled disclosure of these advisory and predecisional documents would cause serious harm to the deliberative processes of the President, NSC, DOJ, CIA, and the Executive Branch as a whole and disrupt the attorney-client relationship between the President and Director of the CIA and their attorneys at the NSC, DOJ, and CIA. Attorneys in the NSC, DOJ, and CIA are often asked to provide advice and analysis with respect to very difficult and unsettled areas of law. Frequently, such issues arise in connection with highly complex and sensitive intelligence activities. It is essential to the

constitutional mission of the Executive Branch that legal advice from NSC, DOJ, and CIA, and the development of that advice, not be inhibited by concerns about public disclosure. Protecting the confidentiality of these documents is essential in order to ensure that even controversial legal issues may be explored candidly, effectively, and in writing, to ensure that Executive Branch officials will continue to request legal advice on such matters. Especially in light of the Nation's ongoing fight against global terrorism, and the public interest in the effective performance of these activities, the need of the President and Director of the CIA for candid, thoroughly considered legal advice in considering potential executive actions is compelling.

48. *Presidential communications* – The presidential communications privilege protects confidential communications between the President and his advisors. I have reviewed the document responsive to Item No. 61 and have determined that it was created by NSC officials at the direction of the President, is signed by the President, and contains confidential communications among the President, members of the NSC, and the Director of the CIA. This document was prepared with the expectation of the President, NSC, and CIA that it would be held in confidence, and it has been held in confidence.

Item No.  1

49.   Item No. 1 requested a "Late 2001 Memorandum from DOJ
to CIA interpreting the Convention Against Torture."  Although
the CIA did not locate such a memorandum, the CIA did locate a
similar document that is responsive to the general FOIA request
in Plaintiffs' 25 May 2004 letter.  The CIA has included this
document in this *Vaughn* declaration, and for purposes of this
declaration will refer to this document as "responsive" to Item
No. 1.  The document responsive to the general FOIA request that
is similar to Item No. 1 is a 31-page undated, unsigned, draft
legal memorandum from OLC to the Office of General Counsel of
the CIA that interprets the Convention Against Torture.  This
document is withheld in its entirety on the basis of FOIA
Exemption b(5).

50.   This undated, unsigned, draft legal memorandum
contains a preliminary analysis of legal matters relating to the
Convention Against Torture and certain other laws and contains a
preliminary version of DOJ's confidential legal analysis and
opinion to the CIA regarding the Convention Against Torture.

51.   *Exemption b(5): Attorney work-product* - This draft
document contains preliminary legal analysis and opinions
prepared by OLC attorneys at the request of the CIA in
contemplation of criminal, civil, and administrative
proceedings.  This legal analysis and opinion is protected from

27

disclosure by the attorney work-product privilege described in paragraphs 44-45, and thus the document responsive to Item No. 1 is withheld in its entirety under Exemption (b)(5).

52.   *Deliberative process* - This draft document contains inter-agency predecisional deliberations between DOJ and the CIA, and reflects intra-agency predecisional deliberations within the CIA, including preliminary evaluations, opinions, and conclusions of government officials that are protected from disclosure by the deliberative process privilege described in paragraphs 46-47, and thus the document responsive to Item No. 1 is withheld in its entirety under Exemption (b)(5).   The deliberations and preliminary conclusions in this draft are not adopted or explicitly referenced in a decision memorandum.

53.   Portions of the document responsive to Item No. 1 contain information that is substantially similar to information contained in two OLC legal memoranda that have been officially released to the public by DOJ.[7]   Disclosure of the draft memorandum responsive to Item No. 1 would permit one to compare the draft OLC legal memorandum with the two released OLC legal memoranda and identify the similarities and differences between the draft and final legal documents.   Such a comparison would

---

[7] See Memorandum for Alberto R. Gonzales, Counsel to the President, from Jay S. Bybee, Asst. Att'y Gen., OLC, DOJ, *Re: Standards of Conduct for Interrogation Under 18 U.S.C. §§ 2340-2340A*, Aug. 1, 2002, *superseded by* Memorandum for James B. Comey, Dep. Att'y Gen., DOJ, from Daniel Levin, Acting Asst. Att'y Gen., OLC, DOJ, Re:  Legal Standards Applicable Under 18 U.S.C. §§ 2340-2340A, Dec. 30, 2004.

damage the very interests sought to be protected by the attorney work-product and deliberate process privileges.  Compelled disclosure of such draft analyses, opinions, and conclusions in this confidential, predecisional, deliberative document would discourage open, frank discussions and would cause serious harm to the deliberative processes of DOJ and the CIA, and disrupt the relationship between the Attorney General and the Director of the CIA for the reasons stated in paragraphs 44-47.

54.   This document is withheld in its entirety on the basis of FOIA Exemption b(5) because there is no meaningful unprivileged information that can be reasonably segregated from the information protected by the attorney work-product and deliberative process privileges.

## Item No. 29

55.   Item No. 29 requested a "DOJ memorandum, specifying interrogation methods that the CIA may use against top al-Qaeda members."  DOJ does not "specify" the activities in which clients may engage, but rather provides legal advice to clients. The CIA, therefore, interprets Plaintiffs' FOIA request in Item No. 29 as a request for a DOJ memorandum advising the CIA regarding interrogation methods it may use against al Qaeda members.  Pursuant to that interpretation, the document responsive to Item No. 29 is an 18-page legal memorandum dated

29

1 August 2002 from OLC to the Office of General Counsel of the
CIA.  This document is withheld in its entirety on the basis of
FOIA Exemption b(5).  Substantial portions of this document also
contain information relating to intelligence sources and methods
that is classified TOP SECRET and is withheld on the bases of
FOIA Exemptions b(1) and b(3).

56.  This legal memorandum contains DOJ's confidential
legal advice to the CIA regarding potential interrogation
methods.  It includes confidential communications from the
client (CIA) to the attorney (DOJ) regarding potential
interrogation methods and the context in which their use was
contemplated.  It then contains DOJ's confidential legal
analysis and opinion to the CIA regarding the potential
interrogation methods.

57.  *Exemption b(1)* - Substantial portions of this document
contain information relating to intelligence activities,
intelligence sources, and intelligence methods that is currently
and properly classified at the TOP SECRET level pursuant to
section 1.4(c) of Executive Order 12958, as amended, as
described in paragraph 18-33, as its disclosure reasonably could
be expected to cause exceptionally grave damage to the national
security, and thus is withheld under Exemption (b)(1).  In
accordance with the NSC's direction to the CIA to establish a
special access program for information relating to the CIA

terrorist detention and interrogation program, the CIA is charged with strictly controlling access to the information contained in the document responsive to Item No. 29.

58.  Disclosure of information regarding potential interrogation methods and the context in which their use was contemplated reasonably could be expected to cause exceptionally grave damage to the national security by revealing to the public--including avowed enemies of the United States during an ongoing war against global terrorism--alternative interrogation methods by which the CIA seeks to collect critical foreign intelligence to disrupt terrorist attacks against the United States and its citizens and interests worldwide.

59.  In his 6 September 2006 speech, the President announced that, with the transfer of fourteen suspected terrorists to Guantanamo Bay, no detainees remained in CIA custody.  Importantly, he also stated that as more suspected high-ranking terrorists are captured, the need to obtain intelligence from such individuals will remain critical, and having a CIA program for questioning terrorists will continue to be crucial to getting lifesaving information.  In reserving the option of detaining terrorists in CIA custody in the future, the President also declined to identify the alternative interrogation methods proposed, authorized, or employed with

31

detainees, or the context in which such methods may be used.
The President stated:

> Many specifics of this program, including where the
> detainees have been held and the details of their
> confinement, cannot be divulged.  Doing so would provide
> our enemies with information they could use to take
> retribution against our allies and harm our country . . . .
> And so the CIA used an alternative set of procedures
> . . . . I cannot describe the specific methods used --
> I think you understand why -- if I did, it would help the
> terrorists learn how to resist questioning and to keep
> information from us that we need to prevent new attacks on
> our country.

60.  The CIA knows from intelligence collection that al
Qaeda trains operatives in interrogation resistance.  If al
Qaeda learns the CIA interrogation methods proposed, authorized,
or employed with detainees, then al Qaeda training in
interrogation resistance techniques could become more effective.
This could allow a captured al Qaeda operative to resist
cooperation, thus jeopardizing the national security by limiting
intelligence collection on terrorist activities and potentially
preventing the United States from averting another terrorist
attack.

61.  *Exemption b(3)* - Substantial portions of this document
contain information relating to intelligence sources and methods
that is protected from disclosure by the statutory requirements
established by section 102A(i)(1) of the National Security Act
of 1947, as amended, 50 U.S.C.A. § 403-1(i)(1) (West Supp.

2006), and section 6 of the CIA Act of 1949, as amended, 50
U.S.C.A. § 403g (West Supp. 2006), described in paragraphs
34-39, and thus is withheld under Exemption (b)(3).  The
information relating to intelligence sources and methods
protected by the National Security Act and the CIA Act is the
same as that protected by Executive Order 12958, and is
described in paragraphs 57-60.

62.  *Exemption b(5): Attorney-client.*  This document
contains confidential communications between OLC attorneys and
their clients concerning information provided by the CIA in the
course of requesting legal advice from DOJ.  These
communications are protected from disclosure by the
attorney-client privilege described in paragraphs 41-43, and
thus the document responsive to Item No. 29 is withheld in its
entirety under Exemption (b)(5).

63.  *Attorney work-product* - This document contains
information, legal analysis, and opinions prepared by OLC
attorneys at the request of the CIA in contemplation of
criminal, civil, and administrative proceedings.  This
information, legal analysis, and opinion is protected from
disclosure by the attorney work-product privilege described in
paragraphs 44-45, and thus the document responsive to Item No.
29 is withheld in its entirety under Exemption (b)(5).

33

64.  *Deliberative process* - This document contains
inter-agency predecisional deliberations between DOJ and the
CIA, and reflects intra-agency deliberations within the CIA,
including preliminary evaluations and opinions of government
officials that are protected from disclosure by the deliberative
process privilege described in paragraphs 46-47, and thus the
document responsive to Item No. 29 is withheld in its entirety
under Exemption (b)(5).  The deliberations are not adopted or
explicitly referenced in a decision memorandum.

65.  This document is withheld in its entirety because
there is no meaningful unclassified and unprivileged information
that can be reasonably segregated from the classified
information relating to intelligence sources and methods and
information protected by the attorney-client, attorney work-
product, and deliberative process privileges.

## Item No. 61

66.  Item No. 61 requested a "Directive signed by President
Bush that grants CIA, the authority to set up detention
facilities outside the United States and/or outlining
interrogation methods that may be used against Detainees."  The
CIA did not locate a document signed by President Bush outlining
interrogation methods that may be used against detainees.  The
CIA did locate one document signed by President Bush that

pertains to the CIA's authorization to set up detention facilities outside the United States. The document responsive to Item No. 61 is a 14-page memorandum dated 17 September 2001 from President Bush to the Director of the CIA pertaining to the CIA's authorization to detain terrorists. This document is withheld in its entirety on the basis of FOIA Exemption b(5). Substantial portions of this document contain information relating to intelligence sources and methods and foreign relations and foreign activities of the United States that is classified TOP SECRET and is withheld on the bases of FOIA Exemptions b(1) and b(3).

67. This 14-page document consists of a 12-page notification memorandum and an attached two-page cover memorandum. The 12-page notification memorandum is a memorandum from the President to the members of the NSC regarding a clandestine intelligence activity. The two-page cover memorandum is a transmittal memorandum from the Executive Secretary of the NSC to the Director of the CIA.

68. The 12-page memorandum pertains to the CIA's authorization to detain terrorists. The memorandum discusses the approval of the clandestine intelligence activity and related analysis and description. The memorandum also discusses other matters not relevant to Plaintiffs' general or specific FOIA requests.

69.  The two-page cover memorandum is a transmittal memorandum from the Executive Secretary of the NSC to the Director of the CIA.  It forwards to the Director of the CIA the attached notification memorandum, along with other information relating to implementation of the activity.

70.  *Exemption b(1)* - Substantial portions of the notification memorandum and portions of the cover memorandum contain information relating to intelligence activities, intelligence sources, and intelligence methods, and foreign relations and foreign activities of the United States that is currently and properly classified at the TOP SECRET level pursuant to sections 1.4(c) and (d) of Executive Order 12958, as amended, as described in paragraphs 18-33, as its disclosure reasonably could be expected to cause exceptionally grave damage to the national security, and thus is withheld under Exemption (b)(1).  In accordance with the NSC's direction to the CIA to establish a special access program for information relating to the CIA terrorist detention and interrogation program, the CIA is charged with strictly controlling access to the information contained in the document responsive to Item No. 61.

71.  The document responsive to Item No. 61 is a presidential communication regarding CIA's authorization to engage in a clandestine intelligence activity.  For the reasons stated in his speech and reiterated in paragraph 14, the

President decided to officially acknowledge the existence of an intelligence activity: the CIA terrorist detention and interrogation program. He also disclosed certain limited facts concerning the program: a small number of suspected terrorist leaders and operatives captured during the war have been held and questioned outside the United States in a program operated by the CIA; the CIA employed an alternative set of interrogation procedures; and fourteen suspected terrorists in CIA custody had been transferred to the United States Naval Base Guantanamo Bay, Cuba.

72. In the same speech, the President emphasized that he was making limited disclosures only and specifically declined to provide any information relating to the details of the CIA terrorist detention and interrogation program. The document responsive to Item No. 61 contains just the sort of specific details of the program that the President declined to disclose.

73. The document responsive to Item No. 61 contains specific information relating to the intelligence sources and methods by which the CIA was to implement the clandestine intelligence activity. Disclosure of such information reasonably could be expected to result in extremely grave damage to the national security, including the United States' defense against transnational terrorism, by revealing to our adversaries

37

the counterterrorism playbook that the CIA intended to employ with them.

74.   In addition to damaging the national security through the disclosure of intelligence sources and methods, disclosure of the information in the document responsive to Item No. 1 reasonably could be expected to impair the foreign relations and foreign activities of the United States by undermining the cooperative relationships that the United States has developed with its critical partners in the global war on terrorism.

75.   *Exemption b(3)* - Substantial portions of the notification memorandum and portions of the cover memorandum contain information relating to intelligence sources and methods that is protected from disclosure by the statutory requirements established by section 102A(i)(1) of the National Security Act of 1947, as amended, 50 U.S.C.A. § 403-1(i)(1) (West Supp. 2006), and section 6 of the CIA Act of 1949, as amended, 50 U.S.C.A. § 403g (West Supp. 2006), described in paragraphs 34-39, and thus is withheld under Exemption (b)(3).   The information relating to intelligence sources and methods protected by the National Security Act and CIA Act is the same as that protected by Executive Order 12958, and is described in paragraphs 70-74.

76.   *Exemption b(5): Attorney-client.*   Portions of the notification memorandum contain confidential communications

38

between NSC, DOJ, and CIA attorneys and the President and the
NSC concerning information provided by the clients in the course
of requesting legal advice from government attorneys.  These
communications are protected from disclosure by the attorney-
client privilege described in paragraphs 41-43, and thus are
withheld under Exemption (b)(5).

77.  *Deliberative process* - Portions of the notification
memorandum contain inter-agency predecisional deliberations,
including preliminary evaluations, opinions, and
recommendations, of NSC, DOJ, and CIA officials that are
protected from disclosure by the deliberative process privilege
described in paragraphs 46-47, and thus are withheld under
Exemption (b)(5).  The deliberations and recommendations are not
adopted or explicitly referenced in the notification memorandum.

78.  *Presidential communications* - This document,
consisting of the notification memorandum and the cover
memorandum, is a confidential communication from the President
that is protected from disclosure by the presidential
communications privilege described in paragraph 48, and thus is
withheld in its entirety under Exemption b(5).  It contains
confidential communications between the President and his
advisors.

79.  This document is withheld in its entirety because
there is no meaningful unclassified and unprivileged information

that can be reasonably segregated from the classified
information relating to intelligence sources and methods and
information protected by the attorney-client, deliberative
process, and presidential communications privileges.

### Segregability

80.   The three documents are withheld in their entirety
because there is no meaningful non-exempt information that can
be reasonably segregated from the exempt information.  The
unclassified and unprivileged information is so inextricably
intertwined with the classified and privileged information that
release of the non-exempt information would produce only
incomplete, fragmented, unintelligible sentences and phrases
composed of isolated, meaningless words.  The unclassified and
unprivileged information does not contain any meaningful
information responsive to Plaintiffs' general FOIA request for
information concerning the treatment, death, or rendition of
detainees, or Plaintiffs' specific FOIA requests for information
concerning DOJ's interpretation of the Convention Against
Torture, DOJ's legal advice regarding interrogation methods that
the CIA may use against top al Qaeda members, or a presidential
directive that grants the CIA the authority to set up detention
facilities outside the United States.

Conclusion

81.   The document responsive to Plaintiffs' general FOIA request that is similar to the document sought by Item No. 1 is withheld in its entirety on the basis of FOIA Exemption b(5) because it contains information exempt from disclosure by the attorney work-product and deliberative process privileges.

82.   The document responsive to Item No. 29 is withheld in its entirety on the basis of FOIA Exemption b(5) because it contains information that is exempt from disclosure by the attorney-client, attorney work-product, and deliberative process privileges.   Substantial portions of this document also are withheld on the basis of FOIA Exemptions b(1) and b(3) because they contain classified information relating to intelligence sources and methods that is exempt from disclosure.

83.   The document responsive to Item No. 61 is withheld in its entirety on the basis of FOIA Exemption b(5) because it contains information that is exempt from disclosure by the presidential communications privilege.   Portions of the 12-page notification memorandum are withheld on the basis of FOIA Exemption b(5) because they contain information that is exempt from disclosure by the attorney-client and deliberative process privileges.   Finally, substantial portions of the 12-page notification memorandum and the two-page cover memorandum are withheld on the bases of FOIA Exemptions b(1) and b(3) because

they contain information relating to classified intelligence

sources and methods and foreign relations and foreign activities

of the United States that is exempt from disclosure.

\*   \*   \*   \*

I hereby declare under penalty of perjury that the

foregoing is true and correct.

Executed this 5th day of January, 2007.

Marilyn A. Dorn
Information Review Officer
National Clandestine Service
Central Intelligence Agency