UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

AMERICAN CIVIL LIBERTIES UNION, CENTER FOR CONSTITUTIONAL RIGHTS, PHYSICIANS FOR HUMAN RIGHTS, VETERANS FOR COMMON SENSE AND VETERANS FOR PEACE,

Plaintiffs,

v.

DEPARTMENT OF DEFENSE, AND ITS COMPONENTS DEPARTMENT OF ARMY, DEPARTMENT OF NAVY, DEPARTMENT OF AIR FORCE, DEFENSE INTELLIGENCE AGENCY; DEPARTMENT OF HOMELAND SECURITY; DEPARTMENT OF JUSTICE, AND ITS COMPONENTS CIVIL RIGHTS DIVISION, CRIMINAL DIVISION, OFFICE OF INFORMATION AND PRIVACY, OFFICE OF INTELLIGENCE, POLICY AND REVIEW, FEDERAL BUREAU OF INVESTIGATION; DEPARTMENT OF STATE; AND CENTRAL INTELLIGENCE AGENCY,

Defendants.

DOCKET NO. 04-CV-4151 (AKH)

**Document Electronically Filed**

---

**PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR CONTEMPT AND SANCTIONS**

# <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................1

ARGUMENT .....................................................................................................4

    I. THE CIA'S OWN STATEMENTS DEMONSTRATE THAT THE
    DESTROYED VIDEOTAPES "WERE IDENTIFIED AND PRODUCED TO
    THE OFFICE OF INSPECTOR GENERAL" WITHIN THE MEANING OF
    THIS COURT'S ORDERS.................................................................................4

    II. THE SO-CALLED "SPECIAL REVIEW" UNDER WHICH THE CIA
    EXAMINED THE TAPES IS CLEARLY AN "INVESTIGATION" WITHIN
    THE MEANING OF THE CIA INFORMATION ACT ...................................8

        A. The So-Called "Special Review" Is An "Investigation" Into
        Impropriety Or Illegality Within The Meaning Of The CIA Information
        Act..............................................................................................................8

            1. The CIA's construction of "investigation" finds no support in the
            CIA's OIG statute or the CIA Information Act. ....................................9

            2. The CIA's own description of the 2003 "special review" within
            which the videotapes were viewed demonstrates that it is in fact an
            "investigation" into impropriety or illegality. .......................................15

    III. EVEN IF THIS COURT WERE TO CONCLUDE THAT THE CIA'S
    2003 "SPECIAL REVIEW" WAS NOT AN "INVESTIGATION," THE
    VIDEOTAPES WOULD NEVERTHELESS BE SUBJECT TO FOIA
    SEARCH AND REVIEW BECAUSE THEY "CONCERN THE SPECIFIC
    SUBJECT MATTER" OF OTHER INVESTIGATIONS. ..............................19

    IV. EVEN IF THIS COURT WERE ULTIMATELY TO CONCLUDE THAT
    THE VIDEOTAPES WERE NOT SUBJECT TO FOIA SEARCH AND
    REVIEW, IT SHOULD FIND THAT THE CIA VIOLATED ITS
    OBLIGATION TO PRESERVE RESPONSIVE DOCUMENTS THAT
    WERE SUBJECT TO POTENTIAL FOIA DISCLOSURE...........................22

    V. THE COURT SHOULD NOT STAY THE INSTANT PROCEEDINGS
    PENDING RESOLUTION OF DOJ'S CRIMINAL INVESTIGATION ........23

CONCLUSION.................................................................................................27

**<u>Declaration and Exhibits Submitted with Plaintiffs' Reply</u>**

Declaration of Amrit Singh, dated January 14, 2008

| | |
|---|---|
| Exhibit K | Central Intelligence Agency Office of the Inspector General, Semi-Annual Report, July – Dec. 2005 |
| Exhibit L | Douglas Jehl, Report Warned CIA About Interrogations, N.Y. Times, Nov. 9, 2005. |
| Exhibit M | Senate Intelligence Committee Report 109-142 (Excerpts of Report to Accompany Fiscal Year 2006 Intelligence Authorization) |

## INTRODUCTION

In moving for contempt and sanctions against the CIA for destroying videotapes of harsh interrogations that were responsive to the FOIA requests before this Court, Plaintiffs argue that Defendant violated not only this Court's September 15, 2004 order to "produce or identify all responsive documents" but also, by analogy to the common law prohibition against spoliation of evidence, its obligation under the Freedom of Information Act ("FOIA") to preserve responsive documents. *See* Pls. Opening Br. at 9, 13-15.

In response, the CIA asserts that the videotapes are not "responsive documents" within the meaning of that order because they constitute "operational files" and are, therefore, exempt from CIA search, review and retention under the CIA Information Act, 50 U.S.C. § 431 (c). As demonstrated below, however, the CIA's destruction of the videotapes violated FOIA and this Court's orders because the tapes contained information concerning CIA Office of Inspector General ("OIG") investigations into impropriety and illegality, and as such were subject to FOIA search and review under the "investigations" exception to the CIA Information Act. [1]

The CIA acknowledges that the tapes were viewed by its Office of Inspector General ("OIG") in May of 2003 at an overseas covert National Clandestine Service ("NCS") facility. Decl. of Constance Rea ("Rea Decl.") ¶ 13. It nonetheless argues that

---

[1] Under the investigations exception, "exempted operational files shall continue to be subject to search and review for information concerning . . . the specific subject matter of an investigation by the congressional intelligence committees, the Intelligence Oversight Board, the Department of Justice, the Office of General Counsel of the Central Intelligence Agency, the Office of Inspector General of the Central Intelligence Agency, or the Office of the Director of National Intelligence for any impropriety, or violation of law, Executive order, or Presidential directive, in the conduct of an intelligence activity." 50 U.S.C. § 431(c)(3).

the tapes are not subject to FOIA search and review under the "investigations" exception because they were never in the custody of the OIG, and moreover, were viewed not as part of an OIG "investigation" but as part of an OIG "special review."  Def. Br. at 11, 13. In doing so, the CIA offers a constricted and novel interpretation of the "investigations" exception as set forth in the CIA Information Act and one that is unwarranted by the text of the statute or its legislative history and incompatible with the decisions of this Court governing the CIA's obligations in this case.  Indeed, all of the facts offered by the CIA in relation to the so-called "special review" bear the hallmarks of an "investigation."

The CIA also acknowledges that on May 11, 2004, the CIA OIG commenced an investigation of allegations of impropriety in Iraq, and adds cryptically that the scope of the so-called "Iraq" investigation at times "expanded as new information pointed to additional programs, operations or persons as subjects of inquiry," and "gave rise to other related investigations" and at other times, contracted.  Rea Decl. ¶ 15.  The CIA does not specify the effect of these "expansions" and "contractions" or the ultimate scope of the so-called "Iraq" investigation or the "other related investigations."  In a carefully worded declaration, the CIA states that "the activities depicted on the videotapes that were reviewed in 2003 were not the specific subject matter of the OIG investigation of allegations of impropriety in Iraq, or any other investigation conducted by OIG."  Rea Decl. ¶ 16.  However, a publicly available CIA Inspector General report for July to December of 2005 states that "[o]ngoing Iraq investigations focus on the circumstances surrounding the movement, confinement and in some cases, alleged mistreatment of detainees. . . . OIG also is investigating a number of incidents concerning *the extraterritorial transfers of individuals and alleged abuse during detentions outside*

2

*Iraq*."  Central Intelligence Agency Inspector General, Semi Annual Report To The Director, Central Intelligence Agency, July-December 2005, 1 *available at* http://static.scribd.com/docs/hvqm53do2p3og.pdf, attached hereto as Ex. K. (Emphasis added).  The videotapes at issue here would certainly seem to contain information "concerning the specific subject matter" of this investigation. The CIA, which bears the burden with respect to any claimed exemption from the FOIA, never explains this report.

Even if this Court were now to conclude that the videotapes were not subject to FOIA search and review under the "investigations" exception, it must still find that the CIA violated FOIA and the Court's orders.  Especially in light of the fact that the tapes had been viewed in the course of a "special review" and the existence of non-frivolous arguments for subjecting the tapes to FOIA search and review, it was incumbent upon the CIA to demonstrate to Plaintiffs and the Court prior to destroying the tapes that they were truly exempt from FOIA search and review.  The CIA was not entitled to unilaterally conclude that the tapes were exempt from FOIA search and review without first informing the Court and Plaintiffs as to the potentially disclosable nature of the tapes. The CIA has no response to this argument.  Nor does it respond to Plaintiffs' argument that this Court is entitled to impose sanctions for the destruction of responsive documents even if it does not hold the CIA in contempt of its orders.  *See* Pls. Opening Br. at 16.

Finally, the CIA has not met its heavy burden of demonstrating that a stay of the contempt proceeding is warranted pending the resolution of a criminal DOJ investigation into the destruction of the tapes.  Its request for a stay should be denied in light of its questionable conduct in this case, because the question of whether it complied with this Court's orders and FOIA is a pure legal issue, because the relief sought by Plaintiffs will

in no way compromise the integrity of that investigation, and because delay will

significantly prejudice Plaintiffs.

**ARGUMENT**

**I.  THE CIA'S OWN STATEMENTS DEMONSTRATE THAT THE DESTROYED VIDEOTAPES "WERE IDENTIFIED AND PRODUCED TO THE OFFICE OF INSPECTOR GENERAL" WITHIN THE MEANING OF THIS COURT'S ORDERS**

Under the Central Intelligence Agency Information Act, the Director of the

Central Intelligence Agency may designate certain "operational files" as exempt from

FOIA search and review.  *See* 50 U.S.C. § 431 (a).  However,  under the same Act,

"exempted operational files shall continue to be subject to search and review for

information concerning . . . the specific subject matter of an investigation by the

congressional intelligence committees, the Intelligence Oversight Board, the Department

of Justice, the Office of General Counsel of the Central Intelligence Agency, the Office

of Inspector General of the Central Intelligence Agency, or the Office of the Director of

National Intelligence for any impropriety, or violation of law, Executive order, or

Presidential directive, in the conduct of an intelligence activity."  50 U.S.C. § 431(c)(3).

In its Opinion and Order dated February 2, 2005, this Court set forth in exhaustive

detail the FOIA obligations of the CIA in light of the CIA Information Act.  *See ACLU v.

Dep't of Def.*, 351 F. Supp. 2d 265 (S.D.N.Y. 2005).   Specifically, the Court observed

that "[s]ection 431(c)(3) is applicable when 'information' is sought 'concerning," *which

is a broadly inclusive term . . .* 'the specific subject matter of an investigation" by "the

Office of Inspector General" into 'any impropriety' or illegality 'in the conduct of an

intelligence activity."  *Id*. at 272 (emphasis added).  Moreover, the Court noted that "[t]he

4

documents in question need not actually have been reviewed and relied upon by the OIG staff . . ." *Id.* at 266-67.

The Court also observed that legislative history of the Act demonstrated a Congressional concern that "if records were transferred from operational (exempted files) to other files and then transferred back, the exemption covering the operational files could no longer protect those records from identified for release or specific exemption under FOIA." *Id.* at 273.  Accordingly, the CIA Information Act provides that "records from exempted operational files which have been disseminated to and referenced in files that are not exempt [from FOIA search and review] and which have been returned to exempted  operational files for sole retention shall be subject to search and review."  50 U.S.C. § 431(d)(3).  The Court noted that according to the legislative history, this provision ensures that "when the CIA is searching a non-exempt file for records responsive to an FOIA request and locates a marker reference which substitutes for a record in an exempted file which may be responsive, the CIA must retrieve the record from the exempted operational file and process it in response to the FOIA request." *ACLU*, 351 F. Supp. 2d at 273-74 (citing H.R. Rep. No. 98-726 pt. 1, at 32).   "Thus, even 'particularly sensitive records,' by virtue of having been disseminated or identified beyond their originating operational files, become subject to FOIA search and review . . ." *Id*.

The Court also observed that the legislative history demonstrated Congress's concern that "information gathered in an investigation could be strategically placed by the CIA in exempted operational files; the inclusion of a specific investigation was to

make relevance, not storage site, the touchstone of public access." *Id*. at 275 (citing S. Rep. No. 98-305, at 25-26).

The CIA argues that the destruction of the videotapes did not violate this Court's September 15, 2004 order as clarified by its subsequent February 18, 2005 and April 18, 2005 orders because the tapes "were not identified and produced to or otherwise collected by, the CIA's Office of Inspector General." Def. Br. at 10 (quoting Order Granting CIA's Motion for Partial Reconsideration, dated April 18, 2005 ("April 18, 2005 Order") and Order Denying Motion for a Stay, dated Feb. 8, 2005 ("February 18, 2005 Order") (Docket No. 57)). In support, the CIA states that the "OIG did not take custody of the videotapes," nor "make or retain a copy of the videotapes for its files." *Id*. at 11.

As a threshold matter, the CIA neglects to note that the April 18, 2005 order refers back to this Court's February 2, 2005 order in which this Court examined the CIA's FOIA obligations in considerable detail. *See* April 18, 2005 Order (ordering "in accordance with the remainder of the Court's February 2, 2005 Opinion and Order"). Accordingly, the April 18, 2005 order must be read in light of the fuller exposition of the CIA's obligations contained in the February 2, 2005 decision. As noted above, that decision specifically observed that in enacting the investigations exemption, Congress intended "relevance, not storage site [to be] the touchstone of public access." *ACLU v. Dep't of Def*., 351 F. Supp. at 275. The CIA's claim that it was not obligated under this Court's orders to search and review the videotapes because they "were not in CIA OIG's

investigative files" nor in the OIG's "custody," *see* Def.'s Br. at 10-11, is therefore clearly inconsistent with this Court's February 2005 decision. [2]

The CIA's conduct also plainly violates the April 18, 2005 order, which states that "in accordance with the remainder of the Court's February 2, 2005 Opinion and Order, the Central Intelligence Agency's 'obligation to search and review [extends] not to operational files, but only to relevant documents that have already been identified and produced to, or otherwise collected by, the CIA's Office of Inspector General. *See* 50 U.S.C. § 431(c)." April 18, 2005 Order. The order does not remotely suggest that records not remaining in the physical custody of the OIG were exempt from FOIA search and review.

CIA Director Michael Hayden has publicly stated that "[t]he Office of General Counsel examined the tapes and determined that they showed lawful methods of questioning. The Office of Inspector General also examined the tapes in 2003 as part of its look at the Agency's detention and interrogation practices." *See* Pls. Opening Br. at 9 (quoting Statement to Employees by Director of the Central Intelligence Agency, General Mike Hayden on the Taping of Early Detainee Interrogations, Dec. 6, 2007, attached as Ex. H to Pls. Opening Br.). Similarly, the CIA's declarant has stated that "OIG reviewed the videotapes at an overseas covert NCS facility in May 2003." Decl. of Constance Rea ("Rea Decl.") ¶ 13. These statements clearly establish that the tapes were "identified and produced to" the OIG within the meaning of this Court's April 18, 2005 order.

---

[2] Although the CIA has stated that it did not bring the videotapes into its files by use of a "marker," *see* Def.'s Br. at 11 n. 3, the logic behind 50 U.S.C. §431(d)(3) would apply equally to the instant case, where the CIA has conceded that the OIG viewed the files.

**II.  THE SO-CALLED "SPECIAL REVIEW" UNDER WHICH THE CIA EXAMINED THE TAPES IS CLEARLY AN "INVESTIGATION" WITHIN THE MEANING OF THE CIA INFORMATION ACT**

The CIA acknowledges that its OIG viewed the videotapes in May of 2003, but claims that this viewing was conducted in the course of a so-called "special review" of the CIA terrorist detention and interrogation program.  *See* Def. Br. at 13, Rea Decl. ¶¶ 11, 13.  Finding no support in the plain language of any statute, it relies on a self-described "internal guideline" in arguing further that a "special review" is distinct from an "investigation" as contemplated by 50 U.S.C. § 431 (c)(3) because unlike an "investigation," a "special review" is not "initiated in response to an allegation of wrongdoing."  Def. Br. at 13-14, Rea Decl. ¶ 11.  As demonstrated below, these arguments are without merit.

**A.  The So-Called "Special Review" Is An "Investigation" Into Impropriety Or Illegality Within The Meaning Of The CIA Information Act**

The CIA Information Act explicitly directs courts to engage in de novo review of CIA's compliance with that Act.  50 U.S.C. 431(f) ("judicial review shall be available under the terms set forth in section 552(a)(4)(B) of Title 5").  The legislative history confirms that Congress intended to ensure "effective judicial review" of CIA non-compliance with the Act.  *See* House Report at 3770 ("Subsection [](f ) ensures effective judicial review by providing that allegations that CIA has improperly withheld records because of failure to comply with [50 U.S.C. 431] shall be reviewed in accordance with subparagraph 552(a)(4)(b) of Title 5, which is the judicial review provisions of the FOIA providing for de novo review").  As demonstrated below, de novo review by this Court will lead it to conclude that the CIA did not comply with the CIA Information Act.

<u>1.  The CIA's construction of "investigation" finds no support in the CIA's OIG statute or the CIA Information Act.</u>

The plain language of the statute establishing the CIA's OIG and the plain language and legislative history of the CIA Information Act demonstrate that the CIA's construction of the term "investigation" is overly narrow and in error.

There is no reference to "reviews" or to "special reviews" in the statute establishing the CIA's OIG.  *See* 50 U.S.C. § 403q.  That statute states that its purpose is to establish an "objective and effective office, appropriately accountable to Congress, to initiate and conduct independently *inspections, investigations, and audits* relating to programs and operations of the Agency.  50 U.S.C. § 403q(a)(1) (emphasis added).  The CIA does not claim that the OIG's review of the tapes was an "audit" or an "inspection." Instead, it relies on a single "internal guideline" which it claims establishes "different procedures for handling special reviews and investigations."  Def. Br. at 13 n. 4.  In fact, those "guidelines" say nothing about "special reviews."  *See* Ex. 1 to Rea. Decl.[3]  Nor do they establish "different procedures for handling special reviews and investigations." Def. Br. at 13 n. 4.  The internal guideline merely describes "handling procedures" for OIG audit, inspection and "special assessment" *reports*.[4]  Moreover, the CIA's attempt to

_____

[3] The CIA's declarant cites no authority in support of her claim that "special assessment reports" are what OIG refers to as special reviews.  Rea Decl. ¶ 7.

[4] The CIA argues that its "conclusion that special reviews are distinct from investigations is entitled to some deference from this Court,"  Def. Br. at 13, n.4. However, the "internal guideline" on which the CIA relies to demonstrate that a so-called "special review" does not amount to an "investigation" within the meaning of the CIA Information Act would be accorded very limited deference.  *See Christensen v. Harris County*, 529 U.S. 576, 587 (2000) ("Interpretations such as those in opinion letters - like interpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law - do not warrant Chevron-style deference.").  Furthermore, as the CIA itself

paint a "special review" as being similar to an "audit" or an "inspection" and dissimilar to

an "investigation" is belied by its own declarant, who states that "a special review . . . is

not conducted on a regular schedule, such as some audits or inspections."   Rea Decl. ¶ 6.

Similarly, the CIA provides no authority for its claim that an OIG "investigation"

can only arise in response to "an *allegation* of wrongdoing."  Def.'s Br. at 17.  Notably,

the plain language of the CIA Information Act states unambiguously that an investigation

concern "any impropriety, or violation of law, Executive order, or Presidential directive,

in the conduct of an intelligence activity."  50 U.S.C. § 431(c)(3).[5]  The statute clearly

encompasses investigations "for any impropriety" or illegality that are not initiated in

response to an *allegation* of impropriety or illegality.  An inquiry to determine whether

the CIA transgressed the boundaries of legal interrogation is clearly, in plain English, an

---

concedes, any such limited deference would extend only to "permissible constructions"
of a statute.  Def. Br. at 13, n.4 (citing *Reno v. Koray*, 515 U.S. 50, 61 (1995)).  As
demonstrated below, the CIA's self-described "internal guideline establishing different
procedures for handling special reviews and investigations," Def. Br. at 13, n.4,  is simply
not a permissible construction of the CIA OIG statute, which establishes duties to audit,
inspect and investigate, but nowhere mentions or establishes "special reviews."  *See* 50
U.S.C. 403(q).

[5] Contrary to the government's assertion, the legislative history of the CIA Information
Act does not "make[] plain that the exception is implicated only where there is an
investigation into 'allegations of impropriety or illegality in the conduct of an intelligence
operation.'" Def. Br. at 17 (quotations omitted).  Although the House Report suggests
that an investigation may be triggered by an allegation of impropriety, at no point does
the Report state that an OIG action constitutes an investigation *only* if it is initiated in
response to such an allegation.  *See* H.R. Rep. 98-726, at 28-29.  Instead, without in any
way constraining the definition of "investigation," the House Report merely states that
the public may request all files concerning an investigation by the CIA Inspector General
or General Counsel Office, the Department of Justice, congressional intelligence
committees, and executive oversight boards, including files categorized by the CIA as
operational files.

"investigation" into possible "impropriety or violation of law," whether or not the inquiry was triggered by a specific allegation of wrongdoing. [6]

The CIA's claim that the CIA Information Act exemption would be rendered "largely useless" if special reviews were to trigger § 431(c)(3), *see* Def.' Br. at 14, is without merit because audits and inspections—which presumably encompass a large number of operational files--would remain outside the scope of the investigations exception. As noted above, the CIA's own declarant states that "a special review . . . is not conducted on a regular schedule, such as some audits or inspections." Rea Decl. ¶ 6. It would appear therefore that "special reviews" are less frequently conducted than audits and inspections and are therefore likely to entail fewer numbers of documents. Notably, the CIA's declarant's affidavit is conspicuously silent on how many such "special reviews" have been conducted by the CIA in the past, identifying only the single "special review" in 2003 during which the videotapes were examined.

Under the CIA's narrow construction of "investigation," the agency would be permitted to shield its improper actions from public disclosure simply by characterizing its OIG investigations as "reviews," thereby eviscerating the investigations exception to the operation files exemption. Such a narrow construction is contrary to what Congress intended. Congress enacted the CIA Information Act in 1984 to streamline CIA processing of FOIA requests by creating "a *limited* exemption from the Freedom of

---

[6] The CIA's reliance on *Sullivan v. CIA*, 992 F.2d 1249, 1254 (1st Cir. 1993) is misplaced. *See* Def.'s Br. at 14-15. The court in Sullivan did not hold that an "investigation" must be prompted by an "allegation" of impropriety or illegality. Moreover, the Sullivan court's conclusion that the Church Committee's "inquir[y] into certain covert operations against Cuba," 992 F. 2d at 1254 was not an "investigation" under § 431(c)(3) was subsequently rejected as "unnecessary to its holding and limited by its context" by the D.C. Circuit's holding in *Morley v. CIA*, --F.3d --, 2007 WL 4270576, at *6 (D.C. Cir. 2007)

Information Act for  selected CIA records." H.R. Rep. No. 276(II), 98th Cong., 2d. Sess. (1984),1984 U.S.C.C.A.N. 3778, 3780 (emphasis added) ("House Report").[7]  In so doing, it reaffirmed the CIA's broad obligations under the FOIA, explaining that "the legislation does not make any change in the basic policy on which the FOIA is based."  *Id.*  "In fact, H.R. 5164 represents a reaffirmation by the Congress that the principles of freedom of information are applicable to the CIA."  *Id.*[8]  "The continued availability of information under the FOIA helps to foster public confidence that *the powers of the CIA are not being misused* and that the CIA is serving the national interest."  *Id.* at 3780 (emphasis added).

The legislative history of the CIA Information Act underlines Congress's intent to preserve the ability of the FOIA to serve as a check on CIA wrongdoing.  The House Report explained that the Act "is consistent with the purposes of the FOIA because it will not interfere in any way with the processing of FOIA requests for major categories of CIA information."  *Id.*  "For example, the following types of information will be subject to FOIA search and review requirements to the same extent that they are today . . . (5) *information concerning any agency intelligence activity that was improper or illegal* or that was the subject of an investigation for alleged illegality or impropriety."  *Id.*; *see also id.* at 3746 ("[CIA] Deputy Director McMahon's testimony reaffirmed categories of records which would remain subject to search and review . . . (5) *information concerning*

---

[7]  Because the House bill was passed in lieu of the Senate bill, no Conference Committee report exists for the CIA Information Act, and the House Report is the authoritative legislative history document explaining the bill.  *See* H.R. Rep. No. 276(II), 98th Cong., 2d. Sess. (1984),1984 U.S.C.C.A.N. 3778, 3778.

[8]  Congress rejected attempts by the CIA to seek total exclusion from the FOIA.  See Freedom of Information and the CIA Information Act, 21 U. Rich. L. Rev. 231, 256 (1987) (citing Intelligence Reform Act of 1981:  Hearing before the Senate Select Comm. on Intelligence, 97th Cong., 1st. Sess. (1981)).

*any agency intelligence activity that was improper or illegal* or that was the subject of an investigation for alleged illegality or impropriety.") (Emphasis added).

Toward this end, Congress viewed subsection 50 U.S.C. § 431(c)(3) as broadly protective of the public interest in discovering information of CIA wrongdoing.  In rejecting a proposal to expand subsection 431(c)(1) (a provision requiring FOIA search and review of operational files pertaining to FOIA requesters who are citizens and lawful permanent residents) to include domestic organizations based on concerns of improper or illegal CIA action against domestic organizations, Congress explained: "To the extent that references in operational files to domestic organizations might reflect illegality or impropriety in the conduct of intelligence activities, paragraph 701(c)(3) of the bill providing for continued access to information concerning the specific subject matter of investigations for intelligence illegality or impropriety *constitutes a fully adequate safeguard* in light of existing intelligence oversight[,] reporting and investigations mechanisms."  *Id.* at 3762 (emphasis added).  The CIA's attempt to narrow the scope of subsection (c)(3)  runs contrary to Congress's purpose in enacting the provision – to safeguard the right of the public to uncover acts of impropriety and illegality.

Even if this Court were to find that § 431(c)(3) can only be triggered by an allegation of impropriety -- despite the absence of any such requirement in the statutes themselves – "special reviews" would appear to meet this test.  The CIA itself states in a publicly available OIG report that "special reviews are undertaken by ad hoc teams under the leadership of a senior OIG officer *to address issues of special concern identified by the Congress, senior CIA leaders, or the Inspector General*."  Office of the Inspector General, Semi-Annual Report, July – Dec. 2005, at 69, *available at*

13

http://static.scribd.com/docs/hvqm53do2p3og.pdf, attached hereto as Ex. K. (Emphasis added).  Expressions of "special concern" by these entities would more than suffice to satisfy any "triggering" requirement urged upon this Court by the CIA.  In this context, it is notable that in claiming without support that "special reviews" are not prompted by "allegations of wrongdoing," the CIA's declarant offers no definition of what it means by "allegation" or provide an affirmative explanation of what prompts such "special reviews" generally.  Rea. Decl. ¶ 6 (stating only that a "special review" "is not initiated in response to a specific allegation of CIA impropriety, such as an investigation.")   Most notably, the CIA's declarant does not explain what prompted the specific "special review" during which the OIG viewed the tapes in May 2003.  Rea. Decl. ¶ 11 (stating only that the "special review" "was not initiated in response to an allegation of wrongdoing.")

Because a "special review" is initiated to address an issue of "special concern" to Congress, senior CIA leaders, or the Inspector General, it is clear that the special review is *exactly* the kind of inquiry that Congress meant to reach by using the word "investigation," in the CIA Information Act and *exactly* the kind of inquiry to which Congress thought public access was necessary to ensure a "fully adequate safeguard" against abuse.  *See* p. 13, *supra* (quoting House Report at 3762).  Congress clearly envisioned that dialogue between relevant entities would lead to investigations uncovering illegality and impropriety, thereby allowing for public access under FOIA to information on the same.  Yet, notwithstanding clear Congressional intent, the CIA argues that information concerning the subject matter of special reviews – which are initiated by the OIG, carried out by teams including OIG investigators, and triggered by

14

"special concerns" expressed by the Inspector General, Congress or senior CIA officials – falls outside the scope of exemption (c)(3). This argument contravenes the text and history of 50 U.S.C. 431 and 50 U.S.C. 403q, and should be rejected by this Court.

> 2. The CIA's own description of the 2003 "special review" within which the videotapes were viewed demonstrates that it is in fact an "investigation" into impropriety or illegality.

Regardless of whether or not "special reviews" are generally distinct from "investigations," the CIA's own description of the 2003 "special review" within which the videotapes were examined demonstrates that it is an investigation into impropriety or illegality within the meaning of the CIA Information Act.

In *Morely v. CIA*, the D.C. Circuit recently observed that "the inclusion of the word 'impropriety' alongside 'violation of law' [in 50 U.S.C. § 431(c)(3)] suggests that Congress intended the terms to apply broadly: the misconduct need not amount to illegality." --F.3d--, 2007 WL 4270576, at *6 (D.C. Cir. 2007). The court found that a Senate Select Committee's inquiry into certain covert CIA operations against Cuba was an "investigation" within the meaning of § 431(c)(3) because the committee "sought to *assess the performance* of the intelligence agencies in conducting their own investigations of the assassination; *in fact the Church Committee found that the CIA was 'deficient' in its performance, further indicating that it was specifically investigating the possibility of CIA 'impropriety.'" Id*. (emphasis added). Accordingly, under *Morely*, if the so-called OIG "special review" "assessed the performance" of the CIA and made findings about the CIA's performance, that fact would indicate that the OIG was specifically investigating the possibility of CIA "impropriety."

Several facts conceded by CIA's own declarant confirm that the so-called "special review" of CIA interrogation and detention operations was in fact an "investigation" into impropriety or illegality, as contemplated by the investigations exemption of the CIA Information Act.

- <u>First</u>, this "special review" was intended to "evaluate CIA detention and interrogation activities," and Rea Decl. ¶11, and moreover was conducted not by the Office of General Counsel or an operational component of the CIA but by the OIG, an entity charged by statute to be an "*objective*" office that will "initiate and conduct [investigations] *independently*," 50 U.S.C. § 403q(a)(1) (emphasis added). This suggests that the "special review" aimed at determining whether the CIA's program was illegal or improper in any way.

- <u>Second</u>, the "special review" lasted from January 2003 to May 2004. Rea Decl. ¶¶ 11, 13. This period spanned a period of time in which the CIA's detention and interrogation practices had become the subject of considerable public debate. *See, e.g.,* Dana Priest & Barton Gellman, U.S. Decries Abuse but Defends Interrogations, Wash. Post, Dec. 26, 2002 ("Those [detainees] who refuse to cooperate inside this secret CIA interrogation center are sometimes kept standing or kneeling for hours, in black hoods or spray-painted goggles . . . . At times they are held in awkward, painful positions and deprived of sleep with a 24-hour bombardment of lights – subject to what are known as "stress and duress" techniques."); David E. Kaplan, et al, Playing Offense: The inside story of

how U.S. terrorist hunters are going after al Qaeda, U.S. News & World
Report, June 2, 2003 ("The CIA has helped move dozens of detainees not
only to Jordan but also to Egypt, Morocco, and even Syria."). (Indeed, it
was in the middle of this period that Plaintiffs filed their October 2003
FOIA request for records relating to the treatment of prisoners held in U.S.
custody abroad).  The leaking of the Abu Ghraib photographs of prisoner
abuse in April 2004 only intensified this debate.  *See e.g.*, John Barry et.
al, The Roots of Torture:  The Road to Abu Ghraib Began After 9/11,
Newsweek, May 24, 2004.

- Third, at the conclusion of the "special review" in May 2004, the "OIG
  notified DOJ and other relevant oversight authorities of the review's
  findings."  Rea Decl. ¶13.  This fact further confirms that the "special
  review" was not a routine or casual "internal evaluation," *see* Def.'s Br. at
  1, but in fact addressed the potential illegality or impropriety of the CIA's
  interrogation and detention program and as such constituted an
  "investigation" within the meaning of  50 U.S.C. § 431(c)(3).

News reports provide additional support for the proposition that the "special
review" described by the CIA's declarant was in fact investigative in nature and related to
the illegality or impropriety of CIA interrogation practices.  According to one such news
article, a CIA OIG report that was "completed in the spring of 2004"  "warned that
interrogation procedures approved by the C.I.A. after the Sept. 11 attacks might violate
some provisions of the international Convention Against Torture."  *See* Douglas Jehl,
Report Warned CIA About Interrogations, N.Y. Times, Nov. 9, 2005, attached hereto as

17

Exhibit L.  The "spring 2004," report referenced in this article appears to be the same as

the "special review" into CIA detention and interrogation operations, which the CIA

concedes ended by May 2004 and was reported to DOJ and "other oversight authorities."

Rea Decl. ¶13.

> The news article further states that:

>> [O]fficials who described the report said it *discussed particular techniques used by the C.I.A. against particular prisoners, including about three dozen terror suspects being held by the agency in secret locations around the world.* They said it referred in particular to the treatment of Khalid Sheikh Mohammed, who is said to have organized the Sept. 11 attacks and who has been detained in a secret location by the C.I.A. since he was captured in March 2003. Mr. Mohammed is among those believed to have been subjected to waterboarding, in which a prisoner is strapped to a board and made to believe that he is drowning.

*Id*.  Moreover, the Senate Intelligence Committee was specifically briefed on the contents

of the OIG's report.  *See id*. ("In an unclassified report this summer the Senate

Intelligence Committee referred briefly to Mr. Helgerson's report and said that the

agency had fully put in effect only 5 of his 10 recommendations.").  This fact is

specifically acknowledged in a report of the Senate Intelligence Committee in a

paragraph entitled "Treatment of Intelligence Community Detainees":

>> During his February 16, 2005, testimony in open session before the Committee, then-Director of Central Intelligence Porter Goss stated that the CIA had received a CIA Inspector General report on the treatment of detainees by members of the Intelligence Community. Director Goss stated that he believed that eight of the ten recommendations made by the CIA Inspector General had been implemented by the CIA.
>> According to the CIA's Office of Inspector General, only five of the ten corrective recommendations have been implemented.  The Committee is concerned with this delay

18

in implementation and urges the Director of the CIA, in
consultation and coordination with the DNI, to complete
the remaining actions recommended by the CIA Inspector
General without further delay.

Senate Intelligence Committee Report 109-142 (Report to Accompany Fiscal Year 2006

Intelligence Authorization), at 41, *available at*

http://intelligence.senate.gov/reportia2006.pdf, relevant excerpts attached hereto as

Exhibit M.   This is consistent with the CIA declarant's claim that OIG "notified . . .

relevant oversight authorities of the review's findings" after the conclusion of the so-

called "special review."  Rea Decl. ¶ 13.


**III. EVEN IF THIS COURT WERE TO CONCLUDE THAT THE CIA'S 2003
"SPECIAL REVIEW" WAS NOT AN "INVESTIGATION," THE VIDEOTAPES
WOULD NEVERTHELESS BE SUBJECT TO FOIA SEARCH AND REVIEW
BECAUSE THEY "CONCERN THE SPECIFIC SUBJECT MATTER" OF
OTHER INVESTIGATIONS.**

The CIA Information Act subjects to FOIA search and review "information

*concerning* . . . the specific subject matter of an investigation . . . ."  50 U.S.C. §

431(c)(3).  As noted above, this Court has recognized that the word  "concerning," *"is a*

*broadly inclusive term*." *ACLU*, 351 F. Supp. 2d at 272 (emphasis added).  Nowhere does

the CIA demonstrate that the tapes do not contain information "*concerning* . . . the

specific subject matter of an investigation," 50 U.S.C. § 431(c)(3) (emphasis added).

Indeed, its carefully worded declarations shy away from saying as much. *See*, *e.g*., Rea

Decl. ¶ 13 ("At no time prior to the destruction of the tapes in 2005 did OIG *initiate a*

*separate investigation into the interrogations depicted on the videotapes*.") (Emphasis

added).  Accordingly, even if it were true, as the CIA claims, that the interrogations

depicted on the tapes were not *themselves* the "subject of an OIG or other investigation

19

into impropriety or illegality," that fact alone would not exempt the tapes from FOIA

search and review.   Thus, in *Morely*, the D.C. Circuit squarely rejected the CIA's

argument that a "congressional investigation d[id] not trigger § 431(c)(3) because it was

not specifically about [the individual who was the subject of plaintiff's FOIA request]."

2007 WL 4270576, at *5.   "This restrictive reading of the statute is foreclosed by its

literal meaning." *Id. (citing Gen. Dynamics Land Sys., Inc., v. Cline*, 540 U.S. 581, 600

(2004); *Skidmore v. Swift & Co*., 323 U.S. 134 (1944)). "Congress chose to use the word

"concerning" in § 431(c), 'a broadly inclusive term,'  that precludes the interpretation

offered by the CIA." *Id.* (*quoting ACLU v. Dep't of Defense*, 351 F. Supp. 2d 265, 272

(S.D.N.Y.2005)).

    As set forth in this Court's February 2, 2005 decision, the CIA has itself

acknowledged that "on May 11, 2004, the CIA's Office of Inspector General . . .

commenced a criminal investigation of allegations of impropriety in Iraq."  *ACLU*, 351 F.

Supp. 2d at 268.  This Court has further noted previously that the CIA has "been

extremely sparing in the details it has supplied about the nature of this investigation."  *Id*.

(observing that "the CIA notes that [a]lthough the Iraq investigation is referred to in the

singular in this memorandum of law, there may be several investigations that are related

to or grow out of the general Iraq investigation").

    The more recently submitted declaration attached to the CIA's opposition brief is

similarly secretive about the scope of the so-called "Iraq" investigation, stating that:

> As with all such broad investigations, the scope of the Iraq
> investigation changed over time as the OIG gathered
> information.  At times, the scope of the investigation
> expanded as new information pointed to additional
> programs, operations, or persons as subjects of inquiry.
> Other times, the scope of the investigation contracted as

> new information disproved allegations or eliminated
> subjects of inquiry.  The initial investigation also gave rise
> to other related investigations.

Rea Decl. ¶ 15.  In contrast, a CIA Inspector General report for July to December of 2005

states more specifically that "[o]ngoing Iraq investigations focus on the circumstances

surrounding the movement, confinement and in some cases, alleged mistreatment of

detainees. . . . OIG also is investigating a number of incidents concerning the

extraterritorial transfers of individuals and alleged abuse during detentions *outside Iraq*."

Central Intelligence Agency Inspector General, Semi Annual Report To The Director,

Central Intelligence Agency, July-December 2005, 1 *available at*

http://static.scribd.com/docs/hvqm53do2p3og.pdf, attached hereto as Ex. K) (Emphasis

added).

The videotapes depict the interrogations of prisoners held overseas.  The subject

matter of the videotapes therefore clearly overlaps with the subject matter of the OIG's

investigations of "incidents concerning the extraterritorial transfers of individuals and

alleged abuse during detentions outside Iraq."  *See, e.g., ACLU*, 351 F. Supp. 2d at 277

(holding that CIA had to process records in light of the "[t]he overlap between the

specific subject matter of the Inspector General's investigation [into improprieties in

Iraq] and plaintiffs' FOIA requests is patent.")  Accordingly, the tapes should have been

subject to FOIA search and review.[9]

_____

[9] There may be still other CIA investigations which overlap with the content of the tapes.
Especially in light of this Court's obligation to conduct *de novo* review of the CIA's
compliance with the CIA Information Act and the paucity of information contained in the
CIA's declarations, this Court must require the CIA to publicly identify all CIA
investigations by date and subject matter with a view to determining overlap of such
investigations.

**IV.  EVEN IF THIS COURT WERE ULTIMATELY TO CONCLUDE THAT THE VIDEOTAPES WERE NOT SUBJECT TO FOIA SEARCH AND REVIEW, IT SHOULD FIND THAT THE CIA VIOLATED ITS OBLIGATION TO PRESERVE RESPONSIVE DOCUMENTS THAT WERE SUBJECT TO POTENTIAL FOIA DISCLOSURE**

FOIA and each of these Court's orders prohibit the CIA from destroying records responsive to Plaintiffs' FOIA request.  *See* Pls. Opening Br. at 10-11, 14.  Moreover, FOIA places on the CIA the burden of demonstrating that it is entitled to withhold documents responsive to Plaintiffs FOIA requests.  *See Halpern v. Dep't of Defense*, 181 F.3d 279, 287 (2d Cir. 1999).  Because the videotapes depicted the post 9/11 interrogations of prisoners held in U.S. custody abroad, they were clearly responsive to Plaintiffs' FOIA requests.  *See* Pls. Opening Br. at 13.[10]  Especially in light of the fact that the tapes had been viewed in the course of a "special review" and there are non-frivolous arguments for subjecting the tapes to FOIA search and review, it was incumbent upon the CIA to demonstrate to Plaintiffs and the Court that the tapes were exempt from FOIA search and review under the CIA Information Act.  The CIA was not entitled to unilaterally conclude that the tapes were exempt from FOIA search and review and destroy the tapes without first informing the Court or Plaintiffs as to the potentially disclosable nature of the tapes.

Accordingly, even if this Court ultimately concludes that the videotapes were not subject to FOIA search and review, it must conclude that the CIA violated FOIA and the Court's orders by destroying the tapes.

---

[10] The CIA does not dispute that the tapes depicted the interrogation prisoners held in United States custody abroad.  Its claim that "the videotapes were not responsive to Plaintiffs' FOIA Requests," *see* Def. Br. at 11, is therefore in error.

22

## V. THE COURT SHOULD NOT STAY THE INSTANT PROCEEDINGS PENDING RESOLUTION OF DOJ'S CRIMINAL INVESTIGATION

Although this is not the first instance of  the CIA's "reluctance to comply with FOIA," *ACLU*, 351 F.Supp.2d at 273, its destruction of the interrogation videotapes presents grave concerns that call for this Court's immediate consideration.

The CIA has not come close to satisfying its heavy burden to demonstrate that a stay should issue here.  "[T]he moving party bears a heavy burden to show why a stay should be granted absent statutory authorization," *Coastal (Bermuda) Ltd. v. E.W. Saybolt & Co., Inc.*, 761 F.2d 198, 204 n.6 (5th Cir. 1985), and "must justify it by clear and convincing circumstances outweighing potential harm to the party against whom it is operative." *Williford v. Armstrong World Industries, Inc.*, 715 F.2d 124, 127 (4th Cir. 1983).  *See also Ohio Envtl. Council v. U.S. Dist. Court, Southern Dist. of Ohio, Eastern Div.*, 565 F.2d 393, 396 (6th Cir. 1977).  ("[T]]he burden is on the party seeking the stay to show that there is pressing need for delay, and that neither the other party nor the public will suffer harm from entry of the order.").  "A stay contemplates 'special circumstances' and the need to avoid 'substantial and irreparable prejudice.'"  *U.S. v. Certain Real Property, Commonly Known as 6250 Ledge Road*, *Egg Harbor, Wis.*, 943 F.2d 721, 729 (7th Cir. 1991).  In other words, "a court must tread carefully in granting a stay of proceedings, since a party has a right to a determination of its rights and liabilities without undue delay." *Ohio Envtl. Council*, 565 F.2d at 396.

The CIA's broad pronouncement that a court should stay civil proceedings whenever a criminal investigation into a related subject exists both ignores its "heavy burden" to justify a stay – which should issue only in "special circumstances" – and

misconstrues relevant case law.  In *United States v. Lot 5, Fox Grove, Alachua County, Fla.*, 23 F.3d 359, 364 (11th Cir. 1994), cited in Def. Br. at 18, for example, the Eleventh Circuit *affirms denial* of the claimant's motion for a stay of civil forfeiture proceedings pending resolution of a criminal investigation into her activities after determining that there was "no real conflict between the forfeiture and Claimant's Fifth Amendment rights." *Id.* at 364. *See also United States v. Simon*, 373 F.2d 649, 653 (2d Cir. 1967), vacated as moot, 389 U.S. 425 (1967) ("We cannot agree that civilized standards of procedure and evidence require that a witness under indictment be given the option of nonappearance in any proceedings in related civil or criminal cases until his own trial is concluded.") (internal quotations and citation omitted), *vacated as moot by Simon v. Wharton*, 389 U.S. 425 (1967); *Kashi v. Gratsos*, 790 F.2d 1050, 1057 (2d Cir. 1986) (upholding lower court's refusal to stay civil securities trial until after criminal statute of limitations had expired notwithstanding petitioner's due process objections).  Here, where Plaintiff seeks no relief against individual officers of the CIA, Defendant cannot even argue that the instant proceedings implicate Fifth Amendment concerns, much less seek a stay on those grounds.

In every other case cited by the CIA in paragraphs 3 and 4 of Section C of its Opposition Brief, civil proceedings are stayed because *the party resisting the stay* is the subject of a criminal investigation or indictment.[11]  In those cases, the courts' primary

---

[11] The stay motions arise in two categories of cases:  (1) the same party is a defendant in parallel civil and criminal cases brought respectively by the Securities and Exchange Commission and the United States Attorney, and the latter moves for a stay; and (2) the United States Government moves to intervene to stay discovery in suits involving two private parties, where criminal investigation is pending against one of the private parties. Obviously, neither scenario is implicated here.

concern was that the resisting party would use liberal civil discovery procedures to circumvent restrictions on criminal discovery.[12]  There can be no doubt that the above concerns regarding circumvention of criminal discovery limitations and the Fifth Amendment are wholly irrelevant to this case.

Nor can the government rely on *Abdah v. Bush*, 04-01254 (HHK), at 2-3 (D.D.C. Jan. 9, 2008) as persuasive authority.  The Court in *Abdah* ruled that interrogation videotapes were not encompassed within its previously issued document preservation order because that order related to evidence regarding treatment of detainees *at Guantanamo Bay*, and the videotapes did not depict treatment at that location.  *See* Decl. of Peter Skinner, Ex. E.  In contrast, the videotapes in this matter clearly were responsive to Plaintiffs' FOIA request, which is not geographically limited to Guantanamo Bay.

A stay is even more inappropriate where, as here, the requester approaches the court with unclean hands.  "A request for a stay is an appeal to equity." *Ofosu v. McElroy*, 98 F.3d 694, 699 (2d Cir. 1996).  As such, this court's decision should be

---

[12] *See SEC v. Chestman*, 861 F.2d 49, 50 (2d Cir. 1988) (affirming stay issued to prevent "discovery in the civil case from being used to circumvent the more limited scope of discovery in the criminal matter"), cited in Def. Br. At 18-19; *Campbell v. Eastland*, 307 F.2d 478, 490 (5th Cir. 1962) (civil discovery stayed because "discovery would give the taxpayer possession of reports denied him in the criminal proceeding"), cited in Def. Br. at 19; *Philip Morris Inc. v. Heinrich*, 1996 WL 363156, at *19 (S.D.N.Y. June 28, 1996) (granting stay because targets would otherwise "have an opportunity to gain evidence to which they are not entitled under criminal discovery rules"), cited in Def. Br. at 19; *SEC v. Downe*, 1993 WL 22126, at *12 (S.D.N.Y. Jan. 26, 1993) ("Court recognizes that a stay of discovery is often necessary where liberal discovery rules will allow a litigant to undermine, *or gain an unfair advantage in*, a potential criminal prosecution which parallels the subject matter of the civil action.") (emphasis added), cited in Def. Br. at 19-20; *In re Ivan F. Boesky Securities Litig.*, 128 F.R.D. 47, 50 (S.D.N.Y. 1989) (noting the "Government's interest in preventing discovery in the civil case from being used to circumvent the more limited scope of discovery in the criminal matter") (internal quotations omitted), cited in Def. Br. at 19; *Founding Church of Scientology of Washington, D. C., Inc. v. Kelley*, 77 F.R.D. 378, 381 (D.D.C. 1977), cited in Def. Br. at 20.

25

guided by principles of equitable relief, including the doctrine of unclean hands.  It is well established that "he who comes into equity must come with clean hands."  *Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co.*, 324 U.S. 806, 814 (1945).  In light of the evidence that the CIA has engaged in improper or illegal activity, this Court should refuse to grant the CIA the equitable relief of stay.  *See Precision Instrument Mfg. Co.*, at 815 ("Any willful act concerning the cause of action which rightfully can be said to transgress equitable standards of conduct is sufficient cause for the invocation of the maxim [of unclean hands]."); *Ofosu*, 98 F.3d at 699 (denying a stay after noting that "[w]hatever the equities would be if [petitioner] were in custody as directed, they are changed by his non-cooperation with a system from which he demands elaborate procedural deference.").

In any event, a stay of proceedings is patently unnecessary because the question of whether the CIA has complied with this Court's orders and FOIA is a pure legal question.  The expeditious adjudication of this pure legal question is vital for ensuring the compliance of federal agencies with their obligations under FOIA in this case as well as in other FOIA cases.  Further delay in the adjudication of this question would signal to the CIA as well as other federal agencies that they may circumvent their obligations under FOIA without facing negative consequences.  It would also prejudice Plaintiffs by delaying an order from this Court prohibiting any further destruction of documents; requiring the identification of all destroyed responsive records; requiring the identification and production of copies, reconstructions, summaries, transcripts or other approximations of the destroyed records; and granting limited discovery relating to the destruction and reconstruction of the videotapes held by the CIA or any other agency or

U.S. government entity.  *See* Pls. Opening Br. at 19, 20; Supplemental Submission

Clarifying Relief Sought In Plaintiffs' Motion For Contempt and Sanctions at 4-5.  As

such, the relief is unlikely to interfere significantly with ongoing criminal proceedings.

Even were this Court to credit the CIA's concerns in moving forward with the

instant proceedings, it should craft protections short of a blanket stay in light of the harms

contemplated by delay.  In lieu of staying civil proceedings where those proceedings and

criminal actions "cover the same ground," this Court "may instead enter an appropriate

protective order."  *Nosik v. Singe*, 40 F.3d 592, 596 (2d Cir. 1994); *Coastal Bermuda*,

761 F.2d at 204 n.6 ("[A] court should tailor its stay so as not to prejudice other litigants

unduly."); *Kaiser v. Stewart*, 1997 WL 66186, at *5 (E.D. Pa. 1997)("a blanket stay of

the civil proceeding is unwarranted . . . .  a proper balance can be achieved by allowing

limited civil discovery to continue.").  To the extent the Court finds that specific aspects

of the relief sought by Plaintiffs would interfere with the ongoing criminal proceedings, it

should defer implementation of only those aspects of the requested relief while requiring

with implementation of the remainder.  *Kaiser v. Stewart*, 1997 WL 66186, at *5 (E.D.

Pa. 1997)("[W]e conclude that a blanket stay of the civil proceeding is unwarranted . . . .

[A] proper balance can be achieved by allowing limited civil discovery to continue.").

## CONCLUSION

For all of the foregoing reasons, this Court should grant Plaintiffs' Motion for

Contempt and Sanctions against the CIA.

27

Respectfully submitted,


_____/AS/_____

Amrit Singh (AS-9916)
Jameel Jaffer (JJ-4653)
Alexa Kolbi Molinas (AK-1112)
Judy Rabinovitz (JR-1214)
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION[13]
125 Broad St.
New York, New York 10004

Lawrence S. Lustberg (LL-1644)
Melanca D. Clark (MC-0809)
GIBBONS, P.C.
One Gateway Center
Newark, New Jersey 07102-5310
(973) 596-4500

Beth Haroules (BH-5797)
Arthur Eisenberg (AE-2012)
NEW YORK CIVIL LIBERTIES
UNION FOUNDATION
125 Broad Street
New York, NY 10004

Michael Ratner (MR-3347)
Shayana Kadidal (SK-1278)
CENTER FOR CONSTITUTIONAL
RIGHTS
666 Broadway, 7th Floor
New York, New York 10012

Dated: Jan. 14, 2007                    *Attorneys for Plaintiffs*

---

[13] Counsel gratefully acknowledge ACLU Fellow Eunice Lee for her invaluable
assistance in preparing this brief.