UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------- x

AMERICAN CIVIL LIBERTIES UNION, et al.,

                     Plaintiffs,

                     v.

DEPARTMENT OF DEFENSE, et al.,

                     Defendants.

__ELECTRONICALLY FILED__

04 Civ. 4151 (AKH)

-------------------------------------------------------- x

AMERICAN CIVIL LIBERTIES UNION, et al.,

                     Plaintiffs,

                     v.

DEPARTMENT OF JUSTICE, AND ITS
COMPONENT OFFICE OF LEGAL COUNSEL,

                     Defendants.

05 Civ. 9620 (AKH)

-------------------------------------------------------- x

**DEFENDANT CENTRAL INTELLIGENCE AGENCY'S MEMORANDUM OF LAW IN
SUPPORT OF ITS FIFTH MOTION FOR SUMMARY JUDGMENT**

LEV L. DASSIN
Acting United States Attorney for the
Southern District of New York
Attorney for Defendants
86 Chambers Street, 3rd Floor
New York, New York 10007
Tel: (212) 637-2702
Fax: (212) 637-2696
Email: heather.mcshain@usdoj.gov

SEAN H. LANE
PETER M. SKINNER
HEATHER K. McSHAIN
  – Of Counsel –

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

POINT I.       FOIA AND SUMMARY JUDGMENT STANDARDS. . . . . . . . . . . . . . 4

POINT II.      THE CIA PROPERLY WITHHELD IN FULL THE OPERATIONAL
               DOCUMENTS UNDER EXEMPTION THREE. . . . . . . . . . . . . . . . . . . 6

       A.      Legal Standard. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

       B.      The Operational Documents at Issue Here Were Properly Withheld in
               Their Entirety Under Exemption 3. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

POINT III.     THE CIA PROPERLY INVOKED EXEMPTION ONE TO
               WITHHOLD THE OPERATIONAL DOCUMENTS IN FULL. . . . . . . . 14

       A.      Legal Standards. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

       B.      The Operational Documents Were Properly Classified
               and Withheld in Full. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

POINT IV.      THE CIA PROPERLY WITHHELD INFORMATION CONTAINED
               IN EIGHT OF THE SAMPLE DOCUMENTS PURSUANT
               TO EXEMPTION 5. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

       A.      Deliberative Process Privilege. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

       B.      Attorney-Client Privilege. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

       C.      Attorney Work Product Doctrine. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

POINT V.       THE CIA PROPERLY RELIED UPON EXEMPTION 6 TO
               WITHHOLD NAMES AND IDENTIFYING INFORMATION
               OF CIA PERSONNEL AND EMPLOYEES OF OTHER
               FEDERAL AGENCIES INVOLVED IN CLANDESTINE
               COUNTERTERRORISM OPERATIONS. . . . . . . . . . . . . . . . . . . . . . . . . 31

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

PRELIMINARY STATEMENT

Defendant Central Intelligence Agency ("CIA"), by its attorney, Lev L. Dassin, Acting

United States Attorney for the Southern District of New York, respectfully submits this

memorandum of law in support of its fifth motion for summary judgment, seeking to withhold in

full information contained in operational cables, notes, logbooks, memoranda, e-mails, and a

single photograph (the "operational documents"), under exemptions to the Freedom of

Information Act, 5 U.S.C. § 552 ("FOIA").[1]

On May 7, 2009, the Court ordered the Government to compile a list of documents

related to the contents of 92 destroyed videotapes of detainee interrogations that occurred

between April and December 2002.  Pursuant to that Order, the CIA identified 580 documents,

and a sample of 65 documents was selected for purposes of resolving disputes with regard to the

CIA's withholding determination.  A majority of the sample is comprised of cables to CIA

Headquarters from a covert overseas CIA facility where interrogations were being conducted.

These TOP SECRET communications consist primarily of sensitive intelligence and operational

information concerning interrogations of Abu Zubaydah.  Drafted during the time frame the

interrogations were being conducted, these communications are the most contemporaneous

documents the CIA possesses concerning these interrogations.  In addition, the sample also

includes a small number of miscellaneous documents—including notes of CIA employees who

reviewed the 92 videotapes before they were destroyed, logbooks containing details of the

interrogations, and a photograph.

---

[1]      Even though plaintiffs seek these documents in the context of a contempt proceeding, the
Government is applying FOIA exemptions in support of the information withheld from the
documents at issue.  Even if FOIA were not applicable in this proceeding, the underlying
exemptions cited by the CIA for the withholding of the documents codify independent and
substantive bases for the withholding of this information.

On June 8, 2009, the Government produced a <u>Vaughn</u> index and unclassified declaration of Leon E. Pannetta, Director of the CIA (the "Panetta Decl."), justifying the withholding of the entire sample of documents under FOIA Exemptions 1, 3, 5, and 6.[2]  On June 19, 2009, plaintiffs informed the Government of the withholdings they intend to challenge:

- Descriptions of the implementation or application of interrogation techniques, and "details of specific interrogations where EITs ['enhanced interrogation techniques'] were applied";

- All information withheld under exemption 5;

- The names of CIA-interrogation contractors or consultants; and

- Information related to the operation and implementation of the CIA's secret detention and interrogation program, including the identities of foreign countries that assisted the CIA in carrying out that program.

<u>See</u> Letter from ACLU of June 19, 2009 (attached as Exhibit A to Declaration of Heather K. McShain ("McShain Decl."), dated July 10, 2009).[3]

---

[2]    The CIA also filed with the Court a classified <u>in camera</u>, <u>ex parte</u> declaration of Director Panetta "to provide additional details that cannot be discussed on the public record."  Panetta Decl. ¶ 4.

[3]    Plaintiffs do not challenge the withholding of the following information:

- "intelligence provided by captured terrorists" and "intelligence that was being provided to the field and intelligence that was being gathered from the interrogations," <u>see</u> Panetta Decl. ¶¶ 6-7;
- "intelligence requirements that CIA prioritized at specific points in time," <u>see id.</u> ¶ 6;
- "what the intelligence community did not know about our enemies in certain time frames, <u>i.e.</u>, intelligence gaps," <u>see id.</u>;
- "information that could identify CIA officers . . . engaged in clandestine counterterrorism operations," <u>see id.</u>, including "[i]nformation concerning the names and titles of CIA personnel." <u>see id.</u> ¶ 8; and
- "information concerning CIA organization, functions, and filing information," <u>see id.</u>

McShain Decl., Ex. A.

As a threshold matter, the documents currently before the Court contain information of a unique and operational nature, and are distinguishable from the four previously-released Office of Legal Counsel ("OLC") memoranda. As detailed herein and in the classified and unclassified declarations of Director Panetta, the operational documents currently before the Court contain descriptions of EITs <u>as applied</u> in actual operations, as well as details of <u>actual</u> intelligence activities, sources, and methods, and are of a qualitatively different nature then the EIT descriptions <u>in the abstract</u> contained in the previously-released OLC memoranda.

The CIA properly withheld in full these operational documents. With respect to Exemption 1, all of the documents at issue contain intelligence sources and methods, as well as information related to the operation and implementation of the CIA's program including the locations of covert CIA facilities and the identities of countries cooperating with the CIA in counterterrorism operations. The CIA has classified this information pursuant to Executive Order ("E.O.") 12958, as amended,[4] which governs the classification of national security information. Director Panetta has affirmed that in the context of these operational documents, release of the information at issue would reasonably be expected to result in exceptionally grave damage to national security.

This same information is properly withheld under Exemption 3, as well. The intelligence sources and methods, names of employees of the CIA and other federal agencies involved in clandestine counterterrorism operations, and locations of covert CIA facilities, are exempt from disclosure under Section 102A(i)(1) of the National Security Act of 1947, as amended, and

---

[4]      E.O. 12958 was amended by E.O. 13292. <u>See</u> Executive Order No. 13292, 68 Fed. Reg. 15315 (March 28, 2003). All citations to E.O. 12958 are to the order as amended by E.O. No. 13292.

Section 6 of the Central Intelligence Agency Act of 1949, as amended, which authorize the withholding of intelligence sources and methods without requiring an articulation of harm to national security.

The CIA has also properly withheld privileged information pursuant to Exemption 5 from eight of the sampled documents because disclosure would reveal intra-agency deliberations or information that is protected by the attorney-client privilege or attorney work-product doctrine.

Finally, the CIA has properly invoked Exemption 6 to withhold from sixty-two of the sampled documents the names and identifying information of employees of the CIA and other agencies engaged in clandestine counterterrorism operations.  Director Panetta has explained that disclosure of this information would constitute a clearly unwarranted invasion of personal privacy and place these individuals and their families at grave risk, with no legitimate countervailing public benefit that could justify endangering U.S. government employees.

When one considers the specific CIA documents at issue and their operational nature, it is clear that they were properly withheld in full under exemptions to FOIA.  Accordingly, for the reasons explained below and in the accompanying classified and unclassified declarations of Director Panetta, the Court should grant the Government's fifth motion for summary judgment.

## ARGUMENT

## I.      FOIA AND SUMMARY JUDGMENT STANDARDS

FOIA was enacted to "ensure an informed citizenry, . . . needed to check against corruption and hold the governors accountable to the governed."  NLRB v. Robbins Tire & Rubber Co., 437 U.S. 214, 242 (1978).  FOIA requires each federal agency to make available to the public a wide array of information, and sets forth procedures by which requesters may obtain

such information.  See 5 U.S.C. § 552(a).  At the same time, FOIA exempts nine categories of information from disclosure, while providing that "[a]ny reasonably segregable portion of a record shall be provided . . . after deletion of the portions which are exempt under this subsection."  5 U.S.C. § 552(b).

In accordance with FOIA's "goal of broad disclosure, these exemptions have been consistently given a narrow compass."  Dep't of the Interior v. Klamath Water Users Protective Ass'n, 532 U.S. 1, 8 (2001) (citation and internal quotation marks omitted); see also Grand Cent. P'ship, Inc. v. Cuomo, 166 F.3d 473, 478 (2d Cir. 1999).  While narrowly construed, however, FOIA exemptions "are intended to have meaningful reach and application."  John Doe Agency v. John Doe Corp., 493 U.S. 146, 152 (1989).  Indeed, Congress recognized that public disclosure is not always in the public interest.  Rather, "FOIA represents a balance struck by Congress between the public's right to know and the government's legitimate interest in keeping certain information confidential."  Ctr. for Nat'l Sec. Studies v. DOJ, 331 F.3d 918, 925 (D.C. Cir. 2003) (citing John Doe Agency, 493 U.S. at 152).

Summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure is the procedural vehicle by which most FOIA actions are resolved.  See, e.g., Miscavige v. IRS, 2 F.3d 366, 369 (11th Cir. 1993) ("Generally, FOIA cases should be handled on motions for summary judgment, once the documents in issue are properly identified.").  "In order to prevail on a motion for summary judgment in a FOIA case, the defending agency has the burden of showing that its search was adequate and that any withheld documents fall within an exemption to the FOIA.  Affidavits or declarations giving reasonably detailed explanations why any withheld documents fall within an exemption are sufficient to sustain the agency's burden."  Carney v.

5

U.S. Dept. Of Justice, 19 F.3d 807, 812 (2d Cir. 1994) (footnote omitted); see also Halpern v.

FBI, 181 F.3d 279, 291 (2d Cir. 1999) (same).  Although this Court reviews de novo the agency's

determination that requested information falls within a FOIA exemption, see 5 U.S.C. §

552(a)(4)(B), the declarations submitted by the agency in support of its determination are

"accorded a presumption of good faith," Carney, 19 F.3d at 812 (citation and quotation marks

omitted).

## II.   THE CIA PROPERLY WITHHELD IN FULL THE OPERATIONAL DOCUMENTS UNDER EXEMPTION THREE

The CIA properly withheld these operational documents in full under Exemption 3, which

permits the withholding of information as authorized by separate statute.[5]  See 5 U.S.C. §

552(b)(3).  Further, with regard to the specific withholdings challenged by plaintiffs, the CIA

properly withheld under Exemption 3 details about the EITs, names of CIA employees and

contractors, identifying information about the location of covert CIA facilities, and operational

details about the CIA facilities.  In the instant case, the CIA relied upon the National Security Act

of 1947, as amended (the "NSA"), and the Central Intelligence Agency Act of 1949, as amended

(the "CIA Act").

### A.   Legal Standard

In examining an Exemption 3 claim, a court must determine whether the claimed statute

is a statute of exemption under FOIA, and whether the withheld material satisfies the criteria of

---

[5]      This brief addresses Exemption 3 before Exemption 1 because the CIA's authority to withhold information under the applicable statutes is broader than its classification authority under E.O. 12958, as amended, which governs the classification of national security information. The Court may thus resolve the CIA's withholding of the documents under Exemption 3 without considering whether the information was properly classified under Exemption 1.

the exemption statute.  See CIA v. Sims, 471 U.S. 159, 167 (1985); A. Michael's Piano, Inc. v.

FTC, 18 F.3d 138, 143 (2d Cir. 1994); Fitzgibbon v. CIA, 911 F.2d 755, 761-62 (D.C. Cir.

1990).  As the D.C. Circuit has explained, "'Exemption 3 differs from other FOIA exemptions in

that its applicability depends less on the detailed factual contents of specific documents; the sole

issue for decision is the existence of a relevant statute and the inclusion of withheld material

within the statute's coverage.'"  Fitzgibbon, 911 F.2d at 761-62 (quoting Ass'n of Ret. R.R.

Workers v. United States R.R. Ret. Bd., 830 F.2d 331, 336 (D.C. Cir. 1987) and Goland v. CIA,

607 F.2d 339, 350 (D.C. Cir. 1978)).

It is well established that Section 102A(i)(1) of the NSA and Section 6 of the CIA Act are

both exempting statutes within the meaning of Exemption 3.  See, e.g., Sims, 471 U.S. at 167-68

(discussing prior version of the NSA); Baker v. CIA, 580 F.2d 664, 667 (D.C. Cir. 1978) (section

6 of the CIA Act); New York Times Co. v. U.S. Dep't of Defense, 499 F. Supp. 2d 501, 512

(S.D.N.Y. 2007) (section 102A(i)(1) of the amended NSA).  The current version of the NSA

provides that the Director of National Intelligence ("DNI") "shall protect intelligence sources and

methods from unauthorized disclosure."  50 U.S.C. § 403-1(i)(1).  Previously, the NSA conferred

the same authority on the Director of Central Intelligence.  50 U.S.C. § 403-3(c)(7) (West 2003).[6]

---

[6]     The NSA was amended by the Intelligence Reform and Terrorism Prevention Act of
2004, Pub. L. No. 108-458, 118 Stat. 3638 (December 17, 2004), which created the position of
the DNI.  The effective date of the Intelligence Reform and Terrorism Prevention Act of 2004
was "not later than six months" after the enactment date of December 17, 2004.  Pub. L. No. 108-
458, Title I, § 1097(a), 118 Stat. at 3698.  Although many of the cases discussed in the text infra,
including CIA v. Sims, refer to the CIA's broad authority to "protect intelligence sources and
methods" under the prior version of the NSA, that authority is now vested in the DNI under the
amended statute.  While this Court has held that it is "the withholding statute in effect at the time
of plaintiffs' requests" that govern the requests, ACLU v. U.S. Dep't of Defense, 389 F. Supp. 2d
547, 559 n.8 (S.D.N.Y. 2005), in the context of this contempt proceeding, and in light of the fact
that the CIA's review of the documents at issue occurred in May and June of 2009, the Panetta

In this case, the DNI directed the Director of the CIA to prevent the unauthorized disclosure of intelligence sources and methods; the CIA relies upon the NSA to withhold intelligence sources and methods.  <u>See</u> Panetta Decl. ¶¶ 1, 32.

Section 6 of the CIA Act similarly prohibits the unauthorized disclosure of intelligence sources and methods.  Specifically, the CIA Act, as amended, provides that the CIA shall be exempted from the provisions of any law that "require the publication or disclosure of the organization, functions, names, official titles, salaries, or numbers of personnel employed by the Agency."  50 U.S.C. § 403g.  One of the CIA's primary functions is to "collect intelligence through human sources and by other appropriate means."  50 U.S.C. § 404-4a(d)(1).  Additionally, the CIA Act allows the CIA to retain the personal services of individuals, including obtaining advice of consultants on a paid or unpaid basis, in support of its mission, without regard to limitations on the types of persons to be employed.  50 U.S.C. § 403j.  Accordingly, the CIA relies upon the CIA Act to protect "information that would reveal the organization, functions, names, and official titles of personnel employed by the CIA, including the collection of foreign intelligence through intelligence sources and methods—such as the conduct of clandestine intelligence activities to collect intelligence from human sources using interrogation methods."  Panetta Decl. ¶ 35.

To establish Exemption 3's second prong—that the information at issue falls within the scope of the withholding statutes—the CIA must demonstrate that the "release of the requested information can reasonably be expected to lead to unauthorized disclosure of intelligence sources

---

Declarations cite to the amended version of the NSA. This is a distinction without a difference, however, as the CIA is acting under the express direction of the DNI in protecting information regarding intelligence sources and methods with respect to the FOIA request at issue.

and methods." Phillippi v. CIA, 546 F.2d 1009, 1015 n.14 (D.C. Cir. 1976); see also Wolf v. CIA, 357 F. Supp. 2d 112, 117 (D.D.C. 2004) ("an answer to the request can 'reasonably be expected to lead to unauthorized disclosure of intelligence sources and methods'") (internal citations omitted), aff'd in part, rev'd in part on other grounds, 473 F.3d 370 (D.C. Cir. 2007). As the Supreme Court held in Sims, the CIA's discretion in determining what would constitute an unauthorized disclosure of intelligence sources and methods is "very broad." 471 U.S. at 168-69. The Court thus made clear that the judiciary must defer to the CIA's judgments with respect to disclosures that affect intelligence sources and methods:

> [I]t is the responsibility of the Director of Central Intelligence, not that of the judiciary, to weigh the variety of complex and subtle factors in determining whether disclosure of information may lead to an unacceptable risk of compromising the Agency's intelligence-gathering process.

Id. at 180; see also Hunt v. CIA, 981 F.2d 1116, 1120 (9th Cir. 1992) (describing CIA's discretion to withhold information under Exemption 3 as "a near-blanket FOIA exemption"); Arabian Shield Dev. Co. v. CIA, No. 3-98-CV-0624-BD, 1999 WL 118796, at *4 (N.D. Tex. Feb. 26, 1999) (the CIA's determination of what would "lead to the unauthorized disclosure of intelligence sources and methods" is "almost unassailable"). Such broad discretion is justified because even "superficially innocuous information" might reveal valuable intelligence sources and methods. Sims, 471 U.S. at 178; see also Fitzgibbon, 911 F.2d at 762 ("the fact that the District Court at one point concluded that certain contacts between CIA and foreign officials were 'nonsensitive' does not help [plaintiff] because apparently innocuous information can be protected and withheld").

    In Sims, the Supreme Court held that "[t]he plain meaning of the statutory language, as

well as the legislative history of the National Security Act, . . . indicates that Congress vested in

the Director of Central Intelligence very broad authority to protect all sources of intelligence

information from disclosure."  471 U.S. at 168-69.  In reaching this conclusion, the Court noted

that with the NSA, Congress granted the CIA "sweeping power" to shield its activities from

public disclosure:

> Section 102(d)(3) specifically authorizes the Director of Central Intelligence to
> protect "intelligence sources and methods" from disclosure.  Plainly the broad
> sweep of this statutory language comports with the nature of the Agency's unique
> responsibilities.  To keep informed of other nations' activities bearing on our
> national security the Agency must rely on a host of sources.  At the same time, the
> Director must have the authority to shield those Agency activities and sources
> from any disclosures that would unnecessarily compromise the Agency's efforts.

Id. at 169.  The Court emphasized that the "plain meaning" of the statute "may not be squared

with any limiting definition that goes beyond the requirement that the information fall within the

Agency's mandate to conduct foreign intelligence."  Id.  Congress, the Court observed, did not

limit the scope of "intelligence sources and methods" in any way.  Id.  Rather, it "simply and

pointedly protected all sources of intelligence that provide, or are engaged to provide,

information the Agency needs to perform its statutory duties with respect to foreign intelligence."

Id. at 169-70.

Furthermore, to claim the protections available under the NSA and CIA Act, the CIA

need not meet the procedural requirements for classification of national security information

under  E.O. 12958, as amended.  Unlike Section 1.1(a)(4) of E.O. 12958, the NSA and CIA Act

do not require a determination that the disclosure of information would be expected to result in

damage to national security.  Compare 50 U.S.C.A. §§ 403-1(i)(1) and 403g with 68 Fed. Reg. at

15315.  The NSA and CIA Act also do not require the CIA to identify or explain the damage to

intelligence sources and methods that would result from a disclosure, as is required by Section 1.1(a)(4) of E.O. 12958.  Compare 50 U.S.C.A. §§ 403-1(i)(1) and 403g with 68 Fed. Reg. at 15315.  Accordingly, the CIA's mandate to protect intelligence sources and methods under the NSA and CIA Act is broader than its ability to classify information in accordance with E.O. 12958.  The Court may thus resolve the CIA's withholding of documents under Exemption 3 without ever considering the separate question of whether the withheld information meets all the criteria for classification under E.O. 12958.  See Assassination Archives and Research Ctr. v. CIA, 334 F.3d 55, 58 n.3 (D.C. Cir. 2003) ("Because we conclude that the Agency easily establishes that the records AARC seeks are exempt from disclosure under Exemption 3, we do not consider the applicability of Exemption 1."); Hunt, 981 F.2d at 1118 ("[w]e need not decide in this case whether exposure of the Agency's 'sources and methods' equals 'damage to the national security' under Exemption 1" because "Exemption 3 provides sufficient grounds to hold in favor of the Agency").

**B.     The Operational Documents at Issue Here Were Properly Withheld in Their Entirety Under Exemption 3**

Here, Director Panetta has affirmed to the extent possible on the public record, and in his classified ex parte in camera declaration, that all of the withheld information constitutes intelligence activities, sources and methods, that is protected by the NSA and CIA Act.  See Panetta Decl. ¶¶ 6-9, 31-36. Specifically, Director Panetta has explained that the withheld information consists of, inter alia, "information concerning intelligence methods" and "information that would disclose the locations of covert CIA facilities overseas and the identities of foreign countries that have assisted the CIA in collecting information on terrorist

11

organizations." Id. ¶ 6.  Director Panetta has affirmed that this information is properly withheld

pursuant to the NSA and CIA Act.  Id. ¶¶ 33, 35.

While plaintiffs challenge the withholding of the descriptions of the implementation and

application of interrogation techniques and specific details of interrogations where EITs were

applied, Director Panetta distinguishes the withheld information as contained in these withheld

documents from the previously-released OLC memoranda, and affirms that in the context of

these operational documents the withheld information expressly challenged by plaintiffs is

properly withheld under the NSA and CIA Act.  See id. ¶¶ 10-12; see also infra Section III

(discussing unique operational nature of documents and distinguishing information contained in

documents at issue from the information released in the four OLC memoranda).  Director Panetta

has also addressed plaintiffs' challenge to withheld information concerning the locations of

covert CIA facilities and the identities of countries cooperating with the CIA in counterterrorism

operations, affirming that such information is properly withheld pursuant to the CIA Act and the

NSA.  See id. ¶ 9 ("The documents at issue also disclose the locations of covert CIA facilities

and the identifies of countries cooperating with the CIA in counterterrorism operations.  As I

discuss in my classified declaration, such information is properly classified and exempt from

disclosure under FOIA Exemptions b(1) and b(3).") .

Records containing operational details, including the names of CIA employees and

locations of covert CIA facilities, plainly fall within the protections of the NSA and the CIA Act.

See, e.g., Riquelme v. CIA, 453 F. Supp. 2d 103, 110-11 (D.D.C. 2006) (human source

information protected under Exemption 3); Davy v. CIA, 357 F. Supp. 2d 76, 86 (D.D.C. 2004)

(cryptonyms, CIA employee names, identifiers, titles, filing instructions and organizational data

properly withheld under Exemption 3); <u>Assassination Archives and Research Ctr. v. CIA</u>, 720 F.

Supp. 217, 222 (D.D.C. 1989) (cryptonyms, locations of cover field installations, foreign

intelligence activities, CIA employee names, official titles, and organizational data properly

withheld under Exemption 3).  Records that would identify the names of CIA contractors

likewise fall within the protections of the NSA and the CIA Act.  <u>See, e.g.</u>, <u>Sims</u>, 471 U.S. at

161-63, 177 (holding that CIA correctly invoked Exemption 3 to withhold names under NSA of

researchers and institutions with whom CIA contracted to conduct research); <u>Gardels v. CIA</u>, 689

F.2d 1100, 1103-05 (D.C. Cir. 1982) (holding that CIA correctly invoked Exemption 3 to neither

confirm or deny the existence of covert contracts that could identify CIA's relationship with

University of California); <u>Halperin v. CIA</u>, 629 F.2d 144, 150 (D.C. Cir. 1980) (holding that the

NSA and CIA Act exempted release of names of CIA-retained attorneys or law firms, as well as

details of legal services rendered, in connection with covert or classified activities).

Indeed, the CIA has "sweeping power" generally to protect against the unauthorized

disclosure of activities under the NSA and the CIA Act.  <u>See</u> <u>Sims</u>, 471 U.S. at 168-70; <u>see also</u>

the CIA Act, 50 U.S.C. § 403g (exempting disclosure of CIA "functions").  And its

determination that the disclosure of the withheld information would reveal information regarding

these intelligence sources and methods is entitled to substantial weight from this Court.  <u>See, e.g.</u>,

<u>Wolf</u>, 473 F.3d at 374.  In light of the Agency's exercise of its "sweeping power" under the NSA

and CIA Act to protect the intelligence sources and methods, the Court need not reach any

arguments from plaintiffs that the disclosure of the information at issue will not harm national

security given recent disclosures in the OLC memoranda about the detention and interrogation

program.[7]  See, e.g., Wilner v. NSA, No. 07 Civ. 3883 (DLC), 2008 WL 2567765, at *6

(S.D.N.Y. June 25, 2008) ("The Court need not address plaintiffs' substantive arguments

concerning the [Terrorist Surveillance Program's] legality, however, because the language of

FOIA Exemption 3 and Section 6 of the [National Security Agency Act of 1959] makes clear that

the defendants permissibly refused to disclose the information requested by plaintiffs."); People

for the Am. Way Found. v. CIA, 462 F. Supp. 2d 21, 31 (D.D.C. 2006) (potential illegality of

activities described in government records cannot be used as basis for challenging withholding of

records under Exemption 3); Sirota v. CIA, No. 80 Civ. 2050 (GLG), 1981 WL 158804, at *3

(S.D.N.Y. Sept. 18, 1981) ("[T]he fact that the underlying intelligence activity may have been

illegal will not defeat an otherwise valid exemption under § 552(b)(3)."); Navasky v. CIA, 499 F.

Supp. 269, 274 (S.D.N.Y. 1980) ("[A] claim of activities ultra vires the CIA charter is irrelevant

to an exemption 3 claim.").

Because the CIA has explained, with reasonable specificity, the intelligence sources and

methods that are discussed in the documents, and provided the Court with sufficient detail to

demonstrate the logical connection between the withheld information in the sampled documents

and the CIA's decision to withhold this information, the Court should uphold the CIA's

application of Exemption 3 to withhold these documents in full.

## III.   THE CIA PROPERLY INVOKED EXEMPTION ONE TO WITHHOLD THE OPERATIONAL DOCUMENTS IN FULL

The CIA likewise properly withheld these operational documents in full under Exemption

1.  With regard to the specific withholdings challenged by plaintiffs, the CIA properly withheld

---

[7]      Moreover, the CIA has articulated the harm to the national security posed by disclosure of this information in these operational documents.  See infra Section III.

under Exemption 1 details about the EITs, the names of CIA employees and contractors,

identifying information about the location of covert CIA facilities, and operational details about

the CIA facilities.

A.    **Legal Standards**

Exemption 1 protects records that are:  (A) specifically authorized under criteria

established by an Executive Order to be kept secret in the interest of national defense or foreign

policy, and (B) in fact properly classified pursuant to an Executive Order.  See 5 U.S.C.

§ 552(b)(1).  E.O. 12958 governs the classification of national security information.  68 Fed.

Reg. at 15315-34.  Section 1.1 of the order lists four requirements for the classification of

national security information:  (1) an "original classification authority" must classify the

information; (2) the information must be "owned by, produced by or for, or [be] under the control

of the United States Government;" (3) the information must fall within one of eight protected

categories of information listed in Section 1.4 of the order; and (4) the original classification

authority must "determine[] that the unauthorized disclosure of the information reasonably could

be expected to result in damage to the national security"[8] and be "able to identify or describe the

damage."  Id. at 15315.  The protected categories of information under Section 1.4 include, inter

alia, intelligence activities (including special activities) or intelligence sources or methods,

§ 1.4(c); and foreign relations or foreign activities of the United States, including confidential

sources, § 1.4(d).  Id. at 15316-17.

An agency can demonstrate that it has properly withheld information under Exemption 1

---

[8]     However, Section 1.1(c) provides that the "unauthorized disclosure of foreign
government information is presumed to cause damage to the national security."  Id. at 15315.

if it establishes that it has met the substantive and procedural requirements of the Executive

Order.  Substantively, the agency must show that the records at issue logically fall within the

exemption, i.e., that E.O. 12958 authorizes the classification of the information at issue.

Procedurally, the agency must demonstrate that it followed the proper procedures in classifying

the information.  See Salisbury v. United States, 690 F.2d 966, 970-73 (D.C. Cir. 1982); Military

Audit Project v. Casey, 656 F.2d 724, 737-38 (D.C. Cir. 1981).  Where the agency meets both

tests, it is entitled to summary judgment.  See, e.g., Abbotts v. NRC, 766 F.2d 604, 606-08 (D.C.

Cir. 1985); Miller v. Casey, 730 F.2d 773, 776-77 (D.C. Cir. 1984).

       Agency decisions to withhold classified information under FOIA are reviewed de novo by

the courts, and the agency bears the burden of proving its claim for exemption.  See 5 U.S.C.

§ 552(a)(4)(B); Miller, 730 F.2d at 776.  Nevertheless, because agencies have "unique insights"

into the adverse effects that might result from public disclosure of classified information, the

courts must accord "substantial weight" to an agency's affidavits justifying classification.

Military Audit Project, 656 F.2d at 738; accord Doherty v. DOJ, 775 F.2d 49, 52 (2d Cir. 1985).

       "Summary judgment is warranted on the basis of agency affidavits when the affidavits

describe 'the justifications for nondisclosure with reasonably specific detail, demonstrate that the

information withheld logically falls within the claimed exemption, and are not controverted by

either contrary evidence in the record nor by evidence of agency bad faith.'"  Miller, 730 F.2d at

776 (quoting Military Audit Project, 656 F.2d at 738).  Where the agency's affidavits meet this

standard, "the court is not to conduct a detailed inquiry to decide whether it agrees with the

agency's opinions; to do so would violate the principle of affording substantial weight to the

expert opinion of the agency."  Halperin, 629 F.2d at 148; see Fitzgibbon, 911 F.2d at 766

(disapproving the district court's performance of "its own calculus as to whether or not harm to

the national security or to intelligence sources and methods would result from disclosure").

Thus, absent evidence of bad faith, where the Court has enough information to understand why

an agency classified information, it should not second-guess the agency's facially reasonable

classification decisions.  See Frugone v. CIA, 169 F.3d 772, 775 (D.C. Cir. 1999) (because

"courts have little expertise in either international diplomacy or counterintelligence operations,

we are in no position to dismiss the CIA's facially reasonable concerns" about the harm that

disclosure could cause to national security); Wolf, 357 F. Supp. 2d at 116 (in reviewing

classification decision, "little more" is required "than a showing that the agency's rationale is

logical"); Students Against Genocide v. Dep't of State, No. CIVA96-667(CKK/JMF), 1998 WL

699074, at *9 (D.D.C. Aug. 24, 1998) ("The Court is in no position to substitute its judgment for

the agency's" with regard to an "evaluation of the national security risk posed by release of

satellite or aerial imagery.").

### B.    The Operational Documents Were Properly Classified and Withheld in Full

Here, these operational documents were properly classified because all four requirements

of Section 1.1 of E.O. 12958 were satisfied.  Director Panetta has been delegated original

classification authority within the meaning of E.O. 12958.  Panetta Decl. ¶ 21.  Director Panetta

personally reviewed the classified information, id., and determined that the withheld information

at issue is "owned by the U.S. Government," id.  ¶ 22.

In addition, Director Panetta determined that the withheld information falls within two of

the protected categories of information set forth in Section 1.4 of E.O. 12958.  Panetta Decl. ¶

23; see also 68 Fed. Reg. at 15317.  Specifically, he determined that the information falls within

the categories of:  "information concerning intelligence activities (including special activities) and intelligence sources or methods [§ 1.4(c)]" and "foreign relations or foreign activities of the United States, including confidential sources [§ 1.4(d)]."  Panetta Decl. ¶ 23.  Director Panetta has also sworn that the CIA had no improper motive in classifying the information at issue. Panetta Decl. ¶ 26; see also id. ("I want to emphasize to the Court that my determinations expressed above, and in my classified declaration, are in no way driven by a desire to prevent embarrassment for the U.S. Government or the CIA, or to suppress evidence of any unlawful conduct.  My sole purpose is to prevent the exceptionally grave damage to the national security reasonably likely to occur from the public disclosure of any portion of these documents, and to protect intelligence sources and methods.").  See Carney, 19 F.3d at 812 (declarations submitted by the agency in support of its determination are "accorded a presumption of good faith") (citation and internal quotation marks omitted).

Finally, Director Panetta determined that the unauthorized disclosure of the classified information "reasonably could be expected to result in serious or exceptionally grave damage to the national security, including damage to the United States' defense against transnational terrorism and to the foreign relations of the United States."  Panetta Decl. ¶ 25.  While plaintiffs challenge the withholding of the descriptions of the implementation and application of interrogation techniques and specific details of interrogations where EITs were applied, Director Panetta identifies the risk that disclosure will pose to national security in the context of these operational documents:

> 10.   As the Court knows, on April 16, 2009, the President of the United States declassified and released in large part Department of Justice, [OLC] memoranda analyzing the legality of specific [EITs].  As

18

the Court also knows, some of the operational documents currently
at issue contain descriptions of EITs being applied during specific
overseas interrogations.  These descriptions, however, are of EITs
<u>as applied</u> in actual operations, and are of a qualitatively different
nature that then EIT descriptions <u>in the abstract</u> contained in the
OLC memoranda.  As discussed below and in my classified
declaration, I have determined that information . . . concerning
<u>application</u> of the EITs must continued to be classified TOP
SECRET, and withheld from disclosure in its entirety under FOIA
Exemptions b(1) and b(3).

11.    The recently declassified OLC memoranda are legal analyses by
Department of Justice (DOJ) attorneys.  Although they discuss the
legality of specific proposed intelligence activities, they do not
reveal the type of information in the operational documents at
issue: details of <u>actual</u> intelligence activities, sources and methods.
Even if the EITs are never used again, the CIA will continue to be
involved in questioning terrorists under legally approved
guidelines.  The information contained in these documents would
provide future terrorists with a guidebook on how to evade such
questioning.  I elaborate further on this point in my classified
declaration.

12.    Additionally, disclosure of explicit details of specific interrogations where
EITs were applied would provide al-Qa'ida with propaganda it could use
to recruit and raise funds.  Al-Qa'ida has a very effective propaganda
operation.  When the abuse of Iraqi detainees at the Abu Ghraib prison
was disclosed, al-Qa'ida made very effective use of that information in
extremist websites that recruit jihadists and solicit financial support.
Information concerning the details of the EITs being applied would
provide ready-made ammunition for al-Qa'ida propaganda.  The resultant
damage to the national security would likely be exceptionally grave, and
the withholding of this information is therefore proper under FOIA
Exemption b(1).

Panetta Decl. ¶¶ 10-12 (emphasis in original).  Director Panetta has also addressed plaintiffs'

challenge to withheld information concerning the locations of covert CIA facilities and the

identities of countries cooperating with the CIA in counterterrorism operations, affirming that

such information is properly classified and exempt from disclosure.  <u>See id.</u> ¶ 9 ("The documents

at issue also disclose the locations of covert CIA facilities and the identities of countries

cooperating with the CIA in counterterrorism operations.  As I discuss in my classified

declaration, such information is properly classified and exempt from disclosure under FOIA

Exemptions b(1) and b(3).") .

Where, as here, the CIA has satisfied the conditions of Section 1.1 of E.O. 12958, courts

have repeatedly endorsed the CIA's ability to classify its intelligence methods.  See, e.g., Hogan

v. Huff, 00 Civ. 6753 (VM), 2002 WL 1359722, at *8 (S.D.N.Y. June 21, 2002) (information

properly withheld under Exemption 1 where disclosure of the information "would potentially

harm the agency by exposing its methods"); Wolf, 357 F. Supp. 2d at 116 (classification

warranted where "disclosure could reveal general CIA methods of information gathering").

Moreover, this Court previously recognized in this case that Exemption 1 protects information

that could harm the United States' foreign relations.  American Civil Liberties Union v.

Department of Defense, 389 F. Supp. 2d 547, 561 (S.D.N.Y. 2005) ("even if the only question

was whether to recognize officially that which was informally or unofficially believed to exist,

the niceties of international diplomacy sometimes make it important not to embarrass a foreign

country or its leaders, and exemptions from FOIA protect that concern as well"), vacated in part,

Order of the United States Court of Appeals for the Second Circuit, dated November 1, 2006; see

also Bassiouni v. CIA, 392 F.3d 244, 246 (7th Cir. 2004) (observing that "[e]ven allies could be

unpleasantly surprised" by disclosure of CIA espionage information involving one of its

citizens).  Accordingly, the CIA properly withheld these operational documents in full under

Exemption 1.

To the extent that plaintiffs argue that the intelligence methods in these documents are

illegal and outside the scope of the agency's authority, and thus are not properly classified, the

interrogation and detention methods addressed in the documents were, until January 2009, within

the CIA's authority.  See Executive Order 13491, 74 Fed. Reg. 4,893 (Jan. 22, 2009) (terminating

CIA terrorist and detention interrogation program).  Moreover, Section 1.7(a) of the Executive

Order does not bar the Government from classifying information that might contain evidence of

illegality, but rather bars the Government from classifying otherwise unclassified information "in

order to"— i.e., for the purpose of—concealing violations of law.  68 Fed. Reg. at 15318.  Here,

the details of the EITs have already been released in the context of the OLC memoranda.  Thus,

the CIA's classification of these operational documents was not intended to conceal any illegal

activity, as the activity itself has already been disclosed.  See Rubin v. CIA, No. 01 Civ. 2274

(DLC), 2001 WL 1537706, at *5 (S.D.N.Y. Dec. 3, 2001) (rejecting argument that CIA must

disclose information that had "already been published" in a book); Canning v. U.S. Dept. of

Justice, 848 F. Supp. 1037, 1048 (D.D.C. 1994) ("To the extent that the Plaintiff contends that

release of this information would be an embarrassment to the government, the Court finds it

difficult to believe that the agency's withholding decisions were motivated by a desire to

improperly conceal such facts.  If anything, the agency has released sufficient information to

facilitate such speculation about the existence of a potentially inappropriate investigation.").

Moreover, Director Panetta has sworn that the CIA has no improper motive in classifying these

operational documents at issue:

> I want to emphasize to the Court that my determinations expressed above, and in
> my classified declaration, are in no way driven by a desire to prevent
> embarrassment for the U.S. Government or the CIA, or to suppress evidence of
> any unlawful conduct.  My sole purpose is to prevent the exceptionally grave
> damage to the national security reasonably likely to occur from public disclosure

of any portion of these documents, and to protect intelligence sources and
methods.

Panetta Decl. ¶ 15; see also id. ¶ 26 (same).

Further, to implicate Section 1.7(a), there must be evidence of improper motive or intent

on the part of the classifying authority; there is no such evidence here in light of Director

Panetta's affirmation and the release of the descriptions of the EITs in the OLC memoranda. See

United States v. Abu Marzook, 412 F. Supp. 2d 913, 923 (N.D. Ill. 2006) (rejecting argument

that information had been improperly classified to prevent embarrassment and to conceal Israel's

use of illegal interrogation methods because, inter alia, "there is simply no evidence that these

materials [were] classified merely to prevent embarrassment to Israel"); Arabian Shield, 1999

WL 118796, at *4 (rejecting argument that information was improperly classified where plaintiff

had "no[t] offered evidence that the CIA classified the requested information for the purpose of

concealing a crime"); Billington v. DOJ, 11 F. Supp. 2d 45, 58 (D.D.C. 1998) (rejecting

argument that FBI violated Executive Order provisions barring classification in order to conceal

violations of law or prevent embarrassment where plaintiff did "not provide any proof of the

FBI's motives in classifying the information" and there was no evidence "that the FBI was

involved in an attempt to cover-up information"), aff'd in part, vacated in part, 233 F.3d 581

(D.C. Cir. 2000); Canning, 848 F. Supp at 1047 (rejecting argument that information was

classified in order to prevent embarrassment or conceal illegal activities because "the Court finds

no credible evidence that the agency's motives for its withholding decisions were improper or

otherwise in violation of [prior version of] E.O. 12356"). Arabian Shield made clear that Section

1.7(a) turns on nefarious intent, not whether the documents might reveal evidence of illegal acts:

> Plaintiff argues that the requested information was improperly classified by the CIA because "national security secrecy cannot be used to conceal information pertaining to the commission of a crime . . ." (Plf. Motion at 1). However, a careful reading of the Executive Order compels a different conclusion. The order provides that "[i]n no case shall information be classified in order to . . . conceal violations of law, inefficiency, or administrative error." Exec. Order 12958 § 1.8(a)(1) (emphasis added). Section 1.8 thus prohibits an agency from classifying documents as a ruse when they could not otherwise be withheld from public disclosure. It does not prevent the classification of national security information merely because it might reveal criminal or tortious acts.

1999 WL 118796, at *4 (emphasis in original);[9] see also Wilson v. Dep't of Justice, Civ. A. No. 87-2415-LFO, 1991 WL 111457, at *2 (D.D.C. June 13, 1991) ("even if some of the information withheld were embarrassing to Egyptian officials, it would nonetheless be covered by Exemption 1 if, independent of any desire to avoid embarrassment, the information withheld were properly classified").

For all of these reasons, there is no evidence that the CIA had an improper motive in classifying the operational documents currently at issue before the Court. Accordingly, the CIA properly withheld these operational documents in full under Exemption 1.

## IV. THE CIA PROPERLY WITHHELD INFORMATION CONTAINED IN EIGHT OF THE SAMPLE DOCUMENTS PURSUANT TO EXEMPTION 5

The CIA also properly withheld information contained within eight of the sampled documents under Exemption 5, which exempts from disclosure "inter-agency or intra-agency memorandums or letters which would not be available by law to a party . . . in litigation with the

---

[9]   Until 2003, the provision now contained in Section 1.7(a) of E.O. 12958 was contained in Section 1.8(a) of the same Order. The Arabian Shield court cited Section 1.8(a) because it considered the pre-2003 version of the Order. The 2003 amendment did not affect the substance of the relevant language of E.O. 12958. Compare 68 Fed. Reg. at 15318 (the 2003 amendment) with 60 Fed. Reg. 19825, 19829 (the pre-2003 version of E.O. 12598).

agency."  5 U.S.C. § 552(b)(5); see also Tigue v. U.S. Dep't of Justice, 312 F.3d 70, 76-77 (2d

Cir. 2002) ("'Stated simply, agency documents which would not be obtainable by a private

litigant in an action against the agency under normal discovery rules (e.g., attorney-client, work

product, executive privilege) are protected from disclosure under Exemption 5.'") (quoting

Grand Cent. P'ship, 166 F.3d at 481).  As described by Director Panetta, the eight documents

(28, 54, 56, 57, and 59-62) contain information reflecting intra-agency communications that is

protected by the deliberative process privilege, and two of the eight documents (Documents 59

and 60) contain information that is protected from disclosure as attorney work-product and

attorney-client confidential communications.  See Pantetta Decl. ¶¶ 13, 37.

### A.    Deliberative Process Privilege

The intra-agency communications withheld from the eight documents are protected by the

deliberative process privilege, which covers documents "reflecting advisory opinions,

recommendations and deliberations comprising part of a process by which government decisions

and policies are formulated."  NLRB v. Sears, Roebuck & Co., 421 U.S. 132, 150 (1975)

("Sears") (internal quotation marks omitted).  As the Supreme Court explained:

> The deliberative process privilege rests on the obvious realization that officials
> will not communicate candidly among themselves if each remark is a potential
> item of discovery and front page news, and its object is to enhance the quality of
> agency decisions by protecting open and frank discussion among those who make
> them within the Government.

Klamath, 532 U.S. at 8-9 (internal quotation marks and citations omitted).  "[E]fficiency of

Government would be greatly hampered if, with respect to legal and policy matters, all

Government agencies were prematurely forced to 'operate in a fishbowl.'"  EPA v. Mink, 410

U.S. 73, 87 (1973) (abrogated by statute on other grounds).

An agency record must satisfy three conditions to qualify for the deliberative process privilege.  It must be "inter-agency or intra-agency," 5 U.S.C. § 552(b)(5), that is, "its source must be a Government agency," Klamath, 532 U.S. at 8; and it "must be both 'predecisional' and 'deliberative.'"  Grand Cent. P'ship, Inc., 166 F.3d at 482 (citations omitted).  See also Hopkins v. HUD, 929 F.2d 81, 84 (2d Cir. 1991); Local 3, Int'l Bhd. of Elec. Workers v. NLRB, 845 F.2d 1177, 1180 (2d Cir. 1988).  A record is "predecisional" when it is "prepared in order to assist an agency decisionmaker in arriving at his decision."  Renegotiation Bd. v. Grumman Aircraft Eng'g Corp, 421 U.S. 168, 184 (1975); see also Schell v. HHS., 843 F.2d 933, 940 (6th Cir. 1988) ("A document is predecisional when it is 'received by the decisionmaker on the subject of the decision prior to the time the decision is made.'") (citation omitted).  "To establish that a document is predecisional, the agency need not point to an agency final decision, but merely establish what deliberative process is involved, and the role that the documents at issue played in that process."  Judicial Watch v. Export-Import Bank, 108 F. Supp. 2d 19, 35 (D.D.C. 2000) (citing Formaldehyde Inst. v. HHS, 889 F.2d 1118, 1223 (D.C. Cir. 1989)).

A record is "deliberative" when "it reflects the give-and-take of the consultative process." Wolfe v. HHS, 839 F.2d 768, 774 (D.C. Cir. 1988) (citation and internal quotation marks omitted) (en banc); see also Vaughn v. Rosen, 523 F.2d 1136, 1143-44 (D.C. Cir. 1975) (a "deliberative" document is one that "makes recommendations or expresses opinions on legal or policy matters").  "There should be considerable deference to the [agency's] judgment as to what constitutes . . . 'part of the agency give-and-take—of the deliberative process—by which the decision itself is made.'"  Chemical Mfrs. Ass'n v. Consumer Prod. Safety Comm'n, 600 F. Supp. 114, 118 (D.D.C. 1984) (quoting Vaughn, 523 F.2d at 1144).  The agency is best situated

"to know what confidentiality is needed 'to prevent injury to the quality of agency decisions . . .

.'"  Chemical Mfrs., 600 F. Supp. at 118 (quoting Sears, 421 U.S. at 151).

As explained by Director Panetta, the eight "intra-agency" documents contain "pre-decisional deliberations, preliminary evaluations, opinions, and recommendations from CIA employees to their management concerning a future policy or course of action."  Panetta Decl. ¶ 37.  The Vaughn entries confirm the pre-decisional nature of the information within the eight documents.  See Vaugn Entries 28 (five-page cable from the field to CIA headquarters regarding interrogation of Abu Zubaydah containing recommendations from CIA employees to their management on policy issues), 54 (two-page draft statement regarding destroyed tapes reflecting comments on the draft statement), 56 (referring to attached four-page memorandum of CIA employee to his superiors concerning the destroyed videotapes reflecting preliminary recommendations and opinions of CIA employees), 57 (handwritten notes including proposed plans for future interrogations reflecting opinions and pre-decisional recommendations of CIA employees), 59 (six pages of handwritten notes of CIA employee discussing the interrogation videos with a CIA attorney reflecting predecisional deliberations), 60 (five-page memorandum for the record relating to the content of destroyed videotapes containing pre-decisional information pertaining to policy and legal guidance), 61 (four-page memorandum of CIA employee regarding destroyed videotapes containing predecisional recommendations and opinions of CIA employees), 62 (forty-seven pages of handwritten notes from a review of the videotapes written in the field containing predecisional deliberations).  Director Panetta explains that release of this information "would discourage open, frank discussions on matters of policy between subordinates and superiors."  Id.  Because the withheld information from these eight

documents consists of intra-agency and pre-decisional deliberations, it is protected by the

deliberative process privilege and properly withheld pursuant to Exemption 5.

### B.      Attorney-Client Privilege

Documents 59 and 60 contain information that is also covered by the attorney-client

privilege, which is designed "to encourage full and frank communication between attorneys and

their clients," and thereby encourage "the observance of law and administration of justice."

Upjohn Co. v. United States, 449 U.S. 383, 389 (1981). "To invoke the attorney-client privilege,

a party must demonstrate that there was (1) a communication between client and counsel, which

(2) was intended to be and was in fact kept confidential, and (3) made for the purpose of

obtaining or providing legal services."  United States v. Constr. Prods. Research, Inc., 73 F.3d

464, 473 (2d Cir. 1996).

The CIA satisfied the three prerequisites for claiming the privilege, as it established that

the two documents contain "attorney-client confidential communications," Panetta Decl. ¶ 37,

between a CIA employee and a CIA attorney, relating to a matter for which the employee sought

counsel's advice, that was intended to be kept confidential and was in fact kept confidential.  See

Panetta Decl. ¶¶ 13 (stating that document 59 "contains an Agency employee's notes from a

discussion with a CIA attorney who reviewed the videotapes to evaluate legal and policy

compliance" and document 60 "contains that attorney's analysis and conclusions to CIA

management concerning his legal and policy review"), 37 (describing document 59 as "notes

from a CIA employee's discussion with a CIA attorney about the attorney's review, at

management request, of the videotapes to evaluate legal and policy compliance" and document

60 as that "CIA attorney's legal analysis and conclusions to CIA management concerning his

legal and policy review"); see also Vaughn Entries 59 ("document is a six-page record of

handwritten notes from a CIA employee discussing the interrogation videotapes with a CIA

attorney . . . [and] include details concerning the destroyed videotapes, communications between

the attorney and Agency management" reflecting "privileged attorney-client communications"),

60 ("five-page memorandum for the record written by a CIA attorney . . . . [containing]

confidential communications between the attorney and CIA personnel").  Director Panetta

explains that disclosure of the attorney-client communications "would discourage CIA managers

from seeking the advice of CIA lawyers."  Panetta Decl. ¶ 37.  Because CIA employees were

dealing with their "attorneys as would any private party seeking advice," Coastal States Gas

Corp. v. DOE, 617 F.2d 854, 863 (D.C. Cir. 1980), the withheld information from Documents 59

and 60 is protected by the attorney-client privilege and was properly withheld under Exemption

5.

### C.    Attorney Work Product Doctrine

Finally, Documents 59 and 60 also contain information that was properly withheld under

the attorney work product doctrine.  The attorney work product doctrine exempts from disclosure

"mental impressions, conclusions, opinions, or legal theories of an attorney or other

representative of a party concerning the litigation," see Fed. R. Civ. P. 26(b)(3), and prepared "in

anticipation of litigation," A. Michael's Piano, 18 F.3d at 146.  The "anticipation of litigation"

element has been read in the Second Circuit to be satisfied where, "in light of the nature of the

document and the factual situation in the particular case, the document can fairly be said to have

been prepared or obtained because of the prospect of litigation."  United States v. Adleman, 134

F.3d 1194, 1202 (2d Cir. 1998).

28

In adopting the "because of" formulation, the Second Circuit rejected the requirement that documents be prepared "primarily or exclusively to assist in litigation," id. at 1198, holding instead that materials created to assist a business decision may qualify so long as litigation was the motivating cause and the material "analyz[es] the likely outcome of that litigation." Id. at 1202. Material that would have been created in the ordinary course of business, whether or not litigation existed or was expected, does not fall under the privilege—the question for such material is whether it "would have been created in essentially similar form irrespective of the litigation." Id. The determination thus turns on the primary motivation behind the creation of the purportedly privileged material. See Hardy v. New York News Inc., 114 F.R.D. 633, 644 (S.D.N.Y. 1987); see also Rexford v. Olczak, 176 F.R.D. 90, 91 (W.D.N.Y. 1997) (courts look to whether, at the time the materials were created, the party asserting the privilege believed that "litigation was likely and whether that belief was reasonable") (quotation omitted); Gulf Islands Leasing, Inc. v. Bombardier Capital, Inc., 215 F.R.D. 466, 475 (S.D.N.Y. 2003) (same).

The CIA has established that Documents 59 and 60 contain the mental impressions, conclusions, opinions, or legal theories of a CIA attorney. As Director Panetta explains, Documents 59 and 60 contain attorney work-product. See Panetta Decl. ¶¶ 13, 37 (explaining that Document 59 contains CIA employee's notes of conversation with CIA attorney regarding the attorney's review of the videotapes "to evaluate legal and policy compliance" and Document 60 contains the CIA attorney's "legal analysis and conclusions to CIA management concerning his legal and policy review"); Vaughn Entries 59 (six-pages of CIA employee's handwritten notes of conversation with CIA attorney discussing interrogation videotapes and containing "attorney work product"), 60 (five-page memorandum for the record written by CIA attorney for

29

management relating to contents of destroyed videotapes containing "attorney work product"). Director Panetta has explained that disclosure of the attorney work-product "could inhibit CIA lawyers from issuing opinions to CIA managers concerning complex and unsettled areas of law." Panetta Decl. ¶ 37.

Given the CIA's unrebutted subjective belief that litigation would follow, see id., it has established that the withheld information in Documents 59 and 60 is protected by the attorney work product doctrine.  See Prebena Wire Bending Mach. Co. v. Transit Worldwide Corp., No. 97 Civ. 9336 (KMW) (HBP), 1999 WL 1063216, at *4 (S.D.N.Y. Nov. 23, 1999) ("Since Universal has submitted unrebutted evidence that it had a subjective belief that litigation would follow and that its subjective belief was reasonable, i.e., the size of the loss made litigation likely, it has met its burden of establishing that [pre-litigation] emails are protected by the attorney work product doctrine.").  The CIA need not identify a particular proceeding it had in mind in order to claim the protection of the attorney work product doctrine.  "[A] document may be protected even if it was 'created prior to the event giving rise to litigation' because '[i]n many instances, the expected litigation is quite concrete, notwithstanding that the events giving rise to it have not yet occurred.'"  In re Grand Jury Proceedings, No. M-11-189 (LAP), 2001 WL 1167497, at *14 (S.D.N.Y. Oct. 3, 2001).  Accordingly, the CIA has properly withheld Documents 59 and 60 pursuant to the attorney work product doctrine.

V.   **THE CIA PROPERLY RELIED UPON EXEMPTION 6 TO WITHHOLD NAMES AND IDENTIFYING INFORMATION OF CIA PERSONNEL AND EMPLOYEES OF OTHER FEDERAL AGENCIES INVOLVED IN CLANDESTINE COUNTERTERRORISM OPERATIONS**

The CIA has properly withheld the names and other identifying information of CIA employees and employees of other federal agencies involved in clandestine counterterrorism operations.[10]

Exemption 6 protects "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(6).  The purpose of Exemption 6 is to "protect individuals from the injury and embarrassment that can result from the unnecessary disclosure of personal information."  United States Dep't of State v. Washington Post Co., 456 U.S. 595, 599 (1982).  The Supreme Court has interpreted Exemption 6 broadly, making clear that all information that "applies to a particular individual" meets the threshold requirement for protection under this exemption.  Washington Post Co., 456 U.S. at 602.  The statutory language concerning files "similar" to personnel or medical files has been read broadly by the Supreme Court to encompass any "information which applies to a particular individual."  Id.; see also New York Times Co. v. NASA, 920 F.2d 1002, 1005 (D.C. Cir. 1990) (finding voice tapes from the shuttle Challenger to be "similar files" because they identified crew members by the sound and inflection of their voices).

Once it has been established that the information at issue "applies to a particular individual," the focus of the inquiry turns to whether disclosure of the record at issue would

---

[10]    Of the 65 documents described in the CIA's Vaughn index, 62 of them contain names or identifying information of CIA employees or personnel involved in clandestine counterterrorism operations.  See Panetta Decl. ¶ 8 n.1.

31

"constitute a clearly unwarranted invasion of personal privacy," 5 U.S.C. § 552(b)(6), which

requires a balancing of the public's interest in disclosure against the interest in privacy that

would be furthered by non-disclosure.  See Dep't of Defense v. FLRA, 510 U.S. 487, 495 (1994).

 The "only relevant public interest to be weighed in this balance is the extent to which disclosure

would serve the core purpose of FOIA, which is contribut[ing] significantly to public

understanding of the operations or activities of the government."  Id. at 495-96 (internal citation

and quotation marks omitted) (emphasis added); see Hopkins, 929 F.2d at 88.  Establishing that

disclosure of personal information would serve a cognizable public interest is the plaintiff's

burden.  See Carter v. U.S. Dep't of Commerce, 830 F.2d 388, 392 n.13 (D.C. Cir. 1987).

    Construing the public interest component, courts have noted that the public interest "is

not fostered by disclosure about private citizens that is accumulated in various government files

but that reveals little or nothing about an agency's own conduct."  Nation Magazine v. United

States Customs Serv., 71 F.3d 885, 894 (D.C. Cir. 1995) (quotation marks and citation omitted).

Rather, the information must "contribute significantly to public understanding of the operations

or activities of the government.  . . . "  U.S. Dept. of Justice v. Reporters Comm. For Freedom of

Press, 489 U.S. 749, 775 (1989) (emphasis added).

    Here, the CIA properly withheld the names and identifying information of CIA employees

and employees of other federal agencies involved in clandestine counterterrorism operations.

See Panetta Decl. ¶¶ 8, 38.  Director Panetta has affirmed that sixty-two of the sampled

documents "contain personal information, and that the disclosure of that information would

constitute a clearly unwarranted invasion of personal privacy."  Id. ¶ 38.  Director Panetta further

affirms that "[d]isclosing information that could identify CIA employees and other personnel

engaged in clandestine counterterrorism operations could place those individuals, and their families and friends, at grave risk from extremists seeking retribution.  There is no legitimate countervailing public benefit that could come close to outweighing this paramount concern to protect U.S. Government employees and their associates." Id.  Accordingly, the CIA properly withheld the names and other identifying information of CIA employees and employees of other federal agencies engaged in clandestine counterterrorism operations under Exemption 6.

## CONCLUSION

For the foregoing reasons, the Court should grant the CIA's fifth motion for summary judgment.

Dated: New York, New York
         July 10, 2009

                                                Respectfully submitted,

                                                LEV L. DASSIN
                                                Acting United States Attorney for the
                                                Southern District of New York
                                                Attorney for Defendants

                              By:    /s/ Heather K. McShain
                                                SEAN H. LANE
                                                PETER M. SKINNER
                                                HEATHER K. McSHAIN
                                                Assistant United States Attorneys
                                                86 Chambers Street, 3rd floor
                                                New York, N.Y.  10007
                                                Tel.:  (212) 637-2696
                                                Email: heather.mcshain@usdoj.gov