# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| AMERICAN CIVIL LIBERTIES UNION, CENTER FOR CONSTITUTIONAL RIGHTS, PHYSICIANS FOR HUMAN RIGHTS, VETERANS FOR COMMON SENSE, and VETERANS FOR PEACE, | DOCKET NO.: 1:04-CV-4151 (AKH) |
| Plaintiffs, | |
| v. | **Document Electronically Filed** |
| DEPARTMENT OF DEFENSE and its components DEPARTMENT OF ARMY, DEPARTMENT OF NAVY, DEPARTMENT OF AIR FORCE, DEFENSE INTELLIGENCE AGENCY; DEPARTMENT OF HOMELAND SECURITY; DEPARTMENT OF JUSTICE and its components CIVIL RIGHTS DIVISION, CRIMINAL DIVISION, OFFICE OF INFORMATION AND PRIVACY, OFFICE OF INTELLIGENCE POLICY AND REVIEW, FEDERAL BUREAU OF INVESTIGATION; DEPARTMENT OF STATE; and CENTRAL INTELLIGENCE AGENCY, | |
| Defendants. | |
| AMERICAN CIVIL LIBERTIES UNION, CENTER FOR CONSTITUTIONAL RIGHTS, PHYSICIANS FOR HUMAN RIGHTS, VETERANS FOR COMMON SENSE, and VETERANS FOR PEACE, | DOCKET NO.: 1:05-CV-9620 (AKH) |
| Plaintiffs, | |
| v. | |
| DEPARTMENT OF JUSTICE and its component OFFICE OF LEGAL COUNSEL, | |
| Defendants. | |

# MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' FIFTH CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT AND IN OPPOSITION TO DEFENDANTS' FIFTH MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................... i

INTRODUCTION ....................................................................................................... 1

FACTUAL BACKGROUND AND PROCEDURAL HISTORY ................................. 3

ARGUMENT .............................................................................................................. 5

   I.    THE COURT SHOULD NOT CONSIDER THE CIA'S CLASSIFIED
       *VAUGHN* DECLARATION ............................................................................ 8

   II.   THE CIA HAS NOT MET ITS BURDEN FOR WITHHOLDING
       INFORMATION RELATED TO ITS USE OF "ENHANCED
       INTERROGATION TECHNIQUES" ............................................................... 10

       A.   Descriptions of the "enhanced interrogation techniques" are not
           properly classified as intelligence activities, sources, or methods ........................... 12

           1.   *The President has banned the use of "enhanced interrogation techniques"* ...... 12

           2.   *The OLC memos already describe the "enhanced interrogation techniques"* .... 14

           3.   *The "enhanced interrogation techniques" are unlawful and not within the*
               *CIA's mandate* ............................................................................................ 19

       B.   Disclosure of descriptions of the "enhanced interrogation techniques"
           would not damage national security ........................................................................ 23

  III.  THE CIA HAS NOT MET ITS BURDEN FOR WITHHOLDING THE
       PHOTOGRAPH OF ABU ZUBAYDAH ......................................................... 28

  IV.  THE CIA HAS NOT MET ITS BURDEN FOR WITHHOLDING THE
       IDENTIFYING INFORMATION OF INDIVIDUALS CONSULTED BY
       THE CIA WITH RESPECT TO THE "ENHANCED INTERROGATION
       TECHNIQUES" ............................................................................................. 29

   V.   THE CIA HAS NOT MET ITS BURDEN FOR WITHHOLDING UNDER
       EXEMPTION 5 ............................................................................................. 30

       A.   The CIA has not satisfied its burden under the deliberative-process
           privilege ............................................................................................................. 31

       B.   The CIA has not satisfied its burden under the attorney-client or
           attorney-work-product privileges ........................................................................... 35

  VI.  THE CIA HAS NOT MET ITS BURDEN FOR WITHHOLDING THE
       IDENTIFYING INFORMATION OF CONSULTANTS OR
       CONTRACTORS UNDER EXEMPTION 6 ..................................................... 38

CONCLUSION ........................................................................................................ 39

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*A. Michael's Piano, Inc. v. Fed. Trade Comm'n*, 18 F.3d 138 (2d Cir. 1994) ............................ 36

*Access Reports v. Dep't of Justice*, 926 F.2d 1192 (D.C. Cir. 1991)............................................ 35

*Allen v. Cent. Intelligence Agency*, 636 F.2d 1287 (D.C. Cir. 1980)............................................ 10

*Am. Civil Liberties Union v. Dep't of Def.*, 339 F. Supp. 2d 501 (S.D.N.Y. 2004) ...................... 3

*Am. Civil Liberties Union v. Dep't of Def.*, 389 F. Supp. 2d 547 (S.D.N.Y. 2005) .............. 25, 29

*Am. Civil Liberties Union v. Dep't of Def.*, 543 F.3d 59 (2d Cir. 2008) ..................................... 25

*Carl Zeiss Stiftung v. V.E.B. Carl Zeiss, Jena*, 40 F.R.D. 318 (D.D.C. 1966) ........................... 32

*Cent. Intelligence Agency v. Sims*, 471 U.S. 159 (1985) ........................................... 12, 19, 20, 22

*Church of Scientology Int'l v. U.S. Dep't of Justice*, 30 F.3d 224 (1st Cir. 1994) ................ 36, 37

*Church of Scientology of Cal. v. U.S. Dep't of the Army*, 611 F.2d 738 (9th Cir.
    1979) ..................................................................................................................................... 6

*Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854 (D.C. Cir. 1980)................ 32, 33, 36

*Dep't of the Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1 (2001) ................... 31

*Falcone v. Internal Revenue Serv.*, 479 F. Supp. 985 (E.D. Mich. 1979) .................................... 37

*Fed. Labor Relations Auth. v. U.S. Dep't of Veterans Affairs*, 958 F.2d 503 (2d
    Cir. 1992) .............................................................................................................................. 5

*Grand Cent. P'ship, Inc. v. Cuomo*, 166 F.3d 473 (2d Cir. 1999).................................................. 5

*Halpern v. Fed. Bureau of Investigation*, 181 F.3d 279 (2d Cir. 1999) ........................ 5, 9, 25, 31

*Hopkins v. U.S. Dep't of Hous. & Urban Dev.*, 929 F.2d 81 (2d Cir. 1991)................................. 32

*In re Grand Jury Proceedings*, No. M-11-189, 2001 WL 1167497 (S.D.N.Y. Oct.
    3, 2001) ........................................................................................................................... 36, 37

*John Doe Corp. v. John Doe Agency*, 850 F.2d 105 (2d Cir. 1988), *rev'd on other
    grounds*, 493 U.S. 146 (1989)........................................................................................... 9, 10

*Jordan v. U.S. Dep't of Justice*, 591 F.2d 753 (D.C. Cir. 1978).................................................. 36

*Judicial Watch, Inc. v. Food & Drug Admin.*, 449 F.3d 141 (D.C. Cir. 2006).............................. 9

*Keys v. U.S. Dep't of Justice*, 830 F.2d 337 (D.C. Cir. 1987) ........................................................ 9

*Lawyers Comm. for Human Rights v. Immigration & Naturalization Serv.*, 721 F. Supp. 552 (S.D.N.Y. 1989) ................................................................................................ 9, 10

*Lykins v. U.S. Dep't of Justice*, 725 F.2d 1455 (D.C. Cir. 1984) ..................................................... 7

*Maynard v. Cent. Intelligence Agency*, 986 F.2d 547 (1st Cir. 1993) ........................................... 12

*Military Audit Project v. Casey*, 656 F.2d 724 (D.C. Cir. 1981) .................................................... 13

*Mohamed v. Jeppesen Dataplan, Inc.*, 563 F.3d 992 (9th Cir. 2009) ............................................ 24

*Nat'l Council of La Raza v. Dep't of Justice*, 411 F.3d 350 (2d Cir. 2005) .......................... passim

*Nat'l Labor Relations Bd. v. Robbins Tire & Rubber Co.*, 437 U.S. 214 (1978) .................... 5, 25

*Nat'l Labor Relations Bd. v. Sears, Roebuck & Co.*, 421 U.S. 132 (1975) ............................ 32, 33

*Navasky v. Cent. Intelligence Agency*, 499 F. Supp. 269 (S.D.N.Y. 1980) .................................. 22

*Niemeier v. Watergate Special Prosecution Force*, 565 F.2d 967 (7th Cir. 1977) ....................... 36

*Paisley v. Cent. Intelligence Agency*, 712 F.2d 686 (D.C. Cir. 1983), *vacated in part on other grounds*, 724 F.2d 201 (D.C. Cir. 1984) ................................................................. 35

*People for the Am. Way Found. v. Nat'l Sec. Agency*, 462 F. Supp. 2d 21 (D.D.C. 2006) .................................................................................................................................... 22

*Phillippi v. Cent. Intelligence Agency*, 546 F.2d 1009 (D.C. Cir. 1976) ...................................... 13

*Resolution Trust Corp. v. Diamond*, 137 F.R.D. 634 (S.D.N.Y. 1991) ........................................ 36

*Senate of P.R. v. U.S. Dep't of Justice*, 823 F.2d 574 (D.C. Cir. 1987) ....................................... 35

*Sirota v. Cent. Intelligence Agency*, No. 80-CV-2050 (GLG), 1981 WL 158804 (S.D.N.Y. Sept. 18, 1981) ...................................................................................................... 22

*Sterling Drug, Inc. v. Fed. Trade Comm'n*, 450 F.2d 698 (D.C. Cir. 1971) ................................ 34

*Tax Analysts v. Internal Revenue Serv.*, 117 F.3d 607 (D.C. Cir. 1997) ...................................... 37

*Taxation With Representation Fund v. Internal Revenue Serv.*, 646 F.2d 666 (D.C. Cir. 1981) ............................................................................................................................ 33

*U.S. Dep't of Justice v. Tax Analysts*, 492 U.S. 136 (1989) .......................................................... 6

*Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973) .......................................................................... 9

*Wash. Post v. U.S. Dep't of Def.*, 766 F. Supp. 1 (D.C. Cir. 1991) ........................................ 23, 24

*Wilner v. Nat'l Sec. Agency*, No. 07-CV-3883 (DLC), 2008 WL 2567765
   (S.D.N.Y. June 25, 2008)........................................................................................ 21, 22

*Wood v. Fed. Bureau of Investigation*, 432 F.3d 78 (2d Cir. 2005) ............................................ 31

**Statutes, Rules, and Executive Orders**

5 U.S.C. § 552 ........................................................................................................ passim

Exec. Order No. 12,958, 60 Fed. Reg. 19,825 (Apr. 17, 1995) .................................. 11, 12, 23, 26

Exec. Order No. 13,292, 68 Fed. Reg. 15,315 (Mar. 28, 2003).................................................... 11

Exec. Order No. 13,491, 74 Fed. Reg. 4,893 (Jan. 22, 2009)....................................................... 12

Fed. R. Civ. P. 56 ......................................................................................................... 6

**Other Authorities**

Brian Ross, Matthew Cole & Joseph Rhee, *Waterboarding, Interrogations: The
   CIA's $1000 a Day Specialists*, ABC News, Apr. 30, 2009, *available at*
   http://abcnews.go.com/Blotter/Story?id=7471217 .................................................... 38

Carrie Johnson, *Waterboarding Is Torture, Holder Tells Senators*, Wash. Post,
   Jan. 16, 2009, *available at* http://www.washingtonpost.com/wp-
   dyn/content/article/2009/01/15/AR2009011500267.html ....................................... 23

Committee on Armed Services, United States Senate, *Inquiry into the Treatment
   of Detainees in U.S. Custody* (Nov. 20, 2008)........................................................ 38

David Johnson, *For Holder, Inquiry on Interrogation Poses Tough Choice*, N.Y.
   Times, July 21, 2009, *available
   at* http://www.nytimes.com/2009/07/22/us/22holder.html?_r=1&scp=3&sq=eri
   c%20holder&st=cse ............................................................................................. 27

Joby Warrick & Peter Finn, *Internal Rifts on Road to Torment*, Wash. Post, July
   19, 2009, *available at* http://www.washingtonpost.com/wp-
   dyn/content/article/2009/07/18/AR2009071802065.html ................................. 30, 38

Memorandum from Jay S. Bybee to John A. Rizzo, *Interrogation of al Qaeda
   Operative* (Aug. 1, 2002)................................................................................. 14, 15

Memorandum from President Barack Obama to the Heads of Executive
   Departments and Agencies, *Freedom of Information Act* (Jan. 21, 2009),
   *available at*
   http://www.whitehouse.gov/the_press_office/Freedom_of_Information_Act/................. 25, 26

Memorandum from Steven G. Bradbury to John A. Rizzo, *Re: Application of 18 U.S.C. §§ 2340–2340A to Certain Techniques That May Be Used in the Interrogation of a High Value al Qaeda Detainee* (May 10, 2005) .................................. 15, 16

Memorandum from Steven G. Bradbury to John A. Rizzo, *Re: Application of 18 U.S.C. §§ 2340–2340A to the Combined Use of Certain Techniques in the Interrogation of High Value al Qaeda Detainees* (May 10, 2005).................................... 16, 17

Memorandum from Steven G. Bradbury to John A. Rizzo, *Re: Application of United States Obligations Under Article 16 of the Convention Against Torture to Certain Techniques That May Be Used in the Interrogation of High Value al Qaeda Detainees* (May 30, 2005)........................................................................ 17, 18, 19, 35

President Barack Obama, Statement on Release of OLC Memos (Apr. 16, 2009), *available at* http://www.whitehouse.gov/the_press_office/Statement-of-President-Barack-Obama-on-Release-of-OLC-Memos/ ........................................ 13, 24, 26, 27

S. Rep. No. 89-813 (1965) ............................................................................................. 31

*US 'Waterboarding' Row Rekindled*, BBC, July 13, 2009, *available at* http://news.bbc.co.uk/2/hi/americas/8144625.stm.................................................. 27

## <u>INTRODUCTION</u>

For over five years, this litigation has sought to vindicate the right of the American public under the Freedom of Information Act ("FOIA") to information regarding the abuse of prisoners held in United States custody abroad and, in particular, the extent of official responsibility for such abuse. Despite the release of a significant volume of documents in response to the request and at the order of this Court, the government continues to withhold documents of enormous public importance. The subset of documents at issue in this cross-motion for partial summary judgment relate to the contents of ninety-two videotapes destroyed by the Central Intelligence Agency ("CIA") in 2005 in violation of several of this Court's orders. Those videotapes recorded the CIA's interrogations of detainees in 2002 using techniques and forms of mistreatment that the government has now repudiated as inconsistent with the Geneva Conventions and domestic law. Especially in light of the destruction of the videotapes, which were the original records responsive to Plaintiffs' FOIA request, this Court should apply FOIA's strong presumption in favor of disclosure of the secondary documents at issue now to help the public attempt to reconstruct the lost records. Their release would shed light upon several significant issues, including: whether the CIA implemented the so-called "enhanced interrogation techniques" in compliance with guidance from the Department of Justice's Office of Legal Counsel ("OLC"); whether the CIA implemented those same techniques before authorized to do so by the OLC; and whether the CIA destroyed the best evidence of the interrogations—the videotapes—to conceal unlawful conduct from the public.

Specifically, this motion challenges the CIA's wholesale withholding of a 65-document sample of approximately 580 records that would assist the public in attempting to reconstruct the contents of the destroyed videotapes. The sample includes, among other things: (1) cables

describing the contents of the destroyed videotapes and the CIA's use of "enhanced interrogation techniques," *see* ACLU v. DOD *Vaughn* Index Nos. 1–2, 54, 56 (attached to Decl. of Leon E. Panetta ¶ 4 (June 8, 2009) ("Panetta Decl.")); (2) documents "summariz[ing] details of waterboard exposures from the destroyed videotapes," *see id.* Nos. 63–64; (3) numerous memoranda and cables discussing and perhaps deciding what to do about the videotapes and the harsh interrogations they depict; and (4) a photograph of Abu Zubaydah presumably depicting the use or consequences of "enhanced interrogation techniques."

The CIA has withheld the documents primarily on the basis of two unprecedented arguments with far-reaching implications for FOIA. First, the CIA seeks to withhold information related to "enhanced interrogation techniques" as "intelligence sources and methods" even though use of the techniques violates domestic and international law; even though the President himself has repudiated and banned their use; and even though the President himself recently ordered the release of four OLC memoranda that describe the enhanced techniques' use and operational specifications in graphic and shocking detail. Significantly, in ordering the release of the OLC memos, the President rejected the CIA's argument that release of details about the techniques would cause harm. Second, the CIA argues that the documents would serve as propaganda for our enemies. Never before has the government withheld textual descriptions of its own misconduct on the ground that such descriptions would inflame the countries' enemies. And never before has a court authorized the withholding of evidence of governmental misconduct on this basis. To do so would enshrine into FOIA a fundamentally antidemocratic principle allowing the greatest protection from disclosure of records documenting the worst governmental misconduct.

For these reasons and those discussed below, the Court should deny the government's motion for summary judgment, grant Plaintiffs' cross-motion, and order the CIA to disclose the cables, notes, memoranda, and photograph at issue here.  At a minimum, the Court should review the documents *in camera* and order the CIA to release any information that can be segregated from whatever limited information is legitimately withheld.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

On October 7, 2003, Plaintiffs filed a FOIA request with the CIA and other federal agencies seeking the disclosure of records concerning the treatment, death, and extraordinary rendition of those detained after September 11, 2001 and held abroad in U.S. custody.  Nearly a year later, and in repudiation of the agencies' delinquency in responding, this Court ordered the CIA and the other agencies to produce or identify all records responsive to Plaintiffs' FOIA request.  *Am. Civil Liberties Union v. Dep't of Def.*, 339 F. Supp. 2d 501, 502 (S.D.N.Y. 2004). Notwithstanding the clear command of this Court and the CIA's continuing obligation to preserve responsive documents under FOIA, the CIA did not produce or even identify hundreds of hours of videotapes of harsh CIA interrogations—records that were clearly responsive to Plaintiffs' FOIA requests.  It destroyed the tapes instead.

Upon learning of the tapes' destruction, Plaintiffs moved this Court to hold the CIA in contempt and to remedy the destruction of the tapes by ordering the government, among other things, to reconstruct the contents of the destroyed tapes, to identify the date of the destruction and the officials responsible, to afford Plaintiffs limited discovery of the contents of the tapes, and to cease any further destruction of or tampering with responsive records.  *See* Pls.' Mem. in Supp. of Pls.' Mot. for Contempt & Sanctions 1–2, 19–20 (Dec. 12, 2007) (dkt. no. 255); Pls.'

Supplemental Submission Clarifying Relief Sought in Pls.' Mot. for Contempt & Sanctions (Dec. 19, 2007) (dkt. no. 266).

To assist its adjudication of the contempt motion and to partially remedy the effects of the tapes' destruction, this Court ordered the government to process two categories of records under FOIA: (1) records relating to the content of the destroyed tapes and (2) records that describe the persons and reasons behind their destruction.[1]  Order Regulating Gov't's Proposed Work Plan ¶¶ 3–4 (Apr. 20, 2009) (dkt. no. 339).[2]  With respect to the first category of records, the Court ordered the CIA to produce a list of all contemporaneous and derivative records by May 18, 2009, and a *Vaughn* index and declaration justifying any withholding of every tenth contemporaneous cable and all non-cable contemporaneous records by June 8, 2009.  *See* Letter from Lev L. Dassin to Hon. Alvin K. Hellerstein (May 5, 2009) (jointly proposing a schedule for the "paragraph 3" records); Order Regulating Proposed Work Plan (May 7, 2009) (dkt. no. 344) (endorsing the proposed schedule for "paragraph 3" records).

On May 18, 2009, the CIA produced a list of 580 records responsive to paragraph 3 of the Court's April 20, 2009 order, and on June 8, 2009, it produced a *Vaughn* index of a 65-record sample of the records as well as a *Vaughn* declaration purporting to justify the withholding of the

---

[1] Although the interim relief of production ordered so far by the Court is critical to the public's understanding of the CIA's interrogation program, that relief does not resolve the fundamental question presented by Plaintiffs' contempt motion: whether the CIA violated this Court's orders in destroying the videotapes such that it should be held in contempt.  Thus, even if withholding these two categories of documents from the public is appropriate as a matter of FOIA law, Plaintiffs must be afforded an opportunity, consistently with the basic standards for resolving claims of civil contempt, to view the records—subject to an appropriately tailored protective order that would preserve their confidentiality—for the purposes of arguing that they evidence contempt by the CIA or any of its agents or officers.  *See* Letter from Amrit Singh to Hon. Alvin K. Hellerstein at 3–5 (June 17, 2009).

[2] At a status conference on July 15, 2009, the Court expanded the date range for records responsive to the second category of documents, discussed in the fourth paragraph of its order of April 20, 2009.  Those records are not at issue in this round of summary-judgment briefing.

sample records in their entirety.  *See* Letter from Lev L. Dassin to Hon. Alvin K. Hellerstein

(May 18, 2009); Letter from Lev L. Dassin to Hon. Alvin K. Hellerstein (June 8, 2009); Panetta

Decl. ¶ 4; ACLU v. DOD *Vaughn* Index.  The government also produced a classified *Vaughn*

declaration to the Court.  Panetta Decl. ¶ 4.

> The CIA asserts that FOIA Exemptions 1, 3, 5, and 6 justify the withholding of all sixty-

five sample records in their entirety.  Plaintiffs file this cross-motion and opposition because the

CIA has failed to justify the complete withholding of all of the sampled records.  Specifically,

Plaintiffs challenge the withholding of:

1. Descriptions of the implementation or application of interrogation techniques, and "details of specific interrogations where EITs ['enhanced interrogation techniques'] were applied," Panetta Decl. ¶¶ 10–12;

2. All information withheld under Exemption 5; and

3. The names of CIA-interrogation contractors or consultants. [3]

## ARGUMENT

> Congress enacted FOIA to "ensure an informed citizenry, vital to the functioning of a

democratic society, needed to check against corruption and to hold the governors accountable to

the governed."  *Nat'l Labor Relations Bd. v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242

(1978); *see also Grand Cent. P'ship, Inc. v. Cuomo*, 166 F.3d 473, 478 (2d Cir. 1999) ("FOIA

was enacted to promote honest and open government and to assure the existence of an informed

citizenry . . . .").  "In keeping with [FOIA's] policy of full disclosure, the exemptions are

'narrowly construed with doubts resolved in favor of disclosure.'"  *Halpern v. Fed. Bureau of*

*Investigation*, 181 F.3d 279, 287 (2d Cir. 1999) (quoting *Fed. Labor Relations Auth. v. U.S.*

*Dep't of Veterans Affairs*, 958 F.2d 503, 508 (2d Cir. 1992)).  In assessing whether withholding

---

[3] Plaintiffs do not challenge the CIA's withholding of the locations of the CIA's black sites and of the names of foreign countries involved in the CIA's interrogation program.

is appropriate, "the burden remains at all times on the government to establish exempt status."
*Church of Scientology of Cal. v. U.S. Dep't of the Army*, 611 F.2d 738, 743 (9th Cir. 1979); *see also U.S. Dep't of Justice v. Tax Analysts*, 492 U.S. 136, 142 n.3 (1989).  Accordingly, a FOIA plaintiff is entitled to summary judgment under Federal Rule of Civil Procedure 56—and a district court may order disclosure—where the agency fails to meet its burden of establishing that its withholdings are justified.  *Id.* at 142; 5 U.S.C. § 552(a)(4)(B).

Here, because the CIA has failed to justify withholding under FOIA Exemptions 1, 3, 5, and 6 of records relating to the content of videotapes it destroyed, the Court should deny the government's motion for summary judgment, grant Plaintiff's cross-motion, and compel disclosure of all records responsive to paragraph 3 of its order of April 20, 2009.

At a minimum, this Court should review the records *in camera* to determine whether they should be released in full or in part.  *See* 5 U.S.C. § 552(a)(4)(B).  Review of the records is particularly important in this case for two reasons.  First, there are discrepancies between the May 1, 2009 *Vaughn* index submitted by the CIA and the recent, June 8, 2009, *Vaughn* index, which calls into question the accuracy and diligence with which the indices were created.  The earlier index catalogues the first half of the August 2002 contemporaneous records, whereas the index relied upon by the CIA in its motion catalogues a sample of *all* paragraph 3 records, including all non-cables and every tenth cable from April 2002 to December 2002.[4]  Due to the overlapping time periods covered by the two *Vaughn* indices, three known entries in the May 1,

---

[4] The government submitted the earlier *Vaughn* index of August 2002 records prior to the parties' agreement on a sample of the records that would cover the entire period of videotaped interrogations, from April 2002 to December 2002.  *See* Letter from Lev L. Dassin to Hon. Alvin K. Hellerstein (May 1, 2009).  The earlier *Vaughn* index will be cited as "May 1, 2009 ACLU v. DOD *Vaughn* Index."

2009 *Vaughn* index correspond to entries from the June 8 index.[5]  *Compare* May 1, 2009 ACLU

v. DOD *Vaughn* Index Nos. 1473, 1494, 1512, *with* ACLU v. DOD *Vaughn* Index Nos. 24, 25,

58.  Surprisingly, the *Vaughn* indices differ dramatically in their descriptions of the documents

withheld and exemptions invoked, even though they concern precisely the same three

documents.  For example, the earlier index describes document 1494 as a "fifty-nine-page

notebook containing handwritten notes concerning treatment and conduct of interrogations;

reactions to the interrogation techniques; specific intelligence topics concerning terrorist threats

to the U.S.; raw intelligence; and medical information."  May 1, 2009 ACLU v. DOD *Vaughn*

Index No. 1494.  By contrast, the later index includes the following brief and featureless

description of the same document: "a 59-page logbook of handwritten notes written in the field.

The notes include observations of interrogation sessions and behavioral notes."  ACLU v. DOD

*Vaughn* Index No. 58.  In other words, the later *Vaughn* index, which the CIA relies exclusively

upon in its motion without reference to the earlier index, omits any reference to notes concerning

"treatment and conduct of interrogations," "reactions to the interrogation techniques," and

"medical information."  These discrepancies suggest inconsistency in the creation of the *Vaughn*

indices and a failure to describe the documents as fully as possible on the public record to allow

meaningful testing of their withholding.  *See Lykins v. U.S. Dep't of Justice*, 725 F.2d 1455,

1463 (D.C. Cir. 1984) (requiring "that as much information as possible be made public" in

*Vaughn* indices to "enable[] the adversary system to operate").  Confusingly, the indices for this

document also differ in the exemptions invoked: the earlier index invokes FOIA Exemptions 1,

3, and 5, whereas the later index invokes Exemptions 1, 3, and 6.  The other two known

---

[5] A fourth entry from the earlier index also corresponds to an entry on the later index, but
insufficient information is given in the indices to determine which.

overlapping entries contain similarly troubling disparities that should arouse this Court's

suspicion about the accuracy and diligence with which the *Vaughn* indices were created.[6]

     The Court should also review the records *in camera* because the CIA has made no

meaningful effort to segregate releasable information even though, as detailed below, there are

specific reasons to believe that the withheld documents contain segregable information.  For

example, given the release of four OLC memos that describe the "enhanced interrogation

techniques" in minute detail, it is implausible that the withheld documents contain no

information overlapping with what has already been officially acknowledged.

## I.    THE COURT SHOULD NOT CONSIDER THE CIA'S CLASSIFIED *VAUGHN* DECLARATION

     Before addressing the merits of the CIA's withholdings, Plaintiffs respectfully submit

that the Court should not consider the CIA's classified *Vaughn* declaration.  Apparently

unsatisfied with its public *Vaughn* declaration, the CIA has filed a supplemental and classified

declaration, *in camera*.  *See* Panetta Decl. ¶ 4.  Plaintiffs submit that the Court should not

consider the CIA's *in camera* declaration because doing so would undermine the purposes of

FOIA and frustrate the adversarial system designed to further FOIA's essential goals.  Review of

the classified declaration would be particularly inappropriate here, as Plaintiffs agreed to a

sample *Vaughn* in part so that *in camera* review would be more manageable.  Rather than

---

[6] For example, the earlier index describes an August 1, 2002 cable as including information concerning the "use of interrogation techniques" and a "threat update," and it invokes Exemptions 1, 3, 5, 6, and 7(c).  May 1, 2009 ACLU v. DOD *Vaughn* Index No. 1473.  The later index omits any reference to "interrogation techniques" or a "threat update," and invokes only Exemptions 1, 3, and 6.  ACLU v. DOD *Vaughn* Index No. 24.  Similarly, the earlier index describes an August 7, 2002 cable as including "an overall status update," "a threat update," and "deliberations between the Field and Headquarters," and it invokes Exemptions 1, 3, and 5.  May 1, 2009 ACLU v. DOD *Vaughn* Index No. 1512.  The later index omits all of those descriptions, and it invokes Exemptions 1, 3, and 6.  ACLU v. DOD *Vaughn* Index No. 25.

consider the CIA's classified declaration, the Court should, if necessary, review *in camera* the actual records withheld.

In *Vaughn v. Rosen*, 484 F.2d 820, 827 (D.C. Cir. 1973), the court held that the government must justify its withholdings under FOIA by submitting a declaration and index describing the documents with "adequate specificity" and alleging a "proper justification" for its asserted exemptions. That requirement "enables the adversary system to operate by giving the requester as much information as possible," thereby enabling the court to "fulfill its duty of ruling on the applicability of the exemption." *Judicial Watch, Inc. v. Food & Drug Admin.*, 449 F.3d 141, 146 (D.C. Cir. 2006) (quoting *Keys v. U.S. Dep't of Justice*, 830 F.2d 337, 349 (D.C. Cir. 1987)) (internal quotation marks omitted); *Halpern*, 181 F.3d at 295 ("Absent a sufficiently specific explanation from an agency, a court's *de novo* review is not possible and the adversary process envisioned in FOIA litigation cannot function."). Thus the basic principles and safeguards of FOIA dictate that Plaintiffs be afforded the opportunity to challenge the CIA's withholding of information and to present evidence to the Court demonstrating that such information was improperly withheld.

Consideration of the CIA's classified *Vaughn* declaration would undermine the adversarial process essential to FOIA's fundamental purposes and would, specifically, thwart Plaintiffs' ability to meaningfully respond to the CIA's withholding decisions in this case. For these reasons, courts disfavor *in camera* review of *Vaughn* declarations. *See, e.g.*, *John Doe Corp. v. John Doe Agency*, 850 F.2d 105, 110 (2d Cir. 1988) ("*In camera* review of a *Vaughn* index and interrogatory answers is unusual, and differs significantly from *in camera* review of the actual requested documents, a procedure expressly authorized by the FOIA."), *rev'd on other grounds*, 493 U.S. 146 (1989); *Lawyers Comm. for Human Rights v. Immigration &*

*Naturalization Serv.*, 721 F. Supp. 552, 568 (S.D.N.Y. 1989) ("Recognizing that plaintiffs will

be unable to mount a complete adversarial argument without access to the submitted affidavits,

the Court will not examine *in camera* affidavits unless it is 'absolutely necessary.'" (quoting

*Allen v. Cent. Intelligence Agency*, 636 F.2d 1287, 1298 n.63 (D.C. Cir. 1980))).

Moreover, *in camera* review of the CIA's *Vaughn* declaration is not absolutely necessary

in this case because *in camera* review of the "actual requested documents" at issue would not be

administratively taxing.  *See John Doe Corp.*, 850 F.2d at 110.  Rather than consider the CIA's

classified declaration, the Court should simply review the sampled paragraph 3 records, which

are the actual subjects of Plaintiffs' FOIA request.  Such review is expressly authorized by 5

U.S.C. § 552(a)(4)(B) and, in contrast to reliance upon the CIA's classified declaration, would

not dramatically subvert Plaintiffs' ability to test the CIA's withholding decisions in an

adversarial manner.

## II.   THE CIA HAS NOT MET ITS BURDEN FOR WITHHOLDING INFORMATION RELATED TO ITS USE OF "ENHANCED INTERROGATION TECHNIQUES"

The heart of this dispute is the government's withholding under Exemptions 1 and 3 of

the details of the CIA's use of "enhanced interrogation techniques."  Invocation of the

exemptions is improper because the techniques are not withholdable as "intelligence sources and

methods" for three reasons: (1) the President has repudiated the techniques and banned their use,

(2) the techniques are no longer clandestine as publicly available OLC memoranda have

described the techniques in harrowing and meticulous detail based upon CIA-provided

descriptions, and (3) the techniques are unlawful and not within the CIA's mandate.

Withholding under Exemption 1 is additionally improper because release of the records at issue

would not damage the national security given that the techniques are banned and already publicly

described in great detail.  Because the CIA has failed to meet its burden for withholding details of the "enhanced interrogation techniques" on the basis of FOIA Exemptions 1 and 3, this Court should grant Plaintiffs' cross-motion and order the information released.

To justify withholding under Exemption 1, the CIA must establish that the information withheld falls within an applicable executive order and that it has been properly classified pursuant to that order.  5 U.S.C. § 552(b)(1).  The CIA relies upon Executive Order No. 12,958, 60 Fed. Reg. 19,825 (Apr. 17, 1995),[7] which provides a comprehensive system for classifying documents that may be kept secret by the government.  The Executive Order attempts to balance "democratic principles requir[ing] that the American people be informed of the activities of their Government" with the recognition that certain qualifying documents may be kept secret in the national interest.  Exec. Order No. 12,958.  Thus, to be properly classified, agency information must fall within an authorized withholding category set forth in the Executive Order.  *Id.* § 1.1(a)(3).  Additionally, information may be classified only if "the original classification authority determines that the unauthorized disclosure of the information reasonably could be expected to result in damage to the national security, . . . and the original classification authority is able to identify or describe the damage."  *Id.* § 1.1(a)(4).  In classifying the details of its use of the "enhanced interrogation techniques," the CIA relies upon the section of the Executive Order that permits classification of "intelligence activities (including special activities) [and] intelligence sources or methods."  *Id.* § 1.4(c).

To justify withholding under Exemption 3, the CIA must establish that the information is "specifically exempted from disclosure by statute."  5 U.S.C. § 552(b)(3).  Here, the CIA relies

---

[7] Executive Order No. 12,958 was amended by Executive Order No. 13,292, 68 Fed. Reg. 15,315 (Mar. 28, 2003).  All citations to Executive Order No. 12,958 are to the order as amended.

upon the National Security Act of 1947 and the Central Intelligence Agency Act of 1949, which, like Executive Order No. 12,958, allow the withholding of "intelligence sources and methods."

    A.   <u>Descriptions of the "enhanced interrogation techniques" are not properly classified as intelligence activities, sources, or methods</u>

The propriety of the CIA's withholdings under both Exemptions 1 and 3 of descriptions of its use of "enhanced interrogation techniques" turns initially on whether release of details regarding the techniques—though banned, revealed in full, and unlawful—would disclose intelligence sources and methods.  It would not.  Although courts often accord some measure of deference to the CIA's experience in determining whether release of information would disclose intelligence sources and methods, the context of the withholdings at issue in this case is entirely unprecedented, and the cases cited by the CIA in support of its argument that it is entitled to wholesale deference shed little light on the issues before the Court.  For three reasons, the CIA's continued withholding of the records at issue is improper.

*1.   The President has banned the use of "enhanced interrogation techniques"*

First, disclosure of details of the CIA's use of "enhanced interrogation techniques" would not reveal protectable intelligence sources and methods because the President has repudiated the techniques and banned their use.  *See* Exec. Order No. 13,491, 74 Fed. Reg. 4,893 (Jan. 22, 2009).  The seminal Supreme Court case interpreting the phrase "intelligence sources and methods" makes clear that the CIA may only withhold information about sources or methods that "fall within the Agency's mandate."  *Cent. Intelligence Agency v. Sims*, 471 U.S. 159, 169 (1985).[8]  Now that the President has banned use of the techniques, they are no longer within the

---

[8] Although *Sims* addressed the scope of protected sources and methods under Exemption 3, the definition of the phrase as it appears in Exemption 1 is identical.  *See, e.g.*, *Maynard v. Cent. Intelligence Agency*, 986 F.2d 547, 555 (1st Cir. 1993) ("When, as here, Exemptions 1 and 3 are

agency's mandate.  Thus, even assuming that the techniques did at one point legitimately and lawfully fall within the CIA's mandate, which Plaintiffs maintain they did not, no amount of disclosure about their use in the past could reveal details about current "intelligence sources and methods" that may be legitimately protected by the CIA.

CIA Director Panetta's declaration acknowledges the banning of the techniques but argues that "[e]ven if the EITs are never used again, the CIA will continue to be involved in questioning terrorists under legally approved guidelines.  The information in these documents would provide future terrorists with a guidebook on how to evade such questioning.  I elaborate further on this point in my classified declaration."  Panetta Decl. ¶ 11.  As an initial matter, the Court should not consider the classified declaration for the reasons set forth above.  The government should be compelled to explain its counter-intuitive theory—that disclosure of details about banned and illegal techniques will lead to the disclosure of lawful interrogation methods—on the public record.  More fundamentally, Mr. Panetta's declaration is illogical: Knowledge about banned interrogation techniques cannot aid future captives in resisting new and different techniques.  Indeed, the President recognized this when he ordered the release of the OLC memoranda in the first instance.  *See* President Barack Obama, Statement on Release of OLC Memos (Apr. 16, 2009), *available at* http://www.whitehouse.gov/the_press_office/Statement-of-President-Barack-Obama-on-Release-of-OLC-Memos/ (releasing the memos because "the interrogation techniques described in these

---

claimed on the basis of potential disclosure of intelligence sources or methods, the standard of reviewing an agency's decision to withhold information is essentially the same."); *Military Audit Project v. Casey*, 656 F.2d 724, 736 n.39 (D.C. Cir. 1981) (noting that Exemption 3 provides overlapping protection with Exemption 1 where disclosure of classified information would reveal intelligence sources and methods); *Phillippi v. Cent. Intelligence Agency*, 546 F.2d 1009, 1015 n.14 (D.C. Cir. 1976) (noting that the "inquiries into the applicability of the two exemptions [1 and 3] may tend to merge" with regard to classification of intelligence sources and methods).

memos have already been widely reported," and because "withholding these memos would only serve to deny facts that have been in the public domain for some time"). Accordingly, the CIA's withholding of details concerning these outlawed techniques is improper.

> 2. *The OLC memos already describe the "enhanced interrogation techniques"*

Second, the release of four OLC memos that describe application of the "enhanced interrogation techniques" in meticulous detail belies Mr. Panetta's claim that disclosure of details about the CIA's use of the techniques would reveal anything new that may be properly kept secret.[9]  Indeed, the government concedes as much in its brief: "Here, the details of the EITs have already been released in the context of the OLC memoranda. . . . [T]he activity itself has already been disclosed."  Gov't Br. 21; *see also* Defs.' Reply in Supp. of Defs.' Cross Mot. for Summ. J. 2 (July 17, 2009) (dkt. no. 364) ("the descriptions of the *actual* interrogation techniques . . . used by the CIA in its terrorist interrogation and detention program . . . *are* released in the OLC memoranda" (first emphasis added)).  Mr. Panetta's declaration, however, attempts to distinguish between descriptions of the techniques in the OLC memos—which he labels "abstract"—and their descriptions in the cables and non-cable records at issue here.  *See* Panetta Decl. ¶¶ 10–11.  Contrary to his conclusory assertion, the descriptions in the OLC memos are anything but abstract: the level of detail provided about the CIA's intended and actual application of the "enhanced interrogation techniques" is concrete and startling.

For example, the first memo, issued on August 1, 2002, analyzes the "enhanced interrogation techniques" that the CIA specifically requested for use on Abu Zubaydah. Memorandum from Jay S. Bybee to John A. Rizzo, *Interrogation of al Qaeda Operative* (Aug. 1, 2002) ("*Abu Zubaydah Memo*").  In great detail, it sets out the "increased pressure phase" that

---

[9] All of the OLC memos are available at http://www.aclu.org/olcmemos.

the CIA intended to use on Abu Zubaydah, and it details the requested techniques one at a time. *Id.* at 1–4, 10–15. These are the actual details of the individual techniques that the CIA intended to use and that the April 2002 to December 2002 cables describe.

The second memo, issued on May 10, 2005, contains nine pages of the CIA's operational details of thirteen "enhanced interrogation techniques," and an additional fifteen pages of descriptions mixed with legal analysis. *See* Memorandum from Steven G. Bradbury to John A. Rizzo, *Re: Application of 18 U.S.C. §§ 2340–2340A to Certain Techniques That May Be Used in the Interrogation of a High Value al Qaeda Detainee* at 7–15, 31–45 (May 10, 2005) ("*Techniques Memo*").[10]  The memo explains in detail how the CIA had used and intended to use each of the interrogation techniques. The CIA's waterboarding, for example, involved "a gurney that is inclined at an angle of 10 to 15 degrees to the horizontal," the pouring of water "from a height of approximately 6 to 18 inches," applications of water for no more than 40 seconds per "application," "with the duration of an 'application' measured from the moment when water—of whatever quantity—is first poured onto the cloth until the moment the cloth is removed from the subject's face." *Id.* at 13. The memo goes on, describing the number of times the CIA may waterboard a detainee per session, per day, and per month, and it describes the protocol required for the presence of medical personnel. *Id.* at 14. Minute details are also given for other techniques. *See, e.g.*, *id.* at 11–13 (two-page description of the operational details of "sleep deprivation (more than 48 hours)"); *id.* at 9–10 (describing the time limits for the use of "water dousing" depending on the temperature of the water used: 41°F for 20 minutes, 50°F for 40 minutes, and 59°F for 60 minutes); *id.* at 9 (describing the CIA's three "stress positions": "(1) sitting on the floor with legs extended straight out in front and arms raised above the head, (2)

---

[10] This memorandum is not paginated.  The page numbers used here refer to its actual pages, with the first page being page one.

kneeling on the floor while leaning back at a 45 degree angle, and (3) leaning against a wall generally about three feet away from the detainee's feet, with only the detainee's head touching the wall, while his wrists are handcuffed in front of him or behind his back, and while an interrogator stands next to him to prevent injury if he loses his balance").

Significantly, the second memo also reviewed the CIA's actual application of the techniques and the impact of the techniques on detainees.  *See, e.g.*, *id.* at 8 ("walling" "is not intended to—and based on experience you have informed us that it does not—inflict any injury or cause severe pain"); *id.* at 9 (same for the "abdominal slap"); *id.* at 11 ("We understand from you that no detainee subjected to this technique by the CIA has suffered any harm or injury, either by falling down and forcing the handcuffs to bear his weight or in any other way."); *id.* at 11 n.15 ("Specifically, you have informed us that on three occasions early in the program, the interrogation team and the attendant medical officers identified the potential for unacceptable edema in the lower limbs of detainees undergoing standing sleep deprivation, and in order to permit the limbs to recover without impairing interrogation requirements, the subjects underwent horizontal sleep deprivation."); *id.* at 12 ("You have informed us that to date, more than a dozen detainees have been subjected to sleep deprivation of more than 48 hours, and three detainees have been subjected to sleep deprivation of more than 96 hours; the longest period of time for which any detainee has been deprived of sleep by the CIA is 180 hours.").

The third memo, also issued on May 10, 2005, continues where the second left off.  In assessing the CIA's combined use of the "enhanced interrogation techniques," the memo describes the operational details of a full-scale "enhanced" interrogation from beginning to end, based on information provided by the CIA.  *See* Memorandum from Steven G. Bradbury to John A. Rizzo, *Re: Application of 18 U.S.C. §§ 2340–2340A to the Combined Use of Certain*

*Techniques in the Interrogation of High Value al Qaeda Detainees* (May 10, 2005) ("*Combined Techniques Memo*").[11]  Interrogations begin in the "Initial Conditions" phase, which involves the transportation and preliminary conditioning of detainees.  *Id.* at 4.  They progress to the "Transition to Interrogation" phase and ultimately to the interrogation phase, which includes establishing a "baseline, dependent state" and the use of "corrective" and "coercive" interrogation techniques.  *Id.* at 4–6.  The detainees are "exposed to white noise/loud sounds (not to exceed 79 decibels) and constant light during portions of the interrogation process."  *Id.* at 5 n.3 (internal quotation marks omitted).  In describing these phases, the memo discusses when the CIA determined to use which techniques, for how long, in what order and combination, and with what expected result.  *Id.* at 5–9.  This includes the CIA's description of a "prototypical interrogation," which contains detailed information about how precisely the CIA conducted interrogations and employed "enhanced interrogation techniques."  *Id.*  Finally, as with the previous memo, the third memo describes the CIA's actual application of the techniques on detainees.  *See, e.g.*, *id.* at 11 ("three of whose interrogations involved the use of the waterboard"); *id.* at 12 ("Other than the waterboard, the specific techniques under consideration in this memorandum—including sleep deprivation—have been applied to more than 25 detainees."); *id.* at 15 ("many of the at least 25 detainees subjected to sleep deprivation have tolerated it well"); *id.* at 18 ("According to [documentation provided by the CIA], the interrogators may tell detainees that they 'will do what it takes to get important information.'").

　　Like the other memos, the fourth provides significant operational detail about the "enhanced interrogation techniques."  *See* Memorandum from Steven G. Bradbury to John A. Rizzo, *Re: Application of United States Obligations Under Article 16 of the Convention Against*

---

[11] This memorandum is not paginated.  The page numbers used here refer to its actual pages, with the first page being page one.

*Torture to Certain Techniques That May Be Used in the Interrogation of High Value al Qaeda Detainees* at 12–15, 29–31 (May 30, 2005) ("*CAT Memo*").  Strikingly, however, it includes even greater detail about the CIA's experiences in implementing the techniques.  For example, it notes that the CIA "has employed enhanced techniques to varying degrees in the interrogations of 28 of these detainees," *id.* at 5; that "the CIA has used [waterboarding] in the interrogations of only three detainees to date (KSM, Zubaydah, and 'Abd Al-Rahim Al-Nashiri) and has not used it since the March 2003 interrogation of KSM," *id.* at 6; that "Abu Zubaydah and KSM are representative of the types of detainees on whom the waterboard has been, or might be, used," *id.*; that the "interrogation team 'carefully analyzed [detainee] Gul's responsiveness to different areas of inquiry' during this time and noted that his resistance increased as questioning moved to his 'knowledge of operational terrorist activities,'" *id.* at 7; that a detainee "feigned memory problems . . . in order to avoid answering questions," *id.* at 8; that the CIA responded to the detainee's feigned memory problems by using "'more subtle interrogation measures [such as] dietary manipulation, nudity, water dousing, and abdominal slap,'" *id.* at 8; and that "[t]welve days into the interrogation, the CIA subjected al-Nashiri to one session of the waterboard during which water was applied two times,'" *id.*  The memo also describes the types of intelligence elicited using the "enhanced interrogation techniques."  *See id.* at 10–11.

Also inconsistent with Mr. Panetta's claim that the OLC memos contain only "abstract" information are two passages in the fourth memo.  The first discloses that the CIA waterboarded Abu Zubaydah "'at least 83 times during August 2002,'" and that it waterboarded KSM "183 times during March 2003."  *Id.* at 37.  And the second relates the following disturbing account:

> According to the *IG Report*, the CIA, at least initially, could not always distinguish detainees who had information but were successfully resisting interrogation from those who did not actually have the information.  *See IG Report* at 83–85.  On at least one occasion, this may have resulted in what might

be deemed in retrospect to have been the unnecessary use of enhanced techniques. On that occasion, although the on-scene interrogation team judged Zubaydah to be compliant, elements within CIA Headquarters still believed he was withholding information. . . . At the direction of CIA Headquarters, interrogators therefore used the waterboard one more time on Zubaydah.

*Id.* at 31.  Given that the records at issue in this cross-motion relate almost exclusively to the interrogation of Abu Zubaydah, as is clear from the government's *Vaughn* entries, they likely contain these and other details released in the OLC memos.

In sum, the OLC memos provide far from "abstract" descriptions of the "enhanced interrogation techniques."  They set forth comprehensive details regarding the decision to use particular techniques, their actual use, and their effect on detainees—all based upon the CIA's own descriptions—and leave little to the imagination.  Moreover, the first memo deals specifically with the interrogation of Abu Zubaydah, as do the records at issue in this case; and the OLC issued the last three memos in 2005, *after* the interrogations videotaped by the CIA in 2002, suggesting that the descriptions in the OLC memos of the CIA's experiences using the techniques encompass the interrogations described by the records at issue here.  For these reasons, the CIA's withholding of details about the "enhanced interrogation techniques" is improper.  The alleged "intelligence sources and methods" have already been disclosed by the President himself.

> 3.   The "enhanced interrogation techniques" are unlawful and not within the CIA's mandate

Finally, the "enhanced interrogation techniques" are not protectable as "intelligence sources and methods" within the CIA's mandate because they are unlawful and violate domestic and international prohibitions.  This result is compelled by the Supreme Court's decision in *Sims*. At issue in *Sims* was the CIA's withholding of the names of individuals and institutions it consulted as part of a clandestine research and development project.  471 U.S. at 161–63.  The

plaintiffs claimed that the CIA could not withhold the names as "intelligence sources and methods" unless the CIA demonstrated that it needed to maintain their confidentiality in order to obtain the information sought. *Id.* at 168. In rejecting the argument, the Supreme Court noted that the plain meaning of "intelligence sources and methods" supports only the limitation that the sources and methods "fall within the Agency's mandate." *Id.* at 169.

Though broad, the Supreme Court's definition of "intelligence sources and methods" is not, as the CIA impliedly suggests, limitless. It prohibits, for example, the classification of unlawful interrogation methods as "intelligence sources and methods" because they do not, and cannot, fall within the CIA's mandate. For reasons detailed by Plaintiffs in their fourth motion for partial summary judgment, the CIA's "enhanced interrogation techniques" were and continue to be illegal and outside the CIA's mandate. Pls.' Fourth Mot. Summ. J. 11–16 (Dec. 12, 2008) (dkt. no. 322). Additional disclosures about their use will not, therefore, compromise any legitimate "intelligence sources and methods."

The CIA responds by attempting to characterize Plaintiffs' argument as an invitation for the Court to engage in a wide-ranging inquiry into whether withheld information evidences illegal conduct. This is a straw man of the government's creation. Where information is otherwise properly classified under Exemptions 1 or 3, it *may* be withheld whether or not that information happens to evidence governmental misconduct. What the government may *not* do under Supreme Court precedent, however, is classify an unlawful and outlawed interrogation technique as an "intelligence source and method." This is because an outlawed and unlawful interrogation technique is not within the agency's mandate and therefore cannot be an "intelligence source and method." *See Sims*, 471 U.S. at 169. Thus, Plaintiffs do not argue that evidence of illegal conduct is generally exempt from classification, merely that illegal and

20

banned interrogation methods are not subject to classification as "intelligence sources and methods."

The decisions cited by the CIA—none of which consider the limiting language of *Sims*—are not to the contrary.  In *Wilner v. National Security Agency*, No. 07-CV-3883 (DLC), 2008 WL 2567765, at *4–6 (S.D.N.Y. June 25, 2008), for example, the court upheld the withholding of details about the "Terrorist Surveillance Program" ("TSP") of the National Security Agency ("NSA") based upon the argument that disclosure would reveal the NSA's "organization, functions, and activities."  Specifically, the NSA argued that releasing information about the TSP would compromise the secrecy and efficacy of its "signals intelligence," or surveillance, functions: it would reveal, among other things, "the types of communications that may be susceptible to NSA detection," "the NSA's technical capabilities," and "the limitations of NSA SIGINT ['signals intelligence] capabilities."  *Id.* at *5.  Furthermore, the NSA noted that surveillance, or "signals intelligence," is one of its "primary functions."  *Id.*  Thus, to reveal information about the TSP would compromise one of the NSA's core surveillance activities, not limited to the TSP.  Not surprisingly, the court upheld the NSA's withholding decision and found that the legality of the TSP was not relevant to the question of whether details about the NSA's surveillance functions were withholdable as "functions and activities" of the NSA.  *Id.* at *6.

The crucial fact in *Wilner*, which makes it inapt here, is that the NSA relied upon its surveillance functions in other programs and not just in the TSP.  Had the court ordered release of the requested information, it would have potentially compromised *ongoing* surveillance activities and not just the TSP.  Therefore, the illegality of the TSP did not affect the NSA's withholding of details about its general surveillance functions, the legality of which had not been challenged.

21

The analysis in *People for the American Way Foundation v. National Security Agency*, 462 F. Supp. 2d 21, 31 (D.D.C. 2006), also cited by the CIA, is consistent and confirms the distinction between wholly unlawful activities and otherwise lawful sources and methods employed in unlawful ways.  In *People*, the court addressed another challenge to the NSA's withholding of information relating to the TSP.  In refusing to determine the legality of the TSP, the court noted that the withholding "of information relating to the NSA's SIGINT activities . . . is not implicated by the ongoing debate regarding the legality of the TSP. . . . Whether the TSP, *one of the NSA's many SIGINT programs involving the collection of electronic communications*, is ultimately determined to be unlawful, its potential illegality" would not prohibit withholding of details about the NSA's "signals intelligence" functions.  *Id.* at 31 (emphasis added).  As in *Wilner*, the court in *People* refused to order the release of information that would disclose the general surveillance functions and capabilities of the NSA.[12]

The facts in this case are quite different.  At issue is not the description of otherwise lawful interrogation protocols and techniques that the CIA implemented in an unlawful manner (or, in the language of the TSP cases, the use of otherwise lawful surveillance functions in a manner that violates the Constitution).  Rather, the "enhanced interrogation techniques" and the protocols implemented by the CIA are unlawful and outlawed in their entirety for the reasons explained in Plaintiffs' fourth motion for summary judgment.  Pls.' Fourth Mot. Summ. J. 11–16 (Dec. 12, 2008) (dkt. no. 322).  Therefore, as even the President has recognized, release of

---

[12] The two other cases cited by the government both predate *Sims* and are, therefore, unavailing. *Sirota v. Cent. Intelligence Agency*, No. 80-CV-2050 (GLG), 1981 WL 158804, at *3 (S.D.N.Y. Sept. 18, 1981); *Navasky v. Cent. Intelligence Agency*, 499 F. Supp. 269, 273–74 (S.D.N.Y. 1980).

details about the techniques would not compromise "intelligence sources and methods" within the CIA's mandate.[13]

### B. Disclosure of descriptions of the "enhanced interrogation techniques" would not damage national security

To withhold descriptions of the "enhanced interrogation techniques" pursuant to Exemption 1, the CIA bears an additional burden under the Executive Order: information may be withheld only if "the original classification authority determines that the unauthorized disclosure of the information reasonably could be expected to result in damage to the national security, . . . and . . . is able to identify or describe the damage." Exec. Order No. 12,958, § 1.1(a)(4).  Where, as here, the government seeks to withhold information that is already in the public domain in whole or in part, it must explain how additional disclosure could damage the national security.  *Wash. Post v. U.S. Dep't of Def.*, 766 F. Supp. 1, 10–12 (D.C. Cir. 1991). Furthermore, information may not be classified under the Executive Order to "conceal violations of law" or to "prevent embarrassment."  Exec. Order No. 12,958, § 1.7(a)(1)–(2).  Here, the CIA has failed to demonstrate that releasing details of the "enhanced interrogation techniques"— which have been banned and are already described in graphic detail in the OLC memos—would damage national security.

---

[13] It is true, as the government notes, that the Court expressed some hesitation during a hearing on the parties' third motions for partial summary judgment about inquiring into the legality of the "enhanced interrogation techniques."  With due respect, the Court never ruled on the matter, and it did not have the opportunity to address the distinction, more fully explained here, between activities that are wholly unlawful and activities that are otherwise lawful but employed in one particular instance in an unlawful manner.  Moreover, the Court would not need to inquire into the legality of at least one of the techniques employed, as the Attorney General has already determined that waterboarding is torture.  *See, e.g.*, Carrie Johnson, *Waterboarding Is Torture, Holder Tells Senators*, Wash. Post, Jan. 16, 2009, *available at* http://www.washingtonpost.com/wp-dyn/content/article/2009/01/15/AR2009011500267.html.

As noted above, the President has outlawed the CIA's use of the "enhanced interrogation techniques," and he has released substantial operational information regarding their use and actual implementation.  In so doing, he specifically rejected the claim, made by Mr. Panetta here, that disclosure of such details would cause harm to national security.  President Barack Obama, Statement on Release of OLC Memos (Apr. 16, 2009).  Given that the techniques have been banned and that the OLC memos describe them in substantial, minute detail, no damage to the national security could possibly flow from disclosure of the additional details at issue here, and the Court should reject Mr. Panetta's contrary contention.  *See, e.g.*, *Wash. Post*, 766 F. Supp. at 9 ("It is a matter of common sense that the presence of information in the public domain makes the disclosure of that information less likely to 'cause damage to the national security.' . . . In other words, if the information has already been disclosed and is so widely disseminated that it cannot be made secret again, its subsequent disclosure will cause no *further* damage to the national security." (emphasis in original)); *Mohamed v. Jeppesen Dataplan, Inc.*, 563 F.3d 992, 1007 (9th Cir. 2009) ("Common sense confirms [that] [t]he government could not seriously argue, for example, that the Pentagon Papers remained 'secret' and therefore subject to the state secrets privilege even after having been published in *The New York Times*, simply because the government itself refused to declassify or otherwise 'officially disclose' the content of the papers.").

The Court should also reject Mr. Panetta's unprecedented and dangerous assertion that the disclosure of textual details of the "enhanced interrogation techniques" could be used as propaganda by our enemies.  Panetta Decl. ¶ 12.  Never before has the government sought to withhold textual descriptions of its own misconduct on the ground that such descriptions would

inflame the countries' enemies.  And never before has a court authorized the withholding of evidence of governmental misconduct on this basis.  This Court should not be the first.

The CIA's argument about propaganda is antithetical to the purposes of FOIA.  Congress enacted FOIA to allow the governed access to information vital to informed decisionmaking and to serve as a check on, and incentive against, executive excess.  *See, e.g.*, *Robbins Tire & Rubber Co.*, 437 U.S. at 242.  For that reason, courts interpret the exemptions to FOIA narrowly. *Halpern*, 181 F.3d at 287.  Acceptance of the CIA's argument for withholding details about the CIA's use of "enhanced interrogation techniques" would, however, turn FOIA on its head by allowing the greatest protection from disclosure of records documenting the worst governmental misconduct.  This would be true even though, as is the case here, the CIA has already officially acknowledged its use of, and significant detail about, the techniques in question.

Moreover, the CIA's argument relies upon rank speculation and has already been rejected by this Court in the context of Exemption 7(F).  As this Court recognized: "Our nation does not surrender to blackmail, and fear of blackmail is not a legally sufficient argument to prevent us from performing a statutory command. . . . The terrorists in Iraq and Afghanistan do not need pretexts for their barbarism; they have proven to be aggressive and pernicious in their choice of targets and tactics."  *Am. Civil Liberties Union v. Dep't of Def.*, 389 F. Supp. 2d 547, 575–76 (S.D.N.Y. 2005); *see also Am. Civil Liberties Union v. Dep't of Def.*, 543 F.3d 59, 71 (2d Cir. 2008) (rejecting the argument as relying upon "miniscule and speculative" risks).  President Obama recently endorsed a similar view of FOIA and its purposes: "The Government should not keep information confidential merely because public officials might be embarrassed by disclosure, because errors and failures might be revealed, or because of speculative or abstract fears."  Memorandum from President Barack Obama to the Heads of Executive Departments and

Agencies, *Freedom of Information Act* (Jan. 21, 2009), *available at*

http://www.whitehouse.gov/the_press_office/Freedom_of_Information_Act/.

      Finally, the CIA's argument runs counter to the express terms of the Executive Order

invoked.  That order forbids classification to "conceal violations of law" or to "prevent

embarrassment."  Exec. Order No. 12,958, § 1.7(a)(1)–(2).  The CIA's attempt to classify the

records for fear of propaganda is, in fact, suppression for the purpose of concealing illegality and

preventing embarrassment, albeit in extreme form.  The agency's concern is that others will react

strongly to confirmation of, and new details about, governmental misdeeds.  This is precisely the

same concern that motivates the suppression of evidence to conceal illegality or prevent

embarrassment.  In other words, the CIA's argument about propaganda evidences its violation of

section 1.7(a) of the Executive Order.  That the CIA is primarily concerned with the reactions of

individuals abroad is of no moment.  Nor is Mr. Panetta's self-serving proclamation that he has

not violated section 1.7(a) of the Executive Order by attempting to conceal illegality and to

prevent embarrassment.  Panetta Decl. ¶ 15.  The agency's attempt to squelch controversy by

suppressing evidence of illegality—and, indeed, its unsupportable attempt to withhold

information about banned, publicly revealed, and illegal interrogation techniques—provide

ample evidence of its intent to conceal violations of the law and to prevent embarrassment.

There is, in short, no other plausible explanation for the CIA's wholesale withholding of the

documents at issue here.

      The CIA argues that its motive in withholding the records at issue could not be to conceal

illegality in light of the release of the OLC memos.  Gov't Br. 21.  But any criminal investigation

with respect to CIA interrogations might focus not only on the memos themselves, but on actions

that went *beyond* what the memos approved.  *See* President Barack Obama, Statement on

Release of OLC Memos (Apr. 16, 2009) ("In releasing these memos, it is our intention to assure

those who carried out their duties *relying in good faith upon legal advice from the Department of*

*Justice* that they will not be subject to prosecution." (emphasis added)); David Johnson, *For*

*Holder, Inquiry on Interrogation Poses Tough Choice*, N.Y. Times, July 21, 2009, *available*

*at* http://www.nytimes.com/2009/07/22/us/22holder.html?_r=1&scp=3&sq=eric%20holder&st=c

se (stating that the Attorney General is considering an investigation into "C.I.A. interrogators and

contract employees who clearly crossed the line and violated the Bush administration's

guidelines and engaged in flagrantly abusive acts").  Thus, details regarding the CIA's use of the

"enhanced interrogation techniques" are crucial to determining whether the CIA overstepped the

authority purportedly granted by the OLC memos.  Notably, John Kiriakou, a CIA agent

involved in the capture of Abu Zubaydah, recently stated that CIA cables from the same time

period as those at issue here confirm that the CIA ordered, and interrogators carried out, the

waterboarding of Abu Zubaydah in late-May or early-June 2002, *prior* to the legal approval for

waterboarding in August 1, 2002, and contrary to numerous governmental representations that

Abu Zubaydah was not waterboarded until August 2002.  *US 'Waterboarding' Row Rekindled*,

BBC, July 13, 2009, *available at* http://news.bbc.co.uk/2/hi/americas/8144625.stm.  If the

Court's *in camera* review of the records reveals evidence of the CIA's failure to comply with the

OLC memos or evidence that the agency used "enhanced interrogation techniques" prior to

August 2002, that would provide further evidence of the CIA's intent to conceal violations of the

law or to prevent embarrassment.

For these reasons, the CIA has not met its burden under Exemptions 1 and 3 for

withholding details regarding its use of "enhanced interrogation techniques."  As set forth above,

this Court should review the records at issue *in camera* to determine whether their withholding is

proper.  Given the level of detail provided in the OLC memos about the CIA's use of "enhanced interrogation techniques" and, in particular, about the interrogation of Abu Zubaydah, it is exceedingly unlikely that there are no segregable portions of the records that should be released.

### III.  THE CIA HAS NOT MET ITS BURDEN FOR WITHHOLDING THE PHOTOGRAPH OF ABU ZUBAYDAH

The CIA has withheld a single responsive photograph of Abu Zubaydah, pursuant to Exemptions 1 and 3, but has failed to provide any justification whatsoever for its withholding.  In the entirety of its substantive "document description" of the October 11, 2002 image, the CIA's *Vaughn* index notes: "This document is a one-page photo of Abu Zubaydah."  ACLU v. DOD *Vaughn* Index No. 65.  The index also lists the applicable exemptions but provides only boilerplate recitations of the scopes of Exemptions 1 and 3 without any explanation of why the "one-page photo of Abu Zubaydah" is properly classified and withheld.  *Id.*  The CIA's *Vaughn* declaration is similarly deficient, mentioning the photograph a single time in its factual recitation of the documents at issue but failing to provide any analysis of what the photo depicts or why it merits classification.  Panetta Decl. ¶ 5.  Finally, the CIA's brief mentions the photo twice in its preliminary statement but also omits any justification for its withholding under Exemptions 1 and 3.  Gov't Br. 1.  Needless to say, the CIA has failed to justify its withholding of the photograph, and the Court should order its disclosure.

Nevertheless, Plaintiffs rely on their analysis above to the extent that the CIA invokes Exemptions 1 and 3 for the same reasons as it does in connection with the details of the "enhanced interrogation techniques."  The techniques are banned, fully revealed, and unlawful, and the photo should not be withheld if it depicts "enhanced interrogation techniques." Moreover, unlike the OLC memos or the communications between the CIA interrogators and Headquarters regarding Abu Zubaydah's interrogation, a photograph of an interrogation cannot

depict the same level of operational detail.  To the extent that the CIA relies on Mr. Panetta's

propaganda rationale for withholding of the photo, Plaintiffs also object.  *See* Panetta Decl. ¶ 12.

The propaganda argument relies exclusively on the "disclosure of explicit details of specific

interrogations where EITs were applied," and not on the release of an image of Abu Zubaydah.

*See id.*  Furthermore, the propaganda argument is particularly damaging to FOIA's purposes

when applied to visual evidence of governmental misconduct.  In the words of this Court:

> As I stated at the time of the original argument, and as I reiterated previously in
> this decision, the pictures are the best evidence of what happened, better than
> words, which might fail to describe, or summaries, which might err in their
> attempt to generalize and abbreviate.  Publication of the photographs is central to
> the purposes of FOIA because they initiate debate, not only about the improper
> and unlawful conduct of American soldiers, "rogue" soldiers, as they have been
> characterized, but also about other important questions as well—for example, the
> command structure that failed to exercise discipline over the troops, and the
> persons in that command structure whose failures in exercising supervision may
> make them culpable along with the soldiers who were court-martialed for
> perpetrating the wrongs; the poor training that did not create patterns of proper
> behavior and that failed to teach or distinguish between conduct that was proper
> and improper; the regulations and orders that governed the conduct of military
> forces engaged in guarding prisoners; the treatment of prisoners in other areas and
> places of detention; and other related questions.

*Am. Civil Liberties Union*, 389 F. Supp. 2d at 578.  Images have a unique ability to transform

public debate and, as is particularly relevant given the CIA's invocation of Exemptions 1 and 3,

to do so without divulging tactical, technical, or operational details.

    For these reasons, the Court should order release of the photograph.

## IV. THE CIA HAS NOT MET ITS BURDEN FOR WITHHOLDING THE IDENTIFYING INFORMATION OF INDIVIDUALS CONSULTED BY THE CIA WITH RESPECT TO THE "ENHANCED INTERROGATION TECHNIQUES"

    For the reasons set forth in Plaintiff's reply in support of their fourth motion for partial

summary judgment, the CIA has failed to carry its burden of establishing that it may withhold

the names, titles, and other identifying information of individuals consulted by the CIA with

respect to the "enhanced interrogation techniques."  Pls.' Reply 23–29 (June 12, 2009) (dkt. no.

353).  The names may not be withheld because information provided by the consultants relates to

interrogation methods that are illegal and have, in any event, been outlawed by the President.

*See id.*  Furthermore, the participation of the consultants in the CIA's use of "enhanced

interrogation techniques" is well documented and officially acknowledged.  *See id.* at 25–29;

Joby Warrick & Peter Finn, *Internal Rifts on Road to Torment*, Wash. Post, July 19, 2009,

*available at* http://www.washingtonpost.com/wp-

dyn/content/article/2009/07/18/AR2009071802065.html (documenting the involvement of James

E. Mitchell and John "Bruce" Jessen in the interrogation of Abu Zubaydah, and discussing the

CIA's use of the cables at issue here to orchestrate every part of Abu Zubaydah's interrogation).

For these reasons and because the CIA has not met its burden of adequately describing how the

withheld information differs from officially disclosed information within the public domain, the

Court should order the CIA to release the names, titles, and other identifying information of

individuals it consulted with respect to the "enhanced interrogation techniques."

## V.   THE CIA HAS NOT MET ITS BURDEN FOR WITHHOLDING UNDER EXEMPTION 5

The CIA has withheld eight documents under the deliberative-process, attorney-work-

product, and attorney-client privileges encompassed by FOIA's Exemption 5, but it has not

sustained its burden of showing that it may withhold any information pursuant to these

privileges.  *See* ACLU v. DOD *Vaughn* Index Nos. 28, 54, 56–57, 59–62.  Specifically, under the

deliberative-process privilege, the CIA has failed to segregate for release factual, post-decisional,

and adopted or incorporated material.  And with respect to the attorney-client and attorney-work-

product privileges, it has both failed to segregate releasable material and to demonstrate that the

documents were created in anticipation of litigation.  For these reasons, discussed in greater detail below, the Court should order release.

Exemption 5 allows the withholding of "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency."  5 U.S.C. § 552(b)(5).  A document qualifies for this exemption if (1) its source is a government agency and (2) it "fall[s] within the ambit of a privilege against discovery under judicial standards that would govern litigation against the agency that holds it."  *Dep't of the Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8 (2001).  The traditional civil discovery privileges incorporated under Exemption 5 include the deliberative-process, attorney-client, and attorney-work-product privileges.  *See Wood v. Fed. Bureau of Investigation*, 432 F.3d 78, 83 (2d Cir. 2005).

    A.   <u>The CIA has not satisfied its burden under the deliberative-process privilege</u>

The CIA has invoked the deliberative-process privilege with respect to all eight documents withheld under Exemption 5.  Because it has failed to segregate releasable factual material from the documents and because it has not demonstrated that the material was *not* adopted as, or incorporated by reference into, the CIA's policies or decisions, the CIA has failed to sustain its burden of showing that the privilege applies.[14]

---

[14] No court has specifically addressed the question of which party carries the burden of establishing adoption or incorporation by reference in the FOIA context.  In light of the fact that FOIA generally places the burden on the government to demonstrate why records should be withheld, *see* 5 U.S.C. § 552(a)(4)(B); *Halpern*, 181 F.3d at 287, and the fact that agencies are far better situated than FOIA plaintiffs to access information relating to their adoption, S. Rep. No. 89-813, at 8 (1965) ("Placing the burden of proof upon the agency puts the task of justifying the withholding on the only party able to explain it."), it is appropriate for the agencies to demonstrate that a record has not been adopted or incorporated by reference into its policy.  Even were the burden to rest upon Plaintiffs, however, they have amply met that burden here.

The deliberative process privilege "is designed to promote the quality of agency decisions by preserving and encouraging candid discussion between officials." *Nat'l Council of La Raza v. Dep't of Justice*, 411 F.3d 350, 356 (2d Cir. 2005).  It covers "documents 'reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated.'" *Nat'l Labor Relations Bd. v. Sears, Roebuck & Co.*, 421 U.S. 132, 150 (1975) (quoting *Carl Zeiss Stiftung v. V.E.B. Carl Zeiss, Jena*, 40 F.R.D. 318, 324 (D.D.C. 1966)).

The CIA's invocation of the privilege contravenes two primary exceptions to it.  First, purely factual matters are not subject to the deliberative-process privilege.  Thus, even if a document is predecisional, the deliberative privilege applies only to the opinion or recommendatory portion of that document, not to factual information in the document, and the agency bears the burden of establishing that no such segregable factual information exists.  *See Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 867 (D.C. Cir. 1980).  Moreover, the Second Circuit has held that conclusory assertions that facts are "inextricably intertwined" with privileged material are insufficient.  *See Hopkins v. U.S. Dep't of Hous. & Urban Dev.*, 929 F.2d 81, 85–86 (2d Cir. 1991).

Here, all eight documents withheld under the deliberative-process privilege appear to contain purely factual and segregable information.  Documents 28 and 57, for example, contain "information concerning the interrogation of Abu Zubaydah."  ACLU v. DOD *Vaughn* Index No. 28; *see also id.* No. 57 ("observations of interrogations sessions").  And documents 54, 56, 59, 60, 61, and 62 all contain information concerning the contents of the destroyed videotapes.  *See id.* No. 54 ("comments on the . . . contents of the videotapes"); *id.* No. 56 ("information concerning the destroyed videotapes"); *id.* No. 59 ("details concerning the destroyed

videotapes"); *id.* No. 60 ("information relating to the contents of the destroyed videotapes"); *id.* No. 61 ("information regarding the destroyed videotapes"); *id.* No. 62 ("information concerning the destroyed videotapes that was incorporated into a final report").  Neither the CIA's brief nor its *Vaughn* declaration attempts to justify the withholding of this purely factual material, *see* Gov't Br. 27–28; Panetta Decl. ¶ 37, and the declaration provides only the most conclusory of explanations as to why, as a general matter, the CIA did not attempt to segregate releasable information from any of the records at issue here, *id.* ¶ 14.

Second, the deliberative-process privilege does not shield post-decisional material or predecisional material that has been adopted or incorporated in final form by an agency. Because the quality of a decision is unlikely to be "affected by communications with respect to the decision occurring after the decision is finally reached," post-decisional communications are not exempt from disclosure under Exemption 5.  *See Sears, Roebuck & Co.*, 421 U.S. at 151. Thus, the deliberative process privilege does not apply to final agency actions that constitute statements of policy, final opinions that have the force of law, or which explain actions that an agency has already taken, or communications that implement an established policy of an agency. *See Taxation With Representation Fund v. Internal Revenue Serv.*, 646 F.2d 666, 677 (D.C. Cir. 1981).  Additionally, even if a document is predecisional at the time it is prepared, it loses its predecisional status if it is adopted or incorporated, formally or informally, as the agency position on an issue or is used as the agency position in its dealings with the public.  *See Sears, Roebuck & Co.*, 421 U.S. at 161; *La Raza*, 411 F.3d at 356; *Coastal States Gas Corp.*, 617 F.2d at 866.  Exemption 5 also may not be invoked to conceal "working law" or "secret law" used by an agency in the discharge of its regulatory duties on the grounds that such law has not been designated "formal," "binding," or "final."  *See Coastal States Gas Corp.*, 617 F.2d at 868; *see*

*also Sterling Drug, Inc. v. Fed. Trade Comm'n*, 450 F.2d 698, 708 (D.C. Cir. 1971)

(distinguishing "ideas and theories which go into the making of the law" from "the law itself," in

requiring disclosure of orders and interpretations applied in actual cases by the Federal Trade

Commission "to prevent the development of secret law"); *see also La Raza*, 411 F.3d at 357 n.5

("courts must examine *all* the relevant facts and circumstances in determining whether express

adoption or incorporation by reference has occurred" (emphasis in original)).

Much of what the CIA has withheld as predecisional appears to be either post-decisional

or adopted as agency policy.  For example, document 62 contains "information concerning the

destroyed videotapes that was incorporated into a final report."  ACLU v. DOD *Vaughn* Index

No. 62.  To the extent this information is not purely factual, it appears to be either post-

decisional or predecisional yet incorporated into the agency's final statement on the matter.  The

same is true of document 54, which contains a "draft of an Agency statement regarding the

destroyed videotapes."  *Id.* No. 54.  The balance of the documents all contain a legal or policy

recommendation directed at either the interrogation of Abu Zubaydah or the destruction of the

videotapes.  *See, e.g.*, *id.* No. 28 ("recommendations from CIA employees to their management

on policy issues"); *id.* No. 56 ("information concerning the destroyed videotapes and preliminary

recommendations and opinions of CIA employees"); *id.* No. 57 ("proposed plans for future

interrogations").  Based upon publicly available evidence, these recommendations likely include

advice that the CIA adopted or incorporated as policy or into practice.  For example, the

documents likely contain recommendations regarding Abu Zubaydah's interrogations that were

in fact carried out—such as the use of a particular interrogation protocol, the use of

waterboarding, or the cessation of waterboarding at a certain point—and they may contain the

suggestion that the CIA destroy the videotapes.  If true, the CIA could not withhold the material

under the deliberative-process privilege, as the public record confirms that the CIA adopted the advice. *See, e.g.*, *CAT Memo* at 37 (noting that the CIA waterboarded Abu Zubaydah eighty-three times); *id.* at 31 (confirming that the CIA waterboarded Abu Zubaydah a final time at the direction of Headquarters, and that waterboarding ceased at that point); CIA's Opp'n to Pls.' Mot. for Contempt & Sanctions (Jan. 10, 2008) (dkt. no. 269) (confirming that the CIA destroyed the videotapes). Neither the CIA's brief nor its *Vaughn* declaration attempts to grapple with this limitation on the deliberative-process privilege. Gov't Br. 27–28; Panetta Decl. ¶ 37.

Finally, other exceptions to the deliberative-process privilege may apply, but the CIA's cursory descriptions of the documents and failure to identify the decisional processes to which they pertain fundamentally impair Plaintiffs' ability to determine or argue that they do. *See Senate of P.R. v. U.S. Dep't of Justice*, 823 F.2d 574, 585 (D.C. Cir. 1987) (finding the agency's "briefest of references" to the subject matter of the withheld information to be "conclusory" and insufficient to invoke the deliberative-process privilege); *Access Reports v. Dep't of Justice*, 926 F.2d 1192, 1196 (D.C. Cir. 1991) (agency must identify a "'definable decisionmaking process' to which the documents contributed (quoting *Paisley v. Cent. Intelligence Agency*, 712 F.2d 686, 698 (D.C. Cir. 1983), *vacated in part on other grounds*, 724 F.2d 201 (D.C. Cir. 1984)).

For these reasons, the CIA has failed to meet its burden for showing that the deliberative-process privilege applies.

      B.   <u>The CIA has not satisfied its burden under the attorney-client or attorney-work-product privileges</u>

With respect to two of the eight documents withheld under Exemption 5, the CIA has also invoked the attorney-client and attorney-work-product privileges. *See* ACLU v. DOD *Vaughn* Index Nos. 59–60. It has failed, however, to segregate releasable material and to demonstrate that the documents were created in anticipation of litigation.

The attorney-client privilege protects "a client's confidences to his or her attorney" made for the purpose of securing legal advice. *Coastal States Gas Corp.*, 617 F.2d at 862. This privilege, however, "is narrowly construed and is limited to those situations in which its purposes will be served." *Id.* Thus, the agency has the burden of demonstrating that confidentiality was maintained at the time of the communication and thereafter. *Id.* at 863. The work-product privilege, by contrast, protects the mental processes of the attorney reflected in materials prepared in anticipation of litigation. *A. Michael's Piano, Inc. v. Fed. Trade Comm'n*, 18 F.3d 138, 146 (2d Cir. 1994). The scope of the privilege is "'modest'" and "'does not extend to every written document generated by an attorney.'" *Resolution Trust Corp. v. Diamond*, 137 F.R.D. 634, 644 (S.D.N.Y. 1991) (quoting *Jordan v. U.S. Dep't of Justice*, 591 F.2d 753, 775 (D.C. Cir. 1978)). "[A]n agency seeking to withhold a document in its entirety under this exemption must identify the litigation for which the document was created (either by name or through factual description) and explain why the work-product privilege applies to all portions of the document." *Church of Scientology Int'l v. U.S. Dep't of Justice*, 30 F.3d 224, 237 (1st Cir. 1994). Documents created merely to avoid litigation, as opposed to anticipating litigation, are not protected by the privilege. *See In re Grand Jury Proceedings*, No. M-11-189, 2001 WL 1167497, at *15 (S.D.N.Y. Oct. 3, 2001). Like the deliberative-process privilege, the attorney-client and attorney-work-product privileges do not protect from disclosure material that has been adopted or that constitutes working law. *See La Raza*, 411 F.3d at 360 ("the attorney-client privilege may not be invoked to protect a document adopted as, or incorporated by reference into, an agency's policy"); *Niemeier v. Watergate Special Prosecution Force*, 565 F.2d 967, 974 (7th Cir. 1977) ("Where litigation is foreclosed as an option and the agency expressly chooses to make use of legal memoranda in its final decision, this choice eliminates any claim of attorney

work product privilege for the expressly adopted document." (quoted in *La Raza*, 411 F.3d at 361)); *Tax Analysts v. Internal Revenue Serv.*, 117 F.3d 607, 619 (D.C. Cir. 1997); *Falcone v. Internal Revenue Serv.*, 479 F. Supp. 985, 990 (E.D. Mich. 1979).

   The CIA has failed to justify its withholdings under these privileges for two reasons. First, as detailed above, much of what is contained in the two documents is segregable, purely factual, or adopted or incorporated as policy or into practice, *see* ACLU v. DOD *Vaughn* Index No. 59 ("discussing the interrogation videotapes," which were later destroyed); *id.* ("details concerning the destroyed videotapes"); *id.* No. 60 ("information relating to the contents of the destroyed videotapes"), and may not, therefore be withheld.  Second, the CIA has failed entirely to demonstrate that either document was prepared "in anticipation of litigation."  In fact, the CIA concedes that at least one of the documents was prepared to evaluate "legal and policy compliance."  Panetta Decl. ¶ 37.  As Judge Preska recognized, however, the work-product doctrine does not encompass "compliance activities."  *In re Grand Jury Proceedings*, 2001 WL 1167497, at *15.  It requires that the withheld documents have been prepared in *anticipation* of litigation, not in "mere *avoidance* of litigation."  *Id.* (emphasis added).  Furthermore, the CIA has failed to identify the nature of the litigation anticipated by documents 59 and 60.  *See Church of Scientology*, 30 F.3d at 237.  Accordingly, its invocation of the attorney-client and attorney-work-product privileges fails.

   For these reasons, the CIA has not satisfied its burden of invoking the deliberative-process, attorney-client, and attorney-work-product privileges of Exemption 5.  The Court should therefore order disclosure or, at the very least, examine the records *in camera* to determine whether the privileges apply and to ensure that segregable information be released.

### VI.   THE CIA HAS NOT MET ITS BURDEN FOR WITHHOLDING THE IDENTIFYING INFORMATION OF CONSULTANTS OR CONTRACTORS UNDER EXEMPTION 6

Under Exemption 6, the CIA has withheld "the names and other identifying information of CIA employees and employees of other federal agencies involved in clandestine counterterrorism operations."  Gov't Br. 31; *see* Panetta Decl. ¶ 38 (withholding "information that could identify CIA employees and other personnel engaged in clandestine counterterrorism operations").  Plaintiffs understand this withholding under Exemption 6 *not* to encompass the names and other identifying information of consultants or contractors who participated in or advised the CIA with respect to the CIA's interrogation program.  *See supra* Part IV.  To the extent that the CIA is invoking Exemption 6 to protect the names or identifying information of such individuals, Plaintiffs note that the names of those individuals and their involvement in the CIA's interrogation program has been officially acknowledged and subject to significant debate in the public domain.  *See* Pls.' Reply 23–29 (June 12, 2009) (dkt. no. 353); Committee on Armed Services, United States Senate, *Inquiry into the Treatment of Detainees in U.S. Custody* 17 (Nov. 20, 2008)[15] (noting the participation of Mitchell in the interrogation of Abu Zubaydah); *see also* Joby Warrick & Peter Finn, *Internal Rifts on Road to Torment*, Wash. Post, July 19, 2009 (quoting one CIA consultant, Mitchell, who confirmed and defended his involvement in the CIA's interrogation program); *id.* (documenting the involvement of Mitchell and another consultant, Jessen, in the interrogation of Abu Zubaydah); Brian Ross, Matthew Cole & Joseph Rhee, *Waterboarding, Interrogations: The CIA's $1000 a Day Specialists*, ABC News, Apr. 30, 2009, *available at* http://abcnews.go.com/Blotter/Story?id=7471217 (discussing the involvement

---

[15] This report is attached as Exhibit A to the declaration of Jennifer B. Condon, which is attached to Plaintiffs' reply in support of their fourth motion for partial summary judgment.  *See* Pls.' Reply (June 12, 2009) (dkt. no. 353).

of Mitchell and Jessen in the CIA's interrogation program).  Disclosure of their names in this context would not, therefore, constitute a "clearly unwarranted invasion of personal privacy," 5 U.S.C. § 552(b)(6), and the public interest in their disclosure is manifest.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully urge the Court to order the CIA to release the documents relating to the contents of the videotapes destroyed by the CIA.  In the alternative, the Court should review the documents *in camera* to determine whether segregable portions may be released.

Dated: July 24, 2009                    Respectfully submitted,


                                          /s/ Jameel Jaffer
                                         _____
                                         Jameel Jaffer
                                         Amrit Singh
                                         Judy Rabinovitz
                                         AMERICAN CIVIL LIBERTIES
                                         UNION FOUNDATION
                                         125 Broad Street, 18th Floor
                                         New York, NY 10004
                                         Tel:   (212) 519-7814
                                         Fax:  (212) 549-2654

                                         Lawrence S. Lustberg
                                         Jennifer B. Condon
                                         GIBBONS, P.C.
                                         One Gateway Center
                                         Newark, NJ 07102-5310

                                         Michael Ratner
                                         Gitanjali Gutierrez
                                         Emilou MacClean
                                         Shayana Kadidal
                                         CENTER FOR CONSTITUTIONAL RIGHTS
                                         666 Broadway, 7th Floor
                                         New York, NY 10012

                                         Beth Haroules
                                         Arthur Eisenberg

NEW YORK CIVIL LIBERTIES
UNION FOUNDATION
125 Broad Street
New York, NY 10004

*Counsel for Plaintiffs*