UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ x

AMERICAN CIVIL LIBERTIES UNION, et al.,

                  Plaintiffs,

                  v.

DEPARTMENT OF DEFENSE, et al.,

                  Defendants.

<u>ELECTRONICALLY FILED</u>

04 Civ. 4151 (AKH)

------------------------------------------------------------ x

AMERICAN CIVIL LIBERTIES UNION, et al.,

                  Plaintiffs,

                  v.

DEPARTMENT OF JUSTICE, AND ITS
COMPONENT OFFICE OF LEGAL COUNSEL,

                  Defendants.

05 Civ. 9620 (AKH)

------------------------------------------------------------ x

## DEFENDANT CENTRAL INTELLIGENCE AGENCY'S
## REPLY MEMORANDUM IN SUPPORT
## OF ITS FIFTH MOTION FOR SUMMARY JUDGMENT

PREET BHARARA
United States Attorney for the
Southern District of New York
Attorney for Defendants
86 Chambers Street, 3rd Floor
New York, New York 10007
Tel: (212) 637-2737
Fax: (212) 637-2686
Email: sean.lane@usdoj.gov

SEAN H. LANE
PETER M. SKINNER
HEATHER K. McSHAIN
   – Of Counsel –

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

POINT I.      THE CIA PROPERLY WITHHELD IN FULL THESE 65 CLASSIFIED
RECORDS UNDER EXEMPTIONS ONE AND THREE. . . . . . . . . . . . . . . . . . 3

    A.    The Court Should Consider the Classified Declaration of
the CIA Director.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    B.    The Court Should Reject Plaintiffs' Effort to Declassify Records
Based on the Status of the CIA's Detention Program. . . . . . . . . . . . . . . . . . . 6

        1.    These Records Are Properly Withheld Notwithstanding That
the CIA Detention Program Is No Longer in Operation. . . . . . . . . . . . . 6

        2.    Plaintiffs' Repeated Attempt to Seek Release Based on
Allegations of Illegality Should Be Rejected.. . . . . . . . . . . . . . . . . . . . . 12

POINT II.     THE CIA PROPERLY WITHHELD INFORMATION CONTAINED
IN EIGHT OF THE SAMPLE DOCUMENTS PURSUANT
TO EXEMPTION 5. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

    A.    Deliberative Process Privilege. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

    B.    Attorney-Client Privilege. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

    C.    Attorney Work Product Doctrine. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

POINT III.   THE CIA PROPERLY RELIED UPON EXEMPTION 6 TO WITHHOLD
NAMES AND IDENTIFYING INFORMATION OF CIA CONSULTANTS
AND CONTRACTORS.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

PRELIMINARY STATEMENT

Defendant Central Intelligence Agency ("CIA"), by its attorney, Preet Bharara, United States Attorney for the Southern District of New York, respectfully submits this reply in further support of its fifth motion for summary judgment, seeking to withhold in full information contained in operational cables, notes, logbooks, memoranda, e-mails, and a single photograph under exemptions to the FOIA.[1]

In its opening brief, the Government established that these CIA documents are properly withheld under FOIA exemptions 1, 3, 5, and 6.  The vast majority of the sample records, 57 of the 65, are documents generated during the course of CIA operations, or their equivalent, including cables consisting primarily of sensitive intelligence and operational information concerning interrogations of Abu Zubaydah.  These operational documents contain descriptions of CIA techniques as applied in actual operations, as well as details of actual intelligence activities, sources, and methods.  As the Director of the CIA has made clear, the release of this classified information would cause exceptionally grave harm to clandestine human intelligence collection and foreign liaison relationships.

In response to the Government's motion, Plaintiffs' opposition raises a variety of misguided arguments that the Court should reject.  As a threshold matter, plaintiffs seek to avoid adjudication of this matter based on a complete record by arguing that the Court should not consider a classified declaration of Leon Panetta, the Director of the CIA.  Plaintiffs' argument has no support in the case law, ignores the classified nature of the information at issue and is inconsistent with this Court prior consideration of such ex parte declarations as appropriate to

---

[1]     The definitions and abbreviations in Defendants' opening brief are incorporated by reference.  Citations to the Government's opening brief and the reply brief of Plaintiffs are referenced as "Mov. Br. at ___" and "Pls. Opp. at ___," respectively.

justify the withholding of classified information.

As to the merits of withholding this classified information, plaintiffs argue that details of these CIA operations must be disclosed because the CIA's detention and interrogation program is no longer in operation and is, in plaintiffs' view, unlawful. But plaintiffs' position ignores that the United States is still engaged in extensive counterterrorism operations, including the questioning of terrorists, and that release of the requested information would undermine those efforts. Moreover, plaintiffs' arguments are inconsistent with the case law governing the withholding of classified information under FOIA, which focuses on the nature of the information sought and the potential ramifications from release, and does not turn upon the continuing nature of the classified program in question or even its legality.

Plaintiffs' claims with respect to the CIA's withholdings under Exemption 5 are equally meritless. Eight of the documents contain information that is predecisional and deliberative, and therefore properly withheld. In addition, two of the eight documents are also properly withheld pursuant to the attorney client privilege and work product doctrine.

Finally, the Court should reject plaintiffs' claims that the names and identifying information of CIA consultants and contractors in 62 of the documents should be released. The CIA has never made an official disclosure of these individuals' names, and the news coverage and Senate report cited by plaintiffs do not constitute a disclosure by the Executive Branch. Moreover, plaintiffs argument that in light of the media coverage, disclosure of the names and identifying information of these individuals could not constitute an unwarranted invasion of personal privacy is wrong, as only the individual whose informational privacy interests are protected by Exemption 6 can effect a waiver of those privacy interests.

For the reasons explained below and in the Government's opening brief, as well as in the accompanying classified and unclassified declarations, the Court should grant the Government's fifth motion for summary judgment.

**ARGUMENT**

## I.    THE CIA PROPERLY WITHHELD IN FULL THESE 65 CLASSIFIED RECORDS UNDER EXEMPTIONS ONE AND THREE

### A.    The Court Should Consider the Classified Declaration of the CIA Director

Rather than decide the withholding of these records based upon a full record, Plaintiffs assert that this Court should not consider the classified CIA declaration from Leon E. Panetta, the Director of the CIA.  Pls. Opp. at 8-10 (citing, inter alia, John Doe Corp. v. John Doe Agency, 850 F.2d 105, 110 (2d Cir. 1988)).[2]  This argument should be rejected because it is contrary to well-established FOIA case law, ignores the classified nature of the information at issue, and is wholly inconsistent with the Court's practice - during the more than five years of litigation in this case - of considering such classified declarations when they provide information relevant to the Court's review of FOIA exemptions 1 and 3.

In fact, courts routinely consider classified declarations in FOIA cases with national security implications. See, e.g., Weberman v. National Sec. Agency, 668 F.2d 676, 677 (2d Cir. 1982) (holding that it was an "abuse of discretion" for trial judge to refuse to consider a top

---

[2]     Plaintiffs also raise the issue of discrepancies between the May 1, 2009, index of documents, and the index (of only the sample documents) submitted on June 8, 2009, with Director Panetta's unclassified declaration.  See Pls. Opp. 8 n.6.  The exemptions found in the June 8, 2009 index control with respect to the exemptions invoked by the CIA to withhold all sixty-five documents in the sample.  With respect to the descriptions of the documents, the descriptions contained in the May 1, 2009, supplement the descriptions found in the June 8, 2009 index.

3

secret affidavit from the NSA); Doyle v. Federal Bureau of Investigation, 722 F.2d 554, 556-57 (9th Cir. 1983) ("Once the government has submitted as detailed public affidavits and testimony as possible, the district court may resort to in camera review of the documents themselves and/or in camera affidavits"); Hayden v. National Sec. Agency/Central Sec. Service, 608 F.2d 1381, 1385 (D.C. Cir. 1979) ("The facts of this case present a situation where the district court could reasonably find that public itemization and detailed justification would compromise legitimate secrecy interests, thus making it appropriate to receive affidavits in camera rather than in public"); cf. Tabbaa v. Chertoff, 509 F.3d 89, 93 n.1 (2d Cir. 2007) ("In an abundance of caution, however, we viewed, ex parte and in camera, the classified intelligence at issue.").

Consistent with this well-established precedent, this Court previously has reviewed such classified declarations in this case where appropriate to resolve the applicability of FOIA exemptions to the records in question.  See, e.g., Am. Civil Liberties Union v. Dep't of Def., 389 F. Supp. 2d 547, 567-568 (S.D.N.Y. 2005) ("[T]he CIA, in further support of its position, provided two classified declarations [the Goss Declaration and the Sixth Dorn Declaration] . . . which I reviewed in camera . . . The explanations provided therein more substantially support the agency's position . . . Accordingly, I am now satisfied that there is no meaningful, reasonably segregable, non-exempt portion of the seventy-one documents that can be produced.").  The case law, and this Court's practice in this case, conforms with the fact that the Government has the burden of establishing withholding under FOIA, 5 U.S.C. § 552, and the fact that the justification for withholding classified information may, by necessity, require providing the Court with classified information that cannot be in the public record.

None of the cases relied upon by Plaintiffs is to the contrary.  For example, neither of the two primary cases relied upon by plaintiffs involved the withholding of classified information.  See Pls. Opp. at 9-10 (citing John Doe Corp. v. John Doe Agency, 850 F.2d 105, 110 (2d Cir. 1988) and  Lawyers Comm. for Human Rights v. Immigration & Naturalization Serv., 721 F. Supp. 552, 568 (S.D.N.Y. 1989) ).  Indeed, the Second Circuit in John Doe Corp. explicitly recognized the use of ex parte review of Vaughn declarations in cases with national security implications.  See 850 F.2d at 110 ("Existing caselaw allowing in camera inspection of a Vaughn index appears limited to cases implicating national security interests.").  Moreover, the facts here are starkly different than those in John Doe Corp., where the trial court had permitted the withholding of non-classified information even though the only Vaughn justification in the case had been withheld in its entirety from the plaintiff.  Id. at 107, 109-10.

By contrast, the Government here has provided not one but two public declarations from the Director of the CIA to justify the withholding of these 65 records.  The Government merely supplemented this extensive public record, as appropriate, to provide additional justification that cannot be shared with the public because of its classified nature.  Such a procedure is entirely consistent with FOIA's requirement to provide a "sufficiently specific explanation" of the reasons for withholding.  Halperin v. FBI, 181 F.3d 279, 295 (2d Cir. 1999).[3]

---

[3]     Plaintiffs further argue that "[r]eview of the classified declaration would be particularly inappropriate here, as Plaintiffs agreed to a sample Vaughn in part so that in camera review would be more manageable."  Pls. Opp. at 8.  But before the Court considers in camera review of the records, it must first decide whether it can resolve the legal issues before it based on the record, including any classified declarations.  As this Court previously stated, "when a government agent can attest in a sworn affidavit that the redactions are necessary, and elaborate on the reasons for the redactions with sufficient specificity, the district court should be able to rule on the appropriateness of the redactions without conducting an in camera review of the redacted materials."  ACLU v. DOD, 389 F. Supp. 2d at 567 (citing Halpern, 181 F.3d at 287).

**B.      The Court Should Reject Plaintiffs' Effort to Declassify Records
Based on the Status of the CIA's Detention Program**

Plaintiffs' argue that information regarding the CIA's interrogation of detainees cannot be

withheld for essentially two reasons: 1) the CIA detention program is no longer in operation; and

2) the CIA's enhanced interrogation techniques were unlawful.  Pls. Opp. at 10-29.  Both of

plaintiffs' arguments are inconsistent with the facts before the Court and the case law under

FOIA regarding classified information.

**1.      These Records Are Properly Withheld Notwithstanding That
the CIA Detention Program Is No Longer in Operation**

The fact that the CIA detention program is no longer in operation does not render

information about the program unclassified.  As the CIA Director explicitly stated:

> Although the program and the use of EITs have been discontinued, the United
> States is still engaged in extensive counterterrorism operations, including the
> questioning of terrorists.  The release of operational details regarding the
> implementation of the program would tend to reveal more generally the
> Government's approach to questioning terrorist suspects, and thus remain
> classified.

Declaration of Leon E. Panetta, dated September 21, 2009 ("Supp. Panetta Decl."), ¶ 6.  For this

reason, "much of the information regarding the CIA's terrorist detention and interrogation

program remains classified."  Id., ¶ 5; Declaration of Leon E. Panetta, dated June 8, 2009 ("First

Panetta Decl."), ¶¶ 10, 11.

The information that remains classified includes the precise information sought by these

plaintiffs here.  For example, plaintiffs seek "[d]escriptions of the implementation or application

---

Of course, to the extent the Court deems it appropriate, the Government will produce these
documents to the Court for in camera review.

6

of interrogation techniques, and details of specific interrogations where EITs . . . were applied."

Pls. Opp. at 5 (internal quotes and citations omitted).  The Director has made clear that such

operational information remains classified:

> Operational details regarding the CIA's former interrogation program -- that is,
> information regarding how the program was actually implemented -- also remain
> classified, as do descriptions of the implementation or application of interrogation
> techniques, including details of specific interrogations where Enhanced
> Interrogation Techniques (EITs) were used (excepting such general information
> that has been released to date on these topics).

Supp. Panetta Decl., ¶ 6.  Such historical information about the CIA's interrogation activities

would no doubt provide insight into the strategies and approaches to be used by the United States

in future interrogations.  See First Panetta Decl., ¶ 11 ("The information in these documents

would provide future terrorists with a guidebook on how to evade such questioning."); id., ¶ 6

(withholding information concerning intelligence methods "that would permit terrorists to evade

questioning").

Similarly, plaintiffs' request for the names of CIA employees, contractors and consultants

involved in the interrogation program seeks information that remains classified.  See Pls. Opp. at

5 (seeking identification of CIA interrogation contractors and consultants); Supp. Panetta Decl., ¶

6 ("the identities of CIA employees, contractors, and consultants involved in the interrogation

program remain classified."); First Panetta Decl., ¶ 8 ("disclosing the identities of CIA

employees and others involved in clandestine counterterrorism operations could place those

individuals, as well as their families and friends, at grave risk from extremists seeking

retribution").

The considered judgment of the agency regarding the classified status of the requested information is, of course, entitled to substantial deference.  Although courts review de novo an agency's withholding of information pursuant to a FOIA request, "de novo review in FOIA cases is not everywhere alike."  Assoc. of Retired R.R. Workers, Inc. v. U.S.R.R. Ret. Bd., 830 F.2d 331, 336 (D.C. Cir. 1987).  In other words, while de novo review provides for "an objective, independent judicial determination," courts nonetheless defer to an agency's determination in the national security context in acknowledgment that "the executive ha[s] unique insights into what adverse affects might occur as a result of public disclosure of a particular classified record."  Ray v. Turner, 587 F.2d 1187, 1194 (D.C. Cir. 1978).  Accordingly, "in the context of national security concerns, courts must accord substantial weight to an agency's affidavit concerning the details of the classified status" of a particular record.  Wolf v. CIA, 473 F.3d 370, 374 (D.C. Cir. 2007) (quotation marks omitted); see also Diamond v. FBI, 707 F.2d 75, 79 (2d Cir. 1983).  "The court is not to conduct a detailed inquiry to decide whether it agrees with the agency's opinions; to do so would violate the principle of affording substantial weight to the expert opinion of the agency."  Halperin v. CIA, 629 F.2d 144, 148 (D.C. Cir. 1980); see Fitzgibbon v. CIA, 911 F.2d 755, 766 (D.C. Cir. 1990) (disapproving the district court's use of "its own calculus as to whether or not harm to the national security or to intelligence sources and methods would result from disclosure").

Thus, absent evidence of bad faith, where the Court has enough information to understand why an agency classified information, it should not second-guess the agency's facially reasonable classification decisions.  See Frugone v. CIA, 169 F.3d 772, 775 (D.C. Cir. 1999) (because "courts have little expertise in either international diplomacy or

8

counterintelligence operations, we are in no position to dismiss the CIA's facially reasonable concerns" about the harm that disclosure could cause to national security); <u>Wolf v. CIA</u>, 357 F. Supp. 2d 112, 116 (D.D.C. 2004) (in reviewing classification decision, "little more" is required "than a showing that the agency's rationale is logical"), <u>aff'd in part</u>, 473 F.3d 370 (D.C. Cir. 2007).

Indeed, the records and information in question at issue in this motion are among the most sensitive in the possession of the CIA.  Of the 65 documents at issue, 57 are records generated during the course of CIA operations, or their equivalent.   The vast majority of these 57 operational records are cables, which are "the most contemporaneous documents the CIA possesses concerning these [detainee] interrogations."  Supp. Panetta Decl., ¶ 3.  As the Director has testified, release of any portion of these 57 operational records "would, among other things, cause exceptionally grave damage to clandestine human intelligence collection and foreign liaison relationships."  Suppl. Decl., ¶ 4.   As the United States is still engaged in extensive counterterrorism operations, the release, even in redacted form, of contemporaneous records generated during the course of counterterrorism operations, or their equivalent:

> would lead our allies, liaison partners and potential human sources to perceive that the CIA is unable to keep secret even its most sensitive records regarding its clandestine operations.  Such a perception, and the loss of trust it would engender, would do lasting damage to the CIA's ability to gather intelligence or conduct clandestine operations.

Supp. Panetta Decl., ¶ 7.  As the Director notes, the CIA "rarely releases operational documents, particularly operational cables . . . [and such a release would] rarely occur close in time to the operations in question or when the United States is still engaged in operations of the same or similar type."  <u>Id.</u>, ¶ 7.

For all these reasons, the operational information here is clearly entitled to protection under exemptions 1 and 3 of FOIA.  See, e.g., CIA v. Sims, 471 U.S. 159, 168-69 (1985) (CIA's discretion in determining what would constitute an unauthorized disclosure of intelligence sources and methods is "very broad."); Hunt v. CIA, 981 F.2d 1116, 1120 (9th Cir. 1992) (describing CIA's discretion to withhold information under Exemption 3 as "a near-blanket FOIA exemption"); Arabian Shield Dev. Co. v. CIA, No. 3-98-CV-0624-BD, 1999 WL 118796, at *4 (N.D. Tex. Feb. 26, 1999) (the CIA's determination of what would "lead to the unauthorized disclosure of intelligence sources and methods" is "almost unassailable"); Azmy v. U.S. Dep't of Defense, 562 F. Supp. 2d 590, 600 (S.D.N.Y. 2008) (techniques and plans used in questioning detainees is properly withheld as intelligence method).

Plaintiffs repeatedly cite to information released in OLC memoranda as a basis for releasing the information requested here.  See Pls. Opp. at 14-19.  But the Director of the CIA has made the considered judgment that there is an important distinction between the information released by the Government on this topic and the information sought here by plaintiffs:

> As the Court knows, on April 16, 2009, the President of the United States declassified and released in large part Department of Justice, Office of Legal Counsel (OLC) memoranda analyzing the legality of specific Enhanced Interrogation Techniques (EITs).  As the Court also knows, some of the operational documents currently at issue contain descriptions of EITs being applied during specific overseas interrogations.  These descriptions, however, are of EITs as applied in actual operations, and are of a qualitatively different nature than the EIT descriptions in the abstract contained in the OLC memoranda.

First Panetta Decl., ¶ 10.  The Director's latest declaration further explains the distinction between the information released on this subject as compared with the operational documents now before the Court:

In withholding the operation records in their entirety, I took into account the prior release on April 16, 2009 of declassified memoranda of the Department of Justice Office of Legal Counsel, and that there would be future releases of non-exempt information pertaining to CIA interrogations, such as the recent release on August 24, 2009.  While the Government released certain information regarding the CIA's activities on those two dates - and will continue to release non-exempt information relevant to this topic when possible, consistent with national security - much of the information regarding the CIA's terrorist detention and interrogation program remains classified.  Moreover, none of the documents released on August 24, 2009 or April 16, 2009 were records generated during the course of CIA operations, or their equivalents, like the 57 operations records at issue (as contrasted with non-operational documents such as policy analysis, legal guidance or even finished intelligence products).

Supp. Panetta Decl., ¶ 5.

Moreover, it is well established that the release of some information on a particular topic by the Government does not mandate the release of all information.  As a district court in the District of Columbia recently explained:

[Just] because information about [a discontinued program] has become publicly available there is [no] reason to be skeptical of DOJ's assertion that releasing the withheld documents would harm national security. To the contrary, just because some information about the [the program] has become public, it does not follow that releasing the documents poses any less of a threat to national security.

Electronic Privacy Information Center, 584 F. Supp. 2d 65, 71 (D.D.C. 2008) (upholding classified status of documents regarding the Terrorism Surveillance Program, notwithstanding that the program had been discontinued).  See Assassination Archives and Research Center v. CIA, 334 F.3d 50, 60 (D.C. Cir. 2003) ("Even if [the ambassadors's] testimony effected 'partial disclosures of classified information' contained in the requested documents, . . . those disclosures did not result in waiver because they did not precisely track the records sought to be released." (quoting Public Citizen v. Dep't of State, 11 F.3d 198, 203 (D.C. Cir. 1993))); Wolf, 473 F.3d at 378 (reaffirming rule in Fitzgibbon and necessity of an "insistence on exactitude" when

considering claim of waiver of national security information); <u>Salisbury v. United States</u>, 690

F.2d 966, 971 (D.C. Cir. 1982) ("The fact of disclosure of a similar type of information in a

different case does not mean that the agency must make its disclosure in every case."); <u>see also</u>

<u>Sims</u>, 471 U.S. at 178 (cautioning that "bits and pieces of data" "may aid in piecing together bits

of other information even when the individual piece is not of obvious importance in itself")

(quotation omitted); <u>cf.</u> <u>Ctr. for Nat'l Security Studies v. U.S. Dep't of Justice</u>, 331 F.3d 918,

930-31 (D.C. Cir. 2003) ("The disclosure of a few pieces of information in no way lessens the

government's argument that complete disclosure would provide a composite picture of its

investigation and have negative effects on the investigation.").  As the Seventh Circuit wisely

observed, the public is "better off under a system that permits [a Government agency] to reveal

some things . . . without revealing everything; if even a smidgen of disclosure required [the

agency] to [completely] open its files, there would be no smidgens."  <u>Bassiouni v. CIA</u>, 392 F.3d

244, 247 (7th Cir. 2004).

> **2.     Plaintiffs' Repeated Attempt to Seek Release Based on
>          Allegations of Illegality Should Be Rejected**

Plaintiffs seek to avoid the obviously classified nature of the information at issue in this

motion by broadly arguing that the information they seek pertains to unlawful conduct.  <u>See</u> Pls.

Opp. Br. at 11.  Plaintiffs' argument is misguided for several reasons.  As a threshold matter,

Plaintiffs' argument is inconsistent with their description of what they seek, which is not limited

to unlawful activity but instead is summarized broadly as descriptions of the application of all

interrogation techniques, without limitation.  Pls. Opp. at 5.  But even more importantly,

plaintiffs' allegations regarding the legality of the CIA's program is a separate and distinct

question from the issue of whether these documents are properly classified, which is a distinction

recognized by this Court and by the case law.

This Court has previously recognized the distinction between allegations of illegality and

the question of whether a document is properly withheld as secret.  See Transcript, January 17,

2008, at 82-84 (hearing on parties' third motion for summary judgment).  In that hearing on

documents withheld by the CIA under Exemptions 1 and 3, the Court specifically contemplated

this question:

> THE COURT:  In other words, if there was a frank concession of illegal conduct,
> not something that the Court has to infer or find or conclude, but somebody
> involved in interrogation or authorizing interrogation said, Look, I know it's
> [il]legal, I know it's torture; do it.  Something like that.
> MR. SKINNER:  Your Honor, even where there was some kind of finding of
> illegality within a document, that would not mean that the document itself was not
> otherwise properly classified.
> THE COURT:  What about this piece of the document.  The segregable portion of
> the document.
> MR. SKINNER:  Even this piece of the document identifying what was
> determined to be an improper technique would itself be properly classified, would
> be referred to proper authorities for investigation and action.  But the revelation of
> what has been determined to be improper would itself be useful information for
> our adversaries in determining what it is we do.  So even that piece could be
> properly withheld.
> THE COURT:  I understand.  I feel – and it would be improper for me to make a
> ruling now.  I'm going to do some in camera inspections.  But I would feel that
> you're correct that torture and improper interrogation techniques are fact-intensive
> and context-intensive.  And as long as there is a good-faith concern to maintain
> the secrecy of our investigative techniques, and that is a concern that has been
> reviewed by appropriate authorities within the CIA, with a conclusion that secrecy
> should extend to very top secret bases, it's not for me to say it's wrong.  I have to
> respect it and follow it.

Transcript, January 17, 2008, at 82-84 (emphasis added); see also Order dated Sept. 19, 2008

(granting, with very limited exceptions, Government's third summary judgment motion).

This Court's views are consistent with the case law on the subject on Exemption 3.  See,

13

e.g., Wilner v. NSA, No. 07 Civ. 3883 (DLC), 2008 WL 2567765, at *6 (S.D.N.Y. June 25,

2008) ("The Court need not address plaintiffs' substantive arguments concerning the [Terrorist

Surveillance Program's] legality, however, because the language of FOIA Exemption 3 and

Section 6 of the [National Security Agency Act of 1959] makes clear that the defendants

permissibly refused to disclose the information requested by plaintiffs."); People for the Am.

Way Found. v. NSA, 462 F. Supp. 2d 21, 31 (D.D.C. 2006) (potential illegality of activities

described in government records cannot be used as basis for challenging withholding of records

under Exemption 3); Navasky v. CIA, 499 F. Supp. 269, 274 (S.D.N.Y. 1980) ("[A] claim of

activities ultra vires the CIA charter is irrelevant to an exemption 3 claim.").

      The same is true under Exemption 1.  See, e.g., Lesar v. DOJ, 636 F.2d 472, 483 (D.C.

Cir. 1980) ("Although the FBI's surveillance of Dr. [Martin Luther] King strayed beyond the

bounds of its initial lawful security aim, that does not preclude the possibility that the actual

surveillance documents . . . may nevertheless contain information of a sensitive nature, the

disclosure of which could compromise legitimate secrecy needs."); Maxwell v. First Nat. Bank of

Maryland, 143 F.R.D. 590, 598 (D. Md. 1992) ("The Executive Order forbids classification of

information that involves violations of law, but is not a threat to national security."); Agee v.

CIA, 524 F. Supp. 1290, 1293 (D.D.C. 1981) (records that reveal evidence of illegal conduct by

CIA nonetheless were properly classified under prior version of E.O. and exempt from disclosure

under FOIA because information intertwined with national security information); cf. Bennett v.

DOD, 419 F. Supp. 663, 666 (S.D.N.Y. 1976) ("[E]ven assuming arguendo that the responsive

documents reveal such violations [of law], there is nothing in the FOIA, its legislative history, or

in Executive Order 11652 to suggest that information vital to the national security is not worthy

14

of protection solely because of the means employed to obtain it."); United States v. Abu

Marzook, 412 F. Supp. 2d 913, 923 (N.D. Ill. 2006) (rejecting argument that information had

been improperly classified to prevent embarrassment and to conceal Israel's use of illegal

interrogation methods because, inter alia, "there is simply no evidence that these materials [were]

classified merely to prevent embarrassment to Israel"); Wilson v. Dep't of Justice, Civ. A. No.

87-2415-LFO, 1991 WL 111457, at *2 (D.D.C. June 13, 1991) ("even if some of the information

withheld were embarrassing to Egyptian officials, it would nonetheless be covered by Exemption

1 if, independent of any desire to avoid embarrassment, the information withheld were properly

classified").[4]

## II.    THE CIA PROPERLY WITHHELD INFORMATION CONTAINED IN EIGHT OF THE SAMPLE DOCUMENTS PURSUANT TO EXEMPTION 5

As explained in the Government's moving brief, the CIA has properly withheld

information contained within eight of the sampled documents under Exemption 5, which

exempts from disclosure "inter-agency or intra-agency memorandums or letters which would not

be available by law to a party . . . in litigation with the agency."  5 U.S.C. § 552(b)(5).  See Mov.

Br. at 23-30.  As described by Director Panetta and CIA Associate Review Officer Wendy

---

[4]      For a more complete discussion on whether intelligence operations no longer currently in use, or even those alleged to be unlawful, are subject to withholding under FOIA, we refer the Court to the Government's prior extensive briefing on these subjects.  See, e.g., Memorandum of Law in Support of Government's Third Motion for Partial Summary Judgment, filed June 8, 2007 [docket no. 239], at 51-61 (briefing, inter alia, withholding of information on DOD interrogation methods, including techniques no longer is use); Reply Memorandum of Law in Support of Government's Third Motion for Partial Summary Judgment, filed December 13, 2007 [docket no. 258], at 8-12 (responding, inter alia, to plaintiffs' claim that release of details of DOD interrogations would not compromise national security); Reply Memorandum of Law on Government's Fourth Motion for Partial Summary Judgment, filed July 17, 2009 [docket no. 364] (addressing plaintiffs' illegality argument as to details regarding CIA interrogations).

Hilton, the eight documents (28, 54, 56, 57, and 59-62) contain information reflecting intra-agency communications that is protected by the deliberative process privilege, and two of the eight documents (Documents 59 and 60) contain information that is also protected from disclosure as attorney work-product and attorney-client confidential communications.

### A.    Deliberative Process Privilege

As explained in the Government's moving brief, see Mov. Br. at 24-27, the CIA has established the three conditions necessary to invoke the deliberative process privilege:  the eight CIA records are inter-agency or intra-agency documents that are both predecisional and deliberative.[5]  Grand Central P'ship, Inc. v. Cuomo, 166 F.3d 473, 482 (2d Cir. 1999). A document is "predecisional" when it is "prepared in order to assist an agency decisionmaker in arriving at his decision."  Renegotiation Bd. v. Grumman Aircraft Engineering Corp., 421 U.S. 168, 184 (1975) (quoted in Hopkins v. U.S. Dept. of Housing and Urban Development , 929 F.2d 81, 84 (2d Cir. 1991), and Grand Central P'ship, 166 F.3d at 482).  This category of material includes "recommendations, draft documents, proposals, suggestions, and other subjective

---

[5]    See also Vaughn Entries 28 (five-page cable from the field to CIA headquarters regarding interrogation of Abu Zubaydah containing recommendations from CIA employees to their management on policy issues), 54 (three-page email attaching two-page draft statement regarding destroyed tapes reflecting comments on the draft statement), 56 (referring to attached four-page memorandum of CIA employee to his superiors concerning the destroyed videotapes reflecting preliminary recommendations and opinions of CIA employees), 57 (handwritten notes including proposed plans for future interrogations reflecting opinions and pre-decisional recommendations of CIA employees), 59 (six pages of handwritten notes of CIA employee discussing the interrogation videos with a CIA attorney reflecting predecisional deliberations), 60 (five-page memorandum for the record relating to the content of destroyed videotapes containing pre-decisional information pertaining to policy and legal guidance), 61 (four-page memorandum of CIA employee regarding destroyed videotapes containing predecisional recommendations and opinions of CIA employees), 62 (forty-seven pages of handwritten notes from a review of the videotapes written in the field containing predecisional deliberations).

documents which reflect the personal opinions of the writer rather than the policy of the agency."
Grand Central P'ship, 166 F.3d at 482 (citation and quotation marks omitted).

      While a document is necessarily predecisional if it "precedes, in temporal sequence, the 'decision' to which it relates," see id., the government need not "point to a specific decision" made by the agency to establish the predecisional nature of a particular record. Tigue v. U.S. Dept. of Justice, 312 F.3d 70, 80 (2d Cir. 2002). Rather, so long as the document "was prepared to assist [agency] decisionmaking on a specific issue," it is predecisional. Id. at 80; see also Moye, O'Brien, O'Rourke, Hogan, & Pickert v. National R.R. Passenger Corp., 376 F.3d 1270, 1280 (11th Cir. 2004) ("Amtrak need not cite to a specific policy decision in connection with which the audit work papers and internal memoranda were prepared in order for these documents to be protected from disclosure by the deliberative process privilege."). As the Supreme Court explained, the "emphasis on the need to protect pre-decisional documents does not mean that the existence of the privilege turns on the ability of an agency to identify a specific decision in connection with which a memorandum is prepared. Agencies are, and properly should be, engaged in a continuing process of examining their policies; this process will generate memoranda containing recommendations which do not ripen into agency decisions; and the lower courts should be wary of interfering with this process." NLRB v. Sears, Roebuck & Co., 421 U.S. 132, 151 n.18 (1975).

      "A document is 'deliberative' when it is actually . . . related to the process by which policies are formulated." Grand Central P'ship, 166 F.3d at 482 (citation and quotation marks omitted; alteration in original); see also New York Public Interest Research Group v. EPA, 249 F. Supp. 2d 327, 337 (S.D.N.Y. 2003) ("A record is deliberative when 'it reflects the

17

give-and-take of the consultative process.'") (quoting <u>Wolfe v. HHS</u>, 839 F.2d 768, 774 (D.C. Cir. 1988) (en banc)) (citation and quotation marks omitted).  The Second Circuit has defined "deliberative" as "indicative of the agency's thought processes."  <u>Local 3, Intern. Broth. of Elec. Workers, AFL-CIO v. NLRB</u>, 845 F.2d 1177, 1180 (2d Cir. 1988).  In determining whether a document is deliberative, courts inquire as to whether it "formed an important, if not essential, link in [the agency's] consultative process," <u>Grand Central P'ship</u>, 166 F.3d at 483, whether it reflects the opinions of the author rather than the policy of the agency, <u>id.</u> at 483; <u>Hopkins</u>, 929 F.2d at 84, and whether it might "reflect inaccurately upon or prematurely disclose the views of [the agency]," <u>Grand Central P'ship</u>, 166 F.3d at 483.

In response to questions raised by plaintiffs, <u>see</u> Pls. Opp.at 33-35, Ms. Hilton has provided further descriptive information to demonstrate that the eight CIA documents are both predecisional and deliberative.  According to Ms. Hilton, documents 28 and 57 contain "impressions" and the "deliberations and recommendations of CIA officers during the interrogation of Abu Zubaydah" and "do not reprsent official policy guidance generated by CIA management."  Declaration of Wendy M. Hilton, dated September 19, 2009 ("Hilton Decl."), ¶ 9; <u>see also</u> <u>id.</u> ¶ 10 (describing document 28 as containing "the recommendations of CIA officers" that were "conveyed to CIA Headquarters" and that the "experience of the CIA officers contained in this document was but one of the many factors considered by CIA management as part of the constantly evolving CIA program").  With respect to document 54, Ms. Hilton has further elaborated that it contains the "impressions, reactions, and comments of an OIG investigator to a <u>proposed</u> 2007 statement by the [Director of the CIA] regarding the destruction of the 92 interrogation videotapes."  <u>Id.</u> ¶ 13 (emphasis added).  She also explains that the investigator

authored document 54 when his management "solicited his comments as part of a broader coordination of the [Director's] statement within the CIA prior to the statement's release."  Id.

Regarding documents 56, 59, 61, and 62, Ms. Hilton has further explained that these documents "reflect the impressions and deliberations of OIG officers as they determine what facts were relevant, what avenues of inquiry they should pursue, and what importance their impressions of the facts, combined with their understanding of the relevant law and policy, should have for the review as it goes forward."  Id. ¶ 11.  Ms. Hilton further confirms that the impressions contained in documents 56, 59, 61, and 62 all predate the "drafting and publication of the OIG's 2004 report and were part of the myriad sources of information the OIG analyzed before drafting its report."  Id.  Finally, with respect to document 60, Ms. Hilton explains that it contains the "analysis and impressions of a CIA attorney shortly after the [a]ttorney's review of the interrogations of subsequently destroyed videotapes, as well as the relevant cable traffic" and it "reflects the CIA Attorney's view on what facts were relevant to determine whether the interrogation of Abu Zubaydah was compliant with law and policy, as well as what information would be informative to CIA management in improving the program going forward."  Id. ¶ 12. For these reasons, the eight CIA documents are deliberative and predecisional, and thus properly withheld under Exemption Five.

Plaintiffs' allegations that information within these eight documents should be released as adopted agency policy, "working" law, or "secret" law, Pls. Opp. at 33-35,  skips a crucial part of the analysis -- i.e., what role did the documents or withheld information play in the larger decision-making process.  See Coastal States Gas Corp. v. Dept. of Energy, 617 F.2d 854, 867 (D.C. Cir. 1980) (whether a document is entitled to protection under Exemption 5 is "dependent

upon the individual document and the role it plays in the administrative process"); see also Sears, 421 U.S. at 138 ("[C]rucial to the decision of this case is an understanding of the function of the documents in issue in the context of the administrative process which generated them.").  As discussed supra, Ms. Hilton has provided additional descriptive information with respect to the eight documents at issue and the role each played in the agency's deliberations sufficient to establish that the documents are both deliberative and predecisional.  Further, Ms. Hilton also confirms that the CIA did not "publicly adopt or cite any of these documents as the reason why the CIA pursued a certain policy."  Hilton Decl. ¶ 14.

Along with their failure to appreciate the role each of these eight documents played in the deliberative process, plaintiffs provide no evidence that the CIA has actually adopted or incorporated by reference the documents at issue here, and the Second Circuit has held that "mere speculation will not suffice."  National Council of La Raza v. Dep't of Justice, 411 F.3d 350, 359 (2d Cir. 2005) (emphasis added).   The doctrine of adoption, first articulated by the Supreme Court in Sears, limits the deliberative process privilege under very limited circumstances:

> [I]f an agency chooses expressly to adopt or incorporate by reference an entire intra-agency memorandum previously covered by Exemption 5 in what would otherwise be a final opinion, that memorandum may be withheld only on the ground that it falls within the coverage of some exemption other than Exemption 5.

421 U.S. at 161 (emphasis added); see also La Raza, 411 F.3d at 356.  As the Court explained:

> The public is only marginally concerned with reasons supporting a policy which an agency has rejected, or with reasons which might have supplied, but did not supply, the basis for a policy which was actually adopted on a different ground.  In contrast, the public is vitally concerned with the reasons which did supply the basis for an agency policy actually adopted.  These reasons, if expressed within

the agency, constitute the "working law" of the agency . . . .

Sears, 421 U.S. at 152-53; see also La Raza, 411 F.3d at 360.

Therefore, a document does not lose the protection of the deliberative process privilege unless the decisionmaker adopts its reasoning. Sears, 421 U.S. at 161 (explaining that a document may lose deliberative process protection if a decisionmaker "chooses expressly to adopt or incorporate [it] by reference"); La Raza, 411 F.3d at 358 ("Mere reliance on a document's conclusions does not necessarily involve reliance on a document's analysis; both will ordinarily be needed before a court may properly find adoption or incorporation by reference."). Thus, "where an agency, having reviewed a subordinate's non-binding recommendation, makes a 'yes or no' determination without providing any reasoning at all, a court may not infer that the agency is relying on the reasoning contained in the subordinate's report." Id. at 359. "Courts have similarly honored the deliberative process privilege where an agency has only casually referred to a document, because a casual reference to a privileged document does not necessarily imply that an agency agrees with the reasoning contained in those documents." Id., 411 F.3d at 359; see also Tigue, 312 F.3d at 81 (holding that two minor references to a document protected by the deliberative process privilege were insufficient to establish adoption or incorporation); Access Reports v. DOJ, 926 F.2d 1192, 1197 (D.C. Cir. 1991) (one "confused statement" that might have been a reference to the document at issue "fell far short of the express adoption required by Sears") (emphasis in original).

In this case, plaintiffs have offered nothing but sheer speculation on this question, and the agency itself has affirmed that the documents were not incorporated or adopted; accordingly, it is clear that the CIA is entitled to the protections afforded by the deliberative process privilege.

21

See, e.g., Tax Analysts v. IRS, 294 F.3d 71, 72, 81 (D.C. Cir. 2002) (considering intra-agency memoranda from IRS Office of Chief Counsel but explaining that "documents that represent the final legal position of the [IRS's Office of Chief Counsel] and travel upward — for example, memoranda to the Commissioner of Internal Revenue advising him on legal issues — may still be part of the agency's deliberative process and thus fall within Exemption 5"); Brinton v. Dep't of State, 636 F.2d 600, 604 (D.C. Cir. 1980) ("[t]here can be no doubt that . . . legal advice, given in the form of intra-agency memoranda prior to an agency decision on the issues involved, fits exactly within the deliberative process rationale . . . ."); Sterling Drug Inc. v. Federal Trade Commission, 450 F.2d 698, 705-08 (D.C. Cir. 1971) (remanding to district court to determine whether memoranda issued by the Commission as a whole contains releasable information with respect to its final decision to approve a merger of two companies, but withholding memoranda prepared by Commission staff and individual Commission members as deliberative).

_____Also contrary to plaintiffs' allegations that the CIA failed to segregate purely factual information in these eight documents, see Pls. Opp. at 32, Ms. Hilton and Director Panetta have confirmed that segregability is not possible as a result of the classified information contained within and the operational nature of these eight documents, see First Panetta Decl. ¶ 14, and because "any revelation of the facts would also serve to reveal the pre-decisional analysis and recommendations of the CIA officer, frustrating FOIA's intent to preserve such analysis from disclosure," Hilton Decl. ¶ 15.   See, e.g., Lead Indus. Assoc., Inc. v. Occupational Safety Health Admin., 610 F.2d 70, 85 (2d Cir. 1979) (explaining that factual discussion in reports that were stated to be based on facts in the record, and included tabular or graphic summaries thereof, were "no less a part of the deliberative process" and "their disclosure would compromise the

confidentiality of deliberative information.") (internal citation and quotation omitted)); Hamilton

Sec. Group Inc. v. Dep't of Hous. and Urban Dev., 106 F. Supp. 2d 23, 33 (D.D.C. 2000)

(holding that even purely factual material is protectible if the deliberative process is revealed by

the manner that the facts are selected or presented).

　　For all of these reasons, the CIA has properly withheld documents 28, 54, 56, 57, and 59-

62 pursuant to the deliberative process privilege.

## B.　Attorney-Client Privilege

　　Documents 59 and 60 contain information that is also covered by the attorney-client

privilege.  See Mov. Br. at 27-28; First Panetta Decl., ¶¶ 13, 37; Hilton Decl. ¶¶ 16-17.  "To

invoke the attorney-client privilege, a party must demonstrate that there was (1) a communication

between client and counsel, which (2) was intended to be and was in fact kept confidential, and

(3) made for the purpose of obtaining or providing legal advice."  United States v. Constr. Prods.

Research, Inc., 73 F.3d 464, 473 (2d Cir. 1996).  Contrary to plaintiffs' allegation, see Pls. Opp.

at 36, the CIA has established that these two documents are properly withheld pursuant to the

attorney-client privilege.

　　Ms. Hilton has confirmed that the communications between the CIA attorney and his

client were "made with the expectation that they would remain confidential and have remained

confidential" and "reflect[] the legal opinions and advice of a CIA attorney, provided to and at

the request of the CIA, the client, regarding the legality of certain activities."  Hilton Decl. ¶ 16.

Moreover, Ms. Hilton has confirmed that none of the information that has been withheld

pursuant to the attorney-client privilege is segregable:

23

> [T]here are no segregable, otherwise releasable facts contained in the documents.
> The confidential, candid communications between the CIA attorney and his client
> were and are an essential part of the dialog between attorney and client, which
> framed and shaped the attorney's advice.  If this type of information was disclosed
> it would likely chill future communications between client-agencies and their
> attorneys, depriving the agencies of the full and frank counsel of their attorneys
> and frustrating FOIA's intention to protect such communications from disclosure.

Hilton Decl. ¶ 17.[6]  Because CIA employees were dealing with their "attorneys as would any

private party seeking advice," Coastal States Gas Corp., 617 F.2d at 863, the withheld

information from Documents 59 and 60 is protected by the attorney-client privilege and was

properly withheld under Exemption 5.[7]

### C.    Attorney Work Product Doctrine

Finally, Documents 59 and 60 also contain information that was properly withheld under

the attorney work product doctrine.  See Mov. Br. at 28-30.  The attorney work product doctrine

exempts from disclosure "mental impressions, conclusions, opinions, or legal theories of an

attorney or other representative of a party concerning the litigation," see Fed. R. Civ. P. 26(b)(3),

and prepared "in anticipation of litigation," A. Michael's Piano Inc. v. FTC, 18 F.3d 138, 146 (2d

Cir. 1994).  The "anticipation of litigation" element is satisfied where, "in light of the nature of

the document and the factual situation in the particular case, the document can fairly be said to

have been prepared or obtained because of the prospect of litigation."  United States v. Adleman,

---

[6]    As already discussed, such factual information is also properly withheld under the
deliberative process privilege, see supra Section II. A.

[7]    To the extent that plaintiffs also allege that the withheld information was "adopted or
incorporated as policy or into practice," see Pls. Opp. at 37, this argument should be rejected for
the same reasons discussed above under the deliberative process privilege, see supra Section II.
A.

134 F.3d 1194, 1202 (2d Cir. 1998).

Contrary to plaintiffs' position that the CIA failed to meet its burden to show that these two documents were prepared in anticipation of litigation, see Pls. Opp. at 37, Ms. Hilton has confirmed that documents 59 and 60 were created in "anticipation of both criminal and civil litigation." Hilton Decl. ¶¶ 18-19. As further explained by Ms. Hilton,

> Throughout the CIA's terrorist interrogation program the CIA was concerned that its officers could face civil and criminal liability for their actions. The CIA directed its attorneys to review the record of the first interrogations to ensure that they were conducted with the Department of Justice's guidance, which could arguably provide a defense to possible domestic and international criminal and civil liability. Therefore, while the CIA attorneys may have performed their analysis to determine legal and policy compliance, that analysis was in the context of evaluating possible defenses for anticipated civil and criminal litigation.

Hilton Decl. ¶ 19. The CIA need not identify a particular proceeding it had in mind in order to claim the protection of the attorney work product doctrine. "[A] document may be protected even if it was 'created prior to the event giving rise to litigation' because '[i]n many instances, the expected litigation is quite concrete, notwithstanding that the events giving rise to it have not yet occurred.'" In re Grand Jury Proceedings, No. M-11-189 (LAP), 2001 WL 1167497, at *13 (S.D.N.Y. Oct. 3, 2001) ("[a] document is prepared in anticipation of litigation if there is the threat of some adversary proceeding."); see also Rexford v. Olczak, 176 F.R.D. 90, 91 (W.D.N.Y. 1997) (courts look to whether, at the time the materials were created, the party asserting the privilege believed that "litigation was likely and whether that belief was reasonable") (quotation omitted); Gulf Islands Leasing, Inc. v. Bombardier Capital, Inc., 215 F.R.D. 466, 475 (S.D.N.Y. 2003) (same). Thus, documents may be considered work product when created with the reasonable belief of future litigation. See, e.g., Upjohn Co. v. U.S., 449

U.S. 383, 388, 397 (1981); <u>A.I.A. Holdings, S.A. v. Lehman Bros.</u>, No. 97 Civ. 4978, 2002 WL

31556382, at *6-*7 (S.D.N.Y. Nov. 15, 2002).

Given the CIA's unrebutted, reasonable subjective belief that litigation would follow the

inception of its terrorist interrogation program, it has established that the withheld information in

Documents 59 and 60 is protected by the attorney work product doctrine.

## III.    THE CIA PROPERLY RELIED UPON EXEMPTION 6 TO WITHHOLD NAMES AND IDENTIFYING INFORMATION OF CIA CONSULTANTS AND CONTRACTORS

The CIA has properly withheld the names and other identifying information of CIA

employees and employees of other federal agencies involved in clandestine counterterrorism

operations.[8]  As explained in the Government's moving brief, Exemption 6 protects "personnel

and medical files and similar files the disclosure of which would constitute a clearly unwarranted

invasion of personal privacy."  5 U.S.C. § 552(b)(6); <u>see</u> Mov. Br. at 31-33.  In their opposition,

plaintiffs challenge only the Government's withholding of names and identifying information of

CIA consultants and contractors.  Pls. Opp. at 38.  Plaintiffs' challenge is meritless as the CIA

has not officially disclosed the names of the consultants and contractors affiliated with the CIA's

interrogation program.

As an initial matter, plaintiffs incorrectly state that the names of contractors and

consultants involved with the CIA's program have been "officially acknowledged and subject to

significant debate."  Pls. Opp. at 38.  In her declaration, Ms. Hilton explains that the media

reports and plaintiffs' references to the 2008 Senate Armed Services Committee Report ("SASC

---

[8]    Of the 65 documents described in the CIA's <u>Vaughn</u> index, 62 of them contain names or identifying information of CIA employees or personnel involved in clandestine counterterrorism operations.  <u>See</u> First Panetta Decl. ¶ 8 n.1.

Report") do not constitute an official acknowledgment because they are not an official

communication from the Executive Branch.  See Hilton Decl. ¶ 21.  Further, Ms. Hilton confirms

that the CIA has not officially acknowledged the names or identifying information of consultants

or contractors affiliated with the CIA's program.  Hilton Decl. ¶¶ 21-22 .

       Plaintiffs also incorrectly conclude that in light of the SASC Report and media coverage,

disclosure of the names and identifying information could not constitute an "unwarranted

invasion of personal privacy."  Pls. Opp. at 39.  Plaintiffs completely fail to acknowledge that

"only the individual whose informational privacy interests are protected by Exemption 6 can

effect a waiver of those privacy interests."  Sherman v. U.S. Dep't of the Army, 244 F.3d 357,

363-64 (5th Cir. 2001) ("the fact that otherwise private information at one time or in some way

may have been placed in the public domain does not mean that a person irretrievably loses his or

her privacy interest in the information"); see Edmonds v. FBI, 272 F. Supp. 2d 35, 53 (D.D.C.

2003) (holding that FBI could withhold agent names under Exemption 6 despite the fact that

"names of several persons have already been identified in the media" because such disclosure

"does not lessen their privacy interest" or "defeat the exemption"); see also Dep't of Justice v.

Reporters Comm. for Freedom of the Press, 489 U.S. 749, 762-63 (1989) (just because "an event

is not wholly private does not mean that an individual has no interest in limiting disclosure or

dissemination of the information"); Kimberlin v. Dep't of Justice, 139 F.3d 944, 949 (D.C. Cir.

1998) (official's statement to the press that he was investigated and disciplined did not waive his

privacy interests for FOIA purposes); Bast v. United States Dep't of Justice, 665 F.2d 1251, 1255

(D.C. Cir. 1981) ("publicity in the popular media cannot vitiate the FOIA privacy exemption").

       As Ms. Hilton explains, the individuals associated with the program "have a strong

interest in retaining their privacy."  Hilton Decl. ¶ 22; see also First Panetta Decl. ¶ 38.  Because

there has been no official acknowledgement by the CIA of these individuals' identities, and only

the individuals themselves may waive their privacy interests under Exemption 6, the CIA

properly withheld their names and identifying information.

<u>**CONCLUSION**</u>

For the foregoing reasons, and the reasons set forth in the Government's opening brief,

the Court should grant the CIA's fifth motion for summary judgment.

Dated: New York, New York
       September 22, 2009

        Respectfully submitted,

        PREET BHARARA
        United States Attorney for the
        Southern District of New York
        Attorney for Defendants

    By: <u>/s/ Sean H. Lane</u>
       SEAN H. LANE
       PETER M. SKINNER
       HEATHER K. McSHAIN
       Assistant United States Attorneys
       86 Chambers Street, 3rd floor
       New York, N.Y.  10007
       Tel.:  (212) 637-2696
       Email: sean.lane@usdoj.gov