UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------- x
AMERICAN CIVIL LIBERTIES UNION, et al.,       :
                                              :
                    Plaintiffs,               :          ELECTRONICALLY FILED
                                              :
            v.                                :          04 Civ. 4151 (AKH)
                                              :
DEPARTMENT OF DEFENSE, et al.,                :
                                              :
                    Defendants.               :
-------------------------------------------------------- x


**DEFENDANT CENTRAL INTELLIGENCE AGENCY'S MEMORANDUM OF LAW IN
OPPOSITION TO PLAINTIFFS' MOTION FOR CONTEMPT AND SANCTIONS**

PREET BHARARA
United States Attorney for the
Southern District of New York
Attorney for Defendants
86 Chambers Street, 3rd Floor
New York, New York 10007
Tel: (212) 637-2746/6559
Fax: (212) 637-2702
Email: tara.lamorte2@usdoj.gov

TARA M. La MORTE
AMY A. BARCELO
Assistant United States Attorneys
   – Of Counsel –

**Table of Contents**

Preliminary Statement. ................................................................................................ 1

Factual and Procedural Background. ........................................................................... 3

I.    Events Preceding Plaintiffs' Original Contempt Motion. ................................... 3

II.   The Department of Justice's Investigation and Plaintiffs' Motion
      for Contempt and Sanctions. ........................................................................... 7

Argument. .................................................................................................................... 11

I.    The Court's Civil Contempt Power. ................................................................. 11

II.   The CIA Has Worked Diligently and in Good Faith to Comply With
      This Court's Orders Designed to Remedy the Destruction of the Videotapes
      and Achieve the Purposes of FOIA ............................................................... 15

III.  The CIA's Interpretation of the Court's Orders Was Reasonable
      and in Good Faith. .......................................................................................... 21

      A.    It Was Reasonable for the CIA to Search and Process Only
            the OIG's Files. ..................................................................................... 22

      B.    It was Reasonable for the CIA to Consider Documents Viewed by OIG in
            Connection with the Special Review Not to Fall Within the Investigative
            Exception . ............................................................................................. 25

IV.   Plaintiffs' Other Requested Remedies Would Not Serve Any Remedial
      or Coercive  Purpose, Would Not Achieve the Purposes of FOIA, and
      Are Unworkable. ............................................................................................. 27

      A.    Discovery and Access to Classified Information. ................................. 28

      B.    Order to Show Cause as to Why Jose Rodriguez Should Not be Held in
            Contempt or Ordered to Pay Attorney's Fees. ..................................... 30

      C.    Additional Processing of Paragraph 4 Documents. .............................. 32

      D.    Attorney's Fees and Costs. .................................................................. 33

V.    Further Contempt Proceedings Are Unwarranted in Light of the Remedial
      Measures Being Implemented by the CIA . ..................................................... 34

A.  The CIA Is Implementing Remedial Policies and Procedures. ........................... 34

B.  The Court Need Not and Should Not Mandate the CIA-OIG to Conduct an Investigation for Purposes of Proposing Reforms to CIA's Document Procedures ......................................................................................... 36

Conclusion. ................................................................................................................ 38

## Table of Authorities

**CASES**                                                                  **PAGE**

*ACLU v. Department of Defense*,
    351 F. Supp. 2d 265 (S.D.N.Y. 2005)....................................................  passim

*Arieff v. Department of the Navy*,
    712 F.2d 1462 (D.C. Cir. 1983). ................................................... 28

*Armstrong v. Guccione*,
    470 F.3d 89 (2d Cir. 2006)..................................................... 17, 20

*Berger v. Heckler*,
    771 F.2d 1556 (2d Cir. 1985).............................................. 13, 14, 19

*Cadle Co. v. Schlictmann, Conway, Crowley & Hugo*,
    939 F. Supp. 90 (D. Ma. 1996). ................................................ 22

*Chao v. Gotham Registry, Inc.*,
    514 F.3d 280 (2d Cir. 2009)..................................................... 27

*Class v. Norton*,
    376 F. Supp. 496 (D. Conn.), *aff'd in part and rev'd in part on other grounds*,
    505 F.2d 123 (2d Cir. 1974)................................................. 14, 15

*Cobell v. Babbitt*,
    37 F. Supp. 2d 6 (D.D.C. 1999). ............................................  passim

*Consumer Federation of America v. United States Department of Agriculture*,
    539 F. Supp. 2d 225 (D.D.C. 2008). .......................................... 37

*Department of Navy v. Egan*,
    484 U.S. 518 (1988)............................................................ 29

*Dorfmont v. Brown*,
    913 F.2d 1399 (9th Cir. 1990). ............................................... 29

*Drywall Tapers, Local 1974 v. Local 530, Operative Plasterers International Association*,
    889 F.2d 389 (2d Cir. 1989), *cert. denied*, 494 U.S. 1030 (1990). ............................ 12, 21

*Guillot v. Garrett*,
    970 F.2d 1320 (4th Cir. 1992). ............................................... 29

*Halkin v. Helms*,
  598 F.2d 1 (D.C. Cir. 1978)................................................................. 29

*Hart Schaffner & Marx v. Alexander's Department Stores, Inc.*,
  341 F.2d 101 (2d Cir. 1965)............................................................... 12

*Hess v. New Jersey Transit Rail Operations, Inc.*,
  846 F.2d 114 (2d Cir. 1988).................................................. 12, 19, 26

*Inmates of the Allegheny County Jail v. Wecht*,
  901 F.2d 1191 (3d Cir. 1990).............................................................. 37

*International Longshoreman's Association v. Phila. Marine Trade Association*,
  389 U.S. 64 (1967)................................................................................ 11

*Internal Revenue Service v. Norton*,
  717 F.2d 767 (3d Cir. 1983)................................................................ 27

*In re Irving*,
  600 F.2d 1027 (2d Cir. 1979)............................................................. 17

*Kukui Gardens Corp. v. Holco Capital Group, Inc.*,
  675 F. Supp. 2d 1016 (D. Ha. 2009)................................................... 21

*Labor/Community Strategy Ctr. v. Los Angeles Metropolitan Transport Authority*,
  564 F.3d 1115 (9th Cir. 2009). .......................................................... 21

*Landmark Legal Foundation v. EPA*,
  272 F. Supp. 2d 70 (D.D.C. 2003). ............................. 14, 20, 31, 33

*Lemon v. Kurtzman*,
  411 U.S. 192 (1973)............................................................................. 15

*Milliken v. Bradley*,
  433 U.S. 267 (1977)............................................................................. 37

*Morley v. CIA*,
  508 F.3d 1108 (D.C. Cir. 2007). ....................................................... 23

*N.Y. State National Organization for Women v. Terry*,
  886 F.2d 1339 (2d Cir. 1989)..................................................... 13, 18

*Now v. Operation Rescue*,
  747 F. Supp. 772 (D.D.C. 1990). .......................................... 14, 20, 22

*Nye v. United States*,
    313 U.S. 33 (1941)................................................................................ 13, 17, 19

*Orleans Audubon Society v. Department of Interior*,
    Civ. A. No. 94-3510, 1996 WL 39436 (E.D. La. Jan. 31, 1996). ..................................... 22

*Paramedics Electromedicina Comercial, Ltd. v. GE Medical System Information Technologies, Inc.*,
    369 F.3d 645 (2d Cir. 2004)..................................................................... 12, 13

*People's Mojahedin Organization v. Department of State*,
    327 F.3d 1238 (D.C. Cir. 2003). ................................................................... 29

*Perez v. Danbury Hospital*,
    347 F.3d 419 (2d Cir. 2003)........................................................................ 11

*Pollard v. FBI*,
    705 F.2d 1151 (9th Cir. 1983). .................................................................... 29

*Project B.A.S.I.C. v. Kemp*,
    947 F.2d 11 (1st Cir. 1991)................................................................... passim

*SD Protection, Inc. v. Del Rio*,
    587 F. Supp. 2d 429 (E.D.N.Y. 2008). ........................................................ passim

*Reno v. Koray*,
    515 U.S. 50 (1995)................................................................................ 27

*Shady Records, Inc. v. Source Enterprises*, .
    351 F. Supp. 2d 64 (S.D.N.Y. 2004)............................................................ 18, 19

*Spallone v. United States*,
    493 U.S. 265 (1990)........................................................................... passim

*Sterling v. Tenet*,
    416 F.3d 338 (4th Cir. 2005). ..................................................................... 29

*Sullivan v. CIA*,
    992 F.2d 1249 (1st Cir. 1993)................................................................. 25, 26

*United States v. Ayer*,
    866 F.2d 571 (2d Cir. 1989).................................................................. 18, 19

*United States v. City of Yonkers,*
   856 F.2d 444 (2d Cir. 1988), *rev'd on other grounds,*
   *Spallone v. United States*, 493 U.S. 265 (1990)............................................................. 14

*United States v.  United Mine Workers of America,*
   330 U.S. 258 (1947)............................................................................... 12, 13, 18

## STATUTES

50 U.S.C. § 431(a). ........................................................................................... 6, 7

50 U.S.C. § 431(c). ........................................................................................... 7

50 U.S.C. § 431(c)(3) ........................................................................................... passim

50 U.S.C. § 431(f). ........................................................................................... 29

50 U.S.C. § 431(f)(2). ........................................................................................... 30

50 U.S.C. § 431(f)(1). ........................................................................................... 30

50 U.S.C. § 431(f)(5). ........................................................................................... 30

50 U.S.C.  §431(f)(6). ........................................................................................... 30

**Preliminary Statement**

Notwithstanding the substantial steps taken by the Central Intelligence Agency ("CIA" or "Agency") to rectify the destruction of videotapes of detainee interrogations – and the Agency's willingness to do even more – Plaintiffs maintain that the Court must, among other things, punish the Agency by finding it in contempt of court, and allow Plaintiffs to conduct discovery into highly classified and sensitive CIA records.  Plaintiffs' demands should be rejected, as they serve no remedial purpose in this Freedom of Information Act ("FOIA") case.

Civil contempt is an extraordinary and powerful remedy.  It is one of a number of sanctions that a court may impose, if necessary, to coerce compliance with its orders or compensate an injured party for violations of its orders.  In this case, the CIA has done everything it reasonably could do to fully fulfill the purposes of FOIA in light of the destruction of the videotapes.  The Agency worked diligently to reconstitute the destroyed videotapes by collecting and processing hundreds of documents reflecting the contents of the videotapes.  In addition, the Agency has processed hundreds of documents reflecting the reasons behind the destruction of the videotapes, and has made as much non-privileged information as possible available to the public.  These actions achieved the objective of Plaintiffs' FOIA request – access to non-exempt CIA information.  To make Plaintiffs completely whole – the very object of civil contempt – the CIA has also offered to compensate Plaintiffs for reasonable attorney's fees and costs associated with their contempt motion.  And finally, in addition to these significant efforts, the Agency is voluntarily implementing new policies and training requirements designed to enhance its record retention and preservation procedures.

In light of these substantial remedial efforts, no proper purpose would be served by further proceedings or a formal finding of contempt.  As this Court previously observed, labeling

the CIA with the "pejorative" term of contempt fulfills no function other than to punish the

Agency and generate a news headline.  Plaintiffs confirm this point in claiming that a finding of

contempt is necessary to "officially acknowledge and express disapproval of the CIA's conduct."

These goals represent an impermissible use of the civil contempt power, and thus Plaintiffs'

motion to hold the Agency in contempt should be denied.

Plaintiffs' assertion that a finding of contempt also "provide[s] a basis for civil sanctions"

misstates the law and contradicts their prior representations to this Court.  As Plaintiffs are well

aware, it has long been held that a finding of contempt is not a necessary predicate for imposition

of sanctions.  Indeed, this Court has already granted Plaintiffs' requested remedy to order the

CIA to assemble and process records reflecting the contents of the videotapes and the persons

and reasons behind their destruction.  The CIA has completed these difficult tasks promptly and

in accordance with the Court's orders.

Moreover, while the Court has stated that the CIA's failure to identify the destroyed

videotapes in response to Plaintiffs' FOIA request violated its orders concerning the Agency's

identification and processing obligations related to ordinarily exempt operational records, the

CIA's interpretation of the Court's orders and the relevant statute was not so unreasonable as to

justify the extraordinary finding of contempt.  The Agency's interpretation of the Court's orders

as requiring it to search and process documents actually present in the files of its Office of the

Inspector General ("OIG") was not unreasonable, even if it the Court's intent was not so limited.

Additionally, the violation of the Court's orders rests on the interpretation of an exception to an

exemption in a complicated statute for which there is sparse precedent.  Insofar as the CIA's

interpretation of the Court's orders was reasonable – even if, in the Court's view, incorrect –

contempt is not warranted.

Plaintiffs' remaining requested relief – which includes classified discovery; access to the withheld, classified paragraph 4 documents; collection of additional paragraph 4 documents; an order requiring Jose Rodriguez, a former high-level CIA official, to show cause as to why he should not be held in contempt; and attorney's fees unrelated to the contempt proceeding – should also be denied. Plaintiffs have not identified any remedial purposes that would be served by these overreaching demands, and it is patently improper to permit them to access sensitive and classified documents that the Agency withheld in this FOIA litigation. Indeed, Plaintiffs' requested relief would likely extend the contempt proceedings for years.

Finally, in addition to expending substantial effort to achieve compliance with the Court's remedial orders, the CIA has worked in good faith to develop new policies designed to enhance its record retention and preservation procedures. The CIA will train its attorneys on these new protocols, as well as the responsibilities and obligations that come with service as an attorney for the Government.

For these reasons, Plaintiffs' motion for contempt and additional sanctions should be denied.

## Factual and Procedural Background

### I.   Events Preceding Plaintiffs' Original Contempt Motion

In January 2003, the CIA-OIG initiated a special review of the CIA terrorist detention and interrogation program (the "Special Review"), with the aim of evaluating CIA detention and interrogation activities. (Declaration of Constance Rea dated January 10, 2008 ("Rea Decl.") (Dkt. No. 271) ¶ 11). That Special Review was not, however, initiated in response to an

allegation of wrongdoing by the CIA.  (*Id.*).  During the course of the Special Review, OIG learned of the existence of videotapes of the interrogations of detainees.  (*Id.* ¶ 12).  In May 2003, as part of the Special Review, OIG reviewed those videotapes at an overseas CIA facility, but did not take custody of the videotapes or make a copy of them for its files.  (*Id.* ¶ 13).  The Special Review was completed in May 2004, at which point OIG notified the Department of Justice and other relevant oversight authorities of the review's findings.[1]  (*Id.*).

Around the same time that OIG was completing the Special Review of the CIA terrorist detention and interrogation program, *i.e.*, by May 2004, the OIG had commenced an investigation into the allegations of impropriety in Iraq.  (Rea Decl. ¶ 15; Declaration of Mona B. Alderson dated November 9, 2004 (Dkt. No. 40) ¶ 5).  That investigation was not, however, aimed at the same activities that were the subject of the OIG Special Review initiated in January 2003.  (Rea Decl. ¶ 16).

On October 27, 2003, the American Civil Liberties Union sent a letter to the CIA containing a FOIA request on behalf of the Plaintiffs in this action.  (*See* Declaration of Scott A. Koch, dated October 15, 2004, (Dkt. No. 20) ("Koch Decl.") ¶ 14).  On May 25, 2004, counsel for Plaintiffs sent the CIA a letter containing a second FOIA request, which sought the same information covered in their October 7, 2003 request, as well as any additional records generated or obtained since the October 7, 2003 request.  (*Id.* ¶17).  On June 2, 2004, Plaintiffs filed this

_____

[1]  As is explained more fully in the Rea Declaration submitted in connection with the CIA's Memorandum of Law in Opposition to Plaintiffs' Motion for Contempt and Sanctions dated January 10, 2008, OIG performs various functions in addition to conducting special reviews, including conducting independent audits, inspections, and investigations relating to CIA programs and operations.  (Rea Decl. ¶¶ 5-6).  Each of these functions serve different purposes and follows different procedures.  (*Id.* ¶¶ 5-7).  Notably, a special review, unlike an investigation, is not initiated in response to a specific allegation of CIA impropriety.  (*Id.* ¶ 6).

lawsuit.

On September 15, 2004, the Court entered an Opinion and Order requiring the defendant

agencies, including the CIA, to "produce or identify" all documents responsive to Plaintiffs'

FOIA requests.  (Opinion and Order, dated September 15, 2004 ("September 15, 2004 Opinion

and Order") (Dkt. No. 16) at 4).  On November 10, 2004, the CIA moved for limited relief from

the Court's September 15, 2004 Opinion and Order, acknowledging the OIG's investigation into

allegations of impropriety in Iraq as well as that the investigation brought within the scope of

FOIA those operational files concerning the specific subject matter of that investigation that were

otherwise exempt from search and review under FOIA.  (*See* Memo. of Law in Support of the

Central Intelligence Agency's Application for Limited Relief from the September 15, 2004

Order, dated November 10, 2004 ("CIA Application for Limited Relief") (Dkt. No. 39), at 2-5).

Because OIG's investigation was ongoing, however, the CIA sought relief from its obligation

under the September 15, 2004 Opinion and Order to review and process operational and

investigative files until after the OIG investigation into improprieties in Iraq was complete.  The

CIA explained that such an undertaking would be unduly burdensome and contrary to Congress'

intent.  (*Id.* at 7-20).

On February 2, 2005, the Court denied the CIA's motion for limited relief.  *See ACLU v.*

*Dep't of Def.*, 351 F. Supp. 2d 265, 278 (S.D.N.Y. 2005) (the "February 2, 2005 Opinion and

Order").  Discussing OIG's investigation into allegations of impropriety in Iraq, the February 2,

2005 Opinion and Order further held that even if the CIA had satisfied the procedural

requirements for invoking the operational files exemption, it had not established that the

operational files at issue were not subject to FOIA, "at least to the extent documents have been

produced or gathered pursuant to the investigation." *Id.* at 272.  The Court explained its holding that because the OIG maintained documents it had received during its investigation in its files, "there can be no additional material burden in searching and reviewing the documents already in the OIG's files that are also responsive to plaintiffs' FOIA requests," *id.*, because "the search has already been made," *id*. at 274.

The February 2, 2005 Opinion and Order also recognized the difficulty the Court faced in interpreting the "seldom construed" CIA Information Act, including the Act's operational files exemption and the exception to that exemption for files "concerning the specific subject matter of an investigation" by, among others, the OIG, "for any impropriety, or violation of law, Executive Order, or Presidential directive, in the conduct of an intelligence activity." *Id.* at 267; *see also* 50 U.S.C. §§ 431(a), (c)(3).

On February 8, 2005, the CIA moved for a stay of the Court's February 2, 2005 Opinion and Order (*see* Memo. of Law in Support of the Central Intelligence Agency's Mot. for a Stay Pending Consideration of Appeal, dated February 8, 2005 (Dkt. No. 52), at 1), and on February 16, 2005, moved for partial reconsideration of the Court's February 2, 2005 Opinion and Order.

On February 18, 2005, the Court denied the CIA's motion for a stay.  (Order Denying Motion for a Stay, dated February 18, 2005 ("February 18, 2005 Order") (Dkt. No. 57)).  In that order, the Court held that the February 2, 2005 Opinion and Order was "limited in scope" and had required that "if the CIA satisfies the procedural requirements of 50 U.S.C. § 431(a), its obligation to search and review will extend, not to operational files, but only to relevant documents that have already been identified and produced to, or otherwise collected by, the CIA's Office of Inspector General."  (*Id.* at 2).

6

After hearing argument on the CIA's Partial Reconsideration Motion and requiring the CIA to submit additional evidence, on April 18, 2005, the Court held that the CIA had satisfied the procedural requirements to invoke the CIA Information Act's operational files exemption, 50 U.S.C. § 431(a).  (April 18, 2005 Opinion and Order (Dkt. No. 86) at 3).  The Court further held that, "in accordance with the remainder of the Court's February 2, 2005 Opinion and Order, the Central Intelligence Agency's 'obligation to search and review [extends], *not to operational files*, but only to relevant documents that have already been identified and produced to, or otherwise collected by, the CIA's Office of Inspector General.  *See* 50 U.S.C. § 431(c).'" (*Id.* (quoting February 18, 2005 Order) (emphasis added, brackets in original)).

On December 6, 2007, CIA Director Michael Hayden announced the destruction of the videotapes.  (Pls.' Br. at Ex. 47).

## II.   The Department of Justice's Investigation and Plaintiffs' Motion for Contempt and Sanctions

On December 8, 2007, the CIA-OIG and Department of Justice opened a preliminary inquiry into the CIA's destruction of the videotapes.  (Dkt. No. 270, Ex. B).  The CIA agreed to preserve any records or documents that would facilitate that inquiry.  (Dkt. No. 270, Ex. C).  On January 2, 2008, Attorney General Michael Mukasey announced the appointment of John H. Durham, then First Assistant United States Attorney for the District of Connecticut, to launch a full criminal investigation into the destruction by CIA personnel of the videotapes.  (Dkt. No. 270, Ex. D; *see* Rea Decl. ¶ 17).  Durham's investigation encompassed the review of whether any person obstructed justice, knowingly made materially false statements, or acted in contempt of court or Congress in connection with the destruction of the videotapes.  (See Dkt. No. 344).

On December 12, 2007, Plaintiffs moved the Court to hold the CIA in contempt and impose other sanctions for the CIA's destruction of the videotapes.  (Dkt. No. 254).  Plaintiffs sought, in addition to a finding of contempt, that the CIA process and produce records relating to the contents of the destroyed videotapes and the reasons for the destruction, as well as "limited discovery" and attorney's fees and costs.  (Dkt. Nos. 254, 266).

In light of Durham's overlapping criminal investigation, the Court deferred its consideration of Plaintiffs' motion, and stayed its order concerning production of information concerning the contents and destruction of the videotapes, until February 28, 2009.  (Order Regulating Proceedings, dated Aug. 20, 2008 (Dkt. No. 305); Order Deferring Consideration of Plaintiffs' Motion to Cite CIA for Contempt, dated Jan. 6, 2009 (Dkt. No. 326)).

Upon expiration of the stay and in anticipation of the Court ordering assembly and production of information relating to the destroyed videotapes, on March 2, 2009, the CIA informed the Court that it was compiling such records.  (Dkt. No. 330).  With respect to the Court's August 20, 2008 order to produce, *inter alia*, "any list of any summaries . . . regarding the videotapes, and of any reconstruction of the records' contents," the CIA explained that certain relevant information was classified and/or protected from disclosure by statute.  (Dkt. No. 331). The CIA thus proposed releasing a redacted, public version of these lists, and offered to make the classified lists available to the Court to help explain the records at issue.  (*Id*.).  Finally, in its March 2, 2009 submission to the Court, the CIA further disclosed – prior to release of the CIA-OIG Special Review – that ninety-two videotapes were destroyed.  (Dkt. No. 330).  The CIA enclosed a redacted inventory of the destroyed videotapes with its March 6, 2009 submission, and offered to make the unredacted inventory available to the Court.  (Dkt. No. 331).  On March

8

26, 2009, the Court reviewed a representative sample of documents and information pertaining to

the destroyed videotapes *ex parte* and *in camera*, and ordered the CIA to create a workplan to

process the material.  (*See* Order Regulating Proceedings, dated March 27, 2009 (Dkt. No. 336)).

    After reviewing materials relating to the destruction of the videotapes *ex parte* and *in*

*camera*, and considering the parties' submissions concerning the processing of this material, the

Court directed the CIA to assemble, and process for potential release, several categories of

information relating to the CIA's destruction of the videotapes.  On April 20, 2009, the Court

directed, among other things, that the CIA process the so-called "paragraph 3" and "paragraph 4"

documents.  (Dkt No. 339).  Paragraph 3 of the Court's order called for production of records

reflecting the content of the videotapes from the entire period of the tapes' existence.  Paragraph

4 of the Court's order required the CIA to produce documents that "describe the persons and

reasons behind" the destruction of the videotapes, from "April 1, 2002 through June 30, 2003" –

which represented "a period reasonably longer" than the period of the videotapes' existence.

(*Id*.).

    After the Court selected this time frame for the paragraph 4 documents, however, the CIA

informed the Court that the most relevant documents concerning the persons and reasons behind

the destruction of the videotapes were likely dated after that time period.[2]  (*See* Dkt. No. 369).

Accordingly, the Court also ordered the CIA to gather and process paragraph 4 documents

created during the period of June 1, 2005 to January 31, 2006, and to submit a Vaughn index.

(*See* Order dated July 30, 2009 (Dkt. No. 369); Order dated July 20, 2009 (Dkt. No. 365)).

_____

[2]  The videotapes were destroyed in November, 2005.  (Dkt. No. 270, Ex. A; Pls. Br. at
Ex. 44).

Plaintiffs never objected to the Court's order expanding the paragraph 4 time frame to include the period surrounding the destruction of the videotapes, nor have they ever shown cause to enlarge the paragraph 4 time frame, as required by the Court's order.  (*See* Order dated July 7, 2009 (Dkt. No. 358)).

The CIA identified thousands of potentially responsive paragraph 3 and paragraph 4 documents.  (*See* Dkt. Nos. 344, 358).  After consulting with Plaintiffs and further reviewing these documents, the CIA identified and processed approximately 580 responsive paragraph 3 documents, and created a sample set of 65 documents, a portion of which the Court reviewed *ex parte* during an *in camera* session.  (*See* Declaration of CIA Director Leon E. Panetta dated June 8, 2009 ¶ 3 (Dkt. No. 352)).  With respect to the paragraph 4 documents, the CIA identified and processed approximately 220 responsive documents (*see* Declaration of Wendy M. Hilton dated Jan 8, 2010 ¶ 4 & n.1 (attached as Ex. A to Declaration of Tara M. La Morte dated Apr. 18, 2011 ("La Morte Decl."))), and on April 15, 2010, released approximately 27 of these documents in part to Plaintiffs.[3]

The parties cross-moved for summary judgment as to the paragraph 3 documents, which were withheld in full under Exemptions 1 and 3 of the FOIA.  (*See* Order dated Oct. 1, 2010 (Dkt. No. 429)).  A majority of the sample set of paragraph 3 documents is comprised of

---

[3]  Plaintiffs spend a substantial portion of their brief characterizing the publicly-released paragraph 4 documents, notwithstanding their repeated admission that the Court could resolve their motion without factual development.  (*See, e.g.*, Jan. 17, 2008 Tr. at 25, 56, 58-59 (attached as Ex. B to La Morte Decl.); Aug. 18, 2008 Tr. at 2-3 (attached as Ex. C to La Morte Decl.); Pls.' Reply in Support of Motion for Contempt and Sanctions, at 3 (Dkt. No. 272).  In any event, while not relevant to resolution of Plaintiffs' motion, Plaintiffs' description of the public record at times mischaracterizes it.  (*Compare, e.g.*, Pls.' Br. at 26 and 27 n.23 *with* Pls.' Exs. 42, 2; *compare* Pls.' Br. at 5 *with* Pls.' Ex. 4 at 69, 73).

classified cables to CIA Headquarters from a covert overseas CIA facility where interrogations were being conducted.  Based upon the Government's submissions, including declarations by the Director of the CIA, Leon E. Panetta, the Court upheld all of the Government's withholding of these operational documents (*see id.*), and Plaintiffs have challenged the Court's ruling on appeal.

The parties have not filed motions for summary judgment as to the paragraph 4 records. Rather, on October 22, 2010, the parties stipulated that the Second Circuit's legal rulings on appeal will govern the Government's withholdings concerning the paragraph 4 documents, and the Court so-ordered the parties' stipulation on October 26, 2010.  (Dkt. No. 433).  Although Plaintiffs may have additional challenges to the withholdings taken on the paragraph 4 documents depending upon resolution of the appeal, "[l]itigation of the 'paragraph 4' records is stayed pending resolution of the appeal."  (*Id.*).

On November 9, 2010, the Department of Justice publicly announced that Durham had concluded that he would not pursue criminal charges for the destruction of the interrogation videotapes.  (*See* Dkt No. 445 (Order dated Dec. 21, 2010)).  However, portions of Durham's investigation are still ongoing.

## Argument

## I.    The Court's Civil Contempt Power

"The judicial contempt power is a potent weapon."  *Int'l Longshoreman's Ass'n v. Phila. Marine Trade Ass'n*, 389 U.S. 64, 76 (1967); *see also Project B.A.S.I.C. v. Kemp*, 947 F.2d 11, 16 (1st Cir. 1991).  Consequently, "a district court's contempt power is narrowly circumscribed." *Perez v. Danbury Hosp.*, 347 F.3d 419, 423 (2d Cir. 2003).

11

Civil contempt sanctions may be imposed only when the movant establishes by clear and convincing evidence that the opponent violated the district court's edict. *Hart Schaffner & Marx v. Alexander's Dep't Stores, Inc.*, 341 F.2d 101, 102 (2d Cir. 1965) (per curiam). Specifically, a movant must establish that (1) the order the opponent failed to comply with is clear and unambiguous; (2) the proof of noncompliance is clear and convincing; and (3) the opponent has not diligently attempted to comply in a reasonable manner. *Paramedics Electromedicina Comercial, Ltd. v. GE Med. Sys. Info. Techs., Inc.*, 369 F.3d 645, 655 (2d Cir. 2004).

As to the first requirement, courts have held that a clear and unambiguous order is one that leaves "no uncertainty in the minds of those to whom it is addressed," *Hess v. New Jersey Transit Rail Operations, Inc.*, 846 F.2d 114, 116 (2d Cir. 1988), causing the party to "be able to ascertain from the four corners of the order precisely what acts are forbidden," *Drywall Tapers, Local 1974 v. Local 530, Operative Plasterers Int'l Ass'n*, 889 F.2d 389, 395 (2d Cir. 1989), *cert. denied*, 494 U.S. 1030 (1990); *accord Project B.A.S.I.C.*, 947 F.2d at 17 ("For a party to be held in contempt, it must have violated a clear and unambiguous order that left no reasonable doubt as to what behavior was expected and who was expected to behave in the indicated fashion."); *id.* at 21 ("[N]o one may be punished, under our system of justice, for failing to conform his conduct to rules that he could not ascertain"). Thus, where an order contains, "any ambiguities or uncertainties" those ambiguities and uncertainties "must be read in a light favorable to the person charged with contempt." *Id.* at 16.

Importantly, a civil contempt action is a remedial sanction. Courts may properly impose civil contempt sanctions to achieve either of two ends: "to coerce the defendant into compliance with the court's order, and to compensate the complainant for losses sustained." *United States v.*

*United Mine Workers of Am.*, 330 U.S. 258, 303-04 (1947); *see also, e.g.*, *N.Y. State Nat'l Org. for Women v. Terry*, 886 F.2d 1339, 1352 (2d Cir. 1989) ("A civil contempt sanction may . . . serve either to coerce the contemnor into future compliance with the court's order or to compensate the complainant for losses resulting from the contemnor's past noncompliance."). Thus, "[t]he measure of the court's power in civil contempt proceedings is determined by the requirements of full *remedial* relief." *Berger v. Heckler*, 771 F.2d 1556, 1568 (2d Cir. 1985) (internal quotation marks omitted) (emphasis added).

Accordingly, as the Supreme Court and Second Circuit have repeatedly held, it is inappropriate to use civil contempt as a means to punish a party or to vindicate the authority of the court. *See, e.g.*, *United Mine Workers*, 330 U.S. at 304; *Nye v. United States*, 313 U.S. 33, 41-43 (1941) (distinguishing characteristic of civil contempt is that "the punishment is wholly remedial, serves only the purpose of the complainant, and is not intended as a deterrent to offenses against the public"); *Paramedics*, 369 F.3d at 657 ("Such sanctions may not be imposed as a purely punitive measure."). Rather, those aims are the province of criminal contempt proceedings. *Paramedics*, 369 F.3d at 657 ("Criminal contempt is typically imposed to punish the violation and vindicate the court's authority." (internal quotation marks omitted)); *Terry*, 886 F.2d at 1351 (criminal contempt sanctions are intended "to punish for an offense against the public and to vindicate the authority of the court"); *SD Protection, Inc. v. Del Rio*, 587 F. Supp. 2d 429, 433 (E.D.N.Y. 2008) (distinguishing civil and criminal contempt and explaining that "[c]riminal contempt is used to punish the contemnor, deter future offenses against the public and/or vindicate the court's authority"). Unlike criminal contempt sanctions, compensatory civil sanctions are designed to reimburse the wronged party for actual losses sustained as the result of

13

the contempt; in other words, to make the wronged party whole.  *Terry*, 886 F.3d at 1353; *Landmark Legal Foundation v. EPA*, 272 F. Supp. 2d 70, 76 (D.D.C. 2003) ("[T]he goal of compensatory contempt is to indemnify the plaintiff directly for the harm the contemnor caused by breaching the injunction.  Courts utilize compensatory contempt to restore the plaintiff as nearly as possible to his original position.  The remedy is not penal, but rather remedial.").

　　Because the imposition of contempt sanctions is a drastic measure, district courts are required "to use the *least* possible power adequate to the end proposed" in selecting among sanctions.  *Spallone v. United States*, 493 U.S. 265, 276 (1990) (emphasis added); *see also United States v. City of Yonkers*, 856 F.2d 444, 454 (2d Cir. 1988), *rev'd on other grounds*, *Spallone*, 493 U.S. 265; *Project B.A.S.I.C.*, 947 F.2d at 16 ("[I]n levying contempt sanctions, the court must exercise the least possible power suitable to achieve the end proposed."). Accordingly, as Plaintiffs have repeatedly acknowledged, courts frequently decline to enter findings of contempt, but grant remedial relief pursuant to their inherent powers to fashion appropriate equitable remedies.  *See Berger*, 771 F.2d at 1569 ("Ensuring compliance with a prior order is an equitable goal which a court is empowered to pursue even absent a finding of contempt."); *Class v. Norton*, 376 F. Supp. 496, 501 (D. Conn.), *aff'd in part and rev'd in part on other grounds*, 505 F.2d 123 (2d Cir. 1974) (declining to find defendant in contempt and drawing on "discretionary power" to fashion equitable remedies which are "a special blend of what is necessary, what is fair, and what is workable"); *Now v. Operation Rescue*, 747 F. Supp. 772, 776-77, 778 (D.D.C. 1990) (expressly declining to hold defendant in contempt of court but ordering other sanctions).

14

II.     **The CIA Has Worked Diligently and in Good Faith to Comply With This Court's Orders Designed to Remedy the Destruction of the Videotapes and Achieve the Purposes of FOIA**

This Court heeded the Supreme Court's admonition that "in selecting among contempt sanctions, a court is obliged to use the least possible power adequate to the end proposed," *Spallone v. United States*, 493 U.S. 265, 276 (1990), when it fashioned equitable remedies that were "'a special blend of what is necessary, what is fair, and what is workable.'" *Class*, 376 F. Supp. at 501 (D. Conn.) (quoting *Lemon v. Kurtzman*, 411 U.S. 192 (1973)).  In light of the CIA's diligence and good faith in complying with the Court's remedial orders, and its willingness to voluntarily implement further remedial measures – including measures designed to enhance its document preservation procedures, to train its attorneys, and to reimburse Plaintiffs' reasonable attorney's fees relating to the contempt motion – further sanctions would not serve the proper purposes of civil contempt.  Issuing a finding of contempt solely to have that finding on the record as an expression of disapproval, as Plaintiffs request here, simply punishes the CIA for past conduct.  (*See* Jan. 14, 2011 Tr. at 5 (Court observing that "chastising to get better conduct in the future. . . . [is] in the nature of punishment also.") (attached as Ex. D to La Morte Decl.)).

As noted above, this Court ordered the CIA to collect and process records reflecting the contents of the videotapes and records that describe the persons and reasons behind the destruction of the videotapes.  This sanction, of course, was designed to rectify the destruction of the videotapes as best as possible by having the Agency reconstruct the details of those videotapes and their destruction using a method accommodating of the highly classified nature of the information at issue.  Indeed, Plaintiffs expressly sought reconstruction as a remedy for the CIA's destruction of the videotapes in their initial contempt motion.  (*See* Jan. 17, 2008 Tr. at 57

15

(Plaintiffs' counsel stating that "the reconstruction of documents, as well, is an important remedial measure that we are seeking"); Pls.' Memo. in Support for Contempt and Sanctions dated Dec. 12, 2007, at 16 ("Reconstruction of the destroyed documents to the extent possible is an appropriate remedy for document destruction.") (Dkt. No. 255)).

The CIA has expended substantial resources to comply with these orders and has acted in good faith in doing so; indeed, the Agency proactively notified the Court that the most relevant paragraph 4 documents post-dated the time frame contained in the Court's initial orders, thus helping to ensure that a fulsome record of the videotapes was created and available for the Court's consideration.  Moreover, the Agency reviewed thousands of records potentially responsive to paragraph 3 of the Court's April 20, 2009 Order.  The CIA made public as much non-privileged information from these records as possible, consistent with its mandate to protect national security and classified information.  In performing these actions, the CIA has worked diligently to ensure that the purposes of FOIA have been achieved to the greatest extent possible in light of the destruction of the videotapes.[4]

The CIA's efforts have not stopped there, however.  As detailed further below and in the accompanying declaration from CIA General Counsel Stephen W. Preston, the CIA is voluntarily implementing new policies designed to enhance its record retention and preservation procedures, including with respect to records subject to judicial orders, and will train its attorneys on the new

---

[4] Plaintiffs' statement that the CIA's destruction "forever den[ied] them records that they assert they had a right to obtain" (Pls.' Br. at 25) is overstated.  The Court has reviewed records reflecting the contents of the videotapes *in camera* and upheld the CIA's invocation of FOIA exemptions designed to protect this national security information from disclosure.  (*See* Dkt. No. 429).  Applying the same logic and analysis, the videotapes themselves would almost certainly have been similarly protected.

records policies and their professional obligations.  And as undersigned counsel made clear to

this Court during the hearing on January 14, 2011, the Agency is prepared to reimburse Plaintiffs

for the reasonable attorney's fees and costs they incurred in bringing their contempt motion.

    In these circumstances, issuing a finding that the CIA is in contempt would not remedy

the destruction of the videotapes or coerce compliance with this Court's order; in other words, it

would not achieve either of the permissible ends of civil contempt.  (*See* Jan. 14, 2011 Tr. at 5

(Court observing that holding CIA in contempt is not "obtaining compliance" with a judicial

decree, but rather is "chastising" the CIA and "in the nature of punishment")).  As this Court

previously observed, "nothing is accomplished by labeling it as a contempt.  It's just a pejorative

term." (Jan. 17, 2008 Tr. at 57; *see also id*. at 59 (Court questioning "what value flows from . . .

a holding of contempt," "except to write a newspaper headline")).

    Plaintiffs repeatedly acknowledge that they seek a civil contempt finding as "a means for

this Court to express official disapproval of the CIA's egregious conduct in this case." (Pls.' Br.

at 29; *see also id*. at 2 (CIA's actions "cannot . . . be left to stand without the clear statement of

disapproval that contempt engenders"), 31 (a contempt finding is needed "to vindicate our system

of government itself" and "express disapproval of the CIA's conduct").  However, as this Court

has expressly recognized, it is not appropriate for the Court to use its civil contempt powers to

achieve these punitive ends.  (Jan. 17, 2008 Tr. at 57 ("[T]he role [of civil contempt] is remedial,

not punishment.")).  It has long been established that courts should not impose civil contempt

sanctions to punish a party, to deter future offenses against the public, or to "'vindicate the

court's authority.'"  *Armstrong v. Guccione*, 470 F.3d 89, 101 (2d Cir. 2006) (quoting *In re

Irving*, 600 F.2d 1027, 1031 (2d Cir. 1979)); *see Nye*, 313 U.S. at 41-43 (explaining that civil

17

contempt is wholly remedial and "not intended as a deterrent to offenses against the public");

*United States v. Ayer*, 866 F.2d 571, 573-74 (2d Cir. 1989) (contempt order designed to coerce

conduct in future cases is criminal, not civil).  Rather, those are the functions of criminal

contempt.  *See United Mine Workers*, 330 U.S. at 302 ("Sentences for criminal contempt are

punitive in their nature and are imposed for the purpose of vindicating the authority of the

court.");  *Terry*, 886 F.2d at 1351 (same); *SD Protection, Inc.*, 587 F. Supp. 2d at 433 (same)).

        Plaintiffs' citation to *Cobell v. Babbitt*, 37 F. Supp. 2d 6 (D.D.C. 1999), and *Shady*

*Records, Inc. v. Source Enterprises*, 351 F. Supp. 2d 64 (S.D.N.Y. 2004), to suggest that civil

contempt is appropriate purely as a means to "officially acknowledge and express disapproval" of

a party's conduct (Pls.' Br. at 30-31), is simply wrong.  To the contrary, the court in *Cobell*

imposed both compensatory and coercive measures, including a civil contempt finding, only after

expressly finding that defendants "left[] no other viable option" after engaging in a longstanding

pattern of disobeying court orders, covering up that disobedience, and making multiple

misrepresentations to the court.  37 F. Supp. 2d at 38.  Specifically, the court found that two of its

orders "were either ignored or thwarted at every turn by" defendants, *id*. at 14, that defendants

"had not even come close" to complying with the court's initial order, notwithstanding that it

been issued over two years earlier, *id*. at 15, that defendants "have made numerous illegitimate

representations, failed to correct known misrepresentations, and neglected to inform the court at

every turn about self-inflicted obstacles to compliance," *id*. at 35, and that defendants

"conceal[ed] and cover[ed]-up [their] disobedience with outright false statements that the court

then relied upon," *id*. at 38.  The court emphasized that its "last available option was to proceed

by contempt." *Id*. at 15; *see also id*. at 38 (noting that the court "is left with no other viable

18

option aside from a contempt finding").

Likewise, in *Shady Records*, the court expressly recognized that "[c]ivil contempt is intended either to coerce the contemnor into future compliance with the court's order or to compensate the complainant for losses resulting from the contemnor's past noncompliance."  351 F. Supp. 2d at 66 (internal quotation marks omitted).  The court emphasized the compensatory value of an award of attorney's fees (something the CIA has already offered to do), and a civil contempt finding was used to compensate the plaintiff for its costs in pursuing its contempt motion – not for any inherent value of expressing disapproval of a party's conduct.  *Id.* at 66-68; *see also id.* at 73 (recognizing that if proposed sanction cannot be justified to coerce compliance with an order or compensate plaintiff for actual losses, it could "only function as punishment," which "is the function of criminal, not of civil, contempt").

Unlike *Shady Records* and *Cobell*, Plaintiffs seek a finding of contempt as an end in itself – not as a last resort necessary to rectify misconduct or coerce action.  *See Project B.A.S.I.C.*, 947 F.2d at 16 ("[I]n levying contempt sanctions, the court must exercise the least possible power suitable to achieve the end proposed.").  Where the expression of a court's disapproval is sought as the end rather than the means, a contempt finding is criminal.  *See SD Protection, Inc.*, 587 F. Supp. 2d at 433 ("Criminal contempt is used to . . . vindicate the court's authority") (citing *Nye*, 313 U.S. at 41-43; *Ayer*, 866 F.2d at 573-74; *Hess*, 846 F.2d at 115 (sanction imposed against state agency to get "the point . . . across" is criminal in nature)).

Plaintiffs' additional claim that a finding of civil contempt is "essential" because it provides "a basis for civil sanctions" (Pls.' Br. at 29), is disingenuous.  Not only is this representation wrong as a matter of law, *see Berger*, 771 F.2d at 1569 ("Ensuring compliance

19

with a prior order is an equitable goal which a court is empowered to pursue even absent a finding of contempt."); *see also, e.g.*, *Now v. Operation Rescue*, 747 F. Supp. 772, 776-77, 778 (D.D.C. 1990) (declining to issue contempt finding against defendant but imposing other sanction), but it also contravenes Plaintiffs' previous (correct) representations to the Court that it need not make a finding of contempt to exercise its authority to order remedial and coercive relief.  (*See* Pls.' Memo. In Support of Mot. for Contempt and Sanctions dated Dec. 12, 2007, at 16 ("Sanctions are not, however, contingent on a finding of contempt alone.") (Dkt. No. 255); Pls.' Reply at 3 ("[T]his Court is entitled to impose sanctions for the destruction of responsive documents even if it does not hold the CIA in contempt of its orders.") (Dkt. No. 272); Jan. 17, 2008 Tr. at 60 (Plaintiffs telling Court that it "does not have to make a finding of contempt in order to impose a remedy")).  Indeed, a district court's inherent authority to enforce its orders and issue sanctions is a fundamental principle underlying our judicial structure, and is as old as the judiciary itself. *See Armstrong*, 470 F.3d at 100-101.  The measures already imposed by the Court against the CIA represented an exercise of this Court's inherent authority, and clearly a finding of contempt is not a necessary prerequisite to ordering additional remedial actions.  Nor, importantly, was a finding of contempt necessary to ensure that the CIA diligently comply with the Court's remedial orders, or any other subsequent orders in this case.  (*Cf.* Pls.' Br. at 23 (citing, among other cases *Landmark Legal Found'n*, 272 F. Supp. 2d at 86 (holding that contempt sanctions necessary; not only did defendant violate court order that it agreed to by stipulation, but it made misrepresentations to the court); *Cobell*, 37 F. Supp. 2d at 19-23, 30-36 (entering contempt in non-FOIA matter where, *inter alia*, whole categories of documents had not been produced over two years after original production order was issued, and government

20

attorneys failed to inform court about compliance problems or to correct false representations made to court)).  Plaintiffs' about-face on this point is telling, as it further underscores their desire to use a finding of contempt as a punishment for the CIA's destruction of the videotapes.

The remedial remedies that the Court has crafted in this case were properly aimed towards "accomplishing the purposes of the FOIA statute" and thereby making Plaintiffs whole. (Jan. 17, 2008 Tr. at 57; *see id.* (Plaintiffs agreeing that civil contempt is designed to "make plaintiffs whole").  The CIA has diligently complied with the Court's remedies and has achieved these goals.  In contrast, entering a finding of contempt is nothing but punitive, and for the foregoing reasons, should be rejected.

## III.    The CIA's Interpretation of the Court's Orders Was Reasonable and in Good Faith

This Court should deny Plaintiffs' motion for contempt for the additional, independent reason that implementation of this Court's Operational Files Orders (*i.e.*, the Court's orders of February 2, 2005, February 18, 2005, and April 18, 2005) and the investigation exception to the CIA Information Act, 50 U.S.C. § 431(c)(3), was reasonable and in good faith.  The law is settled that a party should not be held in contempt unless it has violated a "clear and unambiguous order" that put the party on notice of "precisely what acts are forbidden."  *Drywall Tapers*, 889 F.2d at 395.  Thus, even where a court ultimately determines that a party has violated a court order, it should decline to hold that party in contempt where, as here, the party attempted to comply with the order "based on a good faith and reasonable interpretation of the order." *Labor/Community Strategy Ctr. v. Los Angeles Metropolitan Transp. Auth.*, 564 F.3d 1115, 1124 (9th Cir. 2009); *see also Kukui Gardens Corp. v. Holco Capital Group, Inc.*, 675 F. Supp. 2d 1016, 1023-24 (D. Ha. 2009) (declining to hold in contempt defendants who had acted on a

21

"reasonable" interpretation of the court's order "in good faith"); *Cadle Co. v. Schlictmann, Conway, Crowley & Hugo*, 939 F. Supp. 90, 91 (D. Ma. 1996) (denying motion for civil contempt where defendants actions were based on a "reasonable interpretation" of an order that did not "unquestionably command" the defendants to undertake certain action); *Orleans Audubon Society v. Dep't of Interior*, Civ. A. No. 94-3510, 1996 WL 39436, at *2 (E.D. La. Jan. 31, 1996) (same).  Indeed, the District of Columbia district court declined to hold a party in contempt for violation of a court order where the party's reading of the order was "strained, but at least plausible."  *Now*, 747 F. Supp. at 777.

Accordingly, as explained below, even though the Court has expressed that the CIA's interpretation of the Court's Operational Files Orders and the investigation exception to the CIA Information Act, 50 U.S.C. § 431(c)(3), was not correct, the Agency's interpretation was not so unreasonable as to warrant imposition of a finding of contempt.  To be clear, although the CIA respectfully disagrees with the Court's views on these issues as previously expressed during these contempt proceedings, the CIA does not wish to litigate here whether its interpretation was correct.  Rather, it contends only that its interpretation was not so unreasonable as to warrant the extraordinary finding of contempt, especially when considered in light of all of the remedial measures taken by the Agency.

### A.      It Was Reasonable for the CIA to Search and Process Only the OIG's Files

In light of the language contained in the Court's Operational Files Orders, it was reasonable for the CIA to search and process only those records contained in OIG's files that were responsive to Plaintiffs' FOIA requests.  The Court's orders specifically instructed the CIA

22

*not* to search its "operational files," but rather to process only records that had "already been identified and produced to, or otherwise collected by, the CIA's Office of Inspector General." (Feb. 18, 2005 Order at 2; Apr. 18, 2005 Order at 3).  Indeed, in its earlier February 2, 2005 Order, the Court had responded to the CIA's arguments that conducting a search for documents falling within the CIA Information Act's investigative exception would be burdensome by explaining that the CIA did not need to undertake any "additional material burden," beyond "searching and reviewing the documents already in the OIG's files," 351 F. Supp. 2d at 272, and processing those documents that were the result of the search that CIA-OIG had "already . . . made," *id.* at 274.[5]  Based on the Court's overall instructions and its instructions regarding the "limited . . . scope" of the search that the CIA was required to undertake (Feb. 18, 2005 Order at 2), it was reasonable for the CIA to search and process only those responsive records found in OIG's files, which did not include the videotapes of the interrogation of detainees.  (Rea Decl. ¶¶ 13-14); *cf. Morley v. CIA*, 508 F.3d 1108, 1118 (D.C. Cir. 2007) ("[I]nformation that merely 'surfaced in the course of the investigation' should not trigger the § 431(c)(3) exception." Rather, "the requirement of § 431(c)(3) that a FOIA request concern 'the specific subject matter of an investigation' is satisfied where the investigating committee would have deemed the records at issue to be central to its inquiry.") (citations omitted).

---

[5]  At other points in the February 2, 2005 Order, however, the Court described the scope of the documents that fell within the CIA Information Act's investigation exception very broadly, stating that documents "need not actually have been reviewed and relied on by the OIG staff" for them to fall within that exception.  351 F. Supp. 2d at 276-77.  Insofar as the Court's description is in tension with other parts of the Court's orders, which limited the CIA's search obligations to those documents that had "already been identified and produced to, or otherwise collected by, the CIA's Office of Inspector General," (*see* February 18, 2005 Order at 2; April 18, 2005 Order at 3), such ambiguity must be construed in favor of the CIA for purposes of contempt.  *See Project B.A.S.I.C.*, 947 F.2d at 16.

Similarly reasonable was the CIA's interpretation of the phrases "identified and produced to, or otherwise collected by" OIG (*see* Feb. 18, 2005 Order at 2; Apr. 18, 2005 Order at 3), as referring to only those documents that had been removed from the CIA's operational files and placed in OIG's files.  *See* Central Intelligence Agency's Memorandum of Law in Opposition to Plaintiffs' Motion for Contempt and Sanctions dated January 10, 2008 ("Contempt Opposition") (Dkt. No. 269) at 10-11.  Since issuing those orders, the Court in January 2008 described the term "collected" as "key" to the court's February 18, 2005 and April 18, 2005 Orders.  (*See* Jan. 17, 2008 Tr. at 4:19-21).  In that same argument, the Court also suggested that the term "collected" as used in the orders included any records that were "seen" or "viewed" by OIG, regardless of whether OIG retained a copy of those records.  (*Id.* at 31:4-5).

That is not, however, the only reasonable or plausible interpretation of the term "collected."  For example, the Merriam-Webster online dictionary defines "collected" as "gathered together," and defines "to collect," to mean "to bring together into one body or place."[6] Under this definition, it thus was reasonable for the CIA to search in the place that the OIG would have "gathered together" documents in connection with any inquiry, *i.e.*, OIG's files. Although the Court may have intended that any record that was "viewed" by the OIG be subject to FOIA search and review, for purposes of contempt proceedings the Court must be cognizant that, "a court's intentions and its orders are two different things."  *Project B.A.S.I.C.*, 947 F.2d at 18.

---

[6] *See* Merriam-Webster Dictionary Online, available at http://www.merriam-webster.com/dictionary/collected?show=0&t=1301437822 (definition of "collected) (last checked March 29, 2011); http://www.merriam-webster.com/dictionary/collect?show=1&t=1301526522 (definition of "collect" as a verb) (last checked March 30, 2011).

Accordingly, the Court should decline to hold the CIA in contempt because its decision to limit its search for responsive documents to OIG's files was based on a reasonable and good faith interpretation of the Operational Files Orders.

**B.     It was Reasonable for the CIA to Consider Documents Viewed by OIG in Connection with the Special Review Not to Fall Within the Investigative Exception**

Similarly, the CIA reasonably determined that otherwise exempt operational documents viewed by the OIG in connection with the Special Review commenced in January 2003 did not fall within the CIA Information Act's investigation exception based on its determination that the Special Review was not initiated in response to an allegation of wrongdoing by the CIA.

Pursuant to internal CIA guidelines and practices, a special review is distinct from an investigation in various respects that are relevant to whether records fall within the CIA Information Act's investigation exception.  (Rea Decl. ¶¶ 5-7, Rea Decl. App'x A).  Most notably, an OIG special review, unlike an OIG investigation, is not initiated in response to a specific allegation of CIA impropriety.  (Rea Decl. ¶ 6).  This distinction is important, because the CIA Information Act's investigation exception applies only to records that concern the "specific subject matter of an investigation . . . [of] any impropriety, or violation of law, Executive Order, or Presidential directive, in the conduct of an intelligence activity."  50 U.S.C. § 431(c)(3); *see also Sullivan v. CIA*, 992 F.2d 1249, 1254-55 (1st Cir. 1993) (to fall within section 431(c)(3)'s investigation exception, an investigation "must specifically relate to CIA wrongdoing, that is, some 'impropriety' or 'violation of law' in the conduct of the designated intelligence activity"); (Contempt Opp'n at 11-17).

Moreover, the CIA did not violate "clear and unambiguous" instructions from the Court

25

regarding which of OIG's various undertakings constitute an "investigation" within the scope of section 431(c)(3) of the CIA Information Act, because none of the Operational Files Orders addressed that topic at all.  Rather, the Court's Operational Files Orders only discussed those records associated with the CIA's investigation into "allegations of impropriety in Iraq."  351 F. Supp. 2d at 268.  The Operational Files Orders therefore cannot fairly be interpreted to have left "no uncertainty in the minds of" the CIA regarding whether it was obligated to process otherwise exempt operational files related to the Special Review that were located outside of OIG's files, and the Court should decline to hold the CIA in contempt on that basis.  *Hess, Inc.*, 846 F.2d at 116; *see also Project B.A.S.I.C.*, 947 F.2d at 17  (contempt only appropriate where an order "left no reasonable doubt as to what behavior was expected and who was expected to behave in the indicated fashion.").

Furthermore, as the Court noted in its February 2, 2005 Opinion and Order, the CIA Information Act, including its operational files exemption and the investigation exception, is a "seldom construed statute," 351 F. Supp. 2d at 267, that is far from clear or well-settled.  Indeed, the only court to have issued a written opinion regarding what types of investigations fall within the scope of the CIA Information Act's investigation exception—the First Circuit in *Sullivan v. Central Intelligence Agency*, 992 F.2d at 1255—held, consistent with the CIA's position, that records do not fall within section 431(c)(3)'s investigation exception unless they relate to the subject matter of a "direct investigation into CIA wrongdoing."  *Id.* at 1255.  The unsettled scope of the investigation exception and the CIA's reasonable interpretation of that exception – to

26

which at least some deference is owed[7] – are additional reasons why this Court should decline to hold the CIA in contempt.  *Chao v. Gotham Registry, Inc.*, 514 F.3d 280, 284 (2d Cir. 2009) (where defendant "acted on a reasonable [albeit incorrect] interpretation of then unsettled law" plaintiff unable to "meet her burden to prove contempt"); *Internal Revenue Service v. Norton*, 717 F.2d 767, 775 (3d Cir. 1983) ("Inasmuch as the [law] was unclear at the time [the IRS undertook the action for which plaintiffs had moved for contempt], . . . the IRS did not have fair warning" that its action were a "violation of the automatic [bankruptcy] stay" and contempt finding therefore not proper).

Because the CIA acted reasonably and in good faith in its interpretation of the Court's Operational File Orders and the CIA Information Act, the Court should decline to hold the CIA in contempt.

## IV.   Plaintiffs' Other Requested Remedies Would Not Serve Any Remedial or Coercive Purpose, Would Not Achieve the Purposes of FOIA, and Are Unworkable

Plaintiffs have previously represented that factual development is unnecessary to resolution of their contempt motion.  (*See supra* n.3).  Nevertheless, they ask the Court to allow them to take discovery and to review all classified paragraph 4 documents to see if other CIA officials should be subject to civil contempt, and to require former CIA official Jose Rodriguez to

---

[7]   Although the Court did not find the CIA's internal distinction between a special review and an investigation to be compelling, (*see* Jan. 17, 2008 Tr. at 23:17-18 ("The term 'investigation' would seem to encompass special reviews."), the CIA's conclusion that it was not under an obligation to process otherwise exempt operational documents reviewed by OIG in connection with the Special Review is entitled to "some deference" from this Court.  *Reno v. Koray*, 515 U.S. 50, 61 (1995) (even an internal agency guideline that is not "subject to the rigors of the [APA], including public notice and comment," is entitled to "some deference" if it is a "permissible construction of the statute").

show cause why he should not be held in civil contempt.[8]  They also request that the Court order

the CIA to assemble and process any paragraph 4 documents for the time period between July 1,

2003 through May 31, 2005.  Finally, they seek an order directing the CIA and/or former Agency

official Rodriguez to compensate them for *all* attorney's fees and costs associated with this

litigation, apparently beyond the fees and costs incurred with respect to their contempt motion.

(*See* Pls.' Br. at 2-3, 35-36).  These requests are not designed to serve proper remedial or

coercive purposes, would prolong this matter for years, and are otherwise inappropriate and

impracticable.

### A.    Discovery and Access to Classified Information

Plaintiffs' request for "limited discovery" and an order permitting them to review

classified paragraph 4 records is a thinly-veiled attempt to seek access to highly sensitive and

classified information properly withheld by the CIA in this FOIA litigation.  This is

inappropriate.  *See, e.g., Arieff v. Dep't of the Navy*, 712 F.2d 1462, 1471 (D.C. Cir. 1983)

(disclosing information to FOIA plaintiffs in the context of litigation "would involve disclosing

the very material sought to be kept secret").

While the Court's equitable powers are broad, they are not unlimited, and as it has done

with other sensitive matters in this case, the Court should account for the unique and serious

issues attending discovery into the CIA's national security information.  *Cf. Spallone*, 493 U.S. at

276.  Plaintiffs' stated purpose for discovery and access to highly classified and sensitive

information – to ferret out other individuals (if any) who could potentially be punished – is not a

---

[8]  Plaintiffs also claim that "no hearing is necessary" with respect to Mr. Rodriguez, as "it appears that there are no material facts in dispute."  (Pls.' Br. at 33).

persuasive purpose for allowing Plaintiffs access to such records.  In this case, discovery is not coercive or remedial: it's a fishing expedition.

In addition to being unwarranted, Plaintiffs' proposal must be rejected because none of Plaintiffs' counsel possess the requisite clearances to view the highly classified information at issue.[9]  Plaintiffs' counsel could only have access to the information if determined by the Executive Branch to be eligible for such access, based on an appropriate background investigation.  In addition, counsel would have to possess the requisite "need to know" the classified information, which they do not have.  It is well-established that a litigant's access to classified information cannot be granted merely because the classified information is implicated in civil litigation.  Because the Executive Branch has the constitutional responsibility to protect classified information, the decision to grant or deny access to such information rests exclusively within the discretion of the Executive.  *See Dep't of Navy v. Egan*, 484 U.S. 518, 527 (1988); *Guillot v. Garrett*, 970 F.2d 1320, 1324 (4th Cir. 1992); *Dorfmont v. Brown*, 913 F.2d 1399, 1401 (9th Cir. 1990).  In keeping with this rule, courts in civil cases have repeatedly rejected demands that opposing counsel or parties be permitted access to classified material presented to the court *ex parte* and *in camera*.  *See, e.g.*, *Sterling v. Tenet*, 416 F.3d 338, 348 (4th Cir. 2005); *People's Mojahedin Org. v. Dep't of State*, 327 F.3d 1238, 1242-43 (D.C. Cir. 2003); *Pollard v. FBI*, 705 F.2d 1151, 1153 (9th Cir. 1983); *Halkin v. Helms*, 598 F.2d 1, 7 (D.C. Cir. 1978).[10]

---

[9]  Plaintiffs' alternative request – for the Court to review the withheld, classified paragraph 4 documents with the participation of Plaintiffs' counsel (*see* Pls. Br. at 28 n.24, 34 n.26) – raises precisely the same concern.

[10]  It is telling that Congress rejected a discovery remedy in the context of allegations concerning violations of the operational files exemption.  *See* 50 U.S.C. § 431(f).  Section 431 includes specific limitations and conditions on the general FOIA judicial review framework,

In short, as the Court has previously recognized, any further contempt proceedings concerning former and present CIA officials would have to be conducted wholly *ex parte* and *in camera* – a remedy *not* requested by Plaintiffs. (*See* Jan. 14, 2011 Tr. at 5-6 (with respect to examining whether individuals could be held in contempt, Court observing that "there will be extraordinary difficulty in doing that, because the CIA rightfully takes the position that its operatives are not to be identified. . . . [I]dentification can be terribly serious in the way it compromises important government officials, and even endangers their lives and security"); *id*. at 6 ("I could do this ex parte, as it were, but that's not very satisfactory."); Jan. 17, 2008 Tr. at 50-51 (Court noting that it "understand[s] it would be classified.  And I understand it would have to be in camera treatment.")).

## B.   Order to Show Cause as to Why Jose Rodriguez Should Not be Held in Contempt or Ordered to Pay Attorney's Fees

Nor have Plaintiffs stated any basis for this Court to find former CIA employee Jose Rodriguez (or, for that matter, any other current or former employee of the CIA), in contempt. Any order against Mr. Rodriguez or any other individual would stray far from the remedial

---

which, taken together, reflect a clear mandate from Congress that disputes over the operational files exemption should be resolved, wherever feasible, on the basis of the parties' sworn written submissions.  50 U.S.C. § 431(f)(2) (stating that the court should determine any issues of fact "to the fullest extent practicable . . . based on sworn written submissions of the parties").  To the extent classified information is submitted by the CIA for review, Congress demanded that it "be examined ex parte, in camera by the court," *id*. § 431(f)(1), and Congress expressly prohibited party-initiated discovery under the Federal Rules of Civil Procedure, with the sole exception of requests for admission, *id*. § 431(f)(5).  Finally, the "exclusive remedy" for an improper withholding of records under the operational files exemption is to "order the Central Intelligence Agency to search and review" the relevant exempted operational files for responsive records and to "make such records, or portions thereof, available in accordance with" the FOIA.  *Id*. § 431(f)(6) ("[S]uch order shall be the exclusive remedy for failure to comply with this section.").

purposes to be served by a finding of civil contempt.[11]  (*See supra* Point I).

Furthermore, as Plaintiffs concede, a court may not hold a third-party individual such as Mr. Rodriguez in contempt unless it is established that he knowingly violated a court order of which he had actual notice prior to the violation.  (Pls.' Br. at 33); *see also Landmark Legal Found'n*, 272 F. Supp. 2d at 83 (declining to hold individual agency officials in contempt in FOIA action because they did not have actual advance notice of court's orders even though, as agency officials, they were subject to the court's orders).  Plaintiffs' conclusory assertions are not sufficient to carry their burden.  Despite Plaintiffs' claims that there is "little question but that Rodriguez was aware of this Court's order" (Pls.' Br. at 33), and that Mr. Rodriguez "knowingly violated this Court's orders" (*id*. at 2), Plaintiffs do not cite any factual support for that assertion. Indeed, the only assertion for which Plaintiffs have submitted support is that Mr. Rodriguez consulted with CIA General Counsel's Office before taking action with respect to the videotapes, (*id*. at 33-34), and the legal advice that he received after that consultation was that there was "no legal . . . requirement to continue to retain the tapes."  (Pls.' Ex. 42).  That assertion does not reflect any specific knowledge of this action or the orders this Court had previously issued.

The circumstances of this case are also a far cry from those in *Cobell v. Babbitt*, 37 F. Supp. 2d 6 (D.D.C. 1999), which is the only case Plaintiffs cite in which a court held individual government officials in contempt.  (Pls.' Br. at 32).  Unlike in *Cobell*, this case does not present a circumstance in which the court order was clear and reasonably specific, *see supra* Point III, nor

---

[11]   Moreover, because neither Mr. Rodriguez nor any other individual current or former employee of the CIA is a party to this action, they are not individually represented by counsel in the instant proceedings.  If the Court were inclined to pursue such a course, at the very least any individual should be given notice of that possibility and sufficient time to seek representation from the Department of Justice or obtain representation elsewhere.

did Mr. Rodriguez or any other employee of the CIA or the CIA itself make "numerous illegitimate representations [to the Court], fail[] to correct known misrepresentations [to the Court], [or] neglect[] to inform the court at every turn about self-inflicted obstacles to compliance" with the court's orders, or show a "reckless disregard for the orders" of this Court, as was the case in *Cobell*.  *Id.* at 35-36.

### C.    Additional Processing of Paragraph 4 Documents

Plaintiffs also seek identification and production of paragraph 4 documents for the time period between July 1, 2003 through May 31, 2005, for no purpose other than to create a "complete record."  (Pls.' Br. at 3; *id.* at 29).  However, Plaintiffs have failed to point to anything suggesting that an expansion of the time period for processing paragraph 4 documents is necessary to create a fulsome record.

The time frames imposed by the Court for gathering and processing paragraph 4 documents were broadly designed to extend well beyond the times that the videotapes were created and destroyed.  This was done precisely to ensure the reconstruction of a full and complete record.  Indeed, as the Court noted, it ordered the CIA to assemble and process paragraph 4 documents created during the period of June 1, 2005 to January 31, 2006, only after the CIA informed the Court that the most relevant documents concerning the persons and reasons behind the destruction of the videotapes were likely dated after the time frame that was originally imposed.  (*See* Order dated July 30, 2009 (Dkt. No. 369); Order dated July 20, 2009 (Dkt. No. 365)).

Significantly, Plaintiffs have never even sought to show cause for any enlargement of the paragraph 4 time frame at any point since the Court's July 7, 2009 Order, which expressly

32

requires a "showing of cause" by Plaintiffs to enlarge the paragraph 4 time frame. (*See* Order

dated July 7, 2009 (Dkt. No. 358)).  Nor did Plaintiffs interpose any objection after the Court

expanded the paragraph 4 time frame to include documents in the period surrounding the

videotape destruction.  Plaintiffs have failed to show cause to further expand the period of

processing, and requiring the CIA to identify and process additional paragraph 4 documents

would not serve any significant remedial function.

### D.   Attorney's Fees and Costs

As the CIA has previously represented to this Court, it is willing to negotiate reasonable

costs and attorney's fees with Plaintiffs.  However, contrary to their argument, Plaintiffs are not

entitled to costs and attorney's fees beyond those incurred with respect to prosecuting their

contempt motion as part of the remedial relief.

As a remedy for violating a judicial order, awards of attorney's fees and costs serve a

compensatory purpose.  *See Landmark Legal Foundation*, 272 F. Supp. 2d at 76.  As such, it is

inappropriate to compensate the injured party beyond the losses it sustained as a result of the

specific violation at issue.  *See id.* at 87 ("[S]anctions designed to compensate a complainant for

losses sustained must be tailored specifically to remedy that harm." (citing *Cobell v. Norton*, 334

F.3d 1128, 1145-46 (D.C. Cir. 2003) (reversing sanctions and noting that sanctions imposed by

district court "cannot be considered relief for the underlying contempt")).

Accordingly, the appropriate measure of attorney's fees to be awarded is the amount

reasonably expended by Plaintiffs with respect to the contempt motion.  *See, e.g.*, *SD Protection*,

587 F. Supp. 2d at 436.  Plaintiffs' claim for other fees and costs associated with the entire FOIA

litigation are not the proper subject of their motion.

33

## V.      Further Contempt Proceedings Are Unwarranted in Light of the Remedial Measures Being Implemented by the CIA

### A.      The CIA Is Implementing Remedial Policies and Procedures

As explained by Stephen W. Preston, General Counsel of the CIA, the CIA takes its responsibilities to the courts very seriously, including its obligations to preserve relevant documents for use in criminal proceedings and in civil litigation.  (*See* Declaration of Stephen W. Preston, General Counsel, Central Intelligence Agency, dated April 15, 2011 ("Preston Decl."), ¶¶ 5, 6).  Moreover, the Agency appreciates the critical role that Government attorneys play as agency counsel and as officers of the courts, and the important professional responsibilities related thereto.  (*Id*. ¶¶ 5, 7).  To these ends, the CIA is in the process of implementing measures designed to enhance its document retention and preservation procedures, and to train its attorneys about those procedures and the importance of their professional obligations.  (*Id*. ¶¶ 6, 7).

The Agency's decision to implement these new document preservation policies and procedures was informed by a meeting between representatives of the Department of Justice and the Director of the CIA, Leon E. Panetta, as well as General Counsel Preston and other senior CIA managers.  (*Id*. ¶ 4).  That meeting concerned the November 2005 videotape destruction, and served to assist the CIA to identify systemic and procedural issues associated with the document destruction that are amenable to remedial action.  (*Id*.).

In particular, the Agency's Office of General Counsel ("OGC") is establishing a new, formal procedure for handling Agency proposals to destroy documents.[12]  (*Id*. ¶ 6).  Generally, all

---

[12]  This policy pertains to matters "outside the existing process for routine management of Agency materials under the terms of the Federal Records Act and its implementing Records Control Schedules."  (*Id*. ¶ 6).

34

such proposals to destroy documents will be routed to an OGC senior manager, who will then coordinate with relevant and interested entities, both internal and external to the Agency.  (*Id*.). An analysis of the Agency's legal obligations with respect to the records subject to the proposal will also be performed.  (*Id*.).  Once these steps are completed, the OGC senior manager will make a recommendation to the General Counsel of the CIA regarding whether or not to approve the proposal as a legal matter.  (*Id*.).  Both compliance with the procedure, as well as the underlying legal analysis, will be documented.  (*Id*.).  This formal procedure is intended to ensure that Agency proposals to destroy documents are given a thorough, well-documented legal review. (*Id*.).  Furthermore, CIA's OGC is also developing a new policy concerning document preservation instructions.  This policy will provide guidance to attorneys concerning, for example, when document preservation instructions need to be issued and how they should be issued and implemented with respect to, among other things, criminal and civil litigation.  (*Id*.).

As to the CIA's strong commitment to the professionalism of its attorneys, OGC is planning an office-wide "Professional Practice Stand-down."  (*Id*. ¶ 7).  During this time, OGC will train its attorneys on the new policies discussed above, and discuss particular document issues.  (*Id*.).  In addition, the Stand-down will "serve to enhance awareness of broader issues of professional practice" including how to assist the Agency in achieving its objectives "and in complying with the law at the same time."  (*Id*.).  The Stand-down will include outside speakers, such as high level officials with experience in the judiciary, the Department of Justice, and the Agency, to address the professional responsibilities of CIA attorneys and the challenging operational environment in which they work.  (*Id*.).  The CIA will revisit "these document- and practice-related issues from time to time and, especially, with new hires" as they join the Agency.

(*Id*.).

As evidenced by these actions, the CIA, including its Director and General Counsel, takes these matters very seriously.  General Counsel Preston has discussed the "imperative of strict compliance with applicable law in all CIA activities and the role of [Office of the General Counsel] in ensuring legal compliance" with the CIA Director and attorneys in OGC.  (*Id*. ¶ 5). The Agency's newly designed protocols are the product of an informed, considered process, and are specifically designed to further ensure that the Agency's documents are properly handled and that the Agency complies with all of its legal obligations and responsibilities in criminal and civil proceedings.

**B.     The Court Need Not and Should Not Mandate the CIA-OIG to Conduct an Investigation for Purposes of Proposing Reforms to CIA's Document Procedures**

During a hearing before the Court on January 14, 2011, the Court asked counsel for the CIA whether the CIA "Investigations Department" (which the CIA interprets to mean "OIG") would conduct an internal investigation with the goal of proposing procedures to address the issues raised by this case.  (Jan. 14, 2011 Tr. at 6-7).  Plaintiffs have not requested this remedy, either in their original or recent briefing.

As described above, the CIA has been working diligently and expeditiously to develop policies designed to enhance its document preservation and retention procedures, and to train its attorneys on the professional responsibilities and obligations they bear as Government attorneys. (*See generally* Preston Decl.).  Accordingly, the CIA respectfully submits that a court-ordered CIA-OIG investigation for this purpose is unwarranted in light of the CIA's voluntary implementation of these remedial measures.

To order the CIA-OIG to conduct the investigation envisioned by the Court would also present delicate and thorny issues.  While the court's remedial powers are broad, the Supreme Court has cautioned that they are not unlimited, particularly when directed against governmental defendants. "'[T]he federal courts in devising a remedy must take into account the interests of state and local authorities in managing their own affairs, consistent with the Constitution.'" *Spallone*, 493 U.S. at 276 (quoting *Milliken v. Bradley*, 433 U.S. 267, 280-81 (1977)); *see also, e.g.*, *Inmates of the Allegheny County Jail v. Wecht*, 901 F.2d 1191, 1198-99 (3d Cir. 1990).  At least one court declined to order a federal agency's OIG to conduct an investigation into the agency's destruction of documents responsive to a FOIA request.  *See Consumer Fed'n of Am. v. United States Dep't of Agric.*, 539 F. Supp. 2d 225, 228 (D.D.C. 2008).  Instead, the court directed the agency to submit a declaration outlining the steps it would take to respond to a FOIA request, as well as the steps taken, if any, to rectify the problems that had led to the loss of responsive documents.  *Id*.

"[I]n selecting contempt sanctions, a court is obliged to use the least possible power adequate to the end proposed." *Spallone*, 493 U.S. at 276 (internal quotation marks omitted). The CIA respectfully submits that a court-ordered CIA-OIG investigation is unnecessary in light of the sanctions already imposed by this Court, along with the CIA's offer to pay reasonable attorney's fees and costs associated with the contempt motion, and the remedial measures it is voluntarily implementing.

**Conclusion**

For the foregoing reasons, the Court should deny Plaintiffs' motion for contempt and sanctions, and terminate contempt proceedings.

Dated: New York, New York
        April 18, 2011

                              Respectfully submitted,

                              PREET BHARARA
                              United States Attorney for the
                              Southern District of New York
                              Attorney for Defendants

                    By:       /s/ *Tara M. La Morte*
                              TARA M. La MORTE
                              AMY A. BARCELO
                              Assistant United States Attorneys
                              86 Chambers Street, 3rd floor
                              New York, N.Y.  10007
                              Tel.:  (212) 637-2746/6559
                              Email: tara.lamorte2@usdoj.gov

38