## UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| AMERICAN CIVIL LIBERTIES UNION, CENTER FOR CONSTITUTIONAL RIGHTS, PHYSICIANS FOR HUMAN RIGHTS, VETERANS FOR COMMON SENSE, AND VETERANS FOR PEACE, | DOCKET NO.:  04-CV-4151 (AKH) |
| Plaintiffs, | |
| v. | **Document Electronically Filed** |
| DEPARTMENT OF DEFENSE, AND ITS COMPONENTS DEPARTMENT OF ARMY, DEPARTMENT OF NAVY, DEPARTMENT OF AIR FORCE, DEFENSE INTELLIGENCE AGENCY; DEPARTMENT OF HOMELAND SECURITY; DEPARTMENT OF JUSTICE, AND ITS COMPONENTS CIVIL RIGHTS DIVISION, CRIMINAL DIVISION, OFFICE OF INFORMATION AND PRIVACY, OFFICE OF INTELLIGENCE POLICY AND REVIEW, FEDERAL BUREAU OF INVESTIGATION; DEPARTMENT OF STATE; AND CENTRAL INTELLIGENCE AGENCY, | |
| Defendants. | |

---

### SUPPLEMENTAL REPLY MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR CONTEMPT AND SANCTIONS

## TABLE OF CONTENTS

**Page**

TABLE OF EXHIBITS .................................................................................................ii

TABLE OF AUTHORITIES .......................................................................................iii

INTRODUCTION .......................................................................................................1

ARGUMENT ..............................................................................................................3

    I.     This Court Should Find the CIA in Civil Contempt for Its Egregious Violations of This Court's Orders ..........................................................3

          A.     Expressing disapproval of violations of court orders through a finding of civil contempt does not convert a civil contempt proceeding into a "punishment." .............................................3

          B.     A contempt finding is particularly warranted under the circumstances of this case. ....................................................10

    II.    The CIA Violated Clear and Unambiguous Orders ...............................17

    III.   This Court Can and Should Find Rodriguez and Other Officials Who Knowingly Violated Its Orders in Civil Contempt ..............................25

    IV.   The Additional Relief Requested by Plaintiffs Is Warranted...............29

CONCLUSION .........................................................................................................31

## <u>TABLE OF EXHIBITS</u>

Exhibit 53     January 17, 2008 Transcript of Proceedings, *ACLU v. Department of Defense*, 04-cv-4151

Exhibit 54     Vaughn Index of Closed OIG Investigation Documents

Exhibit 55     *Former CIA Clandestine Chief in Memoir to Explain Why Interrogation Videos Destroyed*, Reuters, May 5, 2011

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Al Odah v. United States*,
  559 F.3d 539 (D.C. Cir. 2009) ................................................................ 28

*Am. Civil Liberties Union v. Dep't of Def.* ("*ACLU I*"),
  339 F. Supp. 2d 501 (S.D.N.Y. 2004) ..................................................... 13

*Am. Civil Liberties Union v. Dep't of Def.* ("*ACLU II*"),
  351 F. Supp. 2d 265 (S.D.N.Y. 2005) ...................................... 18, 19, 20, 21

*Am. Civil Liberties Union v. Dep't of Def.* ("*ACLU III*"),
  389 F. Supp. 2d 547 (S.D.N.Y. 2005) ..................................................... 13

*Anderson v. ITT Indus. Corp.*,
  92 F. Supp. 2d 516 (E.D. Va. 2000) ........................................................ 28

*Armstrong v. Guccione*,
  470 F.3d 89 (2d Cir. 2006) ...................................................................... 9

*Berger v. Heckler*,
  771 F.2d 1556 (2d Cir. 1985) .................................................................. 9

*Bloom v. Illinois*,
  391 U.S. 194 (1968) ............................................................................... 5

*Class v. Norton*,
  376 F. Supp. 496 (D. Conn.), *aff'd in part and rev'd in part on other grounds*,
  505 F.2d 123 (2d Cir. 1974) ................................................................... 9

*Cobell v. Babbitt*,
  37 F. Supp. 2d 6 (D.D.C. 1999) .......................................................passim

*Department of the Navy v. Egan*,
  484 U.S. 518 (1988) ............................................................................... 28

*Doe v. Gonzales*,
  386 F. Supp. 2d 66 (D. Conn. 2005) ....................................................... 27

*Dorfmont v. Brown*,
  913 F.2d 1399 (9th Cir. 1990) ............................................................... 28

*Ex parte Robinson*,
   86 U.S. 505 (1874) ........................................................................................................5

*GMA Accessories, Inc. v. Eminent, Inc.*,
   2008 U.S. Dist. LEXIS 55107 (S.D.N.Y. May 29, 2008) ..........................................17

*Gompers v. Bucks Stove & Range Co.*,
   221 U.S. 418 (1911) ........................................................................................................6

*Halpern v. FBI*,
   181 F.3d 279 (2d Cir. 1999) ..........................................................................................13

*Hicks v. Feiock*,
   485 U.S. 624 (1988) ........................................................................................................6

*Home Depot U.S.A., Inc. v. Home Depot Auto Warehouse, Inc.*,
   2001 U.S. Dist. LEXIS 2511 (S.D.N.Y. Mar. 7, 2001) ..............................................14

*Horn v. Huddle*,
   647 F. Supp. 2d 55 (D.D.C. 2009), *vacated due to settlement*, 699 F. Supp. 2d
   236 (D.D.C. 2010) ..........................................................................................................27

*In re Bradley*,
   318 U.S. 50 (1943) ..........................................................................................................6

*In re Guantanamo Bay Detainee Litig.*,
   2009 WL 50155 (D.D.C. Jan. 9, 2009) ........................................................................28

*In re Guantanamo Detainee Cases*,
   344 F. Supp. 2d 174 (D.D.C. 2004) ..............................................................................28

*In re Nat'l Sec. Agency Telecomms. Records Litig.*,
   595 F. Supp. 2d 1077 (N.D. Cal. 2009) ........................................................................27

*Int'l Union, United Mine Workers of Am. v. Bagwell*,
   512 U.S. 821 (1994) .....................................................................................................6, 7

*Judicial Watch, Inc. v. United States Dep't of Commerce*,
   34 F. Supp. 2d 28 (D.D.C. 1998) ..................................................................................30

*Landmark Legal Found. v. Envtl. Prot. Agency*,
   272 F. Supp. 2d 70 (D.D.C. 2003) .........................................................................passim

*Manhattan Indus., Inc. v. Sweater Bee by Banff, Ltd.*,
   885 F.2d 1 (2d Cir. 1989) ..............................................................................................14

*N.Y. State Nat'l Org. for Women v. Terry*,
   886 F.2d 1339 (2d Cir. 1989) .....................................................................................9, 17

*Nat'l Fed'n of Fed. Employees v. Greenberg*,
    983 F.2d 286 (D.C. Cir. 1993) ............................................................................ 28

*Nat'l Research Bureau, Inc. v. Kucker*,
    481 F. Supp. 612 (S.D.N.Y. 1979) ........................................................ 16, 18, 29

*NOW v. Operation Rescue*,
    747 F. Supp. 772 (D.D.C. 1990) ........................................................................ 10

*Nye v. United States*,
    313 U.S. 33 (1941) ............................................................................................... 8

*Paramedics Electromedicina Comercial, Ltda. v. GE Medical Sys. Info. Techs., Inc.*,
    369 F.3d 645 (2d Cir. 2004) ....................................................................... 9, 14, 17

*Phillippi v. CIA*,
    546 F.2d 1009 (D.C. Cir. 1976) ........................................................................ 13

*Project B.A.S.I.C. v. Kemp*,
    947 F.2d 11 (1st Cir. 1991) ............................................................................... 10

*SD Prot., Inc. v. Del Rio*,
    587 F. Supp. 2d 429 (E.D.N.Y. 2008) ................................................................ 9

*Shady Records Inc. v. Source Enters. Inc.*,
    351 F. Supp. 2d 64 (S.D.N.Y. 2004) ................................................................... 8

*Spallone v. United States*,
    493 U.S. 265 (1990) ........................................................................................... 10

*Stehney v. Perry*,
    101 F.3d 925 (3d Cir. 1996) .............................................................................. 28

*United States v. Ayer*,
    866 F.2d 571 (2d Cir. 1989) ................................................................................ 9

*United States v. Greyhound Corp.*,
    508 F.2d 529 (7th Cir. 1974) ....................................................................... 18, 24

*United States v. Lockheed Martin Corp.*,
    1998 WL 306755 (D.D.C. May 29, 1998) ......................................................... 28

*United States v. United Mine Workers of Am.*,
    330 U.S. 258 (1947) ..................................................................................... 6, 8, 25

*Vertex Distrib. Inc. v. Falcon Foam Plastics, Inc.*,
    689 F.2d 885 (9th Cir. 1982) ............................................................................. 22

## **STATUTES**

50 U.S.C. § 431 ................................................................................................... 19, 21, 27

## **OTHER AUTHORITIES**

7 Lord Halsbury, The Laws of England
(1909) ............................................................................................................... 5

Earl C. Dudley, Jr.,
*Getting Beyond the Civil/Criminal Distinction: A New Approach to the
Regulation of Indirect Contempts,* 79 Va. L. Rev. 1025 (1993) ............................... 5

Joseph H. Beale, Jr.,
*Contempt of Court, Criminal and Civil*, 21 Harv. L. Rev. 161 (1908) ..................... 4

Margaret Meriwether Cordray,
*Contempt Sanctions and the Excessive Fines Clause* 76 N.C. L. Rev. 407
(1998) ............................................................................................................... 4

Ronald Goldfarb,
*The History of the Contempt Power*, 1961 Wash. U.L.Q. 1 (1961) ........................... 4

Ronald L. Goldfarb,
*The Varieties of the Contempt Power*, 13 Syracuse L. Rev. 44 (1961) ..................... 7

## <u>INTRODUCTION</u>

The CIA's opposition brief is itself a remarkable document, and only underscores the appropriateness of a contempt finding in this case.   Nowhere in its brief does the CIA acknowledge that it violated a clear order of this Court—in fact, it argues to the contrary. Nowhere in its brief does the CIA explain why it failed to disclose the existence of the interrogation videotapes until it learned that the New York Times was planning to expose their destruction.   And nowhere in its brief does the CIA explain why it never informed this Court about the destruction of the tapes until Plaintiffs moved to hold the agency in contempt.   Further, the CIA's suggestion that its new document retention policies make a contempt finding inappropriate clearly establishes that the agency has entirely failed to come to terms with the nature of its misconduct.   The destruction of the tapes was not a matter of outdated document retention policies; it was the result of a decision made and ratified by the agency's seniormost officials, motivated by the desire to avoid the kind of public and judicial scrutiny that FOIA was meant to guarantee.

Indeed, a contempt finding would be appropriate in this case even if the defendant were a private entity and this case had nothing whatsoever to do with broader principles of governmental transparency and accountability.   But given that the defendant is a government agency, that this case seeks to vindicate the public's right to know about government conduct— some of which the President and Attorney General themselves have characterized as illegal—and that the records that the CIA destroyed were the very subject of Plaintiffs' suit, a contempt finding is not simply appropriate but necessary.

Nor does the expression of disapproval inherent in such a civil contempt finding constitute "punishment."   Rather, it is well established from the history of the contempt power that a contempt finding is an appropriate assertion of judicial authority, which expresses the right

of the Court, and all parties who appear before it, to expect that lawful orders will be obeyed. This vindication of the Court's authority is a proper function of civil contempt, and none of the cases cited by the CIA, which focus on the difference between the kind of sanctions that can be imposed in civil and criminal contempt proceedings, suggest otherwise.

Nor are the CIA's recent remedial efforts a basis to avoid a civil contempt finding, as the agency argues. However salutary, these efforts cannot undo the misconduct through which the CIA has earned a contempt finding. Indeed, the specific document retention and training measures proposed by the CIA as "remedies" in fact reflect its continued failure to acknowledge the nature and scope of its culpability. Likewise, the CIA's effort to characterize the Court's orders as "ambiguous" rests on a series of strained constructions that are flatly belied by both the language of the orders themselves and the agency's own previous representations in this case. The CIA's continued efforts to thus excuse its misconduct, and its refusal to even acknowledge its contumacious behavior, further demonstrates the need for a civil contempt finding, so that the agency will finally be held accountable for its actions.

Further, Plaintiffs have also established an ample basis for a civil contempt finding as against Jose Rodriguez, the former high-level CIA official who authorized the destruction of the videotapes, after Mr. Rodriguez receives appropriate notice and an opportunity to be heard. Specifically, Plaintiffs have presented evidence that Rodriguez knowingly violated this Court's orders; if Rodriguez disputes this characterization of his behavior, he should be required to present evidence to the contrary and submit himself to questioning before this Court. This Court should also hold proceedings to ascertain the responsibility of the additional individuals that Plaintiffs have identified, or provide limited discovery or the opportunity for review of documents in a sealed proceeding with the participation of Plaintiffs' counsel, so that responsible

officials can be identified.  Far from asking the Court to undertake the purported "fishing expedition" about which the CIA complains, Plaintiffs have identified specific individuals whom the record suggests may be in contempt, in light of the limited and heavily redacted documents that the CIA has made public.

Indeed, all of the relief requested by Plaintiffs, including the disclosure of additional paragraph 4 records and attorneys' fees and expenses arising from the CIA's contumacious conduct, is compensatory in nature and therefore an appropriate civil contempt sanction. Because the interrogation videotapes have been destroyed and Plaintiffs' right to litigate their claims under FOIA has been forever extinguished, Plaintiffs can never be fully compensated for the misconduct of the CIA and its officials.  But Plaintiffs have a right to be made as close to whole as possible, and the limited compensatory measures that Plaintiffs request are both reasonable and closely related to the damage done to Plaintiffs by the contempt at issue.

## ARGUMENT

### I.   This Court Should Find the CIA in Civil Contempt for Its Egregious Violations of This Court's Orders

#### A.   Expressing disapproval of violations of court orders through a finding of civil contempt does not convert a civil contempt proceeding into a "punishment."

All findings of contempt—whether civil or criminal—function as an official expression of disapproval of the contemnor's conduct.  Indeed, the very term "contempt" acknowledges that a party has disrespected the court.  The CIA misapprehends this basic principle, arguing that although Plaintiffs concededly seek only remedial sanctions against the CIA via this Court's civil contempt power, the mere act of *finding* the CIA in civil contempt would effectively punish the CIA for past conduct, and is therefore inappropriate.  This argument turns the well-established requirement that civil contempt sanctions must be remedial in nature into a rule that a civil

contempt *finding* cannot be used to express disapproval of contumacious behavior.  But this is not the law.  As the Supreme Court has repeatedly affirmed, civil contempt serves to "vindicate the court's authority" and to express disapproval of violative conduct, as long as the contempt *sanction* is remedial in nature.  This principle reflects the reasoning underlying the modern distinction between civil and criminal contempt, which evolved in order to ensure heightened procedural protections when a contemnor faces criminal-like *sanctions*, but not to undo the historic role of contempt—whether civil or criminal—as a means to express judicial disapprobation for contumacious conduct.  The caselaw reveals that, in fact, courts regularly render civil contempt findings to communicate disapproval of contumacious conduct.  The CIA does not cite even a single case in which a court concluded that finding a party in civil contempt, while imposing remedial sanctions, would be an inappropriate "punishment."

Contempt is an ancient and inherent judicial power, dating to at least the twelfth century. *See* Margaret Meriwether Cordray, *Contempt Sanctions and the Excessive Fines Clause*, 76 N.C. L. Rev. 407, 431 (1998).  The use of the contempt power originated at a time when English courts were thought to act for the king, where "[v]iolation of their writ, or disobedience to their officers, violated the peace and flouted the king they represented," and "their exercise of contempt powers derived from a presumed contempt of the king's authority."  Ronald Goldfarb, *The History of the Contempt Power*, 1961 Wash. U.L.Q. 1, 8 (1961).  Thus, "[f]rom the earliest times a refusal to obey an order of the king or of his officer, formally and expressly directed to a subject, has been regarded as a contempt.  This, doubtless, was deemed a breach of allegiance." Joseph H. Beale, Jr., *Contempt of Court, Criminal and Civil*, 21 Harv. L. Rev. 161, 164 (1908).

Over time, contempt evolved from an expression of the king's power to an inherent power possessed by the courts themselves.  *See* Goldfarb, *The History of the Contempt Power*,

*supra*, at 8-9.  The distinction between "punitive" criminal contempt sanctions and "coercive or compensatory" civil contempt sanctions did not exist at common law, however.[1]  Rather, in all cases, the contempt power was understood as a mechanism for safeguarding the rule of law and expressing the court's authority, "[f]or laws without a competent authority to secure their administration from disobedience and contempt, would be vain and nugatory."  William Blackstone, 4 Commentaries *286 (discussing the appropriateness of attachments for contempt).  This same principle underlay the use of the contempt power in the United States.  *See Ex parte Robinson*, 86 U.S. 505, 510 (1874) (contempt power "is essential to the preservation of order in judicial proceedings, and to the enforcement of the judgments, orders, and writs of the courts, and consequently to the due administration of justice").

The modern distinction between civil and criminal contempt—with contempt characterized as civil when the sanctions imposed are coercive or compensatory and criminal when sanctions are punitive—took on its modern form in the twentieth century, as a way to ensure adequate procedural rights to individuals facing criminal-like penalties.  *See* Earl C. Dudley, Jr., *Getting Beyond the Civil/Criminal Distinction: A New Approach to the Regulation of Indirect Contempts,* 79 Va. L. Rev. 1025, 1037-40 (1993).  A series of decisions granted a broad range of criminal law protections to  alleged contemnors against whom punitive sanctions were sought to be imposed.  *See, e.g.*, *Bloom v. Illinois*, 391 U.S. 194 (1968) (right to a jury trial for

---

[1] Although the labels "criminal" and "civil" contempt existed in England at common law, they had a different meaning than in their modern usage in the United States.  The distinction depended upon the type of behavior at issue: disruptive acts in the courtroom were "criminal," while disobedience to court orders were "civil," or "contempt in procedure."  Cordray, *supra*, at 431.  With respect to civil contempt, the sanction imposed had both a remedial and a punitive purpose, "implying as between the parties to the proceedings merely a right to exercise and a liability to submit to a form of civil execution, but as between the party in default and the State, a penal or disciplinary jurisdiction, to be exercised by the court in the public interest."  *Id.* at 439 (quoting 7 Lord Halsbury, The Laws of England 297-98 (1909)).

criminal contempt involving imprisonment for more than six months); *In re Bradley*, 318 U.S. 50 (1943) (double jeopardy applies to criminal contempt); *Gompers v. Bucks Stove & Range Co.*, 221 U.S. 418, 444 (1911) (right against self-incrimination and to proof beyond a reasonable doubt applies to criminal contempt).   But while the civil/criminal contempt distinction ensures heightened protections when contemnors face punitive sanctions, the traditional justification for the contempt power as an expression of judicial authority remains the same: "Courts independently must be vested with power to impose . . . submission to their lawful mandates . . . . , a power necessary to the exercise of all others."   *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 831 (1994) (internal citations and quotation marks omitted).   Civil contempt can and does still "vindicate[e] [the court's] legal authority to enter the initial court order," as long as the *sanction* is not punitive.   *Hicks v. Feiock*, 485 U.S. 624, 635 (1988).

As *Gompers v. Bucks Stove & Range Co.*, the seminal case establishing the modern civil/criminal contempt distinction, makes clear, the distinction between civil and criminal contempt was never intended to eliminate the expression of disapproval inherent in finding a party in civil contempt.   Instead, *Gompers* explains that the difference between civil and criminal contempt proceedings turns on the *purpose* of the sanction imposed: civil contempt yields remedial or compensatory sanctions, such as a coercive jail term that lifts when a party complies, while criminal contempt yields punitive sanctions, such as a fixed jail term imposed for past misdeeds.   221 U.S. at 441.   The Court reasoned that this distinction was important because proceedings undertaken for the purpose of imposing punitive sanctions "involve substantial rights and constitutional privileges" not at issue in civil contempt proceedings, such as the privilege against self-incrimination and the right to proof beyond a reasonable doubt.   *Id.* at 444. But *Gompers* never suggested that the fact that a sanction was remedial, and therefore did not

require the same level of procedural protections, eviscerated the historic role of contempt as an expression of the court's authority.  Quite the opposite: "For if the case is civil and the punishment is purely remedial, there is also a vindication of the court's authority."  *Id.* at 443; *see also* Ronald L. Goldfarb, *The Varieties of the Contempt Power*, 13 Syracuse L. Rev. 44, 51 (1961) ("In civil contempt cases, though the rationale may be assistance to a private party litigant in the execution of his civil remedies, there is an exaltation of government and a strengthening of its control and power through the judicial process.").  Thus, the court's "subjective intent" in imposing a particular sanction is irrelevant to whether a contempt proceeding is properly deemed civil—what matters is an "examination of the character of the relief itself."  *Bagwell*, 512 U.S. at 828 (internal quotation marks omitted).

Courts holding parties in civil contempt have long applied this principle, recognizing that a court can use language disapproving of a contemnor's behavior without converting a civil contempt finding into an inappropriate "punishment."  *See, e.g.*, *Landmark Legal Found. v. Envtl. Prot. Agency*, 272 F. Supp. 2d 70, 86 (D.D.C. 2003) (finding the EPA in civil contempt and imposing sanctions, and explaining that "[d]isobedience of a court order is inherently disrespectful, but the defendants' conduct in this case has gone beyond disobedience and into disrespect"); *Cobell v. Babbitt*, 37 F. Supp. 2d 6, 38 (D.D.C. 1999) (holding two cabinet secretaries and an assistant secretary in civil contempt and imposing remedial and coercive sanctions, while expressing "deep[] disappoint[ment]" about their "troubling" conduct).  Indeed, in *Cobell*, the court found the officials in civil contempt even though the contemnors agreed to *all* of the requested coercive and compensatory remedies, thus highlighting the expressive role that a finding of civil contempt, on its own, plays.  37 F. Supp. 2d at 36-38.  While the CIA makes much of the *Cobell* court's statement that there was "no other viable option" but to find

the defendants in contempt, the court concluded there was no other option *because* the defendants' "egregious misconduct" caused them to "earn[]" a contempt citation.[2]  *Id.* at 38-39. Moreover, this was the case despite recent "marked[]" improvements in the defendants' conduct that the court considered a "hopeful" sign for the future.[3]  *Id.* at 38-39.

Indeed, although the CIA complains that a civil contempt finding against it would function as an inappropriate punishment, it fails to cite even a single case in which a finding of civil contempt made in connection with imposing remedial sanctions was *itself* deemed a punishment.  Instead, the cases it cites make only the obvious point that civil contempt may not be used to impose *sanctions*, such as fines or imprisonment, that are wholly punitive, rather than coercive or compensatory vis-à-vis the victimized party.  *See, e.g.*, *United States v. United Mine Workers of Am.*, 330 U.S. 258, 303-04 (1947) (in the case of civil contempt sanctions, compensatory fines must be based on actual loss and coercive fines must be based on the magnitude of the harm and the defendant's financial resources); *Nye v. United States*, 313 U.S. 33, 43 (1941) (unconditional fines payable to the United States were criminal contempt

---

[2] Of course, the court never suggested that a contemnor's behavior was required to be egregious or willful in order to qualify for a civil contempt finding.  *See Cobell*, 37 F. Supp. 2d at 36 (noting that a "contemnor need not intentionally violate a court order in order to be held in civil contempt").

[3] The CIA's attempt to distinguish *Shady Records Inc. v. Source Enterprises, Inc.*, 351 F. Supp. 2d 64 (S.D.N.Y. 2004), is likewise unavailing.  In *Shady Records*, the court explained that there was a public policy benefit in encouraging parties to seek a contempt finding, even when there was no need for coercive or compensatory remedies for the underlying violation of the court's order.  The court therefore imposed attorneys' fees associated with bringing the contempt motion as the sole sanction for the defendants' contempt.  *Id.* at 67 (explaining that when the "defendants' behavior was genuinely, if not willfully, worthy of a contempt sanction," attorneys' fees ensure that the party seeking contempt is not " worse off for its efforts to secure compliance with its rights and the court's command").  Thus, *Shady Records* makes clear that a finding of contempt is not only a mechanism for providing compensation, but also a way of holding parties accountable for the violation of court orders.  Also, while the court declined to impose a punitive fine because it would be a "criminal" sanction, it said nothing to suggest that a mere finding of civil contempt would amount to "punishment."  *Id.* at 73.

sanctions); *Armstrong v. Guccione*, 470 F.3d 89, 100-08 (2d Cir. 2006) (upholding coercive incarceration pursuant to court's civil contempt power); *Paramedics Electromedicina Comercial, Ltda. v. GE Medical Sys. Info. Techs., Inc.*, 369 F.3d 645, 657 (2d Cir. 2004) (fines imposed pursuant to civil contempt power may be issued to "secure future compliance with court orders and to compensate the party that has been wronged" but cannot be "a purely punitive measure"); *N.Y. State Nat'l Org. for Women v. Terry*, 886 F.2d 1339, 1353 (2d Cir. 1989) ("[c]ompensatory sanctions should reimburse the injured party for its actual damages," while a coercive sanction must be "reasonable in relation to the facts"); *United States v. Ayer*, 866 F.2d 571, 573-74 (2d Cir. 1989) (jail term was criminal contempt sanction because it had no purge mechanism and the main purpose was to punish past conduct); *SD Prot., Inc. v. Del Rio*, 587 F. Supp. 2d 429, 436 (E.D.N.Y. 2008) (imposing a compensatory fine and attorneys' fees through court's civil contempt power).  Moreover, while the CIA suggests that courts regularly decline to find parties in civil contempt when their orders have been violated, the only case it cites in which a court expressly declined to find a party in contempt is *Class v. Norton*, 376 F. Supp. 496 (D. Conn.), *aff'd in part and rev'd in part on other grounds*, 505 F.2d 123 (2d Cir. 1974), where the court concluded that "much of the failure of compliance may have been the result of good faith attempts on the part of Department personnel to implement policies which were not sufficiently clarified by Department administrators."  *Id.* at 501.  *Class* never stated that a civil contempt finding would be a "punishment," and the good faith attempt at compliance in *Class* is in stark contrast to the CIA's contumacious conduct in this case, where high-level officials disobeyed this Court's orders in an effort to avoid public scrutiny of the CIA's interrogation practices.[4]

---

[4] In *Berger v. Heckler*, 771 F.2d 1556 (2d Cir. 1985), which is also cited by the CIA, the district court's reasons for not holding the defendant in contempt are never explained.  The Circuit noted that while it could "treat the district court's [sanctions] as an exercise of the court's power to

**B.      A contempt finding is particularly warranted under the circumstances of this case.**

A  contempt  finding,  and  the  accompanying  expression  of  disapprobation  that  it engenders, is essential in light of the CIA's extreme misconduct in this case.  As discussed in detail below, Plaintiffs have satisfied all of the requirements for a contempt sanction against the CIA, including demonstrating that this Court's orders were clear and unambiguous.  *See infra* Part II.  But the record in fact demonstrates much more than that.  As Plaintiffs exhaustively described in their supplemental brief, an account that the CIA resists but does not substantively dispute,[5] the CIA intentionally violated this Court's orders for the specific purpose of avoiding scrutiny of the CIA's interrogation program, and by doing so, has injured Plaintiffs in a way that can never truly be fully remedied.  (*See* Pls.' Supp. Br. (Doc. No. 449), at 3-19.)  None of the remedial measures to which the CIA points—which come too late and provide too little—alter this analysis.

Thus, high-level CIA officials knowingly flouted this Court's orders and their obligations under FOIA, all with the intent of evading public scrutiny of the CIA's interrogation program. This contempt by a governmental entity, which is directed toward Plaintiffs as well as toward the

---

hold a party in contempt," it instead would "rest our analysis . . . on the district court's even more basic authority to compel compliance with its orders."  *Id.*  at 1569 n.19.  The other cases cited by the CIA in support of the claim that courts frequently impose equitable relief in lieu of civil contempt sanctions were decided on wholly unrelated grounds.  For example, in *NOW v. Operation Rescue*, 747 F. Supp. 772 (D.D.C. 1990), the court declined to hold one defendant in civil contempt because Plaintiffs failed to establish that he violated a court order, but did hold several other defendants and non-parties in civil contempt.  *Id.* at 776, 779; *see also Spallone v. United States*, 493 U.S. 265 (1990) (holding it was an abuse of discretion to hold individual city councilmembers in civil contempt and impose coercive sanctions when contempt sanctions against the city would accomplish the desired result without perverting the legislative process); *Project B.A.S.I.C. v. Kemp*, 947 F.2d 11 (1st Cir. 1991) (contempt finding in error when the order was not clear and unambiguous).

[5] Although the CIA made a conclusory statement in its brief that Plaintiffs have mischaracterized the public record (CIA Supp. Opp'n Br. (Doc. No. 459), at 10 n.3), it does not point to any specific inconsistencies in Plaintiffs' account, nor are Plaintiffs aware of any.

10

Court, cannot be permitted to go unacknowledged.  *See Cobell*, 37 F. Supp. 2d at 38 ("But when that litigant is the federal government, the misconduct is even more troubling.  The institutions of our federal government cannot continue to exist if they cannot be trusted.").  In particular, the record is clear that the question of what to do with the interrogation videotapes was discussed within the agency almost as soon as the tapes were first created, and was a topic of discussion by high-level agency officials and the agency's General Counsel's Office over the course of years.  (*See* Pls.' Supp. Br. (Doc. No. 449), at 9-13, 14-17.)  Thus, the ultimate decision to destroy the tapes was not an innocent mistake or the effort of a rogue agent: Jose Rodriguez, the CIA's Deputy Director of Operations, authorized the destruction of the tapes, explaining after the fact that he did so because "the heat from destroying is nothing compared to what it would be if the tapes ever got into public domain" and that the tapes "would make us look terrible; it would be 'devastating' to us."  *See* Ex. 42 (Cable, Nov. 8, 2005); Ex. 45 (Email, Nov. 10, 2005).[6]  Another individual whose name has been redacted by the CIA but who "figured prominently in the tapes" and was "in charge of [redacted] at the time and clearly would want the tapes destroyed," drafted the cable that Rodriguez released.  Ex. 46 (Email, Nov. 10, 2005).  Porter Goss, then-Director of the CIA, ratified the destruction after the fact, noting that he "agreed with the decision."  Ex. 45 (Email, Nov. 10, 2005).  Other CIA departments also participated in discussions about whether to destroy the tapes, including the Counterterrorism Center ("CTC") and the Office of General Counsel ("OGC"), the very office that processed Plaintiffs' FOIA request.  *See* Ex. 31 (Timeline Regarding Destruction of Abu Zubaydah Videotapes).

The timing of the destruction also establishes, or at the very least gives rise to the reasonable inference, that the CIA destroyed the tapes to avoid public scrutiny of its

---

[6] References to Exhibits 1-52 are to the exhibits submitted in connection with Plaintiffs' Supplemental Memorandum of Law.  (*See* Declaration of Alicia L. Bannon (Doc. No. 450).)

interrogation tactics, a motive directly at odds with the values animating FOIA.  Strikingly, the tapes were destroyed the week after the Washington Post revealed the existence of the CIA's overseas black sites and Judge Leonie Brinkema, who was presiding over the trial of Zacharias Moussaoui, asked government attorneys whether the CIA had tapes of the Abu Zubaydah interrogations, and the day before the New York Times published an article disclosing the existence of an Office of the Inspector General ("OIG") investigation into CIA interrogation practices (an investigation in which the tapes were viewed).  (*See* Pls.' Supp. Br. (Doc. No. 449), at 16-17.)  Together, these facts clearly establish the appropriateness of holding the CIA, as an agency, in civil contempt: the decision to destroy the tapes was made by high-level officials, with the participation of legal counsel, for the purpose of protecting the agency from scrutiny. There can be no question that the destruction of the tapes is therefore attributable to the agency as a whole, and the CIA should be held accountable.

The need for a civil contempt finding is even more pressing in this case because the destruction occurred in the context of FOIA, and therefore went to "the heart of the [Plaintiffs'] case."  *See Landmark Legal Found.*, 272 F. Supp. 2d at 87.  Indeed, no remedial measures by the CIA can ever fully compensate Plaintiffs—or the public—for the destruction of the tapes, because the tapes were "directly related to the subject matter of this FOIA litigation—[Plaintiffs] sought information, and [the agency] destroyed it."  *Id.*  The CIA tries to trivialize this harm, pointing out that this Court has previously rejected disclosure of the so-called paragraph 3 records describing the content of the videotapes, and likely would have rejected disclosure of the tapes themselves as well.  (*See* CIA Supp. Opp'n Br. (Doc. No. 459), at 16 n.4.)  But this understanding of the goals of FOIA is far too narrow.  FOIA promotes governmental transparency even when records are ultimately withheld, because the government must examine

12

and provide reasons for refusing to disclose them, resulting in scrutiny of the records and the decision to withhold them both inside and outside the government.[7]  Indeed, as has occurred repeatedly throughout this lawsuit, the internal review process that FOIA requires the government to undertake often leads to voluntary disclosures, thus furthering FOIA's goal of governmental transparency.  These process values are central to the review scheme established by FOIA.  *See Am. Civil Liberties Union v. Dep't of Def.* ("*ACLU I*"), 339 F. Supp. 2d 501, 504 (S.D.N.Y. 2004) ("In enacting FOIA, Congress 'emphasize[d] a preference for the fullest possible agency disclosure of . . . information consistent with a responsible balancing of competing concerns . . . .'" (quoting *Halpern v. FBI*, 181 F.3d 279, 284 (2d Cir. 1999))).  Moreover, as the CIA is aware, Plaintiffs have appealed from this Court's ruling with respect to the so-called paragraph 3 records.  Thus, the final determination of whether these records must be disclosed has yet to be made.  By destroying the videotapes, the CIA simply short-circuited this review process, denying Plaintiffs the ability to make their case before this Court and on appeal and eliminating the possibility of the voluntary disclosure of these materials by the next generation of agency officials.

The CIA nevertheless suggests that a contempt finding is inappropriate because the Court can provide compensatory sanctions using its equitable power, thus rendering a finding of civil contempt unnecessary.  But this argument proves too much.  Indeed, were it correct, then a court would *never* be able to hold a party in civil contempt when compensatory sanctions are at issue,

---

[7] Although in some circumstances the government can provide a *Glomar* response to a FOIA request, neither confirming nor denying the existence of a document, even then the government must provide a justification as to why a *Glomar* response is required.  *See Phillippi v. CIA*, 546 F.2d 1009 (D.C. Cir. 1976); *Am. Civil Liberties Union v. Dep't of Def.* ("*ACLU III*"), 389 F. Supp. 2d 547, 559-66 (S.D.N.Y. 2005).  Moreover, a *Glomar* response with respect to the videotapes would have been inappropriate, because the government later officially acknowledged both the fact of the interrogations at CIA black sites and the existence of videotapes of those interrogations.

because it could always order compensation through its equitable power instead.  The truth is, of course, that notwithstanding the availability of sanctions by other means, civil contempt remains a mechanism by which courts impose compensatory sanctions, even in cases (unlike this one) in which the failure to obey a court order was not willful.  *See, e.g.*, *Manhattan Indus., Inc. v. Sweater Bee by Banff, Ltd.*, 885 F.2d 1, 5 (2d Cir. 1989) (ordering compensatory sanctions even though violation of court order was not willful); *Home Depot U.S.A., Inc. v. Home Depot Auto Warehouse, Inc.*, No. 99 Civ. 11067, 2001 U.S. Dist. LEXIS 2511, at *8 (S.D.N.Y. Mar. 7, 2001) (same); *see also Paramedics Electromedicina*, 369 F.3d at 655 ("It need not be established that the violation was willful.").  Where, as here, the CIA's violation of this Court's orders was in fact willful, was undertaken to undermine the very purposes of FOIA, and harmed Plaintiffs in ways that cannot be fully compensated, a finding of contempt is particularly appropriate.

The CIA also counters that a contempt finding is unnecessary because of its recent efforts to remedy the destruction of the tapes and to comply with this Court's subsequent orders.  This argument misstates both the law and the extent and nature of the CIA's remedial measures.  First, it is simply not the rule that subsequent remedial measures render a contempt finding inappropriate or unnecessary, particularly when the initial conduct was as significant a violation as occurred here.  In fact, courts find parties in contempt for violations of court orders even when subsequent conduct demonstrates a "marked" improvement in behavior.  For example, in *Cobell*, the cabinet official defendants facing a contempt motion consented to all of the remedies sought by the Plaintiffs—something that the CIA has not done here.  The defendants in *Cobell* had also shown recent "marked" improvements in their behavior: In addition to agreeing to pay attorneys' fees and to the appointment of a special master to oversee compliance going forward, the government had (1) demonstrated "commendable candor" during the contempt trial and

14

apologized for its misconduct; (2) announced a complete restructuring of the trial team; and (3) demonstrated a "marked[]" improvement in the handling of the litigation since the issuance of the Order to Show Cause.  37 F. Supp. 2d at 31, 36-39.  Nevertheless, the court concluded that the defendants could not avoid a contempt finding.  While a "hopeful sign[] for the future," the court concluded that these changes came "too late" to avoid the contempt citation that these government officials had "earned."  *Id.* at 39.  Like the defendants in *Cobell*, the CIA, in violating this Court's orders and thus irrevocably destroying the videotapes, has clearly "earned" a finding of contempt.  *See also Landmark Legal Found.*, 272 F. Supp. 2d at 79 ("EPA argues that because it is now in compliance with the order, a contempt finding is unnecessary.  The Court disagrees.").

Likewise, although the CIA makes much of its recent remedial efforts, these efforts do not come close to addressing its prior misconduct.  First, the CIA did nothing to remedy its violation of this Court's orders until *after* Plaintiffs filed a contempt motion in 2007 and the CIA faced the prospect of someday having to explain itself to this Court.  Meanwhile, from 2004 until 2007, the CIA wantonly disobeyed this Court's orders without ever apparently considering—and certainly never actually undertaking—any remedial efforts whatsoever.  Instead, it first hid the existence of the tapes from Plaintiffs and the Court, and then destroyed them so that they could never be subject to disclosure.  Nor is there any indication that the CIA *ever* intended to inform Plaintiffs or the Court of the existence of the videotapes: the CIA only announced the existence of the tapes after the New York Times learned of them and was about to publish a story.  *See* Ex. 47 (General Mike Hayden Statement on the Videotapes, Dec. 6, 2007) (describing the existence and destruction of the tapes, and beginning with the statement, "[t]he press has learned that back in 2002, . . . CIA videotaped interrogations, and destroyed the tapes in 2005"); Ex. 48 (Mark

Mazzetti, *C.I.A. Destroyed 2 Tapes Showing Interrogations*, N.Y. Times, Dec. 7, 2007).  Thus, even if the CIA's subsequent efforts have been undertaken in good faith, as in *Cobell*, it is simply "too late to save the defendants from the contempt citation[] they have earned."  37 F. Supp. 2d at 39.

Second, not only can the CIA never fully remedy Plaintiffs for the destruction of these tapes, but their proposed remedial measures fall far short of what they could do by way of remedy.  As discussed in greater detail *infra* Part IV, the agency has refused to consent to several of the remedial measures Plaintiffs have requested, including creating a full record of the circumstances surrounding the destruction of the tapes and full compensatory attorneys' fees relating to their contumacious conduct.  Civil contempt is a means of requiring that the CIA do that which it otherwise will not do: make the Plaintiffs whole.  *See, e.g.*, *Nat'l Research Bureau, Inc. v. Kucker*, 481 F. Supp. 612, 614 (S.D.N.Y. 1979) ("Civil contempt is not a discretionary matter; if a court order has been violated, the court must make the injured party whole.").

Finally, the CIA's conduct since the revelation of its conduct has been, its description to the contrary notwithstanding, far from admirable.  As discussed in further detail *infra* Part II, the CIA has never admitted that it in fact behaved contumaciously, instead providing excuses for its violations of this Court's clear and unambiguous orders that are at best strained and are seemingly disingenuous.  Critically, the agency has never actually acknowledged the scope of its misbehavior.  This point is only underscored by the CIA's new policies imposing new document preservation standards and attorney training.  (*See* CIA Supp. Opp'n Br. (Doc. No. 459), at 34-36.)  The destruction of the tapes occurred not because of inadequate document retention procedures or training of low-level officials, but because of efforts at the highest levels of the agency to avoid scrutiny of CIA policies.  Put simply, there is a basic disconnect between the

CIA's "remedial" measures and the nature of its contumacious conduct.   Under these circumstances, where the CIA's own remedies underscore its failure to take responsibility for its conduct, a contempt finding is particularly appropriate.

## II.       The CIA Violated Clear and Unambiguous Orders

Plaintiffs have met all of the requirements for a finding of civil contempt—including demonstrating that this Court's orders were clear and unambiguous.[8]   In arguing otherwise, the CIA offers only strained constructions of this Court's orders that are flatly belied by both the language of the orders and the agency's own previous representations in this case.   Indeed, the CIA's ongoing refusal—embodied in these arguments—to acknowledge its plainly contumacious conduct further demonstrates the need for a civil contempt finding against it.

In order to be "clear and unambiguous," an order "need only be 'specific and definite enough to apprise those within its scope of the conduct that is being proscribed.'"   *GMA Accessories, Inc. v. Eminent, Inc.*, No. 07 Civ. 3219, 2008 U.S. Dist. LEXIS 55107, 10-11 (S.D.N.Y. May 29, 2008) (quoting *N.Y. State Nat'l Org. for Women*, 886 F.2d at 1352).   As explained in greater detail in Plaintiffs' prior briefing (Pls.' Supp. Br. (Doc. No. 449), at 13-14, 24-25; Pls.' Reply (Doc. No. 272)), this Court clearly and unambiguously ordered the CIA to identify or produce all "relevant documents that have already been identified

---

[8] Though it complains that this Court's orders were ambiguous, the CIA does not even attempt to argue that Plaintiffs failed to establish the other elements of contempt: clear and convincing proof of noncompliance and a failure to diligently attempt to comply with the Court's orders in a reasonable manner.   *See Paramedics Electromedicina Comercial*, 369 F.3d at 655.   Indeed, there is no evidence whatsoever of any attempt by the CIA to comply with its obligations to produce or identify the videotapes, as required by this Court's orders.   Not only did the CIA keep the tapes a secret and fail to identify them to Plaintiffs or the Court, but it then destroyed them so that they could never be disclosed.   Nor was this a minor oversight involving a few stray records; instead, the scope of the destruction was broad, involving at least 92 tapes containing hundreds of hours of material.

and produced to, or otherwise collected by, the CIA's Office of Inspector General ['OIG']." *See* Ex. 26 (Apr. 18, 2005 Order); *Am. Civil Liberties Union v. Dep't of Def.* ("*ACLU II*"), 351 F. Supp. 2d 265, 268 (S.D.N.Y. 2005) (Feb. 2, 2005 Order).  Because the interrogation videotapes were not only "identified and produced to" the OIG in connection with its investigation of CIA interrogation activities, but also actually viewed and relied upon by the OIG in its final report, no reasonable reader could have concluded that the videotapes fell outside the order's purview.

The CIA nevertheless attempts to create ambiguity where none exists, offering "twisted interpretations [and] tortured constructions" of the relevant orders that this Court should resist. *See United States v. Greyhound Corp.*, 508 F.2d 529, 532 (7th Cir. 1974) (internal quotation marks omitted); *see also National Research Bureau*, 481 F. Supp. at 615 (a contempt finding cannot be avoided by a "literal or hypertechnical" reading of an order).  First, the CIA argues that this Court's April 18, 2005 order is ambiguous because it could be interpreted as instructing the CIA *not* to search its operational files at all, even if they contained investigation materials. (CIA Supp. Opp'n Br. (Doc. No. 459), at 22-23.)  Specifically, the CIA points to the following statement in the Court's April 18, 2005 order:

> [I]n accordance with the remainder of the Court's February 2, 2005 Opinion and Order, the Central Intelligence Agency's 'obligation to search and review [extends], not to operational files, but only to relevant documents that have already been identified and produced to, or otherwise collected by, the CIA's Office of Inspector General.

Ex. 26, at 3.  The CIA's proposed interpretation is plainly unreasonable.

As the CIA was well aware, the subject of the April 18, 2005 order was the CIA's *own* motion for partial relief from this Court's February 2, 2005 order.  The February 2, 2005 order discussed the CIA's production responsibilities in great detail and had two main holdings: (1) that the CIA had not properly invoked the operational files exemption under the CIA Information

Act and that its operational files therefore had to be searched and reviewed; and (2) that even if the operational files exemption applied, the CIA's operational files would "once again become subject to FOIA under the [investigation] exception in 50 U.S.C. § 431(c)(3), at least to the extent documents have been produced or gathered pursuant to [an OIG] investigation."[9] *ACLU II*, 351 F. Supp. 2d at 272.  The CIA's motion for partial relief requested the Court to reconsider only the first holding, "that the CIA has not properly invoked the operational files exemption pursuant to 50 U.S.C. § 431."  (CIA Feb. 16, 2005 Br. (Doc. No. 54), at 1.)  Specifically, the CIA sought "a modification of the February Order making clear that *the Court is ordering the CIA to search for and review information from operational files that are the specific subject matter of the ongoing OIG investigation* before that investigation is complete, but that the Court is *not* ordering the CIA to search for and review information from operational files that are not the specific subject matter of the OIG's investigation."  (*Id.* at 2 (emphasis added) (internal citations omitted).)  This is exactly what the Court did; indeed, as quoted above, and in the CIA's brief, the April 18, 2005 order explicitly states that it is "in accordance with the remainder of the Court's February 2, 2005 Opinion and Order."  Ex. 26, at 3.  Therefore, the only possible interpretation of the April 18, 2005 order is that the Court gave the CIA what it asked for: that the CIA only needed to search its operational files for records that were the specific subject matter of an OIG investigation—records that certainly included the interrogation videotapes.  *See*

---

[9] Under the CIA Information Act, the Director of the CIA may exempt "operational files" from the provisions of FOIA.  50 U.S.C. § 431(a).  However, under the "investigations exception" of the Information Act, "exempted operational files shall continue to be subject to search and review for information concerning . . . the specific subject matter of an investigation by the congressional intelligence committees, the Intelligence Oversight Board, the Department of Justice, the Office of General Counsel of the Central Intelligence Agency, the Office of Inspector General of the Central Intelligence Agency, or the Office of the Director of National Intelligence for any impropriety, or violation of law, Executive order, or Presidential directive, in the conduct of an intelligence activity." 50 U.S.C. § 431(c).

*Cobell*, 37 F. Supp. 2d at 16 (considering the "language of and circumstances surrounding the issuance of the order" in determining whether it was unambiguous).

The CIA's parsing of the term "collected by" is likewise unavailing, for the same reasons. That is, the CIA's own briefing demonstrates that the CIA understood that it was required to "search for and review information *from operational files* that are the specific subject matter of the ongoing OIG investigation," and that its search was therefore not limited to documents that were physically in the investigation files.  (*See* CIA Feb. 16, 2005 Br. (Doc. No. 54), at 2. (emphasis added).)  Moreover, in focusing on whether the tapes were "collected by" OIG, the CIA ignores the fact that the videotapes at issue were unambiguously "identified and produced to" the OIG, and therefore fell within the plain text of the April 18, 2005 order.  This interpretation is even clearer when the April 18, 2005 order is read alongside the February 2, 2005 order, which it explicitly references.  *See Landmark Legal Found.*, 272 F. Supp. 2d at 75 (contempt may lie when an order incorporates by reference a document with which the enjoined party is familiar).  Thus, the February 2, 2005 order explained that "even 'particularly sensitive records,' by virtue of having been disseminated or identified beyond their originating operational files [as part of an OIG investigation], become subject to FOIA search and review," even if the records were then returned to the operational file.  *ACLU II*, 351 F. Supp. 2d at 273-74.  Thus, "the inclusion of a specific investigation exception was meant to make relevance, not storage site, the touchstone of public access." *Id.* at 275.  Indeed, the Court explained, "[t]he documents in question need not actually have been reviewed and relied upon by the OIG staff" in order to fall under the investigation exception.[10]  *Id.* at 276-77.

---

[10] Faced with this clear language, the CIA argues that the Court's February 2, 2005 order was also ambiguous because the Court noted that "[t]here can be no additional material burden in searching and reviewing the documents already in the OIG's files."  *ACLU II*, 351 F. Supp. 2d at

Finally, although the CIA asserts that the OIG did not take custody of the videotapes or make a copy of them for its files, (CIA Supp. Opp'n Br. (Doc. No. 459), at 4), the record before the Court reveals that these tapes, or the fact of their existence, was a part of the OIG file in some form. Thus, the public record establishes that the interrogation videotapes were reviewed by OIG, were a central part of its investigation, and figured prominently in its final report. *See* Ex. 2, at 36-37 (OIG Report). Indeed, as this Court has previously explained, even if the tapes were not physically present in the investigation file, some form of "marker" must have been. *See* Jan. 17, 2008 Tr. at 36:13-16, attached hereto as Ex. 53 ("[I]t's inconceivable to me that someone doing either a special review or an investigation of what's going on would not look at these videotapes and not make some summary or have some equivalent summary and some documentation."). And even if it were reasonable to interpret the Court's orders as limiting the CIA's search to the OIG investigation files, which—for the reasons set forth above—it is not, at the very least the order unambiguously required the CIA to search for records referenced by these markers in the investigation file. *See ACLU II*, 351 F. Supp. 2d at 273-74 (discussing the requirement that the CIA retrieve and process records when there are "markers" of the record in the investigation file); 50 U.S.C. § 431(d)(3) ("Records from exempted operational files which have been disseminated to and referenced in [investigation] files . . . and which have been returned to exempted operational files for sole retention shall be subject to search and review.").

---

272. However, the Court's observation was expressly based upon the CIA's *own* representation that in the course of investigating improprieties in Iraq, "the OIG has searched for and received documents, including documents from the operational files of the CIA," and that "these documents are maintained in OIG investigative files, which also include documents created by the OIG." *Id.* (citing CIA's Nov. 11, 2004 brief (Doc. No. 39)). The CIA, of course, never notified the Court, or Plaintiffs, that there was also another OIG investigation involving interrogation practices, and that the videotapes reviewed as part of this investigation were not maintained in the OIG file. In sum, the Court's observations about the documents collected as part of the Iraq investigation do not explain, excuse, or legally justify the CIA's failure to produce or process records, like the videotapes, from other OIG investigations.

Under these circumstances, there is simply no "good faith and reasonable interpretation" of the order that could justify the CIA's decision to hide and then destroy the tapes.  *See Vertex Distrib. Inc. v. Falcon Foam Plastics, Inc.*, 689 F.2d 885, 889 (9th Cir. 1982).

The CIA also attempts to create a second form ambiguity by asserting that the OIG investigation that viewed the videotapes was a "special review," not an investigation, and that the CIA reasonably interpreted this special review as outside the scope of the investigation exception to the CIA Information Act and therefore outside the scope of this Court's orders.  This argument is simply inconsistent with the record: the OIG's "special review," however denominated, was an "investigation" under the CIA Information Act in every sense of the term, and there was thus no reasonable basis for concluding that the orders did not apply to it.  Indeed,  the only distinction between special reviews on the one hand and investigations on the other to which the CIA points in its briefing is that a "special review" is not initiated in response to a specific allegation of CIA impropriety.  Thus, the CIA states that its "position" is that "records do not fall within section 413(c)(3)'s  investigation  exception  unless  they  relate  to  the  subject  matter  of  a  'direct investigation into CIA wrongdoing,'" and that it was therefore reasonable for it to conclude that the OIG's "special review" was not an investigation within the meaning of the CIA Information Act.  (CIA Supp. Opp'n Br. (Doc. No. 459), at 26.)  This is an extraordinary argument, not least because, in fact, the OIG "special review" at issue in this case *was* initiated as a result of specific allegations of wrongdoing.  The OIG Report itself says that it was:

> In January 2003, the DDO [Deputy Director of Operations] informed OIG that he had received allegations that Agency personnel had used unauthorized interrogation techniques with a detainee, Abd Al-Rahim Al-Nashiri, at another foreign site, and requested that OIG investigate.   Separately, OIG received information that some employees were concerned that certain covert Agency activities at an overseas detention and interrogation site might involve violations of human rights.  In January 2003,

> OIG initiated a review of Agency counterterrorism detention and interrogation activities [redacted] and the incident with Al-Nashiri. This Review covers the period September 2001 to mid-October 2003.

Ex. 2, at 1-2 (OIG Report).  An investigation into allegations of "unauthorized interrogation techniques" and "violations of human rights" by Agency personnel is clearly an investigation into specific allegations of wrongdoing.

Accordingly, even giving credence to the CIA's own "position," it has failed to demonstrate any reasonable basis for concluding that the OIG's investigation fell outside the scope of the CIA Information Act and this Court's orders.  Moreover, the CIA *itself* previously categorized the OIG "special report" as an "investigation."  In the Seventh Dorn Declaration, dated January 27, 2006, the CIA categorizes a one hundred and sixteen-page "draft document entitled 'Special Review' and drafted by the CIA's Office of Inspector General" as a "closed OIG investigation document[]" responsive to Plaintiffs' FOIA request.[11]  *See* Vaughn Index of Closed OIG Investigation Documents at 1, 5-8, attached hereto as Ex. 54.[12]

In light of these facts, the videotapes unambiguously fell within the scope of this Court's orders: The videotapes were plainly responsive to Plaintiffs' FOIA request, they were identified and produced to the OIG in the course of its investigation into allegations of abuse and human rights violations by CIA agents, and they were in fact viewed and relied upon by the OIG in its report.  Nor, as the CIA itself previously acknowledged, is there any doubt but that this Court's

---

[11] This document appears to be the same "special review" as the OIG Report at issue here – the draft is dated February 2004, while the Final OIG Report was issued May 2004.

[12] Moreover, even if the "special review" was somehow not an "investigation," the videotapes still fell within this Court's order because they also "concern the specific subject matter" of other OIG investigations, including the investigation of the improprieties in Iraq.  (*See* Pls.' Reply Br. (Doc. No. 272), at 19-21.)

23

orders clearly stated that the CIA was required to search its operational files for investigation materials.

Thus viewed, the CIA's *post hoc* justifications fail to show any reasonable or good faith basis for believing the videotapes fell outside this Court's orders; in fact, its inconsistent statements and omissions to this Court suggest an absence of good faith. This is particularly so because the CIA never brought the existence of the videotapes or the "special review" to the Court's attention or sought any clarification of the orders' scope. *See Greyhound Corp.*, 508 F.2d at 532 ("[A] failure to [seek clarification of an order] when combined with actions based upon a twisted or implausible interpretation of the order will be strong evidence of a willful violation of the decree."). Rather, the agency acted unilaterally—and after much internal discussion—in hiding and destroying the tapes without seeking the guidance of the Court. And even if the CIA genuinely believed that the order did not apply to the videotapes, "defendants' unilateral misinterpretation cannot create an ambiguity when one does not exist." *Cobell*, 37 F. Supp 2d at 18.

Indeed, the CIA's entire line of argument further highlights the need for a contempt finding in this case, because the CIA has never in fact accepted responsibility for violating this Court's orders. Its strained explanations, including the idea that a "special review" is not an investigation, belies any contention that the agency took seriously then, or takes seriously now, its legal obligations to respect and abide by the orders of the Court. Instead, they further demonstrate that, as Plaintiffs contend, the CIA deliberately sought to avoid the Court's orders, and that, far from evidencing that this type of action is a thing of the past, as the agency contends, a finding of contempt is necessary to provide complete relief from its misconduct. Plaintiffs' application should be granted.

**III.    This Court Can and Should Find Rodriguez and Other Officials Who Knowingly Violated Its Orders in Civil Contempt**

The facts presented by Plaintiffs in their Supplemental Brief also support a finding of civil contempt against the CIA officials and former officials who knowingly violated this Court's orders, including Jose Rodriguez.[13]   As with the CIA, individual officials cannot be permitted to flout the requirements of FOIA and the orders of this Court.

With respect to Rodriguez, the CIA does not dispute that Rodriguez ordered the destruction of the tapes, and that he did so for the purpose of avoiding public scrutiny of CIA interrogation practices.   The limited records disclosed by the CIA likewise indicate that Rodriguez had knowledge of this Court's orders.   For instance, there is evidence that the CIA's Office of General Counsel—which processed Plaintiffs' FOIA request and was well aware of this Court's orders[14]—was involved in preparing the order to destroy the tapes, thus supporting the conclusion that Rodriguez was aware of the legal implications of destroying the tapes.   *See, e.g.*, Ex. 31 (Timeline Regarding Destruction of the Abu Zubaydah Videotapes) ("[redacted] CTC [redacted] sends the language to [redacted] and the ODDO front office, as well as OGC [Office of General Counsel] for approval.").   Indeed, the order destroying the tapes itself indicates that Rodriguez sought legal counsel.   *See* Ex. 42 (Cable, Nov. 8, 2005) (stating there is "no legal . . . requirement to continue to retain the tapes").   Finally, after destroying the tapes Rodriguez acknowledged that there might be "heat" from his decision, further indicating his

---

[13] Plaintiffs agree with the CIA that before any contempt finding is issued against Rodriguez or any other official, this Court should provide formal notice to Rodriguez, in the form of an Order to Show Cause, and an opportunity for him to obtain counsel, if he so desires, and to be heard. *See Bagwell*, 512 U.S. at 827.   However, because Plaintiffs seek civil, not criminal, contempt, if Rodriguez or other individual contemnors cannot afford counsel they have no right thereto, just as they do not enjoy the panoply of other rights that would be associated with criminal contempt.

[14] *See, e.g.*, Ex. 27 (Letter from John L. McPherson to Jennifer Ching, Apr. 15, 2005) (describing Office of General Counsel processing of FOIA request); Ex. 28 (Letter from Jennifer G. Loy to Megan Lewis, July 15, 2005) (same).

awareness that his actions were impermissible. *See* Ex. 45 (Email, Nov. 10, 2005). Given this evidence, and in light of the fact that the CIA has disclosed only very limited information about the videotapes' destruction, if Rodriguez disputes that he had knowledge of the Court's order or asserts some other defense, he should be required to present evidence to the Court and submit himself to questioning. Rodriguez in fact recently announced that he will be publishing a book explaining his decision to destroy the tapes, making clear that questioning him about his decision can be done in a manner consistent with any national security concerns. *See Former CIA Clandestine Chief in Memoir to Explain Why Interrogation Videos Destroyed*, Reuters, May 5, 2011, attached hereto as Ex. 55.

This Court should also hold proceedings to ascertain the responsibility of the additional individuals whom Plaintiffs have identified, or provide limited discovery or review in a sealed proceeding with the participation of Plaintiffs' counsel, so that such responsible officials can be identified.[15] Far from asking the Court to undertake the "fishing expedition" described by the CIA, Plaintiffs have identified for the Court specific individuals who the record suggests may be in contempt, in light of the limited and heavily redacted documents that the CIA has made public. John Rizzo, for example, was Acting General Counsel of the CIA at the time the tapes were destroyed. In light of the significant role that the General Counsel's office played both in processing Plaintiffs' FOIA requests and in authorizing the destruction of the tapes, there is a significant probability that Rizzo may have knowingly violated this Court's orders.[16] *See* Ex. 31

---

[15] At the very least, this Court should review records *in camera* to ascertain whether any additional officials should be held in contempt.

[16] Although it is possible that Rizzo disapproved of the destruction of the videotapes, *see* Ex. 45 (Email, Nov. 10, 2005) (email from redacted source stating Rizzo was upset because he was not consulted), Plaintiffs should be permitted to inquire further into Rizzo's role given that Plaintiffs have had access to only a very small number of heavily redacted documents and that Rizzo's office played a central role in the decision to destroy the videotapes.

(Timeline Regarding Destruction of Abu Zubaydah Videotapes); Ex. 45 (Email, Nov. 10, 2005). For similar reasons, the individual attorneys who authorized the tapes' destruction are also likely in contempt.

Limited discovery or review by the Court in a sealed proceeding with respect to these specific individuals is a modest request, which takes into account the CIA's need for secrecy while also providing Plaintiffs the opportunity to obtain relief from appropriately named individual contemnors.[17]   Discovery, for example, could be as simple as a short series of interrogatories to the agency.  Review of select documents is also appropriate.  Significantly, the paragraph 4 records are not themselves the subject of Plaintiffs' FOIA suit—they are part of a remedy provided by the Court for the CIA's violation of its orders.  Thus, there is no reason why Plaintiffs with appropriate security clearance should be denied access to these records.

Indeed, contrary to the CIA's claim (CIA Supp. Opp'n Br. (Doc. No. 459), at 29), numerous courts have determined that, where classified evidence is necessary to the resolution of a civil case, the government must provide some form of access to that evidence to opposing counsel.  *See, e.g.*, *In re Nat'l Sec. Agency Telecomms. Records Litig.*, 595 F. Supp. 2d 1077, 1089 (N.D. Cal. 2009) (ordering the government to process the plaintiffs' counsel for "security clearances necessary to be able to litigate the case"); *Horn v. Huddle*, 647 F. Supp. 2d 55 (D.D.C. 2009) (same), *vacated due to settlement*, 699 F. Supp. 2d 236 (D.D.C. 2010); *Doe v. Gonzales*, 386 F. Supp. 2d 66, 71 (D. Conn. 2005) (ordering the government "to provide plaintiffs with the opportunity for their lead attorney to seek to obtain the security clearance

---

[17] Although the CIA asserts that the CIA Information Act "rejected a discovery remedy" with respect to allegations concerning violations of the operational files exemption (CIA Supp. Opp'n Br. (Doc. No. 459), at 29 n.10), in fact Congress acknowledged that operational-file disputes cannot always be resolved on the basis of affidavits.  *See* 50 U.S.C. § 431(f) ("[T]he court shall, *to the fullest extent practicable*, determine issues of fact based on sworn written submissions of the parties.") (emphasis added).

required to review and respond to the classified materials in connection with the resolution of th[e] case"); *Al Odah v. United States*, 559 F.3d 539, 547-48 (D.C. Cir. 2009) (affirming that Guantánamo habeas counsel entitled to access to classified evidence or an adequate substitute, if feasible); *In re Guantanamo Bay Detainee Litig.*, Misc. No. 08-0442, 2009 WL 50155 (D.D.C. Jan. 9, 2009) (same); *In re Guantanamo Detainee Cases*, 344 F. Supp. 2d 174, 179-80 (D.D.C. 2004) (providing for security clearances for counsel); *see also Anderson v. ITT Indus. Corp.*, 92 F. Supp. 2d 516, 519 (E.D. Va. 2000) (counsel given security clearance); *United States v. Lockheed Martin Corp.*, No. 1:98-CV-731, 1998 WL 306755, at *5 (D.D.C. May 29, 1998) (same).

It is therefore "simply not the case that all security-clearance decisions" rest exclusively within the discretion of the executive branch. *Nat'l Fed'n of Fed. Employees v. Greenberg*, 983 F.2d 286, 289 (D.C. Cir. 1993). The CIA's contrary claim rests upon an interpretation of *Department of the Navy v. Egan*, 484 U.S. 518 (1988), that has been rejected by every court to have considered it. *See, e.g.*, *Greenberg*, 983 F.2d at 289; *Dorfmont v. Brown*, 913 F.2d 1399, 1404 (9th Cir. 1990); *Stehney v. Perry*, 101 F.3d 925, 932 (3d Cir. 1996). Rather, courts are empowered in certain circumstances, such as those presented here, to provide individuals— cleared by the government and subject to any necessary protective orders—with access to classified information in civil litigation. The Court should do just that in this case, in order to allow Plaintiffs the modest access to sensitive information necessary to meaningfully participate in these contempt proceedings, proceedings which, after all, are occasioned by the CIA's actions in flouting this Court's orders.[18]

---

[18] Plaintiffs note that Lawrence S. Lustberg, Esq. already has Top Secret security clearance in connection with his representation of various Guantánamo detainees and other matters.

**IV.     The Additional Relief Requested by Plaintiffs Is Warranted.**

Finally, the additional compensatory relief requested by Plaintiffs is both reasonable and necessary to make Plaintiffs as close to whole as possible in light of the irreversible destruction of the videotapes.[19]  *See Nat'l Research Bureau*, 481 F. Supp. at 614 ("[I]f a court order has been violated, the court must make the injured party whole.").

First, Plaintiffs' request that the CIA identify and process all paragraph 4 documents covering July 1, 2003 through May 31, 2005 is reasonable and necessary, so that Plaintiffs can have a full record of the circumstances leading up to the destruction of the videotapes.[20]  While a more limited paragraph 4 timeframe may have been sufficient for identifying evidence in support of Plaintiffs' contempt motion, Plaintiffs now seek an expanded set of records for a different, compensatory purpose: to create a complete historical record of the CIA's contumacious conduct.[21]

Plaintiffs have now fully analyzed the paragraph 4 documents that have already been released by the CIA.  Based on this review, it is clear that discussions within the CIA about whether to destroy the videotapes were continuous from the time the tapes were created, including during the July 1, 2003 through May 31, 2005 period.  *See, e.g.*, Exs. 21-23 (February

---

[19] Plaintiffs also have no objection to the Court's additional proposed remedy, which would require an OIG investigation into the CIA's conduct in destroying the videotapes.  However, on its own, this remedy is insufficient to compensate Plaintiffs or provide the official expression of disapproval that is required in this case.

[20] On July 30, 2009, the Court ordered the CIA to produce or identify the so-called "paragraph 4 documents," documents relating to the destruction of the tapes, which describe the persons and reasons behind their destruction.  The Court limited the CIA's search to documents from the period April 1, 2002 through June 30, 2003, and June 1, 2005 through January 31, 2006.  The Court also ordered the CIA to produce or identify the "paragraph 3 documents," documents relating to the content of the videotapes.  (*See* Pls.' Supp. Br. (Doc. No. 449), at 20.)

[21] Plaintiffs also previously sought to expand the date range for paragraph 4 records.  This Court rejected Plaintiffs' request "without prejudice for renewal upon a showing of cause for such enlargement."  *See* July 7, 2009 Order (Doc. No. 358).  Plaintiffs have now made their showing of cause.

2003 correspondence between Representative Jane Harmon and CIA General Counsel Scott Muller about whether the videotapes should be destroyed); Ex. 30 (Vaughn Index description of July 28, 2005 email "regarding the DNI's position [on] the destruction of the videotapes").  The CIA has in fact already processed a handful of paragraph 4 records from the missing period, which further demonstrate the relevance of discussions from this period.  *See, e.g.*, Ex. 24 (Vaughn Index listing for April 12, 2004 email discussing "what actions would make the tapes an official record").  Indeed, records from the missing period are likely to be particularly illuminating because this period corresponded to increased public scrutiny of CIA interrogation practices, including the release of the Abu Ghraib photographs.  *See* Ex. 33.  Given that materials responsive to Plaintiffs' FOIA suit have been destroyed, allowing Plaintiffs to create a record of the destruction is a modest form of compensation, that serves FOIA's end of ensuring governmental transparency and accountability.  This Court should therefore require the CIA to identify or produce the remaining paragraph 4 documents as a remedial measure.  *See Judicial Watch, Inc. v. United States Dep't of Commerce*, 34 F. Supp. 2d 28, 46 (D.D.C. 1998) (ordering discovery regarding the removal and destruction of documents responsive to a FOIA request).

Finally, in addition to the attorneys' fees that Plaintiffs will ultimately seek under FOIA, Plaintiffs also have a right to full compensation for the fees and expenses they have accrued as a result of the CIA's unlawful destruction of the videotapes.  *See Landmark Legal Found.*, 272 F. Supp. 2d at 87.  As the CIA acknowledges, Plaintiffs should be compensated for all fees and expenses related to bringing and litigating Plaintiffs' contempt motion.  However, the cost to Plaintiffs from the violation of this Court's orders extends beyond the contempt motion itself. For example, Plaintiffs have expended significant resources reconstructing the contents of the destroyed tapes and determining the persons and reasons behind the destruction of the tapes,

through review of the CIA's paragraph 3 and paragraph 4 disclosures.  Given that the Court ordered these materials produced as a partial remedy for the CIA's contempt and that reviewing them was only necessary because of the CIA's wrongful destruction of the tapes, full compensation requires that Plaintiffs be awarded fees for the time spent reviewing these disclosures.

Finally, Plaintiffs should also be compensated for their fees and expenses related to litigating the CIA's withholdings of paragraph 3 records, both before this Court and on appeal.  The paragraph 3 records raise a host of legal issues, many of them different from the issues that would have been raised by litigating the disclosure of the videotapes themselves.  Because the paragraph 3 records were only released because of the CIA's contempt, Plaintiffs should be compensated for the additional litigation that flowed from the CIA's disclosures.

## CONCLUSION

The CIA and its officers have violated this Court's orders and circumvented their obligations under FOIA.  For these reasons, and the reasons stated in their previous briefing, Plaintiffs respectfully request that this Court:

(1) hold Defendant CIA in civil contempt;

(2) require former CIA official Jose Rodriguez to show cause why he should not be held in civil contempt;

(3) allow limited discovery and review all withheld and partially-withheld paragraph 4 documents in a sealed proceeding, with the participation of Plaintiffs' counsel with appropriate security clearance, to determine if any other CIA officials should be required to show cause why they should not be held in civil contempt;

31

(4) order Defendant CIA to identify or release paragraph 4 documents for the time period July 1, 2003 through May 31, 2005 (a period not addressed by the Court's prior orders), so as to create a complete record of the persons and reasons behind the destruction of the tapes;

(5) order Defendant CIA and/or Jose Rodriguez and other responsible CIA officials to pay all attorneys' fees and costs associated with Plaintiffs' efforts to obtain responsive records from the CIA in this litigation, including efforts made in connection with this Motion, litigation over the paragraph 3 records, and all efforts to reconstruct the contents of the destroyed tapes and to determine the persons and reasons behind the destruction of the tapes; and

(6) order such other relief as may be just and proper.

Respectfully submitted,


    /s/  *Lawrence S. Lustberg*
Lawrence S. Lustberg
Alicia L. Bannon
GIBBONS, P.C.
One Gateway Center
Newark, New Jersey 07102-5310
(973) 596-4500

Jameel Jaffer
Alexander A. Abdo
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
125 Broad St., 18th Floor
New York, NY 10004

Michael Ratner
Gitanjali Gutierrez
Shayana Kadidal
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, NY 10012

Beth Haroules
Arthur Eisenberg
NEW YORK CIVIL LIBERTIES
UNION FOUNDATION
125 Broad Street
New York, NY 10004

Dated:  May 6, 2011

*Attorneys for Plaintiffs*