UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------- x
                                  :

AMERICAN CIVIL LIBERTIES UNION;      :
CENTER FOR CONSTITUTIONAL RIGHTS; :
PHYSICIANS FOR HUMAN RIGHTS;       :
VETERANS FOR COMMON SENSE;        :
VETERANS FOR PEACE,                  :

                    Plaintiffs,     :

                                 :

           -against-              :

                                 :

DEPARTMENT OF DEFENSE, AND ITS     :
COMPONENTS DEPARTMENT OF ARMY,   :
DEPARTMENT OF NAVY, DEPARTMENT OF :
AIR FORCE, DEFENSE INTELLIGENCE    :
AGENCY; DEPARTMENT OF HOMELAND   :
SECURITY; DEPARTMENT OF JUSTICE, AND :
ITS COMPONENTS CIVIL RIGHTS DIVISION, :
CRIMINAL DIVISION, OFFICE OF        :
INFORMATION AND PRIVACY, OFFICE OF  :
INTELLIGENCE POLICY AND REVIEW,    :
FEDERAL BUREAU OF INVESTIGATION;   :
DEPARTMENT OF STATE; CENTRAL      :
INTELLIGENCE AGENCY,            :

                    Defendants.   :

                                 :

                                 :

------------------------------------------------------------- x

**OPINION AND ORDER**
**DENYING MOTION TO HOLD**
**DEFENDANT CENTRAL**
**INTELLIGENCE AGENCY IN**
**CIVIL CONTEMPT**

04 Civ. 4151 (AKH)

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 10/5/11

ALVIN K. HELLERSTEIN, U.S.D.J.:

       Plaintiffs in this long-running litigation under the Freedom of Information Act

("FOIA"), 5 U.S.C. § 552, move to hold defendant CIA in civil contempt, charging that the CIA

violated my orders of September 15, 2004; February 2, 2005; and April 18, 2005, by failing to

identify or produce, in response to plaintiffs' FOIA requests and my repeated orders, videotapes

depicting detainee interrogation sessions, including the use of enhanced interrogation techniques.

The CIA's failure to identify or produce the videotapes came to light only after the media had learned, and the CIA then had acknowledged publicly, that the videotapes had been destroyed.

Plaintiffs, in an effort to remedy harms allegedly suffered at the hands of the CIA, seek a wide array of relief, including an order requiring the CIA to disclose documents that would identify the persons responsible for, and the reasons behind, the videotapes' destruction, for the period between July 1, 2003, and May 31, 2005; limited discovery, specifically, the opportunity to review all withheld and partially withheld documents of that same type, from all relevant time periods, in a sealed proceeding, to determine whether any current or former CIA officials should be ordered to show cause why they should not be held in civil contempt; and an award of attorneys' fees and costs incurred in obtaining responsive documents from the CIA in this litigation. The CIA agrees to an order for fees and costs, but objects to all other aspects of the relief plaintiffs seek. The CIA argues that procedures already ordered by the court have resulted in a substantially full production of documents describing that which the videotapes would have shown and identifying Agency personnel involved in the videotapes' destruction; that the same court-ordered exemptions that justified the CIA's withholding of many of those documents would have justified the withholding of the videotapes, as well, if the CIA timely had identified the videotapes in response to my orders; that the CIA voluntarily has adopted and implemented new protocols to avoid the improper destruction of documents in the future; and that, as a result, plaintiffs already have achieved substantially complete remedial relief.

I hold that plaintiffs have, indeed, achieved nearly complete remedial relief, and I deny plaintiffs' motion, except for awarding plaintiffs their attorneys' fees and costs.

2

## I.   The history of this lawsuit under the Freedom of Information Act.

Plaintiffs submitted their initial FOIA requests to a number of federal government agencies, including the CIA, in October 2003.[1]  First Am. Compl., Am. Civil Liberties Union v. Dep't of Def., No. 04 Civ. 4151 (Doc. No. 5 ¶ 2) (S.D.N.Y. July 6, 2004).  With those initial requests, plaintiffs sought the disclosure of government records that fell into three overlapping categories: (1) "records concerning the treatment of individuals apprehended after September 11, 2001, and held by the United States at military bases or detention facilities outside the United States"—individuals otherwise referred to as "detainees"; (2) "records concerning the deaths of [d]etainees in custody"; and (3) "records concerning the government's practice of 'rendering' [d]etainees to countries known to use torture."  Id.; Am. Civil Liberties Union v. Dep't of Defense ("ACLU I"), 339 F. Supp. 2d 501, 502 (S.D.N.Y. 2004).  Plaintiffs sought updated information, and referred to particular documents discussed by the media but not available to the public, in a second round of requests, submitted in May 2004.  ACLU I, 339 F. Supp. 2d at 502.

The CIA refused to process plaintiffs' requests on an expedited basis.  Id.  And the CIA, along with all but one of the other federal government agencies to which plaintiffs had submitted their requests, failed to identify or produce any responsive records.  First Am. Compl., Am. Civil Liberties Union v. Dep't of Def., No. 04 Civ. 4151 (Doc. No. 5 ¶ 5) (S.D.N.Y. July 6, 2004).  Having been frustrated in their efforts for disclosure at the agency level, plaintiffs filed this lawsuit on June 2, 2004, seeking "the immediate processing and release" of the records they had requested.  Compl., Am. Civil Liberties Union v. Dep't of Def., No. 04 Civ. 4151 (Doc. No. 1 ¶ 1) (S.D.N.Y. June 2, 2004).

After hearing oral argument from the parties as to how they intended to proceed in this matter, I issued my Opinion and Order of September 15, 2004, which required all defendant

---

[1] All matters discussed in this Opinion and Order are available on the public record of these proceedings.

agencies to "produce or identify all responsive documents" no later than October 15, 2004.

ACLU I, 339 F. Supp. 2d at 505. In opposing such a rigorous production schedule, the

government argued that plaintiffs' requests touched upon important national security issues. But,

as I explained,

> before it can be determined if documents requested . . . fall under [FOIA
> disclosure exemptions for records classified as matters of national defense or
> foreign policy], the documents must first be identified, by some form of log, to
> enable a specific claim of exemption to be asserted and justified.   As to
> documents the existence of which the government contends it may be unable to
> confirm or deny, procedures can be established to identify such documents in
> camera or to a special master with proper clearance.   Merely raising national
> security concerns can not justify unlimited delay.

Id. at 504 (citations omitted). I noted, further, that the records plaintiffs had sought related to

"matters of significant public interest." Id. Yet "the glacial pace at which defendant agencies

ha[d] been responding to plaintiffs' requests show[ed] an indifference to the commands of FOIA,

and fail[ed] to afford accountability of government," FOIA's bedrock principle. Id.

On October 15, 2004, the government wrote to advise me of each agency's

progress in responding to plaintiffs' FOIA requests and described the CIA as having "partially

complied." Letter from David N. Kelley, U.S. Att'y, S.D.N.Y., to Hon. Alvin K. Hellerstein,

U.S. Dist. J., S.D.N.Y, Am. Civil Liberties Union v. Dep't of Defense, No. 04 Civ. 4151 (Doc.

No. 18 at 3) (S.D.N.Y. Oct. 19, 2004). The CIA sought "partial relief" from my order, however,

in part, the government claimed, because the CIA could not "review operational documents that

[we]re the subject of ongoing investigations by [the CIA's Office of Inspector General, or

"OIG"] until those investigations [had] closed." Id. at 4. The government elaborated:

> Ordinarily, the CIA is statutorily exempt from searching operational files for
> documents responsive to FOIA requests.   Here, however, some of the CIA's
> operational files will become searchable due to OIG investigations.   The CIA
> cannot ascertain which operational files will be no longer exempt from plaintiffs'
> FOIA requests because the OIG, in the interests of protecting its ongoing

investigations, will not reveal the specific subject matter of its investigations until those investigations are closed.

Id. (citations omitted).

Following a conference with the parties, I ordered the CIA to raise by formal motion its concerns about reviewing and producing records from operational files that were the subject of an ongoing investigation. Order, Am. Civil Liberties Union v. Dep't of Def., No. 04 Civ. 4151 (Doc. No. 35 at 2) (S.D.N.Y. Nov. 1, 2004). Shortly thereafter, the CIA formally moved to stay its obligation to comply with my Opinion and Order of September 15, 2004.

After considering the parties' respective briefs and hearing their oral arguments, I denied the CIA's stay motion by Opinion and Order of February 2, 2005. I held that (1) the CIA had not met the procedural requirements for invoking the operational files exemption from FOIA disclosure, set forth in the CIA Information Act, 50 U.S.C. § 431; and (2) as a result of the ongoing investigation by the CIA's OIG, the CIA was required to search for, review, and disclose, or claim an exemption from the disclosure of, "records responsive to plaintiffs' FOIA requests that ha[d] been produced or gathered pursuant to the investigation." Am. Civil Liberties Union v. Dep't of Def. ("ACLU II"), 351 F. Supp. 2d 265, 268 (S.D.N.Y. 2005).

As to the operational files exemption from disclosure, the CIA had put forth no evidence that the Director of Central Intelligence explicitly had invoked the exemption, as the CIA Information Act requires. Id. at 271–72; see 50 U.S.C. § 431(a). Because the CIA had not shown that it had followed the proper procedures for exempting its operational files from disclosure, I could not find that those "files warrant[ed] any protection from the requirements of FOIA." ACLU II, 351 F. Supp. 2d at 272.

As to the investigation exception to the operational files exemption from FOIA disclosure, I concluded that, even if the Director of Central Intelligence had properly invoked the

operational files exemption, the CIA had not "articulate[d] a viable reason why, under the plain

language of the [CIA Information Act], the[] [operational files] should not once again become

subject to FOIA under the exception in 50 U.S.C. § 431(c)(3), at least to the extent documents

have been produced or gathered pursuant to [an] investigation." Id. The exception in 50 U.S.C.

§ 431(c)(3) provides that,

> [n]otwithstanding subsection (a) of this section, [which sets forth the operational files exemption,] exempted operational files shall continue to be subject to search and review for information concerning . . . the specific subject matter of an investigation by . . . the Office of Inspector General of the Central Intelligence Agency . . . for any impropriety, or violation of law, Executive order, or Presidential directive, in the conduct of an intelligence activity.

The CIA's OIG had undertaken, in May 2004, "'a criminal investigation of

allegations of impropriety in Iraq.'" ACLU II, 351 F. Supp. 2d at 268 (quoting Def.'s Br. at 5).

However, the CIA did not provide this court with any significant details about the nature of that

investigation—in fact, the CIA had made only the vague representation that,

> although the Iraq investigation is referred to in the singular . . . , there may be several investigations that are related to or grow out of the general Iraq investigation. In addition, the OIG is conducting other criminal investigations the specific subject matter of which may overlap with the subject matter of plaintiffs' FOIA requests.

Id. (quoting Def.'s Br. at 2 n.1).

In my Opinion and Order of February 2, 2005, I reviewed the plain terms of the

investigation exception and noted that the exception "is applicable when 'information' is sought

'concerning,' which is a broadly inclusive term, the 'specific subject matter of an investigation'

by 'the Office of Inspector General' into 'any impropriety' or illegality 'in the conduct of an

intelligence activity.'" Id. at 272 (quoting 50 U.S.C. § 431(c)(3)). The CIA had conceded that

the OIG's investigation into "improprieties in Iraq" had triggered the exception. Id. And the

CIA had represented that, in the course of the investigation, the OIG already had searched for

and received documents from operational files and thereafter had maintained those documents in the OIG's investigative files. Id. I concluded that there would be "no additional material burden in searching and reviewing the documents already in the OIG's files that are also responsive to plaintiffs' FOIA requests." Id. Indeed, the burden of responding to plaintiffs' FOIA requests would be "much reduced, for the search ha[d] already been made." Id. at 274.

The CIA argued, however, that the investigation exception should not come into play until after the OIG had concluded its investigation, "effectively delaying the CIA's . . . obligation . . . to comply with FOIA until such time, if ever." Id. at 272. After examining carefully the plain language and legislative history of the CIA Information Act, however, I disagreed. I concluded that "Congress [had] provided an exception to require the CIA to search investigative files for documents moved there from exempted operational files. That is what is at stake in the case before me. The requirement to search and review does not turn on whether the investigation continues, or has ended." Id. at 276.

As far as the scope of the investigation exception was concerned, I relied, once again, on the plain language and legislative history of the CIA Information Act. Id. at 276–78. My review of those materials made clear that the CIA was required to "search and review its information produced or gathered 'concerning . . . the specific subject matter'" of the OIG's investigations "for public release, or specific exemption, under FOIA." Id. at 276. I noted, further, that the "documents in question need not actually have been reviewed and relied upon by the OIG staff, and the CIA may not delay compliance until such time, if ever, an investigation is closed." Id. at 276-77. I therefore ordered the CIA to proceed with its search and review in response to plaintiffs' FOIA requests and in accordance with my Opinion and Order of September 15, 2004. Id. at 278.

7

The CIA moved to stay the effect of my Opinion and Order of February 2, 2005,
pending an appeal. I denied the motion because the CIA had not shown a likelihood of success
on the merits, or that it would suffer prejudice without a stay. Order Den. Mot. for Stay, Am.
Civil Liberties Union v. Dep't of Def., No. 04 Civ. 4151 (Doc. No. 57 at 1) (S.D.N.Y. Feb. 18,
2005). I reiterated that, if the CIA were to satisfy the statutory procedure for invoking the
operational files exemption, the CIA's "obligation to search and review w[ould] extend, not to
operational files, but only to relevant documents that ha[d] already been identified and produced
to, or otherwise collected by, the CIA's Office of Inspector General." Id. at 2; see also id. at 5
("If the CIA chooses to bring itself within the provisions of the CIA Information Act exempting
its operational files from search and review, only its investigative files will have to be
searched."). I noted, further, that even as to records falling under the investigation exception, my
orders would not necessarily require public disclosure; rather, "[p]rocedures for in camera
review and the availability of all FOIA exemptions" would "assure against any prejudice to the
CIA." Id. at 2.

The CIA sought partial reconsideration of my Opinion and Order of February 2,
2005. By order of April 18, 2005, I granted the CIA's motion and found that the CIA had
followed the statutory procedure for invoking the operational files exemption. Order Grant.
CIA's Mot. for Partial Relief, Am. Civil Liberties Union v. Dep't of Def., No. 04 Civ. 4151
(Doc. No. 86 at 1–3) (S.D.N.Y. Apr. 18, 2005). I therefore ordered that, pursuant to the
remainder of my Opinion and Order of February 2, 2005, the CIA's "obligation to search and
review" would extend, "not to operational files, but only to relevant documents that ha[d] already
been identified and produced to, or otherwise collected by, the CIA's Office of Inspector
General." Id. at 3.

## II.     The story of the videotapes.

Unbeknownst to plaintiffs, this court, and the world, between April and December 2002, the CIA had recorded, on a least ninety-two videotapes, interrogation sessions with two detainees, Zayn Al-Abidin Muhammad Husayn ("Abu Zubaydah") and Abd Al-Rahim Al-Nashiri. Decl. of Alicia L. Bannon, Am. Civil Liberties Union v. Dep't of Def., No. 04 Civ. 4151 (Doc. No. 450, Ex. 1) (S.D.N.Y. Feb. 15, 2011). Of the ninety-two videotapes, ninety related to the CIA's interrogations of Abu Zubaydah, and two were of sessions with Al-Nashiri. Id. News accounts suggest the interrogation sessions took place at a facility in Thailand. Decl. of Alicia L. Bannon, Am. Civil Liberties Union v. Dep't of Def., No. 04 Civ. 4151 (Doc. No. 450, Exs. 5–6) (S.D.N.Y. Feb. 15, 2011). Twelve of the videotapes included applications of enhanced interrogation techniques. Decl. of Alicia L. Bannon, Am. Civil Liberties Union v. Dep't of Def., No. 04 Civ. 4151 (Doc. No. 450, Ex. 2 at 36) (S.D.N.Y. Feb. 15, 2011).

Interrogation teams had determined to videotape sessions with Abu Zubaydah in part because he had been wounded during capture—the interrogators wanted "a record of [his] medical condition and treatment should he succumb to his wounds and questions arise about the medical care provided to him." Id. The videotapes were also meant "to assist in the preparation of the debriefing reports," but they were "rarely, if ever, . . . used for that purpose." Id.

Although there had been some talk within the CIA of destroying the videotapes later that same year, the videotapes were not then destroyed. In an email chain dated November 15, 2002, between an officer in the field and officers and attorneys at CIA headquarters, the officer in the field expressed "personnel concerns with the disposition of the video tapes." Decl. of Alicia L. Bannon, Am. Civil Liberties Union v. Dep't of Def., No. 04 Civ. 4151 (Doc. No. 450, Ex. 16) (S.D.N.Y. Feb. 15, 2011). In the same email chain, a CIA attorney discussed a

9

request "to have a random independent review of the video tapes, before they [we]re destroyed."
Id. An attorney in the CIA's Office of General Counsel did, in fact, undertake a review in late
2002, with an eye toward "ascertain[ing] compliance with the August 2002 [Department of
Justice] opinion [regarding the use of enhanced interrogation techniques] and compar[ing] what
actually happened with what was reported to Headquarters." Decl. of Alicia L. Bannon, Am.
Civil Liberties Union v. Dep't of Def., No. 04 Civ. 4151 (Doc. No. 450, Ex. 2 at 36) (S.D.N.Y.
Feb. 15, 2011). The attorney noted, in a memorandum dated January 9, 2003, that he or she had
"reviewed every minute of the videotapes [redacted] in either the 'play' or 'play/fast forward'
mode"; that the review had confirmed that "cable traffic accurately describes the interrogation
methods employed"; and that "[t]here [wa]s nothing remarkable about the interrogation and
debriefing." Decl. of Alicia L. Bannon, Am. Civil Liberties Union v. Dep't of Def., No. 04 Civ.
4151 (Doc. No. 450, Ex. 17) (S.D.N.Y. Feb. 15, 2011).

      Around the same time, in January 2003, the CIA's Inspector General, John L.
Helgerson, initiated his own review of the CIA's counterterrorism detention and interrogation
activities. Decl. of Alicia L. Bannon, Am. Civil Liberties Union v. Dep't of Def., No. 04 Civ.
4151 (Doc. No. 450, Ex. 2 at 2) (S.D.N.Y. Feb. 15, 2011). As part of that review, the OIG
examined the interrogation videotapes in May 2003. Id. at 36. Of the videotapes reviewed,
eleven were blank, two were blank but for one to two minutes of recording, and two were broken
and thus unreviewable. Id. at 37. The OIG's examination of the videotapes disclosed eighty-
three applications of the waterboard. Id. at 36. The OIG's review also "revealed that the
waterboard technique employed at [redacted] was different from the technique as described in
the [Department of Justice] opinion"—with the difference being "the manner in which the
detainee's breathing was obstructed." Id. at 37. More specifically,

in the [Department of Justice] opinion, the subject's airflow is disrupted by the firm application of a damp cloth over the air passages; the interrogator applies a small amount of water to the cloth in a controlled manner. By contrast, the Agency interrogator [redacted] continuously applied large volumes of water to a cloth that covered the detainee's mouth and nose. One of the psychologists/interrogators acknowledged that the Agency's use of the technique differed . . . and explained that the Agency's technique is different because it is "for real" and is more poignant and convincing.

Id.

In opposing plaintiffs' contempt motion, the CIA submitted for my review the declaration of Constance E. Rea, who, from March 2004 until at least January 2008, served as Deputy Assistant Inspector General for Investigations in the CIA's OIG. Decl. of Constance E. Rea, Am. Civil Liberties Union v. Dep't of Def., No. 04 Civ. 4151 (Doc. No. 271 ¶ 1) (S.D.N.Y. Jan. 10, 2008). Rea states that, "[a]lthough OIG reviewed the videotapes . . . in connection with a special review . . . , OIG did not initiate an investigation . . . as a result of the special review." Id. ¶ 4. The CIA relies on Rea's declaration, and the distinction she draws between a "special review" and an "investigation," in an effort to show that the videotapes were not subject to FOIA disclosure under the investigation exception to the operational files exemption—that aspect of the CIA Information Act that I had analyzed in my orders of February and April 2005. Rea distinguishes a "special review" from an "investigation" on the ground that a special review, unlike an investigation, "typically[] . . . is not initiated in response to a specific allegation of CIA impropriety." Id. ¶ 6. Rea maintains that the OIG's special review "was not initiated in response to" any such allegation. Id. ¶ 11. Nor, according to Rea, "did OIG initiate a separate investigation" at any time before the videotapes were destroyed. Id. ¶ 13.

Rea acknowledges that, "[d]uring the course of the special review, OIG was notified of the existence of [the] videotapes" and then reviewed the videotapes at a covert overseas facility. Id. ¶¶ 12–13. However, the OIG never took custody of or copied the

11

videotapes, which remained in the custody of the National Clandestine Service. Id. ¶ 13.

According to Rea, "[b]ecause OIG did not take custody or make copies of the videotapes, they

were not among the materials that OIG provided to the CIA components responsible for

processing" plaintiffs' FOIA requests. Id. ¶ 14. Therefore, the CIA argues, it was under no legal

compulsion to identify or produce the videotapes, and it cannot be held in contempt for failing to

do that which it was not legally required to do.

The CIA's argument, however, is contradicted by its own contemporary writings.

Contrary to the representations in Rea's declaration, in a written report memorializing the OIG's

"special review," dated May 7, 2004, the OIG describes the impetus for undertaking its review:

> In November 2002, the Deputy Director for Operations (DDO) informed the
> Office of Inspector General (OIG) that the Agency had established a program in
> the Counterterrorist Center to detain and interrogate terrorists at sites abroad ("the
> CTC Program"). . . . In January 2003, the DDO informed OIG that he had
> received allegations that Agency personnel had used unauthorized interrogation
> techniques with a detainee, Abd Al-Rahim Al-Nashiri, at [a] foreign site, and
> requested that OIG investigate. Separately, OIG received information that some
> employees were concerned that certain covert Agency activities at an overseas
> detention and interrogation site might involve violations of human rights. . . .
> This Review covers the period September 2001 to mid-October 2003.

Decl. of Alicia L. Bannon, Am. Civil Liberties Union v. Dep't of Def., No. 04 Civ. 4151 (Doc.

No. 450, Ex. 2 at 1–2) (S.D.N.Y. Feb. 15, 2011) (footnote omitted). The OIG concluded, as a

result of its special review, that the CIA had used "[u]nauthorized, improvised, inhumane, and

undocumented detention and interrogation techniques" throughout its counterterrorism detention

and interrogation activities. Id. at 102. Overall, the OIG's report concluded, "The Agency faces

potentially serious long-term political and legal challenges as a result of the CTC Detention and

Interrogation Program, particularly its use of [enhanced interrogation techniques]." Id. at 105.

The OIG's written report makes clear that the videotapes had been identified and

produced to and actually reviewed by the OIG as part of its investigation into allegations that

unauthorized interrogation techniques had been used and human rights violated at overseas detention facilities. Id. at 1–2. The CIA should have identified or produced the videotapes in response to plaintiffs' FOIA requests, seeking records concerning the treatment of detainees at overseas detention facilities, and my orders in this case, because the videotapes were subject to disclosure under the investigation exception in 50 U.S.C. § 431(c)(3). As explained previously, the investigation exception "is applicable when 'information' is sought 'concerning[]' . . . the 'specific subject matter of an investigation' by 'the Office of Inspector General' into 'any impropriety' or illegality 'in the conduct of an intelligence activity.'" ACLU II, 351 F. Supp. 2d at 272 (quoting 50 U.S.C. § 431(c)(3)). The videotapes fall into this category.

## III.    The destruction of the videotapes.

Despite plaintiffs' having submitted FOIA requests in October 2003 and May 2004 and having then filed this lawsuit; and despite my repeated orders that the CIA search for, review, and either identify or produce responsive records, the CIA failed to identify or produce the videotapes. The ninety-two videotapes, which depicted detainee interrogation sessions, including the use of enhanced interrogation techniques, plainly were responsive to plaintiffs' requests. Moreover, the videotapes were subject to disclosure under the investigation exception. In short, the CIA should have identified or produced the videotapes to plaintiffs.

Throughout 2004 and 2005, after plaintiffs had filed this lawsuit, the CIA's terrorist detention and interrogation practices came under increasing public scrutiny. On November 8, 2005, a cable sent from the field to CIA headquarters sought approval to destroy the videotapes. Decl. of Alicia L. Bannon, Am. Civil Liberties Union v. Dep't of Def., No. 04 Civ. 4151 (Doc. No. 450, Ex. 41) (S.D.N.Y. Feb. 15, 2011). The cable states:

> For the reasons cited in Ref, the fact that the Inspector General had advised [redacted] that ref video tapes were no longer required for his investigation and

13

the determination by the Office of the General Counsel that the [redacted] cable traffic accurately documented [redacted] activities recorded on video tape; [redacted] requests HQS authorization for [redacted] to destroy Ref [redacted] video tapes.    Pending HQS approval, [redacted] will oversee [redacted] destruction of [redacted] video tapes.  On completion of the destruction, a cable will be forwarded to HQS noting the date/time of the [redacted] video tape destruction.

Id. Jose Rodriguez, then the CIA's Deputy Director of Operations, responded: "DDO approves Ref A request to destroy [redacted] video tapes as proposed Ref A and for the reasons cited therein (there is no legal or OIG requirement to continue to retain the tapes.) Request that [redacted] advise when destruction has been completed." Decl. of Alicia L. Bannon, Am. Civil Liberties Union v. Dep't of Def., No. 04 Civ. 4151 (Doc. No. 450, Ex. 42) (S.D.N.Y. Feb. 15, 2011). A cable from the field to headquarters on November 9, 2005, confirmed that the ninety-two videotapes had been destroyed. Decl. of Alicia L. Bannon, Am. Civil Liberties Union v. Dep't of Def., No. 04 Civ. 4151 (Doc. No. 450, Ex. 44) (S.D.N.Y. Feb. 15, 2011).

At 5:48 p.m. the next day, November 10, 2005, an individual whose identity has been redacted sent an email to Kyle Dustin "Dusty" Foggo, then the CIA's Executive Director. The email's sender apparently had been present for an "update" from the Directorate of Operations, and the email recounts the internal discussions that had followed word that the videotapes had been destroyed. Decl. of Alicia L. Bannon, Am. Civil Liberties Union v. Dep't of Def., No. 04 Civ. 4151 (Doc. No. 450, Ex. 45) (S.D.N.Y. Feb. 15, 2011). The email's author summarized that, "[c]urrent [redacted] not wanting—smartly—to continue to be custodian of these things [the videotapes] was advised to send in a cable asking for guidance" and thereafter "did so." Id. According to the email, that "[g]uidance," i.e., approval to destroy, had been "cleared by IG [Inspector General], DDO [Jose Rodriguez] and [redacted]" and then sent, and the videotapes had been destroyed. Id.

14

The email suggests that the CIA's General Counsel, John Rizzo, had not received advance notice of the videotapes' destruction: "Rizzo found out today this had occurred as [sic] was upset—apparently because he had not been consulted—not sure if there was another reason. He raised at DO update but was 'calmed' (only slightly) when told [redacted] had approved." Id. The email explains that, later in the day, Jose Rodriguez had approached CIA Director Porter Goss, the email's sender, and someone else whose identity also was redacted, to "explain[] that he (jose) felt it was extremely important to destroy the tapes." Id. Rodriguez allegedly said "that if there was any heat he would take it," at which Goss purportedly "laughed and said that actually, it would be he, [Goss], who would take the heat," but Goss said that he "agreed with the decision" nonetheless. Id. Rodriguez then allegedly said that "heat from destroying is nothing compared to what it would be if the tapes ever got into public domain—he said that out of context, they would make us look terrible; it would be 'devastating' to us," a sentiment with which "[a]ll in the room agreed." Id.

Not long after sending that first email, the same unidentified individual sent a second email to Foggo, at 7:25 p.m., in which the unidentified individual stated that he or she was "no longer feeling comfortable":

> While I understand Jose's 'decision' (and believe the tapes were bad news) I was just told by Rizzo that [redacted] DID NOT concur on the cable—it was never discussed with him (this is perhaps worse news, in that we may have 'improperly' destroyed something). In fact, it is unclear now whether the IG did as well. Cable was apparently drafted by [redacted] and released by Jose; they are the only two names on it, so I am told by Rizzo. Either [redacted] lied to Jose about 'clearing' with [redacted] and IG (my bet) or Jose misstated the facts. (It is not without relevance that [redacted] figured prominently in the tapes, as [redacted] was in charge of [redacted] at the time and clearly would want the tapes destroyed.) Rizzo is clearly upset, because he was on the hook to notify Harriet Miers of the status of the tapes because it was she who had asked to be advised before any action was taken. Apparently, Rizzo called Harriet this afternoon and she was livid, which he said was actually unusual for her. Rizzo does not think this is likely to just go away.

15

Decl. of Alicia L. Bannon, <u>Am. Civil Liberties Union v. Dep't of Def.</u>, No. 04 Civ. 4151

(Doc. No. 450, Ex. 46) (S.D.N.Y. Feb. 15, 2011).

    More than another two years passed before the CIA publicly acknowledged that it

had both created and destroyed videotapes of detainee interrogation sessions. Public

acknowledgement came only after the press had learned about the destruction. On December 6,

2007, CIA Director Michael Hayden issued this statement to the Agency's employees:

> The press has learned that back in 2002, during the initial stage of our terrorist detention program, CIA videotaped interrogations, and destroyed the tapes in 2005. I understand that the Agency did so only after it was determined they were no longer of intelligence value and not relevant to any internal, legislative, or judicial inquiries . . . . The decision to destroy the tapes was made within CIA itself. . . .
>
> . . . .
>
> CIA's terrorist detention and interrogation program began after the capture of Abu Zubaydah in March 2002. . . . Under normal questioning, Zubaydah became defiant and evasive. It was clear, in the President's words, that "Zubaydah had more information that could save innocent lives, but he stopped talking."
>
> That made imperative the use of other means to obtain the information—means that were lawful, safe, and effective. To meet that need, CIA designed specific, appropriate interrogation procedures. Before they were used, they were reviewed and approved by the Department of Justice and by other elements of the Executive Branch. Even with the great care taken and detailed preparations made, the fact remains that this effort was new, and the Agency was determined that it proceed in accord with established legal and policy guidelines. So, on its own, CIA began to videotape interrogations.
>
> . . . .
>
> As part of the rigorous review that has defined the detention program, the Office of General Counsel examined the tapes and determined that they showed lawful methods of questioning. The Office of Inspector General also examined the tapes in 2003 as part of its look at the Agency's detention and interrogation practices. Beyond their lack of intelligence value—as the interrogation sessions had already been exhaustively detailed in written channels—and the absence of any legal or internal reason to keep them, the tapes posed a serious security risk. . . . .

These decisions were made years ago. But it is my responsibility, as Director today, to explain to you what was done, and why. What matters here is that it was done in line with the law.

Decl. of Alicia L. Bannon, Am. Civil Liberties Union v. Dep't of Def., No. 04 Civ. 4151 (Doc. No. 450, Ex. 47) (S.D.N.Y. Feb. 15, 2011).

## IV.    The history of these contempt proceedings.

Just days after the CIA had publicly acknowledged that interrogation videotapes had, at one time, existed, plaintiffs moved to hold the CIA in civil contempt and sought sanctions for the Agency's alleged failure to comply with my Opinion and Order of September 15, 2004. Plaintiffs sought, as part of their remedy, discovery related to the contents and destruction of the videotapes. I heard argument on plaintiffs' motion on January 16 and 17 and August 18, 2008.

In the meantime, however, the Attorney General of the United States had assigned John H. Durham, then-Deputy United States Attorney in the United States Attorney's Office for the District of Connecticut, to lead a formal criminal investigation into the destruction of the videotapes. Decl. of Alicia L. Bannon, Am. Civil Liberties Union v. Dep't of Def., No. 04 Civ. 4151 (Doc. No. 450, Ex. 49) (S.D.N.Y. Feb. 15, 2011). By order of August 20, 2008, I deferred making any finding of contempt, because I did not then have enough facts before me to support relevant findings. Order Reg. Proceedings, Am. Civil Liberties Union v. Dep't of Def., No. 04 Civ. 4151 (Doc. No. 305 at 1) (S.D.N.Y. Aug. 20, 2008). I also ordered the government to submit a declaration of Special Prosecutor Durham addressing, "with as much specificity as possible, how and why the production of a catalog of . . . information regarding the destroyed records"—such as a "list identifying and describing each of the destroyed records"; a "list of any summaries, transcripts, or memoranda regarding the records"; or "[i]dentification of any

17

witnesses who may have . . . retained custody of the videotapes before their destruction"—would interfere with the ongoing criminal investigation. Id. at 2.

In an order dated September 16, 2008, I noted that I had received and reviewed, ex parte and in camera, Special Prosecutor Durham's declaration, in which he had described his continuing criminal investigation into the destruction of the videotapes. Order Deferring Consideration of Pls.' Mot. to Cite CIA for Contempt, Am. Civil Liberties Union v. Dep't of Def., 04 Civ. 4151 (Doc. No. 309 at 2) (S.D.N.Y. Sept. 16, 2008). In his declaration, Special Prosecutor Durham expressed concern that holding civil contempt proceedings simultaneously with the criminal investigation would compromise the integrity of the investigation. Id. In particular, Special Prosecutor Durham was concerned that contempt proceedings would expose potential witnesses in the investigation to factual details to which they had not previously been exposed, which might, in turn, influence their recollection of relevant events. Id. I was satisfied, based on Special Prosecutor Durham's representations, that his criminal investigation was progressing diligently. Id. I was also persuaded that requiring the CIA just then to produce a catalog of information about the destroyed records, as I had contemplated in my order of August 20, 2008, would complicate the ongoing criminal investigation. Id. As a result, I deferred for a number of months the CIA's obligation to comply with my order of August 20, 2008. Id. at 2–3. After receiving a further, supplemental declaration from Special Prosecutor Durham, I deferred the CIA's obligation to comply once more, until February 28, 2009. Order Deferring Consideration of Pls.' Mot. to Cite CIA for Contempt, Am. Civil Liberties Union v. Dep't of Def., No. 04 Civ. 4151 (Doc. No. 326 at 1–2) (S.D.N.Y. Jan. 6, 2009). Plaintiffs' motion for contempt and sanctions remained pending in the meantime.

18

The government advised, by letter of March 2, 2009, that Special Prosecutor Durham had not asked to continue the stay past February 28, 2009; thus, the CIA would begin to gather records responsive to my August 20, 2008, order. Endorsed Letter from Lev L. Dassin, Acting U.S. Att'y, S.D.N.Y., to Hon. Alvin K. Hellerstein, U.S. Dist. J., S.D.N.Y., Am. Civil Liberties Union v. Dep't of Def., No. 04 Civ. 4151 (Doc. No. 330 at 1–2) (S.D.N.Y. Mar. 3, 2009). It was in this March 2009 letter that the government for the first time disclosed to plaintiffs and the court that the records the CIA had destroyed had consisted of ninety-two videotapes. Id. at 2.

Some weeks later, on April 20, 2009, I issued an order that modified the CIA's proposed work plan for producing records responsive to my order of August 20, 2008. In the third numbered paragraph of the April 20, 2009, order, I directed the government to "produce records relating to the content of the tapes . . . from the entire period of the tapes that were destroyed," which the government had represented to be April through December 2002. Order Reg. Gov't's Proposed Work Plan, Am. Civil Liberties Union v. Dep't of Def., No. 04 Civ. 4151 (Doc. No. 339 at 1) (S.D.N.Y. Apr. 20, 2009) (emphasis added). Records responsive to this provision became known as the "paragraph 3 documents." I also required the government, in the fourth numbered paragraph of the April 20, 2009, order, to "produce documents relating to the destruction of the tapes, which describe the persons and reasons behind their destruction," from the period April 1, 2002, through June 30, 2003. Id. at 1–2 (emphasis added). Responsive records became known as the "paragraph 4 documents." I later expanded the class of paragraph 4 documents to include records created between June 1, 2005, and January 31, 2006—a time period that corresponded to the videotapes' destruction—and stated my intention to meet with

Special Prosecutor Durham, to discuss the status of his investigation. Order, Am. Civil Liberties Union v. Dep't of Def., No. 04 Civ. 4151 (Doc. No. 365 at 2) (S.D.N.Y. July 20, 2009).

At an ex parte, in camera hearing held a short time later, Special Prosecutor Durham reported that his criminal investigation into the videotapes' destruction was yet ongoing. Mem. Order, Am. Civil Liberties Union v. Dep't of Def., No. 04 Civ. 4151 (Doc. No. 369 at 2) (S.D.N.Y. July 30, 2009). I accepted his representation that hearings on plaintiffs' contempt motion would impede the investigation's progress. Id. It was apparent to me, based on Special Prosecutor Durham's representations, that material issues in the contempt motion were "subsumed by [the] criminal investigation." Id. Thus, the contempt motion remained pending.

However, the CIA's obligation to identify or produce the paragraph 3 and paragraph 4 documents was not deferred. In response, the CIA identified and processed 580 responsive paragraph 3 documents—those relating to the content of the videotapes. Decl. of Leon E. Panetta, Am. Civil Liberties Union v. Dep't of Def., No. 04 Civ. 4151 (Doc. No. 352 ¶ 3) (S.D.N.Y. June 8, 2009). From this universe of 580 documents, the CIA selected a sample set of sixty-five, id., of which I reviewed a sub-sample, ex parte and in camera. The paragraph 3 documents became the subject of the parties' fifth set of cross-motions for partial summary judgment. In the end, I ordered the paragraph 3 documents withheld in full on the basis of FOIA Exemptions 1 and 3.[2] See Am. Civil Liberties Union v. Dep't of Def., 723 F. Supp. 2d 621, 626–29 (S.D.N.Y. July 15, 2010); Order of Final J. on Fourth & Fifth Mots. for Partial Summ. J.,

---

[2] Under FOIA Exemption 1, the government may withhold records that are "specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy" and that "are in fact properly classified pursuant to such Executive order." 5 U.S.C. § 552(b)(1)(A)–(B). FOIA Exemption 3, on the other hand, applies to agency records that are "specifically exempted from disclosure by statute," so long as the statute either "requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue" or "establishes particular criteria for withholding or refers to particular types of matters to be withheld." Id. § 552(b)(3)(A)(i)–(ii). In invoking FOIA Exemption 3, the CIA cited and relied upon section 102A(i) of the National Security Act of 1947, 50 U.S.C. § 403-1(i), and section 7 of the Central Intelligence Agency Act of 1949, 50 U.S.C. § 403g.

Am. Civil Liberties Union v. Dep't of Def., No. 04 Civ. 4151 (Doc. No. 427 at 2) (S.D.N.Y. Oct. 1, 2010). Plaintiffs filed an interlocutory appeal of my rulings; their appeal is pending. Notice of Appeal, Am. Civil Liberties Union v. Dep't of Def., No. 04 Civ. 4151 (Doc. No. 439) (S.D.N.Y. Nov. 12, 2010).

The CIA also identified and processed 220 responsive paragraph 4 documents—relating to the videotapes' destruction—and released approximately twenty-seven documents, in part, to plaintiffs. See Decl. of Tara M. LaMorte, Am. Civil Liberties Union v. Dep't of Def., No. 04 Civ. 4151 (Doc. No. 461, Ex. A at ¶ 4 & n.1) (S.D.N.Y. Apr. 18, 2011). However, the CIA withheld other paragraph 4 documents on the basis of FOIA Exemptions 1 and 3, among others. Order & Joint Stip'n, Am. Civil Liberties Union v. Dep't of Def., No. 04 Civ. 4151 (Doc. No. 433 at 1) (S.D.N.Y. Oct. 26, 2010). The CIA's reliance on Exemptions 1 and 3 to justify its withholding of paragraph 4 documents raised many of the same legal issues I already had resolved with respect to the paragraph 3 documents. Id. The parties have agreed, and I have so ordered, that litigation regarding the withheld paragraph 4 documents will be stayed pending resolution of plaintiffs' appeal. Id. at 2.

In November 2010, Special Prosecutor Durham announced that he had concluded his investigation into the destruction of the videotapes and would not pursue criminal charges.[3] Decl. of Alicia L. Bannon, Am. Civil Liberties Union v. Dep't of Def., No. 04 Civ. 4151 (Doc. No. 450, Ex. 50) (S.D.N.Y. Feb. 15, 2011). I called a court conference, ordered supplemental briefing on plaintiffs' contempt motion, and heard oral argument on August 1, 2011.

## V.    Plaintiffs' motion for contempt is denied.

I deny plaintiffs' motion because a finding of civil contempt at this point would serve no beneficial purpose. The CIA's failure to identify or produce the videotapes in response

---

[3] Other aspects of Special Prosecutor Durham's investigation continue.

to plaintiffs' FOIA requests and my repeated orders, and the destruction of the videotapes, has been remedied.

The court may hold a party in civil contempt for failure to comply with an order if the court's order "'is clear and unambiguous,'" proof of the party's failure to comply "'is clear and convincing,'" and the party "'has not diligently attempted to comply in a reasonable manner.'" Paramedics Electromedicina Comercial, Ltda. v. GE Med. Sys. Info. Techs., Inc., 369 F.3d 645, 655 (2d Cir. 2004) (quoting King v. Allied Vision, Ltd., 65 F.3d 1051, 1058 (2d Cir. 1995)). Proof of willful noncompliance is not required. McComb v. Jacksonville Paper Co., 336 U.S. 187, 191 (1949); Donovan v. Sovereign Sec., Ltd., 726 F.2d 55, 59 (2d Cir. 1984).

The evidence suggests that the individuals responsible for processing and responding to plaintiffs' FOIA requests may not have been aware of the videotapes' existence before they were destroyed. Decl. of Constance E. Rea, Am. Civil Liberties Union v. Dep't of Def., No. 04 Civ. 4151 (Doc. No. 271 ¶¶ 12–14) (S.D.N.Y. Jan. 10, 2008). Apparently, the videotapes were retained in the field, without physically having been transferred to the OIG and without otherwise having been sent to headquarters. Id.; see also Decl. of Alicia L. Bannon, Am. Civil Liberties Union v. Dep't of Def., No. 04 Civ. 4151 (Doc. No. 450, Exs. 41–42) (S.D.N.Y. Feb. 15, 2011). Nor can I say that the individuals who destroyed, or who approved the destruction, of the videotapes, were aware of court orders requiring identification or production of the videotapes. However, the lapses of individuals cannot excuse the failures of the Agency. The CIA, qua agency, had the obligation to identify or produce the videotapes, and the CIA cannot be excused in its dereliction because of particular individuals' lapses.

Plaintiffs press for depositions and further discovery to ascertain if CIA officials destroyed the videotapes after they had notice of court orders requiring the videotapes to be

22

identified or produced (or making a requirement to identify or produce likely). I will not allow additional discovery, for this is not a criminal contempt proceeding and the purposes of civil contempt already have been served.

"An adjudication of civil contempt is coercive—to compel obedience to a lawful court order"—whereas "criminal contempt is imposed to punish the contemnor for an offense against the public and to vindicate the authority of the court." United States v. Grand Jury Witness (In re Grand Jury Witness), 835 F.2d 437, 440 (2d Cir. 1987); see Landmark Legal Found. v. EPA, 272 F. Supp. 2d 70, 76 (D.D.C. 2003) ("[T]he purpose of a civil contempt proceeding is to vindicate the rights of the non-violating party, not to punish the violator . . . ."). "Generally, the sanctions imposed after a finding of civil contempt serve two functions: to coerce future compliance and to remedy past noncompliance." Vuitton et Fils S.A. v. Carousel Handbags, 592 F.2d 126, 130 (2d Cir. 1979); see In re Grand Jury Witness, 835 F.2d at 441; NOW v. Operation Rescue, 747 F. Supp. 772, (D.D.C. 1990) (court may impose civil contempt sanctions "to compensate an aggrieved party for damages resulting from the contempt").

It is true that the interrogation videotapes, having been destroyed nearly six years ago, cannot now be produced. But the CIA has remedied that failure by a massive production of paragraph 3 and paragraph 4 documents—records that describe the contents of the videotapes, corresponding in time to their creation, and records that relate to the videotapes' destruction, in particular, the persons and reasons behind the destruction, corresponding in time to both the videotapes' creation and destruction. Plaintiffs have had a full and fair opportunity to litigate whether those records, or any of them, are exempt from disclosure under FOIA Exemption 1 or 3 or must be produced. My rulings on those issues are now on appeal.

23

Plaintiffs seek, as part of their remedy for the CIA's alleged contempt, an order that would require the CIA to identify or produce paragraph 4 documents (bearing upon destruction) for an enlarged period, going back to between July 1, 2003, and May 31, 2005. However, as I recounted above, I have already ordered the CIA to produce paragraph 4 documents for an earlier period, between April 1, 2002, and June 30, 2003, coinciding with the videotapes' creation, and for a later period, between June 1, 2005, and January 31, 2006, corresponding with the videotapes' destruction. I am aware of nothing to suggest that ordering the CIA to identify or produce paragraph 4 documents from the intervening period would disclose relevant records or otherwise add to the public's understanding of the persons and reasons behind the videotapes' destruction. Plaintiffs have not shown good cause for putting the CIA to the extensive efforts required to search for, identify, and process responsive documents from an additional two-year period, more than six years ago.

The public gains an additional benefit from the remedial relief put in place by the CIA—improved protocols for the retention of records potentially relevant to an investigation or a judicial, congressional, or administrative proceeding. The destruction of the videotapes exposed serious flaws in the CIA's existing document retention procedures. In August 2011, the CIA adopted new document preservation and destruction protocols, to insure against similar transgressions in the future. I have appended a summary of the new protocols to this opinion.[4] Briefly, they require prompt dissemination of notice once a preservation obligation arises in connection with an investigation or proceeding, with the scope of dissemination determined on a case-by-case basis; consultation with and coordination among various leadership, both within and without the CIA, when an Agency component proposes to destroy a specific record other

---

[4] The Department of Justice's August 18, 2011 letter regarding the protocols and the plaintiffs' September 28, 2011 response to the summary of the protocols are in the public record. The protocols themselves have been filed under seal.

than in the normal course of agency operations; permanent, written documentation of the Office of General Counsel's compliance with the CIA's new protocols; and training for new attorneys on following the CIA's document retention procedures.

Plaintiffs have reviewed the summary and make no comment or objection to its substance, but argue that they would not have made a difference in this case. Plaintiffs cite a recently published article by the CIA's former General Counsel, John Rizzo, in which Rizzo states that Jose Rodriguez, former CIA Deputy Director of Operations, "def[ied] orders" and "went behind [Rizzo's] back" to destroy the videotapes. John Rizzo, 9/11: Three Major Mistakes, Defining Ideas (Sept. 8, 2011), http://www.hoover.org/publications/defining-ideas/article/91992. Plaintiffs argue that, in light of Rizzo's article, it is clearer now than ever that the videotapes were destroyed as a result of "high-level officials['] flout[ing] agency policy to protect themselves and the agency from public scrutiny." In plaintiffs' view, "the CIA's new policies, however salutary, would not have prevented [Rodriguez] from destroying the videotapes." Plaintiffs' argument, premised on the belief that a single high-ranking official, defying orders, was responsible for destroying the videotapes, undermines plaintiffs' overarching contention that the CIA, as an agency, should be held in contempt for that conduct.

In my opinion, contrary to plaintiff's view, the CIA's new protocols would have a remedial and deterrent effect should a CIA official think to destroy documents. The protocols should lead to better communication and more complete written records within the Agency and across the government when an issue of document destruction or retention arises within the Agency. The CIA's new protocols should lead to greater accountability within the Agency and prevent another episode like the videotapes' destruction.

25

The parties agree, and I conclude, that I have the inherent authority to impose an award of attorneys' fees and costs, as a matter of fairness and equity, without finding the CIA in contempt. See Class v. Norton, 376 F. Supp. 496, 501–03 (D. Conn.) (denying motion to hold defendant state official in contempt, but awarding plaintiffs their attorneys' fees for prosecution of motion nonetheless), aff'd in part and rev'd in part on other grounds, 505 F.2d 123 (2d Cir. 1974); see also Sprague v. Ticonic Nat'l Bank, 307 U.S. 161, 164 (1939). The label of "contempt" confers "no magical properties" upon the court. Alexander v. Hill, 707 F.2d 780, 783 (4th Cir. 1983). "[I]ncantations should not decide cases, and the lack of a finding of contempt . . . should not preclude exercise of inherent equitable powers to achieve fair remedial results." Id. Indeed, the CIA has offered to pay plaintiffs their reasonable attorneys' fees and costs incurred in prosecuting the contempt motion, but that is not enough. The CIA also should pay plaintiffs' reasonable attorneys' fees and costs associated with litigation over the paragraph 3 and paragraph 4 documents. The parties should endeavor to settle between them the amounts that fairly are due.

"The measure of the court's power in civil contempt proceedings is determined by the requirements of full remedial relief." McComb, 336 U.S. at 193. Because plaintiffs already have achieved substantial remedial relief and would be entitled to no further relief if I were to find the CIA in civil contempt, I deny plaintiffs' motion to hold the CIA in contempt.

The Clerk shall mark the motion (Doc. No. 254) terminated.

SO ORDERED.

Dated:     October 5, 2011
           New York, New York

ALVIN K. HELLERSTEIN
United States District Judge

26



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*86 Chambers Street. 3rd floor*
*New York. New York 10007*

September 21, 2011

**BY FACSIMILE**
Hon. Alvin K. Hellerstein
United States District Court
Southern District of New York
500 Pearl Street, Room 1050
New York, New York 10007-1312

        Re:  *ACLU v. Department of Defense et al.*, 04 Civ. 4151
            (AKH)

Dear Judge Hellerstein:

    At the Court's request, we write on behalf of the Central Intelligence Agency ("CIA") to provide the Court with a summary of the two policies attached to our letter dated August 15, 2011 that were recently adopted by the Office of General Counsel of the CIA. The CIA has no objection to the Court's reliance on the enclosed summary in any written decision addressing Plaintiffs' motion for contempt and sanctions.

    We thank the Court for its consideration.

                    Respectfully,

                    PREET BHARARA
                    United States Attorney

By:                                    
                    TARA M. La MORTE
                    AMY A. BARCELO
                    Assistant United States Attorneys
                    86 Chambers Street, 3rd Floor
                    New York, New York 10007
                    Tel.   (212) 637-6559
                    Fax   (212) 637-2730

Encl.

cc: Alexander A. Abdo, Esq.
    Alicia Bannon, Esq.

## Summary of CIA Policies Regarding Document Preservation

In August 2011, the Office of General Counsel (OGC) of the Central Intelligence Agency (CIA) formally adopted two new policies regarding document preservation. These policies serve to refine and institutionalize a set of best practices — many of which have previously been standard within OGC — for handling preservation obligations and to generally heighten work force awareness of these issues.

The first of these new policies establishes a formal procedure for handling client proposals to destroy documents outside the existing process for routine management of CIA materials under applicable law or Agency regulations. The aim of the policy is to ensure that any internal CIA proposal to destroy documents is given a thorough and well-documented legal review. Pursuant to this policy, when an OGC attorney receives a proposal from a CIA component to destroy documents that may relate to any pending or anticipated criminal investigation or prosecution, civil litigation, administrative proceeding or congressional oversight activity, the OGC attorney will advise that CIA component, in writing, to preserve such records pending the completion of the procedures required by the policy.

The policy provides that the OGC attorney will then forward such document destruction proposal to an OGC senior manager, who

will facilitate consideration of the relevant circumstances and coordination with the appropriate internal and external entities including, where appropriate, the Department of Justice or any other relevant department or agency.

Once coordination is complete and the Agency's legal obligations are determined, the OGC senior manager will make a recommendation to the CIA General Counsel whether or not to clear the proposal. The CIA General Counsel will be the final decision-maker with respect to that determination, and the General Counsel's decision on that issue will also be documented. After the General Counsel has reached a decision, the OGC attorney handling the matter will notify the requesting CIA component of that decision. Compliance with the procedure, as well as the legal analysis supporting the decision, will be documented. Finally, the policy provides that instruction on the contents of the policy will be provided in the regular orientation curriculum for attorneys new to OGC.

Second, OGC has also adopted a policy that covers the issuance of document preservation notices, and provides practical guidance to attorneys regarding when and how such notices should be issued and implemented in connection with criminal investigations, civil litigation, administrative proceedings and congressional inquiries. Among other things, the policy specifically provides instruction regarding with whom

2

an OGC attorney should consult after he or she becomes aware of such a preservation obligation, the contents of such a preservation notice, and the process an OGC attorney should undergo to determine to whom such a preservation notice should be distributed. The policy specifically provides that where a Department of Justice attorney is assigned to a case, the OGC attorney shall coordinate with the Department of Justice attorney regarding the obligation to issue a preservation notice and the content of such notice. This policy also provides that instruction on the contents of the policy will be provided in the regular orientation curriculum for attorneys new to OGC.