17k1acla

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   AMERICAN CIVIL LIBERTIES
    UNION, et al.,
4
                    Plaintiffs,
5
                 v.                           04-CV-4151 (AKH)
6
    DEPARTMENT OF DEFENSE, et al.,
7
                    Defendants.            Oral Argument
8
    ------------------------------x
9                                          New York, N.Y.
                                           July 20, 2011
10                                         3:24 p.m.

11  Before:

12                     HON. ALVIN K. HELLERSTEIN,

13                                            District Judge

14                          APPEARANCES

15  AMERICAN CIVIL LIBERTIES UNION
         For Plaintiffs
16  BY:  ALEXANDER A. ABDO, ESQ.
         JAMEEL JAFFER, ESQ.
17
    GIBBONS P.C.
18       Attorneys for Plaintiffs
    BY:  ALICIA L. BANNON, ESQ.
19       LAWRENCE S. LUSTBERG, ESQ.

20  UNITED STATES ATTORNEY'S OFFICE
    SOUTHERN DISTRICT OF NEW YORK
21       For Defendants
    BY:  AMY A. BARCELO, AUSA
22       TARA LA MORTE, AUSA

23  CHARLES G. MILLS, ESQ.
         Attorney for Amicus Curiae The American Legion

24

25

         SOUTHERN DISTRICT REPORTERS, P.C.      (212) 805-0300

17k1acla

```
 1                  (In open court)

 2                  (Case called)

 3                  THE CLERK:  Counsel, please state your name for the

 4      record.

 5                  MR. ABDO:  Alexander Abdo for the plaintiffs, your

 6      Honor.

 7                  MR. JAFFER:  Jameel Jaffer for plaintiffs, your Honor.

 8                  MR. LUSTBERG:  Lawrence S. Lustberg, Gibbons, P.C., on

 9      behalf of plaintiffs.

10                  MS. BANNON:  Alicia Bannon, Gibbons, P.C., on behalf

11      of plaintiffs.

12                  MS. BARCELO:  Amy Barcelo, assistant United States

13      attorney, on behalf of the government.

14                  MS. LA MORTE:  Tara La Morte, assistant United States

15      attorney, on behalf of the government.

16                  MR. MILLS:  Charles G. Mills on behalf of the amicus

17      curiae, the American Legion.

18                  THE COURT:  All right.  Who's going to argue for the

19      plaintiff?

20                  MR. ABDO:  I will, your Honor.  Alexander Abdo.

21                  THE COURT:  Go ahead, Mr. Abdo.

22                  MR. ABDO:  Your Honor, at issue today is the

23      government's withholding of approximately 2,000 photographs

24      depicting the abuse of detainees in US custody throughout

25      detention facilities in Iraq and Afghanistan.  The vast
```

17k1acla

1    majority of the photographs have never been publicly described.

2    This court and the Second Circuit ordered their release, as you

3    will recall.  Now, however, the government --

4              THE COURT:  Vividly.

5              MR. ABDO:  Well, now, as I'm sure your Honor recalls,

6    the government is withholding the photographs under new

7    statutory authority provided by Congress.  That statute

8    authorizes the government to withhold certain photographs if

9    the Secretary of Defense determines that release of the

10   photographs would endanger US citizens, civilians, or

11   employees, and the Secretary has made such a determination.

12             The question today for the court is a very simple one:

13   whether there is any judicial review whatsoever of the

14   Secretary's determination that release of the photographs would

15   endanger those individuals.  We think there are -- there is,

16   for three simple reasons.

17             The first is that the photo statute is an Exemption 3

18   withholding statute because it establishes particular criteria

19   for the withholding of agency records.

20             Second, one of those criteria -- indeed, the most

21   important -- is that the Secretary determines that release of

22   the requested records would endanger US individuals.

23             And finally, FOIA requires additional review of that

24   determination, as it does of all criteria established under

25   Exemption 3 statutes.

17k1acla

1            As the briefing to this court shows, the majority of

2     the caselaw supports that simple analysis.  The Ninth Circuit,

3     in a case known as *Long*, and a number of circuits following

4     that decision, encountered a very similar situation that this

5     court is in now.  The Ninth Circuit had ordered the release of

6     certain tax-related information, and Congress responded by

7     passing a statute that provided new statutory authority for the

8     withholding of that information if the Secretary of the

9     Treasury determined that release would cause a particular harm.

10    The district court in that case found that the statute,

11    invocation of the statute was sufficient to discharge the

12    government's obligations to withhold the tax-related

13    information, but the Ninth Circuit reversed, holding that FOIA

14    provides --

15            THE COURT:  Tell me, Mr. Abdo, the nature of the

16    information that was sought in that case.

17            MR. ABDO:  The information was return information

18    submitted by taxpayers that was withheld by the Secretary of

19    the Treasury on the claim that disclosure would adversely

20    impact the administration of the tax laws.

21            THE COURT:  You mean the Freedom of Information Act

22    requests were for the precise returns filed by taxpayers?

23            MR. ABDO:  I don't recall whether it was for

24    particular information within returns, but it was for

25    information covered by the portion of the tax act that

17k1acla

1    protected return information.

2            THE COURT:  I think I need to know more about that to

3    consider if *Long* is a good precedent for you.  Some areas, by

4    the very nature of those areas, the court naturally has a great

5    deal of information and is in possession of a better ability to

6    evaluate the nature of the withholding than perhaps in other

7    areas, and I'd like to compare what a court might well

8    appreciate in *Long* to the very difficult job a judge sitting in

9    New York City, insulated in a courtroom from a battlefield,

10    might be able to evaluate in the case applied.

11            MR. ABDO:  There's no doubt, your Honor, that the

12    context of the two cases are distinct.  What we are asking the

13    court to do, however, is engage in the very type of analysis

14    that courts examining FOIA requests engage in all the time, to

15    determine --

16            THE COURT:  No, they don't.  They don't.  Once the

17    head of an agency has a deliberate consideration and

18    determination, courts tend to respect that.

19            MR. ABDO:  Respectfully, your Honor, there is some

20    deference given to heads of agencies in making those

21    determinations, but all we're requesting at this point is that

22    the government provide a justification for the invocation of

23    the statute, which it has yet to do.

24            For example, in the context of Exemption 1, courts are

25    called upon routinely to determine whether the government's

SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

17k1acla

1    determination of national security harm satisfies its

2    obligation to withhold records that would allegedly endanger

3    the national security.  There may be some measure of deference

4    in that context, but that deference on the question of the

5    substance has never been held to negate the availability of

6    judicial review in the first instance for the government

7    withholdings.

8              THE COURT:  I've done a lot of those reviews in this

9    case.  Mr. Lustberg has been involved in any number of them.

10   And I looked at the particular statement that is subject to the

11   withholding request.  And I looked for a reasonable

12   relationship by the nature of the subject matter to the general

13   classification -- for example, in the CIA papers -- that a

14   method of investigation or inquiry would be disclosed.  And

15   it's not a very detailed evaluation; it is rather superficial,

16   by its very nature.

17             And here, as I understand what happened, the United

18   States was all set to make the publication ordered by me and

19   affirmed by the Second Circuit when the Prime Minister of Iraq

20   importuned President Obama not to allow it for fear that a

21   great deal of civil unrest and insurrection would occur in

22   Iraq, endangering the Iraqi government, the officials of the

23   Iraqi government, the United States military, and civilian

24   forces supporting that government.  And it went up through the

25   chain of command, and Secretary of Defense Gates made the

SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

17k1acla

1    determination, based on recommendations made at every step

2    along the way.

3          When I initially made the determination to release the

4    photographs, I considered an affidavit from the then commander

5    in chief Richard Myers, who wrote as to his concern that the

6    release of the photographs would endanger American military and

7    civilian forces in Iraq and lead to insurrection and the like.

8    And I ruled that these were really speculative, that the

9    terrorists in Iraq needed no pretext to attack American forces,

10   and the core values of the Freedom of Information Act were more

11   cogent and more dear than the speculation of even the commander

12   in chief of the United States military.  And the Second Circuit

13   affirmed.

14         And then we have this presidential order, and an act

15   of Congress.  What more could I do?

16         MR. ABDO:  Respectfully, your Honor, the determination

17   or the public statements you're referring to are from several

18   years ago, and we're simply not in a position to know now

19   whether those are the same types of concerns that are animating

20   the government's withholdings.  A year and a half ago, when the

21   government -- when the President determined not to release the

22   photographs as he had initially determined to do, he made a

23   very time-sensitive statement about the nature of the facts on

24   the ground at the time.  We are now two years removed from that

25   determination and yet we have no record from the Secretary of

17k1acla

1   Defense explaining the entirely conclusory explanation in his

2   certification that disclosure of these records now would cause

3   harm.  Moreover, we don't have any connection drawn --

4            THE COURT:  It's evident.  It's evident.  It's the

5   same concern about harm that's been expressed throughout the

6   case, which I did not follow but which Congress commands me to

7   follow.  I'm just a judge.

8            MR. ABDO:  We understand that, your Honor.  But

9   there's a crucial role for judges to play in the FOIA process.

10  The process of FOIA is not simply for the government to come

11  into court, invoke an exemption, and for courts then to simply

12  ratify that invocation of an exemption.

13           THE COURT:  I don't think the government did that.  If

14  Secretary of Gates had done what you said, I might be tempted

15  to require more.  But in the context of the history of this

16  case, I think the concerns are real, and they've been

17  expressed.  It was a very interesting statement that was made,

18  when the United States was ready, willing, and able to produce

19  the redacted photographs, an amazing statement, and it, in

20  effect, could not be ignored by the President or the Congress.

21  The history makes it quite clear, I think.

22           MR. ABDO:  Your Honor, we respect that the court is

23  inclined to defer to determinations of the agency, but there

24  has to be something to defer to.  Currently before the court,

25  the only document provided by the government attempting to

SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

17k1acla

justify the withholding of these records on this motion is a

Secretary certification, which does no more than essentially

copy and paste the language of the statute relating to the

required harm that must be demonstrated.  The Secretary has not

attempted, nor has any declarant on behalf of the government,

to explain how any one of the photographs would lead to that

harm.  Given the sheer volume of the photographs, 2,000, we

think it unlikely that the release of even one of them, much

less the least inflammatory of them, would cause the type of

harm that the Secretary predicts.  But we're also --

THE COURT:  You want me to go through all 2,000 and

rank them?  This one is benign, we'll let that go through, but

this one shows something more dramatic?  What would I be

looking for?  What kind of criteria would I use to go through

this?

MR. ABDO:  We would invite *in camera* review, your

Honor, but the initial posture of most FOIA cases is to require

the government, through a Vaughn declaration and a Vaughn

index, to make that showing, because the government bears the

burden under FOIA in the first instance of attempting to

justify its withholdings.  It has yet to produce a Vaughn index

or declaration with respect to these 2,000 photographs.  So we

think the first step for the court would be simply to order the

government to produce a Vaughn declaration explaining how

release of each of the photographs would result in the harm it

SOUTHERN DISTRICT REPORTERS, P.C.                (212) 805-0300

17k1acla

1    claims and an index that provides sufficient textual detail,

2    describing each photograph, to allow the court to connect the

3    alleged harm with the actual records.

4          And it's notable that the statute at issue says not a

5    word about textual descriptions of these photographs.  It

6    protects simply the photographs themselves.  And so the court

7    wouldn't be in any way endangering the asserted interests of

8    the government if it merely required a textual description to

9    be provided by the government to the plaintiffs.  All it would

10   be doing would be vindicating FOIA's core purposes by allowing

11   adversarial testing of the government's claim of harm by

12   providing a sufficient record for the court to conduct the *de*

13   *novo* review mandated and, importantly in this case, by creating

14   a full record of the government's reasons for withholding and

15   the contents of the records it seeks to withhold.

16         THE COURT:  Mr. Abdo, I'm looking at your brief, and I

17   take it that you want me, as stated at the bottom of page 9, to

18   conduct a *de novo* review, finding if the release of the

19   photographs actually would cause the harm specified by the act.

20         MR. ABDO:  The phrase --

21         THE COURT:  How am I equipped to do that?

22         MR. ABDO:  We respectfully disagree, your Honor.  FOIA

23   mandates that courts engage in that type of *de novo* review --

24         THE COURT:  Actually would cause the harm.

25         MR. ABDO:  We perhaps misquoted the statute, but

17k1acla

1    whatever --

2         THE COURT:  This is argument.  You didn't quote

3    anything.  You just asked.  This is argument.  That's what you

4    want me to do.  You want me to conduct a *de novo* review to find

5    whether the photographs actually would cause the harm.  What is

6    the harm specified by the law?

7         MR. ABDO:  Subsection (d), your Honor, of the statute

8    authorizes withholding if the Secretary of Defense determines

9    that disclosure of that photograph would endanger citizens of

10   the United States, members of the United States armed forces,

11   or employees of the United States government deployed outside

12   the United States.  That is the very type of determination,

13   albeit with some deference in these contexts, that courts

14   engage in when, for example, they ask whether release of a

15   document would compromise national security under Exemption 1.

16   It is the same type of question that this court asked when the

17   CIA sought to neither confirm nor deny the existence of a

18   particular legal memorandum, an explanation that this court,

19   after conducting *de novo* review, rejected, notwithstanding the

20   context of that withholding, and the same type of determination

21   that this court more recently --

22         THE COURT:  I recall that the government volunteered

23   that information.

24         MR. ABDO:  Ultimately, your Honor, I don't recall

25   whether that's true, but --

17k1acla

1          THE COURT:  I don't remember well enough, but I don't

2     remember having made that determination.  Maybe Mr. Lustberg

3     remembers that.

4          MR. ABDO:  It was in the September 2005 order, your

5     Honor.

6          In any event, your Honor --

7          THE COURT:  I called on Mr. Lustberg because I think

8     only he has memory long enough to the beginning of the case.

9          MR. LUSTBERG:  And I had hair when this case started,

10     Judge.

11          THE COURT:  What shall I say, Mr. Lustberg?

12          MR. LUSTBERG:  I don't have a specific word.

13          I think the issue in that case was that some of those

14     memoranda had already been disclosed in the public record, so

15     there was a different determination that your Honor had to

16     make.

17          THE COURT:  I think that's right.

18          MR. ABDO:  Then I'll point your Honor to a more recent

19     determination that the alleged source and method withheld by

20     the CIA in one of those memoranda was not in fact a source or

21     method but was in fact a source of authority and would not

22     cause the harm claimed by the CIA.

23          In any event, the point is a larger one, your Honor,

24     that FOIA requires that courts conduct that type of review.

25     Although styled *de novo* by FOIA, it varies, of course,

17k1acla

1    according to the circumstances, but the review in any of those

2    circumstances fulfills an important role of the court in

3    ensuring that it is the rule of law respected when records are

4    withheld and not simply a mere ratification of withholding

5    decisions.

6          THE COURT:  I wrestled with that consideration at some

7    earlier time, because the statute seems to be saying two

8    things.  It does call upon a *de novo* review of sorts, but that

9    review seems to be satisfied by looking at the procedure used

10   by the particular head of an agency in claiming an exemption,

11   and the court did not seem -- particularly in matters of

12   defense and intelligence, the courts give a great deal of

13   respect for the decision made.

14         And I remember very well the *Glomar* case, where

15   President Carter ordered the release of information that showed

16   that what the United States had been calling an exploration and

17   scientific research ship actually was used for spying purposes

18   in the Pacific, and notwithstanding the disclosure by the

19   United States, a subsequent claim to withhold disclosure under

20   an exemption was upheld by the District of Columbia circuit

21   because even the provenance of a particular disclosure could

22   embarrass our foreign relations.  I was very struck by that

23   decision, which I thought was something that the Second Circuit

24   would follow, and which I would follow, that matters of defense

25   and intelligence are of such a sensitive nature, it's very

17k1acla

1   difficult for a judge, and maybe impossible, to make the kinds

2   of calculations and evaluations that are necessary for the

3   normal kind of *de novo* review.  And I applied it here.

4          Going back to what happened, here is the certification

5   by Secretary Gates that you quote on page 5 of your brief.

6   "After hearing recommendations of the Chairman of the Joint

7   Chiefs of Staff, the Commander of US Central Command, and the

8   Commander of Multinational Forces, Iraq, that public disclosure

9   of these photographs would endanger citizens of the United

10  States, members of the United States armed forces, or employees

11  of the United States government deployed outside the United

12  States."  I've seen photographs similar to this in an *in camera*

13  review, and it's clear from all the public information as well

14  that what is depicted in these photographs are scenes of

15  inappropriate corrections officers behavior towards detainees.

16  There are scenes where dogs are used, there are scenes where

17  there's public nakedness, there are scenes of compromising

18  behavior.  All of this is on the public record in word

19  descriptions.  Photographs have not been depicted.  And I felt,

20  after seeing these pictures, that the dimension of visual

21  knowledge of what was going on is different in kind and quality

22  from the intellectual knowledge that comes from reading words

23  on a page, and it was for that reason that I held that it was

24  appropriate to publish these photographs.  And I had before me

25  certifications by the military that the publication would

17k1acla

1    endanger lives.  We were in a wartime situation there, and we

2    were being attacked regularly.  And I believed from everything

3    known to me that the danger of our forces and civilians were at

4    such a high level that there need be no pretext for additional

5    terrorist activity against us, and so the photographs would do

6    nothing, and I felt that the speculation of the commander in

7    chief, although entitled to great deference, did not outweigh

8    the core values of FOIA.  But there's now a specific statute

9    that says that these kinds of certifications need to be given

10   conclusive respect.

11        Then, as now, there are still the same issues of the

12   visual image of American troops committing improper and

13   inappropriate acts towards Iraqis which fuel insurrection and

14   terrorist activity, endangering our forces.  We've drawn down

15   our forces.  There are more civilians, many more civilians than

16   military, and we're in the process of continuing to draw down

17   our forces.  The dangers that are certified by Secretary Gates

18   become much more vivid in this kind of an environment.  And

19   although one can argue that the conditions existing now are of

20   a more benign nature than existed when Congress enacted the

21   statute, one could argue the contrary as well.  We continue to

22   hear and read of terrorist activities in Iraq, one Iraqi

23   against another and one Iraqi against the forces of the United

24   States.  We're not out of danger.  And for the same rationale

25   that animated the passage by Congress of the act -- what is the

SOUTHERN DISTRICT REPORTERS, P.C.        (212) 805-0300

1   name, the Protected National Defense --

2              MR. ABDO:  The Protected National Security Documents

3   Act.

4              THE COURT:  Yes.  That should be applied.  I cannot

5   conduct the evaluation that you want.  The certifications are

6   there.  I just read that particular certification.  The other

7   criteria of the law is that the photographs were taken during

8   the period beginning on September 11th, 2001 through

9   January 22, 2009, and relate to the treatment of individuals

10  engaged, captured, or detained after September 11, 2001, by the

11  armed forces of the United States and operations outside of the

12  United States.  There's no serious question that the

13  photographs, each of the 2,000, qualify, is there?

14             MR. ABDO:  We have the Secretary's representation but

15  that's it, your Honor.

16             THE COURT:  You do not --

17             MR. ABDO:  We're not contesting that, your Honor.

18             THE COURT:  You're not.  I think it's enough.

19             Mr. Abdo, I'm sympathetic to your argument, but I

20  think I have to follow this.

21             MR. ABDO:  Your Honor, if I could make just one point.

22             THE COURT:  Yes.

23             MR. ABDO:  It seems that the primary motivation is the

24  court's belief that Congress has conclusively acted, and I'd

25  just like to push back up against that a little bit.

17k1acla

```
1              THE COURT:  You may.
2              MR. ABDO:  Congress could easily have written a
3     statute that would have prohibited the disclosure of these
4     photographs without the availability of any judicial review of
5     a determination of harm.  It could, for example, have drafted a
6     statute like the CIA Act, which protects the operational files
7     of the CIA without any intervention of a court; it could have
8     protected these photographs in the same way it protects
9     information provided by census takers, which is protected in
10    the Census Act, or to visa applicants, protected by the U.S.
11    Code.  Instead it seeks to hinge its holding on the
12    determination of harm, and that determination of harm, under
13    hornbook law of FOIA, is an Exemption 3 criterion that is
14    subject to judicial review.  And at this point there's simply
15    no record before the court to allow that type of review.  The
16    Secretary's certification, with all due respect to the
17    Secretary, is nothing more than a recitation of the statutory
18    language.  It provides no explanation for its determination of
19    harm; it doesn't explain anything about the contents of the
20    2,000 photographs.  It may very well be that some of them are
21    withholdable for the reasons that the court provided, but we
22    simply don't know whether all 2,000 of them are or whether all
23    2,000 have the same type of content that would, you know,
24    self-evidently cause the type of harm that the court has
25    discussed.  And that's because we simply have no record of what
```

17k1acla

```
 1   the photographs are.  We don't know even how many there are

 2   conclusively from the government.  We don't know where they

 3   were taken, and we don't know what they show.  Without that

 4   type of record, the Secretary's conclusory statement that

 5   disclosing them would cause a harm is entirely unreviewable.

 6   It would simply be wholesale deference without any other type

 7   of review that FOIA calls for to ratify that withholding

 8   without, at the very least, satisfying the procedural

 9   requirements of FOIA.

10           And to be frank, it's a very modest request, your

11   Honor.  We're simply asking that the government provide what it

12   does, even in all of the national security cases that your

13   Honor was talking about.  Even in the Glomar context, even in

14   the Exemption 1 and national security Exemption 3 context.

15   Even in those contexts, the government provides a Vaughn

16   declaration and it provides an index that describes the

17   withheld records in as much detail as possible without

18   compromising the interests that it is trying to protect.  It

19   has yet to do that here, and the only basis we can discern for

20   that judgment is that the government thinks the statute has

21   legislated the withholding of these photographs, but that is

22   emphatically not the case.  Congress did not enact the type of

23   categorical ban that it has done in so many contexts.  It

24   hinged withholding on specific criteria -- criteria that are

25   reviewable by courts' determinations of harm, that, albeit
```

17k1acla

1    often reviewed in the context where deference is appropriate,

2    are reviewed nonetheless on the basis of a record provided by

3    the government.  And here all we have is a declaration that

4    recites the photographs, and upon that record, we think it

5    would be improper for the court to uphold the withholding of

6    the photographs without more.

7             THE COURT:  Thank you.

8             Ms. La Morte?

9             MS. BARCELO:  Actually, Ms. Barcelo.

10            THE COURT:  Ms. Barcelo.  Sorry.

11            MS. BARCELO:  No problem, your Honor.

12            THE COURT:  Whenever I become familiar with the

13   assistants, you switch on me.

14            MS. BARCELO:  Yes.  I understand.  The court --

15            THE COURT:  Should the government have issued a Vaughn

16   declaration?

17            MS. BARCELO:  There is no requirement for a Vaughn

18   index -- declarations or index here, your Honor.  The basis --

19   as your Honor noted, this case has a unique history, or this --

20   the coming about of this statute.

21            THE COURT:  I'm not sure it's unique, but it sure is

22   extensive.

23            MS. BARCELO:  Yes.  Well, I do think -- I mean, I

24   think the issue of these specific photos has a unique history,

25   and it resulted in an enactment of a unique statute.  As a

17k1acla

1   result of the enactment of the Protected National Security

2   Documents Act, we're now operating under FOIA Exemption 3.

3   That's the basis under which the government is withholding

4   these documents.  And FOIA Exemption 3 is different from the

5   other FOIA exemptions under which this court has previously

6   considered the documents -- these photographs.  Excuse me.

7            FOIA Exemption 3 requires only that a statute be a

8   FOIA Exemption 3 statute.  Here plaintiffs argue that it is,

9   and that the document -- secondly, that the documents fall

10  within the scope of that statute.  Here the government's

11  argument, the basis for the withholding -- the basis for the

12  documents -- the photographs falling within the scope of the

13  statute is the existence of the Secretary's certification which

14  fulfills all of the requirements of the statute, because each

15  and every one of the photographs falls within the scope of this

16  certification --

17           THE COURT:  How do we know that?

18           MS. BARCELO:  We know that because the certification

19  says so, your Honor.  The certification refers specifically to

20  the photographs that are, I quote, "contained in or derived

21  from records of investigations of allegations of detainee

22  abuse," including the records -- including the records of

23  investigation, process and release in this very case, citing

24  the index number for this very case.

25           THE COURT:  Well, the statute seems to make a

17k1acla

1    distinction between the certificate, which is that disclosure

2    would endanger citizens of the United States, etc., and that

3    the photograph qualifies objectively.  They're two different

4    criteria, and I don't think we can accept the certificate to

5    cover each and all of the photographs.

6         MS. BARCELO:  I'm sorry.  I'm not sure that I

7    understand the question.

8         THE COURT:  The certificate has to do with danger to

9    persons.

10        MS. BARCELO:  That's correct.

11        THE COURT:  The photographs are qualified documents

12   under the act if they were taken during a certain period and if

13   they related to treatments engaged, captured, or detained by

14   the United States armed forces.  So I can't accept the

15   certificate as conclusively saying that each of these 2,000

16   photographs qualifies under subsection (b) of the act.

17        MS. BARCELO:  The certificate does also address both

18   of those points.

19        THE COURT:  But I can't accept that.  The law does not

20   require me to accept that.  It requires me to accept the point

21   of danger.  It doesn't require me to accept that these

22   photographs were taken during a certain period and related to

23   certain individuals.

24        MS. BARCELO:  As an initial matter, plaintiffs are not

25   disputing that either one of those criteria are met here, and I

17k1acla

1    do think the Secretary's certification, which is issued by the

2    Secretary of Defense himself, does speak precisely to both of

3    those issues, the time period during which the photographs were

4    taken.

5           THE COURT:  I don't think that's relevant.  That's not

6    what the statute says.  I do think it would be an idle act to

7    go over each of these 2,000 photographs to see if they qualify

8    under this period.  We won't know from the photograph

9    necessarily exactly when it was taken, although they may be

10   time stamped.  We will be able to see from each of the

11   photographs what they relay.  And I think for the purposes of

12   this motion, we don't have to go into that exercise, but I do

13   not hold that the government's certificate is conclusive on the

14   aspect of subsection (b).

15          MS. BARCELO:  Thank you, your Honor.

16          THE COURT:  Let's talk a little bit about *Long* and

17   *A. Michael's Piano*, two cases that are cited by the plaintiffs.

18   In *Long*, what was sought are standards used or to be used for

19   the selection of income tax returns for examination or that

20   they used for determining such standards.  In other words, what

21   the applicant wanted to know was what criteria did the IRS use

22   in deciding which returns were audited; a valuable piece of

23   information for taxpayers.

24          The government argued that disclosure would qualify

25   under the act, that it authorized these kinds of criteria and

17k1acla

1  data, to establish those criteria, to be exempted from

2  disclosure.

3        The Court of Appeals in the Ninth Circuit held that

4  the court had to make that determination.  The case is not

5  binding on me, since we sit in the Second Circuit, and I don't

6  think I would agree with the Court of Appeals in the Ninth

7  Circuit.  I think this kind of information is inconsistent with

8  the effective tax administration.  But that would be on the

9  substance.  I could understand a rule that says a district

10  judge has to delve into it because these are the kinds of

11  things that judges are aware of.  You have to understand.

12        For the reasons I expressed before, I don't think we

13  have a very good understanding of what may or may not be

14  dangerous on the battlefield in the crazy conditions that exist

15  in Iraq at this point in time.  And even there, the history of

16  what's involved, with which I've become as familiar as almost

17  any person outside the CIA or the Department of Defense, shows

18  to me that the Secretary of Defense has a rational basis for

19  how he wishes to conclude.  I might disagree with him.  I might

20  agree that the core values of FOIA are more important and more

21  cogent.  In fact, I expressed those views.  But I cannot say

22  that there is a lack of a rational basis for what Secretary

23  Gates has certified, and if you want me to do a *de novo* review,

24  I've done it, by reason of my familiarity with the case, and

25  that's as far as I'll go.  I will not opine that there is or is

17k1acla

 1    not a danger in the battlefield because of the disclosure of

 2    pictures of this sort.  And I should say that issuing the

 3    rulings I did was probably the most difficult judicial decision

 4    that I've had to do in 12 years.  We put people in the line of

 5    fire every day.  Regardless of whether we agree or disagree

 6    with one or more aspects of national policy, we cannot gainsay

 7    the fact that these are very brave soldiers and sailors and

 8    airmen who carry out very dangerous missions every day to

 9    protect the United States and advance its policies.  And it's a

10    very difficult act on the part of a district judge to arrogate

11    the function of deciding what measure of danger is permissible

12    and what not.

13             So I will not do the *de novo* review except to the

14    extent of looking for the rational basis of what the Secretary

15    of Defense has done, and I've done that.

16             Before leaving, there's just one other case I wanted

17    to discuss with you, and that's *A. Michael's Piano v. FTC*.  Can

18    you tell me a little bit about that case.  That's a Second

19    Circuit decision.

20             MS. BARCELO:  Certainly, your Honor.

21             In that case, that was an Exemption 3 FOIA case,

22    similar to this -- the issues that we are now discussing.  *A.*

23    *Michael's Piano*, of course, dealt with a different Exemption 3

24    withholding statute than what we're talking about here.  But

25    the fundamental issue that the Second Circuit was addressing

17k1acla

1    here was, how do we determine whether or not a record is

2    protected under Exemption 3?  Do we interpret the statute

3    using, you know, different principles of statutory

4    interpretation when considering it as a FOIA Exemption 3

5    statute than we would for any other sort of -- any other

6    statute that has been enacted by Congress?

7          It looks at, in considering -- excuse me.  In

8    considering the different ways that a FOIA Exemption 3 statute

9    could be interpreted, the Second Circuit looks at the ways

10   other -- other circuits -- excuse me -- had interpreted 6103 of

11   the Internal Revenue Code, which is the statute the plaintiffs

12   argue we should interpret the PNSDA in a manner similar.  What

13   the Second Circuit held was that in those cases, where other

14   circuits had argued or had held that principles of FOIA *de novo*

15   review should be imposed upon the interpretation of the scope

16   of the FOIA Exemption 3 statute and other circuits had argued

17   or had held that APA principles of arbitrating capricious

18   review should be imposed upon the interpretations of the scope

19   of the Exemption 3 statutes, the Second Circuit considered both

20   of those options and rejected them.  Instead, the Second

21   Circuit held, in light of the Supreme Court precedent in the

22   *CIA v. Sims* case -- which I know the court is very familiar

23   with, as it's come up a number of times in the previous case --

24   it held that a FOIA Exemption 3 statute could only be

25   interpreted according to its plain language, its plain meaning,

17k1acla

1    taking into account its structure, its purpose, and the

2    legislative history of the statute, with the ultimate goal of

3    determining Congressional purpose in enacting the statute and

4    determining what Congress intended.  Did Congress intend for

5    the types of documents that we're talking about here to be

6    protected under this statute.  Here, there is no question that

7    that is what Congress is intending with respect to the

8    photographs at issue here.  That I think is what we can -- the

9    sense in which *A. Michael's Piano* was instructive, that a FOIA

10   Exemption 3 statute should be interpreted in the same manner as

11   any other Congressional enactment, on its own terms, its own

12   plain language, and Congressional intent on enacting the

13   statute.

14           THE COURT:  The Second Circuit held -- this is a 1994

15   case -- that the burden of proof on *de novo* judicial review

16   rests with the agency asserting the exemption.  What did

17   Secretary Gates have to do?  Was his certificate sufficient?

18           MS. BARCELO:  His certificate -- certification

19   absolutely was sufficient.

20           THE COURT:  Because that's what the statute says.

21           MS. BARCELO:  Because that's what the statute

22   requires; exactly, your Honor.  The statute requires --

23           THE COURT:  And clearly the materials withheld fall

24   within the scope of the statute.

25           MS. BARCELO:  That's exactly right, your Honor.

17k1acla

1           THE COURT:  And that's the end of the inquiry.

2           MS. BARCELO:  That is also exactly right.

3           THE COURT:  Anything else?

4           MS. BARCELO:  Unless the court has any further

5    questions.

6           THE COURT:  No.  Thank you.

7           MS. BARCELO:  Thank you.

8           THE COURT:  Do we have any legislative history that

9    commands judicial review to a greater extent than I've

10   expressed?

11          MS. BARCELO:  There is none, your Honor.

12          THE COURT:  Last word, Mr. Abdo?

13          MR. ABDO:  Yes, your Honor.  Respectfully, the inquiry

14   about judicial review isn't whether Congress has expressed an

15   intent to maintain the default rule of judicial review under

16   FOIA.  The inquiry under *Long* and all of the other -- the vast

17   majority of the circuits to consider a question similar to this

18   is whether Congress has tried to negate judicial review or get

19   rid of it.  In this context it hasn't.  It has left FOIA as it

20   stands --

21          THE COURT:  It says nothing about judicial review.

22          MR. ABDO:  That's exactly right.  That's --

23          THE COURT:  It says nothing about what standards of

24   inquiry the court should look to.

25          MR. ABDO:  That's the case with all Exemption 3

SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

17k1acla

1    statutes, your Honor.  Not a single one expresses a view on

2    whether the traditional FOIA review should apply, and the only

3    context in which Congress does express a view in those cases is

4    when it does try to extract a withholding statute from the

5    purview of FOIA, which Congress has not done here.  And even

6    today the government concedes for the first time that the

7    proper framework is Exemption 3.  And so it seems to us that

8    the only real question is whether a criterion under the statute

9    for withholding is that the Secretary determined harm or, as

10   your Honor has said a couple times, whether the Secretary

11   merely needs to certify that harm would exist.  We think that's

12   a distinction without a difference.  The statute requires both.

13   The only reason for the existence of a certification process

14   was to allow Congress to impose a temporal limit on the

15   certification, not to allow a single certification or a single

16   determination of harm to preclude release of these photographs

17   for all time.  And the reason for that should be

18   straightforward.  These are records that obviously cut to the

19   core of governmental transparency and to the core of the

20   purposes of FOIA.  And so Congress was careful not to enact a

21   statute that allowed the withholding of these photographs on

22   the basis of one determination, no matter how long ago made.

23          THE COURT:  What's the time period I look to in

24   deciding whether your request for FOIA disclosure were

25   appropriate or not?  As of today or as of the time you made the

17k1acla

1     request?

2           MR. ABDO:  I believe it's the government's burden to

3     justify its withholding as of this moment.  And that's

4     consistent with how the court has, for example, treated

5     withholdings under Exemption 7, where there are temporal

6     considerations.  So for example, when Special Prosecutor Durham

7     withheld certain records under Exemption 7(a), the court asked

8     for periodic updates that might affect the relevance of his

9     withholding analysis at any given moment.  And so I think the

10    question is whether the Secretary's simple statement that the

11    records should be withheld suffices to discharge the

12    government's burden to demonstrate that there would be harm if

13    the photographs were released today with respect to 2,000

14    photographs which we know nothing about.

15          THE COURT:  Okay.  Thank you very much, Mr. Abdo.

16          I deny the plaintiff's motion for disclosure of these

17    documents and hold that the government properly showed the

18    applicability of Exemption 3 of the Freedom of Information Act,

19    5 U.S.C. § 552(b)(3), and Section 565 of the Department of

20    Homeland Security Appropriations Act 2010, Public Law No.

21    111-83, 123, Statute 2142 and 2184-85 of 2009, better known as

22    the Protected National Security Documents Act of 2009.

23          So I deny plaintiff's motion for disclosure and I

24    grant the government's cross-motion for partial summary

25    judgment.

17k1acla

1          This controversy has a rather long history.

2     Plaintiffs started the matter in October 2003 when they

3     submitted a FOIA request to a number of federal government

4     agencies, including the Department of Defense, and several

5     components, seeking the release of all records concerning the

6     treatment of detainees taken into United States custody after

7     September 11, 2001, and held at military bases or detention

8     facilities abroad.

9          This lawsuit, seeking to implement the FOIA request,

10    was filed in June of 2004.

11         I examined *in camera* each of the photographs that were

12    then in issue and I ordered that there be a redaction on most

13    of these photographs to mask the identity of the detainee and,

14    subject to such redaction, that most of these had to be

15    disclosed.

16         My opinion in writing is *American Civil Liberties*

17    *Union v. Department of Defense*, 389 F.Supp.2d 547 at 568-79,

18    issued in 2005 and affirmed by the Court of Appeals at

19    543 F.3d 59, decided in 2008, and then vacated after subsequent

20    proceedings by the United States Supreme Court at

21    130 U.S. 777 (2009).

22         These photographs, known as the Darby photographs,

23    from the person who took them, further claim exemption under

24    Exemption 6 and 7(c) of FOIA, 5 U.S.C. § 552(b)(6) and

25    (b)(7)(C).  It was argued by the government that release of the

17k1acla

 1    photographs would constitute an unwarranted invasion of

 2    personal property or privacy.  It's very interesting to note

 3    that the government at that time did not argue any aspect of

 4    national security or endangerment of any military persons.  I

 5    denied the government's motion because I reasoned the

 6    photographs had been redacted to eliminate all identifying

 7    characteristics of the persons shown.

 8         The government added its Exemption 7(f) argument,

 9    arguing that publication of the Darby photographs would likely

10    incite violence against our troops and Iraqi and Afghan

11    personnel and civilians and that redactions would not avert the

12    danger.  I overruled that objection.  That is reflected at

13    389 F.Supp.2d at 574-79.  After thorough review of all the

14    precedents and all the photographs, I concluded that the core

15    values that Exemption 7(f) was designed to protect are not

16    implicated by the release of the Darby photographs but that the

17    core values under which FOIA commands the disclosure were very

18    much implicated.  Accordingly, I ordered the government to

19    release the Darby photographs.

20         Following that, a third party published the Darby

21    photographs online, and that resulted in a withdrawal by the

22    government of its appeal, at least as to the aspect of the

23    Darby photographs.

24         However, more and more photographs came into being, or

25    at least came out of hiding.  It appears that there were an

17k1acla

1    additional 29 photographs and two videos taken by individuals

2    serving in Iraq and Afghanistan that the government believes

3    were responsive to the FOIA requests.  Again, the government

4    claimed exemption under Section 6, 7(c), and 7(f).

5          On June 8th, 2006, I reviewed the 29 photographs

6    *ex parte* and *in camera*, and that's reflected in an order,

7    04-CV-4151, Document 193, June 9, 2006.

8          I just want to interject that at all times during this

9    case I've been concerned to balance as properly as I could the

10   commands of secrecy and national defense and the commands of

11   publicity for a court record.  I'm very much concerned that as

12   a United States district judge, I should be accountable for all

13   that I do, and at every step along the way I've tried to put on

14   the public record as much as I could about the subject matter

15   of my ruling and my rulings themselves.  And some of this

16   required a good deal of intensive negotiations and stubbornness

17   with various government officials.

18         But in any event, I rejected the government's claimed

19   exemptions for the same reasons I expressed earlier and I

20   ordered the release of 21 of the 29 photographs, subject to

21   redaction to eliminate all identifying facial features.  And as

22   to the other eight photographs, I ruled they were not

23   responsive to the request.  That order was issued, June 9,

24   2006.  It's Document 193.  And it's also reflected in 2006 US

25   District LEXIS 40894 at *3-4.

17k1acla

1           That was not the last of the photographs.  By letter

2   of June 29, 2006, the government advised that the Department of

3   Defense had an additional 23 images of detainees and claimed

4   exemptions on the same bases as before.  However, it was

5   clearly unnecessary to have further argument and further

6   opinion writing on the subject because what I said earlier on

7   several occasions the parties expected and I believe to be

8   consistently applied so there was a stipulation that these 23

9   would be governed by the rulings on the 21 for the purposes of

10  the appeal that followed.

11          So the government appealed my orders for the 21 and

12  the 29 photographs.  On September 22, 2008, a unanimous panel

13  of the United States Court of Appeals for the Second Circuit

14  affirmed my order, directing the release of the photographs.

15  *American Civil Liberties Union v. Department of Defense*,

16  543 F.3d 59 (2d Cir. 2008), and that was vacated subsequently,

17  and a hearing *en banc* was denied.

18          The government advised on April 23, 2009, that it

19  would not seek certiorari review and that it was prepared to

20  release the 21 and the 23 photographs.  There may be somewhat

21  different numbers, but there were two tranches of photographs

22  that were involved.  And the government added that it was

23  processing for release a substantial number of other images

24  contained in the CIC (Criminal Investigation Command) report

25  that it disclosed during the pendency of the case.  The

            SOUTHERN DISTRICT REPORTERS, P.C.      (212) 805-0300

1    government represented that it would process these other images

2    in a manner consistent with the court's previous rulings on

3    responsive images.  Again, the government did not petition for

4    certiorari.

5              The Second Circuit issued a mandate on April 27, 2009.

6              However, just a few weeks later, matters turned

7    around.  On May 13th, 2009, President Barack Obama stated

8    publicly that he would oppose the release of additional

9    detainee photographs.  That followed -- and I'm not sure this

10   is in the record or from my recollection of the news reports,

11   but that followed an urgent request by the Prime Minister of

12   Iraq to the United States government not to publish the

13   photographs.  The Prime Minister of Iraq, which had a more

14   fragile governmental structure at the time than it is today,

15   was concerned that the publication of these photos would fuel

16   insurrection and make it impossible to have a functioning

17   government.  In reaction to that, President Obama expressed his

18   belief that the publication of these photos would not add any

19   additional benefit to the public's understanding of what was

20   carried out in the past by a small number of individuals;

21   rather, the most direct consequence of releasing the

22   photographs, the President added, would be to further inflame

23   antiAmerican opinion and to put our troops in greater danger.

24             Pursuant to the President's statements, on the

25   application of the government, the Second Circuit granted the

17k1acla

1    government's motion to recall the mandate and to stay the

2    effect of the mandate pending disposition of a new petition for

3    certiorari.  The government filed a petition, and it was three

4    months later that the Protected National Security Documents Act

5    of 2009 was signed into law.  The PNSDA specifically exempts

6    from disclosure under FOIA any protected documents, defined as

7    a photograph taken between September 11, 2001, and January 2,

8    2009, relating to the treatment of individuals engaged,

9    captured, or detained, after September 11, 2001, by the United

10   States armed forces in their operations overseas, and for which

11   the Secretary of Defense issued a certification stating that

12   disclosure would endanger United States citizens, military

13   personnel, or federal government employees.  Subsequently, the

14   Secretary of Defense, Robert M. Gates, issued a certification

15   of November 13, 2009, addressing a collection of photographs

16   between the indicated dates and relating to the subject matter

17   of the law.  The collection includes the 23 and 21, or 44,

18   photographs that were involved in these proceedings.  They do

19   not affect the photographs that were, I think -- I'd like to

20   confirm.

21          The first tranche of photographs that I ruled on are

22   out in the public domain, are they not, Mr. Abdo?

23          MR. ABDO:  I believe so, your Honor.

24          THE COURT:  So we're talking about the second tranche,

25   third tranche, and the fourth tranche documents?

17k1acla

 1          MR. ABDO:  Yes.

 2          THE COURT:  Do you agree, Ms. Barcelo?

 3          MS. BARCELO:  I do, your Honor.

 4          THE COURT:  And I mentioned before on the record the

 5    basis that was cited by Secretary Gates and my ruling that,

 6    given the history of how this came about, it was clear to me

 7    that Secretary Gates had a rational basis for his

 8    certifications and that I could not second-guess it, and

 9    notwithstanding the statement made this week by the ACLU, no

10    one really wants me to conduct a second review of that which is

11    in the purview of the Secretary of Defense, beyond looking for

12    a rational basis the way it did.  I find that rational basis.

13          On November 30, 2009, continuing with the history of

14    the case, the United States Supreme Court granted the

15    government's petition for certiorari, vacated the Second

16    Circuit's judgment, and remanded for further consideration, in

17    light of the enactment of the Protected National Security

18    Documents Act and the certification of the Secretary of

19    Defense.  130 U.S. 777 (2009).

20          In turn, the Second Circuit vacated my orders and

21    remanded for further proceedings.  And thus I'm blessed with

22    another appearance by everyone in this courtroom.

23          So I've expressed my holdings in the discussions we've

24    had.  I hold that Exemption 3 makes clear that an agency need

25    not disclose records that are, by separate qualifying statute,

17k1acla

```
1      specifically exempted from disclosure, and that separate

2      qualifying statute is the Protected National Security Documents

3      Act.  I hold that the government has satisfied its burden to

4      support the claimed Exemption 3 from disclosure, and that was

5      the holding of A. Michael's Piano, Inc. v. FTC, which we

6      discussed earlier today, 18 F.3d 138, 143 (2d Cir. 1994),

7      implementing 5 U.S.C. § 552(a)(4)(D).

8            I've expressed my disagreement, as applied to the

9      proceedings before me, of Long v. United States Internal

10     Revenue Service, 742 F.2d 1173 (9th Cir. 1984), and I don't

11     need to elaborate further.

12           And the Second Circuit held, in A. Michael's Piano,

13     which I previously cited, following the Supreme Court decision

14     in CIA v. Sims, 471 U.S. 159, that we look in all statutes to

15     the plain language of the statute and its legislative history

16     in order to determine its legislative purpose.  The legislative

17     purpose here was to provide authorizing legislation to support

18     the President's determination that these images should not be

19     disclosed, should be exempt from FOIA.

20           We saw before the statements in the Congressional

21     record of Senator Lieberman and Senator Graham, who sponsored

22     the bill.  There is no legislative history suggesting any

23     further de novo review or any kind of review by the court.  The

24     legislative history is not helpful.  The language of the

25     statute makes clear what has to be done in terms of qualifying
```

17k1acla

for exemption, that is, the certificate of which we spoke

before by the Secretary of Defense and the objective criteria

of the photographs, 2,000 photographs qualifying by date and by

relation to the criteria of the statute.  So therefore I hold

that the photographs now in question are not subject to

disclosure under FOIA.

It seems to me that as a judge, my obligation is to

follow the law.  We're not involved with the constitutional

determination; we're involved with the application of statutory

law, where, as here, the Executive branches and the Legislative

branches have spoken clearly as to the appropriateness of

exempting these photographs.  My job as a judge is to follow

and not arrogate my own thinking and policy considerations and

derogations of the Legislative and Executive branches, which,

after all, have the job of making laws that I have to implement

and that pertain to the national defense.

Accordingly, the government's sixth motion for partial

summary judgment is granted.

Plaintiff's sixth motion for partial summary judgment

is denied.

The clerk shall mark the motions, Documents Number 443

and 456, terminated.  These are my findings and conclusions.

Thank you very much.

ALL COUNSEL:  Thank you, your Honor.

o0o