UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------ x

AMERICAN CIVIL LIBERTIES UNION, et al.,

                                Plaintiffs,

         -against-

DEPARTMENT OF DEFENSE, et al.,

                                Defendants.

------------------------------------------------------------------ x

:
:
:
:
:
:
:
:
:
:
:
:
:
:

**ORDER AND OPINION
GRANTING SUMMARY
JUDGMENT TO PLAINTIFF**

04 Civ. 4151 (AKH)

**USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 1/18/17**

ALVIN K. HELLERSTEIN, U.S.D.J.:

        Plaintiffs seek release under the Freedom of Information Act of a cache of

photographs taken at the Abu Ghraib prison and other military detention facilities in Iraq and

Afghanistan by U.S. Army personnel between 2003 and 2005, which depict individuals

apprehended and detained abroad after September 11, 2001. The Government resists production.

Both plaintiffs and the Government move for summary judgment, the eighth such motion in this

case.

        This Court has previously ordered these photographs, or similar photographs, to

be produced. Similar photographs have been published widely, without apparent repercussions.

Nevertheless, the Government resists production and certifies, through a certification issued by

Secretary of Defense Ashton Carter dated November 7, 2015, that production of these

photographs would endanger the lives of Americans deployed outside the United States.

        In 2005, when over 140,000 American troops in Iraq were fully deployed and

suffering casualties daily, General Richard B. Myers, Chairman of the Joint Chiefs of Staff,

urged this Court not to order the release of the Abu Ghraib photographs. General Myers stated in

1

his declaration that release of the photographs would endanger Americans in Iraq and Afghanistan by "inciting violence and riots against American troops and coalition forces." Myers Decl., Dkt. No. 115. Nevertheless, I ordered that the important values of both FOIA and judicial review of the executive's duty to carry out the will of Congress required disclosure of the photographs. *Am. Civil Liberties Union v. Dep't of Def.*, 389 F. Supp. 2d 547 (S.D.N.Y. 2005). The Second Circuit affirmed. *Am. Civil Liberties Union v. Dep't of Def.*, 543 F.3d 59 (2d Cir. 2008).

Now, eleven years later, facing a different enemy in Iraq, with far fewer troops deployed, serving in an advisory rather than combat capacity, and with many fewer civilians deployed, the position of Secretary Carter, the current Secretary of Defense, remains unchanged: publication of additional photographs, he has certified, will endanger Americans deployed outside the United States.

The issues that I must decide are whether, as required by the Protected National Security Documents Act ("PNSDA"),[1] Secretary Carter's certification was based on an individualized review of the photographs at issue, and whether the Government has made clear to the Court the criteria and factual bases upon which the Secretary concluded that disclosure of each such photograph would endanger the safety of Americans deployed outside the United States. Resolutions of those questions are necessary to determine whether the Government has satisfied its burden to show that the photographs are exempt from production under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552. For the reasons discussed in this opinion, I hold

---

[1] Section 565 of the Department of Homeland Security Appropriations Act, 2010, Pub. L. 111–83, Title V, § 565, Oct. 28, 2009, 123 Stat. 2184–85.

2

that Secretary Carter's certification is not a sufficient basis to withhold production of the photographs. Summary judgment for plaintiffs is granted.

## Background

This litigation has its origin in FOIA requests filed by plaintiffs thirteen years ago, on October 7, 2003, seeking records related to the treatment of individuals apprehended abroad after September 11, 2001, and held by the United States at military bases or detention facilities outside the United States. *See* Compl., Dkt. No. 1 (June 2, 2004). Plaintiffs' requests have resulted in substantial waves of production by the Department of Defense ("DoD"), the Central Intelligence Agency ("CIA"), and other government agencies. As reflected by scores of orders, I have conducted public and *in camera* proceedings to regulate the Government's obligation to produce under FOIA. I have granted requests and overseen substantial productions, but I have also upheld exceptions to FOIA and overseen redactions to guard against breaches of national security. *See generally, Am. Civil Liberties Union v. Dep't of Def.*, 339 F. Supp. 2d 501 (S.D.N.Y. 2004); *Am. Civil Liberties Union v. Dep't of Def.*, 389 F. Supp. 2d 547 (S.D.N.Y. 2005) ("*ACLU I*"); *Am. Civil Liberties Union v. Dep't of Def.*, No. 04 CIV. 4151 (AKH), 2006 WL 1638025 (S.D.N.Y. June 9, 2006); *Am. Civil Liberties Union v. Dep't of Def.*, No. 04 CIV. 4151 (AKH), 2006 WL 1722574 (S.D.N.Y. June 21, 2006); *Am. Civil Liberties Union v. Dep't of Def.*, 543 F.3d 59 (2d Cir. 2008) ("*ACLU II*"), *vacated*, 558 U.S. 1042 (2009); *Am. Civil Liberties Union v. Dep't of Def.*, 40 F. Supp. 3d 377 (S.D.N.Y. 2014) ("*ACLU III*"), *vacated and remanded* (2d Cir. Jan. 6, 2016).

One category of documents has been the subject of repeated motion practice: photographs taken by U.S. personnel of enemy combatants in U.S. custody at the Abu Ghraib prison in Iraq. The Government's first motion for summary judgment in 2005 asked to exempt

3

photographs taken by Sergeant Joseph Darby at Abu Ghraib ("Darby photographs") on the ground that production would compromise the privacy of the individuals depicted in the photographs. *See* 5 U.S.C. § 552(b)(6), (b)(7)(C). After I conducted an *in camera* review of all the Darby photographs and ordered redactions of all personal characteristics, the Government changed its position and instead invoked FOIA Exemption 7(F), which exempts from production records compiled for law enforcement purposes to the extent that disclosure "could reasonably be expected to endanger the life or physical safety of any individual." 5 U.S.C. § 552(b)(7)(F). Relying on declarations of the commanding general of American forces in Iraq and the Chief of Staff of all U.S. armed forces, the Government argued that publication of the Darby photographs would incite violence against American troops and Iraqi and Afghan personnel and civilians, and that redactions would not avert the danger. The Government further argued that terrorists would use the re-publication of the photographs, under order of a U.S. court, as a pretext for further acts of terrorism.

I denied the Government's motion, held that none of the FOIA exemptions applied, and ordered the Darby photographs to be produced. *ACLU I*, 389 F. Supp. 2d at 579. I held that because of the redactions, the Government's concern about unwarranted invasions of privacy lacked merit. *Id.* at 571. As to Exemption 7(F), I allowed the Government's late argument, and denied its applicability on the merits. I held that a general threat to an unspecified group of individuals was not enough to justify withholding under Exemption 7(F), that FOIA favored production, and that this policy underlying FOIA outweighed a generalized concern that individuals might be exposed to increased risk of harm. "The terrorists in Iraq and Afghanistan," I ruled, "do not need pretexts for their barbarism; they have proven to be aggressive and pernicious in their choice of targets and tactics. They have driven exploding trucks into groups

4

of children at play and men seeking work; they have attacked doctors, lawyers, teachers, judges and legislators as easily as soldiers. Their pretexts for carrying out violence are patent hypocrisies, clearly recognized as such except by those who would blur the clarity of their own vision." *Id.* at 576. Accordingly, I ordered the Government to produce the Darby photographs.

        The Government appealed. After a third party published the Darby photographs, the Government withdrew its appeal as to those photographs. *See* Order, Dkt. No. 184, at 2 (April 10, 2006). The Government continued its appeal, however, against 29 additional photographs and one further batch that the Government identified after the record closed, and which I ordered should be governed by my underlying order. *Amer. Civil Liberties Union v. Dep't. of Def.*, 04 Civ. 4151 (AKH), 2006 WL 1638025 (S.D.N.Y. June 9, 2006); 2006 WL 1722574 (S.D.N.Y. June 21, 2006).

        The Second Circuit affirmed. *ACLU II*, 543 F.3d 59 (2d Cir. 2008). The Second Circuit ruled that Exemption 7(F) for law enforcement records that could reasonably be expected to endanger "any individual" did not apply to the photographs because the exemption, "by conditioning its application on a reasonable expectation of danger *to an individual*, excludes from consideration risks that are speculative with respect to any individual," such as the risk that release of the photographs might endanger "a group so vast as to encompass all United States troops, coalition forces, and civilians in Iraq and Afghanistan." *Id.* at 71. The Second Circuit also affirmed my rulings on the privacy exemptions. It reviewed the *in camera* proceedings, and was satisfied that "all identifying characteristics of the persons in the photographs" had been redacted. *Id.* at 85.

        On April 23, 2009, the Government informed this Court that in light of the Second Circuit's decision, in addition to the photographs previously identified, it was

"processing for release a substantial number of other images contained in Army CID reports"

that were also responsive to plaintiffs' initial FOIA request. *See* Barcelo Decl. Ex. B, Dkt. No.

458 (Apr. 1, 2011). The Government represented that all photographs would be released by May

28, 2009.

However, following a public statement by President Obama on May 13, 2009,

made in response to the Prime Minister of Iraq's request that the photographs not be produced,

the Solicitor General filed a petition for a writ of certiorari seeking review of the Second

Circuit's opinion. While the petition for certiorari was pending, in response to continuing

pressure on the President by the Prime Minister of Iraq, Congress passed the Protected National

Security Documents Act. Pub. L. No. 111-83, 123 Stat. 2142. The PNSDA provided a temporal

and qualified exception to the Government's obligation to produce the photographs under FOIA:

> Notwithstanding any other provision of the law to the contrary, no
> protected document, as defined in subsection (c), shall be subject to
> disclosure under section 552 of title 5, United States Code, or any other
> proceeding under that section. PNSDA § 565(b).

Under the PNSDA, a "protected document" must:

> (a) be a "photograph" that "relates to the treatment of individuals engaged,
> captured, or detained after September 11, 2001, by the Armed Forces of the
> United States in operations outside of the United States," *id.* §
> 565(c)(1)(B)(ii);

> (b) have been created "on September 11, 2001 through January 22, 2009,"
> *id.* § 565(c)(1)(B)(i); and

> (c) be a record "for which the Secretary of Defense has issued a
> certification, as described in subsection (d), stating that disclosure of that
> record would endanger citizens of the United States, members of the United
> States Armed Forces, or employees of the United States Government
> deployed outside the United States." *Id.* § 565(c)(1)(A).

Subsection (d), in turn, provides:

6

> The Secretary of Defense shall issue a certification if the Secretary of
> Defense determines that disclosure of that photograph would endanger
> citizens of the United States, members of the United States Armed Forces,
> or employees of the United States Government deployed outside the United
> States. *Id.* § 565(d)(1).

The statute further provides that any such certification "shall expire 3 years after the date on

which the certification" – or a renewed certification if the original certification has expired – is

issued by the Secretary of Defense. *Id.* § 565(d)(2). Finally, the PNSDA provides for direct

Congressional oversight of any certification issued under the PNSDA, by requiring the Secretary

to provide "timely notice" to Congress when he issues a certification or a renewal certification

pursuant to the PNSDA. *Id.* § 565(d)(4).

In November 2009, shortly after the passage of the PNSDA, then-Secretary of

Defense Robert Gates signed a certification exempting the photographs then at issue in this

litigation.[2] On the basis of the Gates certification, the Supreme Court granted the Government's

petition for certiorari, vacated the Second Circuit's judgment upholding this Court's September

2005 disclosure order, and remanded the action for further consideration in light of the PNSDA

and the Gates certification. *See Dep't of Def. v. Am. Civil Liberties Union*, 558 U.S. 1042

(2009). The Second Circuit, in turn, remanded the case to me.

The parties again cross-moved for partial summary judgment based on the

adequacy of Secretary's certification. On July 21, 2011, after oral argument on the motions, I

denied plaintiffs' motion and granted the Government's motion, and upheld Secretary Gates'

certification. *See* Dkt. No. 469. Without specifically ruling what standard of review should

apply, I found that it was clear from the record that "Secretary Gates had a rational basis for his

---

[2] It is unclear to the Court whether the photographs certified by Secretary Gates in 2009 are the
exact same set of photographs that Secretary Carter certified in 2015.

certifications and that I could not second guess-it." Hr'g Tr., Dkt. No. 474, at 36:6–8 (July 20, 2011). I stated that, "by reason of my familiarity with the case," I had effectively conducted a *de novo* review of Secretary Gates's decision, had found that there was a rational basis for it, and would not "opine" as to whether "there is or is not a danger in the battlefield because of the disclosure of pictures of this sort." *Id.* at 23:21–24:2.

I ruled that the legislative history of the statute, especially statements by Senators Lieberman and Graham who sponsored the bill, made clear that the PNSDA was passed in order "to provide authorizing legislation to support the President's determination that these images should not be disclosed." *Id.* at 37:16–19. President Obama had made this determination in response to a request from the Prime Minister of Iraq that the United States government not publish the photographs for fear that their publication would fuel insurrection and make it impossible to have a functioning government. *Id.* at 34:7–23. In light of that history, I upheld Secretary Gates' certification.

Under the PNSDA, the Gates certification was set to expire on November 13, 2012. Several days before expiration, Secretary of Defense Leon E. Panetta issued a certification, virtually identical to the 2009 Gates certification. The parties once again moved for partial summary judgment upholding and impeaching the 2012 Panetta certification. I granted plaintiffs' motion in part. I first resolved whether the PNSDA qualified as an exemption statute under FOIA Exemption 3, which protects from disclosure documents that are "specifically exempted from disclosure by statute," provided that certain conditions are met. I held that "[t]he PNSDA is an exemption (3) statute, since it provides criteria for the withholding of certain documents from the public under FOIA[.]" *ACLU III*, 40 F. Supp. 3d at 382. Accordingly, "[t]he agency asserting the exemption [from FOIA] bears the burden of proof, and all doubts as

to the applicability of the exemption must be resolved in favor of disclosure." *Id.* at 383 (internal quotation marks omitted). I then rejected the Government's argument that the Panetta certification, standing alone, satisfied the Government's burden to show why the photographs at issue could be withheld.

The Government's review of the photographs leading up to the 2012 Panetta certification began approximately three months prior to the scheduled expiration of the 2009 certification. One attorney, Megan Weis, a deputy general counsel in the Army Office of the General Counsel, carried out the review. She began by gathering and reviewing all the photographs subject to the 2009 certification. She then placed the photographs into three categories and "created a representative sample of five to ten photographs in each category to provide to senior military commanders for their review and judgment of the risk from public disclosure of each category." Weis Decl., Dkt. No. 530, ¶ 8 (Dec. 19, 2014). Factors for creating the three categories included the "extent of any injury suffered by detainee, whether U.S. service members were depicted, and the location of detainee in the photograph." *Id.*

Weis then sent the samples of five to ten photographs from each category to three high level generals, who each reviewed the samples and recommended recertifying all the photographs. *Id.* ¶¶ 9-12. Weis then provided DoD's General Counsel with the representative sample, the Generals' recommendations, a draft renewal of the certification, and a CD containing all of the photographs. *Id.* ¶ 13. The DoD General Counsel met with Secretary of Defense Panetta, and discussed whether to renew the certification. Panetta then signed the draft certification prepared by Weis. *Id.*

I held that the Government had not satisfied its burden. The Panetta certification was "expressed in conclusory fashion, and relate[d] to all the photographs at issue—likely

9

hundreds or thousands." It "track[ed] the language of the statute, without providing any specific

explanation for why the Secretary certified the photographs, except to state that based on the

recommendations of certain senior military officials, the Secretary determined that the

photographs met the criteria of the statute." *ACLU III*, 40 F. Supp. 3d at 383. Noting that

Congress enacted the PNSDA against the "background norm of broad disclosure of Government

records," and that Congress was aware that FOIA "provided for *de novo* judicial review of

agency invocations of FOIA exceptions," I held that "the PNSDA should be read as providing

for judicial review of the basis for the Secretary of Defense's certification." *Id.* at 387-88.

Finally, after noting that the "condition provided by the PNSDA for withholding disclosure is

that each individual photograph, if disclosed, alone or with others" would endanger Americans

abroad, I held that "the government, to invoke the PNSDA, must prove that the Secretary of

Defense considered each photograph individually." *Id.* at 389-90. I then gave the Government

the opportunity to supplement the record by submitting documents and affidavits explaining the

factual basis for withholding the documents under the Panetta certification.

        In response, the Government supplemented the record with additional declarations

and renewed its motion for summary judgment. By order dated February 18, 2015, I found that

the Government had not met its burden, and provided criteria that it could use if it wished again

to supplement the record. Regarding the Government's burden, I stated that the Government

"must make the Secretary's factual basis for concluding that disclosure would endanger U.S.

citizens, Armed Forces, or government employees clear to the Court," and "[a]t minimum, the

submission must describe the categories of objectionable content contained in the photographs,

identify how many photographs fit into each category, and specify the type of harm that would

result from disclosing such content." Order Clarifying Instructions for Defendants' Submissions

("February 18, 2015 Order"), Dkt. No. 543, at 2 (Feb. 18, 2015). Without such information,

"judicial review is impossible, and judicial review is fundamental to FOIA and the APA." *Id.* at

3. In the event the Government feared its submission, by itself, would endanger Americans

deployed abroad, I encouraged the Government to present any supplementary information *in*

*camera. Id.*

> Regarding individualized review, I held:
>
> [T]he Secretary is required, at a minimum, to explain the terms of his delegation so it is the Secretary, and not any subordinate, who takes responsibility for his knowing and good faith Certification that release of a particular photograph would result in the harm envisioned. In order to make such a Certification, the Secretary must demonstrate knowledge of the contents of the individual photographs rather than mere knowledge of his commanders' conclusions. *Id.* at 2.

The Government declined to submit additional declarations. I entered judgment for

plaintiffs but stayed the order for 60 days to allow the Government to appeal. Order Granting

Judgment for Plaintiffs, Dkt. No. 549 (Mar. 20, 2015). The Government filed a timely appeal.

Following briefing of the appeal, the 2012 Panetta certification expired and, on

November 7, 2015, Secretary of Defense Ashton Carter issued a new certification. On motion by

the Government, the Second Circuit vacated the prior judgment and remanded the case to me,

noting that the Carter certification and the process that led to it might have "the potential to

obviate many of the issues cited by the district court in granting relief." Corrected Mandate, Dkt.

No. 558 (Jan. 6, 2016).

The Carter certification – the current, extant certification – is the subject of this

opinion and order. The process leading to the Carter certification began six months before the

Panetta certification expired. According to a declaration submitted by Liam M. Apostol, an

associate deputy general counsel in the DoD's Office of General Counsel, an unnamed attorney

11

from that office collected all the photographs and reviewed each. Apostol Decl., Dkt. No. 566, ¶ 5 (Feb. 26, 2016). The Government does not disclose the number of photographs. The attorney sorted the photographs into categories according to what they depicted, and then sorted them again based on the perceived likelihood of harm from publication. The attorney performed this sorting "on behalf of the Secretary." *Id.* According to the Government, "[t]he purpose of this sorting was to ensure that a true representative sample that contained the full spectrum of what the full group of photographs depicted would be created for the Secretary's review." *Id.* However, the Government has not disclosed the definitions or parameters of the categories, the criteria used to sort the photographs into those categories, or the criteria used, if any, for determining the likelihood of harm upon production.

This first review was then followed by a second-level review by commissioned officers, also unnamed, from the office of the Joint Staff, Deputy Director for Special Operations, Counterterrorism and Detainee Operations ("Joint Staff J37"). This second review was also conducted "on behalf of the Secretary." *Id.* ¶ 6. The second review, like the first, was of each photograph, and the photographs were again sorted based on the likelihood of harm from production. The purpose of the second review was to "assess whether the initial sorting of the photographs would ensure a true representative sample." *Id.* However, no reason is given why the first review was deficient or needed to be improved, and the Government has not explained when, if at all, the second-level reviewers were made privy to the first-level reviewer's determinations. Nor has the Government disclosed the criteria by which the second-level reviewers conducted their review and sort, or whether the criteria they used differed in any respect from those used in the first-level review.

12

A third-level review was then conducted by four new attorneys, three from the Department of Defense's Office of General Counsel and one uniformed attorney from the Department of the Army. Again "on behalf of the Secretary," the four attorneys reviewed the combined work product of the previous two reviews to assess the likelihood of harm from publication. The Government has not disclosed the criteria used by the four attorneys. They reviewed the "combined work product" of the first two reviews, but it is unclear whether their review was *de novo* or in any way built on or deferred to the first two reviews. *Id.* ¶ 7. After the third review, the "attorneys coordinated with the Joint Staff J37 officers and uniformed attorneys from the Office of the Legal Counsel to the Chairman of the Joint Chiefs of Staff to reach a final consensus." *Id.* It remains unclear what coordination occurred, who participated, or how a final consensus was reached.

This process led to a recommendation to Secretary Carter: 198 photographs should be released, and the rest, an unspecified number, should be kept secret. A "representative sample" of the remaining photographs was then created. The Government does not disclose the size of the sample, whether the sample was broken down by category, the criteria used to create the sample, or why the third-level reviewers concluded that the photographs should not be released. The sample was then sent to four high ranking generals: General Lloyd J. Austin, Commander of U.S. Central Command; General David M. Rodriguez, Commander of U.S. Africa Command; Major General Jeffrey S. Buchanan, Commander of U.S. Forces- Afghanistan; and General Joseph F. Dunford, Chairman of the Joint Chiefs of Staff. Each general, after reviewing the sample, recommended that the entire set be certified as likely, if published, to endanger Americans deployed outside the United States. *Id.* ¶¶ 10-18.

13

Finally, the generals' recommendations, the 198 photographs recommended for release, and the representative sample of the remaining photographs were given to Secretary Carter. *Id.* ¶ 19. On November 7, 2015, Secretary of Defense Ashton Carter, acting according to the recommendations and pursuant to the PNSDA, certified the entire set of photographs, other than the 198, as properly withheld from publication. *Id.* On February 5, 2016, the Government released the 198 photographs. *Id.* The Apostol Declaration does not disclose what kind of review Secretary Carter made, whether he examined photographs beyond the sample, whether he looked at any of the 198 photographs ultimately released, or whether he applied any specific criteria in conducting his review other than accepting the generals' recommendation.

The Carter certification states that as to each photograph, public disclosure would cause harm to Americans deployed abroad based "[u]pon the recommendations of the Chairman of the Joint Chiefs of Staff, the Commander of the U.S. Central Command, the Commander of U.S. Africa Command, and the Commander, U.S. forces – Afghanistan and after a review of each photograph by my staff on my behalf[.]" Apostol Decl. Ex. 1 (Nov. 7, 2015). The certification provides no other basis for withholding the photographs at issue.

**The Pending Cross-Motions for Summary Judgment**

The Government offers three arguments in support of its motion. First, it maintains its position, asserted in prior briefing, that because the photographs are "protected documents" as defined under the PNSDA, the Court's role is solely limited to determining "whether the Secretary issued a certification and the documents otherwise satisfy the PNSDA." Second, it argues that even if broader judicial review of the certification is permitted, the Court must apply the deferential "arbitrary and capricious" standard of the Administrative Procedure Act. The Government contends that it has easily satisfied this standard because the Secretary's

14

process for issuing the certification was reasonable and because it complied with this Court's prior ruling that the Secretary of Defense consider "each photograph individually, not collectively." *ACLU III*, 40 F. Supp. 3d at 389. Third, the Government continues to argue a proposition that I rejected and which the Second Circuit affirmed, *see ACLU I*, 389 F. Supp. 2d at 574-78; *ACLU II*, 543 F.3d at 66-83, namely, that the photographs are exempt under FOIA Exemption 7(F), which exempts materials "compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information … could reasonably be expected to endanger the life or physical safety of any individual." 5 U.S.C. § 552(b)(7)(F).

Plaintiffs argue that the Government failed to comply with this Court's prior orders in two key respects. First, plaintiffs argue that Secretary Carter failed to make an individualized determination as to each photograph because he merely relied on the recommendation of the generals, who themselves only reviewed a sample of the photographs. Second, plaintiffs argue that there is no support in the record for the Secretary's assertion that release of the photographs would endanger Americans deployed outside the United States. The record, plaintiffs argue, does not identify the categories into which photographs were sorted, the number of images in each category, the total number of photographs examined, any description of the subject matter depicted in the photographs, or the criteria that were used to determine that release of the photographs would endanger Americans deployed outside the United States.

### Standard of Review

### 1. The PNSDA is an Exemption Statute within the Meaning of FOIA Exemption 3

As a threshold matter, the PNSDA is an exemption statute within the meaning of FOIA Exemption 3. *See ACLU III*, 40 F. Supp. 3d at 382. That exemption permits the

Government to withhold documents from disclosure that are "specifically exempted from disclosure by statute," provided that statute either "requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue" or "establishes particular criteria for withholding or refers to types of matters to be withheld." 5 U.S.C. § 552(b)(3).[3] Here, the PNSDA "establishes particular criteria for withholding" because a "protected document" under the PNSDA must be (a) a photograph; (b) that was taken within a particular time period and "relates to the treatment of individuals engaged, captured, or detained after September 11, 2011, by the Armed Forces of the United States in operations outside of the United States"; and (c) was the subject of a certification issued by the Secretary of Defense stating that "disclosure of that record would endanger citizens of the United States, members of the United States Armed Forces, or employees of the United States Government deployed outside the United States." PNSDA § 565(c)(1).

Nevertheless, the Government argues that the PNSDA should operate independently of FOIA, with a judicial role limited to asking only if the Carter certificate is authentic. Under the Government's proposed approach, the Court would be precluded from considering FOIA at all, and could not review the Government's invocation of a statutory exemption.

There is nothing in the PNSDA that supports the Government's argument. Congress may not supersede FOIA through subsequently passed legislation unless it does so

---

[3] Exemption 3 also states that if the statute was "enacted after the date of enactment of the OPEN FOIA Act of 2009," then it must "specifically cite[]" to Exemption 3. The OPEN FOIA Act of 2009 amended FOIA Exemption 3 to include this very requirement: that any statute exempting documents from disclosure under Exemption 3 specifically cite to Exemption 3, but only if that statute was enacted after Exemption 3 was amended to include this requirement. This provision of Exemption 3 does not apply here because the PNSDA was enacted on the same date as the OPEN FOIA Act of 2009, not after it. *See* H.R. 2892, 111th Cong. (2009).

expressly. As the Supreme Court has held, "FOIA is a structural statute, designed to apply across-the-board to many substantive programs ... and it is subject to the provision, governing all of the Administrative Procedure Act of which it is a part, that a 'subsequent statute may not be held to supersede or modify this subchapter ... except to the extent that it does so expressly.'" *Church of Scientology of California v. I.R.S.*, 792 F.2d 146, 149 (D.C. Cir. 1986) (quoting 5 U.S.C. § 559). More simply, FOIA's provisions cannot be "*sub silentio* repealed" by subsequent statutes. *Id.*

The PNSDA does not repeal any provision of FOIA. Rather, through its use of the phrase "notwithstanding any other provision of the law to the contrary," Congress stylized the PNSDA as creating an *exception* to FOIA for certain materials. Courts have identified other statutes containing similar "notwithstanding" clauses as FOIA Exemption 3 statutes. *See, e.g.*, *Newport Aeronautical Sales v. Dep't of Air Force*, 684 F.3d 160, 165 (D.C. Cir. 2012) (holding that statute beginning with the phrase "notwithstanding any other provision of law" "readily qualifies as an Exemption 3 statute."); *O'Keefe v. U.S. Dep't of Def.*, 463 F. Supp. 2d 317, 325 (E.D.N.Y. 2006) (same).

Additionally, courts "generally presume that Congress is knowledgeable about existing law pertinent to legislation it enacts." *Goodyear Atomic Corp. v. Miller,* 486 U.S. 174, 184–85 (1988). This is particularly so with FOIA. When it passed the PNSDA, "Congress was aware that [the Supreme] Court had construed FOIA as creating a background norm of 'broad disclosure of Government records.'" *ACLU III*, 40 F. Supp. 3d at 387 (quoting *C.I.A. v. Sims*, 471 U.S. 159, 166 (1985)). The PNSDA's legislative history indicates that Congress had no intent to "change FOIA, in its basic construct." 155 Cong. Rec. S5650, S5672 (statement of Sen. Graham). That construct provides for *de novo* judicial review of an agency's invocation of a

17

FOIA exemption. 5 U.S.C. § 552(a)(4)(B). In fact, the PNSDA itself refers to "proceedings" brought under FOIA – such as this one – but does nothing to disturb FOIA's requirement that courts apply *de novo* review in such proceedings. PNDSA § 565(b).

More broadly, there is also a "strong presumption that Congress intends judicial review." *Bowen v. Mich. Acad. of Family Physicians,* 476 U.S. 667, 670 (1986). There is nothing in the legislative record to suggest that when passing the PNDSA, Congress intended to depart from both "the specific policies underlying FOIA and the general presumption of judicial review." *ACLU III,* 40 F. Supp. 3d at 388. Judicial review under FOIA is the norm, even when reviewing certifications made under the PNSDA. I therefore reject the Government's argument that the PNSDA precludes judicial review.

### 2. A District Court Must Review an Agency's Invocation of a FOIA Exemption *De Novo* and the Government Must Provide the Court with Sufficient Information to Conduct that Review

"FOIA clearly contemplates judicial review of agency decisions to withhold information." *Halpern v. F.B.I.*, 181 F.3d 279, 287 (2d Cir. 1999). FOIA provides that upon an agency's invocation of a FOIA exemption, the "court shall determine the matter de novo" and that "the burden is on the agency to sustain its action" of withholding production. 5 U.S.C. § 552(a)(4)(B). As the Second Circuit has explained, FOIA establishes a "general, firm philosophy of full agency disclosure." *A. Michael's Piano, Inc. v. F.T.C.*, 18 F.3d 138, 141 (2d Cir. 1994). It "provided *de novo* review by federal courts so that citizens and the press could obtain agency information wrongfully withheld. *De novo* review was deemed essential to prevent courts reviewing agency action from issuing a meaningless judicial imprimatur on agency discretion." *Id.*

This "essential" *de novo* review should strike "a proper balance between plaintiffs' right to receive information on government activity in a timely manner and the

18

government's contention that national security concerns prevent timely disclosure or identification." *Am. Civil Liberties Union v. Dep't of Def.*, 339 F. Supp. 2d 501, 504 (S.D.N.Y. 2004). Navigating this fundamental tension between two competing, legitimate interests is one of the judiciary's most important functions with respect to FOIA, and courts have grappled with it for decades.

When the documents at issue pertain to national security, and in particular when the Government asserts that release of the documents may jeopardize national security, the Court must give a certain degree of deference to the executive branch, which is tasked with protecting our national security. *See, e.g., ACLU I*, 389 F. Supp. 2d at 564 ("Clearly, the need for such deference is particularly acute in the area of national security."); *Am. Civil Liberties Union v. Dep't of Def.*, 723 F. Supp. 2d 621, 627 (S.D.N.Y. 2010) (noting that judicial review of a CIA Director's affirmation is "limited and deferential."). Indeed, both the Supreme Court and the Second Circuit have made clear that "it is bad law and bad policy to second-guess the predictive judgments made by the government's intelligence agencies regarding whether disclosure of [information] would pose a threat to national security." *Am. Civil Liberties Union v. Dep't of Justice*, 681 F.3d 61, 70-71 (2d Cir. 2012) (internal quotation marks omitted).

This rule of deference is subject to an important qualification. Deference is not owed to the executive unless the executive provides the Court with enough information to permit the Court to carry out its own duty of judicial review. Specifically, the Government "'must supply the courts with sufficient information to allow [the courts] to make a reasoned determination that they were correct' in withholding certain materials." *Nat'l Immigration Project of Nat'l Lawyers Guild v. U.S. Dep't of Homeland Sec.*, 868 F. Supp. 2d 284, 291

(S.D.N.Y. 2012) (quoting *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 861 (D.C. Cir. 1980)).

Here, the Government argues that judicial review of "national security judgments" is precluded entirely, and that the Secretary's certification alone is sufficient to trigger exemption. But that is not the law. Deference with respect to national security issues may limit the *scope* of judicial review, but it does not *preclude* judicial review. And no matter what the degree of deference, judicial review cannot occur unless the Government describes why, "with reasonably specific detail," disclosure of documents should not be required. *Miller v. Casey*, 730 F.2d 773, 776 (D.C. Cir. 1984). *See also Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 861 (D.C. Cir. 1980) (denying agency invocation of FOIA exemption where "the agency has failed to supply us with even the minimal information necessary to make a determination.").

The Government's burden is clear. "Summary judgment is warranted on the basis of agency affidavits when the affidavits describe the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith. Ultimately, an agency's justification for invoking a FOIA exemption is sufficient if it appears logical or plausible." *Wilner v. Nat'l Sec. Agency*, 592 F.3d 60, 73 (2d Cir. 2009) (internal quotation marks and citations omitted). The Government must provide an accounting of *how* it reached its conclusion, so that the court has "an adequate foundation to review" whether the Government has satisfied its burden. *Campbell v. United States Dep't of Justice,* 164 F.3d 20, 30 (D.C. Cir. 1998). Once the court is "satisfied that the proper procedures have been followed and that the information logically falls into the exemption

claimed," the Government has met its burden. *Gardels v. Cent. Intelligence Agency*, 689 F.2d 1100, 1104 (D.C. Cir. 1982).

### 3. The Administrative Procedure Act's "Arbitrary and Capricious" Standard of Review Does not Apply But, Even if it Did, the Government Must Still Articulate a Rational Basis for Its Invocation of an Exemption

The Government argues that the standard of review should not be *de novo*, the standard for FOIA cases, but "arbitrary and capricious," the standard of review under the Administrative Procedure Act ("APA") for review of final determinations of administrative agencies. *See* 5 U.S.C. § 706. Under the latter standard of review, a reviewing court may overturn an agency action only if the agency's decision is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.*

The Government's argument is misplaced. It has not identified a single case in which a court applied the arbitrary and capricious standard when reviewing an agency's invocation of a FOIA exemption. That is because, as the Supreme Court has explained, "[u]nlike the review of other agency action that must be upheld if supported by substantial evidence and not arbitrary or capricious, the FOIA expressly places the burden 'on the agency to sustain its action' and directs the district courts to 'determine the matter de novo.'" *U.S. Dep't of Justice v. Reporters Comm. For Freedom of Press*, 489 U.S. 749, 755 (1989) (quoting 5 U.S.C. § 552(a)(4)(B).

The question before the Court is not whether the Department of Defense acted arbitrarily or capriciously in reviewing the photographs and preparing the certification for Secretary Carter's signature. Rather, it is whether the Government has satisfied its burden to show that the photographs qualify as "protected documents" under the PNSDA, so that they may be withheld under FOIA Exemption 3. That inquiry is subject to *de novo* review. *See A. Michael's Piano, Inc. v. F.T.C.*, 18 F.3d 138, 144 (2d Cir. 1994) ("Conducting a *de novo* review

21

we must determine whether the FTC met its burden of proving that the documents withheld pursuant to Exemption 3 fell within the scope of [the exemption statute].").

Furthermore, even under the arbitrary and capricious standard of review, the Government is not excused from articulating a rational basis for its action. Under the APA, a "court must be satisfied from the record that 'the agency ... examine[d] the relevant data and articulate[d] a satisfactory explanation for its action.' Further, the agency's decision must reveal 'a rational connection between the facts found and the choice made.'" *Islander E. Pipeline Co., LLC v. McCarthy*, 525 F.3d 141, 151 (2d Cir. 2008) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). Accordingly, regardless whether the Court conducts an "arbitrary and capricious" review or a *de novo* review, the Government, at a bare minimum, must disclose the criteria upon which it based its decision that release of the photographs would endanger Americans deployed outside the United States.

## Discussion

### 1. Summary Judgment for Plaintiffs is Proper Because The Government Has Failed to Disclose the Criteria For Concluding That The Photographs, If Released, Would Endanger Americans Deployed Outside the United States

There has been no adequate judicial review of the Government's invocation of Exemption 3. None has been possible because the Government has failed to provide the Court with the criteria it used to withhold the mass of photographs from disclosure. This is true regardless of whether I conduct *de novo* review or apply the APA's "arbitrary and capricious" standard of review.

In prior orders, the Government was instructed to provide "evidence supporting the Secretary of Defense's determination that there is a risk of harm, and evidence that the Secretary of Defense considered whether each photograph could be safely released." *ACLU III*, 40 F. Supp. 3d at 390. The Government was instructed to "indicate the criteria used to

22

categorize the pictures or to select the samples from each category." February 18, 2015 Order, at

2. The Government was instructed to "describe the categories of objectionable content contained

in the photographs, identify how many photographs fit into each category, and specify the type

of harm that would result from disclosing such content." *Id.* at 3. The Government was

instructed to "make the Secretary's factual basis for concluding that disclosure would endanger

U.S. citizens, Armed Forces, or government employees clear to the Court" because, "without

such a record, judicial review is impossible, and judicial review is fundamental to FOIA and the

APA." *Id.*

The Government has not complied with these instructions.[4]  As a result, I cannot

review whether it has satisfied its burden under FOIA, as I am required to do under the statute.

Thus, summary judgment for plaintiffs is appropriate.

First, the Government has not provided any meaningful information as to how it

sorted the photographs into categories. It asserts that its sorting process resulted in a "true

representative sample that contained the full spectrum of what the full group of photographs

depicted," Apostol Decl. ¶ 5, but it has not disclosed the parameters used to define each category,

the criteria used to determine whether a photograph fell into one category or another, or how

many categories or photographs there were.

Second, the Government has not adequately explained the relationship between

the various levels of review. It remains unclear whether the reviewers from each level used the

---

[4] The Government, had it wanted to comply, could have done so *in camera*, as it did with the
photographs covered by my earlier decision. *See ACLU I*, 389 F. Supp. 2d at 568. It could have
exhibited the entire set of withheld photographs ex parte, and explained the criteria by which the
photographs were sorted, a sample was created, and by which the Secretary or his delegates
reached the conclusion that release of the photographs would endanger Americans deployed
abroad.

same or different criteria, and whether they reached the same or different conclusions with respect to categorization and the potential for harm upon release. The second-level review is described as "independent" from the first-level review, but was conducted "for the same purpose." Apostol Decl. ¶ 6. The Government states that the third-level reviewers assessed the "combined work product" of the prior two reviews, but it is unclear whether that review deferred to prior findings or was conducted *de novo*. The third-level review team then "coordinated" with the second-level review team and with attorneys from the Office of the Legal Counsel to the Chairman of the Joint Chiefs of Staff "to reach a final consensus," but no further details are provided regarding how the "final consensus" was reached. *Id.* ¶ 7. A "representative sample" of the photographs to be withheld was then prepared for the generals' review, but no further information regarding that sample was provided. *Id.* ¶ 8. Based on this scant information, it is impossible to know how this tiered review process yielded the recommendations that Secretary Carter adopted.

In short, the Government has not provided any information regarding the criteria it applied to reach the conclusion that release of each withheld photograph would endanger Americans deployed outside the United States. The Government concluded that 198 photographs could be released, but we do not know what distinguishes those photographs from all the others, nor do we know how many photographs the Government seeks to withhold. No matter how many levels of administrative review took place, the Government may not rely on a process that the Court is unable to review.

Under FOIA, the Government's submission must be "sufficiently detailed to permit meaningful review of the claim of exemption." *Larson v. Dep't of State*, 565 F.3d 857, 862 (D.C. Cir. 2009). Withholding may be warranted when "the affidavits describe the

justifications for nondisclosure with *reasonably specific detail*, demonstrate that the information withheld *logically falls within the claimed exemption*, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith." *Id.* (emphases added).  Because the Government has not provided reasonably specific detail as to why the photographs fall within Exemption 3, I cannot determine whether the Government's invocation of Exemption 3 is logical or plausible.

Nor can I assess whether there is in fact a "rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43 (citation omitted).  The generals, for example, concluded that the photographs "would be used to fuel distrust, encourage insider attacks against U.S. military forces, and incite anti-U.S. sentiment across the region."  Apostol Decl. ¶ 10.  But they did not explain what it was about the photographs that would produce these results.  Without knowing the relationship between the substance of the photographs and the specific endangerment referred to in the PNSDA, the Court cannot discharge its Article III duty of judicial review.

It is not as if relevant criteria cannot be applied.  Relevant factors might include the type and extent of injury suffered by a detainee, the presence or absence in the photograph of Americans potentially responsible for the injury, the environment depicted in the photograph, and other like considerations.  Since many photographs have been publicly disseminated, albeit not under Government sponsorship, the Government should compare those photographs with those covered by the Carter certification, and consider whether there have been previous episodes of violence caused by the released photographs.  The Government should also consider the fact that the U.S. troop presence in Iraq has declined significantly, from over 100,000 in 2009 when the PNSDA was enacted, to approximately 5,000 today.  The scope of operations has also

25

significantly narrowed. In *ACLU III*, I observed that "three years is a long time in war, the news cycle, and the international debate over how to respond to terrorism." *ACLU III*, 40 F. Supp. 3d at 384. Seven years is even longer. And while President Obama's desire to withhold these photographs in 2009 was animated by his desire to bolster the government of the Prime Minister of Iraq, that is not now the statutory consideration for withholding publication.

I take seriously the level of deference owed to the executive branch in the realm of national security decision making. The record of this long-pending lawsuit, and the many orders and decisions that I have issued, reflects that deference. As I noted at oral argument, "whenever the executive has articulated a reason, I have deferred to him." Hr'g Tr. at 28:14-23 (May 11, 2016). My complaint is that the executive has failed to articulate the reasons supporting its conclusion that release of the photographs would endanger Americans deployed abroad.

In *Toyosaburo Korematsu v. United States*, 323 U.S. 214 (1944), the Supreme Court sanctioned the government's internment of Japanese-Americans during World War II. Justice Murphy, who dissented, agreed with the majority that in judging military action, "it is necessary only that the action have some reasonable relation to the removal of the dangers of invasion, sabotage and espionage." *Id.* at 235 (Murphy, J., dissenting). However, as Justice Murphy noted, the report prepared by General DeWitt, who ordered the internment, and upon which the government based its "military necessity" argument, contained "no reliable evidence" that Japanese-Americans were in fact disloyal. *Id.* Similarly, Justice Jackson dissented because he concluded that he could not judge whether General DeWitt's measures were reasonably expedient based on the evidence before him: "How does the Court know that these orders have a reasonable basis in necessity? No evidence whatever on that subject has been taken by this or

any other court. There is sharp controversy as to the credibility of the DeWitt report. So the Court, having no real evidence before it, has no choice but to accept General DeWitt's own unsworn, self-serving statement, untested by any cross-examination, that what he did was reasonable." *Id.* at 245 (Jackson, J., dissenting). But, Justice Jackson commented, once the court sanctions the order, the "principle then lies about like a loaded weapon ready for the hand of any authority that can bring forward a plausible claim of an urgent need." *Id.* at 246.

Today, portions of Iraq have been overrun by ISIS, a barbaric terrorist organization whose pernicious campaign of public beheadings, enslavement, and indiscriminate killings of people it considers apostates are indisputable proof that its members, like many other terrorists that the United States has fought in Iraq and Afghanistan, "do not need pretexts for their barbarism." *ACLU I*, 389 F. Supp. 2d at 576. To give in to fear of our enemies, their propaganda, or their blackmail, is to surrender some of our dearest held values. Twelve years after this litigation began, and now fifteen years since the devastating attacks of September 11, it remains the case that "our nation does not surrender to blackmail, and fear of blackmail is not a legally sufficient argument to prevent us from performing a statutory command." *Id.* at 575. It is to that end that we have the Freedom of Information Act. The Secretary's methodologies and criteria, whether by himself or through delegation, must be disclosed. Until then, there cannot be judicial review. A submission that precludes judicial review cannot be the basis for a withholding under FOIA.

### 2. The Government's Individualized Reviews, However Ample, Are Legally Insufficient Unless the Criteria of Delegation and Review Are Set Out

Plaintiffs continue to argue that the review process leading up to the Carter certification was not sufficiently individual as to each photograph. On its face, the Carter certification differs from the Panetta certification in that instead of referring to "a collection of

27

photographs" and to "these photographs," it refers to "each photograph" and to a "review of each photograph by my staff on my behalf." Additionally, the Apostol Declaration makes clear that at each of the first three levels of review, each photograph was reviewed individually. Plaintiffs argue that this is insufficient because even though each photograph was in fact individually reviewed at several points in the process, the Secretary relied upon the recommendation of the four generals, who reviewed only a sample of the photographs.

When previously analyzing the PNSDA, I found that because the plain language of the statute refers to photographs individually ("*that* photograph"), the statute requires the Secretary of Defense to consider "each photograph individually, not collectively." *ACLU III*, 40 F. Supp. 3d at 389.

However, I also have consistently stated that the Secretary need not *personally* review each photograph. The Secretary may delegate the individual reviews, for "[f]ederal agency officials may subdelegate their decision-making authority to subordinates absent evidence of contrary congressional intent." *U.S. Telecom Ass'n v. F.C.C.*, 359 F.3d 554, 566 (D.C. Cir. 2004). This is logical. Courts should not require an agency head to "personally familiarize himself" with all evidence related to a decision he is responsible for, or else "government would become impossible." *Nat'l Nutritional Foods Ass'n v. Food & Drug Admin., U. S. Dep't of Health, Ed. & Welfare*, 491 F.2d 1141, 1146 (2d Cir. 1974).

The PNSDA, however, makes the Secretary personally responsible for the certification as to each photograph. He may delegate the work to his staff, but he must establish the criteria to be utilized in categorizing the photographs and assessing the likely harm upon release. He must also "explain the terms of his delegation so it is the Secretary, and not any

subordinate, who takes responsibility for his knowing and good faith Certification that release of a particular photograph would result in the harm envisioned." February 18, 2015 Order, at 2.

The Secretary has failed to sufficiently explain the terms of his delegation. As discussed above, the Government has not disclosed the criteria by which the Secretary's staff categorized the photographs and concluded that some, but not all, the photographs should be released. Additionally, the four generals, who were the individuals ultimately responsible for executing the Secretary's delegation of decision-making authority, only reviewed a sample of the photographs. This disconnect between the staff that conducted the individual reviews and the generals who made the final recommendation to the Secretary is further indication that the Secretary's certification does not comply with the requirements of the PNDSA.

### 3.   The Photographs are Not Exempt Under Exemption 7(F)

Separate and apart from the Carter certification issued pursuant to the PNSDA, the Government also contends that the photographs are exempt under Exemption 7(F), which protects "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information ... could reasonably be expected to endanger the life or physical safety of any individual." 5 U.S.C. § 552(b)(7)(F). The Government first raised this argument in 2005 with respect to specific photographs taken by American military personnel at Abu Ghraib prison in Iraq. I rejected the argument, and the Second Circuit affirmed that decision.

I ruled that Exemption 7(F) was animated by a desire to "protect individuals involved in law enforcement investigations and trials, as officials and as private citizens providing information and giving testimony," but that the purpose of FOIA as a whole was to "advance[] values important to our society, transparency, and accountability in government."

*ACLU I*, 389 F. Supp. 2d at 576. The task of the court was to balance the goals of the statute at large against the specific exemption, "not to defer to our worst fears, but to interpret and apply the law." *Id.* I held that "the core values that Exemption 7(F) was designed to protect are not implicated by the release of the Darby photographs, but that the core values of FOIA are very much implicated." *Id.* at 578. Accordingly, I held that the Darby photographs, the photographs then at issue, should be released.

On appeal, the Second Circuit affirmed, *see ACLU II*, 543 F.3d at 66-83, holding that Exemption 7(F) extends only to documents that could "reasonably be expected to endanger the life or physical safety of *any individual*." 5 U.S.C. § 552(b)(7)(F) (emphasis added). The Second Circuit reviewed the text of the exemption, its legislative history, and its prior application. In light of the presumption that FOIA exemptions be "narrowly construed," the Second Circuit concluded that the term "any individual" does not include "individuals identified solely as members of a group so large that risks which are clearly speculative for any particular individuals become reasonably foreseeable for the group." *ACLU II*, 543 F.3d at 67. Rather, "an agency must identify at least one individual with reasonable specificity and establish that disclosure of the documents could reasonably be expected to endanger that individual." *Id.* at 71. As a result, Exemption 7(F) did not extend to a group "so vast as to encompass all United States troops, coalition forces, and civilians in Iraq and Afghanistan." *Id.*

The Government, arguing for a change of view, cites *Elec. Privacy Info. Ctr. v. U.S. Dep't of Homeland Sec.* ("*EPIC*"), 777 F.3d 518 (D.C. Cir. 2015), a distinguishable case. In that case, the D.C. Circuit held that the term "any individual" in Exemption 7(F) should be given a "broad interpretation," not limited to the Government's ability to "specifically identify the individuals who would be endangered." *Id.* at 520. The Government was concerned in *EPIC*

30

that release of a protocol for shutting down wireless networks in critical emergencies, such as a terrorist bombing, would enable terrorists to disable the protocol and "freely use wireless networks to activate … improvised explosive devices," thereby endangering individuals in the vicinity of the bomb threat. *Id.* at 521-22. The danger was sufficiently specific, and the zone of endangerment was sufficiently concrete, to justify application of Exemption 7(F). By contrast, the Carter certification is vague and unlimited as to who is endangered: "citizens of the United States, members of the United States Armed Forces, or employees of the United States Government deployed outside the United States." This vast and amorphous group clearly does not satisfy the standard described by the Second Circuit, nor would it likely satisfy the standard adopted by the D.C. Circuit in *EPIC.*

Thus, I decline to reverse my prior holding, affirmed by the Second Circuit, that the photographs at issue are not exempt under Exemption 7(F).

### Conclusion

For the foregoing reasons, plaintiffs' motion is granted and the Government's motion is denied.

SO ORDERED.

Dated:      January **18**, 2017
            New York, New York

ALVIN K. HELLERSTEIN
United States District Judge

31