17-779
*Am. Civil Liberties Union v. U.S. Dep't of Defense*

1:04-cv-04151-AKH

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

————————

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: Aug 22 2018

August Term 2017

(Argued: March 13, 2018    Decided: August 21, 2018)

Docket No. 17-779

AMERICAN CIVIL LIBERTIES UNION, CENTER FOR CONSTITUTIONAL
RIGHTS, INC., PHYSICIANS FOR HUMAN RIGHTS, VETERANS FOR
COMMON SENSE, VETERANS FOR PEACE,

*Plaintiffs-Appellees*,

v.

UNITED STATES DEPARTMENT OF DEFENSE, its components
DEPARTMENT OF ARMY, DEPARTMENT OF NAVY, DEPARTMENT OF AIR
FORCE, DEFENSE INTELLIGENCE AGENCY, UNITED STATES
DEPARTMENT OF THE ARMY,

*Defendants-Appellants*.*

————————

Before:

JACOBS, LEVAL, and WESLEY, *Circuit Judges*.

————————

* The Clerk of the Court is respectfully directed to amend the caption.

CERTIFIED COPY ISSUED ON 08/22/2018

Defendants-Appellants United States Department of Defense and its components Department of Army, Department of Navy, Department of Air Force, Defense Intelligence Agency, and United States Department of the Army (together, the "DoD" or the "Government") appeal from a January 18, 2017 opinion and order of the United States District Court for the Southern District of New York (Hellerstein, J.) granting summary judgment to Plaintiffs-Appellees American Civil Liberties Union, Center for Constitutional Rights, Inc., Physicians for Human Rights, Veterans for Common Sense, and Veterans for Peace (together, "ACLU"). The district court first concluded that the Protected National Security Documents Act of 2009 ("PNSDA"), Department of Homeland Security Appropriations Act, 2010, Pub. L. No. 111-83, § 565, 123 Stat. 2142 (2009), is an exemption statute within the meaning of the Freedom of Information Act's ("FOIA") Exemption 3 and therefore *de novo* review applied to the DoD's invocation of the exemption to withhold the photographs at issue. The district court then concluded that the DoD provided insufficient information for the court to adequately review the Secretary of Defense's (the "Secretary") decision to certify that the DoD's withholding under the PNSDA was proper. Lastly, the district court concluded that FOIA Exemption 7(F) does not apply to the photographs at issue in this case. We hold that irrespective of whether the PNSDA is subject to FOIA, the Secretary's certification—the result of an extensive, multi-step review process including recommendations of several senior U.S. military commanders—and the information provided by the DoD satisfied the requirements of the PNSDA. Accordingly, we **REVERSE** the judgment of the district court and **REMAND** with directions to enter judgment for the DoD.

_____

DROR LADIN, American Civil Liberties Union Foundation, New York, NY (Lawrence S. Lustberg, Avram D. Frey, Gibbons P.C., Newark, NJ, *on the brief*) *for Plaintiffs-Appellees*.

BENJAMIN H. TORRANCE, Assistant United States Attorney (Sarah S. Normand, Assistant United States Attorney; Chad A. Readler, Acting Assistant Attorney General, Douglas N. Letter, Matthew M. Collette, Catherine H. Dorsey, Attorneys, Appellate Staff Civil Division, Department of Justice, *on the brief*) *for* Geoffrey S. Berman, United

States Attorney for the Southern District of New York, *for Defendants-Appellants*.

_____

WESLEY, *Circuit Judge*:

This appeal is the latest installment in lengthy litigation relating to photographs of detainees taken by U.S. Army personnel at military detention facilities in Afghanistan and Iraq in the wake of September 11, 2001. The American Civil Liberties Union and a number of other organizations (together, "ACLU") initially sought records—most notably, photographs—related to the treatment of detainees in U.S. custody via a Freedom of Information Act ("FOIA") request submitted on October 7, 2003, to the United States Department of Defense and its components[1] (together, the "DoD") and other agencies (together with the DoD, the "Government"), and filed suit on July 2, 2004, after receiving no response.

The district court ordered the Government to produce or identify all responsive documents by October 15, 2004, *Am. Civil Liberties Union v. Dep't of Def.* (*ACLU I*), 339 F. Supp. 2d 501, 505 (S.D.N.Y. 2004), and ordered release of the

---

[1] The component departments and agencies are the Department of Army, the Department of Navy, the Department of Air Force, the Defense Intelligence Agency, and the United States Department of the Army.

photographs with redactions on September 29, 2005, *Am. Civil Liberties Union v. Dep't of Def.* (*ACLU II*), 389 F. Supp. 2d 547, 570–74 (S.D.N.Y. 2005).[2] In so doing, the court rejected arguments by the Government that the photographs could be withheld pursuant to three FOIA exemptions.[3] *See ACLU II*, 389 F. Supp. 2d at 570–79. The Government initially appealed but withdrew the appeal when a third party released the photographs without authorization.

During the pendency of the appeal, the Government identified additional photographs potentially responsive to the ACLU's FOIA request and attempted to withhold these newly identified photographs under the same three exemptions. The district court again rejected these arguments, this time without written opinion, and ordered the release of the responsive photographs. *Am. Civil Liberties*

---

[2] While the initial FOIA request sought disclosure of a variety of records, in August 2004 the ACLU created a priority list of documents and the district court ordered disclosure of the listed documents; included in this priority list were "photographs taken by Joseph Darby at Abu Ghraib prison" that were previously "provided to the Army's Criminal Investigative Division." *ACLU II*, 389 F. Supp. 2d at 550–51.

[3] These exemptions were: Exemption 6, 5 U.S.C. § 552(b)(6) ("personnel and medical files"); Exemption 7(C), *id.* § 552(b)(7)(C) ("records or information compiled for law enforcement purposes" that "could reasonably be expected to constitute an unwarranted invasion of personal privacy"); and Exemption 7(F), *id.* § 552(b)(7)(F) ("records or information compiled for law enforcement purposes" that "could reasonably be expected to endanger the life or physical safety of any individual").

*Union v. Dep't of Def.* (*ACLU III*), 04-4151, 2006 WL 1638025, at \*1 (S.D.N.Y. June 9, 2006); *Am. Civil Liberties Union v. Dep't of Def.* (*ACLU IV*), 04-4151, 2006 WL 1722574, at \*1 (S.D.N.Y. June 21, 2006), *vacated sub nom by Dep't of Def. v. Am. Civil Liberties Union*, 558 U.S. 1042 (2009) (mem.).

The Government appealed, and this Court affirmed, holding that the FOIA exemptions did not apply. *Am. Civil Liberties Union v. Dep't of Def.* (*ACLU V*), 543 F.3d 59, 70–71, 83–84, 87, 91 (2d Cir. 2008), *vacated sub nom by Dep't of Def. v. Am. Civil Liberties Union*, 558 U.S. 1042. After this Court's decision, the Government initially informed the district court that it was processing the photographs for release, including additional photographs it also thought responsive to the initial FOIA request, and it "represented that all photographs would be released by May 28, 2009." *Am. Civil Liberties Union v. Dep't of Def.* (*ACLU VII*), 229 F. Supp. 3d 193, 199 (S.D.N.Y. 2017). However, the Government reversed its position at the direction of President Obama following a plea from the Prime Minister of Iraq that release of the photographs "would fuel insurrection and make it impossible to have a functioning government." *Id.* at 200. The Government filed a petition for a writ of certiorari. *Id.* at 199.

Before the Supreme Court took any action regarding the Government's petition, Congress passed the Protected National Security Documents Act of 2009 ("PNSDA"), Department of Homeland Security Appropriations Act, 2010, Pub. L. No. 111-83, § 565, 123 Stat. 2142 (2009). The PNSDA permits the government to withhold disclosure of any photograph "taken during the period beginning on September 11, 2001, through January 22, 2009" (the "time period requirement") that "relates to the treatment of individuals engaged, captured, or detained after September 11, 2001, by the Armed Forces of the United States in operations outside of the United States" (the "subject matter requirement"). PNSDA § 565(c)(1)(B). To withhold a photograph from disclosure under the PNSDA, the Secretary of Defense must issue a certification "stating that disclosure of that record would endanger citizens of the United States, members of the United States Armed Forces, or employees of the United States Government deployed outside the United States." *Id.* § 565(c)(1)(A). The Secretary's certification expires after three years but may be renewed at any time and without limitation. *Id.* § 565(d)(2)–(3). The PNSDA also requires the Secretary to timely notify Congress of the issuance of any certification or renewal. *Id.* § 565(d)(4).

Following the PNSDA's passage, Secretary Gates issued a certification on November 13, 2009 (the "2009 Certification"), stating that "[u]pon the recommendations of the Chairman of the Joint Chiefs of Staff, the Commander of U.S. Central Command, and the Commander of Multi-National Forces-Iraq," he had determined that disclosure of the photographs would endanger persons protected under the PNSDA and that the photographs were therefore "exempt from disclosure." Joint App. 196. The Supreme Court shortly thereafter granted the Government's petition, vacated this Court's opinion, and remanded in light of the PNSDA and the 2009 Certification. *Dep't of Def. v. Am. Civil Liberties Union*, 558 U.S. 1042.

On remand to the Southern District of New York (Hellerstein, *J.*), the ACLU argued that the PNSDA was a FOIA withholding statute and the court should review the Secretary's endangerment determination *de novo*.[4] In the ACLU's view, the 2009 Certification was but a conclusion that failed to justify why "disclosure of [the] records now would cause harm." Joint App. 209. The district court disagreed.

---

[4] The ACLU acknowledged that it was not contesting whether the photographs fell within the specified time period or related to the treatment of individuals engaged, captured, or detained by the armed forces of the U.S. abroad after September 11, 2001. A fuller discussion of the ACLU's reasoning for *de novo* review is found *infra.*

In announcing its decision from the bench on July 20, 2011, the court stated "it [is] clear to me that Secretary Gates had a rational basis for his certifications and that I could not second-guess it . . . beyond looking for a rational basis the way [I] did. I find that rational basis." *Id.* at 237. The court acknowledged that the assessment of the impact of the photographs on the battlefield of Iraq was best left to the military expertise of the DoD. "I don't think we have a very good understanding of what may or may not be dangerous on the battlefield in the crazy conditions that exist in Iraq at this point in time. And even there, the history of what's involved . . . shows to me that the Secretary of Defense has a rational basis . . . ." *Id.* at 224. The district court stated that even if "I might disagree with [Secretary Gates] . . . I cannot say that there is a lack of a rational basis for what [he] has certified, and if you want me to do a *de novo* review, I've done it, by reason of my familiarity with the case, and that's as far as I'll go." *Id.*

Looking "to the plain language of the statute and its legislative history," the district court concluded that "[t]he legislative purpose here was to provide authorizing legislation to support the President's determination that these images should not be disclosed, [and] should be exempt from FOIA." *Id.* at 238.

7

Over a year later, on November 9, 2012, Secretary Panetta issued a certification renewal (the "2012 Certification"). The ACLU challenged the sufficiency of that determination. Even though the 2009 and 2012 certifications were "virtually identical"—the district court's words, not ours—the district court concluded that the 2012 Certification "[was] not sufficient to prevent publication of redacted photographs." *Am. Civil Liberties Union v. Dep't of Def.* (*ACLU VI*), 40 F. Supp. 3d 377, 380, 382 (S.D.N.Y. 2014), *vacated*, 15-1606 (2d Cir. Jan. 6, 2016), ECF No. 134. Despite the district court's recognition of the certifications' marked similarity, the court concluded that it was not compelled to reach the same result because "while the entire legislative history of the PNSDA supported the 2009 [C]ertification, the factual basis for the 2012 [C]ertification is uncertain." *Id.* at 385.[5] *Compare* Joint App. 196 (2009 Certification), *with id.* at 240 (2012 Certification).

---

[5] The court provided additional detail as to how the facts had changed and permitted a different reading of the 2012 Certification:

> Three years is a long time in war, the news cycle, and the international debate over how to respond to terrorism. [The 2012 Certification] was issued under different circumstances from the 2009 [C]ertification of Secretary Gates. On November 9, 2012, the United States' combat mission in Iraq had ended (in December 2011), and all (or mostly all) American troops had been withdrawn from Iraq. I am aware of no impassioned plea from the Prime Minister of Iraq relating to the photographs made at that time. The 2009

8

The Government argued that the PNSDA insulated the basis for the Secretary's determination from judicial review, and that the district court was bound by its prior decision when it declined to second-guess the Secretary beyond looking for "a rational basis." *Id.* at 384. The court, noting what it viewed as a change in facts from 2009 to 2012, concluded that its prior decision "[did] not compel any result in this case." *Id.* at 385. Accordingly, the court concluded that the 2012 Certification was subject to judicial review, and, because the parties agreed on the applicable standard, it adopted *de novo* review. *Id.* While "the text, structure[,] and legislative history of the statute [we]re unclear," nothing indicated that Congress intended the PNSDA to be reviewed differently than other agency invocations of FOIA exemptions, which are reviewed *de novo*, or that the PNSDA was excepted from the "strong presumption that Congress intends judicial

---

Certification was based on the recommendation of the U.S. Commander responsible for the continuing deployments on active battlefields of our forces in Iraq. The 2012 Certification was based on the recommendation of the U.S. Commander responsible for the deployment of our troops in Afghanistan. Given the passage of time, I have no basis for concluding either that the disclosure of photographs depicting the abuse or mistreatment of prisoners would affect United States military operations at this time, or that it would not.

*Id.* at 384–85.

review." *Id.* at 387 (quoting *Bowen v. Mich. Acad. of Family Physicians*, 476 U.S. 667, 670 (1986)).

Additionally, the court read the PNSDA to "require[] that the Secretary of Defense consider each photograph individually, not collectively." *Id.* at 389. "Considering" each photograph individually did not mean that the Secretary had to issue a certification for each photograph, but only that "the [G]overnment, to invoke the PNSDA, must prove that the Secretary of Defense considered each photograph individually." *Id.*

The district court provided an opportunity for the Government to submit additional evidence. *Id.* at 390. In response, the Government submitted a declaration reviewing the certification process by Associate Deputy General Counsel Megan Weis in the Department of the Army's Office of General Counsel.[6] Weis stated that, in deciding what kind of review was appropriate for the 2012 Certification, the Government selected a process that "was similar" to the process

---

[6] Weis was an Associate Deputy General Counsel in the Department of Defense's Office of General Counsel from 2009 to 2014 and in that role managed the review process for the 2012 Certification.

used for the 2009 Certification "in light of the Court's acceptance of [the 2009 Certification] as sufficient." Joint App. 282.

This process involved several steps. First, Weis: (1) reviewed all of the photographs; (2) placed the photographs into three categories based on content, "includ[ing] the extent of any injury suffered by the detainee, whether U.S. service members were depicted, and the location of the detainee in the photograph (e.g., at point of capture, at a medical facility)," *id.* at 283; and (3) created representative samples of five to ten photographs from each category and worked with leadership in the Department of Defense's Office of General Counsel ("OGC") to ensure the accuracy of the samples. *Id.* Then the samples were provided to senior attorneys for the Chairman of the Joint Chiefs of Staff, the Commander of U.S. Central Command, and the Commander of International Security Assistance Force/United States Forces-Afghanistan, and Weis "asked each attorney to provide the sample to his commander" for them to assess whether the 2009 Certification should be renewed. *Id.* The commanders each recommended the renewal of the 2009 Certification for all of the photographs. *Id.* at 283–84. Weis then met with the General Counsel of the Department of Defense to discuss the recommendations and again review the samples, and she also gave the General Counsel a draft

renewal based on the 2009 Certification, the samples, the commanders' recommendations, and a CD containing all of the photographs. *Id.* at 284. The General Counsel met with the Secretary to discuss the 2012 Certification and the Secretary signed the 2012 Certification. *Id.*

The Government also submitted a second declaration explaining the potential harms from release of the photographs from Rear Admiral Sinclair M. Harris, Vice Director of Operations for the Joint Staff at the Pentagon. "The danger associated with release of these photographs is heightened now, at a time when numerous groups continue in their efforts to attack U.S. personnel and interests both abroad and within the continental United States." *Id.* at 295. He emphasized the following:

> The photographs are susceptible to use as propaganda to incite a public reaction and could be used as recruiting material to attract new members to join enemy forces. This risk is much greater with respect to photographs than mere written descriptions. . . . Significantly, ISIL[7] has a particular interest in using imagery associated with U.S. detention practices as part of its propaganda and recruitment efforts.

*Id.* at 297.

---

[7] As Rear Admiral Harris explained, ISIL—The Islamic State of Iraq and the Levant—is an organization that has "called on members to commit attacks in retaliation for the actions of the United States in Syria and Iraq." *Id.* at 295–96.

Despite this additional information, the district court found the submissions insufficient and ordered release of the photographs. The court concluded that the Government's submissions did not meet its burden as to each specific photograph. Although it was unnecessary for the Secretary to personally review each photograph, the court required that he, at a minimum, "explain the terms of his delegation" of the review to subordinates. *Id.* at 328. The Secretary also "must demonstrate knowledge of the contents of the individual photographs rather than mere knowledge of his commanders' conclusions"; this knowledge could be obtained "by reviewing the photographs personally or having others describe their contents to him." *Id.* at 328–29. Further, to meet the burden of withholding, the Secretary needed to "describe the categories of objectionable content contained in the photographs, identify how many photographs fit into each category, and specify the type of harm that would result from disclosing such content." *Id.* at 329. The Government was given one more chance to supplement its submissions before judgment would be granted for the ACLU.

The Government declined, and instead appealed to this Court in May 2015 after the district court issued its order of final judgment. While the appeal was pending, Secretary Carter issued a new certification (the "2015 Certification") for

many of the photographs, and also determined that 198 photographs could be released. The 2015 Certification specified that it "pertain[ed] to each photograph" and that "each of these photographs continue[d] to meet the standard for protected documents." *Id.* at 343. We then remanded the appeal to the district court, recognizing that the 2015 Certification "ha[d] the potential to obviate many of the issues cited by the district court in granting relief." *Am. Civil Liberties Union v. Dep't of Def.*, 15-1606 (2d Cir. Jan. 6, 2016), ECF No. 134.

On remand, the Government submitted a declaration by Associate Deputy General Counsel Liam Apostol of the OGC detailing the six-month-long process behind the 2015 Certification. *ACLU VII*, 229 F. Supp. 3d at 202. This review, as detailed in the Government's submission, was even more extensive than for prior certifications: (1) an attorney from OGC individually examined and categorized each photograph based on the depictions and the likelihood that release would cause the harm identified by the PNSDA in order to create "a true representative sample . . . for the Secretary's review," Joint App. 338; (2) commissioned officers assigned to the office of the Joint Chief, Deputy Director for Special Operations,

Counterterrorism and Detainee Operations ("Joint Staff J37")[8] independently reviewed the photographs for the same purpose as the initial review; (3) three different attorneys from OGC and a uniformed attorney attached to the Department of the Army reviewed the combined results of the first two layers of review, assessing the likelihood of harm once more for each photograph; (4) the reviewers from the first three layers of review then coordinated to reach a final consensus; (5) the OGC developed a representative sample of the remaining photographs (excluding the 198 determined to be disclosable) to provide a "full understanding of the nature of . . . all of the photographs," *id.*; (6) the Commander of U.S. Central Command, the Commander of U.S. Africa Command, the Acting Commander of U.S. Forces, Afghanistan, and the Chairman of the Joint Chiefs of Staff each reviewed the samples and concluded that disclosure would cause sufficient harm to justify nondisclosure; (7) the recommendations, the 198 photographs recommended for disclosure, and the samples were provided to the

---

[8] "The officers, based on their years of military service, past and present duties and responsibilities and military training, collectively have extensive knowledge of the Armed Forces and of the tactics, techniques and means employed by the enemies of the United States in Afghanistan, Iraq, and other regions of the Middle East and Africa." *Id.*

Secretary; and (8) the Secretary certified all but the 198 photographs. Joint App. 338, 341–42.

Conducting *de novo* review, the district court found the Government's submissions and the 2015 Certification insufficient and granted summary judgment to the ACLU. *ACLU VII*, 229 F. Supp. 3d at 212. The court asserted that it could not conduct "adequate judicial review" because the Government failed to submit information regarding the category criteria, the sampling methodology, the types of objectionable content, the quantity of photographs within each category, and the specific harm from disclosing the different photographs. *Id.* at 208–09. The court also concluded that the Secretary failed to demonstrate that the 2015 Certification was adequately individualized, and it further found that the photographs were not exempt under FOIA Exemption 7(F), which applies to documents that "could reasonably be expected to endanger the life or physical safety of any individual." *Id.* at 212–13 (quoting 5 U.S.C. § 552(b)(7)(F)). The Government timely appealed.

## DISCUSSION

This Court reviews grants of summary judgment in the FOIA context *de novo*. *Long v. Office of Pers. Mgmt.*, 692 F.3d 185, 191 (2d Cir. 2012). The parties spend considerable portions of their briefs on the proper level of judicial review of withholding decisions under the PNSDA. The district court concluded in its most recent opinion that the PNSDA falls within FOIA Exemption 3. *ACLU VII*, 229 F. Supp. 3d at 204–05. Exemption 3 covers matters "specifically exempted from disclosure by statute . . . if that statute . . . (i) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue; or (ii) establishes particular criteria for withholding or refers to particular types of matters to be withheld." 5 U.S.C. § 552(b)(3).

Based on this conclusion, the district court explained that *de novo* review applied to the Government's withholding decision, and, although it owed deference to the executive on national security issues, "[t]he Government must provide an accounting of *how* it reached its conclusion, so that the court has 'an adequate foundation to review' whether the Government has satisfied its burden." *ACLU VII*, 229 F. Supp. 3d at 207 (quoting *Campbell v. U.S. Dep't of Justice*, 164 F.3d 20, 30 (D.C. Cir. 1998)).

The Government argues that the PNSDA immunizes photographs certified by the Secretary from FOIA disclosure and litigation. Therefore, once the Secretary has made the certification, disclosure cannot be ordered and the Government need only justify its withholding decision under the Administrative Procedure Act's "arbitrary and capricious" standard, 5 U.S.C. § 706(2)(A)—not FOIA.

But even if the PNSDA is subject to FOIA, the Government contends the PNSDA qualifies as a FOIA Exemption 3 statute. In that event, the Government asserts, judicial review of a withholding decision under the PNSDA is limited to whether the Secretary issued a certification, whether the photograph fell within the PNSDA's specified time period, and whether the photograph related to the treatment of the specified persons under the PNSDA. Therefore, in the Government's view, the district court's more exacting *de novo* review went beyond even FOIA's requirements for Exemption 3 statutes.

Choosing between these positions is difficult, but for our purposes unnecessary. For even under the *de novo* review that the ACLU argues is applicable if the PNSDA falls within FOIA Exemption 3, which at least presents some possibility of disclosure, the Government provided sufficient information to justify withholding the photographs under the PNSDA.

18

FOIA generally "calls for broad disclosure of Government records." *Am. Civil Liberties Union v. Dep't of Justice*, 681 F.3d 61, 69 (2d Cir. 2012) (quoting *Cen. Intelligence Agency v. Sims*, 471 U.S. 159, 166 (1985)). However, "Congress provided that some records may be withheld from disclosure" under certain exemptions, including Exemption 3. *Id.* Agencies withholding documents may use declarations to satisfy their burden of proving the applicability of claimed exemptions, but these declarations must provide "reasonably detailed explanations." *Id.* (internal quotation marks omitted); *see Wilner v. Nat'l Sec. Agency*, 592 F.3d 60, 73 (2d Cir. 2009). "Summary judgment is appropriate where the agency [declarations] 'describe the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record [or] by evidence of agency bad faith.'" *Am. Civil Liberties Union*, 681 F.3d at 69 (quoting *Wilner*, 592 F.3d at 73). Thus, the agency's justification is sufficient if it appears logical and plausible. *See N.Y. Times Co. v. U.S. Dep't of Justice*, 756 F.3d 100, 119

(2d Cir. 2014) (quoting *Gardels v. Cent. Intelligence Agency*, 689 F.2d 1100, 1105 (D.C. Cir. 1982)).[9]

Even if *de novo* review applies, the context within which we conduct that review is of paramount importance. This Court and others "have consistently deferred to executive [declarations] predicting harm to the national security, and have found it unwise to undertake searching judicial review." *Am. Civil Liberties*

---

[9] While this Court in *N.Y. Times* stated the standard as "logical and plausible," *id.*, several courts—including this Court—have cited the standard as "logical or plausible," s*ee Am. Civ. Liberties Union*, 681 F.3d at 69 (quoting *Wilner*, 592 F.3d at 73); *Wilner*, 592 F.3d at 73 (quoting *Larson v. Dep't of State*, 565 F.3d 857, 862 (D.C. Cir. 2009)); *Larson*, 565 F.3d at 862 (quoting *Wolf v. Cent. Intelligence Agency*, 473 F.3d 370, 374–75 (D.C. Cir. 2007)). In 1979, the D.C. Circuit accepted a representation by the National Security Agency because, the court concluded, it was "by no means an illogical or implausible assertion." *Hayden v. Nat'l Sec. Agency/Cent. Sec. Serv.*, 608 F.2d 1381, 1388 (D.C. Cir. 1979). In 1982, in *Gardels*, the D.C. Circuit concluded that the C.I.A.'s position, as described in affidavits and depositions, "appear[ed] 'logical' and 'plausible.'" 689 F.2d at 1105. Decades later, the D.C. Circuit, citing *Gardels* and *Hayden*, appears to have misstated the law: "Ultimately, an agency's justification for invoking a FOIA exemption is sufficient if it appears 'logical' or 'plausible.'" *Wolf*, 473 F.3d at 374–75 (citing *Gardels*, 689 F.2d at 1105; *Hayden*, 608 F.2d at 1388). As noted above, several courts subsequently propagated this standard, but it simply makes no sense. We cannot fathom a scenario where an agency's withholding justification would be logical but implausible—or illogical but plausible—and sufficient. This conclusion is borne out by the cases themselves. *See, e.g.*, *Wilner*, 592 F.3d at 75 ("[T]he agency's affidavits and justification are both logical and plausible."); *Wolf*, 473 F.3d at 376–77 ("The [C.I.A.'s submitted] affidavit both logically and plausibly suffices."). In concluding that a given agency's FOIA justification was sufficient because it was "by no means illogical or implausible," the D.C. Circuit was not crafting a rule that a justification is sufficient when the inverse is true. A sufficient justification must be logical *and* plausible.

*Union*, 681 F.3d at 76 (quoting *Ctr. for Nat'l Sec. Studies v. U.S. Dep't of Justice*, 331 F.3d 918, 927 (D.C. Cir. 2003)). We acknowledged in the past that given "relative competencies of the executive and judiciary, we believe that it is bad law and bad policy to 'second-guess the predictive judgments made by the government's intelligence agencies.'" *Id.* at 70–71 (quoting *Wilner*, 592 F.3d at 76). Notwithstanding the above, "concerns of national security and foreign relations do not warrant abdication of the judicial role." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 34 (2010). Deference to the executive's national security and military judgments is appropriate only where we have sufficient information to evaluate whether those judgments were logical and plausible.

To evaluate the Government's invocation of the PNSDA, we must examine the statute itself. The ACLU does not dispute that the photographs satisfy the time period requirement or the subject matter requirement, but it asserts that the Government failed to provide sufficient evidence "that disclosure of [the photographs] would endanger citizens of the United States, members of the United States Armed Forces, or employees of the United States Government deployed outside the United States." PNSDA § 565(c)(1)(A). Despite the assertion to the contrary, there is sufficient information before us—even when treating the

21

PNSDA as within FOIA Exemption 3—to evaluate whether the Secretary's decision to certify the withheld photographs, based on the endangerment of U.S. lives and personnel abroad, was logical and plausible.

The district court concluded that the Government failed to meet its burden because it did not (1) provide "meaningful information" as to how it sorted the photographs; or (2) "adequately explain[] the relationship between the various levels of review," such as how the reviews were "independent" and how the samples were created, so that the court could discern how the process led to the 2015 Certification. *ACLU VII*, 229 F. Supp. 3d at 209. Further, while the Secretary did not need to review each photograph, the district court required the Secretary to establish the criteria for categorizing and sorting the photographs based on the likelihood of harm, and to explain the delegation of his duties to the court. *Id.* at 212. Lastly, the court took issue with the generals' recommendations because they were based only on samples. *Id.* The ACLU additionally argues that the Secretary must make a certification and finding of harm as to each photograph, and that because the Secretary based his decision on the recommendations of the generals—who reviewed only samples that we know little about—the district court could not possibly review his decision. We disagree.

22

The Apostol declaration submitted by the Government contained enough information—in reasonably specific detail—for us to conclude that the Secretary's justification for certifying the photographs under the PNSDA was logical and plausible. The declaration explains the thorough and robust review undertaken prior to the Secretary's decision. Attorneys in the OGC, commissioned officers from Joint Staff J37, and additional OGC attorneys and a uniformed attorney from the Department of the Army conducted three separate reviews of each photograph—sorting the photographs based on what they depicted and the likelihood of endangerment caused by their release—before coordinating to reach a final consensus. This sorting process sought to create representative samples for the personal review of the Secretary and several military commanders, but also necessarily involved judgment by the reviewers as to whether the potential for harm fell within the PNSDA's purview. The fact that the reviewers recommended 198 photographs for release tends to confirm that this process occurred.[10]

---

[10] In making this observation, we do not mean to suggest that the process would have been inadequate without this verification of the individualized nature of the review. Our decision is based on our review of the Government's submission of the process it employed.

23

This three-part review involving OGC attorneys and commissioned officers from Joint Staff J37—with "extensive knowledge" of the U.S. Armed Forces and the methods of this country's enemies abroad—would likely have satisfied the Government's burden. However, the samples were then additionally provided to the Commander of U.S. Central Command, the Commander of U.S. Africa Command, the Acting Commander of U.S. Forces, Afghanistan, and the Chairman of the Joint Chiefs of Staff, who each opined as to the danger of releasing the photographs based on the samples they reviewed.[11] A review of their recommendations to the Secretary further supports the conclusion that the Secretary's determination that the PNSDA applies was logical and plausible.[12] The

---

[11] Secretary Carter made clear in the 2015 Certification that he relied on both the recommendations and "a review of each photograph by my staff on my behalf." Joint App. 343. We are unpersuaded by the ACLU's argument that the Secretary's decision was based only upon the commanders' recommendations.

[12] General Lloyd J. Austin, Commander of U.S. Central Command, stated that "[t]he potential adverse impact from the release of the photographs to our engagements and partnerships is high. . . . I assess that the release of the photographs will inspire extremist behavior by [Violent Extremist Organizations]," who "will undoubtedly use the photographs in their propaganda efforts to encourage threats to U.S. service members and U.S. Government personnel." *Id.* at 339. General David M. Rodriguez, Commander of U.S. Africa Command, assessed that "public release of the [photographs], even if they were redacted to obscure identifying information, would endanger the lives of U.S. servicemen, U.S. citizens, and government personnel serving overseas in [Africa]," where "insecurity increasingly threatens U.S. interests." *Id.* at 340. Major General Jeffrey S. Buchanan, the Acting Commander of U.S. Forces, Afghanistan, concluded that the designation of the current Afghanistan operation as a "non-combat mission does not

commanders' recommendations, which were based on decades of military experience, inform the potential for harm if the photographs were released. Even though the recommendations were based on review of the samples, the recommendations supplement the already robust review process OGC conducted, as described in the Apostol declaration, and the generals' detailed explanation of the conditions facing U.S. forces and personnel abroad provides important context to the Secretary's decision.

The district court felt compelled to explore the details of the Secretary's decision. The ACLU endorses that view, but we cannot. The Government provided ample information for us to conclude that the Secretary's decision to certify the withheld photographs was logical and plausible, and the information is reasonably specific to confirm that the withholding decision was supported as to

---

eliminate the fact that U.S. and Coalition Forces and Civilians operate in a hostile environment[,] . . . [and] release [of the photographs] could intensify existing and lingering resentment and exacerbate the conditions that foster insurgent 'insider threat' attacks." *Id.* at 340. He further opined that "the release of the photographs could erode the Afghanistan-Pakistan military-to-military relationship and the willingness to cooperate to prevent ISIL from establishing a credible presence in Afghanistan." *Id.* at 341. General Joseph F. Dunford, Chairman of the Joint Chiefs of Staff, "strongly concur[red] with the[] recommendation[s]" of the other commanders, and concluded that "disclosure of any of the photographs recommended for recertification would result in a substantially increased level of danger" to those included in the PNSDA's purview. *Id.* at 341 (brackets omitted).

each individual photograph. The Government's submissions bear no tinge of bad faith, nor are they contradicted by the record. We see no reason to second-guess the Secretary's determination.

The 2015 Certification was made on an individualized basis by OGC attorneys and uniformed officers with extensive military expertise. Four senior U.S. military commanders explained that U.S. citizens and personnel abroad still face significant threats, and after reviewing the photograph samples concluded that releasing the photographs would endanger the lives of U.S. citizens and personnel abroad. Courts are not well-suited to evaluate the constantly evolving military conditions and national security challenges faced by U.S. forces and personnel. Judges do not abdicate their judicial role by acknowledging their limitations and deferring to an agency's logical and plausible justification in the context of national security; they fulfill it.

Accordingly, we conclude that the Government has satisfied its burden—even if its decision is subjected to *de novo* review—and properly withheld the photographs pursuant to the PNSDA.[13]

## CONCLUSION

We REVERSE the judgment of the district court and REMAND with directions to enter judgment for the Government.

A True Copy
Catherine O'Hagan Wolfe, Clerk
United States Court of Appeals, Second Circuit

---

[13] Because we conclude that the photographs were properly withheld pursuant to the PNSDA, we decline to address whether the photographs could separately be withheld pursuant to FOIA's Exemption 7(F).

27

JACOBS, *Circuit Judge*, concurring:

I subscribe without reservation to the opinion of the Court. But one thought may usefully be emphasized.

The Pentagon undertook ramified labors to satisfy the district judge that, given the PNSDA, the relevant photographs could properly be withheld from disclosure under FOIA Exemption 3. Our holding is that those labors were sufficient as a matter of law to justify the nondisclosure; our holding is not that all (or most, or any) of those labors were required.

The PNSDA reads as categorical: "Notwithstanding any other provision of the law to the contrary, no protected document . . . shall be subject to disclosure under [FOIA] or any proceeding under [FOIA]." PNSDA § 565(b). The statute defines "protected document" as any photograph (1) taken between September 11, 2001 and January 22, 2009; (2) related to the treatment of individuals engaged, captured, or detained by the U.S. military abroad; and (3) certified by the Secretary of Defense to be dangerous to our overseas military and civilian personnel if viewed by our enemies. Id. § 565(c). It is undisputed that the time-period and subject-matter requirements have been satisfied here. So, it may possibly be that

1

CERTIFIED COPY ISSUED ON 08/22/2018

all the statute requires to protect American lives is for the Secretary of Defense to issue a certification, and that judicial review may be limited to whether the certification was authentic. In any event, there may have been no need for the U.S. military apparatus to mobilize as it did, and for the Secretary of Defense to be preoccupied as he was.

This is not an idle point. Another triennial recertification is soon due, and the Department of Defense may have other priorities at least equally as compelling.

A True Copy
Catherine O'Hagan Wolfe, Clerk
United States Court of Appeals, Second Circuit

2